# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### C.A. 16-56057

---

### SKIDMORE ET AL.

*Michael Skidmore, Trustee for the*
*Randy Craig Wolfe Trust*
*Plaintiff-Appellant*

v.

### LED ZEPPELIN *ET AL.*

*Defendants-Appellees*

---

# PLAINTIFF-APPELLANT MICHAEL SKIDMORE'S
# EXCERPTS OF THE RECORD
# VOLUME III OF XI

---

(Music copyright infringement, on appeal from the final Order dated June 23, 2016 of the Honorable R. Gary Klausner, of the United States District Court for the Central District of California. The case was docketed in the Central District at 15-cv-03462)

---

### FRANCIS ALEXANDER, LLC
Francis Malofiy, Esquire
Alfred Joseph Fluehr, Esquire
280 N. Providence Road | Suite 1
Media, PA 19063
T: (215) 500-1000
F: (215) 500-1005
*Law Firm / Lawyers for Appellant Skidmore*

## <u>EXCERPTS OF THE RECORD: VOLUME III of XI</u>
(423 – 718)

06/15/2016    Transcript for June 15, PM (Doc. No. 284) ......................................................... 423

06/16/2016    Transcript for June 16, AM (*Doc. No. 277*)......................................................... 587

```
 1                    UNITED STATES DISTRICT COURT

 2           CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3              HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

 4                              - - -

 5                                    )
      MICHAEL SKIDMORE, AS TRUSTEE FOR )
 6    THE RANDY CRAIG WOLFE TRUST,     )
                                       )
 7                      PLAINTIFF,     )
                                       )
 8            vs.                      ) No. CV 15-03462-RGK
                                       )
 9    LED ZEPPELIN; JAMES PATRICK PAGE;)
      ROBERT ANTHONY PLANT; JOHN PAUL  )
10    JONES; SUPER HYPE PUBLISHING,    )
      INC.; WARNER MUSIC GROUP CORP.,  )
11    PARENT OF WARNER/CHAPPELL MUSIC, )
      INC.; ATLANTIC RECORDING         )
12    CORPORATION; RHINO ENTERTAINMENT )
      COMPANY,                         )
13                                     )
                        DEFENDANTS.    )
14    _____)

15

16              REPORTER'S TRANSCRIPT OF JURY TRIAL

17              DAY 2, VOLUME II, PAGES 287-450

18              WEDNESDAY, JUNE 15, 2016

19                       1:02 P.M.

20              LOS ANGELES, CALIFORNIA

21

22              CINDY L. NIRENBERG, CSR 5059, FCRR
                  U.S. Official Court Reporter
23                  255 East Temple Street
                    Los Angeles, CA 90012
24                  www.msfedreporter.com

25
```

288

```
1    APPEARANCES OF COUNSEL:

2

3    FOR PLAINTIFF MICHAEL SKIDMORE AS TRUSTEE FOR THE
     RANDY CRAIG WOLFE TRUST:
4
          FRANCIS ALEXANDER, LLC
5         BY:  FRANCIS MALOFIY, ATTORNEY AT LAW
          280 N. PROVIDENCE ROAD, SUITE 1
6         MEDIA, PENNSYLVANIA  19063
          215-500-1000
7
          KULIK GOTTESMAN & SIEGEL, LLP
8         BY:  GLEN L. KULIK, ATTORNEY AT LAW
          15303 VENTURA BOULEVARD, SUITE 1400
9         SHERMAN OAKS, CALIFORNIA  91403
          310-557-9200
10

11

12   FOR DEFENDANT LED ZEPPELIN:

13        PHILLIPS NIZER, LLP
          BY:  HELENE M. FREEMAN, ATTORNEY AT LAW
14        666 FIFTH AVENUE
          NEW YORK, NEW YORK  10103
15        212-977-9700

16
     FOR DEFENDANTS JAMES PATRICK PAGE, ROBERT ANTHONY PLANT:
17
          LAW OFFICES OF PETER J. ANDERSON, PC
18        BY:  PETER J. ANDERSON, ATTORNEY AT LAW
          100 WILSHIRE BOULEVARD, SUITE 2010
19        SANTA MONICA, CALIFORNIA  90401
          310-260-6030
20
          PHILLIPS NIZER, LLP
21        BY:  HELENE M. FREEMAN, ATTORNEY AT LAW
          666 FIFTH AVENUE
22        NEW YORK, NEW YORK  10103
          212-977-9700
23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**00424**

1   **APPEARANCES OF COUNSEL (CONTINUED):**

2

3   **FOR DEFENDANTS WARNER/CHAPPELL MUSIC, INC., ATLANTIC RECORDING
    CORPORATION, RHINO ENTERTAINMENT COMPANY:**

4
            LAW OFFICES OF PETER J. ANDERSON, PC
5           BY:  PETER J. ANDERSON, ATTORNEY AT LAW
            100 WILSHIRE BOULEVARD, SUITE 2010
6           SANTA MONICA, CALIFORNIA  90401
            310-260-6030
7

8

9

10  ALSO PRESENT:

11          NATHAN OSHER, WARNER/CHAPPELL MUSIC, INC.

12          BRAD COHEN, WARNER MUSIC GROUP

13          SCOTT DUVAL, SENIOR TECHNOLOGY CONSULTANT

14          KEVIN SEGAL, TRIAL TECHNICIAN

15          DAN MORENO, TRIAL TECHNICIAN

16

17

18

19

20

21

22

23

24

25

```
 1                        I N D E X

 2

 3   PLAINTIFF'S WITNESSES:                 PAGE

 4   MARK ANDES

 5       DIRECT BY MR. MALOFIY (RESUMED)    291

 6       CROSS BY MR. ANDERSON             306

 7       REDIRECT BY MR. MALOFIY          328

 8

 9   BRUCE PATES

10       DIRECT BY MR. MALOFIY            333

11   JAMES PATRICK PAGE

12       DIRECT BY MR. MALOFIY            343

13

14

15   FURTHER PROCEEDINGS                   PAGE

16   DISCUSSION HELD OUTSIDE PRESENCE OF JURY  430

17

18

19                   E X H I B I T S

20   TRIAL EXHIBITS                MARKED   ADMITTED

21   2058                            310

22   373                             344

23   160-A                                   391

24   98                                      397

25
```

291

```
 1              LOS ANGELES, CALIFORNIA; WEDNESDAY, JUNE 15, 2016

 2                              1:02 P.M.

 3                           - - - - -

 4       (Jury in at 1:02 P.M.)

 5              THE COURT:  Okay.  The record will indicate that all

 6   the members of the jury are in their respective seats in the

 7   jury box.  The witness is on the witness stand and, counsel,

 8   you may inquire on direct.

 9              MR. MALOFIY:  Thank you, Your Honor.

10                            MARK ANDES,

11              having been previously duly sworn,

12                  testified further as follows:

13                       DIRECT EXAMINATION

14                          (RESUMED)

15   BY MR. MALOFIY:

16   Q.   Proceeding where we left off and the guitar being -- the

17   guitar parts of the songs being played, can we go and again

18   play 532-V.

19       (Playing of videotape.)

20              MR. MALOFIY:  Can we pause it there.

21   BY MR. MALOFIY:

22   Q.   Can you identify that song?

23   A.   That's "Stairway to Heaven."

24   Q.   All right.  Now, I'd like to play the next audio exhibit,

25   which we played in the prior sequence.
```

292

```
 1          (Playing of videotape.)

 2     BY MR. MALOFIY:

 3     Q.    What song is that, sir?

 4     A.    That's "Taurus."

 5     Q.    Thank you.

 6          MR. MALOFIY:  Now let the sequence continue.

 7          MR. ANDERSON:  I have an objection.

 8          THE COURT:  Counsel?

 9          MR. ANDERSON:  First of all, counsel has not provided

10     an exhibit number or a description of what the second guitar is

11     playing.

12          Second, this is the subject of one of the motions.

13     It's a mash-up, basically having two different compositions

14     played at the same time.

15          THE COURT:  Sustained.

16          Well, I don't know what the question is.  It's

17     sustained as to the first point.  I don't know what the

18     question is, so I can't say as to the second objection.

19          MR. ANDERSON:  Thank you, Your Honor.

20          (Playing of videotape.)

21          THE COURT:  No, no.  Cut it off.

22          MR. MALOFIY:  Cut it off.

23          THE COURT:  Can you give the identification to

24     counsel?

25          MR. MALOFIY:  Yes.  These were all provided prior to
```

293

```
 1    the case.  It's 532-V -- 524-V, along with 532-V.
 2              MR. ANDERSON:  This is -- these are -- by number,
 3    Your Honor, I can tell you that this was on a supplemental
 4    exhibit list e-mailed me at 2:37 A.M. --
 5              THE COURT:  Okay.
 6              MR. ANDERSON:  -- a day ago.
 7              THE COURT:  Okay.
 8              MR. ANDERSON:  I still would just like to know what
 9    it purports to be playing.
10              THE COURT:  I don't know.  We haven't had that
11    question.  We've had it presented.  We don't know whether or
12    not it's admissible or not.
13              MR. MALOFIY:  I would like to ask the witness if he
14    recognizes what two songs are being played.
15              MR. ANDERSON:  Well --
16              MR. MALOFIY:  That's -- I don't want to lead the
17    witness.
18              MR. ANDERSON:  Your Honor --
19              THE COURT:  Counsel, I -- counsel's objection is it's
20    completely irrelevant at this time.  And until you show a
21    relevancy, it would be objectionable.  You're going to have to
22    lay the foundation to get it in.
23              MR. ANDERSON:  To expand on that, Your Honor -- I
24    apologize.
25              To expand on that, Your Honor --
```

294

```
 1          THE COURT:  You already made the objection on it.
 2   Did you have another objection to make?
 3          MR. ANDERSON:  Yes, Your Honor.
 4          THE COURT:  Okay.  Go ahead.
 5          MR. ANDERSON:  He's not a designated expert witness.
 6   There's no foundation for the testimony.
 7          THE COURT:  There's no question pending.
 8          Okay.  Counsel.
 9          MR. MALOFIY:  May I play the -- this video and then
10   ask him a question?
11          THE COURT:  No, no, because as of now, you haven't
12   shown any relevancy of these two together.  So next question,
13   counsel.
14          And he has not -- he hasn't been qualified as an
15   expert in this case either.  But go ahead.
16          MR. MALOFIY:  And I agree he's not an expert in this
17   case.
18          THE COURT:  Well, I appreciate that you agree.
19          MR. MALOFIY:  We have plenty of experts to testify in
20   this case.
21   BY MR. MALOFIY:
22   Q.   Did you recognize the two songs being played?
23   A.   It sounds like "Taurus" and "Stairway to Heaven" --
24          THE COURT:  Okay.  That's --
25          THE WITNESS:  -- playing at the same time.
```

295

```
 1            THE COURT:  That's it.  Other than that, the two
 2   being played together, the Court's already said it's irrelevant
 3   at this time, so let's not direct any more questions to the two
 4   being played together.
 5            MR. MALOFIY:  Okay.  Fair enough.
 6   BY MR. MALOFIY:
 7   Q.   Let me move to 525-V.
 8            MR. ANDERSON:  And, Your Honor, if he could identify
 9   what it is.  We have a motion in limine.  I'm concerned
10   about --
11            THE COURT:  Let's -- let me find out.  Has it been
12   received into evidence yet?
13            MR. MALOFIY:  I was already -- this -- I don't
14   believe there is an objection here.
15            THE COURT:  I don't know.  Let's find out.
16            MR. MALOFIY:  Well, I don't -- I don't want to say
17   what it is, Your Honor, because the whole point is that --
18   whether or not this witness can identify.
19            THE COURT:  Why don't you ask your next question and
20   I'll tell you whether or not it's permissible or not.
21            Next question.
22            MR. MALOFIY:  Can he identify the song being played.
23   It is the "Taurus" deposit copy.  I'm not sure why there's
24   objections from defense counsel here.
25            THE COURT:  Okay.  Counsel, back down a little bit.
```

296

1    All he wants to do is be put on notice as to what

2    exhibit you're showing.  As long as you tell him that, he has a

3    chance to look at it, and then he has a chance to make an

4    objection or not.  But he does have the right to know what

5    you're talking about before you start talking about it.

6         MR. MALOFIY:  Yes.  He --

7         THE COURT:  All we want to know is the exhibit number

8    so he knows whether or not he wants to make an objection.

9         MR. MALOFIY:  Thank you, Your Honor.  525-V.

10        THE COURT:  Okay.  Any objection, counsel?

11        MR. ANDERSON:  Based on the -- based on the

12   description on the audio file, no, Your Honor.

13        THE COURT:  Okay.  Okay, counsel.

14        MR. MALOFIY:  Thank you.

15        *(Playing of videotape.)*

16   BY MR. MALOFIY:

17   Q.   What song is that?

18   A.   "Taurus."

19   Q.   All right.  Now, it sounds slightly different from the

20   prior audio example we had.

21        Can you explain why?

22        MR. ANDERSON:  Objection.  Lacks foundation, calls

23   for speculation, and lack of expertise in the area.

24        MR. MALOFIY:  He --

25        THE COURT:  Well, calls for expert testimony also.

297

```
 1   Sustained.
 2           MR. MALOFIY:  Well, it goes back to the actual
 3   deposit copy and the issues in this case.
 4           THE COURT:  You've asked him to give an expert
 5   opinion on it, counsel, and he hasn't been designated as an
 6   expert.
 7           MR. MALOFIY:  It's only --
 8           THE COURT:  You'll have plenty of experts to testify,
 9   I'm sure.
10           MR. MALOFIY:  Yes, Your Honor.  It would only be
11   because of -- well, I'll move forward, Your Honor.
12           THE COURT:  Okay.
13           MR. MALOFIY:  I'll have my experts handle that.
14           THE COURT:  Okay.
15   BY MR. MALOFIY:
16   Q.   There was a couple -- we talked about Mother's Club
17   earlier on in your testimony this morning.
18           Do you recall that?
19   A.   Yes.
20   Q.   Okay.  And in your testimony, you had identified, I
21   think -- I believe you had a -- you had a meet-and-greet with
22   Mr. Page and Mr. Plant in the beginning of that show.
23           Do you recall your testimony there?
24   A.   I do recall the testimony.
25   Q.   All right.  You shared with me that that -- you wanted to
```

1   clarify an issue there; is that correct?

2   A.   Yes.

3   Q.   What -- please tell the jury what fact you wanted to

4   clarify.

5   A.   When I recall, I really don't have a memory of Jimmy Page

6   being at that meet-and-greet.

7   Q.   Is your -- is your memory vivid and distinct as to Robert

8   Plant?

9   A.   Yes.

10  Q.   And is your memory vivid and distinct as to after the

11  concert, playing pool, drinking, and having a good time with

12  Robert Plant and other members of Spirit?

13  A.   Yes.

14  Q.   Okay.

15       MR. MALOFIY:  I'd like to pull up Exhibit 535.

16       Please wait until I get clearance.  535.

17       *(Counsel confer off the record.)*

18       MR. ANDERSON:  Just relevance, Your Honor.  It's a

19  photograph from, I believe, the '80s.

20       MR. MALOFIY:  It's a picture of Robert Plant and also

21  Mark Andes showing that they do know each other, and it goes to

22  their relationship over the years.

23       THE COURT:  Overruled.  Overruled.  You may show it.

24       MR. MALOFIY:  535, yes.

25       *(The exhibit was displayed on the screen.)*

299

```
 1          MR. MALOFIY:  Now, can you blow that up perhaps right
 2   here (indicating)?
 3   BY MR. MALOFIY:
 4   Q.   Do you recognize this photograph?
 5          MR. ANDERSON:  Your Honor, that has been edited.
 6   That is not the same photograph that was produced to us three
 7   days ago.
 8          MR. MALOFIY:  Your Honor, that's -- I don't know how
 9   he's saying it's edited, but I object to that
10   mischaracterization.  This was pulled down --
11          THE COURT:  Let's take it down at this time.
12          MR. MALOFIY:  I'm sorry, Your Honor.
13          THE COURT:  That's okay.
14      Let's take it down at this time and I'm going to give
15   you two a chance to talk to each other and find out if it's the
16   same one that you had shown him beforehand and if you have a
17   copy of it so you can compare them.
18          MR. ANDERSON:  I believe I do.
19          THE COURT:  Well, just -- the two of you, you can
20   figure it out.
21      (Counsel confer off the record.)
22          THE COURT:  You know, we may be wasting an awful lot
23   of time here.  Let me just ask you a question.
24          Did you have pictures taken with yourself and
25   Mr. Plant?
```

300

```
 1                THE WITNESS:  This was at a Heart concert.

 2                THE COURT:  Have you had pictures taken with him?

 3                THE WITNESS:  Yes.

 4                THE COURT:  Okay?  And have you seen those pictures.

 5                THE WITNESS:  Yes.

 6                THE COURT:  Okay.

 7           Okay.  Go ahead, counsel.  I'm sorry.  Sure.

 8                MR. MALOFIY:  I'm sorry, Your Honor.  Can I put the

 9   picture back on?

10                MR. ANDERSON:  Your Honor, the picture that we

11   received has more people.  There are three people standing --

12                THE COURT:  Counsel, why don't we just put his

13   picture up if it's --

14                MR. MALOFIY:  That's fine.  Put the picture up.

15                THE COURT:  Counsel, we don't have to have this

16   discussion.  Why don't we just use your picture.

17                MR. ANDERSON:  I don't have it with us -- with me and

18   I can't access it electronically.

19                THE COURT:  You know, as I said, we're wasting a huge

20   amount of time here.  He's already testified that he's had

21   pictures taken with Mr. Plant and he's seen those pictures and

22   the two of them were together.

23                MR. ANDERSON:  There are three people standing --

24                THE COURT:  Counsel, let's go on.  He's already

25   testified to that, so there's no need for the picture at this
```

301

```
 1    time.
 2              MR. ANDERSON:  Thank you, Your Honor.
 3    BY MR. MALOFIY:
 4    Q.   In the picture that you have in your collection or that
 5    you saw prior to today, can you describe who's in that picture?
 6    A.   It's Heart backstage.  We were opening for Queen in 1982
 7    in England --
 8    Q.   And --
 9    A.   -- and Robert came to the show.
10    Q.   And did you -- did you talk to Robert after that show?
11    A.   Yes.  That's a picture of us having a conversation.
12    Q.   And you said the other people in the picture were members
13    of Heart?
14    A.   Yeah.  That's Ann and Nancy and Howard Leese.
15    Q.   And were you a member of the tremendously successful band
16    Heart?
17    A.   Yes.
18    Q.   All right.  And were you a member of the band during the
19    '80s?
20    A.   Yes.
21    Q.   How many years?
22    A.   Ten, 1982 to 1992.
23    Q.   All right.  Now, just to discuss briefly, what other bands
24    were you in after Spirit?
25    A.   Well --
```

302

```
1    Q.    I think you had mentioned Jo Jo Gunne, but maybe --

2    A.    Well, that was before -- well, after Spirit?

3    Q.    Yes.

4    A.    It was Jo Jo Gunne, Firefall, Heart, and then I played

5    with Dan Fogelberg for many years and Joe Walsh and Stevie

6    Nicks.

7    Q.    I see.

8          Were all these -- was Heart, Firefall, Jo Jo Gunne,

9    Spirit, Canned Heat, all bands --

10   A.    Correct.

11   Q.    -- that were signed to a major label?

12   A.    Yes.

13   Q.    All right.  Now, let me move forward to a couple other

14   things.

15          Did you start this lawsuit?

16   A.    In a way, I think I did.

17   Q.    Why did you do that, sir?

18          MR. ANDERSON:  Objection.  Relevance.

19          THE COURT:  Sustained.

20   BY MR. MALOFIY:

21   Q.    Did you ever have an opportunity to meet Lou Adler, the

22   publisher of Randy California's song "Taurus"?

23   A.    Yes.

24   Q.    All right.  Did you have an opportunity to meet him

25   sometime in the last ten years?
```

303

```
 1   A.   Yes.

 2   Q.   Where did you meet him at?

 3   A.   At his home.

 4   Q.   Where is his home?

 5   A.   Malibu, California.

 6   Q.   Do you know him on a personal basis?

 7   A.   Yes, I do.

 8   Q.   Could you just go to his door, knock on his door, and

 9   speak to him?

10   A.   Well, I would call.  I could, but I would call first.

11        (Laughter.)

12   Q.   Understood.  I'm asking more the level of your

13   relationship.

14   A.   I see.  Yeah, on that particular instance, my wife and I

15   were driving into the LA area and I just thought, "Oh, we

16   should call Lou and say hi."  So spontaneously we called and

17   picked -- Howard picked up the phone and we had a very nice

18   visit.

19   Q.   And --

20   A.   So, yes.

21   Q.   -- during that visit, did you have an opportunity to

22   discuss something that was on your mind in regards to the

23   song -- in regards to Randy and "Taurus"?

24             MR. ANDERSON:  Objection.  Relevance.

25             THE COURT:  Sustained.
```

304

```
 1   BY MR. MALOFIY:
 2   Q.   Did you ever speak about "Taurus" with Lou Adler?
 3            MR. ANDERSON:  Objection.  Relevance.
 4            THE COURT:  I don't know if it is or not.
 5            Did you have a chance to speak with him?
 6            THE WITNESS:  Yes, sir.
 7            THE COURT:  Okay.  Next question.
 8   BY MR. MALOFIY:
 9   Q.   What did you -- what did you speak about?
10            THE COURT:  Sustained.  If you're talking about --
11   sustained.
12            THE WITNESS:  Okay.  So answering the question,
13   correct?
14   BY MR. MALOFIY:
15   Q.   Did you --
16   A.   Yes, yes.  We had -- well, it was an interesting
17   conversation --
18            MR. ANDERSON:  Your Honor --
19            THE WITNESS:  -- because he let me know of a --
20            THE COURT:  Okay.  Let me help you out.  It's not
21   relevant whether or not you wanted to sue or not or how you
22   felt about it.  The case is before the jury at this time and
23   the question is whether or not they can prove the case.  How it
24   started is not relevant and we're not going to get into it.
25            Next question.
```

305

```
 1           MR. MALOFIY:  It goes to ownership, Your Honor.  It's
 2    a big issue that the defense raised in this case throughout.
 3           THE COURT:  His ownership?
 4           MR. MALOFIY:  Ownership of the copyright itself.
 5           THE COURT:  His ownership?
 6           MR. MALOFIY:  No, the --
 7           THE COURT:  How are you going to show somebody else
 8    owned it through his testimony other than hearsay?
 9           MR. MALOFIY:  Because he's intimately familiar with
10    the facts.  He's --
11           THE COURT:  Oh, no, no, no.  That's hearsay,
12    speculation, and conclusionary.  Sustained.
13           Next question.
14    BY MR. MALOFIY:
15    Q.  After you met Lou Adler and spoke to him in regards to
16    "Taurus," what, if anything, occurred thereafter in regards
17    to -- in regards to the song "Taurus"?
18           MR. ANDERSON:  Objection.  Relevance.
19           THE COURT:  Sustained.
20           MR. MALOFIY:  All right.  With that, Your Honor, no
21    further questions of this witness.
22           THE COURT:  Cross-examination.
23           MR. ANDERSON:  Thank you, Your Honor.
24
25    ///
```

306

```
 1                        CROSS-EXAMINATION

 2   BY MR. ANDERSON:

 3   Q.   Good afternoon, Mr. Andes.

 4            When was Spirit formed?

 5   A.   1966, about there.

 6   Q.   Thank you.

 7            Did you sign a songwriter agreement with Mr. Adler's

 8   company, Hollenbeck, in 1967?

 9   A.   We signed a record deal and I -- I'm not sure if there was

10   a separate agreement that had publishing.  I imagine we did,

11   because he -- Hollenbeck Music wound up publishing the music.

12   Q.   And do you recall the Superior Court of the State of

13   California approving the songwriter agreement between Randy

14   Wolfe and Hollenbeck Music?

15   A.   No.

16            MR. ANDERSON:  If we could pull up Exhibit 2060,

17   please.

18            MR. MALOFIY:  Your Honor, objection.  There is no

19   foundation here.  He's not here as a legal expert and we

20   couldn't inquire into these issues.

21            THE COURT:  I don't know what he's going to be asking

22   about it.

23            THE CLERK:  Are you going to ask that it be

24   published -- admitted before it's published?

25            MR. ANDERSON:  I am just going to ask him if it
```

307

1    refreshes his memory.

2            THE COURT:  Well, you don't show it to the jury then.

3    If it refreshes his memory, that's just between you and the

4    witness.

5            THE CLERK:  2060?

6            MR. ANDERSON:  2060.  Thank you.

7            THE COURT:  Okay.  He's showing you a document to

8    refresh your memory.  What that means is he's going to show you

9    a document -- it doesn't make any difference what it is.  It

10   could be a postage stamp.

11           After looking at the document, the question is does

12   that refresh your memory.  The question is not what's on the

13   document or anything about it, just whether or not it refreshes

14   your memory.

15           THE WITNESS:  I understand.

16           THE COURT:  Okay.

17           Counsel, while he's looking at it, refreshes his

18   memory as to --

19           MR. ANDERSON:  As to whether he was told and learned

20   that the Superior Court had approved the contract with --

21   between Randy Wolfe -- counsel raised in direct that Randy was

22   16 years old.

23           THE COURT:  Are you objecting because it's hearsay?

24           MR. MALOFIY:  It's hearsay.

25           THE COURT:  Sustained.

308

```
 1            Next question.
 2    BY MR. ANDERSON:
 3    Q.   Okay.  Yeah, never mind -- never mind on that, Mr. Andes.
 4            THE COURT:  You don't have to look at it now,
 5    although I'm curious if it refreshes your memory.  But, no, you
 6    don't have to look at it.
 7         (Laughter.)
 8            MR. ANDERSON:  Thank you.
 9    BY MR. ANDERSON:
10    Q.   Did the group Spirit perform in concerts live the songs of
11    other groups?
12    A.   Yes.
13    Q.   Did they -- did Spirit perform Beatles songs?
14    A.   I don't recall so many Beatles songs being performed,
15    really.
16    Q.   Do you recall any Beatles songs being performed?
17    A.   No, sir.
18    Q.   Do you recall any other groups whose songs Spirit played
19    live?
20    A.   Yes.  We played Hendrix songs and Bob Dylan songs and
21    other -- a lot of traditional blues songs.
22    Q.   Was Spirit and its members ever sued by either Jimi
23    Hendrix or Bob Dylan?
24    A.   No.
25    Q.   Did Hollenbeck Music and Lou Adler ever file a lawsuit
```

309

```
 1    over "Stairway to Heaven"?

 2    A.    I don't know.

 3    Q.    The -- bear with me for just a second.

 4          You've clarified that you do not recall that Mr. Page

 5    was at Mother's.

 6          Do you recall when your deposition was taken a few

 7    months ago?

 8    A.    Yes.

 9    Q.    And you testified that Mr. Page was not there, right?

10    A.    I believe so, but -- yes.

11    Q.    And isn't it correct that -- well, I'm sorry.

12          You've testified to two occasions at Mother's Club in

13    Birmingham, England where you were -- you spoke with Mr. Plant.

14          And first was a meet-and-greet before Spirit

15    performed, correct?

16    A.    Yes.

17    Q.    And how long was that?

18    A.    How long was the meet-and-greet?

19    Q.    Yeah.

20    A.    I have no idea.

21    Q.    Okay.  Do you recall testifying at your deposition that it

22    was about a minute?

23    A.    I could -- yes.

24    Q.    I don't want you to guess, but is that your best

25    testimony?
```

310

```
1   A.    It was brief probably, to say the least.

2   Q.    Okay.  And isn't it correct that there was no discussion

3   of "Taurus" at any point that night?

4   A.    Correct.

5             MR. ANDERSON:  If we could have Exhibit 2058, which

6   is the "Taurus" deposit copy.

7             And it is something that I believe actually is in

8   evidence, although just by virtue of being on the exhibit list

9   and no one objecting to it.

10            THE COURT:  Are you introducing it?

11            MR. ANDERSON:  I would, yes.

12            MR. MALOFIY:  What is it?

13            MR. ANDERSON:  The deposit copy of the sheet music.

14       (Trial Exhibit 2058 marked for identification.)

15            MR. MALOFIY:  Per defendants -- we object because

16  he's not a musicologist and they don't want him discussing

17  these things on his direct.

18            THE COURT:  You may very well be correct, but it

19  would be premature at this time.  All he wants to do is

20  introduce it.  I don't know if he's -- what he's going to ask

21  him at this time.

22            MR. MALOFIY:  Well, we would object to this

23  witness -- it being introduced.

24            THE COURT:  Overruled.  It may be introduced.  I have

25  no idea what the next question will be.
```

311

```
 1   BY MR. ANDERSON:

 2   Q.   Have you ever seen that sheet music before?

 3   A.   No.

 4        (The exhibit was displayed on the screen.)

 5            MR. ANDERSON:   Okay.   Thank you.

 6   BY MR. ANDERSON:

 7   Q.   Ed Cassidy, John Locke, and Randy Wolfe were all

 8   members -- original members of Spirit?

 9   A.   Yes.

10   Q.   And they've all passed away?

11   A.   Yes.

12   Q.   You're familiar -- counsel referred to a single -- singles

13   being released from an album.

14            What's a single?

15   A.   It's a track from a record that is culled from the record

16   and promoted individually to help promote the record.

17   Q.   In the 1960s and early '70s, were singles played on the

18   radio?

19   A.   Yes.

20   Q.   And what does it mean for a band to tour in support of an

21   album?

22   A.   To go on the road and promote the record and sell records

23   and concert tickets.

24   Q.   And did tour -- did Spirit tour to support its albums?

25   A.   Yes.
```

312

1          MR. ANDERSON:  If we could show the demonstrative,

2     the timeline that was used in the opening.

3          *(The exhibit was displayed on the screen.)*

4          MR. ANDERSON:  And if we could go to the first

5     release.

6     BY MR. ANDERSON:

7     Q.   Do you recognize --

8          MR. ANDERSON:  And maybe a little brighter so --

9     yeah, that's great.  Thank you.

10    BY MR. ANDERSON:

11    Q.   Mr. Andes, do you agree with the information that is on

12    that -- that's on the screen right now?

13    A.   Yes.  It seems like those are the songs in the order that

14    they were placed on the record, yeah.

15    Q.   And do you recall the Spirit album, the first one, being

16    released in or about January of 1968?

17    A.   I thought it was '67, personally.  I thought it was

18    released in '67.

19    Q.   Okay.  Well, thank you.  Thank you.

20    A.   Um-hmm.

21    Q.   Is it correct that "Taurus" was not released as a single?

22    A.   That's my recollection.

23    Q.   And the -- what was the next -- oh, sorry.  What was the

24    next album that was released by Spirit?

25    A.   *The Family That Plays Together*.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**00448**

313

```
 1    Q.    Okay.  And that was released in December of 1968?

 2    A.    That's my recollection.

 3    Q.    Okay.  And "I Got a Line on You" was a single released in

 4    connection with that album?

 5    A.    Correct.

 6    Q.    And did Spirit tour in support of the December 1968 album?

 7    A.    Yes.

 8    Q.    When Spirit toured in support of its albums, did Spirit

 9    tend to play the recordings that were on that album and any

10    previous hits?

11    A.    Spirit would play whatever Spirit wanted to play, and we

12    were not tied to any specific album or set list.  It was very

13    spontaneous, very loose.

14          And so I guess, to answer your question, we were not

15    bound by the play list of a certain album.

16    Q.    No, I understand you weren't bound by it, but Spirit

17    tended, when it was supporting its -- an album that had been

18    released, it would play in concerts the songs from --

19    A.    Songs from --

20    Q.    -- that album.

21    A.    Absolutely.

22    Q.    Right.  If we could -- the December -- I'm sorry.

23          The December performance in 1968 in Denver, was that

24    in support of that new album, *The Family That Plays Together*?

25    A.    I don't recall.
```

314

```
1          MR. ANDERSON:  If we could display Exhibit 320, which
2    was previously admitted.
3          THE COURT:  Okay.
4      (The exhibit was displayed on the screen.)
5    BY MR. ANDERSON:
6    Q.   Do you recognize Exhibit 320 as a handbill that you were
7    looking at earlier?
8    A.   Yes.
9    Q.   And at the top of it, that's the title of the -- Spirit's
10   second album, isn't it, The Family That Plays Together?
11   A.   Yes, it is.
12   Q.   And the "December 26, the Denver Auditorium," refers to
13   the Denver performance in December of 1968 that you were
14   testifying to?
15   A.   Yes.
16          MR. ANDERSON:  If we could display Exhibit 313, which
17   is one of the ones that was shown to the witness.
18      (The exhibit was displayed on the screen.)
19   BY MR. ANDERSON:
20   Q.   Is it correct that -- you identified this as a -- an
21   article that appeared after the performance?
22   A.   Yes.
23   Q.   And do you see that in the article, there's a reference to
24   Spirit's performance of "Mechanical World" and "Elijah"?  Do
25   you see that?
```

315

```
1   A.   Yes.

2   Q.   Those were two songs that commonly -- were commonly

3   performed by Spirit in its concerts, correct?

4   A.   Yes.

5   Q.   And there is no mention of "Taurus" being performed, is

6   there?

7   A.   Not in that sentence.

8   Q.   In that article at all?

9   A.   I would have to read the article, but, yeah.  I mean, I

10  trust you.

11  Q.   Thank you.  Thank you.  I appreciate that.

12            MR. ANDERSON:  If we could -- Exhibit 350 -- excuse

13  me.  352.  I'm not too sure if that is one that has been

14  published yet, so if I could just run that by counsel.

15            THE CLERK:  I don't have it.

16            MR. ANDERSON:  Okay.  Thank you.

17            THE COURT:  Has it been received?

18            MR. ANDERSON:  No.

19      (Counsel confer off the record.)

20            MR. ANDERSON:  I'm waiting for you to tell me -- I'm

21  sorry, Your Honor.

22      (Counsel confer off the record.)

23            MR. MALOFIY:  You can ask him questions as to it.

24            MR. ANDERSON:  Thank you.

25            THE COURT:  Go ahead.
```

316

```
 1        (The exhibit was displayed on the screen.)
 2   BY MR. ANDERSON:
 3   Q.   Mr. Andes, do you recognize Exhibit 352 as a set list that
 4   you testified about at your deposition?
 5   A.   Yes.
 6   Q.   And it refers to a performance by Spirit on February 1st
 7   of 1969 and the set list, the songs that they performed,
 8   correct?
 9   A.   Yes.
10   Q.   And do you have any reason to doubt that on that occasion,
11   February 1st of 1969, Spirit performed the songs that are
12   listed on Exhibit 352?
13   A.   Well, I'm -- I wouldn't necessarily trust that this list
14   was all the songs.  I don't know how -- but, yeah, we probably
15   played a set similar to that.
16   Q.   And isn't that the typical set list for Spirit's
17   performances in that time period?
18            MR. MALOFIY:  Objection.  Vague and ambiguous.
19            THE COURT:  Overruled.
20            I guess what he's saying is would all the songs you
21   played be on that set list necessarily?
22            THE WITNESS:  This would be a good -- I would
23   consider to be a good set to play.
24            THE COURT:  Okay.
25   ///
```

317

```
 1   BY MR. ANDERSON:

 2   Q.   And that's typically what Spirit was performing in that

 3   time period, correct?

 4            MR. MALOFIY:  Objection.  Vague and ambiguous, also

 5   mischaracteriza- -- mischaracterizes his testimony.

 6            THE COURT:  Overruled.

 7            THE WITNESS:  There's not much typical in a Spirit

 8   set list.  Like I said earlier, we would go various places.  We

 9   may have an idea of what we wanted to play, but there was no

10   typical set list, you know.

11            MR. ANDERSON:  Your Honor, I would like to play the

12   video for Mr. Andes' testimony at page 103, lines 18 to 24.

13            If I may provide a copy of the transcript?

14            THE COURT:  Sure.

15            MR. ANDERSON:  Thank you.

16            Actually, I have the sealed original, but -- my

17   apologies.  If we may open the sealed original.

18            Here you go, counsel.

19       (Counsel confer off the record.)

20            MR. MALOFIY:  It's okay.

21            MR. ANDERSON:  Thank you.

22       (Playing of videotape.)

23   BY MR. ANDERSON:

24   Q.   And February 1st of 1969, that performance was

25   approximately a month and a week after the December 26, 1968,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

318

1    performance of Spirit in Denver?

2    A.   I -- I don't know.  I mean, I guess.

3    Q.   Counsel asked you about the Northern California Pop

4    Festival in May of 1969.

5            Isn't it true you testified you do not know if

6    Led Zeppelin was even there?

7    A.   Correct.

8    Q.   I believe counsel may have shown you a poster, and didn't

9    you also testify that the mere fact that their name was on --

10   the band's name was on the poster did not mean that they had

11   actually appeared?

12   A.   Yes.

13   Q.   At the Atlanta International Pop Festival in July of 1969,

14   didn't you testify that there was no interaction between the

15   band members?

16           MR. MALOFIY:  Objection.  Again, Your Honor, he's

17   using the deposition to phrase his question rather than using

18   it as impeachment.

19           THE COURT:  Overruled.

20           And, ladies and gentlemen, you're not to assume,

21   unless it's given to you in evidence, that anything he's saying

22   is in any deposition or anything else.  The fact that he

23   happens to be looking down doesn't mean that he's reading from

24   the deposition.

25           Go ahead, counsel.

319

```
 1              MR. ANDERSON:  Thank you, Your Honor.
 2   BY MR. ANDERSON:
 3   Q.   Isn't it true that you do not recall -- at least when your
 4   deposition was taken, you did not recall any member of
 5   Led Zeppelin interacting with any member of Spirit at the
 6   Atlanta festival?
 7   A.   Man, it's been so long, but --
 8              THE COURT:  That's okay.  If you don't remember, just
 9   say you don't remember.
10              THE WITNESS:  I'm not sure.
11              MR. ANDERSON:  Okay.  If we could have the portion of
12   the transcript from page 128, lines 20 to 23, played for the
13   jury.
14              MR. MALOFIY:  Your Honor, again, it's for what
15   purpose?
16              THE COURT:  I don't know.  It's for impeachment, I'm
17   assuming.
18              MR. ANDERSON:  And his best --
19              THE COURT:  That's the only reason he could read it.
20              MR. MALOFIY:  Is it from the prior question and his
21   prior answer?
22              THE COURT:  Counsel, you have to either object or not
23   object.
24              MR. MALOFIY:  It's objection.  I mean --
25              THE COURT:  On what grounds?
```

320

```
 1          MR. MALOFIY:  On the grounds that he's playing it not

 2   for impeachment, but to phrase a question.

 3          THE COURT:  Overruled.

 4       (Playing of videotape.)

 5          THE COURT:  Okay.  And, counsel, that wasn't

 6   impeachment.  That's what he's testified to now.

 7          MR. ANDERSON:  I thought he had qualified his answer.

 8   I may have misheard and I apologize if I did.

 9   BY MR. ANDERSON:

10   Q.   Isn't it also --

11          THE COURT:  It's only impeachment, ladies and

12   gentlemen, if it contradicts something he already said.  In

13   this case, he said the same thing both times, so it's not

14   impeachment.

15          Go ahead, counsel.

16          MR. ANDERSON:  Thank you, Your Honor.

17   BY MR. ANDERSON:

18   Q.   And isn't it true you do not know whether "Taurus" was

19   performed in Atlanta by Spirit?

20   A.   I don't recall playing "Taurus" that -- that show.  Excuse

21   me.

22   Q.   Counsel asked you about the Seattle Pop Festival in July

23   of 1969.

24          And isn't it true that, setting aside a poster that

25   may have mentioned Led Zeppelin was there, you have no
```

321

1    recollection of Led Zeppelin being at the Seattle Pop Festival?

2    A.    Correct.

3    Q.    Is it also true that you have no recollection of what

4    songs Spirit performed at the Seattle Pop Festival?

5    A.    Correct.

6    Q.    At the Texas Pop Festival on August 30th through

7    September 1, 1969 -- counsel showed you Exhibit 319.

8            MR. ANDERSON:  If we could call that up briefly.

9        *(The exhibit was displayed on the screen.)*

10   BY MR. ANDERSON:

11   Q.    And, Mr. Andes, isn't it true that the -- as far as you

12   know, Led Zeppelin and Spirit performed on different days, if

13   at all, at the Texas Pop Festival?

14   A.    Oh, yeah.  I think we both played that festival.

15   Q.    And different days, correct?

16   A.    Correct.

17   Q.    And you have no recollection of Led Zeppelin performing at

18   the Texas festival in 1969, do you?

19   A.    I did not see their show.

20           MR. ANDERSON:  If we could go back to the

21   demonstrative, which is --

22   BY MR. ANDERSON:

23   Q.    I'm sorry.  That's just my way of referring to the little

24   chart that we get to move along.

25       *(The exhibit was displayed on the screen.)*

322

```
 1    BY MR. ANDERSON:

 2    Q.    What was the next album that was released by Spirit?

 3    A.    That would be Clear.

 4    Q.    And, actually, I sort of misspoke.

 5          It was the Spirit album released by Lou Adler's

 6    company, Ode Records, right?

 7    A.    Yes.

 8    Q.    And the information under October 1969 and including that

 9    date, is that accurate?  I'm sorry.  It says, "October 1969,

10    Clear album released."

11          Is that your recollection of when the Clear album was

12    released?

13    A.    I don't recall exactly when that album was released.

14    Q.    Is that -- to the best of your recollection, are those the

15    recordings or tracks that appeared on the Clear album?

16    A.    Looks like they are, yeah.

17    Q.    Okay.  And did Spirit tour in support of that album?

18    A.    Yes.

19          MR. ANDERSON:  I would like to display -- or ask this

20    gentleman to display Exhibit 2114-1, which I can show you if it

21    makes it easier.

22          THE CLERK:  I'm sorry.  Can I get the number again?

23          MR. ANDERSON:  Yes.  2114-1.  Thank you.

24          (The exhibit was displayed on the screen.)

25    ///
```

323

```
 1   BY MR. ANDERSON:
 2   Q.   Do you recognize Exhibit 2114-1?
 3   A.   No.
 4   Q.   Do you recall within a week or so of the -- Spirit's
 5   performance at Mother's Club, that Spirit played at the Hornsey
 6   Town Hall in North London?
 7   A.   Yes.
 8   Q.   And do you have any reason to believe that the songs in
 9   this song list for that performance are not correctly stated in
10   Exhibit 2114?
11        MR. MALOFIY:  Objection, Your Honor.  He said he
12   doesn't know this exhibit and he's not familiar with it and he
13   didn't produce it or create it.
14        THE COURT:  Overruled.
15        Do you have any reason to believe that other songs
16   were played other than this?
17        THE WITNESS:  Not really.  I mean --
18        MR. ANDERSON:  Thank you.
19        THE COURT:  Let me just ask, to try to make it a
20   little quicker, did you always play only the songs that are on
21   the play list or did sometimes you play other songs?
22        THE WITNESS:  Played other songs.
23        THE COURT:  They couldn't hear you.
24        THE WITNESS:  I'm sorry.  We often played other
25   songs.  We didn't adhere to a set list completely most times.
```

324

```
1   BY MR. ANDERSON:
2   Q.   And this exhibit actually, like the other set list I think
3   I showed, is a list of songs that appear on an audio recording
4   of the performance.  It's -- so it's not -- I would like to
5   distinguish between two things.
6            Did Spirit have handwritten or typed-written lists
7   before it performed of what they expected to play?
8   A.   We often did.
9   Q.   And didn't Spirit sometimes deviate from the list -- the
10  handwritten list that it had before it was about to play?
11  A.   Yes.
12  Q.   Okay.  Now, my question on this exhibit is -- this was
13  produced to us by the plaintiff with a CD --
14           THE COURT:  Counsel, that's not a proper question.
15  Why don't you just go ahead and ask the question.
16           MR. ANDERSON:  Okay.  My apologies, Your Honor.
17  BY MR. ANDERSON:
18  Q.   Do you have any reason to doubt that the songs recorded at
19  the Hornsey Town Hall performance by Spirit in February of 1970
20  are accurately reflected in the list that appears above the
21  photocopy of the CD?
22  A.   I --
23           MR. MALOFIY:  Objection.  Calls for speculation.
24           THE COURT:  Overruled.
25           THE WITNESS:  I don't have any reason to believe this
```

325

1    is incorrect.

2              MR. ANDERSON:  Thank you.

3              And going back to the chart, the demonstrative.

4    BY MR. ANDERSON:

5    Q.    What's the next album after the *Clear* album was released?

6    A.    That was *Twelve Dreams of Dr. Sardonicus*.

7    Q.    And was that released in November of 1970, as indicated in

8    the chart?

9    A.    I believe so.

10   Q.    And are the tracks that are listed in this the tracks that

11   appear on that album?

12   A.    Yes, they are.

13   Q.    And did Spirit tour in support of that album upon its

14   November 1970 release?

15   A.    We did.

16   Q.    Have you ever spoken with Jimmy Page?

17   A.    No.

18   Q.    Is it true that you don't recall seeing any member of

19   Spirit ever speak with Jimmy Page?

20   A.    I do not know.

21   Q.    Did you ever speak with John Paul Jones or John Bonham?

22   A.    Not that I recall.

23   Q.    And as far as you know, you've -- well, I'm sorry -- your

24   recollection is you've never seen any member of Spirit speak

25   with John Paul Jones or John Bonham; isn't that correct?

326

```
1   A.   Well, there was an introduction from Toby Roberts at one

2   point, but there was -- we didn't -- I don't recall anybody

3   hanging out with those guys in our band.

4   Q.   Right.  And you testified, if I remember correctly, that

5   Toby Roberts was the gentleman that was involved in

6   Led Zeppelin, the band, arranging for its first lease of its

7   own airplane, correct?

8   A.   Correct, yes.

9   Q.   Getting back to the December performance at the Denver

10  arena, is it true that you do not know when Led Zeppelin left

11  that arena?

12  A.   That's true.

13  Q.   And you do not know if Led Zeppelin or any of its members

14  heard Spirit perform at the Denver arena in December of 1968?

15  A.   Well, I know that they were in the building when we

16  played.

17  Q.   But you don't know if they heard Spirit perform.  They

18  could have left, correct?

19  A.   They could have left.

20  Q.   Do you recall testifying at your deposition that you had

21  only a faint recollection that "Taurus" was performed at the

22  Denver arena because that was typically what was performed?

23  A.   We played it frequently, yes.

24  Q.   And isn't it true that at your deposition, you said you

25  had only a faint recollection of it being performed that day?
```

327

```
1    A.   Yes, I believe we did.

2    Q.   Do I understand correctly that Mr. Malofiy is your counsel

3    in other litigation that you have filed -- excuse me,

4    litigation that you have filed before this case was filed?

5    A.   Well, he -- yes, he -- yes.

6    Q.   Okay.  If I could just --

7    A.   Can I -- can I clarify a little bit on that?

8    Q.   I think that would be up to Mr. Malofiy.

9              MR. ANDERSON:  But I defer to Your Honor.  If you

10   want me to let him -- he's -- the witness is asking if he

11   can --

12             THE COURT:  No, my question is what's your next

13   question?

14             MR. ANDERSON:  Depending on what Ms. Freeman tells

15   me, I may be done.

16             THE COURT:  Okay.  Your attorney can ask further

17   questions.

18             MR. ANDERSON:  And I just got the nod, Your Honor.

19   I'm going to sit down.

20             THE COURT:  Okay.  Redirect, counsel.

21             MR. MALOFIY:  One moment, Your Honor.  Just grabbing

22   a file.

23             One moment, Your Honor.  We're pulling a document up.

24        (Counsel and computer tech confer off the record.)

25        (Counsel confer off the record.)
```

328

```
 1            MR. ANDERSON:  I believe it's outside the scope,
 2   Your Honor.
 3            THE COURT:  What's outside the scope?  There's no
 4   question.
 5            MR. ANDERSON:  The --
 6            THE COURT:  Counsel, there's no question.
 7            MR. ANDERSON:  He's showing me deposition testimony
 8   that he --
 9            THE COURT:  I don't know what he's showing you, but
10   right now there's no question.  I can't rule on it unless
11   there's a question.
12            MR. ANDERSON:  Okay.  Thank you, Your Honor.
13            MR. MALOFIY:  I was just showing it to counsel so --
14   to move things along as I proceed with my questioning.
15                      REDIRECT EXAMINATION
16   BY MR. MALOFIY:
17   Q.   Do you have any financial interest in this case
18   whatsoever?
19   A.   No, sir.
20   Q.   Next issue.  Defense counsel mentioned that I had
21   represented you in some way.
22            Can you share with the jury what you wanted to say?
23   A.   Yes.  I -- the group Heart was inducted into the Rock and
24   Roll Hall of Fame and Denny Carmassi and I were not included,
25   yet they were using our images and the music that we performed
```

329

1    on to promote their induction.

2            And, of course, I was very disappointed that we

3    weren't included, so my wife Valerie found you, Francis, and

4    you, as a favor, totally pro bono, represented Denny and I to

5    let them -- the Rock and Roll Hall of Fame know that it was not

6    okay with us if they -- if they were going to not induct us,

7    then do not use our image or the music that we performed on to

8    promote them.

9    Q.   Did I charge you one cent?

10            MR. ANDERSON:  Your Honor --

11            THE WITNESS:  No, sir.

12            MR. ANDERSON:  -- relevance.

13            THE COURT:  Counsel, you brought it up.

14            MR. ANDERSON:  Okay.

15            THE COURT:  Overruled.

16   BY MR. MALOFIY:

17   Q.   Thank you, Mr. Andes.

18            I have deposition testimony which was referenced

19   earlier on.  I'd like you to take a moment to review it.  It's

20   in regards to your interactions at -- with Led Zeppelin and the

21   Atlanta Pop Festival.

22            MR. MALOFIY:  Can I use it to refresh his

23   recollection, Your Honor?

24            THE COURT:  There's been no demonstration that he

25   needs his memory refreshed.  Why don't you ask him a question

330

```
 1   and then if he says he doesn't remember, we can do that.

 2   BY MR. MALOFIY:

 3   Q.   Isn't it true, actually, in Atlanta, that backstage you

 4   did have interactions with Robert Plant?

 5   A.   We could -- yes.

 6           MR. ANDERSON:  Excuse me.  I'm sorry, Your Honor.

 7   Slow on my feet.  Objection.  Leading.

 8           THE COURT:  Overruled.

 9           Did you have conversation with him?

10           THE WITNESS:  I don't recall a conversation, but I

11   think we did have a time where we were in the same area and

12   acknowledged --

13           THE COURT:  So you say you may have had contact, but

14   maybe not conversation?

15           THE WITNESS:  Correct.

16           THE COURT:  Okay.

17           MR. MALOFIY:  I'd like to play page 109, line 2, to

18   110, line 14.

19           THE COURT:  For what purpose, counsel?

20           MR. MALOFIY:  For the purpose to refresh his

21   recollection; also, to further illustrate his --

22           THE COURT:  He doesn't need his memory refreshed.  He

23   hasn't indicated he has any problem remembering.  I don't think

24   you're doing it to impeach your own witness.

25           MR. MALOFIY:  No, I'm just doing it to refresh his
```

331

1    recollection.  I was hoping --

2            THE COURT:  He doesn't need it refreshed.

3            MR. MALOFIY:  Okay.  Very well.

4            I have no further questions of this witness.

5            THE COURT:  Okay.  Anything further in that --

6            MR. ANDERSON:  I have no further questions.

7            THE COURT:  Okay.  You may step down.  Thank you very

8    much for being here.

9            MR. MALOFIY:  Your Honor, I have to check the hallway

10   to see what witness is next.

11           THE COURT:  May this witness be excused or do you

12   need to keep him?

13           MR. MALOFIY:  Fine by plaintiff's side.  Thank you.

14           MR. ANDERSON:  I -- if -- I hate to impose on him.

15   If we could hold off for a day before we excuse him.  And I do

16   understand he's a resident of Texas.  If that is a hardship --

17           THE COURT:  Are you going back to Texas?

18           MR. MALOFIY:  He's on- --

19           THE WITNESS:  No, I'll be here until Friday.

20           THE COURT:  Okay.  Well, then --

21           MR. ANDERSON:  Great.

22           THE COURT:  Okay.  That's fine, then.  Okay.  Thank

23   you.

24           MR. ANDERSON:  Thank you, Your Honor.

25           THE COURT:  Next witness.

332

```
 1            MR. MALOFIY:  One moment, Your Honor.  I'll check the
 2   hallway.
 3            THE COURT:  Sure.
 4       (Brief pause in the proceedings.)
 5            THE COURT:  Let's hope plaintiff's counsel hasn't
 6   gone home.
 7       (Laughter.)
 8            THE COURT:  Okay.  Next witness, counsel.
 9            MR. MALOFIY:  Mr. Bruce Pates.
10            THE COURT:  Thank you.
11            THE CLERK:  Please raise your right hand.
12            Do you solemnly swear that the testimony you shall
13   give in the matter now before this Court shall be the truth,
14   the whole truth, and nothing but the truth, so help you God?
15            THE WITNESS:  I do.
16            THE CLERK:  Thank you.  Please be seated.
17            May I please ask that you state your full name for
18   the record and spell your last name.
19            THE WITNESS:  I will.  My name is Bruce Pates.
20   That's P, like in Paul, A-T-E-S, like in Sam.
21            THE COURT:  Okay.  Thank you.
22            Counsel, you may inquire.
23
24
25   ///
```

333

```
 1                          BRUCE PATES,

 2                   having been first duly sworn,

 3                      testified as follows:

 4                     DIRECT EXAMINATION

 5   BY MR. MALOFIY:

 6   Q.   Mr. Pates, where do you live?

 7   A.   I live in -- near Memphis, Tennessee, sir.

 8   Q.   And how long have you lived there?

 9   A.   I've been there since 2004.

10   Q.   Now, can you tell the jury a little bit about your

11   relationship to the band Spirit?

12   A.   I met -- I was a long-time fan.  I've been a fan since

13   1968.  I saw the band 29 times from 1979 to 1996, a huge fan.

14          I finally met the band December 25th of 1984.  I

15   always tell everybody it's the best Christmas present I ever

16   got.

17          And I had written an article on them -- in fact, two

18   articles on them in Goldmine Magazine, and when I met Randy

19   California and Ed Cassidy on December 25, 1984, Randy had seen

20   the article that I had written and was very excited about it.

21          And because of that article, we became close friends,

22   and I did more and more for him over the years.

23   Q.   All right.  Now, did you know Randy California personally?

24   A.   Yes, I did.

25   Q.   How many times did you meet him?  Can you even estimate?
```

334

1    A.    Oh, jeez.  Well, I saw him 29 times, but I would have -- I

2    would have known him 28 times.

3    Q.    Okay.  Did he -- did you ever spend time together?  In

4    other words, more than just seeing him in a concert?

5    A.    Oh, sure.  They stayed as my house guests at least four

6    times from 1994 to 1996.  I tried to do that to try to help

7    them out a little bit.

8    Q.    Why did you need to help them out a little bit?

9    A.    Well, they were in pretty bad financial shape, and so I

10   always would try to volunteer to do anything to help them out.

11   And I figured I can save them all the hotel fees.  You stay

12   with me, that's more money in your pocket.

13         I would work for him as a roadie.  I did press

14   releases for them.  I did a press kit for them.  Just anything

15   I could do to help them out, I was there to try to help them

16   out.

17   Q.    Are you familiar with the Spirit catalog?

18   A.    Oh, pretty much, yes, sir.

19   Q.    And do you have every album in the Spirit catalog?

20   A.    I have -- jeez, I have so many records on Spirit, it's

21   ridiculous, from various countries, United States, UK, Germany,

22   Australia, Japan, you name it, singles.

23   Q.    I want to focus specifically on the first album --

24   A.    *Okay.*

25   Q.    -- *Spirit* -- self-titled *Spirit*.

335

```
 1              In your collection, how many records do you have that
 2    were distributed or printed in a different country?
 3              MR. ANDERSON:  Objection.  Lacks foundation, and he's
 4    also not a designated expert.
 5              THE COURT:  No expert testimony is being asked right
 6    now, but sustained.  It would be speculative.
 7    BY MR. MALOFIY:
 8    Q.   Sir, do you have an album in your collection -- your
 9    Spirit collection that was printed in the UK?
10    A.   Yes, I do.
11              MR. ANDERSON:  Objection.  Lacks foundation.
12              THE COURT:  Sustained.  Calling for speculation.
13              MR. MALOFIY:  It's -- it's print- -- Your Honor --
14              THE COURT:  Next question, counsel.
15    BY MR. MALOFIY:
16    Q.   Are you familiar or do you have facts to establish where
17    the Spirit records were -- in what countries they were sold?
18    A.   Well, I actually have the albums.
19    Q.   And what do the back of the albums indicate?
20              MR. ANDERSON:  Objection.  Speculation and hearsay.
21              THE COURT:  Overruled.  Overruled as to what the back
22    of the albums say.
23    BY MR. MALOFIY:
24    Q.   What do the back -- you can answer.
25    A.   Okay.  I have -- obviously, I have the first album.  The
```

336

```
 1    back of the album says "United Kingdom."

 2             I have the first album.  The back of the album says

 3    "Germany."

 4             I have the first album.  The back of the album is

 5    "Japan."

 6             I have the first album.  The back of the album is

 7    "Australia."

 8             THE COURT:  Next question.

 9    BY MR. MALOFIY:

10    Q.   Do you have one that also says "United States"?

11    A.   Oh, of course, yes.

12    Q.   What about Canada?

13    A.   I believe I have a Canadian.  Yes, I do have a Canadian

14    one.

15    Q.   Any other countries, Scandinavian countries or elsewhere,

16    you can think of?

17    A.   Not off the top of my head at the moment.

18    Q.   All right.  Are you familiar with where this first album

19    charted in the Billboard?

20    A.   Yes.  In the United States --

21             MR. ANDERSON:  Objection.  Lacks foundation and it is

22    hearsay -- based on hearsay.

23             THE COURT:  Sustained.  He's not qualified as an

24    expert.  Sustained.

25    ///
```

337

```
 1   BY MR. MALOFIY:

 2   Q.   Have you ever read Billboard magazine?

 3   A.   Yes, I have.

 4   Q.   Have you ever had an opportunity to view the chart of

 5   songs by Spirit?

 6   A.   Yes, I have.

 7   Q.   And did the first album chart in Billboard?

 8   A.   Yes, it did.

 9        MR. ANDERSON:  Objection.  Again, hearsay.

10        THE COURT:  Sustained.  Sustained.

11        MR. MALOFIY:  I'll move forward.

12   BY MR. MALOFIY:

13   Q.   You had mentioned that Randy California did not have much

14   money; is that accurate?

15   A.   That is true.

16   Q.   Was he poor?

17        MR. ANDERSON:  Objection.  Relevance.

18        THE COURT:  Overruled.  Well, excuse me.  Sustained.

19        MR. MALOFIY:  It goes to -- if I may, Your Honor --

20        THE COURT:  Goes to --

21        MR. MALOFIY:  -- why the suit wasn't filed for 40

22   years, and they raised it in their opening.

23        THE COURT:  Sustained.  I understand that.

24   Sustained.  And it's also a subject of a motion in limine.

25        MR. MALOFIY:  It was only because he opened the door
```

338

```
 1   in opening, Your Honor, but I'll move forward.
 2              THE COURT:  Okay.
 3   BY MR. MALOFIY:
 4   Q.   Did Randy California ever file suit in regards to his
 5   musical composition "Taurus"?
 6   A.   Not that I'm aware of, but he did seek legal counsel.
 7   Q.   Did he do that throughout his life?
 8              MR. ANDERSON:  Objection.  Vague and ambiguous.
 9              THE COURT:  Sustained.  You're calling for hearsay.
10   BY MR. MALOFIY:
11   Q.   Did you ever meet any of the attorneys that he worked
12   with?
13   A.   Yes, I did.
14   Q.   Who did you meet, sir?
15   A.   I met Linda Mensch, if I'm pronouncing her name correctly,
16   in Chicago.
17   Q.   Did she provide a declaration in this case?
18              MR. ANDERSON:  Objection.  Relevance.
19              THE COURT:  Sustained.
20   BY MR. MALOFIY:
21   Q.   When you met --
22              THE COURT:  If she wants to testify, that's fine, but
23   sustained.
24   BY MR. MALOFIY:
25   Q.   Did you meet her in Chicago?
```

339

```
 1    A.    Yes, I did.

 2    Q.    And where did you meet her at?

 3    A.    I met her at her offices downtown.

 4    Q.    All right.  What, if anything, did she do in filing the

 5    lawsuit on behalf of Mr. California?

 6              MR. ANDERSON:  Objection.

 7              THE COURT:  Counsel, he can't talk about what some

 8    other person did.  Call that witness if you wish to, but he

 9    can't testify as to what other people did or said.

10              Next question.

11    BY MR. MALOFIY:

12    Q.    Did you have any communications by and between Ms. Mensch

13    and yourself?

14    A.    Only about two minutes where I thanked her for helping

15    Spirit.

16              MR. ANDERSON:  Objection.

17              THE COURT:  Next question.

18    BY MR. MALOFIY:

19    Q.    Did you help facilitate Mr. California seek- -- getting

20    legal help from Ms. Mensch?

21    A.    I did.

22    Q.    How did you do that?

23    A.    I have a very good friend of mine, Ken Unterberg, who is a

24    real estate attorney.  He called in a favor to his friend

25    Peter, whose last name I unfortunately forget, and Peter called
```

340

```
 1   in a favor to Linda Mensch.

 2   Q.   And is that how Mr. California sought legal counsel

 3   through --

 4   A.   That's correct.

 5              MR. ANDERSON:  Objection.

 6   BY MR. MALOFIY:

 7   Q.   -- Ms. --

 8              THE COURT:  Sustained, counsel.  I'm going to ask you

 9   to move on to a different area, because I've already told you

10   that is not acceptable.  If you want to bring her in, that's

11   fine, but he cannot testify as to any arrangements or

12   understanding between counsel and Mr. Wolfe.

13   BY MR. MALOFIY:

14   Q.   Were you ever told by Ms. Mensch --

15              THE COURT:  Counsel, that's calling for hearsay.

16              MR. MALOFIY:  I'm sorry.  I'll move forward,

17   Your Honor.  I'll move forward.

18              THE COURT:  Okay.

19   BY MR. MALOFIY:

20   Q.   Do you have an understanding when "Taurus" was written?

21   A.   Yes.

22              MR. ANDERSON:  Objection.  Lacks foundation.

23              THE COURT:  Overruled.  He has an understanding.

24   BY MR. MALOFIY:

25   Q.   What is that understanding, sir?
```

341

A.   I understand it was written in probably the early part of

1967.

Q.   All right.

A.   It's one of their earliest songs.

Q.   When you say "their earliest songs," who are you referring

to?

A.   Well, the band, but it's Randy's song.  He's the

songwriter on that.

Q.   Okay.  Has it ever been disputed that Randy was the

songwriter of the song "Taurus" that you're aware of?

A.   Not that I'm aware of, no.

Q.   Okay.  And as a historian for the band Spirit, are you

also aware that Spirit and Led Zeppelin had shared the bill on

a number of shows and played together?

A.   Correct.

          MR. ANDERSON:  Objection.

          THE COURT:  Sustained.  No foundation.

          Counsel, you're asking him to testify to all kinds of

things he has no foundation to testify based on hearsay, based

on speculation, based on his own opinion.  All of that is

objectionable.  So let's limit ourselves just to testifying to

what he saw or did.

          Next question.

          MR. MALOFIY:  I have no further questions of this

witness, Your Honor.

342

```
 1              THE COURT:  Okay.  Cross.

 2              MR. ANDERSON:  No, Your Honor.  Thank you.

 3              THE COURT:  You may step down and you may be excused,

 4    sir.  Thank you very much for coming in.

 5              Next --

 6              THE WITNESS:  Thank you, sir.

 7              THE COURT:  Next witness.

 8              MR. MALOFIY:  I'm going to need two minutes,

 9    Your Honor, maybe even three.  It can go against my -- maybe

10    even three minutes.  It can go against my time.  I need to

11    confer with counsel briefly.

12              THE COURT:  Go ahead.

13         (Counsel confer off the record.)

14              MR. MALOFIY:  It can go against my time, Your Honor.

15    And if you would give me the courtesy of a brief moment.  Thank

16    you.

17         (Brief pause in the proceedings.)

18              MR. MALOFIY:  Our next witness is going to be

19    Mr. Jimmy Page.

20              How you doing?  Good to see you again.

21              THE CLERK:  Please raise your right hand.

22              Do you solemnly swear that the testimony you shall

23    give in the matter now before this Court shall be the truth,

24    the whole truth, and nothing but the truth, so help you God?

25              THE WITNESS:  I do.
```

343

```
 1                THE CLERK:  May I please ask that you state your full
 2     name for the record and spell your last name.
 3                THE WITNESS:  My name is James Patrick Page, spelled
 4     P-A-G-E.
 5                THE CLERK:  Thank you.
 6                THE COURT:  Counsel, you may inquire.
 7                          JAMES PATRICK PAGE,
 8                   having been first duly sworn,
 9                     testified as follows:
10                        DIRECT EXAMINATION
11     BY MR. MALOFIY:
12     Q.   Mr. Page, thank you for being here.  I know you came from
13     all the way over from the UK.
14                If you recall, we had a deposition many months ago.
15     Do you recall that?
16     A.   Yes.
17     Q.   Okay.  And we spent a lot of time together asking
18     questions in regards to this case.
19                Do you recall that?
20     A.   I do.
21     Q.   And also in regards to this case, you had put together a
22     declaration.
23                Do you recall that?
24     A.   Initially, yes.
25     Q.   And in your declaration, you had indicated that you
```

344

```
 1    actually had Spirit's first album.

 2              Do you recall that?

 3    A.   That's correct.

 4              MR. MALOFIY:  All right.  Now, this exhibit is at

 5    373, and we do have that.  I'd like to mark it and move that

 6    into evidence, Your Honor.

 7              THE COURT:  Any objection?

 8              MR. ANDERSON:  If I can just have a moment,

 9    Your Honor, to --

10              THE COURT:  Sure.

11              While they're doing that, if you could move that

12    microphone a little closer to you so we can pick up your voice.

13              THE WITNESS:  Yeah.

14              THE COURT:  That's good.  Thank you.

15              MR. ANDERSON:  Your Honor, our records indicate that

16    Exhibit 373 is -- is not a declaration.  Looks like the back of

17    a Spirit album.

18              MR. MALOFIY:  That's what I said (indicating).

19              MR. ANDERSON:  Oh, I thought you said declaration.

20    I'm sorry.

21              THE COURT:  Any objection, counsel?

22              MR. ANDERSON:  No, Your Honor.

23              THE COURT:  Okay.  It may be marked.

24         (Trial Exhibit 373 marked for identification.)

25    ///
```

345

```
 1              THE WITNESS:  Excuse me.  Can I -- can I have a look
 2    at exactly what that album is?
 3              MR. MALOFIY:  Sure.
 4              May I approach, Your Honor?
 5              THE COURT:  If you wish.
 6              MR. MALOFIY:  Thank you.
 7              THE WITNESS:  Yes.
 8    BY MR. MALOFIY:
 9    Q.    You recall that album, right?
10    A.    Yes, I do.
11    Q.    And you recall that album because it's in your collection?
12    A.    That's correct.
13    Q.    Now, if you go --
14              MR. ANDERSON:  It's vague and ambiguous as to whether
15    he is suggesting that (indicating) --
16              THE COURT:  Well, he's -- I'm assuming -- we're all
17    assuming that it's not that exact album.
18         (Laughter.)
19              MR. ANDERSON:  Thank you, Your Honor.  Thank you,
20    Your Honor.
21              THE WITNESS:  Well, to be precise, I think this is --
22    this is different on the back to the one I have, but I have an
23    album with that front.
24    BY MR. MALOFIY:
25    Q.    You know -- you recognize the front of that album,
```

346

```
1    correct?

2    A.   Yes, I recognize the album now.

3    Q.   And you recognize the band Spirit, correct?

4    A.   Yes, I do.

5    Q.   You're familiar with the band Spirit?

6    A.   I am familiar with the --

7    Q.   You're very familiar with the band Spirit, correct?

8    A.   Not very familiar, but I'm familiar with the band, yeah.

9    Q.   And you were aware of this band going back as far as

10   1960s, correct?

11   A.   I'd heard their music on the radio in the 1960s, yeah.

12   Q.   And let me go to the album itself.

13         If you look at the back of the album, do you see it

14   has track listings?

15   A.   Yes, it does.

16   Q.   All right.  And what's the first song there?  Is it "Fresh

17   Garbage"?

18   A.   The first track is "Fresh Garbage."

19   Q.   And what's the second track?

20   A.   "Uncle Jack."

21   Q.   What's the third track?

22   A.   "Mechanical World."

23   Q.   And then there's that fourth track?

24   A.   "Taurus."

25   Q.   "Taurus."
```

347

```
 1              Now, you're familiar with the song "Fresh Garbage,"
 2   correct?
 3   A.   Yes, I am.
 4   Q.   Very familiar, correct?
 5   A.   Yes.
 6   Q.   In fact, in your deposition, you said that you would play
 7   music of people you liked and chip a wink to what was hot in
 8   the scene at that time.
 9              Do you remember that?
10              MR. ANDERSON:  Objection, Your Honor.  Misstates the
11   document.
12              THE COURT:  Overruled.  You can just ask him is that
13   true, that statement.
14              THE WITNESS:  Yes.
15              THE COURT:  Okay.
16              THE WITNESS:  Yeah.
17   BY MR. MALOFIY:
18   Q.   And do you recall that in your deposition, you said -- you
19   used the actual words "chip a wink."
20              Do you remember that?
21   A.   I may have done.
22   Q.   Okay.  Well, I'm not going to pull it up, but do you
23   recall saying that you would play bands that you felt were
24   instrumental or important at the time?
25   A.   I think I --
```

348

```
 1          THE COURT:  Go ahead.  The question is -- go ahead.
 2    You can answer the question.
 3          THE WITNESS:  Yeah.  Chip a wink to that riff.
 4    BY MR. MALOFIY:
 5    Q.   Well, you call it a riff, correct?
 6    A.   Yeah, yeah, yeah.
 7    Q.   And you're familiar with the "Fresh Garbage" what you call
 8    riff, right?
 9    A.   Yeah.
10    Q.   Because you actually included it in part of Led Zeppelin's
11    live sets, correct?
12    A.   That's correct.
13    Q.   All right.  Now, when you say just a riff, isn't it true
14    that you played it for minutes and minutes and minutes, this
15    riff, over and over again?
16    A.   Well, the nature of a riff anyway is the fact that it's a
17    cycle of notes which is repetitive and repetitive.
18    Q.   I'm just --
19    A.   And so we employed it that way in a medley that we did.
20    We used to play that riff over and jam over it.
21    Q.   You didn't create that riff, did you?
22    A.   No.
23    Q.   You copied that riff?
24    A.   Copied it?  In what -- what do you mean?  We --
25          THE COURT:  You played it.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**00484**

349

```
 1              THE WITNESS:  We played it, yeah.
 2    BY MR. MALOFIY:
 3    Q.   But you didn't create it on your own, you took it from the
 4    band Spirit, correct?
 5    A.   I heard -- yeah, I'd heard -- I'd heard it.
 6    Q.   Now, to be clear, Mr. John Paul Jones, when he was
 7    deposed -- did you have an opportunity to ever see his
 8    deposition testimony?
 9    A.   Oh, no.
10    Q.   No.  Did you understand who brought that piece of music to
11    the band, "the band" referring to Led Zeppelin?
12    A.   Well, from my recollection, when -- when we were actually
13    putting the band through the rehearsal stage, which was at my
14    house, it was put forward as something for a medley that we
15    were doing in a number called "As Long As" -- "As Long As I
16    Have You."
17              So there would be "As Long As I Have You" -- a medley
18    of bits and pieces and then "As Long As I Have You," and that
19    was something that came up during that point in time.
20    Q.   To be clear, the riff --
21    A.   Something to jam over, yeah.
22    Q.   Yeah, the riff from Spirit's first album --
23    A.   Yeah.
24    Q.   -- on the same side as "Taurus" was a bit and piece that
25    you incorporated into music that Led Zeppelin played live on
```

350

1   stage, correct?

2   A.   That's fair enough.

3   Q.   And you didn't just play it once, you played it many

4   times, correct?

5   A.   What do you mean by that?  The riff?  The amount of times

6   of the riff in one number or subsequent days?

7   Q.   Let me be more clear.

8        What I'm referring to is how many times did you play

9   this in separate concerts?

10       MR. ANDERSON:  Objection.  Vague and ambiguous.

11       THE COURT:  By "this," you mean that -- what did you

12   call the comp- -- the composite?

13       THE WITNESS:  A medley.

14       THE COURT:  Yeah.  What did you call it?

15       THE WITNESS:  "As Long As I Have You" is the title.

16       THE COURT:  Are you referring to the medley "As Long

17   As I Have You," how many times did he play that?

18       MR. MALOFIY:  Well, no, I'm referring to "Fresh

19   Garbage," which was a piece contained in the medley.

20       THE COURT:  Then why don't we ask the question again

21   so we -- we're focusing on what you're asking.

22   BY MR. MALOFIY:

23   Q.   At how many difference concerts did you play this medley

24   which contained the composition of "Fresh Garbage"?

25       MR. ANDERSON:  Objection.

351

```
1          THE COURT:  Overruled.
2          THE WITNESS:  Okay.  I -- I really don't know, but I
3   do know that we -- we rehearsed the band and the Led Zeppelin
4   outfit and then we had a handful of dates in Scandinavia, and
5   by that I mean like half a dozen dates or so.
6          Then we were doing a few dates in England, and we
7   were recording the first album, and then we came over to the
8   States.
9          So we're talking, say, somewhere between September
10  and December.  Whenever these early concerts were on, we were
11  playing it then.
12  BY MR. MALOFIY:
13  Q.   Now, would it be accurate to say you played it somewhere
14  between 12 to 15 times in concert?
15  A.   Oh, yes, I would say so, yes.
16  Q.   And maybe even more, correct?
17  A.   Maybe so.
18  Q.   All right.  Now, would you agree that Spirit is a band
19  that you liked?
20  A.   Yeah.  I liked Spirit, yeah.
21  Q.   And isn't it true that Spirit is a band that you
22  appreciated over the years?
23  A.   Well, I -- I bought a record of theirs, that's for sure.
24  In fact, I bought two records of theirs.
25  Q.   Let's go with the first record.  What was the first record
```

352

```
 1   you bought by Spirit?

 2   A.    The Family That Play Together, which is an album that has

 3   like a Motel 6 cover on the front.  It's got -- "I've Got a

 4   Line On You Babe" is the -- the sort of main track.

 5   Q.    And besides the first album that you bought and put in

 6   your collection, what was the second album that you bought

 7   and --

 8            MR. ANDERSON:  Objection.

 9   BY MR. MALOFIY:

10   Q.    -- put in your collection?

11            MR. ANDERSON:  Misstates the testimony.  It's

12   argumentative.  There's no testimony he bought the first album.

13            MR. MALOFIY:  I'm sorry.  I thought he --

14            THE COURT:  I'm sorry.  How did -- how did you

15   acquire the first album?

16            THE WITNESS:  Well, I -- I --

17            THE COURT:  Did you buy it or was it given to you?

18            THE WITNESS:  To be honest with you, I'm not

19   absolutely sure.  But I definitely -- I could possibly have

20   bought it or I was given it.

21            THE COURT:  Yeah, that's a good answer.  If you're

22   not definitely sure, just say you're not sure.  That's a

23   great --

24            THE WITNESS:  Sure.

25            THE COURT:  -- answer.
```

353

```
 1          Okay.  Counsel.
 2          MR. MALOFIY:  Could I have his answer read back two
 3   answers ago?
 4          THE COURT:  Why don't you ask the next question.
 5   BY MR. MALOFIY:
 6   Q.   Did you just testify that you had bought two Spirit
 7   albums?
 8   A.   Well, yeah, but loosely saying.  I don't actually really
 9   know, but I was going to just say the albums that I had.
10   Q.   Well, I want to be clear, because I thought I heard you
11   say on the stand under oath that you had bought two --
12   A.   Yeah, maybe I did.
13          THE COURT:  No.  You --
14   BY MR. MALOFIY:
15   Q.   Well, hold on a second, because only one person can take
16   down the testimony.
17          THE COURT:  Well, and also only one person that tells
18   him to hold on for a second, counsel.  And it's not --
19          MR. MALOFIY:  I apologize, Your Honor.  I apologize
20   to Mr. Page.
21      (Laughter.)
22          THE COURT:  You said -- you may or may not have said,
23   "I bought the albums."  Did you mean by that you have two of
24   their albums?
25          THE WITNESS:  Yeah.
```

354

1          THE COURT:  And you're not too sure whether you

2    bought them or were given you; you don't know right now?

3          THE WITNESS:  Yeah.

4          THE COURT:  Okay.

5          THE WITNESS:  It -- I definitely have two --

6          THE COURT:  Okay.

7          THE WITNESS:  -- two of the albums that I remember

8    getting in the day --

9          THE COURT:  Okay.

10          THE WITNESS:  -- yeah.

11          THE COURT:  Then let's go ahead.

12    BY MR. MALOFIY:

13    Q.   To be clear, when you say you remember getting two --

14    getting two of the albums in the day, does that mean in the day

15    of when they came out and were released?

16    A.   In the '60s.

17    Q.   All right.

18    A.   '60s.

19    Q.   Would you agree with me that the "Taurus" album that

20    you -- excuse me.

21          Would you agree with me that the Spirit album that

22    you have, you bought in the '60s?

23    A.   No.

24          MR. ANDERSON:  Objection.  Vague and ambiguous.

25          The problem is Spirit is a group and the name of an

355

```
 1   album.  It also misstates the testimony.
 2            THE COURT:  Sustained.  He indicated that he somehow
 3   or another acquired two and he acquired them in the '60s.
 4            Next question.
 5   BY MR. MALOFIY:
 6   Q.   Well, was it the first Spirit album that you acquired in
 7   the '60s, sir?
 8   A.   No.
 9   Q.   What Spirit album did you acquire in the '60s?
10   A.   The two albums that I -- that I sort of recollect having
11   had and what I do have are Family Plays Together and Clear
12   Spirit, which I believe is the third album.  Second album,
13   third album.
14   Q.   Did you acquire those albums after hearing "Fresh Garbage"
15   and being familiar with that piece of work from the first
16   album?
17   A.   I seem to remember -- well, I seem to remember the first
18   album that comes into my possession is the Motel 6 album, The
19   Family that Plays Together with "I Got a Line on You Babe."  So
20   that's as a result probably of hearing that on the radio, that
21   track.
22   Q.   And then the second album?
23   A.   The other album that I've got, the third album, Clear
24   Spirit, yeah, that had -- "Dark Eyed Woman" was the title track
25   on there.
```

356

```
 1              And I quite liked -- I quite liked both of those
 2     songs, "I've Got a Line on You Babe" and "Dark Eyed Woman."
 3     Q.   "I've Got a Line on You" was a charting single, correct?
 4     A.   Well, I don't know.  I guess so.
 5     Q.   You heard it on the radio, correct?
 6     A.   Yeah, yeah.
 7     Q.   It was very popular in the UK, correct?
 8     A.   Yeah.
 9     Q.   It was popular --
10     A.   I heard it over here, though.
11     Q.   It was popular in the U.S., too, correct?
12     A.   Yeah.
13     Q.   Okay.  Now, my question earlier on was a little different.
14     I asked you did you -- were you familiar with "Fresh Garbage"
15     from Spirit's first album prior to purchasing the second and
16     third -- or prior to purchasing the second and third album?
17     A.   Yes, I was.
18     Q.   Okay.  Is that what caused you to purchase the second and
19     third album?
20     A.   I don't know whether that's the reason at all, no.
21     Q.   Do you happen to know why you purchased the second and
22     third album?
23     A.   Because I liked the tracks that I -- that I heard on
24     the -- you know, I bought them independent.  I didn't buy them
25     both together; it was as I heard the songs on the radio.
```

357

1   Q.   I see.  So you heard Spirit songs on the radio, you liked

2   them, and then you went to go buy the albums?

3   A.   Yeah.

4   Q.   I see.

5   A.   Yeah, the second album and the third album.

6   Q.   Only the second album and the third album?

7   A.   Yeah.

8   Q.   Although you're familiar --

9   A.   Didn't get around to getting the first album.

10  Q.   Well, you -- at some point you got around to getting the

11  first album.

12  A.   Well, I don't know.  It's in -- it's in my collection.

13  Q.   So somehow it was discovered by you in your collection,

14  correct?

15  A.   Correct.

16  Q.   You're not really sure how that happened, though?

17  A.   No.

18          MR. ANDERSON:  Objection.  Vague and ambiguous.

19          THE COURT:  Overruled.

20  BY MR. MALOFIY:

21  Q.   Now, let's go to your declaration.

22          In your declaration -- excuse me.

23          In your response to your interrogatories, Response to

24  Interrogatory Number 11, the question was asked by plaintiff:

25  "Have you ever acquired a recording of 'Taurus' by purchasing

358

```
 1    it or any other means?  State the date or approximate date when

 2    this occurred."

 3              Your answer was:  "At some time presently unknown to

 4    defendant, he came into possession of the album Spirit, which

 5    he understands includes a recording of 'Taurus' that he did not

 6    listen to."

 7              Now, it says:  "Discovery is not complete and

 8    defendant reserves the right to supplement or amend the

 9    foregoing response."

10              Is that still your response as you --

11              THE COURT:  Counsel, that's not proper.  You can read

12    in the interrogatories and the responses just like depositions.

13    You don't ask whether or not the deposition was true.  It's

14    testimony just like -- it comes in to the jury just like

15    testimony from a deposition.

16    BY MR. MALOFIY:

17    Q.   That was your -- that was your interrogatory response,

18    correct?

19    A.   Sir, could you please repeat the question?

20    Q.   Was your interrogatory response accurate when you said:

21    "At some time presently unknown to Mr. Page, he came into

22    possession of the album Spirit, which he understands includes a

23    recording of 'Taurus' that he did not listen to."

24    A.   Well, I do know when the time of that was.  It wasn't a

25    time unknown.  I know when the time was.
```

359

1    Q.    Okay.  So did you then discover when you came into

2    possession of this album?

3    A.    Yes.

4    Q.    When was that?

5    A.    Okay.  It was after the internet comparisons came up,

6    which is a few years ago.  And I -- well, my son-in-law brought

7    it to my attention that there was a comparison of "Stairway to

8    Heaven" and a Spirit song, and I said that I'd like to hear it.

9    I don't do the internet or the computer, so he played it to me.

10          And initially, what happened was that there was some

11   music there which I've never heard before, like an orchestra,

12   and I said, "Well, what is this?"  And then it goes into the

13   sort of rundown on acoustic guitar.  And he said, "This is the

14   Spirit song."  So I knew that I had never heard it before.

15          But what I did do, within a week of that, I went to

16   the location where all my records are and I thought, you know,

17   "I'll have a look," because he -- well, basically, "I'm going

18   to have a look and see what Spirit records I've got."

19          And what happens is -- I know that in my mind that

20   there were two records that I had, which is the second album

21   and the third album, and then it turns out that I've got the

22   *Twelve Dreams of Dr. Sardonicus* and even a Spirit live album,

23   which is like a double album.  I mean, I have no recollection

24   of that whatsoever.  But there is this album, the first album.

25   I don't know how it got there or anything.

1  Q.   Okay.  So to be clear, you have the first album of Spirit,

2  correct?

3  A.   It's in the collection.

4  Q.   In your collection?

5  A.   Yeah.

6  Q.   Then you have the second album of Spirit --

7  A.   Yes.

8  Q.   -- correct?

9  A.   Yes.

10 Q.   You have the third album of Spirit?

11 A.   Yes.

12 Q.   You have *Twelve Dreams of Dr. Sardonicus*, another album of

13 Spirit?

14 A.   Yes.

15 Q.   So -- and then you have a double album of Spirit live.

16 A.   That's correct.

17 Q.   So in total, you have one, two, three, four, five, six

18 albums of Spirit in your collection?

19 A.   Is that because one is a double album?

20 Q.   That is why.

21 A.   Okay.  Well, I can tell you I've never even heard that

22 album.

23 Q.   You just had it in your collection?

24 A.   Yeah.  I've got -- I've actually -- just because of this

25 trial, I've checked to see how many records I've got, and

361

```
 1    there's a count as of yesterday and it's 4,329 albums and 5,882
 2    CDs.  That's a massive amount and, you know, I can assure you I
 3    haven't heard --
 4              THE COURT:  Let me hold you up just a second.
 5    That's quite -- we have to do it through questions and answers.
 6              THE WITNESS:  I'm sorry.
 7              Do you mind if I have some water?
 8              THE COURT:  No, we'll get you some.  Just a second.
 9              THE WITNESS:  Thank you.
10              MR. MALOFIY:  May I proceed or do you want to wait?
11              THE COURT:  Yes, certainly.
12    BY MR. MALOFIY:
13    Q.   So in your collection, you have five Spirit albums.  One
14    of them is a double live set of Spirit, correct?
15              And you have a number of music in your collection.
16              Do you recall -- do you remember every song you've
17    ever heard, sir?
18    A.   Do I remember every song I've ever heard?  I couldn't
19    possibly say that I could.
20    Q.   Is it possible you've heard the song "Taurus" and just
21    didn't take mental note of it?
22              MR. ANDERSON:  Calls for speculation.
23              THE COURT:  Sustained.
24              MR. ANDERSON:  Thank you.
25    ///
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

362

```
 1    BY MR. MALOFIY:
 2    Q.    How many times did you listen to the first album?
 3              MR. ANDERSON:  Objection.  Argumentative.
 4              THE COURT:  Overruled.  If you know.
 5              THE WITNESS:  Well, I don't think I have listened to
 6    the first album, even since the comparisons and all of that.  I
 7    didn't really want to get too close to it.
 8              THE COURT:  Okay.
 9    BY MR. MALOFIY:
10    Q.    Okay.  I understand.
11              How about the second album?  How many times did you
12    listen to the second album?
13    A.    Oh, quite a -- quite a few, I would think.
14    Q.    How many times?
15    A.    I don't know.  I can't tell.  This is so far -- a long,
16    long while ago.
17    Q.    More than 10?  Less than 10?
18    A.    I'd say more than 10 times.
19    Q.    More than 20?
20    A.    Yes.
21    Q.    More than 50?
22    A.    No, I don't think so.
23    Q.    Somewhere between --
24    A.    Maybe it's somewhere between 10 and 20.  I don't know.  It
25    was quite a popular album.  I enjoyed it.  I did listen to the
```

363

1　album.

2　Q.　What about *The Family That Plays Together*?  How many times

3　did you listen to that album?

4　　　　MR. ANDERSON:  Objection.  I think that's asked and

5　answered.  That is the second album.

6　　　　MR. MALOFIY:  I'm sorry.

7　BY MR. MALOFIY:

8　Q.　The sec- -- excuse me, the third album.

9　A.　*Clear* --

10　　　　MR. MALOFIY:  I'm getting some clarification now.

11　　　　THE WITNESS:  *Clear Spirit*, yeah.

12　　　　Probably not as many times as the -- that I -- that I

13　listened to the second album.

14　BY MR. MALOFIY:

15　Q.　Less than 20?

16　A.　It's hard to -- it's hard to quantify this.

17　Q.　Less than --

18　A.　Not so much.

19　Q.　Would it be less than 20?

20　A.　Yes, less than 20, I would say.

21　Q.　More than 10?

22　A.　I'm not sure.

23　Q.　What about the --

24　A.　Let's say eight times.  I really -- you know, I'm

25　speculating.  I'm so sorry.  I'm so sorry.  It's so difficult

364

```
 1    to remember that far back.  I used to listen to a lot of music.

 2              THE COURT:  That's okay.

 3              Next question.

 4    BY MR. MALOFIY:

 5    Q.   It's so hard to remember that far back -- do you

 6    remember -- or do you have any recollection of playing "Taurus"

 7    ever?

 8    A.   No.  Only more recently --

 9    Q.   So your --

10    A.   -- hearing it.

11    Q.   Is your memory clear and distinct as to whether or not you

12    heard "Taurus," but to other songs you're not sure?

13    A.   No, no.  I -- the fact is that when the internet

14    comparison was there, there was this orchestra, and -- and it

15    was just totally alien to me.

16              And when you said do I have a good recall on music,

17    yes, I think I do, and something like that would stick in my

18    mind, you know?  I'd remember that and the acoustic guitar

19    part.  But it was totally alien to me.  I didn't know it.

20              THE COURT:  Ladies and gentlemen, it is 2:30, so

21    we're going to break for our afternoon recess.  We'll see you

22    back in 15 minutes.

23              Remember the admonishment not to discuss the case

24    among yourselves or with anybody else or form or express any

25    opinions about the matter until it's submitted to you and you
```

365

```
 1    retire to the jury room.

 2              We'll see you back in 15 minutes.  We'll be in

 3    recess.

 4         (Jury out at 2:30 P.M.)

 5         (Recess taken 2:30 to 2:44 P.M.)

 6         (Jury in at 2:44 P.M.)

 7              THE COURT:  Okay.  The record will reflect that all

 8    the members of the jury are in their respective seats in the

 9    jury box, the witness is on the witness stand, and he is under

10    direct examination.

11              Counsel, you may continue.

12              MR. MALOFIY:  Thank you.

13    BY MR. MALOFIY:

14    Q.  You had testified a moment ago before break that once you

15    heard -- you said that once you heard "Taurus," you --

16    recently -- that's what you testified to -- that you would have

17    recognized it, it would have stuck in your mind, correct?

18              MR. ANDERSON:  Objection.  Misstates the testimony.

19              THE COURT:  Overruled.

20              Is that what you said?

21              THE WITNESS:  I said that when I heard the comparison

22    of -- that was on the internet between "Stairway to Heaven" and

23    "Taurus" a few years ago, that when it came to the "Taurus"

24    part, it started off with an orchestra, which is pretty -- you

25    know, it's a pretty memorable thing, is what it was, except it
```

366

```
 1    wasn't in my memory because I hadn't heard it before.
 2              And so I was a bit confused as I was hearing the
 3    comparison, because I thought what's that got to do with
 4    "Stairway to Heaven"?  And it followed in --
 5              THE COURT:  Let me interrupt you just for a second,
 6    because I don't think that's exactly what his question was.  I
 7    think --
 8              THE WITNESS:  Sorry.
 9              THE COURT:  -- the question was when you heard it --
10              THE WITNESS:  Yeah.
11              THE COURT:  -- and you're talking about that now.
12    When you heard it, was it the type of song that you said to
13    yourself, "I would have remembered this if I heard it earlier"?
14              THE WITNESS:  Yes.
15              THE COURT:  Okay.  Next question.
16    BY MR. MALOFIY:
17    Q.   Now, let's get -- you heard the album recording, correct?
18              MR. ANDERSON:  The question lacks foundation.
19              THE COURT:  I'm sorry.  State the question again.
20              You heard what?
21    BY MR. MALOFIY:
22    Q.   When you heard "Taurus" recently, you were listening to
23    the album recording, correct?
24    A.   That's what it said it was, yeah.
25    Q.   Right.  And what you have in your collection is actually
```

367

```
 1   the album recording that was released to the public, correct?
 2   A.    That's correct.
 3   Q.    And did you happen to listen to your album "Taurus" on
 4   your record player?
 5            MR. ANDERSON:  Objection.  Asked and answered.
 6            THE COURT:  Overruled.
 7            THE WITNESS:  No, I didn't.
 8            THE COURT:  Whose record player did you listen to
 9   "Taurus" on?
10            MR. ANDERSON:  Objection.
11            THE WITNESS:  I didn't --
12            THE COURT:  Yeah, well, why don't you clarify how you
13   heard it.
14            THE WITNESS:  Yeah.  I heard it on an internet
15   comparison between "Stairway to Heaven" and "Taurus."
16            THE COURT:  So you heard it on the computer.
17            THE WITNESS:  That's where I heard it, on -- yeah, on
18   the computer.
19   BY MR. MALOFIY:
20   Q.    And it's a comparison of the "Taurus" album recording and
21   the "Stairway to Heaven" --
22   A.    Yeah.
23   Q.    -- album recording --
24            MR. ANDERSON:  Objection.  Lacks foundation.
25   ///
```

368

```
 1    BY MR. MALOFIY:

 2    Q.    -- is that correct?

 3               THE COURT:  Overruled.

 4               THE WITNESS:  It was the album.

 5    BY MR. MALOFIY:

 6    Q.    All right.  Now, when you listened to the album, you said

 7    it didn't sound familiar to you and it was something you would

 8    have recognized.

 9               Are you referring to specifically the first 45

10    seconds of "Taurus" or did you actually listen to the song all

11    the way through?

12               MR. ANDERSON:  Objection, Your Honor.  Compound.

13    Lacks foundation.

14               THE COURT:  Overruled.

15               MR. ANDERSON:  Calls for speculation.

16               THE COURT:  Overruled.

17               THE WITNESS:  The -- what was on the comparison, I

18    believe, as far as I remember, was the orchestra preceding the

19    acoustic guitar.

20    BY MR. MALOFIY:

21    Q.    Now, once the acoustic guitar came in, isn't it true the

22    two songs are similar in that section?

23               MR. ANDERSON:  Objection.  Vague and ambiguous.

24               THE COURT:  Overruled.

25               THE WITNESS:  Oh, I don't think so.
```

369

```
 1   BY MR. MALOFIY:

 2   Q.    You don't think so?

 3         Do you --

 4   A.    Sorry.  Can you just -- can you just repeat that again

 5   exactly?  You said after the introduction --

 6   Q.    Yes.  After the introduction --

 7   A.    The orchestra.

 8   Q.    -- of the album recording of "Taurus" which you listened

 9   to at some point --

10   A.    Yeah.

11   Q.    -- and then you said it went into an acoustic guitar

12   part --

13   A.    Yeah.

14   Q.    -- when you heard those -- that acoustic guitar part and

15   when it went down the chord progression, did you recognize that

16   chord progression as being similar to the chord progression in

17   "Stairway to Heaven"?

18         MR. ANDERSON:  Objection, Your Honor.  It's within

19   the motion in limine.  He's talking about the sound recording.

20         THE COURT:  Sustained.

21         We're talking about just the -- what was -- what

22   was --

23         MR. ANDERSON:  The deposit copy that was --

24         THE COURT:  The deposit copy.  Thank you.  I couldn't

25   think of the name.  We were talking about just the deposit
```

370

```
 1    copy.
 2              The only question is whether or not it's similar to
 3    the deposit copy, not to what was on the record.
 4              MR. MALOFIY:  The -- Your Honor, if I may briefly?
 5              THE COURT:  Yes.
 6              MR. MALOFIY:  The reason it's at issue is because we
 7    have a dispute of access.  In other cases, there was no dispute
 8    of access.  Mr. Page did not hear the deposit copy ever, he
 9    heard the album recording.
10              And how can I ask this gentleman if he's ever heard
11    this album, the Spirit "Taurus" sound recording, if I don't get
12    a chance to play it for him?
13              THE COURT:  You got it.  You can't.
14              Next question.
15    BY MR. MALOFIY:
16    Q.   Sir, did you ever go to the Library of Congress?
17    A.   No.
18    Q.   Did you ever see the "Taurus" deposit copy lead sheet
19    marked as Exhibit --
20              MR. MALOFIY:  Mr. Anderson, was it 2065?
21              MR. ANDERSON:  I believe it's 2058 or 2085, but --
22              MR. MALOFIY:  2058.  Can we pull it up?
23              THE WITNESS:  When precisely --
24              THE COURT:  Just a second.  We have to -- you want to
25    pull it up first?
```

371

```
 1              MR. MALOFIY:  I would.  It was used in the prior
 2     deposition -- excuse me, prior witness, Mr. Andes.
 3              THE COURT:  Okay.  You're losing me with all the --
 4     is there a question pending in front of the witness at this
 5     time?
 6              MR. MALOFIY:  Yes.  I want to ask --
 7              THE COURT:  What -- what is that question?
 8              MR. MALOFIY:  -- him if he ever saw --
 9              I'm sorry, Your Honor.  I --
10              THE COURT:  Wait.  What is the question?
11              MR. MALOFIY:  If he ever saw the deposit copy or lead
12     sheet of "Taurus" which was deposited in the copyright office.
13              THE COURT:  Perfect.  Thank you.
14              THE WITNESS:  The Library of Congress?  No, I never
15     visited the Library of Congress.
16              THE COURT:  Okay.  Thank you.
17     BY MR. MALOFIY:
18     Q.  At any point, did you see --
19              MR. MALOFIY:  Can we publish this for Mr. Page?
20          (The exhibit was displayed on the screen.)
21     BY MR. MALOFIY:
22     Q.  You have what's marked as Exhibit 2058.  I'll represent to
23     you it's the "Taurus" deposit copy that was produced in this
24     case.
25              Have you ever -- saw this piece of music?
```

372

```
 1   A.   Well, I'm not -- I'm not absolutely sure.  I don't think I
 2   have, but it might have been flashed past me at some point in
 3   my preparation.  But I don't think I've seen this.
 4   Q.   And --
 5   A.   It doesn't -- no.
 6   Q.   And is it -- is it fair to assume that if you had heard
 7   "Taurus" at any point, it would have been from the album
 8   recording?
 9        MR. ANDERSON:  Objection.  Lacks foundation.  Calls
10   for speculation.
11        THE COURT:  Overruled.  You haven't heard "Taurus"
12   from any other thing other than the recording, have you?
13        THE WITNESS:  Sorry, sir?
14        THE COURT:  You haven't heard "Taurus" from any other
15   means other than the recording that you mentioned?
16        THE WITNESS:  That's correct.
17        THE COURT:  Okay.  Next question.
18   BY MR. MALOFIY:
19   Q.   Are you familiar with deposit copies that are deposited in
20   the copyright office, sir?
21        MR. ANDERSON:  Vague and ambiguous.
22        THE COURT:  Overruled.
23        THE WITNESS:  No, I'm not familiar with any sort of
24   things like that.
25   ///
```

373

BY MR. MALOFIY:

Q.   Did you ever have an opportunity to see the "Stairway to Heaven" deposit copy that was deposited in the copyright office?

A.   No.  I didn't have anything to do with doing that.

Q.   Did you ever transcribe the notes to give to someone to deposit into the deposit -- into the copyright office for "Stairway to Heaven"?

A.   Not that I remember.

Q.   At any point, did anyone ever play you the deposit copy of "Taurus"?

          MR. ANDERSON:  Objection.  Calls for speculation.

          THE COURT:  Overruled.  But he's already testified that he never heard "Taurus" at anything other than the -- what was on the record, so it's already been asked and answered.

BY MR. MALOFIY:

Q.   And even as you sit here today, you've never heard the "Taurus" deposit copy, correct?

          MR. ANDERSON:  Objection.  Asked and answered.

          THE COURT:  Overruled.

          THE WITNESS:  I -- I don't know whether I've -- I don't know at what point I would have heard it.

          THE COURT:  Okay.

BY MR. MALOFIY:

Q.   When you heard the album recording of "Taurus," where were

374

```
 1    you?

 2    A.    I was in my house in London.

 3    Q.    Who was there?

 4    A.    My son-in-law and myself.

 5    Q.    Did you hear it from the internet?

 6    A.    Yeah.

 7    Q.    And are these the internet comparisons of "Stairway to

 8    Heaven" and "Taurus" which are -- exist?

 9    A.    Sorry.   The what?

10    Q.    When you heard it, you were -- you were looking at

11    comparisons that people have done of the two works, the

12    "Taurus" album recording and the "Stairway to Heaven" album

13    recording --

14    A.    There was --

15    Q.    -- correct?

16    A.    There was something that appeared on the internet a couple

17    of years ago or so, and it had -- and it had like the

18    Led Zeppelin "Stairway to Heaven" and the -- and the "Taurus."

19    And it -- there was some sort of buzz going on, that there was

20    a comparison going on --

21    Q.    When you say "buzz" --

22    A.    -- and he -- and so my son-in-law brought it to my

23    attention.

24          You see, the thing is I don't do -- I don't do the

25    internet, so I'm not like anybody else in here, because, you
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

375

```
1    know, most people go on the internet and they see what's
2    trending and all this sort of stuff.  I don't do that, so he
3    brought it to my attention.
4    Q.   When he brought --
5              THE COURT:  Next question.
6    BY MR. MALOFIY:
7    Q.   When he brought it to your attention, did he say, "Hey,
8    these two songs sound the same"?
9    A.   No, he didn't say that at all.
10   Q.   What, if anything, did you do after that?
11   A.   I didn't do anything immediately after it.  I don't think
12   I -- I think I might have asked him to play it again, the
13   comparisons, you know, and that was it.  Didn't discuss it,
14   really, with him even --
15   Q.   And it's your --
16   A.   -- not to any real degree.
17   Q.   And when you heard it, did you say, "Hey, these sound
18   similar"?
19             MR. ANDERSON:  Objection again.  Relevance.  It's --
20             THE COURT:  Sustained.  Sustained.
21   BY MR. MALOFIY:
22   Q.   Let me move --
23             THE COURT:  It's the jury that has to determine
24   whether it's similar or not, not the witness.
25   ///
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

376

```
 1    BY MR. MALOFIY:
 2    Q.   Sir, let's be clear.  "Taurus" and "Stairway to Heaven"
 3    are in the same key, correct?
 4    A.   That's correct.
 5    Q.   And it's A minor, correct?
 6    A.   That's correct.
 7    Q.   You'd agree that the tempo of "Taurus" and "Stairway to
 8    Heaven" are very similar, correct?
 9            MR. ANDERSON:  Objection.  Tempo doesn't appear in
10    the deposit copy.
11            THE WITNESS:  Yeah, it didn't --
12            MR. ANDERSON:  He's now going back to the sound
13    recording.
14            THE COURT:  Sustained.
15    BY MR. MALOFIY:
16    Q.   Sir, you never heard the "Taurus" deposit copy, correct?
17            MR. ANDERSON:  Objection.  Asked and answered.
18            THE COURT:  Sustained.  He said he has not.
19    BY MR. MALOFIY:
20    Q.   Sir, in the instrumentation of those two pieces of work
21    that you heard on the internet, was the -- were they -- did
22    they both incorporate an acoustic guitar?
23            MR. ANDERSON:  Objection.  There's no instrumentation
24    in the deposit copy.  It's irrelevant and it's barred by the
25    ruling on the motion in limine.
```

377

1          THE COURT:  Sustained.

2   BY MR. MALOFIY:

3   Q.   Sir, the arrangement -- wouldn't you agree that the

4   arrangement is similar of "Taurus" and "Stairway to Heaven"?

5          MR. ANDERSON:  Objection.  Vague and ambiguous as

6   to --

7          THE COURT:  Overruled.

8          THE WITNESS:  What do you mean by "the arrangement"?

9   BY MR. MALOFIY:

10  Q.   Remember in your deposition we discussed the structure of

11  the two songs, "Stairway to Heaven" and "Taurus"?

12         MR. ANDERSON:  Objection again.  He asked him about

13  the sound recording.

14         THE WITNESS:  It depends on what you mean about

15  remember.  There's a lot that was discussed about it.

16         THE COURT:  Let me back off a little bit.

17         Again, ladies and gentlemen, what we're concerned

18  about is if there is a copying of the deposit copy, not the

19  musical arrangement that was played or performed.  It was the

20  deposit copy.  And so the only thing we're concerned with here

21  is the similarity between "Stairway to Heaven" and the deposit

22  copy, and so that's why we're limiting it just to the

23  comparison of those two.

24         Next question.

25  ///

378

```
 1    BY MR. MALOFIY:

 2    Q.   Sir, you've never done an analysis of whether or not the

 3    "Taurus" deposit copy and the song "Stairway to Heaven" are the

 4    similar -- are similar, have you?

 5              MR. ANDERSON:  Objection.  It's irrelevant and it's

 6    argumentative.

 7              THE COURT:  Overruled.  You never heard it?

 8              THE WITNESS:  No.  I heard it today, though.

 9              THE COURT:  Okay.

10              THE WITNESS:  Yeah.

11              THE COURT:  Next question.

12    BY MR. MALOFIY:

13    Q.   All right.  So when you heard it today, would you agree

14    that the tempos are similar?

15              MR. ANDERSON:  Objection.  It's for the jury.

16    Relevance.

17              THE WITNESS:  Well, when I heard the deposit copy --

18              THE COURT:  Excuse me.  Excuse me.

19              THE WITNESS:  Sorry.

20              THE COURT:  Has he been designated as an expert in

21    this area?

22              MR. ANDERSON:  No, Your Honor.

23              THE COURT:  Sustained.

24              MR. MALOFIY:  Not designated as an expert, but the

25    alleged composer of "Stairway to Heaven," and so I would like
```

379

```
 1    to inquire as to those issues, respectfully, Your Honor.

 2              THE COURT:  Sustained.

 3    BY MR. MALOFIY:

 4    Q.   Do you remember when we discussed the structure of

 5    "Stairway to Heaven"?

 6    A.   I remember that we did discuss that.  I don't know what

 7    specifically you're referring to, though, because we -- we had

 8    a conversation that went over hours.  So what precisely is it

 9    that you want to ask me about that?

10    Q.   During that conversation that went on for hours where we

11    shared tea --

12    A.   Mm-hmm.

13    Q.   -- do you recall that we discussed the Part A of "Stairway

14    to Heaven" and that Part A repeats itself twice, does it not?

15    A.   Yes, it does, that's correct.

16    Q.   And then it goes to a Part B, correct?

17    A.   Right, yeah.

18    Q.   And then it goes to Part A and Part A repeats itself,

19    correct?

20    A.   Yes.

21    Q.   And then it goes to Part B, correct?

22    A.   Yes.

23    Q.   And then it goes to Part A two more times, correct?

24    A.   I think that's correct.

25    Q.   So just a recap here, it's A-A-B-A-A-B-A-A, correct?
```

380

```
 1   A.   I think so.

 2   Q.   And that's the same structure as the "Taurus" deposit

 3   copy, correct?

 4        MR. ANDERSON:  Objection.  Again, he's not a

 5   designated expert.

 6        THE COURT:  Well, not only that, he -- sustained.  He

 7   can't testify as to the deposit copy.  He can testify to what

 8   his is and what he did.

 9        THE WITNESS:  Sorry.  Am I --

10        THE COURT:  That's okay.  You don't answer.  When I

11   sustain it, you don't answer it.

12   BY MR. MALOFIY:

13   Q.   When you heard this --

14        THE COURT:  To help you out, if I -- if I overrule an

15   objection, then you answer it; if I sustain an objection, you

16   don't answer.  Okay?

17        THE WITNESS:  Yes.

18        THE COURT:  Okay.  Go ahead, counsel.

19        MR. MALOFIY:  Yes.

20   BY MR. MALOFIY:

21   Q.   When you heard the comparison that you had said was

22   creating a lot of buzz on the internet of "Stairway to Heaven"

23   and "Taurus," did you recognize that there was any

24   similarities?

25        MR. ANDERSON:  Objection.  Again -- same objections,
```

381

```
 1    Your Honor --
 2              THE COURT:  Sustained.
 3              MR. ANDERSON:  -- relevance and --
 4              THE COURT:  Sustained.
 5    BY MR. MALOFIY:
 6    Q.   Do you remember, prior to your deposition, you said that
 7    you didn't have a recollection of liking the band Spirit?
 8    A.   Sorry?
 9    Q.   Remember when we had the deposition in London?  Do you
10    recall that?
11    A.   Yeah, I do.
12    Q.   Yeah.  And do you recall that it was under intense
13    questioning that you had to then say that you did, in fact,
14    like the band Spirit?
15              MR. ANDERSON:  Objection.  Vague.  Ambiguous.
16              THE COURT:  It was argumentative.
17              MR. ANDERSON:  Argumentative.
18    BY MR. MALOFIY:
19    Q.   Do you remember initially in this case, you didn't
20    indicate that you liked the band Spirit?
21    A.   I don't know that that's --
22              MR. ANDERSON:  Objection.  Argumentative.
23              THE COURT:  Overruled.
24              Did you ever say you didn't like the band Spirit?
25              THE WITNESS:  I -- I didn't ever say I didn't like
```

382

```
1    the band Spirit.
2              THE COURT:  Okay.
3    BY MR. MALOFIY:
4    Q.   Didn't you forget that you liked the band Spirit until I
5    questioned you in your deposition and played you an audio clip
6    of your own voice from 1972 where you said, "I like the band
7    Spirit"?
8              MR. ANDERSON:  Objection.
9              THE COURT:  Sustained.
10   BY MR. MALOFIY:
11   Q.   Sir, do you recall in your deposition you admitted that
12   you liked the band Spirit after hearing an interview where you
13   Had said that?
14             MR. ANDERSON:  Objection.  Argumentative.
15             THE COURT:  Yeah, let's cut through it.  Overruled.
16             Let's see if you can answer the question.  Go ahead.
17             THE WITNESS:  I think really, basically, I've said
18   that I've liked Spirit over the years.  I mean, I don't think
19   that that is really in question, is it?  Or is it in doubt?
20   BY MR. MALOFIY:
21   Q.   All right.
22   A.   I mean, I've said it -- I've -- you know, I've liked
23   Spirit.  I've liked a lot of bands, to be honest with you.
24             THE COURT:  Did you ever say you didn't like -- did
25   not like Spirit?
```

383

1           THE WITNESS:  I didn't say -- I've never said I

2    didn't like Spirit, no.

3    BY MR. MALOFIY:

4    Q.   Isn't it true that you forgot until I played you your

5    quote from an interview where you said, "I like Spirit," that

6    you forgot that you liked Spirit except until that time?

7           MR. ANDERSON:  Objection.  Argumentative.  Relevance.

8           THE COURT:  Overruled.

9           THE WITNESS:  I'm not sure that that is exactly how

10   it was, Mr. Malofiy.

11   BY MR. MALOFIY:

12   Q.   Well, thank you.

13   A.   The question -- no.  It was a question that I was asked

14   about an interview, and I couldn't -- and, "Did you say this,

15   did you say that," and I said, "I don't remember the

16   circumstances of giving an interview, whenever it was, way back

17   in the day," and I stand by that.  I don't remember the

18   circumstances of interviews from 40 years ago or whatever.

19   Q.   Well, let me play that deposition clip for you, Mr. Page.

20   It is 439 -- page 439, lines 3 to 6.

21          MR. ANDERSON:  If I could just have a moment,

22   Your Honor.

23          THE COURT:  Sure.

24          MR. ANDERSON:  No objections, Your Honor.  Excuse me,

25   Your Honor.

384

```
1              THE COURT:  Go ahead.

2          (Playing of videotape.)

3              MR. MALOFIY:  Sorry.  Maybe we can start from the

4     beginning, please.  It was a tech issue.

5              We have to cue it up again.  I apologize.

6              THE COURT:  Okay.

7          (Playing of videotape.)

8              MR. ANDERSON:  Your Honor, if I may, that's not the

9     testimony he cited.  So if I can just have a moment to read it.

10             THE COURT:  No.  And he's played the testimony, and

11    let's move on to the next question.

12    BY MR. MALOFIY:

13    Q.   Now, do you remember when I played you the interview, you

14    remembered that you liked the band Spirit?

15    A.    Well, Mr. Malofiy, the time readout on that last clip

16    looks like it's 6:54 at night, and we began that deposition

17    very, very early on in the day.

18             THE COURT:  Let's not talk about when the

19    deposition --

20             THE WITNESS:  Sorry.  Okay.

21             THE COURT:  -- was taken or not.

22             THE WITNESS:  Sorry.  Do I remember --

23             THE COURT:  Excuse me.  One of the things is you said

24    something about not remembering ever saying you did or didn't

25    like them, and that's in.
```

385

```
 1              I don't know what the next question is, but I'm not
 2    too sure if it conflicts with what he's already stated.  What's
 3    the next question?
 4              There's a difference between saying, "I don't
 5    remember if I said I liked them or liked them" and saying, "I
 6    didn't like them."  There's a difference there.
 7              Next question.
 8    BY MR. MALOFIY:
 9    Q.   That was your testimony under oath, correct, even though
10    it was late?
11              THE COURT:  Counsel, you read the deposition in.
12    It's read to the jury.
13              MR. MALOFIY:  Thank you.
14              One second.
15    BY MR. MALOFIY:
16    Q.   Did you ever say Spirit is a band that struck you on an
17    emotional level?
18    A.   I don't know that I said that.
19    Q.   Did you ever say Spirit is a band you really liked in
20    interviews in the early '70s?
21    A.   Yeah, I could have said it was a band I liked, yeah.
22    Q.   Are -- isn't it true that you, in fact, did say, "Spirit
23    is a band I really liked" in an interview?
24              THE COURT:  If you remember.
25              THE WITNESS:  It's quite possible, yeah.  I don't
```

386

1    know which interview.

2    BY MR. MALOFIY:

3    Q.   Well --

4          THE COURT:  You're saying it's quite possible you

5    would have --

6          THE WITNESS:  Yes.

7          THE COURT:  -- said that?

8          THE WITNESS:  Yes.

9          THE COURT:  Okay.

10   BY MR. MALOFIY:

11   Q.   The interview is the *ZigZag* interview in 1972.  It's

12   160-A.

13         MR. MALOFIY:  Can we play that clip?

14         THE COURT:  No, counsel.  That's not -- that's not

15   impeachment from what he said.

16         MR. MALOFIY:  Well --

17         THE COURT:  Counsel, it's not impeachment.  It has to

18   be a clear impeaching statement where he's saying something

19   contrary to what he's saying now.  He's saying he could have,

20   he couldn't have.  It's not impeachment.

21         Next question.

22         MR. MALOFIY:  It only -- he is a party, Your Honor,

23   and it's for that reason, as well.  But I --

24         THE COURT:  Next question, counsel.

25   ///

387

```
 1   BY MR. MALOFIY:
 2   Q.   So isn't it true that you did, in fact, say that you liked
 3   the band Spirit in 1972?
 4            MR. ANDERSON:  Objection.  Asked and answered.
 5            THE COURT:  It is asked and answered.  He says he
 6   very likely did.
 7            In fact, I think you said you did say you liked them.
 8            THE WITNESS:  I did say I liked them.
 9   BY MR. MALOFIY:
10   Q.   Now, isn't it true that you also said in the late '7- --
11   in the early '70s that you saw Spirit play live?
12   A.   I'm not so sure that I said that.
13   Q.   Okay.
14        (Counsel confer off the record.)
15   BY MR. MALOFIY:
16   Q.   Do you recall saying to a reporter, when asked the
17   question, "Can I ask you about certain bands?  Like you
18   mentioned Buffalo Springfield in connection with all the
19   offshoots of these things.  Don't you like their stuff," you
20   went on to answer:
21            "They were like that, very cut and dried and very
22            samey every night.  They were obviously very good,
23            even though they didn't strike me on an emotional
24            level like Spirit did, for instance.  I saw Spirit a
25            couple times and thought they were very good."
```

388

```
 1              Do you remember those words?
 2    A.   I certainly don't remember those words, actually.
 3    Q.   Is it possible you also don't remember listening to
 4    "Taurus" back in the early '70s?
 5              MR. ANDERSON:  Objection.
 6              THE COURT:  Overruled.
 7              THE WITNESS:  Actually, where you are putting
 8    something which is -- I'm supposed to be quoted on in a day
 9    when people were just taking notes --
10              THE COURT:  Let me help you here, because sometimes
11    rules of court are a little different and so you have to
12    explain them.
13              If he asked a question, he's not insinuating, and the
14    jury is not to take it as being true unless you say that it's
15    true.
16              THE WITNESS:  Yeah.
17              THE COURT:  So they're not to take it as being true
18    that you said that unless somebody comes in and testifies to
19    that.  So --
20              THE WITNESS:  Oh, okay.  Yeah.
21              THE COURT:  So let's --
22              THE WITNESS:  Because I can't really tell, you see,
23    it's so --
24              THE COURT:  I understand.
25              THE WITNESS:  -- long ago.
```

389

```
 1              THE COURT:  I understand.

 2              THE WITNESS:  But it could be distorted, too.

 3              THE COURT:  And let's go ahead and proceed with the

 4    next question --

 5              THE WITNESS:  But --

 6              THE COURT:  -- and let's -- it's okay.

 7              Next question.

 8              And if your counsel wants you to expound on it, he'll

 9    ask you further questions.

10              Go ahead, counsel.

11              MR. MALOFIY:  I'd like to move in Exhibit 157 into

12    evidence, which is the ZigZag article which was produced by

13    defendants in this case, which has this quote from Mr. Page.

14              It's Exhibit -- Defendants' Exhibit 157.

15              MS. FREEMAN:  Your Honor, we were asked to produce --

16    this particular quote was in the complaint.

17              THE COURT:  Counsel, is there any objection to these?

18              MS. FREEMAN:  Yes, Your Honor.  We object.  It's

19    hearsay.  It's hearsay.  The witness has said he doesn't know.

20              THE COURT:  Overruled.

21              MR. MALOFIY:  One second, with the Court's

22    indulgence.  We're trying to pull up an audio.

23              THE COURT:  I'm sorry, counsel.  I thought you were

24    talking about a newspaper article.

25              MR. MALOFIY:  It is, but we believe there is also
```

390

```
 1    associated audio with the newspaper article.

 2              THE COURT:  I don't -- counsel, what are you -- what

 3    are you talking about?  Is this an article that was in the

 4    paper?

 5              MR. MALOFIY:  This is an article, yes, that was

 6    produced by defendants --

 7              THE COURT:  And it was --

 8              MR. MALOFIY:  -- in the case.

 9              THE COURT:  And it was an audio?

10              MR. MALOFIY:  We also have an audio file.

11              THE COURT:  Of what?

12              MR. MALOFIY:  Of Mr. Page -- of this interview or

13    part of it.

14              THE COURT:  That's not what I asked you.  As far as

15    the newspaper article, if there's some newspaper article, you

16    can introduce that.  As far as some audio, there's been no

17    foundation laid for that.

18              MR. MALOFIY:  It's -- I can lay foundation by asking

19    him if this is his voice.

20              THE COURT:  Don't ask me how to put your case on.  If

21    you want to ask him a question, ask him a question and I'll

22    deal with it.

23              MR. MALOFIY:  Play the audio.  160-A.

24              MR. ANDERSON:  I -- excuse me, Your Honor.  I'm not

25    sure what they're about to play, but I believe it's within one
```

1    of the motions in limine and it's only for impeachment.  I

2    don't think he's using it for impeachment.  I mean, he said he

3    doesn't recall and --

4              THE COURT:  Overruled.  Overruled.

5              MR. ANDERSON:  Thank you, Your Honor.

6              MR. MALOFIY:  Can we turn up the volume there?  Thank

7    you.

8         *(Playing of audio recording.)*

9         *(Trial Exhibit 160-A admitted into evidence.)*

10             MR. ANDERSON:  Your Honor, if he could play the whole

11   quote and not just that.

12             MR. MALOFIY:  Well, sure.  Let's start it from the

13   top, and it's a --

14             THE COURT:  Counsel, no, wait.  Just a second.

15             First of all, was that your voice?

16             THE WITNESS:  Yes, I think so.  It's very muffley and

17   hard to understand.

18             THE COURT:  I understand, but do you think that was

19   your voice?

20             THE WITNESS:  I think so.

21             THE COURT:  Okay.  Go ahead, counsel, play it.

22             MR. MALOFIY:  Play it again.

23        *(Playing of audio recording.)*

24             MR. MALOFIY:  Pause that for a second.

25             Your Honor, I was focused on this -- the first

392

```
 1   sentence --
 2            THE COURT:  Okay.
 3            MR. MALOFIY:  -- where it says, "Spirit is a band I
 4   really liked."
 5   BY MR. MALOFIY:
 6   Q.   Did you hear yourself say that?
 7   A.   Yes.
 8   Q.   And that's your voice, right?
 9   A.   Yeah.
10   Q.   Okay.  Do you recall -- earlier on -- I asked you a
11   moment -- two questions ago, perhaps, or maybe even a little
12   bit more, I asked you about you seeing Spirit live and you
13   said, no, you don't recall that, correct?
14   A.   That's correct.
15   Q.   All right.  Do you recall saying in response to, "What do
16   you think of the American pop scene," your answer was, "Blood,
17   Sweat and Tears aren't my cup of tea.  Spirit do some really
18   nice things on albums.  They give a really nice atmosphere when
19   they play and I always enjoy seeing them."
20   A.   I'm not really sure what that is.
21   Q.   Are you familiar with *New Musical Express*?  It's very
22   popular in the UK?
23   A.   Yes, I am.
24   Q.   And what is *New Musical Express*?
25   A.   It was a musical journal that was -- yeah, it was only in
```

393

```
 1    the UK.  It didn't -- wasn't over here.
 2            MR. MALOFIY:  This is Exhibit 98.  Can we pull that
 3    up?
 4            THE COURT:  Well, you've already read it, counsel.
 5            MR. MALOFIY:  I want to show it to him.  He said he's
 6    not sure.  I thought I'd show him the article to refresh his
 7    recollection.
 8            THE COURT:  Show it to him and see if it refreshes
 9    his memory, but it's not going to be presented in front of the
10    jury yet.
11            THE WITNESS:  Thank you very much.
12            THE COURT:  And after reading it, the only question
13    is does that refresh your memory as to whether or not you said
14    that?
15            THE WITNESS:  Well, I can't be sure whether I really
16    said it or not.  It's --
17            THE COURT:  So it doesn't refresh your memory one way
18    or the other?
19            THE WITNESS:  No, it doesn't.
20            THE COURT:  Okay.  Okay.  Why don't you pass it back
21    to counsel, then.  Okay.
22    BY MR. MALOFIY:
23    Q.   That doesn't refresh your recollection, correct?
24    A.   No, it doesn't.
25    Q.   And you are familiar with *New Musical Express*, correct?
```

394

```
 1            MR. ANDERSON:  Objection.

 2            THE WITNESS:  I am --

 3            MR. ANDERSON:  Asked and answered.

 4            THE WITNESS:  -- yeah.

 5  BY MR. MALOFIY:

 6  Q.   And do you have any reason to dispute this quote?

 7  A.   Well, the thing is the time when that is, it's -- it's

 8  in -- when is that coming out?  March or May is it -- I

 9  couldn't quite read it -- 1970?

10  Q.   I'll represent it's April 25, 1970 --

11  A.   Yeah.

12  Q.   -- before --

13  A.   Well, in those days -- in those days, they were still sort

14  of jotting down things on notepads when you were -- when you

15  were doing interviews.  So it wasn't like it is today.  You

16  know, that's how journalists were doing things.

17            So I -- I can't -- you know, I don't -- I don't

18  really remember the actual interview and I don't -- you know, I

19  can't say that I said that.

20            THE COURT:  So you're saying you may have or you may

21  not have?

22            THE WITNESS:  Yeah.

23            THE COURT:  Okay.

24            THE WITNESS:  Basically, yeah.

25  ///
```

395

```
 1   BY MR. MALOFIY:

 2   Q.   To be clear, you don't remember the interview?  You don't

 3   remember giving the interview, correct?

 4   A.   Absolutely.

 5   Q.   You don't remember seeing Spirit live?

 6   A.   I didn't see Spirit live.

 7   Q.   So this quote, you dispute the accuracy of this quote?

 8        THE COURT:  Counsel, he didn't.  He says he may have

 9   said it, he may not have said it.  He just doesn't know.

10   BY MR. MALOFIY:

11   Q.   Well, this quote says you enjoyed seeing Spirit live,

12   correct?

13   A.   That's what it -- that's --

14        MR. ANDERSON:  Objection.  Argumentative.

15        THE COURT:  No.  Overruled.

16   BY MR. MALOFIY:

17   Q.   It says you enjoyed seeing Spirit live; isn't that

18   correct?

19   A.   Apparently, that's what it says, yes.

20   Q.   And you're telling me that you don't remember the

21   interview that you gave when you gave this quote?

22        THE COURT:  Asked and answered.

23        How many times can we, you know, beat a dead horse?

24   It's been asked and answered.

25        Go ahead.
```

396

```
 1    BY MR. MALOFIY:
 2    Q.    It also says here you enjoyed Spirit albums.  It has
 3    "bums" -- "albums," plural.
 4            Did you see that when you read it?
 5    A.    I heard you say that, and I -- and I saw that part, as
 6    well.
 7    Q.    And you saw that it was in plural, correct?
 8    A.    I did see that.
 9    Q.    And prior to 1970, is it accurate that you had more than
10    one Spirit album?
11    A.    Well, I think we already established that I had two albums
12    by then --
13    Q.    And would that have been --
14    A.    -- which was The Family That Plays Together and Clear
15    Spirit.
16    Q.    And it wouldn't have been the first album that came out
17    prior to 1970 and prior to "Stairway to Heaven"?
18            MR. ANDERSON:  Objection.  Argumentative, lack of
19    foundation, vague and ambiguous.
20            THE COURT:  Well, what do you mean by that?  Was it
21    the very -- are you asking him did he also have the very first
22    album?
23            MR. MALOFIY:  Right.
24            MR. ANDERSON:  That's been asked and answered.
25            THE COURT:  Okay.  And he -- that's been asked and
```

397

1    answered.  He said he did not have it at that time.

2    BY MR. MALOFIY:

3    Q.   Does it refresh your recollection, now seeing this

4    interview, whether or not you had the first album, since it

5    states here that you had albums?

6              THE COURT:  That's argumentative, counsel.

7              MR. MALOFIY:  I'll move forward.

8              Your Honor, D-98, which is defendants' exhibits, is

9    the *New Musical Express* which we just impeached Mr. Page with.

10   We'd like to move that into evidence.

11             MR. ANDERSON:  Your Honor --

12             THE COURT:  It's wishful thinking, counsel, when you

13   said you think you impeached him, but if you wish to introduce

14   that, yes, it can be received into evidence.

15             The Court has already indicated that he indicated he

16   may or may not have said that, so it doesn't come in as far as

17   his being, "Well, he's been impeached."  But they can consider

18   that as far as reaching their verdict.

19             MR. MALOFIY:  Thank you, Your Honor.

20        *(Trial Exhibit 98 admitted into evidence.)*

21             THE CLERK:  I'm sorry.  Could I have that number?

22             MR. MALOFIY:  I'm sorry.  It's 98-00001 is the

23   official Bates number.

24             THE COURT:  Okay.

25             MR. MALOFIY:  And to clarify a point a moment ago,

```
 1    the prior official Bates number of the article from ZigZag was

 2    160-00009.

 3              THE COURT:  Thank you.

 4              MR. MALOFIY:  With the Court's indulgence, give me

 5    one moment, Your Honor.

 6              THE COURT:  Sure.

 7              MR. MALOFIY:  Thank you.

 8    BY MR. MALOFIY:

 9    Q.    I want to go back to "Fresh Garbage," a song by Spirit

10    written by Jay Ferguson.

11              Did you know that Jay Ferguson had written that song?

12    A.    No, I didn't, really.

13    Q.    Did you ever tell him you liked that song?

14    A.    Yeah, I really liked the song.

15    Q.    Did you ever tell Mr. Ferguson you liked that song?

16    A.    I never met him.

17    Q.    Okay.  You did see him testify here today -- oh, I believe

18    it was yesterday now -- oh, it was both days, actually, yeah.

19              You did see Mr. Ferguson testify here in court,

20    correct?

21    A.    Well, I did, yeah.

22    Q.    That was the first time -- when was the last time you saw

23    Mr. Ferguson?

24              THE COURT:  Last time other than today?

25              MR. MALOFIY:  Yes.
```

399

```
1              THE WITNESS:  Yesterday.

2              MR. ANDERSON:  Objection.  Argumentative.  Lacks

3     foundation.

4              THE COURT:  Did you see him before yesterday when he

5     came in to testify?

6              THE WITNESS:  I have no recollection.

7              THE COURT:  You don't remember ever seeing him?

8              THE WITNESS:  Well, I have no recollection of --

9              THE COURT:  Okay.

10             THE WITNESS:  No, I don't think I have ever seen him.

11             THE COURT:  Okay.

12    BY MR. MALOFIY:

13    Q.   Let me play Exhibit 6-A, which we already played earlier

14    on in this case.

15         (Counsel confer off the record.)

16             MR. ANDERSON:  No objection, Your Honor.  Thank you.

17             THE COURT:  Okay.

18             MR. MALOFIY:  One second, Your Honor.

19             Exhibit 6-A is the live performance of Led Zeppelin

20    playing "Fresh Garbage" January 10, 1969.

21             Can we play that audio for Mr. Page?

22             THE COURT:  There is no objection.

23         (Playing of videotape.)

24    BY MR. MALOFIY:

25    Q.   Now, did you hear that?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00535**

400

```
 1    A.    I did.

 2    Q.    Do you recognize you playing guitar on that track?

 3    A.    Yes.  It's in 19- -- you said January the 10th, 1969?

 4    Q.    Yes, that's --

 5    A.    Yeah.

 6    Q.    Excuse me.  1969.

 7    A.    Yeah, at the Fillmore.

 8    Q.    Yes.

 9    A.    Well, that would be then, yeah.  I haven't really heard it

10    since then, so it's a bit testy.

11    Q.    No, that's -- but you do recognize yourself playing  the

12    "Fresh Garbage" composition, correct?

13    A.    I recognize -- I recognize that that's Led Zeppelin doing

14    the riff from "Fresh Garbage."

15    Q.    Now, earlier on your counsel said it was a very short

16    little piece of music taken.  That went on, I'll represent, for

17    2 minutes and 51 seconds.

18              MR. ANDERSON:  Objection.  It's argumentative.

19              THE COURT:  Sustained.

20    BY MR. MALOFIY:

21    Q.    How long did that go on for, do you know?

22    A.    I didn't really -- I didn't have a stopwatch.  I didn't

23    check it, no.  It was -- but, if you don't mind me saying, it

24    was part of another number called "As Long As I Have You" and

25    it was part of a segue in the middle, like a medley.
```

401

```
 1    Q.   It was a --
 2    A.   Yeah.  So you can tell we're just jamming on that riff.
 3    That's all we're doing.
 4    Q.   Right.  So this is a riff that you were playing and you'd
 5    agree that it wasn't just a small little piece, it was a few
 6    minutes long, correct?
 7            MR. ANDERSON:  Objection again.  Argumentative.
 8            THE COURT:  Well, sustained.  The jury makes that
 9    determination.
10            THE WITNESS:  Yeah.  Yeah.
11    BY MR. MALOFIY:
12    Q.   How many times did you repeat that riff over and over
13    again?
14    A.   Do you know if you had asked me to start counting when you
15    played it, I might have tried to hazard a guess, but as it is,
16    I don't know.
17            THE COURT:  But many times, right?
18            THE WITNESS:  Well, that night, that riff, or --
19    yeah, we've already -- yeah, yeah.  It's repetitive, so I don't
20    know.  I didn't count.  But the "Fresh Garbage" was played a
21    number of times.
22            THE COURT:  No question pending right now.
23            Next question.
24    BY MR. MALOFIY:
25    Q.   When you say it was played a number of times, did you --
```

402

```
1   it wasn't just the bass riff that was being -- playing that
2   piece of music; isn't that correct?
3              MR. ANDERSON:  Objection.  Vague and ambiguous.
4              MR. MALOFIY:  Let me clarify my question.
5   BY MR. MALOFIY:
6   Q.   It's not just a bass riff.  In fact, Mr. John Paul Jones
7   is playing it on bass and you're copying the same riff on
8   guitar, correct?
9   A.   I wouldn't call it copying, I call it playing in unison,
10  playing together.
11  Q.   Okay.  So you're playing this piece of music, this part of
12  this composition "Fresh Garbage," in this song that we just
13  heard, correct?
14  A.   Well, we're playing a riff from "Fresh Garbage."
15  Q.   And it's not just -- on that performance that we just
16  heard, it's not just the bass riff, correct?
17             MR. ANDERSON:  Objection.  Vague and ambiguous.
18  BY MR. MALOFIY:
19  Q.   There's more than --
20             THE COURT:  Go ahead.  Ask -- reask the question
21  then.
22  BY MR. MALOFIY:
23  Q.   It's not solely a bass riff that is being played, it's
24  also the guitar playing it, correct?
25  A.   On what we just heard.
```

403

```
 1              MR. ANDERSON:  I think counsel -- it's vague and
 2    ambiguous.  I can explain why, if Your Honor --
 3              THE COURT:  No.  I'm going to allow the question in.
 4              MR. MALOFIY:  Now, can we play Spirit's "Fresh
 5    Garbage," and I'll represent it's 206-A.
 6              Your Honor, may I play the 206-A?
 7              Thank you.
 8              MR. ANDERSON:  No objection, Your Honor, assuming --
 9    we can't look it up at this point, but assuming it's what
10    counsel represents, we have no objection.
11         (Playing of videotape.)
12              MR. MALOFIY:  That's a mistake.  We had it
13    mislabeled, an exhibit.
14              I thought it -- that was -- actually, it sounds
15    like -- obviously, Mr. Plant's voice is distinct.  I believe we
16    mislabeled an exhibit.
17              Give me one moment to address it with my trial tech.
18              My apologies and the Court's indulgence.  Thank you.
19              My apologies, Your Honor, and -- my apologies to the
20    Court and defense counsel.  I was one exhibit off.  It's 205-A,
21    which is Spirit performing live "Fresh Garbage."
22              THE COURT:  Okay.
23              MR. ANDERSON:  No objection, Your Honor --
24              THE COURT:  You may play it, counsel.
25              MR. ANDERSON:  -- again assuming it's what counsel
```

404

1    represents.

2             THE COURT:  Okay.

3             MR. MALOFIY:  I believe I got it right this time.

4             THE COURT:  Okay.

5         *(Playing of videotape.)*

6    BY MR. MALOFIY:

7    Q.    I think that captures it.  This song goes on for quite a

8    long time and there is a breakdown part and everything else.

9             You recognize that piece of music being played,

10   correct?

11            MR. ANDERSON:  Objection.  It's vague and ambiguous.

12            THE COURT:  As to?

13            MR. ANDERSON:  Well, he's played a live version, as

14   opposed to the sound recording that was played, apparently, on

15   the radio, and I'm just unclear what he's talking about.  If --

16            THE COURT:  Overruled.

17            MR. ANDERSON:  Okay.  Thank you, Your Honor.

18            THE WITNESS:  Yeah, it's not -- it's not the version

19   that I'm familiar with that I'd heard before.  I've never heard

20   that version before, but it is "Fresh Garbage," yeah.

21   BY MR. MALOFIY:

22   Q.    You could recognize it was "Fresh Garbage," correct?

23   A.    Yeah.

24   Q.    And that's the piece of music you were copying when you

25   were performing live, correct?

1    A.    From that -- from that song, we were playing the riff over

2    and over again, yes.

3    Q.    Now, to be clear, I believe your testimony was that you

4    even played "Fresh Garbage" at the Denver 26 -- excuse me --

5    the December 26, 1968, show in Denver, Colorado.

6          Do you recall that?

7    A.    Yeah, I would have thought we did, yeah.  Yeah,

8    definitely.

9    Q.    And was that part of your staple songs during those

10   concerts?

11   A.    When we played "As Long As I Have You" starting from

12   December -- in September of '68, we were doing -- we were doing

13   "As Long As I Have You" and we were putting that in in the

14   medley.

15          Because we did it during the rehearsals, as to the

16   best of my recollection, but we definitely did it during

17   Scandinavia and, obviously, we did it when we came here on our

18   first date.

19   Q.    Your first -- your first show on U.S. soil, correct?

20   A.    In the -- Denver was our first show.

21   Q.    Right.  Now, when you said, "We were putting it in," when

22   you say "it," what are you referring to specifically?

23   A.    We were putting -- you know, we were leaving the medley

24   the same as we had done it during the previous dates that we

25   did in Scandinavia.  In other words, it was in "As Long As I

406

```
 1    Have You."

 2    Q.   Well, what --

 3    A.   So we would have -- you've asked me a question would we

 4    have played it at Denver, and my answer to you is yes.

 5    Q.   And the part that you would have put in is "Fresh

 6    Garbage" -- the "Fresh Garbage" piece that we heard, correct?

 7         MR. ANDERSON:  Objection.  Misstates the testimony.

 8    Asked and answered.

 9         THE COURT:  Overruled.

10         THE WITNESS:  It wouldn't have been too dissimilar to

11    the way that you heard it at the Fillmore because that's only a

12    few days later.

13         That's a pirate tape.  The other one, as well, but --

14    BY MR. MALOFIY:

15    Q.   To be clear, isn't it true that "Fresh Garbage" was a

16    staple song -- well, strike that.

17         Isn't it true that "As Long As I have You" containing

18    the composition of "Fresh Garbage" was a staple song in your

19    performances in late '68 and early '69?

20         MR. ANDERSON:  Objection.  Argumentative as to

21    "containing the composition 'Fresh Garbage.'"

22         THE COURT:  Sustained.  Yeah, sustained.

23         In the composition, you had some riffs from "Fresh

24    Garbage."  Okay?

25         THE WITNESS:  Yes.
```

407

```
 1              THE COURT:  Okay.  And that's what he's asking you.

 2   Was that a staple?

 3              THE WITNESS:  Yeah, right from -- right from day one

 4   of our tour, if you like, that we did in Scandinavia, we were

 5   doing it then.  So we were doing it -- we didn't have a lot of

 6   material in those days.  We only had an album.  So, yeah, that

 7   was part of the staple diet, if you like, of the concerts every

 8   night.

 9              MR. MALOFIY:  Now, give me -- with the Court's

10   indulgence, I want to pull up a set list indicative of what

11   Led Zeppelin was playing I believe right around the time --

12   well, around the time they were performing with Led Zeppelin.

13              One moment, Your Honor.

14              MR. ANDERSON:  Do you have an exhibit number?

15              MR. MALOFIY:  Well, I'm looking for it, yes.

16              MR. ANDERSON:  Oh, okay.

17              MR. MALOFIY:  Yeah, I just need a second.  Sorry.

18              My apologies.  I have to get one document,

19   Your Honor.

20              THE COURT:  Okay.

21   BY MR. MALOFIY:

22   Q.   Do you recall your second show on U.S. soil, whether or

23   not it was the show in Gonzaga University?

24   A.   What is it?  Do I recall -- sorry.  Can you ask the

25   question --
```

408

```
1    Q.   I believe it was the second show.  It was on December 30,
2    1968, four days after the -- your first show in Denver,
3    Colorado.
4         Do you recall that show?
5         MR. ANDERSON:  Objection.  Mischaracterizes the
6    evidence, misstates the facts, and argumentative.
7         THE COURT:  Overruled.
8         THE WITNESS:  What I know about that show is it's the
9    first Led Zeppelin bootleg.
10   BY MR. MALOFIY:
11   Q.   The December 30 --
12   A.   The Gonzaga show is the first -- I don't remember
13   anything, really, about the show, apart from the fact that I
14   know it's the first bootleg.
15   Q.   Do you -- have you ever listened to that bootleg?
16   A.   Not really.
17   Q.   Do you agree that it has "Fresh Garbage" on it?
18   A.   I'm sure it has.
19   Q.   Do you agree that you also performed a song called "Train
20   Kept A-Rollin"?
21   A.   Yes.
22   Q.   That was a cover song, correct?
23   A.   Yeah.
24   Q.   Do you agree that you performed a song, "I Can't Quit You
25   Baby"?
```

409

```
 1   A.    Yes, we did.

 2   Q.    You agree that was a cover song?

 3   A.    Yes.

 4   Q.    Do you agree you played "Fresh" -- well, you just

 5   testified you played "Fresh Garbage."

 6         You agree that was a cover song?

 7         MR. ANDERSON:  Objection.  Vague and ambiguous as to

 8   "cover song."  Also relevance.

 9         THE COURT:  Overruled.

10         THE WITNESS:  That we played the riff from "Fresh

11   Garbage" -- I mean, yeah, I don't want anyone to get the idea

12   that we're doing "Fresh Garbage" because we just heard a

13   version of that with the -- with the vocal and it's got a

14   different sort of syncopation arrangement to it.  We never --

15   we never sang "Fresh Garbage," we just played this riff.

16   BY MR. MALOFIY:

17   Q.    Understood.

18   A.    But I agree that we played it.  Yeah, we played it from

19   day one at rehearsals.

20   Q.    And there was also "Dazed and Confused" that you played at

21   that show; is --

22   A.    That's right.

23   Q.    -- that correct?

24         MR. ANDERSON:  Objection.  Relevance.

25   ///
```

410

```
 1    BY MR. MALOFIY:
 2    Q.   That was a cover, too, correct?
 3              THE COURT:  Sustained.
 4    BY MR. MALOFIY:
 5    Q.   That was a cover, too?
 6              MR. MALOFIY:  I'm sorry.
 7              THE COURT:  Sustained.
 8              MR. MALOFIY:  I missed that, Your Honor.
 9              THE COURT:  Okay.
10    BY MR. MALOFIY:
11    Q.   And you played a song called "White Summer"; isn't that
12    correct?
13              MR. ANDERSON:  Objection again.  Relevance.
14              THE WITNESS:  Yeah.
15              THE COURT:  Sustained.
16    BY MR. MALOFIY:
17    Q.   And that -- and that was a cover?
18              THE COURT:  No, it was sustained.  We don't want to
19    go through every song they've ever played in their history.
20    BY MR. MALOFIY:
21    Q.   Let me -- I'll summarize it.
22              The seven songs you played in -- December 30, 1968,
23    six of those seven were covers, correct, sir?
24              MR. ANDERSON:  Objection.  Lacks foundation.
25              THE COURT:  Overruled.
```

411

```
 1              If you know.

 2              THE WITNESS:  I really don't know.  Because I'm not

 3    partial to seeing the set list, I can't weigh it up, balance.

 4              MR. MALOFIY:  Can I finish going through the set list

 5    with him, Your Honor?

 6              THE COURT:  Sorry?

 7              THE WITNESS:  Can I finish going through the set list

 8    with him to ask him if they were covers?

 9              THE COURT:  Again, it was irrelevant.  You've

10    mentioned several already.  That should be enough.

11              Go ahead.

12              MR. MALOFIY:  Very well.  I'll move forward.

13    BY MR. MALOFIY:

14    Q.   You'd agree with me that in the early years of

15    Led Zeppelin, '68 and '69, before the first album came out,

16    Led Zeppelin was primarily playing cover music, correct?

17              MR. ANDERSON:  Objection.  Vague and ambiguous.

18              THE COURT:  Overruled.

19              THE WITNESS:  That Led Zeppelin were playing -- well

20    when we were in Scandinavia, we were doing Yardbirds numbers,

21    which that was covering stuff, I suppose, if you say that.  But

22    then we were called the New Yardbirds, but it was still the

23    members of Led Zeppelin.

24    BY MR. MALOFIY:

25    Q.   But you were covering other people's music, sir; isn't
```

412

```
 1   that correct?

 2   A.   We did at that time, yeah, but we also played our -- we

 3   were showcasing our own album, as well, our first album.

 4          MR. MALOFIY:  If I may present this to Mr. Page -- if

 5   I may approach.  I would like him to take a look at the set

 6   list and share with me what other -- what original numbers are

 7   on the set list from Gonzaga.

 8          THE COURT:  Under 403 the Court is excluding it.  It

 9   is much more time consuming than it is relevant, counsel.

10          MR. MALOFIY:  Yes, Your Honor.  Very well.

11   Understood.

12          THE COURT:  So you covered a lot and you also played

13   some of your own; is that correct?

14          THE WITNESS:  That's correct.

15          THE COURT:  Okay.

16   BY MR. MALOFIY:

17   Q.   You started -- strike that.

18          You were initially a session musician, correct?

19   A.   No, I wasn't initially a session musician.

20   Q.   Well, I imagine you picked up the guitar at a younger age.

21   How old were you?

22   A.   About 12.

23   Q.   And I guess it's safe to assume you weren't a session

24   musician at 12, correct?

25   A.   That's absolutely correct.
```

413

```
 1    Q.   Later on -- you had a gift in being able to play the
 2    guitar, correct?
 3    A.   Well, yeah.
 4         (Laughter.)
 5    BY MR. MALOFIY:
 6    Q.   And you, in fact, played as a session musician, correct?
 7    A.   Yes, when I was about 17 --
 8    Q.   And --
 9    A.   -- 18, 19.
10    Q.   -- this went on from what years?  17, 18, 19?
11    A.   Well, I did about four years as a studio musician from the
12    age of about 17.
13    Q.   Okay.  And during those years, you were in the studio
14    playing other people's music to track on records, correct?
15    A.   Well, that is correct.
16    Q.   Well, I appreciate that.  I'm only -- it's for the
17    orientation of the jury.  They may not know what a session
18    musician is or --
19    A.   Okay.
20    Q.   -- or what a session musician does.  That's why I'm
21    inquiring into that.
22         So a session musician, it's fair to say, plays --
23    goes in the studio and plays other people's music to be
24    recorded on album recordings; fair statement?
25    A.   It was -- that's sort of a fair analysis except --
```

414

```
1            THE COURT:  Why don't we have you define what a
2   session --
3            THE WITNESS:  Yes, please.  Yeah.
4            Well, the thing is I was a side man -- over here they
5   call it a side man -- and I was a very young guitarist.  In
6   fact, I was seven years younger than any of the other musicians
7   that were around.
8            And the reason why I was there -- or how I got
9   brought into it was the fact that I had -- I understood the
10  points of reference for all the young musicians at that point,
11  whether it was blues or rock and roll or whatever it was,
12  because we had all come up through the same roots, if you like.
13           So what -- initially, when I first became a studio
14  musician, they would get me to go in there and they would give
15  me a part, which I could read, just chords, which is very
16  basic, and they would say just to play something to it.  So I
17  would be coming up with riffs and things.
18           And, basically, I must have done pretty good,
19  because, you know, it's pretty radical for the rest of these
20  musicians who are older than me.  You know, one of those wasn't
21  going to be working because I was there.  And --
22       (Laughter.)
23           THE WITNESS:  No, but it's true.  And I -- and I --
24  and I had to -- I guess I kept managing to deliver.
25           THE COURT:  Excuse me.  Let me cut you off, because
```

415

```
 1    the question is what is a session musician.

 2               THE WITNESS:  Yeah.  I'm trying to sort of explain

 3    it.

 4               THE COURT:  Not what you were, but what was a session

 5    musician.  What is it -- well, how --

 6               THE WITNESS:  Okay.  Okay.  But he said you play

 7    other people's music.

 8               THE COURT:  But that's not the question in front of

 9    you now.  The question is can you explain to the jury what a

10    session musician is.

11               THE WITNESS:  Okay.  You go in and you have a chart

12    and you play along to the chart.  Sometimes it's written music.

13               Well, that's it.  But -- and, certainly, for me,

14    after a year or so, it was written music, as well.

15               THE COURT:  Okay.  Thank you very much.

16               Counsel.

17    BY MR. MALOFIY:

18    Q.   And how many sessions were you on during those years of

19    17, 18, 19?  Would it be -- would it be 50?  Would it be a

20    hundred?  Would it be hundreds?

21    A.   Hundreds per year.

22    Q.   Per year?

23    A.   Yeah.

24    Q.   Thank you.

25               Do you recall ever touring with Spirit?
```

416

```
 1   A.    No.

 2   Q.    Do you recall ever playing shows with the band Spirit?

 3   A.    No, I don't recall playing shows with them, no.

 4   Q.    Do you recall any interactions that you had with the band

 5   Spirit?

 6   A.    I didn't have any interactions with the band Spirit, no.

 7   Q.    Is it possible that you forgot your interactions with the

 8   band Spirit?

 9         MR. ANDERSON:  Objection.  Calls for speculation.

10         THE COURT:  It will be sustained.  Obviously, it's

11   possible for anybody to forget something.

12         Why don't you ask the next question.

13   BY MR. MALOFIY:

14   Q.    You don't dispute that you performed on December 26, 1968,

15   in Denver, Colorado, correct?

16   A.    I did, absolutely, yeah.

17   Q.    And you don't dispute the fact that you opened for Spirit,

18   correct?

19   A.    Well, it's only until this court case that I knew Spirit

20   were on the bill -- not the court case, but all of the papers

21   and everything.

22         Because on our initial dates as Led Zeppelin -- there

23   was about six of them altogether -- we were supporting Vanilla

24   Fudge, and I always thought that that Denver show was us

25   supporting Vanilla Fudge.  I didn't know that Spirit were on
```

417

```
 1    until all of this has come up.
 2    Q.   Did you hear the testimony earlier on today where Spirit
 3    and Vanilla Fudge co-headlined that tour?
 4    A.   Yes.  I've heard it since I've been in here, yeah.
 5    Q.   Is that the first time you heard that?
 6    A.   Yeah, I didn't -- yeah, sure.
 7    Q.   Do you have any recollection of whether or not you were
 8    excited to open for a band that you were covering their music?
 9    A.   Well, I don't think -- I don't think that we were --
10         MR. ANDERSON:  Objection.  Argumentative.  Lacks
11    foundation.
12         THE COURT:  Sustained.
13         MR. ANDERSON:  And vague and ambiguous.
14         THE COURT:  Why don't you rephrase the question.
15    BY MR. MALOFIY:
16    Q.   Were you excited to be opening for a band that you
17    appreciated?
18    A.   Well, I was excited to be opening for Vanilla Fudge
19    because they were great heroes of ours.
20    Q.   Oh, I see.
21         How many Vanilla Fudge songs did you cover?
22         None --
23    A.   Well, I don't think --
24    Q.   -- correct?
25    A.   -- I don't think we necessarily covered any of their
```

418

1   music.

2   Q.   So --

3   A.   Paid attention very much to how -- you know, what they did

4   on their records.

5   Q.   Right.  You --

6   A.   Familiar with them.

7   Q.   -- paid attention to what they did, but you never

8   incorporated it as part of your live set, correct?

9   A.   Well, I don't think we used like a little phrase of theirs

10  repetitively, no.

11  Q.   So getting back to my question, were you excited to open

12  for a band that you appreciated --

13         MR. ANDERSON:  It's vague --

14  BY MR. MALOFIY:

15  Q.   -- Spirit?

16         MR. ANDERSON:  Vague and ambiguous.

17         THE COURT:  He answered yes, he was.

18         MR. MALOFIY:  He said yes to Vanilla Fudge.

19         THE COURT:  Yeah.  Oh, were you asking him -- why

20  don't you restate the question again.  I didn't hear you say

21  "Spirit" on it.

22         MR. MALOFIY:  I'm sorry, Your Honor.

23  BY MR. MALOFIY:

24  Q.   Were you excited to open for a band you appreciated,

25  Spirit?

419

```
 1   A.   I didn't know they were on the bill.

 2        THE COURT:  Okay.

 3   BY MR. MALOFIY:

 4   Q.   When you -- do you recall, when you were playing their

 5   song at that concert, if you then realized that they were on

 6   the bill?

 7        MR. ANDERSON:  Objection.  Argumentative.

 8        THE COURT:  Overruled.

 9        THE WITNESS:  No, I don't -- I -- you know, I really

10   don't have any recollection of them being on the -- on the

11   show.  I just remember -- from my memory recall, I just know

12   that we were on and we were supporting Vanilla Fudge, but

13   that's it.

14   BY MR. MALOFIY:

15   Q.   From your memory recall, do you recall "Taurus" being

16   performed at that show?

17   A.   Well, by Vanilla Fudge?  No.  No.

18   Q.   No.  "Taurus" not by Vanilla Fudge.

19   A.   I didn't hear.  I didn't hear --

20   Q.   I'm sorry.

21   A.   I didn't hear Spirit at the Denver show.

22        THE COURT:  So your testimony is you didn't hear

23   Spirit --

24        THE WITNESS:  No.

25        THE COURT:  -- so you didn't hear "Taurus" performed
```

420

```
 1   by them?
 2            THE WITNESS:  Yes.
 3            THE COURT:  Okay.  Next question.
 4   BY MR. MALOFIY:
 5   Q.   Why didn't you hear Spirit?
 6            THE COURT:  He said he didn't hear it.
 7            MR. MALOFIY:  Well, I'm asking him why.
 8            THE COURT:  Okay.
 9   BY MR. MALOFIY:
10   Q.   Did -- was there a reason why?  Were -- that you didn't
11   hear Spirit?
12   A.   I think the reason would have been we definitely would
13   have opened up this.  I remember it was a huge place and we
14   opened it up, and we had to move on to another show after that.
15   The following day was Seattle, and I would assume that we
16   probably had to make a run for it after we'd more or less
17   finished.
18   Q.   Let's be clear.  You said you would assume.
19            Do you have a distinct memory of what you did after
20   you finished that first show on December 26, 1968?  Yes, you
21   do, or no, you don't?
22   A.   I have a memory of after having done the show, yes, I do.
23   Q.   And is that memory that you immediately ran out the door?
24   A.   No.
25   Q.   Is that memory that you didn't hear any of Spirit's set,
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

421

```
1    who played right after you?
2    A.   Oh, it certainly -- it certainly doesn't have anything to
3    do with Spirit, my memory recall at this point.
4    Q.   And do you recall any other music being played by any
5    other band that night?
6    A.   No, not necessarily, no.
7    Q.   Your first time in -- you're in the United States,
8    correct?  Oh, no.
9    A.   Yes.
10   Q.   I'm sorry.  You were there before.  Mr. Plant -- I'm
11   sorry.
12            This was not the first time you were in the United
13   States, correct?
14   A.   No, that's correct.  I had been over here with the
15   Yardbirds.
16   Q.   Right.  And when you were over here with the Yardbirds,
17   didn't you become familiar with the band Spirit?
18   A.   I heard Spirit on the radio at that time.
19   Q.   Right.  Did you also --
20   A.   I think -- you know, I think I did.  It's fair enough to
21   say that.
22   Q.   So even before Led Zeppelin, when you were with the band
23   the Yardbirds, you were familiar with the band Spirit, correct?
24   A.   I had heard Spirit on the radio over here and in the UK.
25   Q.   So to be clear, you were familiar with the band Spirit in
```

422

```
1    the United States and in the United Kingdom from hearing it on
2    the radio in two separate countries?
3    A.   Well, I had heard it.  I mean, not all the time, but I had
4    heard "Fresh Garbage" on the radio, yeah.
5    Q.   How many other songs did you hear on the radio prior to
6    January 1971?
7              MR. ANDERSON:  Objection.  Vague.
8              THE COURT:  How many other songs?
9              MR. MALOFIY:  Spirit songs.  Spirit -- excuse me.
10   Thank you for the clarification, Your Honor.
11             THE COURT:  You bet.
12             MR. MALOFIY:  Spirit songs.
13             THE WITNESS:  Between when?
14   BY MR. MALOFIY:
15   Q.   I should say the titles of the songs themselves.
16             Between the beginning of time and 1971, January --
17   A.   Yeah.
18   Q.   -- how many different --
19   A.   Okay.
20   Q.   -- Spirit songs did you hear playing on the radio?
21   A.   Okay.  I heard "Fresh Garbage" and I heard "I've Got a
22   Line on You Babe" and I heard "Dark Eyed Woman."
23   Q.   So let me get that correct.
24             "Fresh Garbage" was on the first album.  The second
25   one you mentioned was "I Got a Line on You"?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**00558**

423

```
 1    A.    Yeah.

 2    Q.    That was on the second album, correct?

 3    A.    Yeah.

 4    Q.    And the third song was -- what was it?

 5    A.    "Dark Eyed Woman" is on the third album.

 6    Q.    When you -- did you become a fan after hearing -- a fan of

 7    Spirit after hearing "Fresh Garbage"?

 8              MR. ANDERSON:  Objection.  Vague and ambiguous.

 9              THE COURT:  Well, it depends on what you mean by

10    "fan."

11              Why don't you -- I don't know.  Why don't you reask

12    the question.

13              MR. MALOFIY:  I -- I -- it's --

14              THE COURT:  Maybe there's no other word you can use.

15              MR. MALOFIY:  I mean, I -- I can step through it,

16    Your Honor.

17              THE COURT:  Well, let's -- were you a follower of

18    theirs after you heard their music?

19              THE WITNESS:  I didn't follow it necessarily.  After

20    hearing "Fresh Garbage," I just thought that was quite a good

21    riff.

22              THE COURT:  So you enjoyed their music?

23              THE WITNESS:  Oh, yeah, I enjoyed what I heard.

24              THE COURT:  Okay.  Go ahead.

25    ///
```

424

```
 1   BY MR. MALOFIY:

 2   Q.   In appreciating or enjoying their music, did you then want

 3   to listen to and buy the first album?

 4              MR. ANDERSON:  Objection.

 5              THE COURT:  Overruled.

 6              THE WITNESS:  I didn't buy the first album.

 7   BY MR. MALOFIY:

 8   Q.   Okay.  What songs did you play on December 26, 1968, in

 9   Denver, Colorado?

10   A.   Okay.  We probably played "Train Kept A-Rollin."

11   Q.   Hold on.  One second there.  "Train Kept A-Rollin."

12   A.   Yeah.  I honestly -- I'll never be able to give you the

13   full set list.  I'm sorry.  But I think we probably opened with

14   "Train Kept A-Rollin."

15   Q.   What would be the next song?

16              THE COURT:  If you remember.

17              THE WITNESS:  I don't really remember.  I don't

18   remember what the next song was.

19   BY MR. MALOFIY:

20   Q.   Do you remember what was typical on your set list during

21   those years?

22   A.   Yes, but I can't -- yeah.  Yeah.  I can remember numbers

23   that we did, yeah.

24   Q.   Can you remember those songs that you did in those early

25   years?
```

425

```
 1   A.   Yes.
 2   Q.   Can you -- can you give me a typical set list or the set
 3   list that you used in -- December 26, 1968?
 4   A.   I can't -- I can't give you like first number, second
 5   number, third number, fourth number, no.
 6   Q.   I don't --
 7   A.   I can tell you -- you want me -- I can give a rough
 8   approximation of a set, but it doesn't mean to say that it is
 9   the full set.  It probably means it's a rough approximation of
10   maybe half a dozen numbers.
11   Q.   Approximation of a half a dozen numbers?
12   A.   Okay.  Okay.  So we did the "Train Kept A-Rollin."  We
13   would have done "You Shook Me."  We would have done "I Can't
14   Quit You Baby."  We would have done "Communication Breakdown."
15   Let's see.  Oh, "Babe I'm Going to Leave You," we'd do that.
16            THE COURT:  Next question.
17   BY MR. MALOFIY:
18   Q.   Is that all you can recall?
19   A.   Yeah.  I'm sure Mr. Plant can probably do a better job
20   than me, but that's about it for the minute.
21            Oh, sorry.  "As Long As I Have You."  It's obvious we
22   did that.
23   Q.   And that's -- that's the medley that contains the piece of
24   music from "Fresh Garbage," correct?
25   A.   Yes.
```

426

```
 1          MR. MALOFIY:  We have Defense Exhibit 158, which is

 2   Bates'd as 100158.

 3   BY MR. MALOFIY:

 4   Q.   Sir, this document is from a newspaper.  It's --

 5          MR. ANDERSON:  Your Honor, if counsel could please

 6   identify it to counsel so I know what we're talking about.

 7          THE COURT:  I thought he gave you the exhibit number.

 8          MR. ANDERSON:  Right, but we don't show a 158, so if

 9   I can just please see it.

10       (Counsel confer off the record.)

11          THE CLERK:  I'm sorry.  Could I get the Bates number

12   again?

13          MR. MALOFIY:  Yes.  It's 100158.

14          THE CLERK:  Thank you.

15   BY MR. MALOFIY:

16   Q.   Earlier on, you said you didn't recall opening for Spirit,

17   correct?

18   A.   Yes, I would have said that, yeah.

19   Q.   Okay.  Can we -- in this article, you said:  "Page

20   reflected on Zeppelin's success, 'It's kind'" -- quote, "It's

21   kind of funny on our first tour around we played second fiddle

22   to other groups.  Last time we were the second group and Spirit

23   was -- and Spirit was the third.  Now we've each gone up a

24   notch on the current to where Spirit has second billing."

25          This is from June 7, 1969.
```

427

1      Did you forget that you opened for Spirit in the last

2  30 years?

3  A.  Well, I didn't think we did open for Spirit.  And

4  actually -- yeah, okay.  Well, this is what I'm saying.  As far

5  as Denver, I thought it was Vanilla Fudge.  But here I am now.

6  This is 1969 you're saying, so (indicating).

7      MR. MALOFIY:  May I publish this to the jury?  I

8  believe there's no objection from defense counsel.

9      THE COURT:  Yes.

10      THE WITNESS:  Actually, I can't see it on -- my

11  monitor isn't working possibly, but I -- oh, okay.

12      *(The exhibit was displayed on the screen.)*

13  BY MR. MALOFIY:

14  Q.  For the orientation of the jury, Mr. Page, I'm referring

15  to the end of the first column and the top of the second

16  column.  I believe there is a --

17      MR. MALOFIY:  I believe this -- this monitor is not

18  working, Your Honor.

19      THE COURT:  Well, we had one -- there you go.

20      MR. MALOFIY:  For the orientation of the jury, I'm

21  referring to the second column here and the top of the third.

22      THE COURT:  Okay.

23  BY MR. MALOFIY:

24  Q.  Mr. Page, can you see that?

25  A.  To be honest with you, my eyes are really bad and I just

428

```
1    tried with my spectacles and I can't see.  I can see the two --
2    the yellow bits that I'm supposed to be looking at.
3             THE COURT:  Can it be enlarged at all?
4             MR. MALOFIY:  Oh, yes.  Please enlarge for Mr. --
5             THE WITNESS:  Yeah.
6             MR. MALOFIY:  -- Page or I can hand him a paper copy
7    if that would benefit --
8             THE WITNESS:  That will be fine.  Thank you very
9    much.
10            THE COURT:  You may.
11            MR. MALOFIY:  (Indicating.)
12            THE WITNESS:  Thanks.
13            Oh, I see.  Well, I see what's written.
14   BY MR. MALOFIY:
15   Q.   Does that refresh your recollection --
16   A.   No, it doesn't.
17   Q.   -- that you toured with Spirit and opened for Spirit?
18   A.   That we toured with Spirit?  Well, I can see what's
19   written.
20   Q.   Do you dispute the accuracy of the quote or do you just
21   not remember?
22   A.   Well, I don't really remember the context of -- it's
23   referring to two times here, isn't it, really.
24   Q.   Well, this is quotes attributed to you.
25            Is there any reason that you would dispute this quote
```

429

1  that's attributed to you or is it just that you don't remember

2  giving this quote?

3  A.   I certainly don't remember giving the quote, that's for

4  sure.

5  Q.   Do you dispute that you opened for Spirit?

6  A.   During the testimony of this court case, I've heard that

7  on the first Denver show, they closed the show.  But I

8  didn't -- I wasn't aware of that.  But I understand that

9  conflicts with this, but --

10       MR. MALOFIY:  With the Court's indulgence, just to

11  be -- so I know where I'm going with the -- with the

12  questioning of this witness, are we stopping exactly at 4:00,

13  Your Honor?

14       THE COURT:  We're stopping exactly at 4:00, which is

15  about 30 seconds from now, so why don't we break now.

16       MR. MALOFIY:  Very well, Your Honor.  Thank you.

17       THE COURT:  Okay.  Ladies and gentlemen, at this time

18  we are breaking for the evening.  Remember that admonishment

19  that I always give you not to discuss the case among yourselves

20  or with anybody else or form or express any opinions about the

21  matter until it's submitted to you and you retire to the jury

22  room.

23       Have a pleasant evening.  Watch -- is it tonight or

24  tomorrow night, the NBA playoffs?  Anyway, watch TV, but don't

25  think about this case until you get back tomorrow.

1          So I'm going to excuse you at this time.  I'm going

2    to ask you to leave quietly, because afterwards I'm going to

3    talk to the attorneys a little bit.

4          You may also step down, sir.

5          THE WITNESS:  Thank you, sir.

6          THE CLERK:  All rise.

7    *(Jury out at 3:59 P.M.)*

8    *(The following was heard outside the presence of the*

9    *jury.)*

10          THE COURT:  Okay.  The record will reflect that the

11   jurors have left the courtroom, and I'm going to go ahead and

12   have some discussions as far as procedures with the attorneys,

13   so I'm going to ask the rest of the audience if they would go

14   ahead and leave now, and I'll talk privately with the attorneys

15   as far as logistics and what we're going to be doing tomorrow.

16   *(Audience members exit the courtroom.)*

17          THE COURT:  Okay.  Counsel, again, if there's

18   anything that comes up that you're anticipating coming up and

19   if there's going to be objections, the sooner you can get it to

20   the Court the better so I can be prepared before the objections

21   actually come up.

22          I understand some things you can't, they just come up

23   and, you know, you have to object at that time.

24          I, again, don't want anybody to be blindsided in this

25   case.  And I've talked to you a couple times about this before.

431

```
 1   How you put the case on, again, is completely up to you, but I
 2   just want to keep you informed as to where you are on it.
 3          As of right now on the time sheet, the plaintiff has
 4   used 295 minutes, which means he has 305 minutes left.  The
 5   defendant has used 76 minutes, which means he has 524 minutes
 6   left.  At least for the plaintiff, half of the time has been
 7   used just on accessibility.  We haven't even gotten into
 8   similarities.  We haven't gotten into damages.
 9          I just want to make sure everybody is aware.  I'm not
10   asking for a response or anything else; I just want to keep
11   everybody aware of where we're going.
12          But once you run out of time, which would be tracked
13   when you're asking questions or cross-examination, once you're
14   out of time, that's it.  And if the other side has more time
15   and is asking questions, you're not going to be able to
16   cross-examine.  So just keep that in that mind and prepare the
17   rest of the trial accordingly.
18          As -- and I'll say it again -- most of what's gone
19   on, a great percentage of what's gone on, far more than half,
20   really isn't necessary to this case, but it may be creating the
21   case that you want to, and that's fine, as long as you realize
22   what the -- what the limitations are on it.
23          Okay.  With that, have a pleasant evening and we'll
24   see you back in --
25          MR. MALOFIY:  Your Honor, if I may --
```

432

```
 1            THE COURT:  Yes.
 2            MR. MALOFIY:  -- there's a few issues I'd like to
 3   address.
 4            THE COURT:  Sure.
 5            MR. MALOFIY:  Should I take the podium?
 6            THE COURT:  No, you can stay where you are.
 7            MR. MALOFIY:  Okay.  The one issue -- and it's come
 8   up now and I think defendants have clearly opened the door on
 9   it -- is this whole issue of the sound recording.
10            We're not -- we're not even saying that it's coming
11   in to establish the compositional elements which are
12   infringing, it's coming in solely for purposes of access.
13            And the issue here is that Mr. Plant -- excuse me,
14   Mr. Page has indicated he had this album in his collection.  He
15   has indicated he -- and we see quotes that he's seen them live.
16   He has indicated -- we have quotes from '72 where he -- where
17   he said he hears their albums.
18            And he has testified that he did not -- he's not
19   familiar with the deposit copy, that he didn't go to the
20   Library of Congress, that he didn't pull out the lead sheet for
21   it, and so the only way I can establish access in this case if
22   he heard this is by playing him the album recording and saying,
23   "Sir, have you ever heard this?"  Otherwise, I can't put that
24   evidence in my case in chief.  But --
25            THE COURT:  You can ask him if he's ever heard it.
```

433

```
1            MR. MALOFIY:  I'd like to play it for him and ask

2    him.

3            THE COURT:  Well, why do you have to play it for him?

4    Just ask him if he's ever heard the composition, if he's ever

5    heard it being played.

6            MR. MALOFIY:  Well, the things is how can he know if

7    he heard it if I don't play it for him?

8            I don't know if he heard just the first 45 seconds,

9    the intro, or if he heard the full song, and I'm entitled to

10   get that evidence here in trial.

11           But the reason I share this with Your Honor,

12   respectfully -- and give me a --

13           THE COURT:  Well, let me stop you for a second.

14           He indicated that he heard "Taurus" when his

15   son-in-law played it for him, the composition, not what has

16   been recorded, but the composition.  So he said he's had -- he

17   has heard it.

18           And, you know, I don't know where you want to go

19   other than the fact that he's heard it.

20           MR. MALOFIY:  Well, where I want to go is that in

21   other similar cases, the "Blurred Lines" case, the Pharrell

22   Williams case, in that case the issue was that access was not

23   in dispute.  The defendants --

24           THE COURT:  Here, access is in dispute.  You are

25   correct.
```

434

```
 1              MR. MALOFIY:  Right.  In this case, they're saying,

 2    "We never heard it."  How do I say --

 3              THE COURT:  Well, he's told -- well, that's not

 4    exactly true.  He said he's heard it once with his

 5    son-in-law --

 6              MR. MALOFIY:  Well, I'm saying --

 7              THE COURT:  -- and you can ask him -- and you can ask

 8    him, "Have you ever heard it prior," and he's answered that.

 9              Now, if you play it again for him now -- he's heard

10    it once.  You play it for him twice, is he going to be any more

11    equipped to say that "I've heard it before" than he did the

12    first time through?

13              MR. MALOFIY:  The issue is I don't know what he heard

14    by his counsel or what he heard from his son-in-law or what was

15    played on the radio.  There's no way I can establish this fact

16    of what Mr. Page heard.  He might not even have heard it today.

17    He might get on the stand here and say, "Oh, my God, it's the

18    same song."  I don't know that.

19              And the only way I can determine that is if it comes

20    in in evidence in this case.  If access wasn't disputed, that

21    would be a whole different thing, but access is disputed here.

22    And the whole point is that we know Mr. Page didn't go to the

23    Library of Congress, didn't get the deposit copy lead sheet,

24    and the way he heard it, presumably, is from the album

25    recording more recently.
```

435

```
1              I'm entitled to impeach him, say, "Sir, let me play
2    this for you now.  Did you hear this prior to the filing of
3    this law?"
4              THE COURT:  Counsel?
5              MR. ANDERSON:  Yes, Your Honor.  Thank you.
6              Counsel actually did play the sound recording at the
7    deposition.  Mr. Page listened to it and said, "I've never
8    heard that before."
9              So -- and there's no recording of the Denver
10   performance, and that didn't stop him from asking, "Did you
11   hear it at Denver?"  You know, this argument has been made
12   before.  It's been rejected.
13             THE COURT:  So your position is that he's heard it,
14   he heard it at deposition -- do you both agree with that, that
15   he heard it at deposition?
16             MR. MALOFIY:  There's two issues, Your Honor.  One is
17   that if -- even if he heard it in the deposition --
18             THE COURT:  Let me get to your two issues in just a
19   second.  Let's try my question first.
20             Is it agreed that he heard it during deposition?
21             MR. ANDERSON:  Yes.
22             MR. MALOFIY:  That's correct.
23             THE COURT:  Okay.  Now your two issues.
24             MR. MALOFIY:  If he heard it during his deposition, I
25   am entitled to put him on in my case --
```

436

1          THE COURT:  To try to impeach him.

2          MR. MALOFIY:  -- and ask him that and to try to

3     impeach him, because it's so strikingly similar -- that's

4     our -- plaintiff's perspective, okay, respectfully, that -- or

5     very similar, that even if some elements are not protectable

6     and even though some elements are, we're not offering it.  And

7     we'd like an instruction to the jury that they can't consider

8     it in any way for compositional elements or from the context of

9     musicological analysis but solely for the purpose of access.

10          THE COURT:  So what you want to do is play it for him

11     and ask him if he's ever heard it before, with the instruction

12     to the jury that they are not to consider whether or not this

13     recording they hear today is similar or not, that's not before

14     them, the only reason you're presenting it is to show whether

15     or not he's heard this before?  Is that what you're saying?

16          MR. MALOFIY:  That's entirely what I'm asking,

17     Your Honor.

18          MR. ANDERSON:  You can't unring the bell, Your Honor.

19          They would have to then -- once they've heard the

20     recording, they would have to then do this analysis of pulling

21     out all the performance elements, which their experts are

22     having trouble doing that.

23          This was the -- the whole point of the motion and the

24     ruling on the motion in limine was that it is not only

25     irrelevant because the sound recording is not copyrighted, but

437

```
 1    also --
 2           THE COURT:  For purposes of similarity, it's not
 3    admissible.
 4           MR. ANDERSON:  Right.  But --
 5           THE COURT:  His argument is not that.  His argument
 6    is that for purposes of access and to ask him, "Have you ever
 7    heard this before," that they can play it to ask him, "Have you
 8    ever heard this composition before," and -- with the jury being
 9    instructed that this composition that you -- that is being
10    played now is not being offered to show that there's any
11    similarities.
12           MR. ANDERSON:  But -- and I understand that.  He made
13    that argument before and the Court rejected it and issued the
14    order granting the motion in limine even though he made the
15    argument.
16           There's several different levels to this.
17       (Counsel confer off the record.)
18           MR. ANDERSON:  There's several different levels to
19    this.  I understand that he's trying to use access to get the
20    sound recording in front of the jury.  We've raised it under
21    403.  That would just cause confusion.
22           There's another additional problem.  We've raised
23    that the -- the experts who claim that these elements --
24    performance elements that are not protected by copyright --
25    everyone -- that's already been decided -- are probative of
```

438

```
 1   access, but none of the experts did any of the analysis, none
 2   of the experts established -- they didn't do any research.  The
 3   performance elements, they admit, were common.
 4           THE COURT:  But my understanding is you're not
 5   offering it for similarities.
 6           MR. MALOFIY:  Absolutely not.
 7           THE COURT:  I want to give you guys -- you'll love
 8   this.  I'm going to allow you to give no more than a three-page
 9   brief on both sides and submit it to the Court before 8 o'clock
10   tomorrow morning, so I'll have that half hour.  Okay?
11           MR. MALOFIY:  How would you like it submitted?
12   Because we want to make sure --
13           THE COURT:  Three pages.  I'm sorry?
14           MR. MALOFIY:  How should we submit it so it doesn't
15   get rejected?  Should we --
16           THE COURT:  I just told you to submit it.  You don't
17   have to worry about rejection here.
18           There's court rules as to when you can submit
19   motions, et cetera, as far as time limits go.  I'm telling you
20   by tomorrow morning at 8 o'clock I want anything you wish to me
21   to consider in writing, no more than three pages.
22           MR. MALOFIY:  Thank you, Your Honor.
23           THE COURT:  It won't get rejected.  You just bring it
24   up, give it to the clerk.
25           MR. MALOFIY:  I'm sorry.  I understand now.  I
```

439

```
 1    thought you meant to file it --
 2              THE COURT:  Oh, no, no, no, no.  With the clerk.
 3    Just hand it to the clerk.  You don't have to file it.
 4              MS. FREEMAN:  We have one exhibit from Mr. Ware's
 5    deposition.
 6              THE COURT:  Well, wait a second.
 7              Was there anything else from the plaintiff?
 8              MR. MALOFIY:  I'm sorry.
 9              THE COURT:  Have we covered your issues?
10              MR. MALOFIY:  No.
11              THE COURT:  Because she's got something else she
12    wants to bring up.
13              MR. MALOFIY:  There's other issues I have.
14              THE COURT:  Go ahead.
15              MR. MALOFIY:  It's our position that defendants are
16    identifying Quinn Wolfe as a fact witness in this case to
17    dispute the ownership of the copyright or that -- whether or
18    not the trust has ownership of the copyright.
19              We believe, and we filed a motion for request of
20    judicial notice, that for 12 or 14 years, nothing has occurred
21    on the docket in the Ventura County courthouse, that there's
22    orders that were entered clearly separating the money that the
23    son received from the intellectual property, which the Trust
24    received.
25              And those orders we ask the Court to take judicial
```

440

```
 1    notice of because, in this instance, it seems that at the very
 2    least, defendants would have to -- or we would -- we would ask
 3    for special questions outside the presence of the jury or an
 4    offer of proof from defendants as to why they're having this
 5    witness come and testify, and we ask that the Court take
 6    judicial notice -- and we request judicial notice of the
 7    Ventura County orders, which clearly were entered into by and
 8    between counsel and the guardian ad litem and were -- all
 9    parties were fully represented, including Quinn Wolfe,
10    Mr. Wolfe's son, including --
11            THE COURT:  Counsel, let me cut you off so you don't
12    spend too much time on it, because that's the second document
13    that you're going to submit by 8 o'clock tomorrow morning, and
14    they'll have a chance to respond.
15            MR. MALOFIY:  Thank you, Your Honor.
16            THE COURT:  But I wanted to let you -- make sure that
17    you stated your position so they don't have to wait to see your
18    paper to respond.
19            MR. MALOFIY:  Very well.
20            THE COURT:  Okay?
21            MR. ANDERSON:  If it helps --
22            THE COURT:  Yeah.  Well, otherwise I'd have to wait
23    and give you a chance to look at it and then respond.  Now you
24    know what the issue is and you can respond.
25            MR. ANDERSON:  He filed the request for judicial
```

441

1   notice.  We did file opposition.

2          THE COURT:  You can -- you can put it in your papers.

3          MR. ANDERSON:  Okay.

4          THE COURT:  Okay?

5          MR. ANDERSON:  Thank you, Your Honor.

6          MR. MALOFIY:  Thank you, Your Honor.

7          THE COURT:  Okay.  That's limited to three pages --

8   or four pages each for that one.  Okay.

9          MR. MALOFIY:  I have one last issue.

10         THE COURT:  One last one.

11         MR. MALOFIY:  One last issue is that there was an

12  issue with the designations of Mr. Plant and Mr. Page and

13  Mr. Jones.  We had gone through great length to spend tens of

14  thousands of dollars to conduct the depositions in the UK,

15  including video trial testimony of both -- of all three

16  individual defendants, who two are remaining.

17         We did that and we initially received condensed or

18  Min-U-Script versions of the depositions.  Those Min-U-Scripts,

19  although they were four on a page and not the preference of the

20  Court, a full page, they were signed and certified by the court

21  reporter.  It's what we -- it's what plaintiff had at the time

22  to indicate the designations to opposing counsel.

23         They've had these designations for months now and

24  they filed no objections and did nothing with them other than

25  argue to say that they're not going to lodge objections or

442

1    consider them unless they're on full-page transcripts.

2         The issue I have here is that we didn't receive the

3    full-page transcripts which were signed and certified until

4    much later, near the beginning of this trial.  We only had the

5    four-on-a-page transcript.

6         THE COURT:  So what's your question?

7         MR. MALOFIY:  My question is I have designations

8    which they never objected to, the sole basis -- they thought it

9    was they weren't signed and certified, which they were.  Now

10   they're arguing that it's because they're in Min-U-Script form.

11        THE COURT:  What's your question?

12        MR. MALOFIY:  I want to play the designations

13   tomorrow, and I don't want to have -- and I know the Court

14   would want to view the designations, but there's no objections

15   for the Court to view and I don't want to have a problem with

16   my schedule tomorrow.

17        THE COURT:  Okay.  So what's the position of the

18   defense?

19        MR. ANDERSON:  What --

20        THE COURT:  Are you going to be objecting?

21        MR. ANDERSON:  Yes, strenuously, Your Honor.  And if

22   I could explain.

23        THE COURT:  Is the basis of the objection what you've

24   already submitted to the Court in writing this morning?  I have

25   two pages of objections.

443

1          MR. ANDERSON:  Basically.

2          And I just wanted to clarify.  I never even noticed

3   that they were apparently certified.  That wasn't the issue.

4   The issue was, one, under the Local Rules, we were supposed to

5   do the 40-day meeting, but then also you can't fit objections

6   onto the mini pages.  And so what I have asked counsel to do is

7   to put it on full-page transcripts.

8          Last Friday, he told me he was doing that and had

9   added additional testimony that he wanted to play, which I've

10  never seen.  I've never seen any new designations.

11         So all I've asked is -- and this is all in lieu of

12  live testimony.  If it's going to be used for impeachment, then

13  that's a different animal.

14         THE COURT:  Correct.

15         MR. ANDERSON:  Thank you.

16         THE COURT:  What is the -- depositions of who?

17         MR. MALOFIY:  Mr. Page, Mr. Plant, and Mr. Jones.

18         THE COURT:  Counsel, how are you going to

19  introduce -- they're live witnesses.  They can testify here in

20  court.

21         MR. MALOFIY:  But as --

22         THE COURT:  You want to use it for impeachment,

23  that's fine, but if you want to bring testimony of the live

24  witnesses that are here in court, you're going to do it live,

25  you're not going to do it through depositions.

444

1          MR. MALOFIY:  Well, there's two things, respectfully,

2     Your Honor, because they're -- I would agree if they were not

3     party opponents, but because --

4          THE COURT:  Thank you.

5          MR. MALOFIY:  -- because they're party opponents, the

6     rules allow us to use the deposition testimony as if they -- as

7     we wish, not just solely for impeachment.

8          THE COURT:  Well, they can be -- they can be used

9     for --

10         MR. MALOFIY:  Very limited -- I'm sorry.  Even if

11    they're very limited admissions.

12         THE COURT:  Okay.  In this particular matter, you can

13    use them as impeachment purposes -- well, I don't even have to

14    get into deciding that.

15         The objections are going to be overruled.  They can

16    be used for impeachment purposes and I will handle that as

17    impeachment.  But as far as live witnesses, if you want to ask

18    them anything -- any question, then you can ask him that as a

19    live witness.

20         Okay.  And then you can use the documents to impeach

21    him if you wish, yes.

22         MR. ANDERSON:  And just to clarify, it would be the

23    normal rules.  He would identify --

24         THE COURT:  Normal rules.

25         MR. ANDERSON:  He identifies what he's going to --

445

```
1   what he plans on playing.  If we have an objection, we state

2   the objection, the Court rules, and we move on to the next.

3            THE COURT:  Normal rules.  Normal rules.

4            MR. ANDERSON:  Thank you, Your Honor.

5            THE COURT:  You have one more issue?

6            MR. MALOFIY:  As it relates to John Paul Jones, who

7   is not here, how does the Court view that situation?

8            MR. ANDERSON:  We've never received a transcript and

9   I was told I would get one, a transcript, in full form.

10            I also want to mention they made a motion to compel

11   the defendants to appear and to -- I believe to use those

12   designations.

13            THE COURT:  I'm sorry.  We've dealt with that before.

14   I'm not even going to get into that and this is not the time to

15   get into it and it's not timely made.  A lot of this should

16   have been made long before that.

17            As far as deposition testimony of witnesses who

18   aren't available, same rules.  They can come in if they're not

19   available.

20            MR. MALOFIY:  They can or they can't?

21            THE COURT:  Sure they can.

22            MR. MALOFIY:  Okay.

23            THE COURT:  And I've already overruled the objection

24   that they're not full transcripts.

25            Counsel, you had a question you wanted to ask.
```

446

```
 1          MS. FREEMAN:  Yes.  We have the admission of one
 2   exhibit.  It has been pending from Mr. Ware's deposition.  It
 3   was Exhibit 2950.  The copy that is bound in the deposition
 4   transcript was materially reduced in size to render it
 5   illegible.
 6          I have the original copy that --
 7          THE COURT:  This is the one we talked about before,
 8   wasn't it?
 9          MS. FREEMAN:  Yes, correct.
10          THE COURT:  And does anybody quarrel with the
11   blown-up copy coming in?
12          MS. FREEMAN:  It's the -- it's what I was handed at
13   the time.
14          THE COURT:  Yeah.  Anybody have any objection to that
15   coming in?
16          MR. MALOFIY:  I don't have an objection at the time.
17   However, I wanted to look at the testimony, because I believe
18   it's unclear.
19          THE COURT:  Okay.  Well, take a look at it and, you
20   know, that's -- there's plenty of time to have that come in.
21          [Overtalking.]
22          MR. ANDERSON:  My apologies, Your Honor.
23          THE COURT:  Okay.  Take a look at it and if there's
24   no objection to it, that's fine.  If there is, I'll hear what
25   the objections are after you've taken a look at it.
```

447

1          MR. MALOFIY:  We -- today or tomorrow?

2          THE COURT:  Take a look at it tonight and -- I mean,

3    all she's saying is what you used, this is the same thing but

4    she wants it blown up.

5          MR. MALOFIY:  All right.  Could I just take a look at

6    our copy and get back tomorrow?

7          THE COURT:  Sure.  Sure.  That's what I'm saying,

8    yeah.

9          MR. MALOFIY:  I believe there's exhibits -- we didn't

10   move all them into evidence.  I know it's Your Honor's -- it

11   seems to be the policy, the procedures --

12         THE COURT:  Let me help you out on that.  And it's

13   not just mine.  I mean, this is under the -- in the federal

14   court, what you should be doing is you should be identifying

15   the exhibit before it's published.  You should be saying, "I

16   would like to move this into evidence."  If it's accepted into

17   evidence, "May I publish it," and we publish it.

18         Now, I haven't held you to that tight standard, but

19   that's normally what you do.

20         You move it into evidence first.  And before it's

21   published, it should be identified as being an exhibit that's

22   been received into evidence, unless you want it just for

23   demonstration.  And then if you say that, that's fine, it's not

24   an exhibit that's received into evidence.

25         So, yeah, that's the procedure we normally use, and

448

```
 1   that is go ahead and identify it and move it into evidence and
 2   then we publish it.
 3            MR. MALOFIY:  I appreciate that.  We do it a little
 4   bit differently in Philadelphia, so thank you for that
 5   clarification.  I appreciate it.
 6            THE COURT:  They do a lot of things different in
 7   Philadelphia.
 8            MR. MALOFIY:  They do.
 9            MR. ANDERSON:  If counsel could identify the
10   witnesses he intends to call tomorrow, that would be --
11            THE COURT:  Yeah, if you'd give him a list and also
12   give the Court a list of the witnesses that you intend to call
13   tomorrow, okay?  Before you leave, just write them down.  And
14   it can be on a piece of -- counsel, it can be on a piece of
15   paper like this.  I don't care.
16            MR. MALOFIY:  I don't want to burden the Court with
17   any more time issues.  Can we address the ones we need to move
18   into evidence when we come here tomorrow before --
19            THE COURT:  Oh, yeah, yeah.  We have plenty of time.
20            MR. MALOFIY:  Thank you.
21            THE COURT:  In fact, we can do that after we finish
22   testimony, we can make sure everything --
23            MR. MALOFIY:  Thank you, Your Honor.
24            THE COURT:  And the clerk will go over it with you to
25   make sure everything is received into evidence.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**00584**

449

1        MR. MALOFIY:  Thank you, Your Honor.

2        MR. ANDERSON:  May we electronically e-mail service

3  copies by 8 o'clock tomorrow of the filings tomorrow?

4        THE COURT:  Yeah, you should -- either that or just

5  give it to him at 8 o'clock in the morning when they come.

6        MR. MALOFIY:  Thank you.

7        MR. ANDERSON:  Of course, the old-fashioned way.

8        THE COURT:  The old-fashioned way.

9        Okay.  We'll be in recess.

10      *(Evening recess taken 4:20 P.M.)*

11                      --oOo--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

450

CERTIFICATE

     I hereby certify that pursuant to Section 753,
Title 28, United States Code, the foregoing is a true and
correct transcript of the stenographically reported
proceedings held in the above-entitled matter and that the
transcript page format is in conformance with the
regulations of the Judicial Conference of the United States.

Date: JUNE 16, 2016




                        /s/  Cindy L. Nirenberg, CSR No. 5059

                             Official Court Reporter

1        **UNITED STATES DISTRICT COURT**

2    **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3      **HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE**

4                     **- - - -**

5


6    **MICHAEL SKIDMORE, AS TRUSTEE FOR  )**
     **THE RANDY CRAIG WOLFE TRUST,       )**
7                                        **)**
                       **PLAINTIFF,      )**
8                                        **)**
          **vs.                          )     No. CV 15-03462-RGK**
9                                        **)**
     **LED ZEPPELIN; JAMES PATRICK PAGE; )**
10   **ROBERT ANTHONY PLANT; JOHN PAUL    )**
     **JONES; SUPER HYPE PUBLISHING,      )**
11   **INC.; WARNER MUSIC GROUP CORP.,    )**
     **PARENT OF WARNER/CHAPPELL MUSIC,   )**
12   **INC.; ATLANTIC RECORDING           )**
     **CORPORATION; RHINO ENTERTAINMENT   )**
13   **COMPANY,                           )**
                                         **)**
14                     **DEFENDANTS.       )**

15


16        **REPORTER'S TRANSCRIPT OF JURY TRIAL**

17       **DAY 3, VOLUME 1; PAGES 451 TO 582**

18            **THURSDAY, JUNE 16, 2016**

19                  **8:17 A.M.**

20           **LOS ANGELES, CALIFORNIA**

21

22    _____

23        **SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR**
          **Official Reporter, U.S. District Court**
24               **255 East Temple Street**
               **Los Angeles, CA  90012**
25                 **213.894.5949**

452

**APPEARANCES OF COUNSEL:**


**FOR PLAINTIFF MICHAEL SKIDMORE AS TRUSTEE FOR THE
RANDY CRAIG WOLFE TRUST:**

    FRANCIS ALEXANDER, LLC
    BY:  FRANCIS MALOFIY, ATTORNEY AT LAW
    280 N. PROVIDENCE ROAD, SUITE 1
    MEDIA, PENNSYLVANIA  19063
    215.500.1000

    KULIK GOTTESMAN & SIEGEL, LLP
    BY:  GLEN L. KULIK, ATTORNEY AT LAW
    15303 VENTURA BOULEVARD, SUITE 1400
    SHERMAN OAKS, CALIFORNIA  91403
    310.557.9200


**FOR DEFENDANT LED ZEPPELIN:**

    PHILLIPS NIZER, LLP
    BY:  HELENE M. FREEMAN, ATTORNEY AT LAW
    666 FIFTH AVENUE
    NEW YORK, NEW YORK  10103
    212.977.9700


**FOR DEFENDANTS JAMES PATRICK PAGE, ROBERT ANTHONY PLANT:**

    LAW OFFICES OF PETER J. ANDERSON, PC
    BY:  PETER J. ANDERSON, ATTORNEY AT LAW
    100 WILSHIRE BOULEVARD, SUITE 2010
    SANTA MONICA, CALIFORNIA  90401
    310.260.6030

    PHILLIPS NIZER, LLP
    BY:  HELENE M. FREEMAN, ATTORNEY AT LAW
    666 FIFTH AVENUE
    NEW YORK, NEW YORK  10103
    212.977.9700


///

///

///

453

```
 1   APPEARANCES OF COUNSEL (CONTINUED):

 2

 3   FOR DEFENDANTS WARNER/CHAPPELL MUSIC, INC., ATLANTIC RECORDING
     CORPORATION, RHINO ENTERTAINMENT COMPANY:
 4
          LAW OFFICES OF PETER J. ANDERSON, PC
 5        BY:  PETER J. ANDERSON, ATTORNEY AT LAW
          100 WILSHIRE BOULEVARD, SUITE 2010
 6        SANTA MONICA, CALIFORNIA  90401
          310.260.6030
 7

 8

 9   ALSO PRESENT:

10        NATHAN OSHER, WARNER/CHAPPELL MUSIC, INC.

11        BRAD COHEN, WARNER MUSIC GROUP

12        SCOTT DUVAL, SENIOR TECHNOLOGY CONSULTANT

13        DAN MORENO, TRIAL TECHNICIAN

14

15

16

17

18

19

20

21

22

23

24

25
```

454

```
1                          I N D E X

2

3    PROCEEDINGS                                        PAGE

4    Discussion outside the presence of the jury        455

5    Testimony outside the presence of the jury         470

6

7    PLAINTIFF'S WITNESSES:                             PAGE

8    JAMES PATRICK PAGE

9      DIRECT EXAMINATION (CONTINUED) BY MR. MALOFIY     476

10     CROSS-EXAMINATION BY MR. ANDERSON                 564

11     REDIRECT EXAMINATION BY MR. MALOFIY               569

12     RECROSS-EXAMINATION BY MR. ANDERSON               571

13
     LARRY FUZZY KNIGHT
14
       DIRECT EXAMINATION BY MR. MALOFIY                 572
15
       CROSS-EXAMINATION BY MR. ANDERSON                 578
16

17

18

19                      E X H I B I T S

20   TRIAL EXHIBIT      MARKED FOR I.D.    RECEIVED IN EVIDENCE
       NUMBER:             PAGE:               PAGE:
21
       2023-A               --                   508
22
       D040194             538                    --
23
       D39243              546                   557
24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00590**

455

1            LOS ANGELES, CALIFORNIA; THURSDAY, JUNE 16, 2016

2                              8:17 A.M.

3                              - - - -

4       (Outside the presence of the jury:)

5            THE COURT:  Okay.  Counsel, there are three areas that

6    I want to talk about that were raised yesterday.

7            One is, we were asked if we would take judicial notice

8    that there's been no challenges to the Trust.  I'm not too sure

9    that defense is even contesting that one way or the other.  But

10   the Court's not going to take judicial notice as to the fact

11   that there's been no challenges to the Trust.  It's very easy

12   to put the trustee on and say have there been any challenges,

13   and he can say no, and that's it, unless they can show there

14   has been some challenges.  So you can handle that through your

15   witnesses, but the Court's not taking judicial notice of all

16   that.  I'm not going to go through all the court records.

17           As to the witness hearing the composition -- take that

18   back.  Hearing the performance and testifying whether he has

19   ever heard it or not, counsel's right, that can come in for

20   access, but it can't come in as to whether or not, in the

21   jury's mind, whether or not that is similar or not similar,

22   because we're not talking about the performance, we're talking

23   about the deposit copy.

24           So this is what you're going to do, if you wish to do it.

25   We will play the performance here in court, not in front of the

456

```
1    jury, but have the witness here, and then when we bring the
2    jury in, you can ask him, have we just played the performance
3    for you, have you listened to it, is it similar or not?
4         (Mr. Malofiy enters the courtroom.)
5         THE COURT:  The Court finds it is much too prejudicial
6    for the jury to hear that composition, so we're not going to
7    allow the jury to hear that composition, but you can have the
8    witness hear that composition, and then you can ask him
9    questions in front of the jury about it.
10        The third area that we wanted to talk about is the
11   deposition.  You mentioned the rule said that you can allow
12   that deposition in.  Give me a quote on where that rule is that
13   you're talking about.  As of now, the default is, is that, no,
14   if there's a live witness here, you have to go through live
15   testimony rather than introducing the deposition, except for
16   impeachment.  But I'll give you a chance to provide the Court
17   with that rule that you said, if there is a rule, saying that
18   it's allowed in even though we have a live witness here in
19   court.
20        So those were the three things we were talking about.
21   I'll give you about five minutes to determine whether or not
22   you want to go ahead and play the composition for the witness
23   and then ask questions after the jury comes back in or not.
24   And let me know.  If so, we'll have to play that right away
25   before we bring the jury in.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00592**

457

1      Any questions?

2           MR. KULIK:  May I be heard, Your Honor?

3           THE COURT:  Pardon me?

4           MR. KULIK:  May I be heard on one of those points,

5  Your Honor?

6           THE COURT:  Sure.

7           MR. KULIK:  The judicial notice.  We didn't ask for

8  the judicial notice that there has been no challenge to the

9  Trusts over the course of the years.  You're exactly correct,

10 we can put the trustee on.

11          THE COURT:  Sure.

12          MR. KULIK:  What we were seeking judicial notice of is

13 the orders of the probate court which established the existence

14 of the Trust and which decided what Bernice Pearl, who is the

15 mother and who became the Trustee of the Trust, would receive

16 versus what Quinn Wolfe would receive.  That was all determined

17 in the probate court.  There were final binding orders to that

18 effect.

19          THE COURT:  Well, what you can put in is the Trust

20 itself.  The Trust says -- if I'm not mistaken, the Trust says

21 all the intellectual property goes into the Trust.

22          MR. KULIK:  Your Honor, one of the other matters

23 before the Court --

24          THE COURT:  Let me also ask you, are you contesting

25 whether or not Quinn owns it or not?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00593**

458

```
 1          MR. ANDERSON:  No, Your Honor.

 2          THE COURT:  Okay.

 3          MR. KULIK:  Well, then my question is, why is Quinn

 4   Wolfe on the witness list to testify?

 5          THE COURT:  I don't know.  They can put anybody on a

 6   witness list.

 7          MR. KULIK:  Well, but --

 8          THE COURT:  That, Counsel, as you know, many times is

 9   done as far as gamesmanship, et cetera, that you may put

10   witnesses on that you don't call.  Don't have to call all the

11   witnesses.

12          MR. KULIK:  But Your Honor, in the opening statement

13   that was given by the defendants, they told the jury that Quinn

14   Wolfe would come and testify that he's the owner of copyrights

15   to "Taurus."

16          THE COURT:  Okay.

17          MR. KULIK:  And my question is, the whole point is --

18   I don't know if you received our motion.  You told us to file

19   a --

20          THE COURT:  Yeah, we did.  I'm reading it back there.

21          MR. KULIK:  The whole point of that is, there is

22   absolutely no evidence to support that.

23          THE COURT:  Okay.

24          MR. KULIK:  And he would just simply come in here and

25   emotionally tell us why he feels he was taken advantage of in
```

459

1    the probate proceedings.

2           THE COURT:  If it's put into issue, then I'm going

3    to -- we'll let you get into that, but until it's in issue, we

4    can't get into it.  In other words, it can't be in the case in

5    chief, but if they bring it up, if they bring it in as an

6    issue, you can get into it.  Right now there's no issue as to

7    whether or not Quinn owns it or not.  If it becomes an issue,

8    we'll let you get into it.

9           MR. KULIK:  Okay.  But the point is, it will be highly

10   prejudicial if Quinn comes and testifies before the jury before

11   this Court makes a determination that anything he has to say

12   has some possible basis in fact or law.  If you just let him

13   come in here and start to testify and we start to object, the

14   damage will have been done, Your Honor.  So what we asked

15   for --

16          THE COURT:  Are you asking that he be excluded from

17   testifying?

18          MR. KULIK:  Either that he be excluded, or, before he

19   testifies --

20          THE COURT:  Let's get down to --

21      Do you intend to call Quinn?

22          MR. ANDERSON:  It appears that we will not be able to

23   call Quinn.

24          THE COURT:  Okay.

25          MR. ANDERSON:  And Counsel is actually incorrect about

460

```
 1    what I said in the opening statement.  I never said that Quinn

 2    was going to come in and say that he owns the copyrights.

 3            THE COURT:  Okay.  Counsel, I don't want to get into

 4    that.  I want to get into right --

 5            MR. KULIK:  If he's not going to testify --

 6            THE COURT:  That's what I want to get into.

 7            MR. KULIK:  -- then I have nothing else to say.

 8            THE COURT:  If he's not going to testify, then it's

 9    not an issue.  If he does testify, then let me know ahead of

10    time, and we'll rule on it at that time.

11            MR. ANDERSON:  Thank you, Your Honor.

12            THE COURT:  Perfect.  Satisfied both sides.

13            MR. KULIK:  Yes, Your Honor.

14            THE COURT:  Give you a few minutes as to whether or

15    not you want to play that composition in front of the witness

16    but outside the presence of the jury.

17            MR. KULIK:  May I have a second, Your Honor?

18            THE COURT:  Sure.

19            MR. KULIK:  Because he wasn't here when you started

20    speaking.

21            THE COURT:  I know that.  He should have been here at

22    8:00 o'clock.  I'm not going to wait on that.

23        But let me tell you, Counsel, what we were saying.

24            MR. MALOFIY:  Yes, Your Honor.

25            THE COURT:  Court finds under 403 it's too prejudicial
```

461

```
 1   to play that performance in -- or the composition that came off
 2   the record in front of the jury, because it may confuse them as
 3   to what is being compared to what.  But access is an issue,
 4   you're correct, and so you can play it in front of the witness
 5   outside the presence of the jury, have him listen to it, and
 6   then we'll bring the jury in and you could say have you just
 7   listened to the composition off that record and have you ever
 8   heard it before, et cetera.  That's your option on it.  So if
 9   you want to do it before the jury comes, that's fine.
10   Otherwise, we'll just continue.
11        MR. MALOFIY:  Will I be permitted to ask him as to
12   elements of that musical composition which he allegedly wrote?
13   The chord sequence, the key, the progression?
14        THE COURT:  Why would that be significant?
15        MR. MALOFIY:  Well, if he allegedly was the composer
16   of this piece of music, or at least first half of the
17   introduction, I should be able to inquire as to --
18        THE COURT:  As to the musical performance?
19        MR. MALOFIY:  No.  As to the musical composition
20   elements embodied both in his recording of "Stairway to Heaven"
21   and also the compositional elements embodied in the album
22   recordings --
23        THE COURT:  No.
24        MR. MALOFIY:  -- present in the deposit copy.
25        THE COURT:  No, Counsel.  We've ruled on that many,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00597**

462

1    many times in the past.  This is a comparison between the

2    composition of "Stairway to Heaven" and the deposit copy.

3    That's what it is, and that's why I wasn't going to allow it

4    in.  You brought up an excellent point yesterday, and that is,

5    but you should be able to go into it as far as access, has he

6    ever heard it before, and I'm allowing you to do that.  But I'm

7    not going to compare the performance to the "Stairway to

8    Heaven."  It's a comparison between the "Stairway to Heaven"

9    and the deposit copy only.

10            MR. MALOFIY:  As to the rebutting the independent

11   creation argument which defendants have made, I believe it's

12   also highly probative and relevant in that regard.

13            THE COURT:  Okay, and the Court's already ruled on it,

14   and you can take -- you can make the decision at this time

15   whether or not you want to play it in front of him so you could

16   ask him questions as to whether or not he ever heard it before.

17   If you want that, I'll do that for you.

18            MR. MALOFIY:  Thank you, Your Honor.  Let me just

19   address one issue.

20            THE COURT:  Okay.

21            MR. MALOFIY:  Am I going to be permitted to inquire as

22   to compositional elements of "Stairway to Heaven" and also the

23   "Taurus" deposit copy --

24            THE COURT:  Yes.

25            MR. MALOFIY:  -- with Mr. Page?

463

```
 1              THE COURT:  I'm sorry?

 2              MR. MALOFIY:  With Mr. Page.  Because I wasn't able --

 3              THE COURT:  Oh, that's correct, because he wasn't

 4    designated as an expert.

 5              MR. ANDERSON:  Yes, he's not designated as an expert,

 6    so -- but I'm not quite sure what counsel is asking.

 7              THE COURT:  Well, but counsel is saying that he's the

 8    composer, and in composing it, did he, you know, copy it in

 9    any -- you can ask that.

10              MR. ANDERSON:  Absolutely, Your Honor, but the

11    composer of "Stairway to Heaven."  If he wants to ask about

12    the composition, how it was created, whatever, "Stairway to

13    Heaven" --

14              THE COURT:  Yeah.

15              MR. ANDERSON:  -- that's a different animal.

16              THE COURT:  Yeah, and he can ask that as far as how

17    that compares to the deposit copy, yes.

18              MR. MALOFIY:  So I can't ask him --

19              MR. ANDERSON:  But if he gets to the point -- and this

20    came up yesterday when counsel asked Mr. Page whether there was

21    similarity between the two, and as the Court ruled, he's not an

22    expert witness, so --

23              THE COURT:  And whether or not there's similarities

24    between the two or not is a jury determination.  I don't care

25    whether or not Mr. Page thinks there's similarity, I don't care
```

464

1    whether or not -- that's a jury determination.  In fact, you're

2    not going to be able to ask the experts is there a similarity

3    between these two.  All you can do is ask the experts

4    hypotheticals and then prove the hypotheticals.  Experts can

5    only testify as to hypotheticals.  So you ask the hypotheticals

6    and then you do it that way.

7            MR. ANDERSON:  Okay.  Thank you, Your Honor.

8            THE COURT:  So -- well, I'm not going to tell you how

9    to try a case.  You all know that.  You've all been around

10   before.

11           MR. MALOFIY:  Only so we're clear and so I'm clear --

12           THE COURT:  Yeah.

13           MR. MALOFIY:  I will be allowed to ask Mr. Page the

14   compositional elements in his piece of work, "Stairway to

15   Heaven," the key, the chord sequence, things like that --

16           THE COURT:  Sure.

17           MR. MALOFIY:  -- and also ask him the same questions

18   as it relates to the "Taurus" deposit copy --

19           THE COURT:  Yes.

20           MR. MALOFIY:  -- correct?

21           THE COURT:  Yes.  Yeah.

22           MR. MALOFIY:  Thank you.

23           THE COURT:  The ultimate question is what he was

24   saying.  Can you tell -- can you ask him whether or not these

25   two things are similar.  You can't get -- that's the ultimate

465

```
1    question the jury has to determine.  But you can ask him the
2    underlying elements, yes, like you just mentioned.
3            MR. MALOFIY:  And I could, of course, ask him, isn't
4    the key the same, isn't the chord sequence the same --
5            THE COURT:  Sure.
6            MR. MALOFIY:  -- isn't this the same?
7            THE COURT:  Okay.  You decide whether you want the
8    jury -- or whether you want him to hear the production outside
9    the presence of the jury or not.
10           MR. MALOFIY:  That's the only way it's coming in, I
11   believe, or that's the only way I can question him on it.
12       If I can just take 10 seconds with counsel here.
13           THE COURT:  Well, I'm leaving the bench for a second,
14   so you can talk to him, yeah.
15           MR. MALOFIY:  Oh, okay.  Do I have a minute to speak
16   to counsel just so --
17           THE COURT:  Oh, yeah.  Yeah, we'll take a couple of
18   minutes before we --
19           MR. MALOFIY:  Thank you, Your Honor.  Appreciate it.
20           THE COURT:  Okay.  We'll be in recess.
21           THE CLERK:  All rise.
22       (Recess held from 8:28 a.m. to 8:35 a.m.)
23       (Outside the presence of the jury:)
24           THE COURT:  Okay.  Counsel, we decided that we're
25   going to play the recording in front of the witness?
```

466

```
1           MR. MALOFIY:  Yes, Your Honor.

2           THE COURT:  Okay.  Want to put the witness on the

3    stand?

4           MR. KULIK:  Your Honor, before we do so, may I have

5    one more minute of the Court's time?

6           THE COURT:  Sure.

7           MR. KULIK:  I just want to make sure that I understood

8    the Court clearly that in a -- I think heard the Court say that

9    in a copyright infringement action where the issue is whether

10   or not the two compositions are substantially similar, both

11   sides have engaged expert witnesses for the express purpose of

12   giving a professional opinion on whether elements of the works

13   are substantially similar, you are not going to allow the

14   parties, or at least you're not going to allow us, to ask our

15   engaged expert if, in his professional opinion, the two works

16   are similar?  Because I just -- that would be one extraordinary

17   ruling, I think, in my experience, in the --

18          THE COURT:  Counsel, let me -- I understand what

19   you're saying, and it does sound a little weird.  The reality

20   is, the rules are very clear, and it's not extraordinary, that

21   an expert witness can testify as to hypotheticals that are put

22   in front of him.

23       Now, if you put in front of him this work here,

24   hypothetically, if you look at this work here and you look at

25   this work here, hypothetically would you say that those two are
```

467

1   similar?  You could say that.  You can't say -- and I know it's

2   a technical distinction.  You can't say, is the defendants'

3   work similar to the composition?  You have to say, is this --

4   hypothetically, if this is a composition and this is a

5   composition, are they similar?  You can say that, and then

6   you're going to have to prove that those are the two

7   compositions.  And I don't know why you're saying that's

8   extraordinary, Counsel.  It's very, very clear --

9           MR. KULIK:  Your Honor, an expert witness --

10          THE COURT:  Can testify to hypotheticals only.

11          MR. KULIK:  To hypotheticals only?

12          THE COURT:  And you're going to have to prove the

13  hypotheticals.

14      Now, listen very carefully what I'm saying, because I

15  think -- I don't think it's an issue.  I think you're going to

16  be doing this.  Listen to what I'm saying.  You ask him,

17  hypothetically, if this is the deposit copy, and

18  hypothetically, if this is the work of -- that's been produced,

19  are they similar?  And he can testify that these two are

20  similar, but it's up to you to show that that work is

21  Led Zeppelin's work and this work is the deposit copy.  That's

22  up to you.

23          MR. KULIK:  I understood -- so you're saying of course

24  we have to lay a foundation that these are the works.

25          THE COURT:  Not only a foundation.  When you ask the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00603**

468

```
1   question, you're going to say, is this thing that was presented
2   to you, this hypothetical that was presented to you, and this
3   one, are they the same?  You can ask that.
4           MR. KULIK:  Okay.
5           THE COURT:  But you can't ask the ultimate question.
6   And I don't know why that's -- it's a little technical, but --
7           MR. KULIK:  Isn't that why you engage an expert?
8   That's why --
9           THE COURT:  Counsel, I'm not going to argue and get
10  into theory with it.  I can tell you the black letter law is
11  that an expert can only testify to hypotheticals.  Unless
12  they're a percipient witness, only to hypotheticals.  They can
13  testify, if they hear A and they hear B, are they similar, but
14  then -- so it's a very technical distinction is what I'm
15  saying.  It shouldn't be bothering you one way or the other.
16          MR. KULIK:  Your Honor, okay.  And one last thing,
17  similarly on the question of access.
18      I understand the Court's ruling this morning, but how can
19  the jury assess the witness's credibility when you ask him,
20  okay, now -- the question, the ultimate question -- after the
21  jury comes back into the courtroom --
22          THE COURT:  Okay.
23          MR. KULIK:  -- and Mr. Page is on the stand, for
24  example, and we ask him a question, how can the jury assess his
25  credibility --
```

469

```
 1          THE COURT:  He may not be, then, Counsel.  Then my
 2   ruling would be, if we don't do it this way, it is much more
 3   prejudicial than it is probative, and it doesn't come in at
 4   all.  Because there's no question in the Court's mind that that
 5   would confuse the jury and they may very well be comparing the
 6   production to the infringing -- or alleged infringing
 7   composition.
 8          MR. KULIK:  But Your Honor, don't you think the
 9   production itself can be highly relevant to the question of
10   access?  For example, if there are certain elements --
11          THE COURT:  Counsel, your minute is long gone.  We can
12   sit here and debate this forever on it, but there's no question
13   in my mind that it is much more prejudicial under 403, and I'm
14   telling you right now, I would keep out the jury hearing the
15   production.
16      We're looking at, and the jury has to determine, between
17   the deposit copy and "Stairway to Heaven."  That's what they're
18   going to have to look at, and I don't want them hearing other
19   things that they may say, well, is it similar to this
20   production or that -- they have to determine whether or not
21   it's similar to the deposit copy, and so for that reason, under
22   403 I would not allow them to hear the other -- the production
23   copy.
24          MR. KULIK:  Okay.
25          THE COURT:  Okay.  But I'm assuming you still would
```

470

```
 1    like to do it this way.

 2            MR. MALOFIY:  Yes, I would, Your Honor.

 3            THE COURT:  Okay.  Let's do it.

 4        Mr. Page, yeah, why don't you take the witness stand.

 5        Do you have a recording?

 6            MR. MALOFIY:  Yes, I do, Your Honor.  In fact, we have

 7    three, because we're not -- there's multiple albums he has,

 8    Mr. Page has in his collection, which contain more than one

 9    different version of "Taurus."

10            THE COURT:  Okay.

11        (James Patrick Page took the witness stand.)

12            THE CLERK:  And I'll just remind you, you're still

13    under oath.

14            THE WITNESS:  Yes.

15            THE COURT:  Okay.  We're not going to be asking you

16    any questions other than playing this for you, and then later

17    we'll ask you questions --

18            THE WITNESS:  Yes.

19            THE COURT:  -- in front of the jury.  But we want the

20    record to indicate that the witness is on the witness stand,

21    and there will be musical compositions played at this time.

22        Go ahead.  Why don't we go ahead and play it.

23            MR. MALOFIY:  Go ahead.

24            MR. MORENO:  Ready?

25            MR. MALOFIY:  Yes.
```

471

1          (Audio played.)

2              THE COURT:  Counsel, can we identify what record that

3    came from?

4              MR. MALOFIY:  This is the album recording of "Taurus,"

5    from the 45 seconds to the end.

6              THE COURT:  On which record?

7              MR. MALOFIY:  Spirit's --

8              THE COURT:  I want you to be able to ask him as to all

9    three, so we have to distinguish between the three.

10             MR. MALOFIY:  Thank you, Your Honor.

11         It's on the Spirit self-titled album *Spirit*.

12             THE COURT:  Thank you, Counsel.

13         Next production.

14             MR. MALOFIY:  You'd like me to play them and then ask

15   questions afterwards, correct?

16             THE COURT:  You're not going to ask questions until

17   the jury comes in.

18             MR. MALOFIY:  I'm sorry, we're going to ask questions

19   in the presence of the jury?

20             THE COURT:  Yes.

21             MR. ANDERSON:  And Your Honor, if I may, just so the

22   record is clear, that was not -- that omitted the first 45

23   seconds, I think is what counsel was saying, of that sound

24   recording.

25             MR. MALOFIY:  From 45 seconds on.  The relevant

472

1    portion.

2        THE COURT:  Thank you, Counsel.

3        MR. MALOFIY:  Yes.  And this is 39-A in our audio

4    examples.

5        THE COURT:  And is it also starting 45 seconds into

6    it?

7        MR. MALOFIY:  No, this starts from the beginning, and

8    so -- Mr. Page has testified that he has live albums of

9    "Taurus" -- excuse me, of Spirit, and this is a live recording

10   of "Taurus" which I believe he may have.

11       THE COURT:  Okay.  And do we know which record it's

12   from?

13       MR. MALOFIY:  No, because there was many live bootlegs

14   that came out, and so, because he has -- Mr. Page has live

15   bootlegs in his collection --

16       THE COURT:  Let's call it the second song, then.

17       MR. MALOFIY:  Fair enough.

18      (Audio played.)

19       THE COURT:  Okay.  Thank you, Counsel.

20       MR. ANDERSON:  If I may, Your Honor, if counsel could

21   please identify it by exhibit number.  And I believe that's a

22   1990s live recording, so I would raise an objection of

23   relevance, but just for the record.

24       THE COURT:  Okay.  It will be overruled.

25      The third recording that you're going to play now?

473

```
 1            MR. MALOFIY:  Yes, we did identify this as 39-A,

 2    Mr. Anderson.

 3            MR. ANDERSON:  Thank you.  I didn't catch that.

 4            THE CLERK:  Can I get the identification of the first

 5    recording?

 6            MR. MALOFIY:  Yes, one second.

 7       With the Court's indulgence --

 8            THE COURT:  Sure.

 9            MR. MALOFIY:  -- we're going to just confirm the

10    number.

11       With the Court's indulgence...

12       (Mr. Malofiy and Mr. Anderson conferred privately.)

13            THE COURT:  Counsel, we can identify them later.  I

14    know you're taking some time to find that, and that's okay.  We

15    can define those later as the first recording, the second

16    recording, then the third recording.  So why don't we go ahead

17    with the third recording now.  I don't know if you can describe

18    what it is.

19            MR. MALOFIY:  Yes.  This is the comparison video which

20    Mr. Page had identified in his testimony as creating a lot of

21    buzz on the Internet which he had heard.

22            THE COURT:  Okay.  Why don't we go ahead and play

23    that, then.

24            MR. MALOFIY:  Just want to make sure it's the correct

25    one, Your Honor.
```

474

```
1           THE COURT:  Sure.

2           MR. MALOFIY:  If it would help, Your Honor, just to

3    identify, and perhaps the first song would be the album

4    recording of Spirit released on the Spirit self-titled -- the

5    album recording of "Taurus" on the Spirit self-titled album.

6    The second one is "Taurus" live recording.  The third one is

7    the comparison video which we believe --

8           THE COURT:  Okay.

9           MR. MALOFIY:  -- Mr. Page had identified.

10          THE COURT:  Okay.  Thank you, Counsel.  If you'd play

11   the third one, please.

12      (Video played.)

13          THE COURT:  Okay.  Now you've heard three different

14   versions.

15          THE WITNESS:  I have.

16          THE COURT:  One is from the album, one is from a live

17   production, and one is a comparison album.

18      You're familiar with all -- excuse me.  You understand

19   you've heard all three now; is that correct?

20          THE WITNESS:  I'm sorry?

21          THE COURT:  You've heard all three today.

22          THE WITNESS:  I've heard all three now.

23          THE COURT:  Okay.

24      Okay.  Counsel, we're going to bring the jury in now and

25   continue on to cross-examination, then.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00610**

475

```
 1            MR. MALOFIY:  And I can ask some questions --

 2            THE COURT:  It would be direct examination.

 3       Pardon me?

 4            MR. MALOFIY:  And I can ask some questions as to what

 5   he just heard?

 6            THE COURT:  Yeah, you can.  Well, sure.  Yeah.

 7            MR. MALOFIY:  Thank you.

 8            THE COURT:  Okay.  We'll be in recess.

 9       Bring the jury in.

10            THE CLERK:  All rise.

11       (Recess held from 8:53 a.m. to 8:56 a.m.)

12       (In the presence of the jury:)

13            THE COURT:  Okay.  The record will reflect that all

14   the members of the jury are in their respective seats in the

15   jury box.

16       Apologize, ladies and gentlemen, for getting started a

17   little late, but we had to do some things before we got to

18   court.  And to keep you informed, because you should be, one of

19   the things we did is, we played some recordings for the witness

20   so the witness could hear those recordings.  We didn't play

21   them for you because they're recordings of Spirit of the

22   "Taurus," and that's not going to come in front of you because

23   it's not the recordings that you have to look at to see what

24   the comparison is.  It is the deposit copies and whether or not

25   the deposit copies are infringed, not the productions or the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00611**

476

```
1    records themselves.  So that's why we didn't play it in front
2    of you, because we don't want to confuse you with other things
3    that you're not supposed to be deciding on this case.
4         Now, hopefully none of you spent time, as I told you
5    yesterday, looking for the NBA playoff game.  Wasn't on.  But
6    tonight if you want to listen to it, I think you'll catch it
7    tonight.
8         Are you all ready?
9              JUROR:  Yes.
10             THE COURT:  Okay.  Let's go.  We were at
11   cross-examination -- or excuse me, examination, and the record
12   will reflect that the witness is on the witness stand.
13                JAMES PATRICK PAGE, PREVIOUSLY SWORN,
14                CALLED AS A WITNESS BY THE PLAINTIFF,
15                    DIRECT EXAMINATION (CONTINUED)
16   BY MR. MALOFIY:
17   Q.   Mr. Page.
18   A.   Yes.
19   Q.   You had the opportunity to listen to three separate
20   recordings of "Taurus" which I played for you outside the
21   presence of the jury, correct?
22   A.   That's correct.
23   Q.   Were you able to hear them?
24   A.   Yes.
25   Q.   And it was your testimony earlier on that you have, in
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

477

```
 1   fact, in your possession and control, five Spirit albums,

 2   correct?

 3   A.   That's correct.

 4   Q.   And one of them's a double disc live album, correct?

 5   A.   An official release, yes.

 6   Q.   Now, when you listened to the first song, would you agree

 7   that the "Taurus" album recording and "Stairway to Heaven"

 8   album recording, part A, is in the same key?  Yes, it is?  No,

 9   it's not?

10        MR. ANDERSON:  Objection.

11        THE COURT:  Objection is sustained.

12     Again, we're comparing "Stairway to Heaven" to the deposit

13   copy, not to some other recording that he may have heard, okay?

14   BY MR. MALOFIY:

15   Q.   Sir, do you agree that there are -- do you agree that

16   "Taurus" album recording is in your possession and control?

17   A.   Sorry?  Say that again.

18   Q.   You agree that the "Taurus" album recording that you just

19   heard is actually in your collection, in your possession and

20   control, correct?

21        MR. ANDERSON:  Objection, asked and answered.

22        THE COURT:  You may answer it.

23        THE WITNESS:  Yes, I have a copy of that first album.

24   BY MR. MALOFIY:

25   Q.   And that first album is Spirit's first self-titled album,
```

478

```
1    correct?
2    A.   Yes.  Quite right, yeah.
3    Q.   Did you have the opportunity to listen to the "Taurus"
4    album recording as well as "Stairway to Heaven" part A?
5              MR. ANDERSON:  Objection, vague and ambiguous.
6              THE WITNESS:  Umm, I'm not really sure what you mean
7    by that.
8              THE COURT:  Why don't you restate the question.
9    BY MR. MALOFIY:
10   Q.   Do you agree that the "Taurus" album recording, which you
11   just heard, and "Taurus" deposit copy, and "Stairway to Heaven"
12   album recording are all in the key of A minor?
13             MR. ANDERSON:  Objection.
14             THE COURT:  Sustained.
15        Counsel, we're not concerned with the recording.  You
16   could ask him about the recording as to whether or not he had
17   access to the song before, but if it's similar to the
18   recording, nobody cares.  It's not an issue in this case.  The
19   only issue is whether or not it's infringing on the deposit
20   copy.
21        Go ahead, Counsel.
22   BY MR. MALOFIY:
23   Q.   Sir, do you agree that you had access to "Taurus" and you
24   had that album in your possession and control?
25             MR. ANDERSON:  Objection, calls for a legal
```

479

```
1    conclusion, vague and ambiguous.
2              THE COURT:  Just a second.
3              THE WITNESS:  Sorry?
4              THE COURT:  Overruled.
5         That means you can answer the question.
6              THE WITNESS:  I do --
7              THE COURT:  You want it restated?
8              THE WITNESS:  Yeah, please.  Yeah.
9    BY MR. MALOFIY:
10   Q.   Do you agree that you had the "Taurus" album recording in
11   your possession and control?
12             MR. ANDERSON:  Objection, vague and ambiguous.
13             THE COURT:  Overruled.
14             THE WITNESS:  What I've said is, I have a copy of the
15   album that contains "Taurus," but that I -- that I not -- I
16   didn't have any knowledge of "Taurus."  So, in other words, a
17   record appeared in my collection.
18             THE COURT:  Okay.
19   BY MR. MALOFIY:
20   Q.   Do you agree that the "Taurus" deposit copy and "Stairway
21   to Heaven" album recording are both in the key of A minor?
22             MR. ANDERSON:  Objection.
23             THE COURT:  Overruled.
24             THE WITNESS:  I don't know.
25   ///
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00615**

480

```
 1   BY MR. MALOFIY:

 2   Q.   Sir, you're a session musician, correct?

 3   A.   Yeah, but I'm not familiar with the deposit copy.

 4              THE COURT:  Okay.

 5              MR. MALOFIY:  Well, one moment.  We'll provide

 6   Mr. Page Exhibit 2058, the "Taurus" deposit copy.

 7   Q.   You do read and write music, right, Mr. Page?

 8   A.   To a degree.

 9   Q.   And you've sat on hundreds of sessions, correct?

10   A.   Yeah, that's correct.

11              THE COURT:  Counsel, I'm sorry.

12        You're not familiar with the deposit copy at all?

13              THE WITNESS:  No.

14              THE COURT:  Can you testify, as to what you wrote, is

15   that in the key of A?

16              THE WITNESS:  A minor, yes.

17              THE COURT:  A minor, okay.

18   BY MR. MALOFIY:

19   Q.   And do you agree that what you wrote is a tempo roughly

20   about 72 to 73 BPMs in the first 2 minutes and 14 seconds of

21   "Stairway to Heaven"?

22   A.   Well, I never actually -- I never actually checked the

23   tempo, you know, the beats per minute.  I don't know.

24   Q.   You know --

25   A.   But --
```

481

1    Q.    You would agree with me that there's something called a

2    slow tempo, a medium tempo, and a fast tempo, correct?

3    A.    Measured tempo, yeah.

4    Q.    And you agree that "Stairway to Heaven" is not a fast

5    tempo, correct?

6    A.    Not -- not at the beginning, no.

7    Q.    And you'd agree with me, in the first 2 minutes and 14

8    seconds it's a slow tempo, somewhere between 72 and 73 BPM,

9    correct?

10   A.    Well, okay.

11         MR. ANDERSON:  Objection, lack of foundation.

12         THE COURT:  If you --

13         THE WITNESS:  Don't know.

14   BY MR. MALOFIY:

15   Q.    Would you like to count it out and maybe you can determine

16   that?

17   A.    Well, have you got a -- have you got a meter, then?

18   Q.    Umm, I can provide you one.  One second.

19         MR. ANDERSON:  Objection.  I'm not sure what he's

20   going to provide him and --

21         THE COURT:  I don't know, either.

22         And I just want to remind you, Counsel, that there are

23   time limits on presenting the evidence, and if you want to

24   waste time going into it, that's fine, I'm going to let you do

25   that, but keep in mind that this is not going to extend the

482

```
 1   time at the end of the case when you go into things that can be
 2   done much quicker.
 3        Go ahead.
 4   BY MR. MALOFIY:
 5   Q.   Let me just break it down.  You agree that "Stairway to
 6   Heaven," the first 2 minutes and 14 seconds, is a slow tempo,
 7   correct?
 8   A.   Yes, I do.  Yeah.
 9   Q.   You'd agree it's less than a hundred BPM, correct?
10   A.   Hundred BPM sounds fast, yeah.
11   Q.   Right.  You'd agree it's probably less than 80 BPM?
12   A.   Yeah, but I can't -- I can't estimate where it is.  I
13   don't know what beats per minute it is.  But I -- but I agree,
14   yeah, it's slow.
15   Q.   So as you stand up here on the stand, and being a session
16   musician and playing guitar and music for 30, 40 years, you're
17   telling me that you can't determine approximately what the BPM
18   of "Stairway to Heaven" is?
19   A.   Yeah, I'm telling you that.
20   Q.   Okay.  You'd agree that the main instrument in the first 2
21   minutes and 14 seconds of "Stairway to Heaven" is guitar,
22   acoustic guitar, correct?
23   A.   Yes.
24   Q.   And you have a pad or an accompaniment with the recorders
25   which John Paul Jones played by himself on his own, correct?
```

483

```
1    A.    That's correct.

2    Q.    And you didn't tell him what to play, correct?

3    A.    I didn't tell him not to play.

4    Q.    Well, I understand that.  My question is, you didn't tell

5    him to play those recorder parts, correct?

6    A.    He volunteered the idea of playing the recorders.

7    Q.    And initially your idea was to put acoustic guitar and

8    electric piano, correct?

9    A.    It depends on where you're actually referring to.  If

10   you're referring to the opening, opening measures of

11   "Stairway," where it's acoustic guitar --

12   Q.    I am.

13   A.    -- and then acoustic guitar with the first vocals, I

14   always intended to have that as acoustic guitar.  The electric

15   piano was going to come in later.

16   Q.    And "Taurus" has electric piano and acoustic guitar,

17   correct?

18          MR. ANDERSON:  Objection, Your Honor.

19          THE WITNESS:  I don't know.

20          THE COURT:  Sustained.

21          MR. ANDERSON:  That's the performance.

22          THE COURT:  Sustained.

23          THE WITNESS:  Umm...

24          THE COURT:  No, that means you don't answer.  If I say

25   sustained --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00619**

484

```
 1              THE WITNESS:  Oh, don't answer.
 2              THE COURT:  -- you don't answer.
 3         Let's get the next question.
 4              MR. MALOFIY:  Sure.
 5    Q.   The arrangement --
 6    A.   Yeah.
 7    Q.   -- of "Stairway to Heaven," the first 2 minutes and 14
 8    seconds, the structure is A A B A A B A A.
 9         You testified to that earlier, correct?
10    A.   Yes, you asked me yesterday.
11    Q.   And you agree that's accurate, correct?
12    A.   Well, I believe it to be, yeah.
13    Q.   And the chord -- and the structure, song structure of
14    "Taurus" is A A B A A B; isn't that correct?
15    A.   I --
16              THE COURT:  Of the deposit copy of "Taurus"?
17              MR. MALOFIY:  Yes, Your Honor.
18              THE COURT:  Okay.
19              THE WITNESS:  I don't know.
20              THE COURT:  Okay.
21              MR. MALOFIY:  I need to pull up Exhibit 2058 for
22    Mr. Page.
23         Yeah, it's already been published.  That's fine.
24         Correct, Your Honor?
25              THE COURT:  Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

485

```
 1              MR. MALOFIY:  Thank you.

 2              THE COURT:  Can you tell from looking at the deposit

 3    copy enough to answer his question?

 4              THE WITNESS:  I mean, I can't tell.

 5              THE COURT:  Okay.

 6              MR. MALOFIY:  One moment, Your Honor.  Here it is.

 7              THE COURT:  Okay.

 8    BY MR. MALOFIY:

 9    Q.   Sir, was your testimony you can't tell?

10    A.   Yeah.  You're asking me whether it's A A B's, A A's.  I

11    can't -- I can't really tell from this.

12    Q.   You want to step through it?  Take a moment.

13    A.   Not necessarily.  Because, how -- you know, how I'm

14    looking at this, the first -- the first four bars don't repeat.

15    So that would be -- it goes into a sustain on the -- on the

16    fifth and sixth bar, which would only give you one A, and I

17    guess that's a B, is it, coming up, or what?

18    Q.   Did you review the expert reports that were provided in

19    this case by your side?

20    A.   No, I didn't.

21    Q.   Do you have any reason to dispute that your experts

22    identified the structure as A A B A A B?

23              MR. ANDERSON:  Objection, Your Honor, calls for --

24              THE COURT:  Sustained.

25
```

486

1   BY MR. MALOFIY:

2   Q.   Did you speak to your experts in this case at all?

3   A.   No, I didn't.

4   Q.   Are you providing any expert opinion as to the

5   similarities between "Taurus" and "Stairway to Heaven"?

6           MR. ANDERSON:  Objection, vague and ambiguous.

7           THE COURT:  Well, we've already discussed the fact

8   that he's not an expert in this area, so he can't give expert

9   opinion.

10          MR. MALOFIY:  I'm just clarifying the issue to be sure

11  that on cross, to be sure that defense counsel doesn't elicit

12  that testimony.

13          THE COURT:  Just go ahead with the next question.  If

14  he does, we'll deal with it at that time.

15  BY MR. MALOFIY:

16  Q.   Sir, did you do a musicological analysis on these two

17  pieces of work?

18  A.   No, I didn't.  I -- I made sure that the people who were

19  dealing with our side of it paid attention to the introduction

20  and the first verse, et cetera, of what I'd played on "Stairway

21  to Heaven."

22  Q.   So you --

23  A.   That's -- that's about my input into it.

24  Q.   And I just want to be --

25  A.   So I didn't check with them whether they had.  I just --

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00622**

487

```
 1    you know, obviously --
 2            THE COURT:  Next question.
 3            THE WITNESS:  -- they knew it anyway.
 4    BY MR. MALOFIY:
 5    Q.   And you're not offering an opinion as to the similarities
 6    between "Stairway to Heaven" and "Taurus" as you sit here
 7    today, correct?
 8            MR. ANDERSON:  Objection again, vague and ambiguous as
 9    to whether he means him personally.
10            MR. MALOFIY:  I mean him personally.
11            MR. ANDERSON:  Then that's asked and answered.
12            THE COURT:  If you were asked for your opinion, the
13    Court would sustain it anyway, because you haven't been
14    designated as an expert.  So I'm assuming he's not offering his
15    opinion, because it wouldn't be admissible.
16            MR. MALOFIY:  Thank you.
17    Q.   Sir, as you sit here today, can you definitively state the
18    structure of the deposit copy of "Taurus" which is in front of
19    you?  Yes, you can?  No you can't?
20    A.   Can I what?
21    Q.   Can you identify the structure, the song structure.
22    A.   I prefer to hear it.
23    Q.   Prefer to hear it.  Let's do this.  Hold on.
24    A.   To check it.
25    Q.   Hold on for a second.
```

488

```
 1        Can you do it by looking at the deposit copy that's
 2   contained in Exhibit 2058?  Yes, you can --
 3   A.   Well, I'm asking if I could hear what was played
 4   yesterday.
 5            THE COURT:  No, but --
 6            THE WITNESS:  No?
 7            THE COURT:  -- his question is, just from looking at
 8   it, can you make that determination?
 9            THE WITNESS:  Can I -- sorry, the last part?  By
10   looking at a deposit copy, can I --
11   BY MR. MALOFIY:
12   Q.   Definitively tell this jury what the structure of the song
13   is.  Yes, you can?  No, you can't?
14   A.   No, I don't think I can.
15   Q.   Sir, would you agree that the harmony of "Stairway to
16   Heaven" and the harmony contained in the "Taurus" deposit copy
17   are the same?
18            MR. ANDERSON:  Objection, Your Honor.  Again expert
19   testimony.
20            THE WITNESS:  Umm, I don't know what you mean by
21   harmony.
22            THE COURT:  Overruled.
23        I'm sorry?
24            THE WITNESS:  I don't know what he means by the
25   harmony.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

489

```
 1          THE COURT:  Okay.

 2   BY MR. MALOFIY:

 3   Q.   Do you know what the word "harmony" means?

 4   A.   Yes, I do.

 5   Q.   What does it mean, sir?

 6   A.   It's usually two notes or three note, three part harmony

 7   all joined together.

 8   Q.   Would you agree that harmony is the combination of notes

 9   sounded simultaneously to produce chords?

10   A.   Umm, well, it could be an octave, which is harmony, but

11   then it could be a third in the middle or a fifth, yeah.

12   Q.   Could be a first, a third, a fifth --

13   A.   Yeah.

14   Q.   -- an octave?

15   A.   Yeah.

16   Q.   Well, if you look at this deposit copy lead sheet of

17   "Taurus" and you consider your composition "Stairway to Heaven"

18   and we're focused on the first 2 minutes and 14 seconds, do you

19   agree that the harmonies are the same?

20   A.   No, I can't really tell.

21   Q.   You can't make that determination as you stand up there

22   today, correct?

23          THE COURT:  That's what he testified to.

24          THE WITNESS:  Yeah.

25   ///
```

490

```
 1   BY MR. MALOFIY:

 2   Q.   Let me move forward.  Do you see two -- do you recognize

 3   two harmony lines -- excuse me, strike that.

 4        Do you recognize two melody lines in "Stairway to

 5   Heaven" -- yes, you do?  No, you don't? -- in the first 2

 6   minutes and 14 seconds?

 7   A.   Yes, I do.

 8   Q.   All right.  And those two melody lines, would you agree

 9   that it is the guitar, acoustic guitar progression, along with

10   another part?

11   A.   What I --

12              MR. ANDERSON:  Objection, vague and ambiguous.

13              THE COURT:  Overruled.

14              THE WITNESS:  I don't know what you mean by "another

15   part."

16   BY MR. MALOFIY:

17   Q.   Well, you identified that there are two melodies in

18   "Stairway to Heaven," the first 2 minutes and 14 seconds,

19   correct?

20   A.   Yes.

21   Q.   And what do you define those two parts, sir?

22   A.   Define the two parts as they're running at counterpoint.

23   Counterpoint, it's where you've got two melodies moving in two

24   directions.

25        So the underlying melody is the one that starts on A, as
```

491

```
 1   the key is in A minor, and then it descends in a chromatic
 2   scale, which is one note -- passing notes next to each other,
 3   and those notes would be A, G sharp, G, F sharp, F.  So that is
 4   chromatic rundown, okay?  So going in --
 5   Q.   So you're referring --
 6   A.   Going in -- okay.
 7   Q.   Didn't mean to interrupt.
 8   A.   Going in counterpoint with that, on the top line is A, B,
 9   C, and then it goes down to F sharp.
10   Q.   So let's be --
11   A.   The first string.
12   Q.   So let me be clear.  You recognize two melodies.  One is
13   the descending chromatic chord progression, which is A minor,
14   A minor over G --
15   A.   G sharp.
16   Q.   G sharp, and then F, correct?
17   A.   It's A minor, A -- A minor --
18   Q.   Over G --
19   A.   -- 7 over G sharp, yeah, and then a G minus -- A minus 7
20   and then F, F -- D with an F sharp bass.
21   Q.   Isn't it F major 7?
22   A.   Where?
23   Q.   On the F?
24   A.   No.  That's at the end.  I didn't get there.
25   Q.   Okay.
```

492

1   A.   Yeah, so it's D and then it's F major 7.

2   Q.   Let me ask you this.  On the top line you identified A, B,

3   and C --

4   A.   Yes.

5   Q.   -- of this ascending scale, correct?

6   A.   Yeah, going -- going at counterpoint to the descending

7   scale.

8   Q.   It's ascending, right?

9   A.   It's descending, which is A, G sharp, G, F sharp, F.

10  Q.   Right.

11  A.   And then on the top line you have A, B, C, F sharp.

12  Q.   That's what I'm referring to.

13  A.   Okay.

14  Q.   You recognize on the ascending line there is an AB pair, a

15  BC pair, and C to F sharp, correct?

16       MR. ANDERSON:  Objection.  First of all, objection,

17  expert testimony.  It also misstates the testimony.

18       THE COURT:  Sustained.  We're getting into expert

19  testimony and both sides have designated experts to testify in

20  this area.

21       THE WITNESS:  Yeah.

22       MR. MALOFIY:  If I could --

23       THE WITNESS:  Yeah, I think it's a little --

24       THE COURT:  That's okay, I've sustained --

25       THE WITNESS:  -- confusing for the jury to --

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00628**

```
1            THE COURT:  Remember what I told you yesterday.  If I
2  sustain the objection, you don't have to answer.
3            THE WITNESS:  Okay.
4            THE COURT:  If I overrule it, you do.
5            THE WITNESS:  Okay.
6            THE COURT:  Don't worry about it.  I'll let you know
7  if -- okay.
8            THE WITNESS:  Thank you.
9  BY MR. MALOFIY:
10 Q.   I'll move forward, but just to understand your testimony
11 correctly, you recognize two melodies in "Stairway to Heaven"
12 part A.  Those are the descending chromatic line along with the
13 ascending line A to B, B to C, C to F sharp?
14 A.   Yes.
15           MR. ANDERSON:  Objection.
16           MR. MALOFIY:  Okay, thank you.
17           MR. ANDERSON:  Misstates testimony and expert
18 testimony.
19           THE COURT:  Overruled.  Next question.
20 BY MR. MALOFIY:
21 Q.   Are you familiar with the term "cadence"?
22 A.   Can you explain to me what "cadence" is.
23 Q.   The way I look at it is, when you're running down a chord
24 progression, it's how the song resolves and goes back to the
25 tonic.  So, in other words --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

494

```
1   A.    Yeah, go ahead.

2   Q.    -- are you familiar with the rundown in "Stairway to

3   Heaven"?

4   A.    Well, I am very, yeah.

5   Q.    It doesn't go to the fifth, correct?

6   A.    I don't know what you mean by the fifth.

7   Q.    Well, you have the first, which is the A minor.

8   A.    Yeah.

9   Q.    And it doesn't ever go to the E, correct?

10        MR. ANDERSON:  Objection, again expert --

11        THE WITNESS:  Oh.

12        MR. MALOFIY:  See?

13        THE COURT:  Overruled.  He's talking about his own

14  composition.

15        MR. ANDERSON:  Thank you, Your Honor.

16  BY MR. MALOFIY:

17  Q.    You understand what I'm saying, correct?

18        THE COURT:  You can go ahead and answer.

19        THE WITNESS:  Umm, okay.  Just -- just ask me the

20  question again, please.

21  BY MR. MALOFIY:

22  Q.    Doesn't -- "Stairway to Heaven" chord progression does not

23  go to the fifth.

24  A.    Umm...

25  Q.    It skips over the fifth and goes back --
```

495

1   A.   Well, not necessarily.  But you mean the note of fifth,

2   which --

3   Q.   That's right.

4   A.   -- would be the A, right?

5   Q.   It's absent, correct?

6   A.   No, it isn't absent, because it catches up at the end of

7   the whole of this first phrase.  It's included there.  So

8   you've got your rundown coming from A through to the F sharp,

9   F, and then it goes "dum, dum, dum," and at that point, that's

10  where you get the E coming in.

11  Q.   Tell me the first chord.

12  A.   First chord is A minor.

13  Q.   Second chord.

14  A.   Is -- it's an A -- A major 7 over G sharp.

15  Q.   Third chord.

16  A.   Is A minor 7.

17  Q.   Fourth chord.

18  A.   Is D with an F sharp bass.

19  Q.   Sixth chord.

20  A.   F major 7.

21  Q.   Okay.  Does it ever go to the E before it resolves back to

22  the A?

23  A.   The E chord or the E note?

24  Q.   E.

25  A.   E note?

496

```
1    Q.    Right.

2    A.    Yes.  After it goes -- after the F sharp major, it goes to

3    like a sort of tail end, "dun, dun, dun," and that's where the

4    E is there.  It's then in -- playing in a fifth with the A.

5    Q.    I'll move forward.  We'll address that with your expert.

6            THE COURT:  Okay.

7    BY MR. MALOFIY:

8    Q.    Did you see your expert reports?  You said no, correct?

9            THE COURT:  He's already testified no, he has not.

10           THE WITNESS:  Yeah.

11   BY MR. MALOFIY:

12   Q.    Okay.  Is it your testimony that "Stairway to Heaven" does

13   not descend the five pitches and avoid the fifth chord, the E?

14           MR. ANDERSON:  Objection, vague, ambiguous and expert

15   testimony.

16           THE COURT:  Overruled.

17       Do you understand the question?

18           THE WITNESS:  Umm, I'm not sure, you see, what you

19   mean by an E.  If you mean an E chord --

20   BY MR. MALOFIY:

21   Q.    Correct.

22   A.    Yeah, it's -- it's not actually an E chord.

23   Q.    It misses the E chord, I want to be clear, correct?

24   A.    Yeah, it goes to A minor, but the E is in an A minor.

25   Q.    You would agree that the "Taurus" deposit copy also misses
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

497

1    that E chord?

2    A.   I don't know.

3    Q.   Well, take a look.

4    A.   Actually, I can't tell.

5         THE COURT:  Okay.

6    BY MR. MALOFIY:

7    Q.   You can't tell by looking at the "Taurus" deposit copy

8    lead sheet?

9    A.   I can't see very well.

10        THE COURT:  Okay.

11   BY MR. MALOFIY:

12   Q.   Is there anything I can do to make that easier for you?

13   Perhaps we can blow it up.

14        THE COURT:  No.  Just move on to the next question.

15   He says he can't tell.

16   BY MR. MALOFIY:

17   Q.   You'd agree that both songs start in A, on the note A?

18   A.   They start on -- yeah.

19   Q.   Do you agree that every part of "Stairway to Heaven" is

20   important?

21        MR. ANDERSON:  Objection, vague and ambiguous.

22        THE WITNESS:  Umm...

23        THE COURT:  Excuse me.  Overruled.

24   You may answer.

25        THE WITNESS:  When you say A, it's an A octave on --

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

498

```
 1   on the "Stairway to Heaven."  I don't believe that it's an A

 2   octave on the other ones I've heard, "Taurus."

 3   BY MR. MALOFIY:

 4   Q.   What do you believe it is?

 5   A.   I don't know what it is.  But it's not -- it's not an

 6   octave.

 7   Q.   It is an A, sir, correct?

 8   A.   It's an A note, but on the "Stairway to Heaven" it's an

 9   octave.

10   Q.   There's multiple A's in a keyboard or an A in the note.

11   A.   Yeah.

12   Q.   Right?

13   A.   That's correct.  It --

14   Q.   You can --

15        THE REPORTER:  One at a time.

16        THE COURT:  Counsel, please don't interrupt.  Let's go

17   one at a time, otherwise the reporter's going to miss both of

18   you.

19      Okay.  The --

20        MR. MALOFIY:  Apologize.

21        THE COURT:  -- question?

22   BY MR. MALOFIY:

23   Q.   They both start on the note A, correct?

24        MR. ANDERSON:  Objection, asked and answered.

25        THE WITNESS:  They start with an A note.
```

499

```
 1              THE COURT:  Overruled.

 2              MR. MALOFIY:  Thank you.

 3  Q.   Do you agree that the first 2 minutes and 14 seconds of

 4  "Stairway to Heaven" is memorable and an important part of that

 5  piece of music?

 6              MR. ANDERSON:  Objection, compound and --

 7              THE COURT:  Overruled.

 8         Is it an important part of the music?

 9              THE WITNESS:  Umm, yes, I think so.

10  BY MR. MALOFIY:

11  Q.   Do you agree that the rhythm of "Stairway to Heaven" and

12  the rhythm of "Taurus" are similar?

13              MR. ANDERSON:  Objection, Your Honor.  Again --

14              THE COURT:  As to the sheet copy?  Are you talking

15  about the deposit copy?

16              MR. MALOFIY:  Your Honor, you were very clear that

17  we're talking about the deposit copy.  That's why I have it in

18  front of him as well.

19              THE COURT:  So your question is -- say it again.

20  State the question again.

21  BY MR. MALOFIY:

22  Q.   Do you agree that the rhythm in the first 2 minutes and 14

23  seconds of "Stairway to Heaven" and the rhythm identified on

24  the "Taurus" deposit copy lead sheet --

25              THE COURT:  Thank you.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00635**

500

```
1    BY MR. MALOFIY:

2    Q.    -- are similar?

3    A.    Well, I don't know.  It doesn't have -- you know, you

4    asked me BPM, beats per minute.  Does it have a BPM on this?

5              THE COURT:  Well, if you --

6              MR. MALOFIY:  Sir --

7              THE COURT:  -- if you can see it --

8              THE WITNESS:  I don't -- I don't know whether it --

9    what does it say?  Does it --

10             MR. MALOFIY:  Well, let's go through two things --

11             THE WITNESS:  It doesn't actually say what tempo it's

12   at.

13             THE COURT:  Okay.  So you can't tell?

14             THE WITNESS:  I can't tell.

15             THE COURT:  Okay.  Next question.

16   BY MR. MALOFIY:

17   Q.    My question's a little bit different, Mr. Page.  It's not

18   what the tempo is, it's not what the BPMs are.  It's the

19   rhythm.  You can identify rhythm by looking at the notes and

20   looking at the duration of those notes, correct?  There's whole

21   notes.  There's eighth notes.  Do you see that?

22   A.    Mm-hmm.

23   Q.    Can you see that?

24   A.    Yeah.

25   Q.    You can see that, right?
```

501

```
1   A.    I can see.  I can see that, yeah.

2   Q.    And you'd agree that those notes on that page indicate

3   duration, correct?

4   A.    Yeah.

5   Q.    And you'd agree with me that even in the signature it

6   shows that it's in common time, correct?

7   A.    It's in common time, yeah, four-four.

8   Q.    Common time means four-four, correct?

9   A.    Yeah.

10  Q.    You see that, correct?

11  A.    Yeah.

12  Q.    And so you can determine the rhythm here, correct?

13  A.    Yeah.

14  Q.    Thank you.

15  A.    But determine the rhythm -- I can determine the pacing on

16  there.  I don't know what -- you know, I wouldn't know whether

17  that was -- if I -- if I saw a piece of music, I wouldn't know

18  what the tempo of it was unless it actually had an indication.

19  Q.    Let's be clear to the jury.  There's --

20  A.    Slow, andante --

21  Q.    -- a difference --

22         MR. ANDERSON:  Your Honor, if --

23         THE COURT:  Yeah, one at a time.

24    Go ahead, Counsel.

25  ///
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00637**

502

```
 1    BY MR. MALOFIY:
 2    Q.   You'd agree there's a difference between tempo and rhythm,
 3    correct?
 4              MR. ANDERSON:  Counsel keeps interrupting the witness
 5    and --
 6              THE COURT:  No, no.  I've already covered that.  Is
 7    there an objection to that question?  If there's not, go ahead
 8    and ask it again, because we've been interrupted.
 9         Ask again.
10              MR. MALOFIY:  Thank you, Your Honor.
11    Q.   Do you agree that there's a difference between tempo and
12    rhythm?
13    A.   Yes, I think I would.
14    Q.   All right.  And they are two separate, distinct musical
15    concepts, correct?
16    A.   Well, to me they are.
17    Q.   And you'd agree with me that you can determine the rhythm
18    by looking at the "Taurus" deposit copy lead sheet, correct?
19              THE COURT:  Again, Counsel, you're asking for expert
20    testimony, so why don't you move to the next question.
21              MR. MALOFIY:  If you can't determine, I'll move
22    forward.
23              MR. ANDERSON:  Objection to the comment of counsel.
24              THE COURT:  Yeah.  He hasn't determined.  He said he
25    could or couldn't determine.  I sustained the objection.  He
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

503

```
 1   hasn't answered it.

 2       Next question.

 3   BY MR. MALOFIY:

 4   Q.   Do you agree that -- do you agree that you would double

 5   time pick the end of part A on the acoustic guitar, of part A

 6   of "Stairway to Heaven"?

 7            MR. ANDERSON:  Objection, vague, ambiguous, calls

 8   for --

 9            THE COURT:  Overruled.  Overruled.

10       You may answer.

11            THE WITNESS:  Umm, on the very last measures of where

12   the vocals in, you mean, in "Stairway to Heaven"?

13   BY MR. MALOFIY:

14   Q.   Right, the last measures of 2 minutes and 14 seconds of

15   using double --

16   A.   Yeah, I'm doing more of a rippling pattern when the

17   fingers start.  Sort of doubles up.  Is that what you meant?

18   Q.   It is.

19   A.   Yeah.

20   Q.   Do you recognize that on the "Taurus" deposit copy lead

21   sheet?

22   A.   No.

23   Q.   Do you want to take a look?  If there's anything I can do

24   to help you --

25            THE COURT:  Counsel, he's looked at it.  He said he
```

504

```
1    doesn't.
2            MR. MALOFIY:  Okay.
3            THE WITNESS:  Your Honor, may I have a word?  May I
4    have a word?  On --
5            THE COURT:  On what?
6            THE WITNESS:  Well, when we were describing the
7    chords, I -- I omitted -- I omitted something, getting caught
8    up in the whole rundown thing, that it's actually an A minor
9    7th 9th.
10           THE COURT:  Okay.
11           MR. MALOFIY:  Thank you for --
12           THE WITNESS:  Yeah, and that's really important to
13   distinguish these two.  I'm so sorry.
14           THE COURT:  That's okay.
15       Next question.
16   BY MR. MALOFIY:
17   Q.  Does any of the albums you have have a quote that says --
18   by Randy California, that says, "People always ask me why
19   'Stairway to Heaven' sounds exactly like 'Taurus,' which was
20   released two years earlier.  I know that Led Zeppelin" --
21           THE COURT:  I'm sorry, you're reading something in
22   front of the jury.  What is this?  Why don't you designate it
23   first before you read hearsay in front of the jury?  What are
24   you asking of him?
25           MR. MALOFIY:  I'm asking if his albums -- if his liner
```

505

```
 1    notes have this quote in regards to "Taurus" and "Stairway to

 2    Heaven."

 3              MR. ANDERSON:  Objection.  That's a quote from what

 4    was played outside the presence of the jury.

 5              MR. MALOFIY:  It's not.  It's actually on the liner

 6    notes.  We believe it might be one of the albums he has.

 7              THE COURT:  I don't know if it is or not.  Why don't

 8    you show it to him before you read it in front of the jury --

 9              THE WITNESS:  Thank you.

10              THE COURT:  -- because --

11              MR. ANDERSON:  And Your Honor, if he could show

12    counsel, because I don't believe that's an exhibit that's been

13    produced.  Thank you.

14              MR. MALOFIY:  This was produced, Counselor.  I'll

15    represent that.  And it was included in the things that we

16    provided you.

17              THE COURT:  Are you talking about something he read on

18    one of his albums?  I don't know what you're asking.

19              MR. MALOFIY:  It's for purposes of cross-examination

20    and also to determine --

21              THE COURT:  This is not -- this is direct examination

22    at this point, but that's beside the point.  He is an adverse

23    witness.  The question is, is what are you referring to?  Is

24    this a writing on an album cover?  Is that what you're saying?

25              MR. MALOFIY:  It's a quote attributed to Randy
```

506

```
 1    California which was --

 2             THE COURT:  No, no.

 3             MR. MALOFIY:  -- published as part of the liner notes

 4    in albums that we believe Mr. Page has.

 5             THE COURT:  And why would it not be hearsay?

 6             MR. MALOFIY:  I'm using it to refresh his recollection

 7    and to also see if whether or not he ever read that or which

 8    album he has.

 9             THE COURT:  Okay.  Why don't you show him the quote

10    and see if he's ever read it.

11             MR. ANDERSON:  Your Honor, if counsel could identify

12    by exhibit number so we can look at it or --

13             MR. MALOFIY:  One moment.

14             MR. ANDERSON:  Thank you.  Thank you.

15             THE COURT:  Counsel, I gotta be honest here, I still

16    don't know where you're going with it.  If it's a quote on an

17    album he had, he still can't testify to this unless he was the

18    person making the statement.  It's still hearsay.  So

19    therefore, it'll be excluded.

20             MR. MALOFIY:  I'll move forward, Your Honor.

21             THE COURT:  Sure.

22    BY MR. MALOFIY:

23    Q.   Outside the presence of the jury you heard a live

24    recording of "Taurus."  Do you recall that?

25    A.   Yes, I do.
```

507

```
 1              THE COURT:  In fact, you heard three.  Oh, one live

 2    recording, yes.  I'm sorry, Counsel, you were correct.  Number

 3    two was a live recording.

 4              THE WITNESS:  Yes.

 5              THE COURT:  Okay.

 6    BY MR. MALOFIY:

 7    Q.   Then do you agree with Randy California's statement that

 8    preceded that --

 9              THE COURT:  Counsel, that's a very improper way to get

10    hearsay in front of the jury.

11              MR. MALOFIY:  I'm just --

12              THE COURT:  If it's a statement by Randy Wolfe or

13    whoever it is, it's a statement by him.  You can ask him what

14    he said, but you can't ask him what somebody out of court has

15    said.

16              MR. MALOFIY:  I wasn't going to offer the statement.

17    I was going to offer whether or not he heard it and agreed with

18    it.

19              THE COURT:  You're going to state the statement in

20    front of the jury, and that --

21              MR. MALOFIY:  I wasn't --

22              THE COURT:  -- would be improper.

23              MR. MALOFIY:  I wasn't going to.  That's why I wanted

24    to confer with counsel.  I wanted to ask him, did he hear the

25    statement that Randy California made in regards to "Taurus" and
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00643**

```
 1    "Stairway to Heaven," and do you agree with that statement?

 2              THE WITNESS:  I disagree with that statement.

 3              MR. MALOFIY:  Thank you.

 4         Could we play audio exhibit 2023-V.  Excuse me.  Video

 5    exhibit 2023-V.

 6              THE CLERK:  I'm sorry, 2023?

 7              MR. ANDERSON:  If we could have just a moment,

 8    Your Honor.

 9              THE COURT:  Sure.

10              THE CLERK:  And are you going to ask to have that

11    moved in?

12              MR. MALOFIY:  Yes.

13              THE COURT:  Okay.  Any objection?

14              MR. ANDERSON:  No objection.

15              THE COURT:  It will be received.  You may publish it.

16              MR. MALOFIY:  Twenty- -- I'm sorry, 2023-A.

17              THE COURT:  Okay.

18              MR. ANDERSON:  Your Honor, could we just have a

19    moment?

20              MR. MALOFIY:  You want a moment?

21              MR. ANDERSON:  If I could just ask counsel?

22              THE COURT:  Go ahead.

23              MR. ANDERSON:  No objection, Your Honor.

24              THE COURT:  Okay.

25         (Received in evidence, Trial Exhibit 2023-A.)
```

509

```
 1              MR. MALOFIY:  Ready?

 2              MR. ANDERSON:  Yeah.

 3         (Audio was played.)

 4    BY MR. MALOFIY:

 5    Q.   Sir, are you familiar with that piece of work?

 6    A.   Certainly am.

 7    Q.   And in fact, in your declaration in this case, you

 8    referenced it as giving you an idea to use in "Stairway to

 9    Heaven," correct?

10    A.   I don't think -- did I say it like that?

11    Q.   I think you said it like that.  Do you recall that?

12    A.   That's not exactly right, but what I did say is that it

13    has the same four note rundown -- or five note rundown on this

14    one as "Stairway," yeah.

15    Q.   Sir, is it your testimony that "Chim Chim Cher-ee"

16    inspired you to write "Stairway to Heaven"?

17    A.   No, I didn't say that.

18    Q.   Is it your testimony that you used the compositional

19    elements in "Chim Chim Cher-ee" to write "Stairway to Heaven"?

20    A.   No.

21    Q.   Is it your testimony that "Chim Chim Cher-ee" and

22    "Stairway to Heaven" have similarities to them?

23              MR. ANDERSON:  Objection, Your Honor, expert

24    testimony.

25              MR. MALOFIY:  It's his declaration.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00645**

510

```
 1            THE COURT:  Sustained.
 2    BY MR. MALOFIY:
 3    Q.   Sir, do you remember your declaration?
 4    A.   No.  Not verbatim, no.
 5    Q.   Did you write your declaration?
 6    A.   Oh, sorry.  The declaration.
 7    Q.   Yeah, the declaration, where it identified --
 8    A.   Sorry, I was getting mixed up with the deposition.  The
 9    declaration.  Is that the discovery, is it?
10    Q.   It was what you provided, you signed under oath and you
11    provided in this case, and you identified pieces of work
12    that --
13    A.   Yeah, okay.
14    Q.   -- was inspirational in forming "Stairway to Heaven."
15            MR. ANDERSON:  Objection.  I believe it
16    mischaracterizes the document.
17            THE COURT:  Sustained.
18    BY MR. MALOFIY:
19    Q.   Do you recall in your deposition that you identified
20    "Chim Chim Cher-ee" as a piece of work that you used as
21    inspiration for "Stairway to Heaven"?
22    A.   I don't believe that I did say it like that.
23    Q.   How do you believe you said it?
24    A.   Well, it's -- it's slightly confusing.  I think I may have
25    said that it -- that the chord se- -- the chord sequence is
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

511

1    very similar, because that chord sequence has been around

2    forever.

3    Q.    Do you recognize that chord sequence that you just said

4    has been around forever is the same chord sequence that

5    "Stairway to Heaven" has with the "Taurus" deposit copy?  You

6    recognize that?

7    A.    No, I wouldn't go so far as to say that.

8    Q.    You said if you heard -- when you heard "Taurus" the first

9    time, it was unique and you would have recognized it.

10        Do you believe that there are similarities or there are no

11   similarities in "Stairway to Heaven" and "Taurus" deposit copy?

12            MR. ANDERSON:  Objection, mischaracterizes the

13   testimony yesterday.

14            THE WITNESS:  I'm sorry, I got --

15            THE COURT:  Overruled.

16            THE WITNESS:  -- lost from "Chim Chim Cher-ee,"

17   "Chim Chim Cher-ee."

18            THE COURT:  Okay.  Let's get off "Chim Chim Cher-ee"

19   for a second.  Why don't we state the question again.

20   BY MR. MALOFIY:

21   Q.    You recognize similarities in "Chim Chim Cher-ee" and

22   "Stairway to Heaven," is that what you're telling this jury?

23   Correct?

24   A.    It's -- yeah, a sequence, yeah.

25   Q.    Do you also recognize similarities in "Taurus" deposit

512

```
1    copy and "Stairway to Heaven's" --
2    A.   Well, I'm not sure --
3    Q.   -- that would have -- excuse me.
4    A.   -- the deposit copy.  I've been saying that.  I didn't --
5    Q.   You can't determine that.
6         THE COURT:  That's what he's indicated, he can't
7    determine.
8              THE WITNESS:  Yeah.
9              MR. MALOFIY:  Let me do this.
10             THE WITNESS:  I believe we heard the deposit copy
11   yesterday of the "Taurus," and you could hear the descending
12   line.
13   BY MR. MALOFIY:
14   Q.   You'd agree that it has a descending line, correct?
15             MR. ANDERSON:  Your Honor, again, if he could wait, if
16   counsel could wait until the witness is finished talking.
17             THE COURT:  Overruled.
18        The question is, do you agree there was a descending line
19   in "Taurus?"
20             THE WITNESS:  Yes, I do.
21             THE COURT:  Yes.
22   BY MR. MALOFIY:
23   Q.   And do you agree that also it's a descending arpeggiated
24   line?  Correct?
25   A.   Arpeggio, yeah.
```

513

```
1    Q.   And did you also, when you listened to the "Taurus"
2    deposit copy --
3    A.   No, no, no.  Wait a minute.  I -- no.  I need to be
4    refreshed on the "Taurus."  No.  I -- I -- I -- what I said
5    was, I could hear that there was the descending line.  That's
6    what I said.
7              THE COURT:  Okay.  Next question.
8              THE WITNESS:  I really need to hear it again to be
9    able to give expert opinions.
10             THE COURT:  Excuse me.  Next question.
11             MR. MALOFIY:  Yes.  I'd like to play for Mr. Page what
12   we previously had played, which is the "Stairway to Heaven"
13   part A re-recording, 524-V.
14             MR. ANDERSON:  Objection.  I'm not sure why we're
15   playing a re-recording rather than "Stairway to Heaven."
16   That's the allegedly -- that's the work that they're suing
17   over.
18             THE COURT:  Sustained.
19             MR. MALOFIY:  Your Honor, we're just focusing on the
20   part A, that's why.  We're just -- we're not focusing on the
21   other elements that are not copyrightable.  We're just focusing
22   on part A.
23             THE COURT:  I'll tell you again, you have time limits.
24   You're wasting a huge amount of time getting into quasi
25   expert -- he is not designated as an expert.  You're going to
```

514

```
 1    have -- I'm assuming you have experts.  I don't know if you're

 2    going to have time for them, but I'm assuming you have experts

 3    that are going to testify in this area.  Just use your time

 4    judicially is all I'm saying.

 5              MR. MALOFIY:  I'll move forward, Your Honor.

 6              THE COURT:  Okay.

 7    BY MR. MALOFIY:

 8    Q.   Sir, is it your testimony that "Stairway to Heaven" was

 9    written in -- was written in 1970, 1971?

10    A.   1970 I think I would have said.

11    Q.   Was it recorded in 1971?

12    A.   I think it's recorded at the end of 1970, in December.

13    Q.   Now, is it your testimony as you sit here today that the

14    recording of "Stairway to Heaven" and the writing of "Stairway

15    to Heaven" occurred at Headley Grange?

16    A.   The compilation of "Stairway to Heaven" as far -- Headley

17    Grange, yes.

18    Q.   And do you agree that the album recording took place

19    thereafter at Island Records?

20    A.   That's correct.

21    Q.   And do you agree that after it was tracked at Island

22    Records, you then came to the United States and you did

23    additional mixes of "Stairway to Heaven"?

24    A.   Umm, along with other tracks from the fourth album.

25    Q.   So you came to the United States and did additional work
```

515

```
1   on "Stairway to Heaven" --
2   A.   No.  What do you mean by additional work?
3   Q.   Well, you were mixing it in the studio in L.A., correct?
4   A.   Oh, I see.  Mixing.  Yeah.
5   Q.   Am I -- is that accurate?
6   A.   Yeah, that's -- mixing, yeah.
7   Q.   And would you agree that it was called Sunset Studios
8   where you mixed it in?  Would you agree it was in Sunset
9   Studios where you mixed it?
10          MR. ANDERSON:  Objection, vague and ambiguous.
11          THE COURT:  Overruled.
12          THE WITNESS:  I seem to remember it was called Sunset
13  Sound, but it could be Sunset Studios.
14  BY MR. MALOFIY:
15  Q.   And do you agree that the mixed version that was
16  recorded -- excuse me.  Strike that.
17      Do you agree that the mixed version that was done at
18  Sunset Studios was recently released as part of the reissues in
19  the last three years?
20  A.   Yes, that's correct.
21  Q.   You say that you wrote "Stairway to Heaven's" guitar
22  intro, the first 2 minutes and 14 seconds, by yourself,
23  correct?
24  A.   Yes, that's right.
25  Q.   And you also say that later Mr. Plant had added lyrics; is
```

516

1    that correct?

2    A.    Yes.  At Headley Grange.

3    Q.    And it's your testimony that this occurred at Headley

4    Grange, correct?

5    A.    The process where Robert is writing the lyrics with me,

6    yes.

7    Q.    Isn't it true that you initially wrote only the

8    introduction of "Stairway to Heaven" on an acoustic guitar,

9    part A, and Mr. Plant had added some lyrics at a Welsh cottage

10   called Bron-yr-Aur?

11   A.    That's incorrect.

12          MR. ANDERSON:  I'm sorry.  Withdrawn.

13          THE COURT:  Okay.  You may answer.

14          THE WITNESS:  Yeah, incorrect.

15   BY MR. MALOFIY:

16   Q.    Why do you say it's incorrect?

17   A.    Because it wasn't -- it wasn't something that we were

18   doing at Bron-yr-Aur.  It's something that was done after we

19   were at Bron-yr-Aur.  In other words, we did it at Headley

20   Grange.

21   Q.    Do you recall the band members of Led Zeppelin, including

22   yourself, saying that it was written, just the intro, the

23   part A, at a cottage in Bron-yr-Aur with an acoustic guitar,

24   and maybe Mr. Plant had added a few lyrics?  You don't recall

25   that, correct?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00652**

517

```
1    A.    The members of the band saying that?  No, I don't.  I
2    don't.
3    Q.    I'd like to play --
4    A.    However, however, I do know that there is, and I guess
5    this is what you're going to show me, an article whereby I say
6    it starts at Bron-yr-Aur.
7    Q.    Excuse me?
8    A.    There is an article where I'm quoted as saying that --
9    that it was -- that I was playing the introduction at
10   Bron-yr-Aur, but it's not right.
11   Q.    The introduction.
12   A.    Yeah.
13   Q.    Let's play clip 100165-A, Zig Zag audio.
14            THE CLERK:  Is that in evidence?
15            MR. MALOFIY:  It was -- it's not in evidence in this
16   case as of yet.  It was defendants' exhibit.
17            THE COURT:  Want to introduce it?
18            MR. MALOFIY:  Yes, I do, Your Honor.
19            THE COURT:  Any objection?
20            MR. ANDERSON:  We never got to numbers like that on
21   defendants' side, so I really don't know what exhibit.  So if
22   we could just have a moment to --
23            THE COURT:  Okay.
24            MR. MALOFIY:  It's defendants' Exhibit 165.  I just
25   prefaced it with 100,000 so it wouldn't change the Bates, to
```

518

1    make it easy and clear.

2            MS. FREEMAN:  165?

3            MR. MALOFIY:  165.

4            THE CLERK:  And can I get the page number from 165?

5            MR. MALOFIY:  It's audio.  So it's 100165-A.

6            THE CLERK:  Thank you.

7            MR. ANDERSON:  Our description of it is not what

8    counsel is describing 165-A, so I'm confused as to what

9    counsel's about to --

10           THE COURT:  Why don't you both go over at a break, and

11   you can re-call the witness if you wish.  Unless you want to

12   waste time now and talk about it.

13           MR. MALOFIY:  This was produced by defendants in

14   discovery.

15           THE COURT:  Counsel, you want to discuss it, that's

16   fine, but it's eating up time.  This should have been done

17   before trial.  All of this should have been done before trial.

18   That's part of the preparation for trial.

19           MR. MALOFIY:  All of our exhibits, we --

20           THE COURT:  So Counsel, if you want to talk about it,

21   that's fine, but it's going to come off your time.  If you'd

22   like to wait until the next break and talk about it, that's

23   fine, and you can re-call this witness and play it for him

24   then, whichever way you want to go.

25           MR. MALOFIY:  Give me one moment, but --

519

```
 1              THE COURT:  Sure.
 2              MR. MALOFIY:  Just for the record, these were all
 3    provided to counsel before trial.
 4              THE COURT:  Counsel, I don't want to get into the
 5    discovery and the lack of professionalism and the discovery in
 6    this case and before this case.  You know and I know what we
 7    would be talking about.  Go ahead and do what you want to do.
 8              MR. ANDERSON:  Your Honor, may I -- counsel would like
 9    to confer, so --
10              THE COURT:  Sure.
11         (Counsel conferred privately.)
12              THE COURT:  Ladies and gentlemen, let me ask you,
13    because I normally break to give you an even amount of time
14    before and after.  If you want to break now while they're
15    discussing all this, we can do that, or we can wait until 10:00
16    o'clock.  Do you have a preference?  You want to break now?
17    Okay, let's break now, take our 15-minute -- that means the
18    second session's going to take a little longer.  That's okay?
19    Okay, we'll break now.
20         Remember the admonishment not to discuss the case among
21    yourselves or with anybody else or form or express any opinions
22    about the matter until it's submitted to you and you retire to
23    the jury room.  We'll see you back in 15 minutes.
24              THE CLERK:  All rise.
25         (Recess held from 9:46 a.m. to 10:04 a.m.)
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00655**

520

```
1          (In the presence of the jury:)

2          THE COURT:  Okay.  Ready to go until 11:30?  Great.

3      The record will reflect that all the members of the jury

4   are in their respective seats in the jury box and the witness

5   is on the witness stand, and we were still in direct

6   examination.

7      Counsel, you may inquire.

8          MR. MALOFIY:  Yes.  We had audio exhibit 100165 that

9   we'd like to play for Mr. Page --

10         MR. ANDERSON:  And Your Honor --

11         MR. MALOFIY:  -- for --

12         MR. ANDERSON:  Sorry.  My apologies.

13         MR. MALOFIY:  -- play for Mr. Page for impeachment

14  purposes.

15         THE COURT:  Okay.

16         MR. ANDERSON:  Your Honor, this is -- we've conferred,

17  and I do not believe this is an exhibit that was either

18  produced by us or produced to us.  Counsel indicates that, if I

19  understood correctly, that it was produced within the last

20  week, which I assume means that it's on the hard drive of 1500

21  files that was handed to me on Tuesday.

22         THE COURT:  Is that when it was produced?

23         MR. MALOFIY:  No, that's absolutely incorrect.

24         THE COURT:  When was it produced?

25         MR. MALOFIY:  It was produced by defendants in this
```

```
1   case in response to our first document request.  He's referring
2   to the transcription.  I'm referring to the actual audio that
3   defendants produced to plaintiff in this case.
4              THE COURT:  Okay.  You may play it.
5              MR. MALOFIY:  Thank you.
6          (Audio was played.)
7              MR. MALOFIY:  Pause it right there.
8   Q.   Did you hear that?
9   A.   Yes, I did.
10  Q.   Is that your voice, sir?
11  A.   Well, yes, it is.
12  Q.   And does it not say -- in regards to writing "Stairway to
13  Heaven," it said, "Like the intro of it I came up with at
14  Bron-yr-Aur in the cottage where we were together."  Did you
15  hear that?
16  A.   I did hear that.
17  Q.   Now, does that refresh your recollection that when
18  "Stairway to Heaven" was initially written, it was written, you
19  in a cottage with an acoustic guitar, and all that was there
20  was just the intro, correct?
21  A.   No, it doesn't refresh my memory to that at all,
22  because --
23  Q.   Is --
24  A.   -- that -- that's -- that's incorrect, the statement
25  that's said there.
```

522

```
 1            THE COURT:  The statement that you made at that time
 2    was incorrect?
 3            THE WITNESS:  Yeah, about Bron-yr-Aur, it's incorrect.
 4            THE COURT:  Okay.  Next question.
 5    BY MR. MALOFIY:
 6    Q.   Is your memory today better than it was shortly after
 7    writing the piece in 1972?
 8            MR. ANDERSON:  Objection, vague and ambiguous as to
 9    writing the piece.  I'm not sure what he's -- it's a recording.
10            THE COURT:  Overruled.
11       The question is, is your memory better today than when
12    that statement was made?
13            THE WITNESS:  Umm, yes.  Well, I don't know about yes
14    or no.  I'd like to think my memory's pretty good, though.
15       May I ask a question, please?  Is this --
16            THE COURT:  No, no.  Excuse me.
17            THE WITNESS:  No.
18            THE COURT:  I know it's a little difficult, but it's
19    gotta be done by a question and answer, and if your attorney
20    wants you to go further into something, he will ask you to
21    expand on it.
22       Go ahead, next question, Counsel.
23            THE WITNESS:  Yes.
24    BY MR. MALOFIY:
25    Q.   So just to be clear, do you believe your memory of the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00658**

523

```
1   events in writing the introduction to "Stairway to Heaven" were
2   more clear and present in your mind in 1972?
3           THE COURT:  Counsel, it's been asked and answered.
4   He's already answered it.  I hate to push you on this, but
5   we're wasting a lot of time.
6           MR. MALOFIY:  Understood, Your Honor.  I'll move
7   forward.
8           THE COURT:  Okay.
9   BY MR. MALOFIY:
10  Q.   When it said in this quote, "when we were together," who
11  are you referring to being together with in Bron-yr-Aur?
12  A.   Well, I'm not referring to playing "Stairway to " -- oh,
13  you -- at Bron-yr-Aur.  I probably -- I think I'm glitching by
14  this point.  It's a mammoth interview, a very long one, and
15  when I'm saying "together" -- well, sorry, what is the question
16  exactly as far as us being together?  Go on.
17          THE COURT:  Why don't you restate the question.
18          MR. MALOFIY:  Sure.
19  Q.   Did you spend time alone with Mr. Plant in Bron-yr-Aur
20  cottage in the Welsh mountains prior to recording "Stairway to
21  Heaven"?
22  A.   We had been to Bron-yr-Aur cottage, but we didn't do
23  "Stairway to Heaven" at Bron-yr-Aur cottage.
24  Q.   I understand that's your testimony here today.  The audio
25  that we just heard says something different, correct?
```

524

1      THE COURT:  Counsel, that's argumentative.  The jury's

2  heard them both.

3      MR. MALOFIY:  Understood.

4  Q.   The person you're saying -- referring to as being

5  together, it was referring to Mr. Plant, correct?

6  A.   I'm sorry?  Say that again.

7  Q.   In that interview, when you said you were together with

8  someone in Bron-yr-Aur, would that be referring to Mr. Plant?

9  A.   Well, I'm not sure whether I'm meaning Bron-yr-Aur or

10  whether I'm meaning Headley Grange there.  You know, I've

11  glitched quite clearly.

12      THE COURT:  That wasn't his question.  His question

13  is, when you said "with somebody else," would that somebody

14  else been Mr. Plant?  If you know.

15      THE WITNESS:  Umm, but it depends on the location, you

16  see, so I don't -- I'm not referring to that.  I have to --

17  not -- I can't really be clear about that, because it's -- it's

18  a glitch as far as, you know, what I'm saying there.

19      THE COURT:  Okay.

20      MR. MALOFIY:  I'll move forward.

21      THE WITNESS:  It's hard -- it's hard for me to --

22      THE COURT:  Excuse me.  You've answered the question.

23    Next question.

24      MR. MALOFIY:  I'll move forward.

25    For cross-examination impeachment purposes, please play

525

```
1    audio 164-A.

2         THE CLERK:  Has that been admitted into evidence?

3         MR. MALOFIY:  Yes, your -- Miss Williams.

4         THE COURT:  Okay.

5         MR. MALOFIY:  And that's 100164-A, BBC Arms of Atlas

6    interview, which was provided by defendants in this case in

7    response to initial production.

8         MR. ANDERSON:  My problem is, the exhibit numbers he's

9    using don't match the exhibit numbers on what was provided or

10   the joint exhibit list, so if counsel could please just explain

11   what this is, and then we could basically disregard the exhibit

12   numbers.

13        THE COURT:  Okay.  Go ahead.  This all should have

14   been done before trial.  Go ahead.

15        MR. MALOFIY:  It's 100164-A.  You produced it to us in

16   our initial production.  Your Bates number --

17        THE COURT:  He's asking what it is, not --

18        MR. MALOFIY:  I identified it as BBC Arms of Atlas

19   Our View interview, which was produced by defendants in this

20   case.

21        MR. ANDERSON:  Based on that description, Your Honor,

22   and representation of counsel, we don't have an objection.

23        THE COURT:  Okay.

24        MR. MALOFIY:  May we play it, Your Honor?

25        THE COURT:  Yes.
```

526

1            MR. MALOFIY:  Thank you.

2        (Audio was played.)

3  BY MR. MALOFIY:

4  Q.   Did you recognize the first person's voice in that

5  interview?

6  A.   Yes.

7  Q.   That was your voice, right, sir?

8  A.   Yes indeed.

9  Q.   And the second person's voice was Mr. Plant's voice,

10  correct?

11  A.   That's right.

12  Q.   And the third person's voice was Mr. John Paul Jones'

13  voice, correct?

14  A.   That's correct.

15  Q.   And Mr. John Paul Jones in that interview had said that

16  you and Mr. Plant had come back from the Welsh mountains with

17  the guitar intro and maybe a verse.  Did you hear that?

18  A.   I heard what he thought, yes, he thought what we'd done.

19  Q.   Did I hear it correctly?

20  A.   That's what he says.

21  Q.   And that's also what you had said in that prior audio clip

22  that we heard from 1972, correct?

23            MR. ANDERSON:  Objection, mischaracterizes the

24  evidence.

25            THE COURT:  Sustained.  We've already covered that.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00662**

1    BY MR. MALOFIY:

2    Q.   Is it your belief that both of these quotes are wrong?

3    A.   As far as my quotes, I know that's wrong.  As far as the

4    John Paul Jones one, could you just play it again?

5    Q.   Be happy to.

6    A.   Yeah.

7         MR. MALOFIY:  We'll play it from the beginning.

8    Excuse me.  I'll just queue it up to the relevant portion if

9    that's acceptable to the Court.

10        THE COURT:  Okay.

11        (Audio was played.)

12   BY MR. MALOFIY:

13   Q.   Did you hear that?

14   A.   Yeah, I hear what he's saying.

15   Q.   And you also dispute this audio quote of your band member,

16   John Paul Jones, who also said that you, Mr. Page and Mr. Plant

17   came back from Welsh cottage with a guitar sequence and intro

18   and maybe a verse?

19        MR. ANDERSON:  Objection, argumentative and

20   mischaracterizes --

21        THE COURT:  Overruled.

22        MR. ANDERSON:  -- the testimony.

23        THE COURT:  Do you dispute that that was true?

24        THE WITNESS:  That -- that he -- that -- he says that.

25   That's what he might have thought that we'd -- that we'd done

528

```
1    it, wherever.  I don't know where he thought we'd done it,

2    but -- but he -- well, I do, because he's saying that he

3    thought we did it at Wales, but --

4              THE COURT:  Okay.

5              THE WITNESS:  -- that wasn't the case.

6              THE COURT:  Next question.

7    BY MR. MALOFIY:

8    Q.   Do you believe that "Stairway" crystallized the essence of

9    Led Zeppelin as a band?

10             MR. ANDERSON:  Objection, vague and ambiguous.

11             THE COURT:  Overruled.

12        You may answer.

13             THE WITNESS:  Oh.

14        No.  No, I don't think so.  I don't think any one song

15   crystallizes the essence of Led Zeppelin.

16   BY MR. MALOFIY:

17   Q.   Did you ever say, "I thought 'Stairway' crystallized the

18   essence of a band"?

19   A.   I might have done --

20   Q.   "It had everything there and showed the band at its best.

21   Every musician wants to do something that will hold up a long

22   time, and I guess we did that with 'Stairway.'"

23        Do you remember --

24   A.   Well, I might have been referring to crystallizing like

25   all the sum parts.  Do you know what I mean?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

529

```
 1            THE COURT:  Okay, but you might have said that?
 2            THE WITNESS:  I might -- I might have said that, yeah.
 3            THE COURT:  Next question.
 4   BY MR. MALOFIY:
 5   Q.   You'd agree with me that when "Stairway" was initially
 6   written, it was a guitar intro chord sequence --
 7   A.   No, I disagree with that.
 8   Q.   -- and a verse?
 9        You disagree with that?
10   A.   Mm-hmm.
11   Q.   I'll move forward.
12        How many times did you meet Mr. Randy California?
13   A.   I've no recollection of meeting Randy California.
14   Q.   How many times did you interact with Mr. Randy California?
15   A.   I've no recollection of meeting him or interacting with
16   him.
17   Q.   You remember hanging out with him at an afterparty in the
18   UK in 1973 after they performed there?
19            MR. ANDERSON:  Objection, Your Honor, lack of
20   foundation and mischaracterizes the evidence.
21            THE COURT:  Well, he's already said he's never met
22   him.
23   BY MR. MALOFIY:
24   Q.   Does that refresh your recollection?
25   A.   I'll say no.
```

530

```
 1              THE COURT:  Okay.

 2   BY MR. MALOFIY:

 3   Q.   Do you recall ever going to a Spirit concert?

 4   A.   No.  Although -- although there was some times when we

 5   were on the bill, but I didn't see them.  Are you referring to

 6   in England?

 7              THE COURT:  No.  He just said have you ever seen them,

 8   have you ever gone to a concert.

 9              THE WITNESS:  No.

10              THE COURT:  And you've answered no, they may have been

11   on a bill with you, but you'd never seen them.

12              THE WITNESS:  Yes, right.

13              THE COURT:  Okay.  Next question.

14   BY MR. MALOFIY:

15   Q.   Do you recall a CBS afterparty in '73 after they performed

16   at the Rainbow, where you interacted with members of Spirit?

17   A.   I certainly don't.

18   Q.   Did you ever hang out with an individual by the name of

19   Larry Fuzzy Knight, a bass player?

20   A.   No.  I don't know who he is.

21   Q.   He was a bass player in Spirit after the first lineup,

22   after Mark Andes was no longer the bass player.

23   A.   Well, who was he with beforehand?  Because I obviously

24   never saw him in Spirit.  Who did he play with beforehand, when

25   you say hanging out with him?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00666**

531

```
1    Q.   I'm not sure.  We'll bring him on the stand later on, we

2    can ask him that.  Let me move forward to something else.

3    A.   Yeah, the answer to it is no.

4    Q.   No.  Okay.  Let me move forward to some additional

5    questions.

6         You made a lot of money from "Stairway to Heaven,"

7    correct?

8              MR. ANDERSON:  Objection, lacks foundation, vague and

9    ambiguous.

10             THE COURT:  Sustained.

11   BY MR. MALOFIY:

12   Q.   Did you receive compensation from the exploitation of

13   "Stairway to Heaven"?

14   A.   Well, we would have got royalties for it.

15   Q.   The last -- recently isn't it true that you signed a

16   publishing deal where you received, as a band, 60 million

17   dollars for your catalog?

18   A.   Well, I don't know about that, but I signed catalog --

19   I've signed publishing contracts, yeah.

20   Q.   Do you recall publishing --

21   A.   But I don't know what -- I don't know what the terms of

22   them are.

23   Q.   Do you recall signing a publishing contract where you were

24   to receive 60 million dollars over the course of time?

25             MR. ANDERSON:  Your Honor, Counsel said recently, but
```

532

```
 1   we're talking something -- about something way outside the
 2   three-year statute of limitations, so it's within the motion in
 3   limine.
 4           MR. MALOFIY:  It's -- respectfully, it is not with
 5   that -- it's not out of the three-year statute of limitations.
 6   It's contained within portions of the payments.
 7           THE COURT:  The question is, do you recall receiving
 8   such a contract for production of "Stairways to Heaven" that
 9   was produced within the last three years?
10           THE WITNESS:  Just "Stairway to Heaven" or the whole
11   catalog of Led Zeppelin?
12           MR. MALOFIY:  Well, respect --
13           THE COURT:  Well, you can clarify it, Counsel.
14   BY MR. MALOFIY:
15   Q.   Sir, it was the catalog of Led Zeppelin --
16   A.   Catalog.
17   Q.   -- which contained --
18   A.   Mm-hmm.
19   Q.   -- the song "Stairway to Heaven."
20   A.   Mm-hmm.
21   Q.   Okay.  Do you recall signing a publishing deal where you
22   received 60 million dollars?
23           MR. ANDERSON:  Again, Your Honor, it's outside the
24   statute of limitations, and it's within the motion in limine.
25           THE WITNESS:  I don't know how much the amount of
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00668**

533

```
1    money was for, but I did sign a contract.
2           THE COURT:  You signed a contract, and it was for a
3    production within the last three years?
4           THE WITNESS:  Yeah, I guess so, yeah.
5           THE COURT:  Okay.  Okay.
6           MR. MALOFIY:  I'd like to pull up Exhibit D -- excuse
7    me.  Strike that.  Pull up Exhibit 100642.
8           MR. ANDERSON:  Your Honor, up until today there have
9    been no exhibits in the hundred-thousands.  This is the
10   continuing problem, and so if there is an exhibit on the hard
11   drive that I was given the first --
12          THE COURT:  Is this for purposes of impeachment,
13   Counsel?
14          MR. MALOFIY:  Oh, this is -- this is -- it's for
15   purposes of showing him the publishing contract which he
16   signed, which was produced by defense counsel.  What we did --
17          THE COURT:  Sustained.  Next question, Counsel.
18      The discovery on this has been abominable, and it should
19   have been taken care of before trial, and we're not going to
20   get into that discussion here in trial.
21      Sustained.  Next question.
22          MR. MALOFIY:  What I'll do to make it easier for
23   defense counsel, and I'll just share with you --
24          THE COURT:  Okay.
25          MR. MALOFIY:  -- when we have an exhibit a
```

534

1    hundred-thousand and then 642, we put all your discovery at a

2    hundred-thousand.  So it wouldn't change your initial Bates

3    numbers.  So it would be D --

4           THE COURT:  Counsel, we're trying a case here.  We're

5    not having a private discussion between the two of you.  You

6    can do that at the break.

7        Next question.

8    BY MR. MALOFIY:

9    Q.    Sir, do you recall signing a record deal with

10   Rhino Entertainment where you received 10 million dollars?

11   A.    As part of the band, yes.

12   Q.    Okay.

13   A.    Well, I don't know if it's 10 million.  I don't -- I don't

14   know the figures, but I did sign a contract, but --

15   Q.    And didn't that include compensation for the song

16   "Stairway to Heaven"?

17          MR. ANDERSON:  Objection, calls for legal conclusion,

18   lacks foundation.

19          THE COURT:  Sustained.

20       But the contract that you signed was for material.  Did it

21   also include "Stairway to Heaven"?

22          THE WITNESS:  It included all material.

23          THE COURT:  Okay.  Next question.

24   BY MR. MALOFIY:

25   Q.    Isn't it true that Flames of Albion's a music publishing

535

```
1    company for the Led Zeppelin catalog?

2    A.   Umm, I think -- I believe it is.

3    Q.   Isn't it true that you're a director of that publishing

4    company?

5    A.   Yes.

6    Q.   Isn't it true that you control that publishing company?

7         MR. ANDERSON:  Objection, calls for a legal

8    conclusion.

9         THE WITNESS:  No.

10        THE COURT:  Overruled.

11        THE WITNESS:  I don't know that I control the company.

12   BY MR. MALOFIY:

13   Q.   Isn't it true that all the money that Flames of Albion

14   receives then gets distributed to the individual living members

15   of "Stairway to Heaven"?

16        MR. ANDERSON:  Objection, lacks foundation.

17        THE COURT:  Overruled.

18        THE WITNESS:  I think it get -- it gets -- I believe

19   it's more than that.  I think it's the living members and also

20   the estate of John Bonham.

21   BY MR. MALOFIY:

22   Q.   I would agree.  Thank you for the clarification.

23        But you would agree that the only people that are

24   participants in that publishing company is Mr. Plant, Mr. Page,

25   yourself, Mr. John Paul Jones, and also the heirs of Mr. John
```

536

```
1    Bonham, correct?
2              MR. ANDERSON:  Objection, vague and ambiguous as --
3              THE COURT:  Overruled.
4              THE WITNESS:  Yeah, I believe that's the case.
5    BY MR. MALOFIY:
6    Q.   And there's no other individuals that benefit directly
7    from Flames of Albion publishing company, correct?
8    A.   I don't think so.
9    Q.   Okay.  And you would agree with me that all the money that
10   comes in the Flames of Albion then gets passed through to these
11   beneficial individuals, correct?
12   A.   Yes, I believe that's how it works.
13   Q.   Is it fair to characterize this entity, Flames of Albion,
14   as a pass-through entity?  It passes through the income to the
15   individuals?
16             MR. ANDERSON:  Objection, vague and ambiguous, calls
17   for a legal conclusion.
18             THE COURT:  Overruled.
19             THE WITNESS:  Can you repeat that, please?
20   BY MR. MALOFIY:
21   Q.   Is it fair to characterize Flames of Albion publishing
22   company as a publishing company that passes through the
23   financial interest to the individual members of Led Zeppelin,
24   including the living heirs or heir of John Bonham?
25   A.   Like -- like -- like a holding company, and then it
```

537

```
1    redistributes, yeah.  Is that what you mean?

2    Q.   Exactly.

3    A.   Yeah.  Yeah.

4    Q.   Thank you.

5         We just talked about a record deal with Rhino

6    Entertainment Company a moment ago.  You testified under oath

7    that you received 10 million dollars as part of that record

8    deal, which included the whole catalog of Led Zeppelin

9    material, including "Stairway to Heaven," correct?

10             MR. ANDERSON:  Objection.

11        Excuse me.  Sorry, Counsel.

12        Objection, mischaracterizes the testimony, argumentative,

13   and lacks foundation.

14             THE COURT:  Overruled.

15             THE WITNESS:  Can you repeat it?  Repeat the question.

16   Sorry.

17             MR. MALOFIY:  I'm going to have the court reporter

18   read it back, if she may.

19             THE COURT:  No, Counsel.  You can repeat the question.

20             MR. MALOFIY:  Okay.  Fair enough.

21   Q.   Do you recall just a moment ago testifying that you were

22   involved in a record deal with Rhino records where, for the

23   Led Zeppelin catalog of music, including "Stairway to Heaven,"

24   10 million dollars was received?

25   A.   I believe so.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

538

1    Q.   I'm going to show you a document by defendants' Bates

2    number D040194.

3          MR. ANDERSON:  Counsel --

4      This is a document that was designated confidential under

5    the protective order in the case.  We have asked that it not be

6    published, and it's dealt with -- the subject's dealt with in

7    our trial brief.  No response was ever provided by plaintiff.

8          THE COURT:  Overruled.

9          MR. MALOFIY:  Thank you.

10      (For identification, Trial Exhibit D040194.)

11          MR. MALOFIY:  May we publish it, Your Honor?

12          THE COURT:  I don't want you publishing it, but you

13    can ask him questions about it.

14          MR. ANDERSON:  Thank you, Your Honor.

15          THE COURT:  Some of the document may or may not be --

16    be --

17          MR. MALOFIY:  What I'd like --

18          THE COURT:  But you can show it to him, and you can

19    ask him any questions you want about it.

20          MR. MALOFIY:  Since we're not publishing it to the

21    jury, would you like me to present it to Mr. Page?

22          THE COURT:  Sure, if you'd like to.

23          MR. MALOFIY:  May I approach?

24          THE COURT:  Yeah, and you can ask him any questions

25    you want about it, but part of that document may very well be

539

```
 1   privileged and not public.
 2        (Document was handed to the witness.)
 3            THE WITNESS:  Thank you very much.
 4   BY MR. MALOFIY:
 5   Q.   I'm going to direct your attention to the last page.
 6   Before I do that, could you just read the title of that
 7   document?
 8   A.   "Confidential."
 9   Q.   Oh.
10   A.   That's what it says at the top.
11   Q.   Could you read me the Bates number all the way at the
12   bottom right-hand corner, please.  It starts with a D.
13   A.   Oh.  D040241.
14   Q.   One more time.
15   A.   D040241.
16   Q.   Thank you.
17        I want to pull it up on the system here, not publishing it
18   to the jury, with the Court's indulgence.
19        You see the back of that document?
20            THE COURT:  Back page?
21            MR. MALOFIY:  Yes.
22            THE COURT:  Yes.
23            THE WITNESS:  Yes, I do.
24   BY MR. MALOFIY:
25   Q.   Do you agree that it's your signature above the line, with
```

540

```
 1   the name Jimmy Page below the line?
 2   A.   Correct.
 3   Q.   Do you agree that this is a accurate document as it
 4   relates to your publishing deal?
 5   A.   I don't know about that.
 6            MR. ANDERSON:  Objection, Your Honor.  Counsel's
 7   referred to it as an agreement with Rhino.  That's not a
 8   publishing deal, so it's argumentative, misstates the document.
 9            THE COURT:  Counsel.
10   BY MR. MALOFIY:
11   Q.   Just to be clear, that's your signature, correct?
12   A.   Yes.
13   Q.   And you recognize your signature, correct?
14   A.   Yes, I do.
15   Q.   And you would -- isn't it fair to characterize this
16   document as a Flames of Albion publishing deal where
17   Led Zeppelin or the surviving members or the heirs receive
18   60 million dollars for the catalog of Led Zeppelin songs?
19            MR. ANDERSON:  Objection, calls for a legal conclusion
20   and lacks foundation.
21            THE COURT:  Overruled.  Overruled.
22            THE WITNESS:  I've no idea.  I've no idea.  I'm
23   looking at the last page of the document that says
24   "Confidential" at the top in huge letters, and I see -- I see
25   the -- I see my signature and the other members of the band.
```

541

```
1            THE COURT:  So you signed that document?

2            THE WITNESS:  I signed this document for sure.

3            THE COURT:  How would you describe the document?  What

4   is that document?

5            THE WITNESS:  I don't know what it is.

6            THE COURT:  I'm sorry?

7            THE WITNESS:  I don't know what it is.  There's so

8   many legal documents that I guess relate to Led Zeppelin.

9            THE COURT:  If you want a second to look at it and

10  tell me if you --

11           THE WITNESS:  Oh, sorry, that -- do excuse me.  It

12  does say Rhino Entertainment Company, and somebody signed

13  underneath that, so presumably it's something to do with the

14  Rhino deal.

15           THE COURT:  Okay.

16           THE WITNESS:  But I don't know whether it's to do with

17  publishing or whatever.

18  BY MR. MALOFIY:

19  Q.   I'm sorry, let me read it to you here.  I have it in front

20  of me.  It says, on the top, "Rhino Entertainment Company, a

21  Warner Music Group Company."  It's dated July 2nd, 2012.

22       Do you see that on the first page of that document?

23  A.   On the first page?  You asked me to look at the last.  Oh.

24  Oh.  I can't really see that.

25       Do you mind if he comes and points it out to me?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00677**

542

```
 1              THE COURT:  I do mind.

 2              THE WITNESS:  Because I can't -- I can't really --

 3              THE COURT:  That's okay.

 4              THE WITNESS:  On the first page?

 5              MR. MALOFIY:  I'll make this easier --

 6              THE COURT:  Sure.

 7              MR. MALOFIY:  -- if I could.

 8         I'll represent this is -- this document is a Rhino record

 9    deal, it's for 10 million dollars, it was for Led Zeppelin's

10    catalog of music, and that Mr. Page had testified that he

11    signed it on the back page, and I'd just like to move it into

12    evidence, Your Honor.

13              MR. ANDERSON:  Your Honor, I think counsel's actually

14    testifying.  If I --

15              THE COURT:  He's proposing a stipulation so we can get

16    this thing moving.

17              MR. ANDERSON:  Okay.  If I could just have a moment to

18    look at it, because --

19              THE COURT:  Go ahead.

20              MR. ANDERSON:  -- of the characterization of it as a

21    publishing agreement.  That's what concerns me.

22              MR. MALOFIY:  Record deal with Rhino.  Come over here.

23              MR. ANDERSON:  Can I have a second to look at it?

24              MR. MALOFIY:  I'm going to show it to you here.

25              MR. ANDERSON:  Oh, I apologize.  And this is the
```

1    entire contract?

2         (Counsel conferred privately.)

3              MR. ANDERSON:  Thank you, Your Honor.

4              THE COURT:  Okay.  So stipulate?

5              MR. ANDERSON:  Yes, that is the 2012 Rhino contract.

6              THE COURT:  Okay.  That's fine.

7         Go ahead, Counsel.  Thank you.

8              MR. MORENO:  Publish it?

9              MR. MALOFIY:  No.  It's into evidence and --

10             THE COURT:  Okay.

11             MR. MALOFIY:  In regards to the Flames of Albion

12   publishing deal, not the record deal we just discussed, but the

13   publishing deal, for the purposes of showing it to Mr. Page and

14   having him authenticate his signature, may I approach the

15   bench, Your Honor?

16             THE COURT:  Yes.

17             MR. MALOFIY:  Thank you.

18             THE COURT:  So we're talking about two separate

19   contracts; is that correct, Counsel?

20             MR. MALOFIY:  That is correct, Your Honor.  The first

21   one we just identified and moved into evidence was the Rhino

22   record deal.  This is the publishing deal.

23             THE COURT:  Okay.

24             MR. ANDERSON:  And just for clarification, it's a 2008

25   publishing deal.

544

```
 1              THE COURT:  Okay.
 2   BY MR. MALOFIY:
 3   Q.   Can you read me the Bates number on the bottom right-hand
 4   corner of that document, Mr. Page?
 5   A.   Yes, certainly.  It's D000650.
 6   Q.   And do you agree that this is the Flames of Albion
 7   publishing deal where Led Zeppelin, the surviving members and
 8   the heirs of John Bonham, received 60 million dollars over a
 9   course of time for the Led Zeppelin song catalog?
10   A.   I can't agree with that till I've had a look.
11              MR. ANDERSON:  Objection, Your Honor --
12              THE COURT:  Excuse me.
13              MR. ANDERSON:  I'm sorry.  It's a 2008 contract, so
14   it's way outside the statute of limitations and within the
15   motion in limine --
16              MR. MALOFIY:  He -- this is --
17              MR. ANDERSON:  -- number 9.
18              MR. MALOFIY:  This has been raised repeatedly.  The
19   payments are in the statutory period, and they're for a period
20   of ten years, which brings it to 2018.
21              THE COURT:  Does this concern publishing rights for
22   things that were produced before three years ago?
23              THE WITNESS:  It -- it's dated January the 1st, 2008.
24              THE COURT:  Sustained.
25              MR. MALOFIY:  With all due respect --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

545

1        THE COURT:  Sustained, Counsel.  I'm not going to

2   argue in front of the jury.  We've talked about it many times

3   in the past.  Sustained.

4   BY MR. MALOFIY:

5   Q.   Is that your signature on the back page of that document?

6   A.   Yeah, it is.

7        MR. MALOFIY:  I'd like to move that into evidence,

8   Your Honor.

9        MR. ANDERSON:  Objection, relevance, Your Honor.

10        THE COURT:  Sustained.

11   BY MR. MALOFIY:

12   Q.   Do you agree that the monies attributable to this

13   publishing deal were received in the last three years?

14        MR. ANDERSON:  Objection.  It's a 2008 contract.  The

15   payments were under that contract.  It's way outside the

16   statute.

17        THE COURT:  Sustained.

18        MR. MALOFIY:  One moment, Your Honor, with the Court's

19   indulgence.

20     (Plaintiff's counsel conferred privately.)

21        MR. MALOFIY:  I have what's been marked by defendants,

22   I'll use their Bates label so it would be easier, D39243,

23   Report of Directors and Unaudited Financial Statements, Year

24   End March 31st, 2015, for Flames of Albion.

25        MR. ANDERSON:  Okay.  If counsel could also provide

546

1    the exhibit number, that would be helpful.

2              THE COURT:  Is there an exhibit number on it?

3              MR. MALOFIY:  Yes.  Hundred-thousand 39243.

4              THE COURT:  Okay.  Go ahead, Counsel.

5         (For identification, Trial Exhibit D39243.)

6              MR. MALOFIY:  May I approach Mr. Page?

7              THE COURT:  Yes.

8              MR. MALOFIY:  With the Court's indulgence, one moment,

9    Your Honor.

10             THE COURT:  Sure.

11        While they're looking at that, ladies and gentlemen, let

12   me help you a little bit, because you may wonder what we're

13   doing here as far as time limits go.

14        There's a statute of limitation period, and the only thing

15   that's going to come for your decision is if there is an

16   infringement during that statute of limitation period.  If it's

17   before, doesn't make any different.  But if there is an

18   infringement during the statute of limitation periods and what

19   are the damages that were produced from that infringement, and

20   so that's why we're limiting it to the time period we've talked

21   about.

22             MR. ANDERSON:  While counsel's doing that, to move

23   things along, could I raise a point, Your Honor?

24             THE COURT:  I don't know if --

25             MR. ANDERSON:  Okay.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00682**

547

```
 1              THE COURT:  Okay.  Let's wait until it becomes an

 2   issue.

 3              MR. ANDERSON:  Okay.  Thank you, Your Honor.

 4              MR. MALOFIY:  Thank you for the Court's indulgence.

 5              THE COURT:  Counsel.

 6         (Document was handed to the witness.)

 7              THE WITNESS:  Thank you.

 8   BY MR. MALOFIY:

 9   Q.    Do you see that, Mr. Page?

10   A.    See what, sir?

11   Q.    The document.

12   A.    Yes.

13   Q.    Do you agree it says "Report of Directors and Unaudited

14   Financial Statements for Year End March 31, 2015, for Flames of

15   Albion"?

16   A.    It does say that.

17   Q.    That's the title of the document, correct?

18   A.    Yeah.

19   Q.    Now, if you go to the first red flag there, which I've

20   marked to direct your attention, do you see that?

21              MR. ANDERSON:  If counsel could identify where he put

22   the red flag.

23              THE COURT:  Page number?

24              MR. MALOFIY:  I can identify it by Bates number,

25   Your Honor, if you would like.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

548

```
 1              THE COURT:  Go ahead.
 2              MR. MALOFIY:  D039247.
 3              THE COURT:  Thank you.
 4              THE WITNESS:  Oh, I'm looking at 245 with that little
 5     tag.
 6              THE COURT:  Is that tag on 245?
 7              THE WITNESS:  Yeah, it is.
 8              MR. MALOFIY:  I'm sorry, let me address 245 first.
 9         On 245 -- may I take a moment to look at 245?  One second.
10              THE COURT:  Yes.
11              MR. MALOFIY:  I thought I'd be able to publish it, so
12     I didn't think I'd have to have an extra copy, Your Honor.
13     Q.   To be clear, on 245, the directors are listed as
14     J.P. Page, R.A. Plant, J. Baldwin, and J. Hudson.  Do you see
15     that?
16     A.   Yes, I do.
17     Q.   And that would be Mr. Plant, Mr. Page, Mr. John Paul
18     Jones, I guess professionally known as, and may be legally
19     known as J. Baldwin; is that correct?
20     A.   Correct.
21     Q.   And then the heir of Mr. John Bonham, who is the deceased
22     drummer of Led Zeppelin.  I believe it's -- is it -- oh, I'm
23     sorry.  And then there's a Joan Hudson, correct?
24     A.   It says Joan Hudson.
25     Q.   Okay.  Let me move forward to the next tab that you see,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00684**

549

```
1    which I'll represent is D039247.
2    A.    Right.
3    Q.    It says "Profit and Loss Account for the Year Ended
4    March 31st, 2015."  It has 6.6 million pounds going in, and at
5    the end, it has -- and for administrative expenses, it has
6    6.6 million dollars, leaving a net profit of zero dollars at
7    the end of this period.  Do you see that?
8    A.    I do see that.
9    Q.    Did I read that correctly?
10   A.    I did -- did you?  Umm...
11          MR. ANDERSON:  Your Honor, I have an objection.
12          THE COURT:  Go ahead.
13          MR. ANDERSON:  Flames of Albion is not a party to this
14   case.  This is basically gross figures that don't -- aren't
15   attributable to "Stairway to Heaven" in particular.  I don't
16   really see the relevance of it, and I believe it lacks
17   foundation.
18          THE COURT:  Overruled.  And you can argue that on --
19   when you're putting on your case.
20          MR. ANDERSON:  Okay.  Thank you, Your Honor.
21          THE WITNESS:  Okay.  So the turnover, it gives a
22   figure for the turnover.
23   BY MR. MALOFIY:
24   Q.    Six point --
25   A.    And administrative expenses, it gives a figure for that.
```

550

```
1    And then, yeah, basically at the end says profit financial
2    year.  Is that what you're getting at?
3    Q.    Right.
4    A.    This is -- yeah.
5    Q.    Profit zero.
6    A.    Yeah.
7    Q.    6.6 million dollars went in for the year ended March 31st,
8    2015 -- sorry, 6.6 million pounds went in for year ended
9    March 31st, 2015, and 6.6 million pounds went out for the year
10   ending March 31st, 2015, leaving zero dollars net profit,
11   correct?
12          MR. ANDERSON:  Objection.  The document speaks for
13   itself, and there's no foundation that this witness knows
14   anything about accounting.
15          THE COURT:  Overruled.
16      Is that what it says?
17          THE WITNESS:  It says that, yeah.
18          THE COURT:  Okay.  Next question.
19   BY MR. MALOFIY:
20   Q.    And earlier on you testified that Flames of Albion was a
21   publishing company --
22   A.    Yeah.
23   Q.    -- for Led Zeppelin's catalog that acted as a pass-through
24   entity to benefit the individual surviving members and the heir
25   of Mr. John Bonham, correct?
```

551

1    A.    Yeah.

2    Q.    Okay.  Now, let me go to exhibit -- excuse me, Bates

3    number D039289.  I believe it's the next flag, red flag on the

4    side there for your orientation, Mr. Page.

5    A.    Yeah.

6          MR. ANDERSON:  I believe this is a separate --

7    objection.  I believe this is a separate document from the one

8    that's been identified.

9          THE WITNESS:  Okay.

10         MR. ANDERSON:  He's combined several.

11         THE COURT:  Is it all part of the same document?

12         MR. MALOFIY:  Yes, it is, Your Honor.  It was produced

13   by defendants.

14         THE COURT:  Overruled.

15   BY MR. MALOFIY:

16   Q.    If you go to the middle of the page there, I've circled it

17   for you for your orientation, it says "Related party

18   disclosures."

19   A.    Yeah.

20   Q.    Am I reading it correctly?  "The company is controlled by

21   J.P. Page."

22   A.    Yes, you are.

23   Q.    Did I read that correctly?

24   A.    That's what it says.

25   Q.    That's you, correct?

552

```
1    A.    That's me.

2    Q.    Okay.  Now, on the bottom, it also identifies --

3            MR. ANDERSON:  Your Honor, and I apologize, but

4    he's -- he's got a Flames of Albion contract, which is -- or

5    document, which is a publishing contract.  He's attached a

6    Super Hype Tapes, another entity that is in this case, that is

7    a record company -- or not record, but record related.  These

8    are different reports that have been combined into a single

9    exhibit.

10           THE COURT:  As I say, you can get into that on your

11   case in chief when you're talking to the jury.  You can explain

12   all that to the jury.

13       But it's part of one exhibit; is that correct, Counsel?

14           MR. MALOFIY:  This was --

15           MR. ANDERSON:  No.

16           MR. MALOFIY:  -- produced by defense.

17       It is, Your Honor.  It's the attached -- it's the attached

18   documents that support this aud- --

19           THE COURT:  No, Counsel.  I'm asking you, it's part of

20   one exhibit?  I don't care if you have six documents or a

21   hundred documents --

22           MR. MALOFIY:  Yes.

23           THE COURT:  -- if it's introduced as one exhibit.

24       And then, Counsel, when you present your case, you can get

25   into the fact that there are different documents in this
```

553

```
1    exhibit and they're not related, okay.
2            MR. ANDERSON:  Thank you, Your Honor.
3            THE WITNESS:  Yeah.
4    BY MR. MALOFIY:
5    Q.   Just to go back to the question, this is a company
6    controlled by J.P. Page, correct?
7    A.   The company's called Super Hype Tapes.
8    Q.   That's controlled by you?
9    A.   Yes.
10   Q.   Okay.  Now, it identifies on this page three other
11   entities:  Classicberry Limited, Trolcharm Limited,
12   JPJ Communications Limited.
13       Are those three companies also pass-through entities where
14   the individual members of Led Zeppelin receive publishing
15   royalties which then get passed through to them individually?
16           MR. ANDERSON:  Objection, lacks foundation, and vague
17   and ambiguous.
18           THE COURT:  If you know.
19       Overruled.
20       If you know.
21           THE WITNESS:  Umm, no, I think that's how -- I think
22   these are the companies that -- you know, when it gets shared
23   out in the holding company, we're talking about it gets shared
24   out, or distributed out.  These -- these certainly, the --
25   yeah, Classicberry is my company, for example.
```

554

```
 1    BY MR. MALOFIY:

 2    Q.    And this money that then gets distributed and shared

 3    out --

 4    A.    Yeah.

 5    Q.    -- and goes to the individual members --

 6    A.    Yeah.

 7    Q.    Trolcharm is Mr. Plant's pass-through entity, correct?

 8    A.    What it says here, yeah.  Yeah.

 9    Q.    Okay.  And JPJ Communications is John Paul Jones'

10    pass-through publishing entity, correct?

11    A.    I guess it is, yeah.

12    Q.    And those monies benefit the individual defendants,

13    correct?  You, Mr. Plant --

14    A.    Say that again.

15    Q.    Those monies that pass through these publishing entities

16    benefit you, Mr. Page, Mr. Plant, and Mr. John Paul Jones,

17    correct?

18          MR. ANDERSON:  Objection.  Objection.  They're not

19    publishing entities.  Again, counsel's confusing different

20    things.  But I -- I apologize for that, Your Honor, but it also

21    is vague and ambiguous.

22          THE COURT:  Okay.  Overruled.

23       These entities, the money passes through them to you if

24    you wish to use the money; is that correct?

25          THE WITNESS:  Umm, it -- yeah.
```

555

```
 1              THE COURT:  Yeah.  Okay.

 2              THE WITNESS:  Yeah.

 3              THE COURT:  Next question.

 4              MR. MALOFIY:  Yes.

 5   Q.   I'd like to move to D -- the page -- the Bates number on

 6   that packet of -- on those financial statements, it's D039321.

 7   A.   Which is that?  It's next one coming?

 8   Q.   It's down in -- it's deep in that stack with the red flag,

 9   Mr. Page.

10   A.   Well --

11   Q.   The following red flag.

12   A.   Is it?  Well, the following red flag -- oh, yeah, 319.  Is

13   that it?  Is that the one?  D0 --

14   Q.   I believe it's 39 --

15   A.   D0 --

16   Q.   I'm sorry.

17   A.   D039319.  That's the next flag.

18   Q.   One moment.  Let me just take a quick look.

19        Is it 39321, or am I reading that incorrectly?

20   A.   The next flag on, from the very last one that we were

21   looking at, which was 289, last three digits, the next flag on

22   from there is the one that goes D039319.

23   Q.   Please go to the next flag, 39321.

24   A.   Certainly.

25   Q.   Do you see that?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00691**

556

```
1    A.    Yeah, I can.

2    Q.    And it says "Profit and Loss Account, Year Ended

3    March 31st, 2015."  Do you see that?

4    A.    Hang on a minute.  31st of March, 2015.

5    Q.    You see that?

6    A.    Yeah.

7    Q.    And it says recording royalties, roughly 10 million

8    pounds.  Do you see that?

9    A.    I wouldn't say it was roughly 10 million pounds.  I'd say

10   it was closer to 9-1/2.

11   Q.    Let me give you the number exactly.  9.696658.

12   A.    Yeah.  Yeah.

13   Q.    9.6 million pounds?

14   A.    Yeah, that's what it says.

15   Q.    Is that better?

16   A.    Yeah.

17   Q.    Okay.  9.6 million pounds.  And then if you look at the

18   expenses, it's 9.7 million pounds.  Do you see that?

19   A.    Yeah.

20   Q.    And then leaving a net profit of zero, correct?

21   A.    Yeah.

22   Q.    Did I read that accurately?

23   A.    Yeah.

24   Q.    Okay.

25         I'd like to move this financial statements into evidence,
```

557

1    Your Honor.  I don't know if I did that earlier on.

2            THE COURT:  I don't know if you have or not, but I'm

3    assuming there's an objection to it, and --

4            MR. ANDERSON:  Yes, Your Honor.

5            THE COURT:  -- it will be overruled.  They'll be

6    received.

7            MR. ANDERSON:  One point, though.  These and the other

8    financial documents, as they are designated under the

9    protective order, if they could be segregated out and sealed.

10           THE COURT:  They'll be -- that's correct, they'll be

11   received under seal.

12           MR. ANDERSON:  Thank you, Your Honor.

13        (Received in evidence, Trial Exhibit D39243.)

14           MR. MALOFIY:  Almost done, Mr. Page.

15      Maybe two minutes of questioning and I'll be through with

16   Mr. Page.  With the Court's indulgence, I just want to

17   check one document.

18           THE COURT:  Counsel, anytime an attorney says two

19   minutes, they never mean two minutes.  But go ahead.  Go ahead.

20           MR. MALOFIY:  I'm just getting it pulled up right now.

21           THE COURT:  Okay.

22           MR. MALOFIY:  Thank you, Your Honor.

23      I'll continue my questioning.  I hope I find the document

24   before we finish.

25   Q.   Is it your position that you own the copyright for

558

```
1    "Stairway to Heaven" along with Mr. Plant?

2            MR. ANDERSON:  Objection, calls for a legal conclusion

3    and relevance.

4            THE COURT:  Overruled.  Or excuse me.  Sustained.

5    Sustained.

6    BY MR. MALOFIY:

7    Q.   Do you know who owns the copyright for "Stairway to

8    Heaven"?

9            MR. ANDERSON:  Objection, relevance.

10           THE COURT:  Sustained.

11   BY MR. MALOFIY:

12   Q.   Do you claim to be a writer on the copyright of "Stairway

13   to Heaven"?

14           MR. ANDERSON:  Objection, vague as -- and ambiguous as

15   to writer on a copyright.

16           THE COURT:  Sustained.

17       Do you claim to be a writer of "Stairway to Heaven"?

18           THE WITNESS:  Yes, I do.

19           THE COURT:  Okay.

20   BY MR. MALOFIY:

21   Q.   Who else?

22   A.   And Robert Plant.

23   Q.   Is it a 50/50 split between you and Mr. Plant as to the

24   writing credit?

25   A.   Yes, it is.
```

559

```
 1          MR. MALOFIY:  I'd like to pull up Exhibit 2708, which
 2   is the "Stairway to Heaven" deposit copy.
 3          THE COURT:  Okay.
 4          MR. MALOFIY:  Any objection, Counsel?
 5          MR. ANDERSON:  I just wanted to confirm.  Thank you,
 6   Counsel.
 7       I don't want to hold it up.  If -- based on counsel's
 8   representation that it's the --
 9       I'm sorry, the deposit copy, you said?
10          MR. MALOFIY:  Yeah.
11          MR. ANDERSON:  If it's the deposit copy for "Stairway
12   to Heaven," I have no objection.
13          THE COURT:  Okay.  You may publish it.
14       (Exhibit was displayed on the screen.)
15   BY MR. MALOFIY:
16   Q.   Have you ever seen this document, Mr. --
17          MR. ANDERSON:  If I may, I believe the marking on the
18   touchscreen has to be cleared.  It relates --
19          THE COURT:  We can clear it.  It can be cleared.
20   Okay.  He's got it.
21          MR. ANDERSON:  Oh, okay.  Thank you.
22   BY MR. MALOFIY:
23   Q.   Do you see that copy of the "Stairway to Heaven" deposit
24   copy?
25   A.   Yeah, I do.
```

560

```
1   Q.    Have you ever seen this before?

2   A.    I'm not sure that I've seen it before, but during the

3   course of all of the paperwork that I've seen relative to all

4   of this trial, it might have been slipped by me, but I -- you

5   know, I hadn't really intently focused on it like I am now.

6   Q.    Do you recall ever writing the score for "Stairway to

7   Heaven" that was deposited in the copyright office?

8   A.    In so many words, what -- did I write that?

9   Q.    Exactly.  Did you write what's --

10  A.    No, I didn't, no.

11  Q.    And even though you wrote "Stairway to Heaven," you didn't

12  write the deposit copy score which was submitted with the

13  copyright office, correct?

14        MR. ANDERSON:  Objection, asked and answered and

15  irrelevant.

16        THE COURT:  He said he didn't.

17  BY MR. MALOFIY:

18  Q.    Do you agree that this deposit copy is inherently bare in

19  not having all the notes to "Stairway to Heaven"?

20        MR. ANDERSON:  Objection, relevance.

21        THE COURT:  Sustained.

22  BY MR. MALOFIY:

23  Q.    Is the solo part of "Stairway to Heaven" identified

24  anywhere in the "Stairway to Heaven" deposit copy?

25        MR. ANDERSON:  Objection, relevance.
```

561

```
 1              THE COURT:  Overruled.
 2              THE WITNESS:  It has the lyrics, in the top line of
 3    the lyrics.
 4    BY MR. MALOFIY:
 5    Q.   Maybe my question wasn't clear.  I'll restate it.
 6         Can you point to where on the deposit copy of "Stairway to
 7    Heaven" it indicates the solo?
 8    A.   I'll have to have a look.
 9    Q.   And if you need us to scroll down, I believe it's a few
10    pages.
11    A.   Umm, I think you need to scroll down one more.
12         (Exhibit was displayed on the screen.)
13              THE WITNESS:  Please scroll one more.
14         (Exhibit was displayed on the screen.)
15              THE WITNESS:  Please one more.
16         (Exhibit was displayed on the screen.)
17              THE WITNESS:  Okay.  That's it.  I've read it.
18              THE COURT:  Okay.  Can you repeat the question again.
19    BY MR. MALOFIY:
20    Q.   You would agree that there's no solo on the deposit copy
21    lead sheet of "Stairway to Heaven" which was deposited with the
22    office?
23    A.   Yeah, we -- I agree with that.  It's not in there, no.
24    Q.   All right.  And you've identified the solo as a very
25    important part of the composition of "Stairway to Heaven,"
```

562

```
1    correct?
2            MR. ANDERSON:  Objection, again relevance.  This is
3    the defendants' work.  He's talking about performance elements.
4            THE COURT:  Sustained.
5    BY MR. MALOFIY:
6    Q.   You'd agree with me that if you go to the beginning of
7    this composition as identified on the deposit copy lead sheet,
8    that it starts with "There's a lady"; it starts with the vocal
9    melody and lyric, correct?
10           MR. ANDERSON:  Again, relevance.
11           THE COURT:  Sustained.  Sustained.
12   BY MR. MALOFIY:
13   Q.   You would agree with me that the introductory notes of
14   "Stairway to Heaven" are not represented in this "Stairway to
15   Heaven" deposit copy, correct?
16           MR. ANDERSON:  Objection, relevance.
17           THE COURT:  Overruled.
18       If you know.
19           THE WITNESS:  The -- the -- say it again, please.
20   BY MR. MALOFIY:
21   Q.   You'd agree with me that the song "Stairway to Heaven"
22   doesn't start with "There's a lady who's sure"; there is an
23   introductory part that precedes that?
24   A.   No.  The lyrics start with "There's a lady who's sure,"
25   but, yes, there's an introductory guitar passage.
```

563

```
1    Q.    And that's not represented in the deposit copy?

2    A.    No.  It was a solo.  You're correct.

3    Q.    Did you see Dr. Lawrence Ferrara's report where he

4    identified that there was --

5          THE COURT:  Counsel --

6          THE WITNESS:  No.

7          THE COURT:  -- he's already testified he didn't see

8    any of the expert reports.

9          THE WITNESS:  No.

10         THE COURT:  And I don't want you reading in what

11   somebody's testified.  They can testify to it.  I don't want

12   that coming in in front of the jury unless a witness testifies

13   to it.

14   BY MR. MALOFIY:

15   Q.    Would you agree that all the notes of "Stairway to Heaven"

16   are not represented in the deposit copy of "Stairway to

17   Heaven"?

18         MR. ANDERSON:  Objection, relevance.

19         THE COURT:  Sustained.  Not relevant.

20   BY MR. MALOFIY:

21   Q.    Is it your testimony as you sit here today that you

22   believe "Stairway to Heaven" is more similar to "Chim Chim

23   Cher-ee" than "Stairway to Heaven" is similar to "Taurus"?

24         MR. ANDERSON:  Objection.  He's not an expert witness.

25   He's asking for a -- I guess a musicological comparison between
```

564

```
 1    a Mary Poppins song and "Stairway to Heaven."

 2              THE COURT:  You still haven't hit it.  Relevancy?

 3              MR. ANDERSON:  Relevance, yes, Your Honor.

 4              THE COURT:  Sustained.

 5              MR. MALOFIY:  I have no further questions of this

 6    witness.

 7              THE COURT:  Okay.  Close to the two minutes, Counsel,

 8    close.

 9              MR. MALOFIY:  Okay.  What's that?

10              THE COURT:  I said it was close to the two minutes.

11              MR. MALOFIY:  Oh.

12              THE COURT:  Cross-examination.

13              MR. ANDERSON:  And with the break being moved around,

14    I didn't quite catch when we're breaking.

15              THE COURT:  11:30.

16              MR. ANDERSON:  11:30.  Great.  Thank you, Your Honor.

17                        CROSS-EXAMINATION

18    BY MR. ANDERSON:

19    Q.   Good morning, Mr. Page.

20    A.   Good morning.

21    Q.   Counsel yesterday, plaintiff's counsel, played an audio

22    recording that you indicated, I believe, was difficult to hear,

23    and it starts with a reference to really liking Spirit, and

24    then it goes on.

25         What was the rest of that audio recording about?
```

565

1    A.    Umm, it -- basically, it was asking what bands I -- I

2    liked, and I'm not -- I -- I can't remember the -- the build-up

3    to it, because it's an interview, and then there's a question,

4    and -- okay, so there's a question, and I -- I start to say

5    which bands I like, and I say I like Spirit, and then I go on

6    to say -- talk about a West Coast band called Kaleidoscope.

7    And I really start talking about Kaleidoscope to the degree

8    that I'd seen them at the Avalon Ballroom, seen them in The

9    Scene club in New York, and that I really like their music, and

10   I was talking about albums that I knew of theirs.

11   Q.    Albums by whom?

12   A.    Kaleidoscope.

13   Q.    Thank you.

14         You testified yesterday that you had heard Spirit singles

15   on the radio.  What singles were you referring to?

16   A.    Fresh Gar- -- this is in the very early stages of --

17   actually, even pre Led Zeppelin, when I was in Yardbirds.  It's

18   "Fresh Garbage" that I heard on the radio.  And during the time

19   of Led Zeppelin, I heard "I Got A Line On You, Babe," and also,

20   a little later on from that, "Dark-eyed Woman."

21   Q.    Thank you.

22         Today counsel asked you about mixes of "Stairway to

23   Heaven" that were done at Sunset Sound.

24         Could you explain for the jury the process of recording

25   from, you know, how it is recorded and then how it is mixed.

566

1    A.    Okay.  Well, the recording of "Stairway to Heaven" is done

2    across a multitrack analog tape.  And by nature of that, you'd

3    say, for example, have the guitar, acoustic guitar introduction

4    on one track, you would have the recorders mixed in over a

5    couple of tracks, you'll have the vocal, you'll have the drums,

6    the electric piano.  All these are taking up all different

7    tracks.  And then there's the guitar overdubs of 12

8    strings and -- electric 12 strings, which is two running

9    through the whole of it.  And then there's the solo.  The bass

10   as well.  So all of these things are across a number of tracks,

11   and you record them.  And this was done in England, the

12   recording.

13       And the first attempt at mixing, not only "Stairway to

14   Heaven," it was the other material that would have been done

15   around that time, including "When the Levee Breaks," we went

16   to -- "we" meaning myself and the engineer, Andy Jones, went to

17   Sunset Sound or Sunset Studios, where we proceeded to start

18   mixing all of the various titles.

19       So -- so the process of mixing is you -- you recall all of

20   the tracks.  They come through a mixing board.  And then you --

21   you balance them.  So some things are in priority to others.

22   You add effects.  And basically that's -- that's the way you

23   go.  You try and get the best blend of all the ingredients that

24   you've got in a mix.

25   Q.    Thank you, sir.

1    So the mix of, for example, "Stairway to Heaven" that was

2    done at Sunset Sounds, that was a mix of multitracks that were

3    created in England?

4    A.    Correct.

5    Q.    And was that mix at Sunset Sounds, was that used for the

6    album *Led Zeppelin IV*?

7    A.    No, it wasn't.  The levee -- "When the Levee Breaks" was

8    used on the *Led Zeppelin IV*, but not the "Stairway to Heaven."

9    Q.    And just to be clear, what -- of the album *Led Zeppelin*

10   *IV*, what songs were mixed in at Sunset Sounds?

11   A.    On *Led Zeppelin IV*?

12   Q.    Yes, sir.

13   A.    The only one that -- that -- that materialized -- see,

14   many of the work that we did at Sunset Sound, and there was a

15   lot, lot of titles involved, is just "When the Levee Breaks."

16   That's the only one.

17   Q.    And the recording of "Stairway to Heaven" that appears on

18   *Led Zeppelin IV*, was that both written by you, recorded, and

19   mixed in England?

20   A.    Yes, it was.  It was after the Sunset Sound recordings.

21   Q.    So could you explain how that came about, that there was a

22   second mix prepared in England?

23   A.    Umm, in effect, when we -- when Andy and I brought the

24   mixes back to London -- the sound system in Sunset Sound was

25   very, very colorful, the speakers, and when we played them back

568

1   in the -- in the little -- well, it's like a listening room at

2   Olympic Studios, it sounded very flat and just very mid range.

3   They didn't have the complete dynamics of everything that we

4   had put into it, what we could hear.  And at that particular

5   point of time, there had been stories about tapes getting

6   demagnetized, and we thought maybe something had happened to

7   the tapes in the transfer.

8        Now, the tapes are these multitracks, and then you mix

9   down to a two-track quarter inch.  And this is what we're

10  referring to.  In fact, all of the tapes could have had a --

11  some -- some -- something might have happened to them.  But in

12  actual fact, we sort of went about remixing it anyway, because

13  some of the mixes weren't quite as up-to-speed.  It was all

14  done in a short space of time over here in L.A., and it was one

15  of those things, well, let's -- let's redo it, because, A, it

16  sounded strange over there.  But what actually happened was,

17  then we remixed everything, and I couldn't equal the mix that

18  was in my mind from the "When the Levee Breaks."  And in actual

19  fact, we sort of opened up the EQ on it, which is the treble

20  and the bass expanding, and it was there, and we could -- we

21  hadn't topped what we'd done at Sunset Sound, so we used it.

22  But actual fact, the mix of "Stairway to Heaven" in England was

23  superior to the Sunset.  It was different, but, you know, it

24  worked for the time.

25  Q.   You referred to after Sunset Sounds there was a remix of

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00704**

569

```
1    the London multitracks.  Where did the remix occur?

2    A.    It was at Island, I think it was, or Olympic, one of --

3    Q.    And where are Island -- and those are recording --

4    A.    Okay, they're in London.  They're in London, yeah.

5    Q.    And they're recording studios?

6    A.    Yeah, they're recording studios, yeah.

7          MR. ANDERSON:  If Your Honor could just indulge me

8    while I confer with counsel.

9          (Defense counsel conferred privately.)

10         MR. ANDERSON:  Thank you, Your Honor.  I apologize.

11   Those are all the questions I have for Mr. Page.

12         THE COURT:  Okay.

13         THE WITNESS:  Thank you.

14         THE COURT:  Redirect?

15         MR. MALOFIY:  Yeah.  Thank you.

16                   REDIRECT EXAMINATION

17   BY MR. MALOFIY:

18   Q.    Just to be clear, initially, "Stairway to Heaven" was

19   recorded at Island Studios in the UK, correct?

20   A.    Correct.

21   Q.    Then you went to the United States, to Sunset Studios here

22   in L.A., and you mixed it down, correct?

23   A.    Along with other tracks, correct.

24   Q.    Right.  Then you went back to the UK.  You went to Olympic

25   Studios for a listening session, correct?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00705**

570

```
 1    A.    Correct.

 2    Q.    And then you didn't like the way the Sunset Sounds mix

 3    sounded, and then you remixed it at Island, correct?

 4    A.    The material that we'd done, yes.

 5    Q.    And then the Sunset Studios --

 6    A.    Mixing.

 7    Q.    -- mix, which was done in the United States, in L.A., was

 8    then re-released just recently in 2015, correct?

 9          MR. ANDERSON:  Objection, misstates the testimony.

10    There was no re-release.  It was never released.

11          THE WITNESS:  No.

12          THE COURT:  No, he may answer the question.

13    Overruled.

14    BY MR. MALOFIY:

15    Q.    The recent -- the recent Led Zeppelin IV album which was

16    released, didn't it have a companion --

17    A.    Correct.

18    Q.    -- audio of the Sunset Studios mix which was done in the

19    United States?

20    A.    It gave an opportunity to be able to -- to present the

21    Sunset Sound mix.

22    Q.    Thank you.

23          No further questions.

24          THE COURT:  Okay.  Redirect?  Or recross?

25    ///
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

571

**RECROSS-EXAMINATION**

1   BY MR. ANDERSON:

2   Q.   Mr. Page, just to clarify, was the Sunset Sounds mix of

3   "Stairway to Heaven" used in any way, at any point, from the

4   beginning of time up until today?

5   A.   Not until the re-releases.

6   Q.   And when was that?

7   A.   Two years ago, I'd say.

8   Q.   Okay.  Thank you.

9           THE COURT:  You may step down.

10          THE WITNESS:  Thank you very much.

11          THE COURT:  Okay.  Next witness.

12          MR. MALOFIY:  I'll let Mr. Page pass me by before I

13  stand.

14          THE COURT:  Sure.

15          MR. MALOFIY:  Thank you, Mr. Page.

16      I was going to give him the courtesy of --

17          THE COURT:  That's okay.  Go ahead, next witness.

18  Just give us the name on it.

19          MR. MALOFIY:  Next witness is Mr. Larry Knight.

20      Can I go summons him?

21          THE COURT:  Okay.

22          MR. MALOFIY:  Thank you.

23      (The witness entered the courtroom.)

24          MR. MALOFIY:  Just go ahead to the chair up there.

572

```
 1            THE CLERK:  Mr. Knight, right here to be sworn,
 2    please.  Raise your right hand, please.
 3        Do you solemnly swear the testimony that you are about to
 4    give in the matter now before the Court shall be the truth, the
 5    whole truth, and nothing but the truth, so help you God?
 6            THE WITNESS:  I do.
 7            THE CLERK:  Thank you.  You may be seated.  You can
 8    adjust the microphone if you need to.
 9        May I please ask that you state your full name for the
10    record and spell your last name.
11            THE WITNESS:  Yes.  Larry Knight, K-n-i-g-h-t.
12            THE CLERK:  Thank you.
13            THE COURT:  Okay.  Counsel, you may inquire.
14        LARRY KNIGHT, CALLED AS A WITNESS BY THE PLAINTIFF,
15                        DIRECT EXAMINATION
16    BY MR. MALOFIY:
17    Q.   Thank you for being here.
18        Mr. Knight, do you also go by Larry "Fuzzy" Knight?
19    A.   Yes, I do.
20    Q.   Is your nickname "Fuzzy"?
21    A.   A nickname?  It's a professional name now.
22    Q.   Professional name?
23    A.   Yeah.
24    Q.   I apologize.
25        All right.  Now, what was your relationship to the band
```

573

```
1    Spirit, if any?
2    A.   My relationship, I was a member of the band.  First met
3    Randy when I came to California in '70.  I joined up with him
4    in '71 to do recording and touring and then was with the band
5    mostly through '71 all the way through '81.
6    Q.   I see.  Now, when you were with the band, what was your
7    role?
8    A.   I was the bassist and vocalist.
9    Q.   Now, did you tour in the United States and also abroad
10   with Spirit?
11   A.   Yes, I did.
12   Q.   When you were touring in the United States and abroad with
13   Spirit, was this also with Randy California?
14   A.   With Randy California and his stepfather, Ed Cassidy.
15   Q.   Now, do you know how many shows you played with Spirit?
16   A.   Many.
17   Q.   Over a hundred?
18   A.   Yes.
19   Q.   Okay.  Maybe a few hundred?
20   A.   Maybe more.
21   Q.   Okay.
22   A.   Yeah.
23   Q.   Now, did you have an opportunity to tour the UK at any
24   point?
25   A.   Yes, we did.
```

574

1    Q.   And did you play shows in London?

2    A.   Yes, I did.

3    Q.   Now, while you were in London, did Spirit live in London

4    and perform locally there?

5    A.   Yes, we did.  We went over, and I believe that

6    Miles Copeland and his brother were doing their booking for us

7    at the time, and they arranged for us to live in a flat in

8    Chelsea on Kings Road, and we lived above a women's boutique

9    dress store.  And from there, we would go out over to the

10   continent, and we'd play Germany, Switzerland, France,

11   everywhere, the Benelux.  We'd play Scandinavia.  We did

12   Ireland.  We did Scotland and the UK.

13   Q.   What years were you touring in the UK?

14   A.   We first went over in '73, and we stayed there for quite a

15   while.  We were there for quite a while.  And then later on I

16   went back again in 1978 and did a number of shows again all

17   over, in Germany and England.

18   Q.   When you were touring throughout the United States and

19   also Europe and the UK, was Spirit songs played on the radio?

20   A.   Oh, yeah.  We did a -- usually when we got to a city, we

21   were arranged to go to a radio station and be interviewed, and

22   they would play music, and, you know, that was pretty normal.

23   Q.   Do you remember your albums being sold throughout the

24   United States and also the UK and Europe?

25        MR. ANDERSON:  Objection, relevance.  This is after

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

575

```
 1    "Stairway to Heaven" was released.

 2              THE COURT:  Sustained.  Sustained.

 3    BY MR. MALOFIY:

 4    Q.   Do you know anyone seated at the defense table?

 5    A.   Do I know anyone?

 6    Q.   Right.  Do you recognize anyone seated at the defense

 7    table?

 8    A.   Well, I recognize Mr. Page.  I don't know anybody else

 9    over there.

10    Q.   Why do you recognize Mr. Page?

11    A.   Excuse me?

12    Q.   Why do you recognize Mr. Page?

13    A.   Why?

14    Q.   Have you met him?

15    A.   Well, because of the -- the music and the band

16    Led Zeppelin and, you know, his concerts and recordings.

17    Q.   Did you ever have an opportunity to meet him in person?

18    A.   One time, in 1973, and --

19    Q.   What happened?  Where were you?

20    A.   Well, we did a show in London at Rainbow Theatre, and it

21    was a great night.  The band had a really good show.  We did --

22    I don't know, broke the encore record at the theatre.  We did

23    like eight or nine encores.  And then afterwards, the record

24    label, I believe it was Columbia, did an afterparty for the

25    band, and we went from the Rainbow, a limo, to the party, and
```

1  at -- there was quite a number of people there, and that's when
2  I spoke with Jimmy Page for just a couple minutes, a minute or
3  so.
4  Q.   What, if anything, did he say to you?
5  A.   Trying to remember the conversation after something like
6  40, 43, 44 years, but, you know, it was general musician to
7  musician:  Great band, are you going to be playing other gigs
8  while you're here?
9       I think I mentioned the fact that we were living in
10 London.  We were going to stay there for quite a while.  And I
11 think I might have mentioned that we were going to be also
12 playing The Marquee Club.  That was another club in down -- in
13 London, downtown.
14 Q.   Did he say he saw you guys play and he liked your
15 performance?
16 A.   Not -- not -- probably not in those words.  A great show
17 maybe, the words "great show," or, you know, good -- you know,
18 that's it.
19 Q.   That's it?
20 A.   Yeah, it wasn't a long conversation.  It was a cordial
21 conversation.  And neither of us looked like we do today, so I
22 don't even know if we'd recognize each other from back then,
23 but that's -- that's what happened.
24 Q.   Do you -- did he indicate that he was aware of the band
25 Spirit when he spoke to you?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00712**

577

```
1           MR. ANDERSON:  Objection, vague and ambiguous.
2           THE COURT:  Overruled.
3      Did he say anything about it?
4  BY MR. MALOFIY:
5  Q.   About your music or about the show, other than "great
6  show"?
7  A.   No, that's pretty much -- you know, that was pretty much
8  it, you know.  We didn't talk songs, we didn't talk music,
9  about, you know, albums or anything like that.
10 Q.   Let me move to something else.  Did you ever see him
11 interacting with any other member of Spirit at that afterparty?
12 A.   Well, we weren't all -- we weren't just standing together,
13 you know.  Randy was circulating around talking to a lot of
14 different people, and so was Cass.  They weren't together
15 either.  Everyone was in their own little group talking to
16 different people throughout the party.  Whether I saw him
17 directly standing in front of him, talking to him, I don't
18 believe I did, but everyone was talking to everybody.  You
19 know, that's what you do at parties.  You, you know, you walk
20 around, talk to everybody.
21 Q.   Do you have an independent recollection, even if faint, of
22 having Randy California speak to Jimmy Page?
23 A.   I'm sorry, repeat that.
24 Q.   Do you have a faint recollection or any recollection of
25 Randy California speaking with Jimmy Page?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00713**

578

```
 1            MR. ANDERSON:  Objection, vague and ambiguous.

 2            THE COURT:  Well, it's also asked and answered.  You

 3    just asked him that question.

 4        You've indicated that they may have been standing near

 5    each other, but you don't remember anything specific.

 6            THE WITNESS:  Yeah.  You know, everyone spoke to

 7    everybody at the party.  It's -- you know, that's what you do.

 8    You know, you say hi, and, you know, you make small talk, and

 9    you move on and you talk to somebody else and --

10            THE COURT:  Next question.

11            MR. MALOFIY:  One moment.

12    Q.   And just to be clear, this afterparty was an afterparty

13    presented by, I think you said, Columbia or CBS?

14    A.   Yes.

15    Q.   An afterparty to Spirit concert, correct?

16    A.   Yes.

17            MR. MALOFIY:  Okay.  No further questions.

18            THE COURT:  Cross.

19                      **CROSS-EXAMINATION**

20    BY MR. ANDERSON:

21    Q.   Hello, Mr. Knight.

22    A.   Hi.

23    Q.   I believe you testified that this afterparty occurred in

24    the spring of 1973?

25    A.   What was that?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00714**

579

```
 1    Q.   When did this afterparty occur?

 2    A.   What do you mean when?

 3    Q.   It was 1973, correct?

 4    A.   Yes.

 5    Q.   Okay.  And what month?

 6              THE COURT:  If you know.

 7              THE WITNESS:  I -- I can't tell you exactly.  I think

 8    it was March when we did our show at the Rainbow.

 9    BY MR. ANDERSON:

10    Q.   Okay.  And what day of the week?

11    A.   What day of the week?

12    Q.   Yes, if you recall.

13              THE COURT:  If you remember.

14              THE WITNESS:  It must have been a Friday or Saturday

15    night, I'm sure.  I don't know.  It's -- that's a long, long

16    time ago.

17    BY MR. ANDERSON:

18    Q.   And where was the afterparty?

19    A.   That was arranged by the record label.  I went in a

20    limousine from the Rainbow to the party, and they shoveled us

21    in.  That was it.  It happens all the time.  It's the -- very

22    normal.

23    Q.   Okay.  Thank you.  Okay.  Thank you.  That's all.

24         Those are all the questions I have.

25              THE COURT:  Any redirect in that area?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

580

```
 1              MR. MALOFIY:  One moment, Your Honor.

 2              THE COURT:  Mm-hmm.

 3              MR. MALOFIY:  No further questions.

 4         Thank you, Mr. Knight.

 5              THE COURT:  Thank you very much for coming in, sir.

 6              THE WITNESS:  Am I done?

 7              THE COURT:  You're excused at this point.

 8              THE WITNESS:  Thank you.

 9              THE COURT:  Next witness.

10              MR. MALOFIY:  Your Honor?

11              THE COURT:  Yes.

12              MR. MALOFIY:  Plaintiff chooses to eat the five

13    minutes and break now and come back after it's done.

14              THE COURT:  Okay.

15              MR. MALOFIY:  All right?

16              THE COURT:  Okay.  Ladies and gentlemen, I guess we

17    break now, then.  You're reminded, as I've told you before, not

18    to discuss the case among yourselves or with anybody else or

19    form or express any opinions about the matter until it's

20    submitted to you and you retire to the jury room.

21         Have a pleasant lunch.

22         Excuse me, ladies and gentlemen, if we can keep it down.

23              THE CLERK:  We're in session.

24              THE COURT:  Have a pleasant lunch.  We'll see you back

25    in at 1:00 o'clock, and we'll start at that time.
```

581

```
1        We'll be in recess.

2            THE CLERK:  All rise.

3        Excuse me.  We're still in session.

4            MR. MALOFIY:  Oh, I'm sorry.

5            THE CLERK:  Court is in recess.

6

7        (Lunch recess commenced at 11:26 a.m.)

8

9        (Afternoon proceedings under separate cover.)

10

11

12                        --oOo--

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00717**

582

```
 1                          CERTIFICATE

 2

 3        I hereby certify that pursuant to Section 753,

 4   Title 28, United States Code, the foregoing is a true and

 5   correct transcript of the stenographically reported proceedings

 6   held in the above-entitled matter and that the transcript page

 7   format is in conformance with the regulations of the

 8   Judicial Conference of the United States.

 9

10   Date:  JUNE 17, 2016

11

12

13

14                    /S/ SANDRA MACNEIL
                      _____

15                Sandra MacNeil, CSR No. 9013

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA