# United States Court of Appeals
# For the Ninth Circuit

### C.A. 16-56057

---

#### Skidmore et al.

*Michael Skidmore, Trustee for the
Randy Craig Wolfe Trust
Plaintiff-Appellant*

v.

#### Led Zeppelin et al.

*Defendants-Appellees*

---

# Plaintiff-Appellant Michael Skidmore's
# Excerpts of the Record
# Volume IX of XI

---

(Music copyright infringement, on appeal from the final Order dated June 23, 2016 of the Honorable R. Gary Klausner, of the United States District Court for the Central District of California. The case was docketed in the Central District at 15-cv-03462)

---

#### Francis Alexander, LLC
Francis Malofiy, Esquire
Alfred Joseph Fluehr, Esquire
280 N. Providence Road | Suite 1
Media, PA 19063
T: (215) 500-1000
F: (215) 500-1005
*Law Firm / Lawyers for Appellant Skidmore*

## EXCERPTS OF THE RECORD: VOLUME IX of XI
(2127 – 2411)

04/08/2016    Order Granting Summary Judgment in Part (*Doc. No. 159*) ............................ 2127

03/30/2016    Excerpts of Plt. Response to Def. Evidentiary Objections   (*Doc. No. 154*) ..... 2147

Declaration of Brian Bricklin (Doc. No. 154-4) ................................................ 2180

Declaration of Erik Johnson (Doc. No. 154-5) .................................................. 2199

Declaration of Kevin Hanson (Doc. No. 154-8) ................................................ 2231

03/25/2016    Def. MIL No. 4 to Preclude Plaintiff's Experts (*Doc. No. 137*) ...................... 2243

03/25/2016    Def. MIL No. 3 to Preclude Sound Recordings (*Doc. No. 136*) ...................... 2327

03/14/2016    Excerpts of Def. Reply in Support of Summary Judgment (*Doc. No. 129*) ..... 2339

Response to Plaintiff's Alleged Uncontroverted Facts (Doc. No. 129-5) ......... 2354

03/08/2016    Notice of Lodging filed Expert Audio and Video (*Doc. No. 125*) .................. 2391

03/08/2016    Notice of Manual Filing by Plaintiff (*Doc. No. 122*) ...................................... 2397

03/08/2016    Excerpts from Decl. of Francis Malofiy in Opposition to SJ (*Doc. No. 124*) .. 2398

Exhibit 10 - Stairway to Heaven Sheet Music (Doc. No. 124-1) ..................... 2404

Exhibit 13 - Robert Plant Crash Article ........................................................... 2409

Exhibit 18 - Spirit Album ................................................................................ 2411

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | **CV 15-3462 RGK (AGRx)** | | Date | April 8, 2016 |
|---|---|---|---|---|
| Title | *Michael Skidmore v. Led Zeppelin et al.* | | | |

| Present: The Honorable | R. GARY KLAUSNER, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Sharon L. Williams | Not Reported | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |
| Attorneys Present for Plaintiffs: | | Attorneys Present for Defendants: |
| Not Present | | Not Present |

**Proceedings:**      (IN CHAMBERS) Order re: Defendants' Motion for Summary Judgment (DE 97)

## I.      INTRODUCTION

On May 31, 2014, Michael Skidmore, as trustee for the Randy Craig Wolfe Trust ("Plaintiff") filed suit against Led Zeppelin, James Patrick Page, Robert Anthony Plant, John Paul Jones, Super Hype Publishing, Inc., and Warner Music Group Corp., which is the parent company of Warner/Chappell Music, Inc., Atlantic Recording Corporation, and Rhino Entertainment Company ("Defendants"). On October 8, 2014, Plaintiff filed a First Amended Complaint ("FAC"). The FAC claims that Defendants' song, *Stairway to Heaven*, infringes another song, *Taurus*, created by the rock band Spirit. The lawsuit alleges: (1) Copyright Infringement and (2) Violation of the Right of Attribution.

Presently before the Court is Defendants' Motion for Summary Judgment. For the following reasons, the Court **DENIES IN PART and GRANTS IN PART** Defendants' motion.

## II.      FACTUAL BACKGROUND

This case involves the vehemently contested history of two songs: the iconic *Stairway to Heaven* by Led Zeppelin and the lesser-known *Taurus* by the rock band Spirit. Because the surviving band members of each group figure prominently in the ensuing narrative, the Court briefly sets out the cast of relevant figures.

In February 1967, Randy Wolfe (guitarist), Mark Andes (bassist), John Locke (keyboardist), Ed Cassidy (drummer), and Jay Ferguson (vocalist/precussionist) joined to form the band Spirit. Only two surviving members of the original group remain, Andes and Ferguson. Across the Atlantic, another rock group formed in 1968 when Jimmy Page (guitarist), Robert Plant (singer), John Paul Jones (bassist), and John Bonham (drummer) joined to create Led Zeppelin. The three surviving members of Led Zeppelin are Page, Plant, and Jones.

### A.     The Genesis of *Taurus*

On August 29, 1967, Spirit signed its first recording contract with Ode Records. On that same day, Wolfe entered into an exclusive songwriter agreement with Hollenbeck Music. The exclusive songwriter agreement deemed Wolfe a "writer for hire" with full rights of copyright renewal vested in Hollenbeck. Late in 1967, Ode Records released Spirit's first eponymous album, which included an instrumental composition of *Taurus*. (Ferguson Depo. 46:10-19; Andes Depo. 57:16-22, ECF No. 97.)

According to Defendants, *Taurus* was initially composed and recorded in Ode Records' studio after signing the August 1967 recording contracts and exclusive songwriter agreement. In his deposition, Ferguson, Spirit's singer and tambourine player, testified that *Taurus* was recorded for the first Spirit album after the 1967 recording contract with Ode Records. (Ferguson Depo. 197:15-198:1, ECF No. 97.) Spirit's bassist, Andes, also confirmed in deposition testimony that *Taurus* was recorded for Spirit's initial album after the 1967 recording contract. (Andes Depo. 150:18-151:3, ECF No. 97.) Finally, Defendants submit a copyright registration showing that on December 22, 1967, Hollenbeck, as "Copyright Claimant," registered a copyright in the *Taurus* musical composition with the Copyright Office.

Plaintiff offers a competing narrative of *Taurus'* origin. According to declarations from Wolfe's sisters, in late 1966—before the recording contract or the exclusive songwriter agreement—Wolfe wrote *Taurus* for his high school sweetheart who would eventually become his wife. (Andrea Wolfe Decl. ¶¶4-5; Janet Wolfe Decl. ¶¶4-5, ECF No. 118.) Andes and Ferguson also testified that Wolfe created the song *Taurus* before the 1967 recording contract and exclusive songwriter agreement. (Andes Decl. ¶4; Ferguson Decl. ¶4, ECF No. 119.) Furthermore, according to Andes and Wolfe's sisters, Spirit regularly played *Taurus* at the Ash Grove club in Hollywood in early 1967—before the songwriter agreement was executed. (Andrea Wolfe Decl. ¶5; Janet Wolfe Decl. ¶5, ECF No. 118; Andes Depo. 150-156, ECF No. 124.)

### B.     Interaction Between Spirit and Led Zeppelin

In 1968, Ode Records released the second Spirit album, titled *The Family that Plays Together*, and launched a tour to promote the new record. Spirit and Led Zeppelin performed at the same venue on the same day at least three times between 1968 and 1970. The first occasion was on December 26, 1968 when Led Zeppelin, in its United States debut, opened for Spirit in Denver, Colorado ("Denver Festival"). Next, the two bands performed at the Atlanta International Pop Festival ("Atlanta Festival") on July 5, 1969. Finally, the groups both appeared, along with at least ten other bands, at the Seattle Pop Festival ("Seattle Festival") on July 27, 1969.

The parties present conflicting versions of the interaction between Led Zeppelin and Spirit at these three events. The surviving members of Led Zeppelin testified that they never toured with, shared a stage with, or listened to any of Spirit's music during these brief encounters. The surviving Spirit members, on the other hand, recalled conversing with the Led Zeppelin members backstage between sets and performing in succession at two of the festivals.

The two groups also performed at the Texas International Pop Festival in August 1969, although on different days. There is no evidence that members of Led Zeppelin were present when Spirit performed at the Texas Pop Festival, and Spirit's surviving members do not recall performing *Taurus* at the Texas Festival. (Pl.'s SGI Nos. 58-63, ECF No. 118.)

Similarly, Plaintiff submits a promotional poster from the three-day Northern California Folk-Rock Festival in May 1969, which shows that both Spirit and Led Zeppelin would be preforming. (Malofiy Decl. Ex. 12, ECF No. 124.) Beyond that, however, there is no evidence that the two groups

performed on the same day or that Led Zeppelin watched Spirit's performance in Northern California. In fact, Spirit's surviving members do not recall performing *Taurus* at the Northern California festival. (Pl.'s SGI No. 65, ECF No. 118.)

### C.   Release of *Stairway to Heaven* and the Intervening Years

The surviving members of Led Zeppelin testified that the band recorded *Stairway to Heaven* between December 1970 and January 1971 entirely in London, England. (Page Decl. ¶4; Plant Decl. ¶4; Jones Decl. ¶3, ECF No. 97.) Plaintiff rebuts with deposition testimony from Page, acknowledging that he and Plant mixed *Stairway to Heaven* at Sunset Studios in Los Angeles, California. (Page Depo. 140-143, ECF No. 124.) Regardless of where the song was mixed, neither party disputes that Led Zeppelin first performed *Stairway to Heaven* in March 1971. The song was first released on the band's untitled fourth album, *Led Zeppelin IV*, in November 1971.

In the intervening years, fans and critics alike noticed the similarity between the two songs. In fact, on April 2, 1991, Wolfe was interviewed in connection with a new album of Spirit recordings titled, *Time Circle*. In the interview, Wolfe was asked about the possibility that Led Zeppelin had copied the opening of *Taurus* for its song *Stairway to Heaven*. Wolfe responded that Led Zeppelin members "used to come up and sit in the front row of all [Spirit's] shows and became friends[,] and if they wanted to use [*Taurus*], that's fine." (Freeman Decl. Ex. 6 at 7, ECF No. 97.) Later in the interview, Wolfe reiterated, "I'll let [Led Zeppelin] have the beginning of *Taurus* for their song without a lawsuit." (Freeman Decl. Ex. 6 at 8, ECF No. 97.)

Wolfe never sued over *Stairway to Heaven* during his lifetime, and he ultimately died in 1997. Wolfe's mother assumed the role as trustee of his trust from 2002 until her death, and she also did not bring suit. Plaintiff in this action became trustee of the Wolfe Trust in 2006. Between 2012-2014, Rhino Entertainment Co. arranged for the re-mastering and re-release of *Stairway to Heaven*. On May 2014, forty-three years after the initial release of *Stairway to Heaven*, Plaintiff initiated the instant action alleging that *Stairway to Heaven* infringed the copyright in *Taurus*.

## III.   EXPERT REPORTS

The parties submit dueling expert reports disputing the similarity between *Taurus* and *Stairway*.

### A.   Plaintiff's Expert Reports

Plaintiff's first expert, Alexander Stewart, prepared a 22-page report comparing recordings of *Taurus* with recordings and sheet music of *Stairway to Heaven*. (Stewart Decl. ¶2, ECF No. 118.) He explains that, for the purposes of the analytic comparison, the only relevant part of *Stairway to Heaven* is the beginning two-minute segment, which contains all the similarities. (Stewart Decl. ¶7, ECF No. 118.) The structural similarities between the two songs are represented below:

| Taurus | Stairway to Heaven |
|---|---|
| 0:00   Intro | 0:00   A (instrumental) |
| 00:45 A | 0:13   A (instrumental) |
| 00:58 A | 0:26   B |
| 1:12  B | 0:53   A (vocal) |
| 1:37  A | 1:06   A (vocal) |

| 1:50 | A | 1:20 | B |
|------|---|------|---|
| 2:04 | B | 1:47 | A (vocal) |
| | | 2:00 | A (instrumental) |
| | | 2:14 | End of relevant portion |

As illustrated by the chart, both songs contain repeated "A" sections consisting of a four-measure descending A minor guitar pattern. In both songs, the "A" sections are separated by a longer "B" section, or bridge. (Stewart Decl. ¶5, ECF No. 118.) The two songs do, however, contain three structural differences. First, the version of *Taurus* appearing on the album contains a 45-second introduction; Stewart notes, however, that this introduction does not appear on any live or demo versions of *Taurus*. (Stewart Decl. ¶6, ECF No. 118.) Second, *Taurus* contains two repeated "A" sections (AABAAB) whereas *Stairway to Heaven* contains three repeated "A" sections (AABAABAA). Finally, the "B" section, or bridge, is seven measures in *Taurus* but eight measures in *Stairway to Heaven*. (Stewart Decl. ¶6, ECF No. 118.)

Despite these minor differences, Stewart opines that "[n]early 80% of the pitches of the first eighteen notes match, along with their rhythms and metric placement. The harmonic setting of these "A" sections feature the same chords during the first three measures and an unusual variation on the traditional chromatic descending bass line in the fourth measure." (Stewart Decl. ¶24, ECF No. 118.)

Beyond the core structural and melodic similarities, Stewart opines that the two songs are also similar in instrumentation and orchestration. Stewart explains that "the presence of acoustic guitar, strings, recorder/flute sounds, and harpsichord as well as the noticeable absence of bass and drums (and other instruments characteristic of rock and roll) lend both songs a decidedly 'classical' style, particularly evoking a Renaissance atmosphere." (Stewart Decl. ¶3, ECF No. 118.) Additionally, Stewart notes that live versions of *Taurus* also "feature a similar fingerpicking style in the passage's later appearances." (Stewart Decl. ¶3, ECF No. 118.)

Plaintiff also submits a 31-page expert report prepared by Erik Johnson who also compared both *Taurus* and *Stairway to Heaven*. Johnson transcribed the song *Taurus* from the sound recording and reduced it to its constituent elements: guitar, harpsichord, atmospheric percussion, and strings. (Johnson Decl. ¶11, ECF No. 118.) He also reconstructed *Stairway to Heaven* and recorded each instrument (electric bass, drum set, and electric piano parts) individually. (Johnson Decl. ¶8, ECF No. 118.)

After comparing the reconstructed versions of *Taurus* and *Stairway to Heaven*, Johnson concludes, "If *Stairway to Heaven* is stripped down to the bare elements that received songwriting credit, the listener is left with two parts: [1] an arpeggiated guitar part, the signature element, which is substantially the same as the signature guitar element in *Taurus*; [2] a vocal melody that bears significant resemblance to the harpsichord in *Taurus*, followed by a series of riffs, chord progressions and solos." (Johnson Decl. ¶18, ECF No. 118.)

Plaintiff's final expert report was prepared by Brian Bricklin, who compared audio files of *Taurus* and *Stairway to Heaven*. Bricklin spends the first eight pages of the report explaining the music production and mixing process. He then analyzes the two songs and concludes that "[b]oth songs are presented, in their final commercially released versions, with substantially similar production and mixing techniques." (Bricklin Decl. ¶16, ECF No. 118.) Bricklin points out specific similarities such as "the use of reverb to create a mystic, dreamlike quality [so that] each note of the guitar has a 'whispering tail.'"

### B.    Defendants' Expert Reports

Defendants submit an expert report by Lawrence Ferrara who opines that *Taurus* and *Stairway to Heaven* are not substantially similar. Ferrara attacks Stewart's report because it "relies upon and analyzes and compares performance elements in *Taurus* recordings that are nowhere mentioned in the *Taurus* Transcription. The *Taurus* Transcription does not mention or reflect, for example, performance techniques, instrumentation and orchestration, or tempo (i.e., performance speed)." (Ferrara Decl. ¶6, ECF No. 97.)

After disregarding the unprotected performance elements in Stewart's report, Ferrara explains that the only remaining similarities are the interchanging "A" and "B" sections reflected in Stewart's chart above. (Ferrara Decl. ¶8, ECF No. 97.) Ferrara concludes that these commonalities do not evince a substantial similarity between the two works for several reasons. First, he explains that interchanging "A" and "B" sections have been generic in music for centuries. Next, Ferrara contends that Stewart's analysis focuses only on the first two minutes of each song while disregarding the last six minutes of *Stairway*, which constitutes over 70% of the song. Finally, Ferrara opines that any similarities between the two songs are insubstantial and represent commonplace musical devices. (Ferrara Decl. Ex. 1 at ¶22, ECF No. 97.)

Defendants also provide an expert report prepared by Rob Mathes who performed and recorded the *Taurus* sheet music deposited with the Copyright Office on a steel string acoustic guitar. (Mathes Decl. ¶3, ECF No. 97.) Mathes echoes the conclusions of Ferrara and finds that the two songs are not substantially similar.

## IV.    JUDICIAL STANDARD

### A.    Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is proper only where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). On issues where the moving party does not have the burden of proof at trial, the moving party is required only to show that there is an absence of evidence to support the non-moving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). Upon such showing, the court may grant summary judgment "on all or part of the claim." Fed. R. Civ. P. 56(a)-(b).

To defeat a summary judgment motion, the non-moving party may not merely rely on its pleadings or on conclusory statements. Fed. R. Civ. P. 56(e). Nor may the non-moving party merely attack or discredit the moving party's evidence. *Nat'l Union Fire Ins. Co. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983). The non-moving party must affirmatively present specific evidence sufficient to create a genuine issue of material fact for trial. *See Celotex Corp.*, 477 U.S. at 324. The materiality of a fact is determined by whether it might influence the outcome of the case based on the contours of the underlying substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over such facts amount to genuine issues if a reasonable jury could resolve them in favor of the nonmoving party. *Id.*

### B.    Copyright

"Proof of copyright infringement is often highly circumstantial, particularly in cases involving music. A copyright plaintiff must prove: (1) ownership of the copyright; and (2) infringement—that the defendant copied protected elements of the plaintiff's work." *Three Boys Music Corp. v. Bolton*, 212

F.3d 477, 481 (9th Cir. 2000). Here, Defendants challenge both elements of the copyright test, arguing that Plaintiff does not own the copyright in *Taurus* and cannot demonstrate copying. Additionally, Defendants raise three defenses: abandonment, laches, and defective deposit copy.

## V.   DEFENSES

Defendants assert three defenses: (1) abandonment/waiver, (2) laches, and (3) defective deposit copy. The Court discusses each below.

### A.   Abandonment/Waiver

Defendants contend that Wolfe waived his right to the *Taurus* musical composition. "In copyright, waiver or abandonment of copyright 'occurs only if there is an intent by the copyright proprietor to surrender rights in his work.'" *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1026 (9th Cir. 2001). "Waiver is the intentional relinquishment of a known right with knowledge of its existence and the intent to relinquish it." *United States v. King Features Entm't, Inc.*, 843 F.2d 394, 399 (9th Cir. 1988). "To find abandonment, 'the copyright owner must have clearly manifested that intention through some affirmative act.'" *Hadady Corp. v. Dean Witter Reynolds, Inc.*, 739 F. Supp. 1392, 1398 (C.D. Cal. 1990).

On April 2, 1991, Wolfe was interviewed in connection with a new album of Spirit recordings titled, *Time Circle*. In the interview, Wolfe was asked about the possibility that Led Zeppelin had copied the opening of *Taurus* for its song *Stairway to Heaven*. Wolfe responded that Led Zeppelin members "used to come up and sit in the front row of all [Spirit's] shows and became friends[,] and if they wanted to use [*Taurus*], that's fine." (Freeman Decl. Ex. 6 at 7, ECF No. 97.) Later in the interview, Wolfe reiterated, "I'll let [Led Zeppelin] have the beginning of *Taurus* for their song without a lawsuit." (Freeman Decl. Ex. 6 at 8, ECF No. 97.) Defendants submit the original article, audio recordings of the interview, and deposition testimony from the journalist who conducted the interview, and argue that Wolfe's public statement demonstrates abandonment of his right in *Taurus*. (Freeman Decl. Exs. 3-7, ECF No. 97.)

Two district court cases have addressed similar arguments of abandonment premised on a copyright holder's public statements. In *Melchizedek v. Holt*, the copyright holder of several videos was quoted at a workshop saying, "I don't care about copyrights or any of that stuff, that doesn't matter. Forget it, just take it and you'll understand what this is all about by tomorrow." 792 F. Supp. 2d 1042, 1053 (D. Ariz. 2011). The court held that the remark was ambiguous as to which copyrights the plaintiff had supposedly abandoned and concluded that "questions of fact exist as to whether the overt acts . . . are indicative of Plaintiff's intent to abandon copyright protection in the [videos]." *Id.* at 1054.

In *Marya v. Warner/Chappell Music, Inc*, the copyright holder, who owned the lyrics to the famed *Happy Birthday* song, was mentioned in a *Time* magazine article as having "no complaint to make on the use of the words because she long ago resigned herself to the fact that her ditty had become common property of the nation." No. CV134460, 2015 WL 5568497, at *11 (C.D. Cal. Sept. 22, 2015). In addressing whether this quote constituted abandonment, the court held, "A public statement like this, if believed, is an overt act on which a reasonable fact finder could base a finding that Patty abandoned her copyright interest in the lyrics. However, we cannot say that this evidence is sufficient [for] a directed verdict at trial inasmuch as it is not a direct quote from [the copyright holder]." *Id.*

At the outset, the Court notes that both *Marya* and *Melchizedek* are factually distinguishable from the instant case. Unlike the copyright holder in *Melchizedek* who did not specify which work was supposedly abandoned, Wolfe explicitly referred to *Taurus* and Led Zeppelin in his interview. *Marya* is similarly distinguishable because the public statement was paraphrased whereas Wolfe's statement was

a direct quote, according to deposition testimony from the journalist who conducted the interview. (Ruhlmann Depo. 17:17-25, ECF No. 124.) While neither *Marya* nor *Melchizedek* squarely governs the instant case, they provide guidance as to how this Court should approach the issue of abandonment. Both cases stand for the larger proposition that a copyright holder's statement must be viewed in context to determine whether it manifests an intent to abandon rights.

Here, Plaintiff has proffered sufficient evidence to raise a triable issue of fact as to whether Wolfe's statement evinced his intent to abandon rights in *Taurus*. For starters, the journalist who conducted the interview testified that Wolfe never received or reviewed the interview notes before the article was published. (Ruhlmann Depo. 17:17-25, ECF No. 124.) Plaintiff also points to the tenor of the interview, which indicates that Wolfe felt cheated by Led Zeppelin and was merely trying to save face and make light of a bad situation. Additionally, Plaintiff submits several pieces of evidence demonstrating that Wolfe acted in a manner inconsistent with an intent to abandon his rights. First, David Waterbury, Spirit's bass player from 1985 to 1988, testified that Wolfe told him that he was upset about the theft and wanted to sue, but was deterred and intimidated. (Waterbury Decl. ¶¶3-9, ECF No. 118.) Next, Wolfe's longtime friend, Tracy Longo, testified that Wolfe had been contemplating a lawsuit against Led Zeppelin for some time before his death. (Longo Decl. ¶26-27, ECF No. 118.)[1] Finally, Plaintiffs proffer testimony from Linda Mensch, an entertainment attorney in Chicago, Illinois, who testified that Wolfe came to see her in the 1990's to inquire about the possibility of bringing a lawsuit against Led Zeppelin. (Mensch Decl. ¶¶2-6, ECF No. 118.)[2]

In sum, a genuine issue of fact exists as to the abandonment defense, and the Court denies summary judgment on this basis.

### B. Laches

Defendants argue that the copyright claim is barred by laches because Plaintiff delayed bringing suit for over four decades (from the 1971 release of *Stairway to Heaven* until the 2014 filing of the instant action).

This issue is squarely governed by the Supreme Court's recent decision in *Petrella v. Metro-Goldwyn-Mayer, Inc.*, where the Court held that "[l]aches . . . cannot be invoked to preclude adjudication of a [copyright] claim for damages brought within the three-year [statute of limitations]." 134 S. Ct. 1962, 1967 (2014). In *Petrella*, the Court explained that until 1957, federal copyright law did not include a statute of limitations for civil suits, which required federal courts to resort to the equitable doctrine of laches. *Id.* at 1968. In 1957, Congress enacted a three-year look-back limitations period for

---

[1] Defendants object to this evidence on the basis of hearsay. The objection is overruled. Wolfe's statements of his intent are admissible under the "state-of-mind" exception to the hearsay rule, which allows "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan)." Fed. R. Evid. 803(3). Of course, Rule 803 allows only a statement of the declarant's state of mind, not "statements as to why [the declarant] held the particular state of mind, or what he might have believed that would have induced the state of mind." *Wagner v. Cty. of Maricopa*, 747 F.3d 1048, 1052 (9th Cir. 2013).

[2] Defendants object to this evidence as inadmissible under the attorney-client privilege. The objection is overruled. Generally, "the client is the holder of . . . attorney/client privilege and has the right to assert such privilege, but . . . . [i]t is also the law that someone other than the actual client can become the holder of the privilege." *Roberts v. Heim*, 123 F.R.D. 614, 629 (N.D. Cal. 1988). Defendants have failed to show how they could possibly hold Wolfe's attorney-client privilege in this situation; therefore, the Court rejects their argument.

all civil claims arising under the Copyright Act, largely obviating the need for the doctrine of laches. *Id.* at 1973. While the Court held that laches was unavailable as a defense to a copyright action seeking damages, it preserved the role of laches in copyright actions seeking equitable relief. *Id.* at 1977 ("In extraordinary circumstances, however, the consequences of a delay in commencing suit may be of sufficient magnitude to warrant, at the very outset of the litigation, curtailment of the relief equitably awardable.").

Here, Plaintiff brought suit within the three-year retrospective statute of limitations, as Defendants released a new, remastered version of *Stairway to Heaven* in 2014. *Id.* at 1969 ("[E]ach infringing act starts a new limitations period."). Regardless of Plaintiff's delay in bringing the action, as long as Defendants have committed an infringing act within the three years preceding suit, laches does not prohibit Plaintiff's claim for damages.

Defendants argue that laches operates to bar Plaintiff's action because the lawsuit is an equitable one and *Petrella* expressly reserved laches as a viable defense to equitable relief. According to Defendants, Wolfe is a beneficial owner, and the relationship between a beneficial owner and a legal owner is an "equitable trust relationship . . . which gives the [beneficial owner] standing to sue for infringement." *Warren,* 328 F.3d at 1144. Defendants seize on this language and argue that because a beneficial owner exists in an "equitable trust relationship," he necessarily brings an "equitable" claim subject to laches. The Court disagrees. Defendants' argument, while semantically convenient, is legally baseless, as they indiscriminately latch onto the word "equitable" even though the word is used in two completely different contexts.

The use of "equitable" to describe the status of a beneficial owner is wholly distinct from the use of "equitable" to describe relief a court may grant under the Copyright Act. To describe the role of a beneficial owner as one in an "equitable trust relationship" is simply to explain that he retains an "equitable" right to bring suit even though he does not hold legal title in a copyright—such a characterization does not even remotely bear on the type of relief, legal or "equitable," that a beneficial owner may pursue. The Supreme Court in *Petrella* was clearly concerned with "equitable" in the sense of the relief awardable, not the manner in which a copyright owner can sue. The language of the opinion bears this out. The Court held that "the consequences of a delay in commencing suit may be of sufficient magnitude to warrant . . . curtailment of the *relief equitably awardable.*" 134 S. Ct. at 1977. Moreover, in providing an example of equitable relief that would be precluded by laches, the Supreme Court referred to "injunctive relief" such as "destruction of the work." *Petrella* 134 S. Ct. at 1978. Thus, the *Petrella* court used the term "equitable" as a concept of relief to be contrasted with legal or monetary remedy; the Court did not contemplate "equitable" in the sense that Defendants are invoking it.

Accordingly, the Court rejects this argument and finds that laches does not bar Plaintiff's claim.

## C.   Sufficiency of the Deposit Copy

Defendants contend that Plaintiff has failed to produce a deposit copy of the *Taurus* musical composition that was submitted to the Copyright Office in 1967. Even though Defendants were able to acquire a copy from the Library of Congress, they argue that the copy is defective because it does not bear the official Library of Congress stamp. (Anderson Decl. Exs. 17-18, ECF No. 97.)

The Court disposes of this argument in short order. First, Defendants do not cite any case law holding that a missing seal from the Copyright Office invalidates a deposit copy or prohibits an infringement claim. In fact, the case law points in the opposite direction, as the Ninth Circuit has held that mistakes or omissions on copyright registration material do not invalidate a copyright absent detrimental reliance by the infringer or intentional fraud by the registrant. *Three Boys Music,* 212 F.3d at 486; *KnowledgePlex, Inc. v. Placebase, Inc.,* No. C 084267, 2008 WL 5245484, at *9 (N.D. Cal. Dec.

17, 2008) ("[T]he Ninth Circuit has held that the standard governing the sufficiency of copyright deposits for purposes of maintaining an infringement suit is 'broad and deferential.'").

Here, Defendants have not alleged or proven either detrimental reliance or intentional fraud. Accordingly, the Court rejects this argument.

## VI.  OWNERSHIP

The instant action is brought on behalf of the deceased Randy Wolfe by the trustee of his trust. Defendants contend that neither Wolfe nor his trustee can sue for copyright infringement of *Taurus* because: (1) the song is a work for hire owned by Hollenbeck Music, (2) Wolfe did not comply with statutory formalities to secure his federal copyright interest, and (3) Wolfe failed to timely respond to a discovery request, thereby conceding the work-for-hire issue.

### A.  Work For Hire

"[T]o analyze questions arising from events that occurred before January 1, 1978, such as who is the author of the [work], the 1909 Act applies; for events that occurred after that date, such as registration of the renewal copyright, the 1976 Act applies." *Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*, 531 F.3d 962, 971 (9th Cir. 2008). Because *Taurus* was created before 1978 (either in 1966 as Plaintiff contends or in late 1967 as Defendants maintain), the issue is governed by the 1909 Act.

Under the 1909 Act, the author of a work owned the copyright in the work; however, the Act provided that "the word 'author' shall include an employer in the case of works made for hire." 17 U.S.C. § 26 (repealed). While the 1909 Act explicitly carved out a work-for-hire exception, "[n]owhere did the [] Act define what was meant by 'work made for hire' or 'employer.'" *Siegel v. Time Warner Inc.*, 496 F. Supp. 2d 1111, 1136 (C.D. Cal. 2007). "Because the 1909 Act did not define 'employer' or 'works made for hire,' the task of shaping these terms fell to the courts. They concluded that the work for hire doctrine codified in [the 1909 Act] referred only to works made by employees in the regular course of their employment." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 744 (1989). Specifically, the Ninth Circuit "evaluated claims that a work was made for hire [under the 1909 Act] by asking whether it was created at the 'instance and expense' of the engaging party." *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 877 (9th Cir. 2005).

Neither party disputes that on August 29, 1967, Wolfe entered into an exclusive songwriter agreement with Hollenbeck. The agreement deemed Wolfe a "writer for hire" with "full rights of copyright renewal vested in Hollenbeck." (Anderson Decl. Ex. 11 at ¶11, ECF No. 97.) Hollenbeck also registered a copyright in the *Taurus* musical composition with the Copyright Office on December 22, 1967. The registration lists Hollenbeck as the "Copyright Claimant" and Wolfe as the "Author." (Anderson Decl. Ex. 16, ECF No. 97.) In January 1996, however, Wolfe renewed the *Taurus* registration in his own name without any reference to Hollenbeck. (FAC Ex. 1, ECF No. 31.) Finally, on February 18, 2016, Hollenbeck filed supplementary registrations with the Copyright Office, amending both the December 1967 initial registration and the January 1996 renewal registration to clarify that *Taurus* was a work for hire. (Anderson Decl. Ex. 27, ECF No. 129.)

Defendants argue that *Taurus* is a work for hire based on the August 1967 exclusive songwriter agreement and the December 1967 copyright registration certificate listing Hollenbeck as a "Copyright Claimant." Even though the December 1967 registration does not expressly designate *Taurus* as a "work for hire," Defendants contend that such an inadvertent omission does not invalidate a registration certificate. *Urantia Found. v. Maaherra*, 114 F.3d 955, 963 (9th Cir. 1997) ("[I]nadvertent mistakes on registration certificates do not invalidate a copyright . . . unless the alleged infringer has relied to its detriment on the mistake, or the claimant intended to defraud the Copyright Office."). Moreover,

CV-90 (06/04)                                CIVIL MINUTES - GENERAL                                Page 9 of 20

Defendants maintain that any mistake in listing *Taurus* as a work for hire has been corrected by the supplementary registration, in which Hollenbeck amended the prior registrations to reflect that *Taurus* was a work for hire.

The Court finds that Defendants' reliance on the copyright registration certificates is misplaced. "A copyright certificate establishes prima facie evidence of the validity of a copyright and of the facts in the certificate. The presumption is rebuttable, and does not definitively resolve the ownership issue." *In re Napster, Inc. Copyright Litig.*, 191 F. Supp. 2d 1087, 1096 (N.D. Cal. 2002). Here, Plaintiff has proffered sufficient evidence to rebut the presumption created by the registration certificates. For instance, the two surviving members of Spirit testified that Wolfe created the song *Taurus* before the August 1967 exclusive songwriter agreement. (Andes Decl. ¶4; Ferguson Decl. ¶4, ECF No. 119.) Wolfe's sisters corroborate this point; they testified that in late 1966, Wolfe wrote *Taurus* for his high school sweetheart who would eventually become his wife. (Andrea Wolfe Decl. ¶¶4-5; Janet Wolfe Decl. ¶¶4-5, ECF No. 118.) Furthermore, according to Andes and Wolfe's sisters, Spirit regularly played *Taurus* at the Ash Grove club in Hollywood in early 1967—before the songwriter agreement was executed. (Andrea Wolfe Decl. ¶5; Janet Wolfe Decl. ¶5, ECF No. 118; Andes Depo. 150-156, ECF No. 124.)

Plaintiff has marshaled sufficient evidence to create a triable issue of fact as to whether Wolfe composed *Taurus* before or after the exclusive songwriter agreement, a question that bears directly on the issue of whether *Taurus* is a work for hire. Therefore, summary judgment on this basis is improper.

### B.   Failure to Comply with Statutory Formalities

Defendants posit that even if Wolfe had composed and performed *Taurus* live or recorded the song before August 29, 1967, he still does not own the copyright because he failed to comply with statutory requirements.

Under the 1909 Act, a work was protected by common law copyright from the moment of its creation; however, as soon as the work was published, the owner was divested of common law protection. *Societe Civile Succession Guino v. Renoir*, 549 F.3d 1182, 1185 (9th Cir. 2008). At the point of divestiture, federal copyright protection did not attach immediately; rather, the owner was required to secure federal copyright protection in one of two ways: (1) by publishing the work with proper notice or (2) by not publishing the work but registering and depositing necessary copies with the Copyright Office. *Williams v. Bridgeport Music, Inc.*, No. LA CV13-06004, 2014 WL 7877773, at *8 (C.D. Cal. Oct. 30, 2014); *Cosmetic Ideas, Inc. v. IAC/Interactivecorp.*, 606 F.3d 612, 618 (9th Cir. 2010) ("[F]ederal copyright protection attached only upon publication, and even then, only if proper notice, registration, and deposit occurred."). Under the first method of securing federal copyright protection, neither a live performance nor distribution of a recording constitutes publication of a musical composition. *ABKCO Music, Inc. v. LaVere*, 217 F.3d 684, 688-89 (9th Cir. 2000) (explaining that selling or distributing records does not qualify as publication); *Am. Vitagraph, Inc. v. Levy*, 659 F.2d 1023, 1027 (9th Cir. 1981) ("It has long been held that mere performance or exhibition of a work does not constitute a publication of that work [under the 1909 Act].").

It is undisputed that Wolfe did not personally comply with the statutory formalities. He did not publish copies of *Taurus* with proper notice, nor did he register and deposit copies of the unpublished musical composition with the Copyright Office. Therefore, Defendants maintain, federal copyright protection never actually vested until Hollenbeck registered *Taurus* with a deposit copy in December 1967. Defendants' argument presumes that Hollenbeck must have owned *Taurus* as a work for hire because the song was not registered until December 1967—well after the exclusive songwriter agreement. That is not necessarily so. Assuming Wolfe did, in fact, compose *Taurus* before the August 1967 exclusive songwriter agreement, he acquired common law copyright protection from the moment

of creation. Absent evidence that he somehow lost or transferred his rights, Wolfe continued to own the copyright in *Taurus* when the common law copyright divested and the federal copyright protection attached upon registration in December 1967. The mere fact that Hollenbeck registered *Taurus* and appears as "Copyright Claimant" on the registration certificate does not dispose of Wolfe's ownership claim.

In fact, the evidence in the record provides a plausible explanation as to why Hollenbeck would have registered *Taurus* as a claimant, even if Wolfe had independently created and continued to own the song. In the August 1967 exclusive songwriter agreement, Wolfe assigned his rights in all existing and future musical compositions to Hollenbeck in exchange for royalties.[3] An author who assigns his copyright in a work in exchange for royalties is considered a beneficial owner, while the assignee receiving title is deemed the legal owner of the copyright. *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1144 (9th Cir. 2003) (defining a beneficial owner as "an author who had parted with legal title to the copyright in exchange for percentage royalties based on sales or license fees."). Even under the 1909 Act, a beneficial owner had standing to sue for copyright infringement. *Moran v. London Records, Ltd.*, 827 F.2d 180, 183 (7th Cir. 1987). Assuming *Taurus* was included in the musical compositions that Wolfe assigned to Hollenbeck, Wolfe would have retained ownership as a beneficial owner, and the record company would have held title as legal owner. In such a situation, it would be entirely conceivable that Hollenbeck would register the song with both its name and Wolfe's name on the certificate.

Of course, the Court does not take a position on the events that transpired over forty years ago. Suffice it to say that Plaintiff has proffered sufficient evidence to create a genuine issue of material fact as to the ownership of *Taurus*.

## C.   Untimely Response to Request for Admission

Defendants' final argument is that Plaintiff failed to answer a request for admissions in a timely manner, thereby conceding that *Taurus* is a work for hire. Counsel for Defendants claims that he warned Plaintiff's counsel twice about late responses to requests for admission, and any delay in responding was inexcusable. (Andersen Decl. Ex. 13-14, ECF No. 97.) Plaintiff explains that the trustee of Wolfe's trust had been involved in a serious accident and was unable to verify the answers by the deadline. Given the special circumstances, Plaintiff's counsel mistakenly understood that he had been granted an extension; he subsequently worked with Defendants' counsel to supplement discovery responses and deny that *Taurus* is a work for hire.

"A trial judge has discretion . . . to permit a late response to a request for admissions made pursuant to [Federal Rule of Civil Procedure 36], and thus relieve a party of apparent default." *Am. Gen. Life & Acc. Ins. Co. v. Findley*, No. CV 12-01753, 2013 WL 1120662, at *3 (C.D. Cal. Mar. 15, 2013). In determining whether to permit withdrawal or amendment of an admission, the court considers: (1) whether presentation of the merits will be subserved and (2) whether the non-moving party will suffer prejudice. *Conlon v. United States*, 474 F.3d 616, 621 (9th Cir. 2007).

---

[3] The exclusive songwriter agreement contains a section entitled "Grant of Rights," in which Wolfe agreed to "irrevocably and absolutely assign[], transfer, set[] over and grant[] to [Hollenbeck] . . . the titles, words and music of any and all original musical compositions . . . which are now owned or controlled and which may, during the term hereof, be written, composed, created or conceived by [Wolfe]." (Anderson Decl. Ex. 11 at ¶3, ECF No. 97.) The agreement also includes a section labeled, "Compensation," which specifies that Wolfe would receive royalties. (Anderson Decl. Ex. 11 at ¶7, ECF No. 97.)

"The first half of the test in [Rule 36] is satisfied when upholding the admissions would practically eliminate any presentation of the merits of the case." *Hadley v. United States*, 45 F.3d 1345, 1348 (9th Cir. 1995). Here, upholding Plaintiff's admission as to the work-for-hire issue would eliminate any presentation of the merits, as he would not have any standing to sue for copyright infringement. Therefore, the first prong is satisfied.

The second prong requires the party relying on the deemed admission to prove prejudice. *Conlon* 474 F.3d at 622. The Court finds that Defendants have not carried their burden to show prejudice. For starters, at the time of the late response, Defendants did not file a motion to compel or have the matter deemed admitted by the court. *Asea, Inc. v. S. Pac. Transp. Co.*, 669 F.2d 1242, 1247 (9th Cir. 1981) ("A party requesting an admission may, if he feels these requirements have not been met, move to determine the sufficiency of the answer, to compel a proper response, or to have the matter ordered admitted."). Defendants chose not to pursue such remedies during discovery.

Beyond their inaction earlier in litigation, Defendants have failed to show any real prejudice. According to Defendants, in reliance on Plaintiff's admission, they chose not to depose certain individuals, like Spirit's producer, about the work-for-hire issue. The Court finds this argument unavailing. Even if Defendants had deposed Spirit's producer and other unnamed potential deponents, they could not conclusively establish that *Taurus* was a work for hire in the face of Plaintiff's contrary evidence. At most, then, Defendants would simply have fortified their position on the work-for-hire issue with additional testimony, but not enough to prevail on summary judgment because of Plaintiff's evidence creating a triable issue of fact.

Accordingly, the Court rejects Defendants' argument that Plaintiff conceded *Taurus* was a work for hire by his untimely response to admissions.

## VII. COPYING

"Because direct evidence of copying is not available in most cases, plaintiff may establish copying by showing that defendant had access to plaintiff's work and that the two works are 'substantially similar' in idea and in expression of the idea." *Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir. 1996). Alternatively, "in the absence of any proof of access, a copyright plaintiff can still make out a case of infringement by showing that the songs were 'strikingly similar.'" *Three Boys Music Corp.*, 212 F.3d at 485.

The Court finds that Plaintiff has failed to proffer evidence of striking similarity, but he has successfully created a triable issue of fact as to access and substantial similarity.

### A. Striking Similarity

"[I]n rare cases, a plaintiff can prove copying even without proof of access if he can show that the two works are not only similar, but are so strikingly similar as to preclude the possibility of independent creation." *Stabile v. Paul Smith Ltd.*, No. CV 14-3749, 2015 WL 5897507, at *9 (C.D. Cal. July 31, 2015). "'[S]triking similarity simply means that in human experience it is virtually impossible that the two works could have been independently created.'" *Stewart v. Wachowski*, 574 F. Supp. 2d 1074, 1103 (C.D. Cal. 2005). "To show a striking similarity between works, a plaintiff must produce evidence that the accused work could not possibly have been the result of independent creation." *Seals-McClellan v. Dreamworks, Inc.*, 120 F. App'x 3, 4 (9th Cir. 2004).

Here, Plaintiff's experts opine that *Taurus* and *Stairway to Heaven* bear striking similarity. The Court disagrees. The expert reports point out structural commonalities shared by both songs, but striking similarity is an exceedingly high bar that requires a much greater showing. In fact, Plaintiff's experts

admit that other works use "similar descending minor harmonic patterns." (Stewart Decl. ¶41, ECF No. 118.) Even though the expert also states that *Taurus* and *Stairway to Heaven* "depart from the traditional sequence in similar and significant ways," the fact remains that the primary feature in both works is a common musical structure. (Stewart Decl. ¶9, ECF No. 118.) Thus, the Court cannot definitively say based on the evidence provided that the two works bear a striking similarity.

In the absence of striking similarity, Plaintiff must show: (1) access and (2) substantial similarity to defeat summary judgment on the second element of his copyright claim. As the Court explains below, Plaintiff has demonstrated copying.

**B.    Access**

"To prove access, Plaintiff must show that the Defendants had a 'reasonable opportunity' or 'reasonable possibility' of viewing Plaintiff's work prior to the creation of the infringing work." *Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1053 (C.D. Cal. 2010). "Absent direct evidence of access, a plaintiff can prove access using circumstantial evidence of either (1) a chain of events linking the plaintiff's work and the defendant's access, or (2) widespread dissemination of the plaintiff's work." *L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 846-47 (9th Cir. 2012)

Defendants contend that Plaintiff has not produced any evidence to show that members of Led Zeppelin had any access to the *Taurus* song. The Court addresses each type of access in turn.

**1.    *Direct Evidence of Access***

"Direct access is shown if there is proof that defendant actually viewed, read, or heard the work at issue." *Shame on You Prods., Inc. v. Elizabeth Banks*, 120 F. Supp. 3d 1123, 1149 (C.D. Cal. 2015).

The Court finds that Plaintiff has not proffered sufficient evidence to raise a triable issue of fact that Led Zeppelin members had direct access to *Taurus*. Plaintiff introduces the testimony of Tracy Longo, Wolfe's longtime friend, who recounted a story Wolfe told him: apparently, in 1968 or 1969, Page asked Wolfe to teach him the opening notes for *Taurus*. (Longo Decl. ¶19-21, ECF No. 118.) Plaintiff also submits an interview from April 1970 in which Page stated, "Spirit do some really nice things on albums. They give a really nice atmosphere when they play and I always enjoy seeing them." (Malofiy Decl. Ex. 3, ECF No. 124.) In another interview, this one conducted in November 1972, Page was quoted as saying, "I saw Spirit a couple of times and thought they were very good." (Malofiy Decl. Ex. 4, ECF No. 124.) Finally, Andes testified that Plant attended a Spirit show in February 1970 in Birmingham, England and went out drinking with the Spirit members after the concert. (Andes Depo. 111-118, ECF No. 119.)

The Court discounts Longo's testimony and Page's quoted remarks as they both constitute hearsay that does not fall into any exception. The only remaining testimony is that Plant attended a Spirit concert in 1970. Plaintiff does not provide any evidence that *Taurus* was played at the 1970 concert; therefore, while Plant's presence at the concert may be circumstantial evidence of access, it does not establish direct access.

**2.    *Circumstantial Evidence: Wide Dissemination***

"As a general matter, it appears that in order for a work to be widely disseminated, it must achieve a high degree of commercial success or be readily available in the relevant market." *Loomis v. Cornish*, No. CV 12-5525, 2013 WL 6044345, at *10 (C.D. Cal. Nov. 13, 2013); *see, e.g., Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1144 (9th Cir. 2009) (finding that 2,000 copies per year sold did not constitute wide dissemination); *Jason v. Fonda*, 526 F. Supp. 774, 776 (C.D. Cal. 1981)

*aff'd*, 698 F.2d 966 (9th Cir. 1982) (finding that 2,000 copies sold nationwide and 700 copies sold in southern California did not constitute wide dissemination); *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1178 (9th Cir. 2003) (finding that 17,000 copies sold over thirteen years did not constitute wide dissemination).

The Court finds that Plaintiff has not proffered sufficient evidence to raise a triable issue of fact on the question of widespread dissemination. Neither party disputes that in 1967, Ode Records released Spirit's first eponymous album, which included an instrumental composition of *Taurus*. (Ferguson Depo. 46:10-19; Andes Depo. 57:16-22, ECF No. 97.) Beyond that, however, the record is devoid of any evidence from which a trier of fact can determine whether the song was disseminated widely. Plaintiff does not provide evidence that *Taurus* was played frequently on the radio or released as a single, nor does he submit any evidence attesting to record sales of Spirit's first album.

Instead, Plaintiff submits inadmissible testimony from Mike and Robert Lee, disc jockeys who worked for a Los Angeles radio station in late 1972 and 1973, who stated that *Taurus* was being played on the radio before 1971. (Mike Lee Decl. ¶¶3-4; Robert Lee Decl. ¶3, ECF No. 119.) The Court rejects this testimony, as neither of these witnesses was disclosed to Defendants. (Anderson Decl. ¶8, ECF No. 129.) "A party that fails to disclose witnesses pursuant to FRCP 26 may be prohibited from using that witness to supply evidence during any proceeding, unless that 'failure was substantially justified or is harmless.'" *Nuance Commc'ns, Inc. v. ABBYY Software House*, No. C 08-02912, 2012 WL 2838431, at *1 (N.D. Cal. July 10, 2012).

Plaintiff also proffers testimony from Wolfe's sisters who claim that after the release of Spirit's first album, the group embarked on a lengthy tour to promote the record. (Andrea Wolfe Decl. ¶6; Janet Wolfe Decl. ¶7, ECF No. 118.) This testimony is devoid of any detail as to the duration of the tour, the size of the venues, or the number of shows played. Moreover Wolfe's sisters do not have personal knowledge about the extent of the tour, as they did not travel with the band. Therefore, the proffered evidence is entirely too speculative to demonstrate widespread dissemination.

Accordingly, Plaintiff has not proffered sufficient evidence to raise a genuine issue of fact as to access through wide dissemination.

### 3. *Circumstantial Evidence: Chain of Events*

The second way a plaintiff can present circumstantial evidence of access is by demonstrating a chain of events between the plaintiff's work and defendant's access to that work. *Gable v. Nat'l Broad. Co.*, 727 F. Supp. 2d 815, 824 (C.D. Cal. 2010) *aff'd sub nom. Gable v. Nat'l Broad. Co.*, 438 F. App'x 587 (9th Cir. 2011).

As discussed in the factual section, the record conclusively establishes that Spirit and Led Zeppelin performed at the same festival on the same day three times between 1968 and the release of *Stairway to Heaven* in 1971. The record further demonstrates that at two of these concerts, the Denver Festival and the Atlanta Festival, the two groups performed in succession. The only question, then, is whether this chain of events is sufficient circumstantial evidence to raise a genuine issue of fact about access.

Defendants contend that these three encounters, without more, are not enough for a reasonable juror to find that Led Zeppelin members had access to *Taurus*. For starters, Defendants argue, Spirit rarely played *Taurus* in its performances between 1968 and 1971 because the goal of the tour was to promote its second album by playing new songs and old hits, which did not include *Taurus*. (Ferguson Depo. 53:22-54:21; Andes Depo. 68:7-70:6; ECF No. 97.) As further evidence that *Taurus* was rarely

performed on tour, Defendants submit a set list from a February 1969 live Spirit performance, which included thirteen songs but no mention of *Taurus*. (Anderson Decl. Ex. 20, ECF No. 97.) When asked about the set list, Andes confirmed that it represents a "typical set list for Spirit's performances in that time period." (Andes Depo. 103:18-24, ECF No. 97.) Even if Spirit had performed *Taurus* at any of these festivals, Defendants maintain, none of the Led Zeppelin members ever shared a stage with or heard any live performances by Spirit. (Page Decl. ¶¶8, 12-13; Plant Decl. ¶¶6-10; Jones Decl. ¶¶5-10, ECF No. 97.) According to Page, while the two bands may have preformed in succession on certain occasions, the process of dismantling and setting up equipment between acts generally took 15-20 minutes, meaning that bands would rarely spend time on stage together. (Page Decl. ¶14-15; Ferguson Depo. 344:10-347:6, ECF No. 97.)[4]

In retort, Plaintiff argues that Spirit regularly performed *Taurus* as part of its live tour. Wolfe's sisters testified that Spirit "played *Taurus* at all their shows" because it was Wolfe's "favorite song until the day he died." (Andrea Wolfe Decl. ¶5-6; Janet Wolfe Decl. ¶5-7, ECF No. 118.) Ferguson testified that "there were certain songs [Spirit] played religiously every show. 'Taurus' was not, but it was played often." (Ferguson Depo. 21:4-20, ECF No. 124.) He also explained that *Taurus* had its own unique role in Spirit shows because it served as an acoustic palate cleanser amidst the predominantly electronic music. (Ferguson Depo. 38:1-21, ECF No. 124.) Furthermore, Plaintiff submits evidence that Spirit crossed paths with Led Zeppelin at these music festivals. Andes testified that a mutual friend briefly introduced him and Spirit members to Led Zeppelin backstage at the Denver Festival. (Andes Depo. 105:11-108:3, ECF No. 124.) As to the Atlanta Festival, Ferguson testified that he had a "very clear memory" of Led Zeppelin performing on the same stage right after Spirit played. (Ferguson Depo. 16:16-23, 104:3-6, ECF No. 124.) Andes also recalled meeting and conversing with Plant when Led Zeppelin was going on stage after Spirit's set at the Atlanta festival. (Andes Depo. 124:17-124:24, ECF No. 124.)

Beyond the interaction at the festivals, Plaintiff introduces other evidence to create a triable issue of fact regarding access. First, to impeach Page's testimony that he "has never seen Spirit perform live," Plaintiff submits two interview excerpts in which Page admitted that he was a fan of Spirit and had attended several shows. (Malofiy Decl. Exs. 3-4, ECF No. 124.) Next, Andes testified that Plant attended a Spirit show in February 1970 in Birmingham, England and went out drinking with the Spirit members after the concert. (Andes Depo. 111-118, ECF No. 119.) Finally, the surviving members of Led Zeppelin admitted to performing a bass riff similar to one featured in one of Spirit's hit songs, *Fresh Garbage*—a song that appears on the same album as *Taurus*. (Page Depo. 388-390, ECF No. 124.) While they admit to playing a similar bass riff, however, the Led Zeppelin members testified that they heard the song from either the radio or a compilation of assorted American rock songs, not from Spirit's album. (Page Decl. ¶17, Plant Decl. ¶13, Jones Decl. ¶¶12-13, ECF No. 97.)

Overall, Plaintiff has produced sufficient circumstantial evidence to raise a factual dispute on the issue of access. He has presented evidence that both bands performed in succession and actually interacted at two festivals. Moreover, Plaintiff submitted evidence that Spirit would often perform *Taurus* because it was arguably Wolfe's favorite song. Beyond the two concerts, Plaintiff also proffers evidence that Led Zeppelin played one of Spirit's songs that appeared on the same album as *Taurus*. Finally, he presents impeachment evidence to counter Page's declaration that he never saw a Spirit performance.

## C.   **Substantial Similarity**

---

[4] Plaintiff disputes this with testimony from Andes that changing equipment between bands would not take a very long time because each band's material was already set up before the show, meaning that the only work to be done was to remove the outgoing band's equipment. (Andes 90:19-91:1, ECF No. 124.)

"Although summary judgment is not highly favored on questions of substantial similarity in copyright cases, summary judgment is appropriate if the court can conclude, after viewing the evidence and drawing inferences in a manner most favorable to the non-moving party, that no reasonable juror could find substantial similarity of ideas and expression." *Shaw v. Lindheim*, 919 F.2d 1353, 1355 (9th Cir. 1990).

The parties submit dueling expert reports on the issue of substantial similarity. Defendants attack Plaintiff's expert reports on two bases: (1) the reports improperly consider unprotected performance elements of *Taurus*, and (2) once all the unprotected elements are stripped away, the remaining similarity is nothing more than a common descending bass line not entitled to protection.

### 1. *Unprotected Performance Elements*

Defendants urge this Court to disregard Plaintiff's expert reports because they improperly consider unprotected performance elements in the sound recordings of *Taurus*. According to Defendants, the only copyrighted work is the musical composition, not the sounds recording, and Plaintiff's experts erred by relying on the performance elements in the sounds recordings to conclude that the two works are substantially similar.

"Sound recordings and their underlying musical compositions are separate works with their own distinct copyrights. . . . Accordingly, the court must first determine what elements of Plaintiff's work are protected by his copyright in the musical composition, as opposed to those protected by the copyright in the sound recording, and 'filter out' the latter." *Newton v. Diamond*, 204 F. Supp. 2d 1244, 1248-49 (C.D. Cal. 2002), *aff'd*, 349 F.3d 591 (9th Cir. 2003). Courts have held that to determine substantial similarity in the context of a musical composition, only elements in the music sheets deposited with the Copyright Office—not elements in the sounds recordings—may be considered. *Williams*, 2014 WL 7877773 at *9-10; *Fahmy v. Jay Z*, No. 207CV05715, 2015 WL 5680299, at *13-14 (C.D. Cal. Sept. 24, 2015).

Plaintiff disputes that his copyright is limited to the music sheet deposited with the Copyright Office. In retort, he invokes *Three Boys Music* to argue that elements reflected in a sound recording, even if not on the deposit sheet, are to be considered by a jury. In *Three Boys Music*, a jury determined that the Michael Bolton song, *Love is a Wonderful Thing*, infringed on an eponymous song by the Isley Brothers. 212 F.3d at 480. Bolton appealed and argued that the Isley Brothers' deposit copy of sheet music varied from the sound recording, and, therefore, the trial court lacked subject matter jurisdiction. *Id.* at 486. The Ninth Circuit rejected this argument and explained, "Although the 1909 Copyright Act requires the owner to deposit a 'complete copy' of the work with the copyright office, our definition of a 'complete copy' is broad and deferential: 'Absent intent to defraud and prejudice, inaccuracies in copyright registrations do not bar actions for infringement.'" *Id.* Plaintiff seizes on this language and contends that a deposit copy of sheet music does not constitute the entirety of a protected work; rather, additional elements, such as those embodied in a sound recording, may be considered. The Court finds this argument unavailing.

In *Three Boys Music*, the Ninth Circuit did not suggest that a copyright claimant may rely on additional elements in a sound recording to prove infringement of an underlying musical composition. Instead, the court merely reiterated the established proposition that an incomplete deposit copy of sheet music does not invalidate a copyright or strip the court of jurisdiction. The quoted language Plaintiff relies on addressed only subject matter jurisdiction—not the content protected by copyright. *Williams*, 2014 WL 7877773 at *9 (explaining that *Three Boys Music* "address[ed] only subject matter jurisdiction, not the material actually protected by the copyright."). In fact, in *Three Boys Music*, the plaintiff's expert "testified that *the deposit copy included all of the song's essential elements* such as the

title hook, chorus, and pitches." *Id.* at 486 (emphasis added). Ironically, then, the very case Plaintiff relies on to argue that elements beyond the deposit copy should be considered presents a scenario in which no elements outside the deposit copy were considered.[5]

In the present case, Plaintiff's only copyright claim lies in the musical composition of *Taurus*, not the sound recording. *Dowling v. United States*, 473 U.S. 207, 211, 105 n.4 (1985) ("Congress did not extend federal copyright protection to sound recordings until the Sound Recording Act of 1971 . . . and then only to sound recordings fixed after February 15, 1972."). The Court finds that Plaintiff's experts impermissibly relied on performance elements found in the sound recordings. For example, Stewart opined that *Stairway to Heaven* is substantially similar to recorded versions of *Taurus* based on common "fingerpicking style," "acoustic guitar," "classical instruments such as flute . . . strings and harpsichord," "atmospheric sustained pads," and "fretboard positioning." Similarly, Bricklin focused almost exclusively on the music production and mixing process to conclude that *Taurus* and *Stairway to Heaven* shared a common ethereal ambience created in the production process. By analyzing performance elements in the sound recording of *Taurus*, Plaintiff's experts improperly considered features beyond the scope of the musical composition—such features will be disregarded by this Court.

### 2.    *Extrinsic Test*

Once all the unprotected performance elements are stripped away, the only remaining similarity is the core, repeated A-minor descending chromatic bass line structure that marks the first two minutes of each song.

"The substantial-similarity test contains an extrinsic and intrinsic component. At summary judgment, courts apply only the extrinsic test; the intrinsic test, which examines an ordinary person's subjective impressions of the similarities between two works, is exclusively the province of the jury." *Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1077 (9th Cir. 2006). "In analyzing musical compositions under the extrinsic test, [the Ninth Circuit has] never announced a uniform set of factors to be used. . . . So long as the plaintiff can demonstrate, through expert testimony that . . . the similarity was 'substantial' and to 'protected elements' of the copyrighted work, the extrinsic test is satisfied." *Swirsky v. Carey*, 376 F.3d 841, 849 (9th Cir. 2004). "[E]xpressions that are standard, stock, or common to a particular subject matter or medium are not protectable under copyright law." *Satava v. Lowry*, 323 F.3d 805, 810 (9th Cir. 2003).

Here, Plaintiff has submitted expert testimony attesting to the substantial similarity of protected elements in *Taurus* and *Stairway to Heaven*. The similarity consists of repeated A-minor descending chromatic bass lines lasting 13 seconds and separated by a bridge of either seven or eight measures. Moreover, the similarity appears in the first two minutes of each song, arguably the most recognizable and important segments of the respective works. Finally, "[n]early 80% of the pitches of the first eighteen notes match, along with their rhythms and metric placement. The harmonic setting of these 'A' sections feature the same chords during the first three measures and an unusual variation on the traditional chromatic descending bass line in the fourth measure." (Stewart Decl. ¶24, ECF No. 118.)

Defendants argue that the descending chromatic bass line is a centuries-old, common musical

---

[5] Plaintiff's reliance on *KnowledgePlex, Inc. v. Placebase, Inc.* is misplaced, as that case merely held that an incomplete deposit does not deprive the court of subject matter jurisdiction. Likewise, Plaintiff improperly relies on *Scentsy, Inc. v. B.R. Chase, LLC.*, because that case addressed copyright protection under the 1976 Act. 942 F. Supp. 2d 1045, 1050 (D. Idaho 2013), *aff'd in part, rev'd in part and remanded sub nom. Scentsy, Inc. v. Harmony Brands, LLC*, 585 F. App'x 621 (9th Cir. 2014).

element not entitled to protection, and, therefore, Plaintiff has failed to satisfy the extrinsic test. The Court disagrees. While it is true that a descending chromatic four-chord progression is a common convention that abounds in the music industry, the similarities here transcend this core structure. For example, the descending bass line in both *Taurus* and *Stairway to Heaven* appears at the beginning of both songs, arguably the most recognizable and important segments. *Baxter v. MCA, Inc.*, 812 F.2d 421, 425 (9th Cir. 1987) ("Even if a copied portion be relatively small in proportion to the entire work, if qualitatively important, the finder of fact may properly find substantial similarity.") Additionally, the descending bass line is played at the same pitch, repeated twice, and separted by a short bridge in both songs. *Swirsky* 376 F.3d at 851 ("[E]ven an arrangement of a limited number of notes can garner copyright protection.").

The Court finds that Plaintiff has demonstrated "enough similar protectable expression here that the issue of substantial similarity should [proceed to the jury]." *Scentsy, Inc. v. Harmony Brands, LLC*, 585 F. App'x 621, 622 (9th Cir. 2014); *Shaw v. Lindheim*, 919 F.2d 1353, 1360 (9th Cir. 1990) ("Once a court has established that a triable question of objective similarity of expression exists, by analysis of each element of the extrinsic test, its inquiry should proceed no further. What remains is a subjective assessment of the 'concept and feel' of two works . . . a task no more suitable for a judge than for a jury.") Accordingly, the Court denies summary judgment on this ground.

## VIII.  DAMAGES

### A.  Recovery as a Beneficial Owner

Defendants argue that any potential recovery should be reduced by 50% because Plaintiff is suing as a beneficial owner based on his right to royalties under the 1967 exclusive songwriter agreement.  (Anderson Decl. Ex. 11 at ¶11, ECF No. 97.) The exclusive songwriter agreement limited Wolfe to 50% of any recovery, and, therefore, the trust is also limited to half of any damages. *Manno v. Tennessee Prod. Ctr., Inc.*, 657 F. Supp. 2d 425, 432 (S.D.N.Y. 2009) (explaining that recovery in a copyright case is limited to a co-owner's share of damages); *Nimmer on Copyright* § 12.03 (a joint owner can sue only "for his particular share of damages or profits").

Plaintiff has not opposed this argument in his opposition brief. Therefore, the Court grants summary judgment on this issue and holds that Plaintiff, as a beneficial owner, is entitled to only 50% of the recovery.

### B.  Laches as a Bar to Profits

Defendants argue that four decades of delay have severely prejudiced them in the form of lost documents, fading memories, and deceased witnesses. (Page Decl. ¶21-22, ECF No. 97.) They also claim that they did not know of the claim until shortly before it was filed in 2014, and, as a result, they could not have filed an action for declaratory relief. Therefore, Defendants maintain, laches operates to bar any award of profits.

In *Petrella*, the Supreme Court held that if a plaintiff ultimately prevails on a copyright claim, a district court may consider the plaintiff's delay in commencing suit when "determining appropriate injunctive relief and assessing profits." 134 S. Ct. at 1978. The Court cautioned, however, that courts should closely examine the defendant's alleged reliance on the plaintiff's delay and take into account

> [defendant's] early knowledge of [plaintiff's] claims, the
> protection [defendant] might have achieved through pursuit
> of a declaratory judgment action, the extent to which
> [defendant's] investment was protected by the separate-

> accrual rule, the court's authority to order injunctive relief "on such terms as it may deem reasonable," § 502(a), and any other considerations that would justify adjusting injunctive relief or profits.

*Id.* at 1978-79.

Defendants' request is overbroad in light of the passage recited above. The Supreme Court did not hold that laches operates to categorically bar an award of profits; rather, it explained that an undue delay in bringing suit may justify adjusting profits. While this Court is sympathetic to Defendants' reliance on the 40-year delay, the circumstances do not merit an outright exclusion of all profits. Instead, if there is ultimately a finding of liability, Defendants may renew their request to reduce profits in an amount commensurate with the delay, and the Court will consider the issue again at that time.

### C.    **Extraterritorial Profits**

Finally, Defendants contend that Plaintiff's damages should not extend to profits obtained from the exploitation of *Stairway to Heaven* outside the United States because the Copyright Act has no extraterritorial reach.

The Ninth Circuit has held that "infringing actions that take place entirely outside the United States are not actionable" under the Copyright Act. *Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*, 24 F.3d 1088, 1091 (9th Cir. 1994). An exception exists, however, allowing a plaintiff "to recover damages flowing from exploitation abroad of the domestic acts of infringement committed by defendants." *Los Angeles News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 992 (9th Cir. 1998).

Defendants contend that the extraterritorial principle applies to limit Plaintiff's profits because the undisputed evidence demonstrates that *Stairway to Heaven* was created entirely outside the United States, in London, England. (Page Decl. ¶4; Plant Decl. ¶4; Jones Decl. ¶3, ECF No. 97.) Plaintiff rebuts with Page's testimony that an early iteration of the song was actually mixed at Sunset Studios in Los Angeles, California. (Page Depo. 140-143, ECF No. 124.)

Plaintiff has proffered evidence to create a triable issue of fact as to whether extraterritorial profits are recoverable. Accordingly, the Court denies summary judgment on this issue.

### IX.    **REMAINING CLAIMS**

#### A.    **Claims as to John Paul Jones and Hype**

Defendants argue that summary judgment is proper as to John Paul Jones, Super Hype Publishing, Inc., and Warner Music Group Corp. because none of these parties performed or distributed *Stairway to Heaven* within the three years preceding the instant action. In fact, in the 26(f) report, Plaintiff conceded that the three-year statute of limitations "precludes relief as to any alleged infringements prior to May 31, 2011." Plaintiff has not opposed this argument in the opposition brief. Therefore, the Court grants summary judgment as to John Paul Jones, Super Hype Publishing, Inc., and Warner Music Group Corp.

#### B.    **Right of Attribution Claim**

Defendants also seek summary judgment on Plaintiff's second claim, labeled "Right of Attribution—Equitable Relief—Falsification of Rock n' Roll History."

The Court grants summary judgment on this claim. Plaintiff presents an inventive—yet legally baseless—claim creatively termed, "Falsification of Rock n' Roll History." The Court has diligently searched but is unable to locate any cognizable claim to support this theory of liability.

Plaintiff's Right of Attribution also fails, but for different reasons. First, the right of attribution, which arises under the Lanham Act, is limited to producers of actual products, not "to the author of any idea, concept, or communication embodied in those goods." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37, 123 S. Ct. 2041, 2050, 156 L. Ed. 2d 18 (2003). Second, "[t]he law is clear with respect to the right of attribution under Copyright Act— only works of visual arts may enjoy the right of attribution." *Lahiri v. Universal Music & Video Distribution Corp.*, No. CV 02-8330, 2006 WL 6030551, at *4 (C.D. Cal. Mar. 24, 2006). Third, Plaintiff has not opposed Defendants' motion for partial summary judgement on this claim.

Accordingly, the Court grants summary judgment on the Right of Attribution claim.

## X.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment as to the Right of Attribution claim and as to all claims against John Paul Jones, Super Hype Publishing, Inc., and Warner Music Group Corp. The Court also **GRANTS** Defendants' request to limit Plaintiff's damages to 50% of the recovery (his share as a beneficial owner).

The Court **DENIES** Defendants' Motion for Summary Judgment as to the Copyright Infringement claim against the remaining Defendants.

**IT IS SO ORDERED.**

_____ : _____

Initials of Preparer   _____

1  Francis Malofiy, Esq.
2  Francis Alexander, LLC
   280 N. Providence Rd. | Suite 105
3  Media, PA 19063
4  T: (215) 500-1000; F: (215) 500-1005
   E: francis@francisalexander.com
5  *Attorney for Plaintiff*

6
   Glen L. Kulik, Esq. (SBN 082170)
7  Kulik Gottesman & Siegel LLP
   15303 Ventura Blvd., Suite 1400
8  Sherman Oaks, CA 91403
9  T: (310) 557-9200; F: (310) 557-0224
   E: gkulik@kgslaw.com
10 *Attorney for Plaintiff*

11

12

13        **UNITED STATES DISTRICT COURT**

14      **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

15 MICHAEL SKIDMORE, as Trustee for       Case No. 15-cv-03462 RGK (AGRx)
16 the RANDY CRAIG WOLFE TRUST,
                                          Hon. R. Gary Klausner
17          Plaintiff,
                                          **PLAINTIFF'S RESPONSE IN**
18     v.                                 **OPPOSITION TO DEFENDANTS'**
                                          **EVIDENTIARY OBJECTIONS RE:**
19                                        **MOTION FOR SUMMARY**
20 LED ZEPPELIN; JAMES PATRICK            **JUDGMENT OR PARTIAL**
   PAGE; ROBERT ANTHONY PLANT;            **SUMMARY JUDGMENT**
21 JOHN PAUL JONES; SUPER HYPE
   PUBLISHING, INC.; WARNER MUSIC         Date:   March 28, 2016
22 GROUP CORP., Parent of                 Time:   9:00 a.m.
23 WARNER/CHAPPELL MUSIC, INC.;           Room:   850
   ATLANTIC RECORDING
24 CORPORATION; RHINO
25 ENTERTAINMENT COMPANY,

26          Defendants.

27

28
                                    1
            PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
         EVIDENTIARY OBJECTIONS RE: MOTION FOR SUMMARY JUDGMENT

1

# TABLE OF CONTENTS

2

Page

3   I.     INTRODUCTION ................................................................2

4   II.    RESPONSE TO EVIDENTIARY OBJECTIONS ................2

5   Declaration of Tracy Longo (Doc. No. 118-2) ...........................2

6   Andrea Wolfe Declaration (sister of Randy Wolfe) (Doc. No. 118-3) ....................10

7   Declaration of Janet Wolfe (Randy Wolfe's Sister) (Doc. No. 118-4) ....................14

8   Declaration of Linda Mensch (Attorney) (Doc. No. 118-5) ....................17

9   Dave Waterbury (former Spirit band member) (Doc. No. 118-6) ....................18

10   Declaration of Francis Malofiy (Doc. No. 118-7) ....................23

11   Declaration of Alexander Stewart – Plaintiff's Musicologist (Doc. No. 119-8) ....................45

12   Declaration of Plaintiff's Expert Erik Johnson (Doc. No. 118-9) ....................49

13   Declaration of Brian Bricklin (Doc. No. 118-10) ....................55

14   Declaration of Larry Knight (Doc. No. 118-11) ....................60

15   Declaration of Paul Franklin (friend of Randy Wolfe) (Doc. No. 119) ....................65

16   Declaration of Barry Hansen (Doc. No. 119-1) ....................73

17   Declaration of Bruce Pates (Doc. No. 119-2) ....................75

18   Declaration of Jay Ferguson (Doc. No. 119-3) ....................77

19   Declaration of Michael Skidmore (Doc. No. 119-4) ....................83

20   Declaration of Mike Lee (Doc. No. 119-5) ....................88

21   Declaration of Robert Lee (Doc. No. 119-6) ....................90

22   Declaration of Mark Andes (Doc. No. 119-7) ....................92

23   Declaration of Kevin Hanson (Doc. No. 119-8) ....................94

24   Declaration of Denny Somach (Doc. No. 119-9) ....................98

25   Objection 109 – All Audio Exhibits Other Than Stairway to Heaven ....................99

26

27

28

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
EVIDENTIARY OBJECTIONS RE: MOTION FOR SUMMARY JUDGMENT

1    at trial. <u>Conlon</u>, 474 F.3d at 623 (concluding that when deemed admissions resulted

2    in the opposing party choosing not to engage in other discovery it does not constitute

3    prejudice for purposes of a motion to withdraw).

4         As Defendants' work for hire argument is namely one of legal interpretation,

5    with sufficient facts in the record—and because Defendants were well aware of this

6    issue and the pertinent witnesses for the entirety of the discovery period and in fact

7    did conduct discovery into this question—there will be no prejudice to Defendants at

8    trial if the admissions in question are withdrawn.

9         Thus, both prongs under Rule 36(b) favor allowing withdrawal of the deemed

10   admissions (if the requests were in fact deemed admitted). Plaintiff notes that he

11   answered the admissions within the discovery period, believed he had an informal

12   extension to answer from defense counsel, and otherwise cooperated extensively in

13   discovery.

14   **Objection 43 – Admissions**

15         **Material objected to:** page 4, ¶ 27.

16         **Grounds for objection:** (1) bare conclusion; and (2) relevance, Fed. R. Evid.

17   401.

18         **Plaintiff's Response:** See response to Objection 42.

19

20        **Declaration of Alexander Stewart – Plaintiff's Musicologist (Doc. No. 119-8)**

21   **Objection 44 – Declaration of Alexander Stewart**

22         **Material objected to:** Stewart Declaration and its attachments and exhibits,

23   in their entirety.

24         **Grounds for objection:** (1) failure to apply appropriate analysis; (2) lack of

25   foundation for claimed expert opinions, Fed. R. Evid. 702; and (3) relevance, Fed.

26   R. Evid. 401.

27         **Plaintiff's Response:**

28         Defendants' attempt to claim that only the deposit copy of Taurus should be

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
EVIDENTIARY OBJECTIONS RE: MOTION FOR SUMMARY JUDGMENT

1  used in the relevant comparisons. This is simply not accurate and Defendants do not
2  support their argument with any applicable case law. The deposit copy of Taurus
3  does not reflect the entirety of the musical composition in a work, which is instead
4  reflected by the composition of Taurus embodied in the 49-year old sound recording.
5  Stewart Decl., ¶29-33.

6       The deposit requirement under 17 U.S.C. § 408(b) "is to identify the
7  copyrighted work for the purposes of registration." Paul Goldstein, Goldstein on
8  Copyright § 3.8 (2013). "Although the 1909 Copyright Act requires the owner to
9  deposit a 'complete copy' of the work with the copyright office, [the Ninth Circuit's]
10 definition of a 'complete copy' is broad and deferential: 'Absent intent to defraud
11 and prejudice, inaccuracies in copyright registrations **do not bar actions for
12 infringement**.'" Three Boys Music Corp., 212 F.3d at 486 (citing Harris v. Emus
13 Records Corp., 734 F.2d 1329, 1335 (9th Cir. 1984)); see also Scentsy, Inc. v. B.R.
14 Chase, 942 F. Supp. 2d 1045, 1050 (D. Idaho 2013) (finding that identification
15 materials are not required to disclose every element in which they claim a copyright);
16 KnowledgePlex, Inc. v. Placebase, Inc., C 08-4267 JF (RS), 2008 WL 5245484, at
17 *10 (N.D. Cal. Dec. 17, 2008) (finding the Ninth Circuit has rejected the argument
18 that claims are limited to the scope of the deposit copy). Indeed, under the 1909 Act,
19 a claimant could not submit a recording of the composition in lieu of a lead sheet. See
20 Copyright Act of 1909, § 12, 35 Stat. 1075 (1909) (repealed 1978).

21      Moreover, Defendants only cite Newton v. Diamond to support their argument,
22 a largely inapposite case focused on different issue. In Newton, which applied the
23 1976 Copyright Act, the sound recording had been licensed but the underlying
24 composition had not. Newton v. Diamond, 204 F. Supp. 2d 1244, 1249 (C.D. Cal.
25 2002), aff'd 388 F.3d 1189. The Court found that the use of the composition was de
26 minimis. Newton simply did not address when the composition contained in the
27 recording can be used as proof of the protected compositional elements of a work.
28 Newton was clear that the composition of a song is that part of the song which does

1   not change from performance to performance. *Newton v. Diamond*, 204 F. Supp. 2d

2   1244, 1259 (C.D. Cal. 2002) ("A musical composition's copyright protects the

3   generic sound that would necessarily result from any performance of the piece." In

4   other words, the composition is that part of the song that remains constant from

5   performance to performance.). In the recent post-trial motion opinion from *Pharrell*

6   *Williams, et al. v. Bridgeport Music, Inc., et al.* LA CV13-06004 JAK (AGRx) (CD

7   Cal. July 14, 2015) the Court made it clear that a recording of the work in question

8   and the compositional elements embodied in that recordings is relevant to expert

9   testimony even in cases under the 1909 Copyright Act. *Id.* at p.7.

10      The Ninth Circuit has held that the composition elements embodied in a

11   recording, even if not on the deposit lead sheet, are to be considered by a jury. <u>Three</u>

12   <u>Boys Music Corp.</u>, 212 F.3d at 486-87. If the differences do not result in prejudice

13   and are not the result of fraudulent intent, then the consideration of the composition

14   embodied in the recording is appropriate. <u>Id.</u>

15      Here, there is no prejudice and no fraud—nor do Defendants attempt to argue

16   there is any. Defendants' own expert, Mathes, demonstrated the relevance and

17   necessity of examining the composition of the recording of "Taurus" as his expert

18   report explicitly compares the composition embodied in the recording of "Taurus" to

19   the composition embodied in the recording of Stairway to Heaven. Stewart Decl.

20   ¶32-33. When the opposing party's *own expert* admits the relevance of the

21   composition embodied in the recording it is an unambiguous sign that Defendants are

22   well aware of the material being compared and that they have suffered no prejudice.

23      To be clear, Plaintiff is not and has never argued that the specific performance

24   related aspect of Taurus's recordings are protected. He has always argued that the

25   underlying composition was taken and used in Stairway. Plaintiff's experts were

26   explicit that they had disregarded specific performance related elements for the

27   substantial similarity comparison. Stewart Decl., at ¶51.

28      The fact that Defendants seek to obscure is that lead sheets are often not

47

**02151**

1  detailed and do not represent the entirety of the protected composition. Stewart Decl.,

2  at ¶33; *KnowledgePlex, Inc. v. Placebase, Inc.*, C 08-4267 JF (RS), 2008 WL

3  5245484, at *9 (N.D. Cal. Dec. 17, 2008). An excellent example of this is the lead

4  sheet deposit copy submitted for *Stairway to Heaven* is significantly incomplete

5  when compared to the actual composition of the song as embodied in the recording of

6  *Stairway to Heaven*. Stewart Decl., at ¶33. The fact of the matter is that all parties are

7  explicitly aware of the compositional comparison being conducted in this lawsuit and

8  Defendants cannot demonstrate any prejudice whatsoever as the experts on both sides

9  have made the relevant comparison.

10      Plaintiff's expert Stewart complied with Rule 702 in all particulars and is well

11  qualified having been admitted in many courts. Plaintiff's expert report is based on

12  specialized knowledge, applies voluminous facts and data as part of the musical

13  analysis, such analysis is regularly used within the field, and the method of analysis

14  has been reliably applied.

15  **Objection 45 – Objection to Stewart Report**

16      **Material objected to:** pages 5-6, ¶¶ 10.

17      **Grounds for objection:** (1) failure to apply appropriate analysis; (2) lack of

18  foundation fo claimed expert opinions, Fed. R. Evid. 702; and (3) relevance, Fed. R.

19  Evid. 401.

20      **Plaintiff's Response:** See Response to Objection 44.

21  **Objection 46 – Objection to Stewart Report**

22      **Material objected to:** page 7, ¶¶ 14-15.

23      **Grounds for objection:** (1) failure to apply appropriate analysis; (2) lack of

24  foundation for claimed expert opinions, Fed. R. Evid. 702; and (3) relevance, Fed.

25  R. Evid. 401.

26      **Plaintiff's Response:** See Response to Objection 44.

27  **Objection 47 – Objection to Stewart Report**

28      **Material objected to:** pages 8-9, ¶¶ 16-19.

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
EVIDENTIARY OBJECTIONS RE: MOTION FOR SUMMARY JUDGMENT

1  **Grounds for objection:** (1) failure to apply appropriate analysis; (2) lack of
2  foundation for claimed expert opinions, Fed. R. Evid. 702; and (3) relevance, Fed.
3  R. Evid. 401.

4  **Plaintiff's Response:** See Response to Objection 44.

5  **Objection 48 – Objection to Stewart Report**

6  **Material objected to:** pages 9-10, ¶¶ 20-21.

7  **Grounds for objection:** (1) failure to apply appropriate analysis; (2) lack of
8  foundation for claimed expert opinions, Fed. R. Evid. 702; and (3) relevance, Fed.
9  R. Evid. 401.

10  **Plaintiff's Response:** See Response to Objection 44.

11  **Objection 49 – Objection to Stewart Report**

12  **Material objected to:** page 11, lines 15-17.

13  **Grounds for objection:** (1) failure to apply appropriate analysis; (2) lack of
14  foundation for claimed expert opinions, Fed. R. Evid. 702; and (3) relevance, Fed.
15  R. Evid. 401.

16  **Plaintiff's Response:** See Response to Objection 44.

17  **Declaration of Plaintiff's Expert Erik Johnson (Doc. No. 118-9)**

18  **Objection 50 – Signature on Declaration**

19  **Material objected to:** Johnson Declaration and its attachments and exhibits,
20  in their entirety.

21  **Grounds for objection:** failure to comply with 28 U.S.C. § 1746 and Local
22  Rule 5-4.3.4.

23  **Plaintiff's Response:** A hand-signed declaration is attached to this response.
24  Plaintiff further notes that the case cited by Defendants to support their position is
25  totally inapposite. Defendants wrote:

26  Plaintiff submitted Johnson's and other declarations without the
27  declarant's signatures. That is a fatal defect and the unsigned
28  declarations are properly disregarded and stricken. *Davis v. Solid*

49

1   *Waste Servs., Inc.*, 20 F. Supp. 3d 519, 530 (E.D. Pa. 2014) (six

2   unsigned declarations submitted by plaintiff disregarded summary

3   judgment granted), *aff'd*, 625 F. App'x 104 (3d Cir. 2015).

4   This is a blatant misrepresentation. All of Plaintiff's declarations were signed, some

5   by hand and other electronically. None of them were "unsigned." The cited *Davis*

6   case disregarded declarations that were totally unsigned in any manner and were also

7   lacking in any other appropriate formality. That is not the case here.

8   **Objection 51 – Entire Johnson Declaration and Analysis**

9   **Material objected to:** Johnson Declaration and its attachments and exhibits,

10   in their entirety.

11   **Grounds for objection:** (1) failure to apply appropriate analysis; (2) lack of

12   foundation for claimed expert opinions, Fed. R. Evid. 702; and (3) relevance, Fed.

13   R. Evid. 401.

14   **Plaintiff's Response:** Erik Johnson is a well-qualified musical expert. As

15   with Mr. Stewart, Defendant claims that Mr. Johnson did not use the correct

16   representation of Taurus and that his analysis is invalid.

17   Defendants' attempt to claim that only the deposit copy of Taurus should be

18   used in the relevant comparisons. This is simply not accurate and Defendants do not

19   support their argument with any applicable case law. The deposit copy of Taurus

20   does not reflect the entirety of the musical composition in a work, which is instead

21   reflected by the composition of Taurus embodied in the 49-year old sound recording.

22   Stewart Decl., ¶29-33.

23   The deposit requirement under 17 U.S.C. § 408(b) "is to identify the

24   copyrighted work for the purposes of registration." Paul Goldstein, Goldstein on

25   Copyright § 3.8 (2013). "Although the 1909 Copyright Act requires the owner to

26   deposit a 'complete copy' of the work with the copyright office, [the Ninth Circuit's]

27   definition of a 'complete copy' is broad and deferential: 'Absent intent to defraud

28   and prejudice, inaccuracies in copyright registrations **do not bar actions for**

50

1  infringement.'" Three Boys Music Corp., 212 F.3d at 486 (citing Harris v. Emus

2  Records Corp., 734 F.2d 1329, 1335 (9th Cir. 1984)); see also Scentsy, Inc. v. B.R.

3  Chase, 942 F. Supp. 2d 1045, 1050 (D. Idaho 2013) (finding that identification

4  materials are not required to disclose every element in which they claim a copyright);

5  KnowledgePlex, Inc. v. Placebase, Inc., C 08-4267 JF (RS), 2008 WL 5245484, at

6  *10 (N.D. Cal. Dec. 17, 2008) (finding the Ninth Circuit has rejected the argument

7  that claims are limited to the scope of the deposit copy). Indeed, under the 1909 Act,

8  a claimant could not submit a recording of the composition in lieu of a lead sheet. See

9  Copyright Act of 1909, § 12, 35 Stat. 1075 (1909) (repealed 1978).

10      Moreover, Defendants only cite Newton v. Diamond to support their argument,

11  a largely inapposite case focused on different issue. In Newton, which applied the

12  1976 Copyright Act, the sound recording had been licensed but the underlying

13  composition had not. Newton v. Diamond, 204 F. Supp. 2d 1244, 1249 (C.D. Cal.

14  2002), aff'd 388 F.3d 1189. The Court found that the use of the composition was de

15  minimis. Newton simply did not address when the composition contained in the

16  recording can be used as proof of the protected compositional elements of a work.

17  Newton was clear that the composition of a song is that part of the song which does

18  not change from performance to performance. *Newton v. Diamond*, 204 F. Supp. 2d

19  1244, 1259 (C.D. Cal. 2002) ("A musical composition's copyright protects the

20  generic sound that would necessarily result from any performance of the piece." In

21  other words, the composition is that part of the song that remains constant from

22  performance to performance.). In the recent post-trial motion opinion from *Pharrell*

23  *Williams, et al. v. Bridgeport Music, Inc., et al.* LA CV13-06004 JAK (AGRx) (CD

24  Cal. July 14, 2015) the Court made it clear that a recording of the work in question

25  and the compositional elements embodied in that recordings is relevant to expert

26  testimony even in cases under the 1909 Copyright Act. *Id.* at p.7.

27      The Ninth Circuit has held that the composition elements embodied in a

28  recording, even if not on the deposit lead sheet, are to be considered by a jury. Three

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
EVIDENTIARY OBJECTIONS RE: MOTION FOR SUMMARY JUDGMENT

1   Boys Music Corp., 212 F.3d at 486-87. If the differences do not result in prejudice

2   and are not the result of fraudulent intent, then the consideration of the composition

3   embodied in the recording is appropriate. Id.

4         Here, there is no prejudice and no fraud—nor do Defendants attempt to argue

5   there is any. Defendants' own expert, Mathes, demonstrated the relevance and

6   necessity of examining the composition of the recording of "Taurus" as his expert

7   report explicitly compares the composition embodied in the recording of "Taurus" to

8   the composition embodied in the recording of Stairway to Heaven. Stewart Decl.

9   ¶32-33. When the opposing party's *own expert* admits the relevance of the

10   composition embodied in the recording it is an unambiguous sign that Defendants are

11   well aware of the material being compared and that they have suffered no prejudice.

12         To be clear, Plaintiff is not and has never argued that the specific performance

13   related aspect of Taurus's recordings are protected. He has always argued that the

14   underlying composition was taken and used in Stairway. Plaintiff's experts were

15   explicit that they had disregarded specific performance related elements for the

16   substantial similarity comparison. Stewart Decl., at ¶51.

17         The fact that Defendants seek to obscure is that lead sheets are often not

18   detailed and do not represent the entirety of the protected composition. Stewart Decl.,

19   at ¶33; *KnowledgePlex, Inc. v. Placebase, Inc.*, C 08-4267 JF (RS), 2008 WL

20   5245484, at *9 (N.D. Cal. Dec. 17, 2008). An excellent example of this is the lead

21   sheet deposit copy submitted for *Stairway to Heaven* is significantly incomplete

22   when compared to the actual composition of the song as embodied in the recording of

23   *Stairway to Heaven*. Stewart Decl., at ¶33. The fact of the matter is that all parties are

24   explicitly aware of the compositional comparison being conducted in this lawsuit and

25   Defendants cannot demonstrate any prejudice whatsoever as the experts on both sides

26   have made the relevant comparison.

27         Plaintiff's expert Johnson complied with Rule 702 in all particulars and is well

28   qualified. Mr. Johnson's report is based on specialized knowledge, applies

52

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'<br/>EVIDENTIARY OBJECTIONS RE: MOTION FOR SUMMARY JUDGMENT

1  voluminous facts and data as part of the musical analysis, such analysis is regularly

2  used within the field, and the method of analysis has been reliably applied.

3        Moreover, Mr. Johnson's analysis is valid in its totality. Defendants, for

4  instance, claim that arpeggiation and chromatic scales are not protectable without

5  citation to any sort of binding authority. Defendants also claim that Mr. Johnson

6  opined in his declaration that it is "'preposterous' to suggest that arpeggios and

7  minor line clichés – a descending chromatic scale – are public domain and not

8  protectable." This is an egregious and misleading summation of Mr. Johnson's

9  report. Mr. Johnson made it quite clear that what was "preposterous" was, in the

10 context of his report and analysis of the song, the suggestion that the use of these

11 musical devices was afforded no protection as part of the composition of the song.

12 By context, he was referring to paragraph 25 of his report/declaration (*Doc. No. 118-*

13 *9*):

14        Moreover, I strongly object to the idea that extrinsic evidence is
         somehow limited to this kind of pseudo-mathematical reduction. In
15       the case of comparing *Taurus* and *Stairway* it is imperative to
         consider the combination of all of the features of the contested
16       musical territory, including the following obvious commonalities
         between the two compositions and recordings, specifically the crucial
17       "name that tune" 8 bar initial musical statement:
18       • Many common pitches
19       • Same key
20       • Strikingly similar rhythm
         • Nearly identical articulation
21       • Strikingly similar mood/stylistic qualities
22       • Nearly identical tempo
         • Identical primary instrumentation ( both crucial parts
23         played on acoustic guitar)
24       • Similar supplemental instrumentation (flute on *Taurus*,
           recorders on *Stairway*)
25       • Identical phrase length of crucial initial eight-bar
26         statements

27 Mr. Johnson, not Defendants, is indisputably correct on how to analyze music. The

28 Ninth Circuit is unambiguously clear that even small bits of music are protectable

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
EVIDENTIARY OBJECTIONS RE: MOTION FOR SUMMARY JUDGMENT

1  and that any analysis has to take into account that a combination of unprotectable
2  musical elements is afforded protection. *Swirsky v. Carey*, 376 F.3d 841, 849, 851-
3  52 (9th Cir. 2004). Thus, when Defendants object to Mr. Johnson's opinion that the
4  arpeggios and chromatic scales in *Taurus* are protectable, and were copied, they are
5  ignoring Ninth Circuit precedent and also that Mr. Johnson's analysis and
6  conclusions was that the totality of the relevant portions of the compositions are
7  protectable and similar.

8      Defendants' also claim that performance elements of the two works are
9  irrelevant. This is correct with respect to substantial similarity for a musical
10 composition, and Mr. Johnson made sure to distinguish between compositional
11 elements and performance elements. But performance elements *are relevant* to
12 proving that Defendants had access to Taurus. As Defendants claim that they never
13 heard *Taurus* before, Mr. Johnson analyzed the performance components of the
14 sound recordings and found that the recordings are strikingly similar and preclude
15 independent creation.

16 **Objection 52 – Prior Copying by Led Zeppelin**

17     **Material objected to:** pages 2-3, ¶ 6.

18     **Grounds for objection:** (1) Federal Rules of Evidence 407 and 408; (2) lack
19 of foundation for claimed expert opinions, Fed. R. Evid. 702; and (3) relevance, Fed.
20 R. Evid. 401.

21     **Plaintiff's Response:** See Response to Objection 23.

22 **Objection 53 – Lack of Foundation for Opinion**

23     **Material objected to:** page 8, ¶ 21.

24     **Grounds for objection:** (1) failure to apply appropriate analysis; (2) lack of
25 foundation for claimed expert opinions, Fed. R. Evid. 702; and (3) relevance, Fed.
26 R. Evid. 401.

27     **Plaintiff's Response:** Defendant claims that Mr. Johnson's opinions on
28 striking similarity are conclusory in paragraph 21. The only way to make this claim

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
EVIDENTIARY OBJECTIONS RE: MOTION FOR SUMMARY JUDGMENT

1  is to ignore the rest of Mr. Johnson's report which delineates exactly why he finds
2  the songs strikingly similar.

3  **Objection 54 – Focus on Small Musical Element with Respect to Striking**
4  **Similarity**

5        **Material objected to:** page 15, ¶ 42.

6        **Grounds for objection:** (1) failure to apply appropriate analysis; (2) lack of
7  foundation for claimed expert opinions, Fed. R. Evid. 702; and (3) relevance, Fed.
8  R. Evid. 401.

9        **Plaintiff's Response:** See response to Objection 51, 53.

10

11              **Declaration of Brian Bricklin (Doc. No. 118-10)**

12  **Objection 55 – Signature on Declaration**

13        **Material objected to:** Bricklin Declaration and attachments in their entirety.

14        **Grounds for objection:** failure to comply with 28 U.S.C. § 1746 and Local
15  Rule 5-4.3.4.

16        **Plaintiff's Response:** A hand-signed declaration is attached to this response.
17  See also Response to Objection 50.

18  **Objection 56 – Wrong Analysis and Not Protectable Material**

19        **Material objected to:** Bricklin Declaration and attachments in their entirety.

20        **Grounds for objection:** (1) failure to apply appropriate analysis; (2) lack of
21  foundation for claimed expert opinions, Fed. R. Evid. 702; and (3) relevance, Fed.
22  R. Evid. 401.

23        **Plaintiff's Response:**

24        Defendants' attempt to claim that only the deposit copy of Taurus should be
25  used in the relevant comparisons. This is simply not accurate and Defendants do not
26  support their argument with any applicable case law. The deposit copy of Taurus
27  does not reflect the entirety of the musical composition in a work, which is instead
28  reflected by the composition of Taurus embodied in the 49-year old sound recording.

1  Stewart Decl., ¶29-33.

2       The deposit requirement under 17 U.S.C. § 408(b) "is to identify the

3  copyrighted work for the purposes of registration." Paul Goldstein, Goldstein on

4  Copyright § 3.8 (2013). "Although the 1909 Copyright Act requires the owner to

5  deposit a 'complete copy' of the work with the copyright office, [the Ninth Circuit's]

6  definition of a 'complete copy' is broad and deferential: 'Absent intent to defraud

7  and prejudice, inaccuracies in copyright registrations **do not bar actions for**

8  **infringement.**'" Three Boys Music Corp., 212 F.3d at 486 (citing Harris v. Emus

9  Records Corp., 734 F.2d 1329, 1335 (9th Cir. 1984)); see also Scentsy, Inc. v. B.R.

10 Chase, 942 F. Supp. 2d 1045, 1050 (D. Idaho 2013) (finding that identification

11 materials are not required to disclose every element in which they claim a copyright);

12 KnowledgePlex, Inc. v. Placebase, Inc., C 08-4267 JF (RS), 2008 WL 5245484, at

13 *10 (N.D. Cal. Dec. 17, 2008) (finding the Ninth Circuit has rejected the argument

14 that claims are limited to the scope of the deposit copy). Indeed, under the 1909 Act,

15 a claimant could not submit a recording of the composition in lieu of a lead sheet. See

16 Copyright Act of 1909, § 12, 35 Stat. 1075 (1909) (repealed 1978).

17      Moreover, Defendants only cite Newton v. Diamond to support their argument,

18 a largely inapposite case focused on different issue. In Newton, which applied the

19 1976 Copyright Act, the sound recording had been licensed but the underlying

20 composition had not. Newton v. Diamond, 204 F. Supp. 2d 1244, 1249 (C.D. Cal.

21 2002), aff'd 388 F.3d 1189. The Court found that the use of the composition was de

22 minimis. Newton simply did not address when the composition contained in the

23 recording can be used as proof of the protected compositional elements of a work.

24 Newton was clear that the composition of a song is that part of the song which does

25 not change from performance to performance. Newton v. Diamond, 204 F. Supp. 2d

26 1244, 1259 (C.D. Cal. 2002) ("A musical composition's copyright protects the

27 generic sound that would necessarily result from any performance of the piece." In

28 other words, the composition is that part of the song that remains constant from

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
EVIDENTIARY OBJECTIONS RE: MOTION FOR SUMMARY JUDGMENT

1   performance to performance.). In the recent post-trial motion opinion from *Pharrell*

2   *Williams, et al. v. Bridgeport Music, Inc., et al.* LA CV13-06004 JAK (AGRx) (CD

3   Cal. July 14, 2015) the Court made it clear that a recording of the work in question

4   and the compositional elements embodied in that recordings is relevant to expert

5   testimony even in cases under the 1909 Copyright Act. *Id.* at p.7.

6        The Ninth Circuit has held that the composition elements embodied in a

7   recording, even if not on the deposit lead sheet, are to be considered by a jury. Three

8   Boys Music Corp., 212 F.3d at 486-87. If the differences do not result in prejudice

9   and are not the result of fraudulent intent, then the consideration of the composition

10  embodied in the recording is appropriate. Id.

11       Here, there is no prejudice and no fraud—nor do Defendants attempt to argue

12  there is any. Defendants' own expert, Mathes, demonstrated the relevance and

13  necessity of examining the composition of the recording of "Taurus" as his expert

14  report explicitly compares the composition embodied in the recording of "Taurus" to

15  the composition embodied in the recording of Stairway to Heaven. Stewart Decl.

16  ¶32-33. When the opposing party's *own expert* admits the relevance of the

17  composition embodied in the recording it is an unambiguous sign that Defendants are

18  well aware of the material being compared and that they have suffered no prejudice.

19       To be clear, Plaintiff is not and has never argued that the specific performance

20  related aspect of Taurus's recordings are protected. He has always argued that the

21  underlying composition was taken and used in Stairway. Plaintiff's experts were

22  explicit that they had disregarded specific performance related elements for the

23  substantial similarity comparison. Stewart Decl., at ¶51.

24       The fact that Defendants seek to obscure is that lead sheets are often not

25  detailed and do not represent the entirety of the protected composition. Stewart Decl.,

26  at ¶33; *KnowledgePlex, Inc. v. Placebase, Inc.*, C 08-4267 JF (RS), 2008 WL

27  5245484, at *9 (N.D. Cal. Dec. 17, 2008). An excellent example of this is the lead

28  sheet deposit copy submitted for *Stairway to Heaven* is significantly incomplete

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
EVIDENTIARY OBJECTIONS RE: MOTION FOR SUMMARY JUDGMENT

1  when compared to the actual composition of the song as embodied in the recording of

2  *Stairway to Heaven*. Stewart Decl., at ¶33. The fact of the matter is that all parties are

3  explicitly aware of the compositional comparison being conducted in this lawsuit and

4  Defendants cannot demonstrate any prejudice whatsoever as the experts on both sides

5  have made the relevant comparison.

6       Plaintiff's expert Brian Bricklin complied with Rule 702 in all particulars and

7  is well qualified. Plaintiff's expert report is based on specialized knowledge, applies

8  voluminous facts and data as part of the musical analysis, such analysis is regularly

9  used within the field, and the method of analysis has been reliably applied.

10  **Objection 57 – Prior Copying by Led Zeppelin**

11       **Material objected to:** pages 3-5, ¶¶ 9-10.

12       **Grounds for objection:** (1) Federal Rules of Evidence 407 and 408; (2) lack

13  of foundation for claimed expert opinions, Fed. R. Evid. 702; and (3) relevance, Fed.

14  R. Evid. 401.

15       **Plaintiff's Response:** See response to objection 23. Defendants previously

16  objected that the prior songs Led Zeppelin copied are not admissible because they

17  were not addressed by an expert. Yet, as they implicitly admit here, Mr. Bricklin did

18  address this. Defendants now object and claim his discussion is conclusory. Mr.

19  Bricklin's relied upon the actual audio of the songs from which he concludes that

20  many Led Zeppelin songs were unmistakably derived from the work of other artists.

21  In addition, Bricklin relies upon the party admission of Plant and Page that they

22  lifted music and used that to create many of those songs. Bricklin Decl. (*Doc No.*

23  *118-10*), at ¶10. Mr. Bricklin's expert report identified many Led Zeppelin songs

24  which were based on prior art without proper credit being given to those other

25  artists:

26       Black Mountain Side (1969) Led Zeppelin

27       Black Waterside (Bert Jansch, 1966)

28       How Many More Times (1969) Led Zeppelin

No Place to Go (a.k.a. How Many More Years)(Howlin' Wolf)(1959)
Rosie (Alexis Korner Blues Inc.)(1967)
Steal Away (Alexis Korner Blues Inc. & Robert Plant)(1968)
The Hunter (Albert King)(1967)

Babe I'm Gonna Leave You (1969) Led Zeppelin
    Babe I'm Gonna Leave You (Anne Bredon)(1962)

The Lemon Song (1969) Led Zeppelin
    Killin' Floor (Howlin' Wolf)(1964)
    Traveling Riverside Blues (Robert Johnson)(1937)

Bring it on Home (1969) Led Zeppelin
    Traveling Riverside Blues (Robert Johnson)(1937)

Hats Off to (Roy) Harper (1970) Led Zeppelin
    Em on Down (Bukka White)(1937)

Since I've Been Loving You (1970) Led Zeppelin
    Never (Moby Grape)(1968)

Bron-Y-Aur Stomp (1970) Led Zeppelin
    The Waggoner's Lad (Bert Jansch)(1966)

When the Levee Breaks (1971) Led Zeppelin
    When the Levee Breaks (Memphis Minnie & Kansas Joe McCoy)(1929)

Custard Pie (1975) Led Zeppelin
    Drop Down Mama (Sleepy John Estes)(1935)
    I Want Some of Your Pie (Blind Boy Fuller)(1940)

In My Time of Dying (1975) Led Zeppelin
    Jesus Gonna Make Up my Dying Bed (a.k.a. In my Time of Dying) (Josh White)(1933)
    Jesus Make up My Dying Bed (Blind Willie Johnson)(1927)

Boogie with Stu (1975) Led Zeppelin
    Ooh, My Head (Ritchie Valens)(1957)

59

Nobody's Fault but Mine (1976) Led Zeppelin
  Ooh, My Head (Ritchie Valens)(1957)

White Summer-Black Mountain Side (1969) Led Zeppelin
  White Summer (Yardbirds)(1969)
  She Moved Thro' the Fair (Davy Graham) (1963)

The Girl I Love She Got Long Black Wavy Hair (1969) Led Zeppelin
  The Girl I Love She Got Long Curly Hair (Sleepy John Estes)(1927)
  Watch Your Step (Bobby Parker)(1961)

Your Time Is Gonna Come Led Zeppelin
  Dear Mr. Fantasy (Traffic) (1967)

Communication Breakdown (1969) Led Zeppelin
  Nervous Breakdown (Eddie Cochran)

### Declaration of Larry Knight (Doc. No. 118-11)

**Objection 58 – Lack of Disclosure**

**Material objected to:** Knight Declaration in its entirety.

**Grounds for objection:** failure to disclose Knight as a witness plaintiff would rely upon, Fed. R. Civ. P. 26(a), 26(e) and 37(c)(1).

**Plaintiff's Response:** Larry Knight has personal knowledge of the meeting between Jimmy Page and Randy California. Defendants object that Larry "Fuzzy" Knight was not disclosed as a witness. Mr. Knight is a former bassist of Spirit from the 1970s.

It is simply inaccurate for Defendants to claim that they did not know who he was and that he was not disclosed. Mr. Knight's name came up repeatedly in the deposition of plaintiff Michael Skidmore and Defendants were well aware of who he is. *See* Skidmore Deposition at p.27, 61, 176, 178, 179, 180. Defendants had the ability to talk to Mr. Knight and failed to do so. Moreover, Plaintiff had no intention to rely on Mr. Knight for this case. After Defendants filed for summary judgment

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
EVIDENTIARY OBJECTIONS RE: MOTION FOR SUMMARY JUDGMENT

**Objection 64 – *Taurus* Written by Wolfe in 1966**

**Material objected to:** page 1, ¶ 3.

**Grounds for objection:** (1) lack of foundation as to personal knowledge, Fed. R. Evid. 602; (2) lack of foundation for opinion testimony, Fed. R. Evid. 701; (3) hearsay, Fed. R. Evid. 802; (4) best evidence rule, Fed. R. Evid. 1002; and (5) relevance, Fed. R. Evid. 401.

**Plaintiff's Response:** Franklin's declaration is based on his personal experience and first-hand knowledge. Franklin was Randy Wolfe's life-long best friend and knew him in 1966. Franklin's declaration states that he knows that Taurus was written in 1966. His declaration also states that he saw the song performed live in various clubs in 1966 to 1968. Defendants object that Franklin provides no underlying facts, that hearsay bars this testimony, and that it is irrelevant.

**First**, Defendants' objection on lack of knowledge ignores the actual content of the declaration. Franklin's declaration establishes that he knew Wolfe well and saw the song performed in 1966 to 1968 in clubs around Los Angeles when Spirit was just formed. Franklin Decl. (*Doc. No. 119*), at ¶1-4. This is more than sufficient. **Second**, Defendants' objection on hearsay is nonsensical and it is not clear how it applies. It is also not hearsay because it comes in for impeachment, credibility, contradiction, rebuttal, and cross examination. In addition, the residual hearsay exception applies in Rule 807 because there are circumstantial guarantees of trustworthiness as noted immediately below. **Third**, Defendants' objection on relevance is spurious. Defendants are attempting to claim Taurus was a work for hire. But the overwhelming evidence in the record establishes that the song was created in 1966, well before the August 1967 work for hire contract. *See* Andrea Wolfe Decl., at ¶4-5 (*Doc. No. 118-3*); Janet Wolfe Decl., at ¶4-5 (*Doc. No. 118-4*); Malofiy SJ Decl. (*Doc. No. 124*), Exhibit 8 – Andes Depo., p.150-156; Barry Hansen Decl. (Doc. No. 119-1), ¶1-2 & Emails; Skidmore Decl. (Doc. No. 119-4), at ¶12; Brian Bricklin Decl. (Doc. No. 118-10), Audio Exhibits 33-36 (recordings of

66

1   Taurus played live before August 29, 1967). Defendants' claim that because the

2   copyright was registered after the work for hire contract that it is a work for hire. But

3   this contention is baseless and not supported by case law. The case law states that a

4   work for hire contract cannot retroactively designate already existing material as

5   made for hire. *Gladwell Govt. Services Inc. v. County of Marin*, 265 Fed. Appx. 624

6   2008 WL 268268 (9th Cir. 2008); *see also Playboy Enters., Inc. v. Dumas*, 53 F.3d

7   549, 558-59 (2d Cir .1995); *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d

8   410, 412-13 (7th Cir. 1992) ("The writing must precede the creation of the property"

9   to qualify as a work-for-hire agreement.).

10   **Objection 65 – Franklin's Knowledge of Concerts**

11   **Material objected to:** 1, ¶ 4.

12   **Grounds for objection:** (1) lack of foundation as to personal knowledge, Fed.

13   R. Evid. 602; (2) lack of foundation for opinion testimony, Fed. R. Evid. 701; and

14   (3) relevance, Fed. R. Evid. 401.

15   **Plaintiff's Response:** Franklin has personal first-hand knowledge of these

16   events. Franklin's declaration states that he went to shows from 1966 to 1971 where

17   Spirit played Taurus. He states that Taurus was regularly played. Defendants object

18   that he does not have personal knowledge of this and that it is irrelevant.

19   Again, Franklin is stating that he has personal knowledge, so the objection

20   that he does not is baffling and conclusory. In addition, it is relevant to establish that

21   Taurus is not a work for hire and that Taurus was widely played by Spirit at their

22   concerts, which is relevant to establishing access given that Page admitted in an

23   April 1970 interview with New Musical Express that he went to several Spirit

24   concerts before 1970 and because Robert Plant was also known to attend Spirit

25   concerts. At a minimum this information comes in for impeachment, credibility,

26   contradiction, rebuttal, and cross examination.

27   There is much evidence in the record that Spirit played these concerts and

28   played Taurus. The declarations and/or depositions of Andrea Wolfe, Janet Wolfe,

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
EVIDENTIARY OBJECTIONS RE: MOTION FOR SUMMARY JUDGMENT

1   not sue while he was alive.

2      **Declaration of Barry Hansen (Spirit's first agent/manager) (Doc. No. 119-1)**

3   **Objection 70 – Audio Recordings of Prior Performances of Taurus**

4      **Material objected to:** page 1, ¶ 1.

5      **Grounds for objection:** (1) lack of foundation as to personal knowledge, Fed.

6   R. Evid. 602; (2) hearsay, Fed. R. Evid. 802; (3) best evidence rule, Fed. R. Evid.

7   1002, and (4) relevance, Fed. R. Evid. 401.

8      **Plaintiff's Response:** Barry Hansen has personal first-hand knowledge of the

9   facts in his declaration. Barry Hansen's declaration establishes that he made

10  recordings at the Ash Grove of Spirit playing Taurus. Hansen relates that he

11  maintained those recordings through the years. Defendants object that Hansen does

12  not have personal knowledge and that these tapes are irrelevant.

13  Ground 1 – Lack of Personal Foundation

14     These tapes are authentic and Hansen's declaration is from first-hand

15  knowledge. Hansen's declaration and attached authenticated emails establish that he

16  personally recorded the tapes in question and maintained them. They also establish

17  that Hansen gave these tapes to Michael Skidmore. Skidmore in turn confirms that

18  these are the tapes that were turned over in discovery to Defendants. *See* Skidmore

19  Decl. (Doc. No. 119-4), at ¶12. There is a clear chain of custody from the origination

20  of recordings to their production to Defendants in discovery. Additionally, Hansen

21  identifies from personal experience that Spirit played Taurus in 1967 and 1968 at the

22  Ash Grove. That these tapes depict Spirit's earliest performances is not credibly

23  disputed. Jay Ferguson's deposition established that Hansen was the first producer

24  and manager of the band and was at Spirit's earlier shows before August 1967.

25  Malofiy Decl. (Doc. No. 124), Exhibit 9 – Ferguson Depo., at p.243-44. In addition,

26  many people attended these shows and have so testified. *See* Andrea Wolfe Decl., at

27  ¶4-5 (*Doc. No. 118-3*); Janet Wolfe Decl., at ¶4-5 (*Doc. No. 118-4*); Malofiy SJ

28  Decl. (*Doc. No. 124*), Exhibit 8 – Andes Depo., p.150-156; Barry Hansen Decl.

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
EVIDENTIARY OBJECTIONS RE: MOTION FOR SUMMARY JUDGMENT

1  (Doc. No. 119-1), ¶1-2 & Emails; Skidmore Decl. (Doc. No. 119-4), at ¶12; Franklin

2  Decl. (Doc. No. 119); Brian Bricklin Decl. (Doc. No. 118-10), Audio Exhibits 33-36

3  (recordings of Taurus played live before August 29, 1967). In addition, Defendants

4  rely on the Spirit gig list provided by Bruce Pates of Spirit's shows in their summary

5  judgment motion, (Doc. No. 97-10, at ¶22), but ignore that the list also shows 15

6  confirmed performances at the Ash Grove in Los Angeles before August 29, 1967,

7  five of which were recorded. This confirms and supports Hansen's declaration.

8  Ground 2 – Hearsay

9       In addition, Defendants' hearsay objection is misplaced. This is non hearsay.

10  **First**, it goes to impeachment, credibility, rebuttal, cross examination, and

11  contradiction. **Second**, the tapes are ancient documents. Third, the tapes are business

12  records as Hansen regularly taped Spirit's earlier shows as their agent. Fourth, the

13  residual exception because there are circumstantial guarantees of truthfulness as

14  demonstrated immediately above.

15  Ground 3 – Best Evidence Rule

16       As to the best evidence rule, Hansen is the best person to testify as to the

17  provenance of the audio tapes as he has first-hand knowledge being the one who

18  recorded and maintained them. The audio recordings are the best evidence of Spirit

19  performing at these shows. These are the tapes that were produced in discovery.

20  Furthermore, Defendants were aware of Barry Hansen, were aware of these tapes,

21  and have every opportunity to depose him but chose not to. They can cross examine

22  him at trial.

23  Ground 4 – Relevance

24       These tapes are relevant because they definitively establish that Randy

25  composed *Taurus* and that Spirit played *Taurus* live and did so before the work for

26  hire contract in August 1967. By law, work for hire contracts do not operate

27  retroactively and for a work to be "for hire" the operative contract must have been

28  signed before the material in question was created. *Gladwell Govt. Services Inc. v.*

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
EVIDENTIARY OBJECTIONS RE: MOTION FOR SUMMARY JUDGMENT

1 | *County of Marin*, 265 Fed. Appx. 624 2008 WL 268268 (9th Cir. 2008); *see also*

2 | *Playboy Enters., Inc. v. Dumas*, 53 F.3d 549, 558-59 (2d Cir .1995); *Schiller &*

3 | *Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 412-13 (7th Cir. 1992) ("The writing

4 | must precede the creation of the property" to qualify as a work-for-hire agreement.).

5 | Newton v. Diamond makes it clear that the composition of the song is the part of a

6 | song that remains consistent from performance to performance. These tapes are

7 | important to establish these compositions elements. These tapes are also important

8 | to establish when these compositional elements were created. Thus, these tapes are

9 | crucial to the work for hire issue. In addition, these tapes show that *Taurus* was

10 | being played to the public. Access to a work may be demonstrated by widespread

11 | distribution. *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000).

12 | **Objection 71 – Hansen Providing Tapes to Skidmore**

13 |   **Material objected to:** page 1, ¶ 2, and attached e-mails.

14 |   **Grounds for objection:** (1) lack of foundation as to personal knowledge, Fed.

15 | R. Evid. 602; (2) hearsay, Fed. R. Evid. 802; (3) best evidence rule, Fed. R. Evid.

16 | 1002; and (4) relevance, Fed. R. Evid. 401.

17 |   **Plaintiff's Response:** See Response to Objection 70.

18 |

19 |     **Declaration of Bruce Pates (Doc. No. 119-2)**

20 | **Objection 72 – Signature on Declaration**

21 |   **Material objected to:** Pates Declaration, in its entirety.

22 |   **Grounds for objection:** failure to comply with 28 U.S.C. § 1746 and Local

23 | Rule 5-4.3.4.

24 |   **Plaintiff's Response:** A hand-signed declaration is attached to this response.

25 | See also Response to Objection 50.

26 | **Objection 73 – Irrelevance**

27 |   **Material objected to:** Pates Declaration, in its entirety.

28 |   **Grounds for objection:** relevance, Fed. R. Evid. 401.

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
EVIDENTIARY OBJECTIONS RE: MOTION FOR SUMMARY JUDGMENT

1  Fed. R. Evid. 701-02; (2) failure to identify as a claimed opinion witness, Fed. R.

2  Civ. P. 37(c)(2); and (3) relevance, Fed. R. Evid. 401.

3      **Plaintiff's Response:** Pates has first-hand knowledge of the songs in question

4  and is not being offered as an expert. The similarities between the first half of

5  *Stairway to Heaven* and *Taurus* is not even credibly in dispute. The only people who

6  dispute that the songs sound similar are Defendants' hired musicological experts.

7  Even they say there are similarities, but that the similarities are not legally

8  protectable. It undisputed that Page, Jones, Mark Andes, Jay Ferguson, Dave

9  Waterbury, Tracy Longo, Bruce Pates, and every musician in this case who testified

10  have admitted that the first half of *Stairway to Heaven* is similar to *Taurus*

11      This evidence is relevant because it comes in for impeachment, credibility,

12  rebuttal, contradiction, and cross examination. In addition, it rebuts Defendants'

13  laches and abandonment arguments. See Response to Objection 73.

14

15      **Declaration of Jay Ferguson (Doc. No. 119-3)**

16  **Objection 75 – Performance of Taurus Prior to Recording**

17      **Material objected to:** page 2, ¶ 3.

18      **Grounds for objection:** relevance, Fed. R. Evid. 401.

19      **Plaintiff's Response:** Spirit's vocalist and percussionist Jay Ferguson

20  confirms that Taurus was played live at shows in 1967 before it was recorded with

21  Hollenbeck. Defendants object and claim this is irrelevant.

22      Defendants are claiming *Taurus* is a work for hire. Yet, a work for hire

23  contract cannot be retroactive. Ferguson's declaration, in addition to voluminous

24  evidence in the record, establishes that Taurus's composition was created and

25  performed well before August 1967 when the work for hire contract was signed. *See*

26  *also* Andrea Wolfe Decl., at ¶4-5 (*Doc. No. 118-3*); Janet Wolfe Decl., at ¶4-5 (*Doc.*

27  *No. 118-4*); Malofiy SJ Decl. (*Doc. No. 124*), Exhibit 8 – Andes Depo., p.150-156;

28  Barry Hansen Decl. (Doc. No. 119-1), ¶1-2 & Emails; Skidmore Decl. (Doc. No.

77

1   119-4), at ¶12; Brian Bricklin Decl. (Doc. No. 118-10), Audio Exhibits 33-36

2   (recordings of Taurus played live before August 29, 1967). **All this proves that the**

3   **Taurus was created before the work for hire contract in August 1967**. By law,

4   work for hire contracts do not operate retroactively and for a work to be for hire the

5   operative contract must have been signed before the material in question was

6   created. *Gladwell Govt. Services Inc. v. County of Marin*, 265 Fed. Appx. 624 2008

7   WL 268268 (9th Cir. 2008); *see also Playboy Enters., Inc. v. Dumas*, 53 F.3d 549,

8   558-59 (2d Cir .1995); *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410,

9   412-13 (7th Cir. 1992) ("The writing must precede the creation of the property" to

10  qualify as a work-for-hire agreement.). Thus, Ferguson's statements are relevant to

11  the work for hire issue.

12      Note that Defendants try very hard to claim that Jay Ferguson stated in his

13  deposition that *Taurus* was a work in progress throughout 1967 and that the song

14  was only finalized as a work after Lou Adler added an orchestral arragement to the

15  beginning of Taurus, recorded it, and copyrighted it. Defendants argue that Taurus

16  was created after August 29, 1967. But this is simply not true. <u>Newton v. Diamond</u>

17  is explicit that the composition of the song is what remains consistent from

18  performance to performance. Ferguson was clear in his deposition that the

19  composition of Taurus never changed from early 1967 until it was copyrighted by

20  Hollenbeck Music:

21      Q.                    Is it correct that -- so is it your testimony that the

22                            composition [of Taurus] was being worked on in that

23                            time frame and including live performances at the Ash

24                            Grove?

25      MR. MALOFIY:          Objection.

26      THE WITNESS:          The composition was not worked on; it was added to. It

27                            was arranged. So there's two different levels of creating

28                            music. One is authorship and composition. The other is

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
EVIDENTIARY OBJECTIONS RE: MOTION FOR SUMMARY JUDGMENT

1    arrangement.

2

3    Malofiy Decl., Exhibit 9 – Ferguson Depo., at p.206. What happened after August

4    29, 1967 is that Lou Adler added an orchestral arrangement to Taurus. *Id.* at p.19-20

5    (stating that Taurus composition was guitar piece). But, as Ferguson makes clear,

6    this had nothing to do with the song's composition as written by Randy Wolfe and is

7    not even protectable expression. Ferguson's declaration and deposition establish that

8    the Taurus composition was written, created, and composed well before August 29,

9    1967.

10        In addition, this statement shows that Taurus was being played to the public.

11   Access to a work may be demonstrated by widespread distribution. *Three Boys*

12   *Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000).

13        This evidence is also relevant because it comes in for impeachment,

14   credibility, rebuttal, contradiction, and cross examination.

15   **Objection 76 – Performance of Taurus Prior to August 1967 Contract**

16        **Material objected to:** page 2, ¶ 4.

17        **Grounds for objection:** (1) lack of foundation as to personal knowledge, Fed.

18   R. Evid. 602; (2) contradicts witness' deposition testimony; and (3) relevance, Fed.

19   R. Evid. 401.

20        **Plaintiff's Response:** Ferguson's knowledge is based on his first-hand

21   experience. Ferguson confirms that Taurus was created before the work for hire

22   contract was signed on August 29, 1967. Defendants object that this is irrelevant and

23   that it allegedly contradicts Ferguson's deposition testimony.

24        Defendants' argument that Ferguson's declaration contradicts his deposition

25   testimony is false. Ferguson has been consistent that the Taurus composition was

26   created before the August 29, 1967 contract. See Response to Objection 75.

27   Furthermore, this is highly relevant to the work for hire issue and based upon

28   Ferguson's personal knowledge as a Spirit band member. *Id.*

79

1 | **Objection 103 – Hanson Analysis of Composition of Taurus**

2 |     **Material objected to:** Hanson Declaration and its exhibits, in their entirety.

3 |     **Grounds for objection:** (1) failure to apply appropriate analysis; (2) lack of

4 | foundation for claimed expert opinions, Fed. R. Evid. 702; and (3) relevance, Fed.

5 | R. Evid. 401.

6 |     **Plaintiff's Response:** Defendants' attempt to claim that only the deposit copy

7 | of Taurus should be used in the relevant comparisons. This is simply not accurate and

8 | Defendants do not support their argument with any applicable case law. The deposit

9 | copy of Taurus does not reflect the entirety of the musical composition in a work,

10 | which is instead reflected by the composition of Taurus embodied in the 49-year old

11 | sound recording. Stewart Decl., ¶29-33.

12 |     The deposit requirement under 17 U.S.C. § 408(b) "is to identify the

13 | copyrighted work for the purposes of registration." Paul Goldstein, Goldstein on

14 | Copyright § 3.8 (2013). "Although the 1909 Copyright Act requires the owner to

15 | deposit a 'complete copy' of the work with the copyright office, [the Ninth Circuit's]

16 | definition of a 'complete copy' is broad and deferential: 'Absent intent to defraud

17 | and prejudice, inaccuracies in copyright registrations **do not bar actions for**

18 | **infringement**.'" Three Boys Music Corp., 212 F.3d at 486 (citing Harris v. Emus

19 | Records Corp., 734 F.2d 1329, 1335 (9th Cir. 1984)); see also Scentsy, Inc. v. B.R.

20 | Chase, 942 F. Supp. 2d 1045, 1050 (D. Idaho 2013) (finding that identification

21 | materials are not required to disclose every element in which they claim a copyright);

22 | KnowledgePlex, Inc. v. Placebase, Inc., C 08-4267 JF (RS), 2008 WL 5245484, at

23 | *10 (N.D. Cal. Dec. 17, 2008) (finding the Ninth Circuit has rejected the argument

24 | that claims are limited to the scope of the deposit copy). Indeed, under the 1909 Act,

25 | a claimant could not submit a recording of the composition in lieu of a lead sheet. See

26 | Copyright Act of 1909, § 12, 35 Stat. 1075 (1909) (repealed 1978).

27 |     Moreover, Defendants only cite Newton v. Diamond to support their argument,

28 | a largely inapposite case focused on different issue. In Newton, which applied the

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
EVIDENTIARY OBJECTIONS RE: MOTION FOR SUMMARY JUDGMENT

1   1976 Copyright Act, the sound recording had been licensed but the underlying

2   composition had not. Newton v. Diamond, 204 F. Supp. 2d 1244, 1249 (C.D. Cal.

3   2002), aff'd 388 F.3d 1189. The Court found that the use of the composition was de

4   minimis. Newton simply did not address when the composition contained in the

5   recording can be used as proof of the protected compositional elements of a work.

6   Newton was clear that the composition of a song is that part of the song which does

7   not change from performance to performance. *Newton v. Diamond*, 204 F. Supp. 2d

8   1244, 1259 (C.D. Cal. 2002) ("A musical composition's copyright protects the

9   generic sound that would necessarily result from any performance of the piece." In

10  other words, the composition is that part of the song that remains constant from

11  performance to performance.). In the recent post-trial motion opinion from *Pharrell*

12  *Williams, et al. v. Bridgeport Music, Inc., et al.* LA CV13-06004 JAK (AGRx) (CD

13  Cal. July 14, 2015) the Court made it clear that a recording of the work in question

14  and the compositional elements embodied in that recordings is relevant to expert

15  testimony even in cases under the 1909 Copyright Act. *Id.* at p.7.

16      The Ninth Circuit has held that the composition elements embodied in a

17  recording, even if not on the deposit lead sheet, are to be considered by a jury. Three

18  Boys Music Corp., 212 F.3d at 486-87. If the differences do not result in prejudice

19  and are not the result of fraudulent intent, then the consideration of the composition

20  embodied in the recording is appropriate. Id.

21      Here, there is no prejudice and no fraud—nor do Defendants attempt to argue

22  there is any. Defendants' own expert, Mathes, demonstrated the relevance and

23  necessity of examining the composition of the recording of "Taurus" as his expert

24  report explicitly compares the composition embodied in the recording of "Taurus" to

25  the composition embodied in the recording of Stairway to Heaven. Stewart Decl.

26  ¶32-33. When the opposing party's *own expert* admits the relevance of the

27  composition embodied in the recording it is an unambiguous sign that Defendants are

28  well aware of the material being compared and that they have suffered no prejudice.

1    To be clear, Plaintiff is not and has never argued that the specific performance
2  related aspect of Taurus's recordings are protected. He has always argued that the
3  underlying composition was taken and used in Stairway. Plaintiff's experts were
4  explicit that they had disregarded specific performance related elements for the
5  substantial similarity comparison. Stewart Decl., at ¶51.

6    The fact that Defendants seek to obscure is that lead sheets are often not
7  detailed and do not represent the entirety of the protected composition. Stewart Decl.,
8  at ¶33; *KnowledgePlex, Inc. v. Placebase, Inc.*, C 08-4267 JF (RS), 2008 WL
9  5245484, at *9 (N.D. Cal. Dec. 17, 2008). An excellent example of this is the lead
10  sheet deposit copy submitted for *Stairway to Heaven* is significantly incomplete
11  when compared to the actual composition of the song as embodied in the recording of
12  *Stairway to Heaven*. Stewart Decl., at ¶33. The fact of the matter is that all parties are
13  explicitly aware of the compositional comparison being conducted in this lawsuit and
14  Defendants cannot demonstrate any prejudice whatsoever as the experts on both sides
15  have made the relevant comparison.

16    Plaintiff's expert Kevin Hanson complied with Rule 702 in all particulars and
17  is a well-qualified master guitarist. Plaintiff's expert report is based on specialized
18  knowledge, applies voluminous facts and data as part of the musical analysis, such
19  analysis is regularly used within the field, and the method of analysis has been
20  reliably applied.

21

22  **Objection 104 – Knowledge of Copying**

23    **Material objected to:** page 2, ¶ 6.

24    **Grounds for objection:** (1) Federal Rules of Evidence 407 and 408; (2)
25  failure to provide expert reports establishing that copying occurred, Fed. R. Evid.
26  702; and (3) relevance, Fed. R. Evid. 401.

27    **Plaintiff's Response:** Hanson states in his report that the similarities between
28  Taurus and Stairway to Heaven struck him immediately. Defendants claims this is

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
EVIDENTIARY OBJECTIONS RE: MOTION FOR SUMMARY JUDGMENT

1   "gratuitous." The similarity of the songs is the reason for Hanson's report. There is

2   nothing gratuitous about Hanson's comment.

3   **Objection 105 – Hanson's Analysis**

4      **Material objected to:** pages 2-3, ¶ 7.

5      **Grounds for objection:** (1) failure to apply appropriate analysis; (2) lack of

6   foundation for claimed expert opinions, Fed. R. Evid. 702; and (3) relevance, Fed.

7   R. Evid. 401.

8      **Plaintiff's Response:** See response to objection 103.

9                **Declaration of Denny Somach**

10  **Objection 106 – Lack of Ink Signature**

11     **Material objected to:** Somach Declaration in its entirety.

12     **Grounds for objection:** failure to comply with 28 U.S.C. § 1746 and Local

13  Rule 5-4.3.4.

14     **Plaintiff's Response:** A hand-signed declaration is attached to this response.

15  See also Response to Objection 50

16  **Objection 107 – Relevance of Somach**

17     **Material objected to:** Somach Declaration in its entirety.

18     **Grounds for objection:** relevance, Fed. R. Evid. 401.

19     **Plaintiff's Response:** Somach is an expert on the history of Led Zeppelin. He

20  is offered to establish the importance of the song to Led Zeppelin's catalogue. He is

21  also offered to establish the widespread and pervasive borrowing of artistic

22  expression without giving proper credit by Led Zeppelin. Also, defendant Page has

23  absurdly declared that he wrote Stairway to Heaven and based it on Chim Chim

24  Cher-ee from Mary Poppins. Somach is offered as rebuttal to state that Page, to

25  Somach's knowledge, has never once in the last forty years stated that he based

26  Stairway to Heaven on a song from Mary Poppins.

27     Somach is a historian of Led Zeppelin and is offered as such. His expertise is

28  relevant to the importance of Led Zeppelin, the importance of the opening to

98

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
EVIDENTIARY OBJECTIONS RE: MOTION FOR SUMMARY JUDGMENT

1  Stairway to Heaven (which is derided as a minor line cliché by defendants), and to

2  rebut Page's assertion—for the first time ever—that he based the most famous song

3  in rock and roll on Mary Poppins. This is all highly relevant.

4      This evidence and testimony is also relevant because it comes in for

5  impeachment, credibility, rebuttal, contradiction, and cross examination.

6

7  **Objection 108 – Similarities of Other Works**

8      **Material objected to:** pages 4-6, ¶¶ 9-12, 14.

9      **Grounds for objection:** (1) Federal Rules of Evidence 407 and 408; (2)

10  failure to provide expert reports establishing that copying occurred, Fed. R. Evid.

11  702; and (3) relevance, Fed. R. Evid. 401.

12      **Plaintiff's Response:** Somach establishes that Led Zeppelin obviously took

13  other artists' work and passed it off as their own. Defendants claim this is irrelevant.

14  See response to objection 23.

15      This evidence and testimony is also relevant because it comes in for

16  impeachment, credibility, rebuttal, contradiction, and cross examination.

17

18  **Objection 109 – All Audio Exhibits Other Than Stairway to Heaven**

19      **Material objected to:** plaintiff's Audio Exhibits other than the recording of

20  Led Zeppelin performing *Stairway to Heaven*.

21      **Grounds for objection:** relevance, Fed. R. Evid. 401.

22      **Plaintiff's Response:** Defendants vaguely object to all audio exhibits

23  submitted except Stairway to Heaven as irrelevant. This objection is frivolous and

24  vague. Plaintiff has submitted audio and video exhibits of Plaintiff's experts

25  performing both Taurus and Stairway, and other exhibits use by those experts for

26  establishing access by way of striking similarity. These exhibits are also relevant to

27  both the extrinsic test and intrinsic test. These are highly relevant and crucial

28  exhibits. Defendants do not explain why these exhibits are not admissible. In

99

1  addition, Defendants' other objections are addressed by Plaintiff's responses to

2  objections 23 and 44.

3      This evidence is also relevant because it comes in for impeachment,

4  credibility, rebuttal, contradiction, and cross examination, especially as to show

5  what the composition elements of Taurus are, and to show that the compositional

6  elements of Taurus did not change from when the song was first written to after the

7  August 29, 1967 contract.

8

9

10

11

12         *****

13        *Respectfully submitted,*

14        Francis Alexander, LLC

15        */s/ Francis Alexander Malofiy*
      Francis Alexander Malofiy, Esquire

16        Attorney ID No.: 208494
      280 N. Providence Road | Suite 105

17        Media, PA 19063
      T: (215) 500-1000

18        F: (215) 500-1005
      E: francis@francisalexander.com

19        */d/ March 30, 2016*

20

21

22

23

24

25

26

27

28

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
EVIDENTIARY OBJECTIONS RE: MOTION FOR SUMMARY JUDGMENT

02178

# CERTIFICATE OF SERVICE

Plaintiff hereby represents that Plaintiff's Response to Defendants' Evidentiary Objections has been served upon counsel by email:

Helene Freeman, Esquire
666 Fifth Avenue
New York, NY 10103-0084
T: (212) 841-0547
F: (212) 262-5152
E: hfreeman@phillipsnizer.com
*Attorneys for Defendants James Patrick Page, Robert Anthony Plant, and John Paul Jones (collectively with John Bonham (Deceased), professionally known as Led Zeppelin)*

Peter J. Anderson, Esquire
100 Wilshire Blvd. | Suite 2010
Santa Monica, CA 90401
T:(310) 260-6030
F: (310) 260-6040
E: pja@pjanderson.com
*Attorney for Defendants Super Hype Publishing, Inc., Warner Music Group Corp., Warner/Chappell Music, Inc., Atlantic Recording Corporation, and Rhino Entertainment Company*

\*\*\*\*\*

*Respectfully submitted,*

Francis Alexander, LLC

*/s/ Francis Alexander Malofiy*
Francis Alexander Malofiy, Esquire
Attorney ID No.: 208494
280 N. Providence Road | Suite 105
Media, PA 19063
T: (215) 500-1000
F: (215) 500-1005
E: francis@francisalexander.com
*/d/ March 30, 2016*

1

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
EVIDENTIARY OBJECTIONS RE: MOTION FOR SUMMARY JUDGMENT

1  Francis Malofiy, Esq.
2  Francis Alexander, LLC
   280 N. Providence Rd. | Suite 105
3  Media, PA 19063
4  T:  (215) 500-1000; F:  (215) 500-1005
   E:  francis@francisalexander.com
5  *Attorney for Plaintiff*

6
   Glen L. Kulik, Esq. (SBN 082170)
7  Kulik Gottesman & Siegel LLP
8  15303 Ventura Blvd., Suite 1400
   Sherman Oaks, CA 91403
9  T:  (310) 557-9200; F:  (310) 557-0224
10 E:  gkulik@kgslaw.com
   *Attorney for Plaintiff*
11

12              **UNITED STATES DISTRICT COURT**

13          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

14

15 MICHAEL SKIDMORE, as Trustee for          Case No. 15-cv-03462 RGK (AGRx)
   the RANDY CRAIG WOLFE TRUST,
16                                            Hon. R. Gary Klausner
17              Plaintiff,
                                             **DECLARATION OF BRIAN**
18         v.                                **BRICKLIN IN OPPOSITION TO**
                                             **DEFENDANTS' MOTION FOR**
19                                           **SUMMARY JUDGMENT OR IN**
   LED ZEPPELIN; JAMES PATRICK              **THE ALTERNATIVE, PARTIAL**
20 PAGE; ROBERT ANTHONY PLANT;             **SUMMARY JUDGMENT**
   JOHN PAUL JONES; SUPER HYPE
21 PUBLISHING, INC.; WARNER MUSIC
   GROUP CORP., Parent of                    **Date:   March 28, 2016**
22 WARNER/CHAPPELL MUSIC, INC.;            **Time:  9:00 a.m.**
23 ATLANTIC RECORDING                        **Room:**
   CORPORATION; RHINO
24 ENTERTAINMENT COMPANY,
25
26              Defendants.
27
28

Case No. 15-cv-03462 RGK (AGRx)          DECLARATION OF BRIAN BRICKLIN IN OPPOSITION TO
                                         DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## <u>DECLARATION OF BRIAN BRICKLIN</u>

I, Brian Bricklin, declare:

1.      I am a music producer, audio engineer, performing arts school and studio owner, college instructor, musician, band member, song writer and live sound engineer. I am over the age of 18 and competent to testify as to the matters stated herein.

2.      I have been retained by Plaintiff in this action to render my opinion regarding the following items:

(i)      Compare and contrast the compositions, and recordings, of "Taurus" (T) written by Randy California and performed by the band Spirit and "Stairway To Heaven" (STH) by Robert Plant and Jimmy Page, performed by Led Zeppelin

(ii)     Render my opinion as to whether Led Zeppelin employed a songwriting process.

(iii)    Identify the individual components of each individual recorded version of each song and if there are similarities in their studio production.

## <u>MATERIALS REVIEWED</u>

3.      I reviewed the following items:

- Led Zeppelin's Discovery Production D0001-0606
- Taurus – Audio
- Stairway to Heaven – Audio
- Deposition of James Patrick Page and exhibits
- Deposition of John Paul Jones and exhibits
- Deposition of Robert Anthony Plant and exhibits
- The case docket and filings

1

## ANALYSIS

4.    I was initially presented two audio files by the plaintiff's attorney:  1. *Stairway to Heaven* by Led Zeppelin and 2. *Taurus* by Spirit.

5.    Both songs contain a musical composition that are almost identical. The four-measure piece appears four times in T at 0:44, 0:58, 1:36, and 1:50. In STH the piece also appears four times, at 0:00; 0:12; 0:52; and 1:06. These sections are in the same key (A minor) and contain a descending chromatic bass line, both feature a similar slow tempo and a single acoustic guitar.

6.    The following report contains my analysis and conclusions based on thorough review of substantial material, music, interviews, critical listening as well as recording recreations of the multitrack tape recordings of both the song T and STH. I will start with defining the recording and mixing process an artist uses to record and release material for public consumption and monetization.

## Songwriting Process

7.    As a songwriter I have had songs featured in major motion pictures like Bill and Ted's Excellent Adventure (Orion Pictures) and Election (MTV Paramount), many TV and radio commercials, as well as signed two times to major labels (A&M, Hybrid/Sire).

8.    There are multiple ways that a song can "come to life." For instance, in some cases there are people who write lyrics, melody and music as well teams where one person writes the music and the other the lyrics. All of these scenarios can exist within a band too. There is also a process known as "jamming." This is where multiple musicians are creating things "on the spot" in a live performance situation (with or without an audience). A simple musical phrase may be introduced by one person which then inspires another person to expand on it.  All of this happening in "real time." Many times, if a bona fide song is created from a jam session, credit is given to all of the participating musicians. Other times one person

might present a completed, or almost completed song to "the group" and often only the person or persons who were involved in the genesis of the song are credited. In addition, many songwriters will acknowledge they were inspired by another artist, sometimes an older artist in a specific genre as the inspiration for their NEW creation. In many cases the songwriter has only been "inspired" by a previous work, but doesn't "lift" verbatim lyric, melody or music. Unfortunately, there are cases where a previous work doesn't inspire and is instead used verbatim and put forth as a new original creation. In almost all cases songwriters usually follow a process for their works that is repeated as they hone their "craft."

### Led Zeppelin's Songwriting Process

9.     Based on my expert experience, listening to Led Zeppelin's songs, listening to songs upon which Led Zeppelin based their songs, and the deposition testimony of the individual defendants, I conclude that Led Zeppelin utilized two primary songwriting methods. The first was where a band member, usually Jimmy Page and/or Robert Plant, would present a song to the band. In these cases, only Page and/or Plant would be credited. The second is where the band would jam and the resulting creation would usually be credited to all members of the band and always at least three members. It is my expert opinion that both songwriting processes heavily involved the use of other artists' work, especially in the first four Led Zeppelin albums.

10.     Take, for example, the song *Dazed and Confused* from Led Zeppelin I when contrasted with Jake Holmes 1967 song titled similarly, *Dazed and Confused*.

**Audio Exhibit 1: Dazed and Confused by Led Zeppelin**

**Audio Exhibit 2: Dazed and Confused by Jake Homes (1967)**

It is obvious that Led Zeppelin made some additions to the song *Dazed and Confused* by Jake Holmes, but by no means is it a new and unique creation.

3

When originally released on Led Zeppelin I, *Dazed and Confused* was credited to Jimmy Page alone and Jake Holmes wasn't acknowledged at all.  It's clear that they incorporated Jake Holmes's original creation in their version of the song.  This is the start of a systematic process the band used for years while creating their music and it became their core songwriting technique; incorporate existing material by other writers verbatim, or add a slight modification or alteration, and then present it as a unique and NEW creation**.**

Another song, from Led Zeppelin II, *Whole Lotta of Love*, further illustrates this type of songwriting process, which in my opinion is pervasive in Led Zeppelin's music. Led Zeppelin's version is derived from two other songs: *You Need Love* performed by Muddy Waters, and You *Need Loving* by The Small Faces. It's apparent that parts of each of these songs (times listed next to each audio exhibit marker) were incorporated into their recording of *Whole Lotta Love.*

However, the song was originally uncredited to any other songwriters other than the members of Led Zeppelin.

**Audio Exhibit 3: Whole Lotta Love by Led Zeppelin**

**Audio Exhibit 4: Muddy Waters' You Need Love (1962)**

   **(10 seconds – 28 seconds)**

**Audio Exhibit 5: The Small Faces' You Need Loving (1966)**

   **(25 seconds – 48 seconds)**

After hearing testimony from Jimmy Page, John Paul Jones, and Robert Plant, in January of 2016, it is evident to me that their songwriting process included using previous musical compositions and incorporating them into their songs. In many cases they took sole credit for Led Zeppelin's songs and presented them as unique, NEW creations. There are many more examples of this songwriting process used by Led Zeppelin, including *Babe, I'm Gonna Leave You* (originally written by Anne Bredon), B*lack Mountain Side* (originally

4

written by Bert Jansch), *Bring It On Home* (originally written by Willie Dixon), and *Since I've Been Loving You* (originally written by Moby Grape). This is far from a complete list. This demonstrated songwriting process by Led Zeppelin is unfortunately more akin to "lifting" verbatim sections of music and lyrics without attribution and presenting it as a new, unique creation.

Both Jimmy Page and Robert Plant have admitted, in various publications and interviews, that Led Zeppelin did indeed lift and copy the work of other artists to varying degrees without giving credit.  Jimmy Page did so in an interview with Brad Tolinski for Guitar World in May 1993, and Robert Plant did so in an NPR interview with Robert Plant on Fresh Air with Terry Gross in 2004.

### Led Zeppelin's Familiarity with Spirit

11.    From listening to live recordings of Led Zeppelin from their first tour of America in 1968, reading and listening to interviews with Jimmy Page, and from hearing first hand Jimmy Page talk about playing a piece from Spirit's song Fresh Garbage in their early live sets, it's clear the band was aware of and thought highly enough of Spirit to include Spirit's music in their own live shows.

**Audio Exhibit 6: Live performance of Led Zeppelin playing Fresh Garbage 1-10-1969**

This recording is significant as it shows Led Zeppelin were aware, and held in high regard, Sprit's music. In addition, I have seen significant evidence and to my knowledge unrefuted evidence that Spirit and Led Zeppelin played the same shows in the late 1960s and 1970s and I have also been told that Mark Andes and Jay Ferguson testified that at least one festival Led Zeppelin immediately followed Spirit on stage and that the band members interacted backstage. I also heard Jimmy Page testify that he owns the eponymous Spirit

5

1 album which contains the song *Taurus*, although he claims he does not know

2 when he acquired it.

3

4 **Stairway to Heaven vs. Taurus**

5     12.    On my initial comparison of T vs. STH, the very first thing that

6 struck me was that both songs feature a single acoustic guitar, picking identical

7 arpeggios upon their entrance. Jimmy Page has commented in interviews that

8 initially he allegedly composed just the acoustic guitar introduction to the

9 song, and the song built from the introduction. The surrounding instrumental

10 accompaniment on both T, and STH, is initially sparse. T has a background of

11 orchestral strings, flute and then harpsichord (keyboard), STH, recorder(s) and

12 then electric piano (keyboard). Both songs feature similar production and in

13 order to expand on how musical accompaniment and the recording studio

14 "process" can brand a recording, one must have an understanding of how

15 music is produced and "captured" in modern recording studios since music has

16 been distributed for profit.

17     13.    When a song is recorded by an artist or band, there are usually two

18 other key personnel:

19     (i)    Producer:

20     The producer is akin to a director in the motion picture industry, i.e., the

21     vision for the recording project is in the hands of the producer. The

22     producer generally makes all decisions as to what is recorded, which

23     performances are kept or deleted. The producer also works closely with

24     the recording engineer as to how each instrument or vocal is recorded,

25     which microphone or, other recording equipment, is used to capture the

26     performances. The producer often has final say on the final blend of the

27     instrumentation (mixing) and how the final recordings fits in to a

28     "running order" for an album, i.e. the song order."

6

(ii)     The Recording Engineer:

The recording engineer is responsible for placing microphones to capture acoustic instruments or vocals, routing direct signals to a recording console, setting up and getting volume levels set for the performers to hear each other. Setting volume levels and tone for the items being recorded. Maintaining the equipment in the recording studio as well as anything technical the producer or artist/band requests during the recording session.

14.    It is important to note that all of Led Zeppelin's recordings, including STH, were produced by band member Jimmy Page. This means, as stated above, he alone was responsible for the final say in regard to the final recorded product that Led Zeppelin commercially released. In addition to producing STH, Jimmy Page, along with band member Robert Plant, are credited as the alleged composers of the song.

15.    The song T, by Spirit, was produced by Lou Adler with the band members of Spirit. Lou was not a member of the band Spirit. It's important to note, in regards to the song T, I am told that the surviving band members of Spirit, Jay Ferguson and Mark Andes, state that the band was not happy with the introduction of the final version of the song. In its final commercial release, T contains 45 seconds of orchestral music at the top of the song that the band members did not like, including Randy California, T's author. This introduction was added to the song by Lou Adler and it was not a part of Randy's original composition. In essence, to compare STH and T, it is important to start 45 seconds into the commercially released version of T as this is how the author intended it to be. In fact, all recorded live performances of the song T, by Spirit, did not contain this additional orchestral introduction.

16.    Both songs are presented, in their final commercially released versions, with substantially similar production and mixing techniques. In

7

Case No. 15-cv-03462 RGK (AGRx)                    Declaration of brian bricklin in Opposition to Defendants' Motion for Summary Judgment

recording studios, since the time when Les Paul invented the technology behind multitrack recording, musicians record instrumentation, vocals and any other elements, to individual "tracks" on a master multitrack recorder. (Since both  these songs were recorded before digital technology was the standard, these songs were recorded on multitrack tape recorders.) Multitrack recorders allow each instrument, or element, to be recorded on to individual tracks of a recorder. These tracks will play back individually, or collectively, and can be blended at different volume levels and tone control after a live performance has been captured. In addition, a performance can be played back while another performance is captured over the existing one. This process is commonly referred to as overdubbing.

17.    In order to deconstruct each song at a musical "organic" level, since the multitrack tapes were not available to me for comparison, I faithfully rerecorded each song. Utilizing a skill called critical listening, I was able to discern and identify each musical instrument and component, and recreate the multitrack recordings utilizing master studio musicians performing each part. I recorded the songs using digital multitrack recording software called Avid Pro Tools, the audio elements are illustrated on the next page in Images A and B. (Software – Audacity for images only),

Case No. 15-cv-03462 RGK (AGRx)         DECLARATION OF BRIAN BRICKLIN IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT



Image A:  Recreated Multitrack recording of STH



9

Case No. 15-cv-03462 RGK (AGRx)

Image B.: Recreated Multitrack recording of T

18.     This process allowed me to isolate the components of both T and STH to further evaluate individual musical performances that made up each recording. The following images show each song's discreet elements:

♪ Acoustic Guitar

♪ Bass

♪ Drums

♪ Electric 12 Strings

♪ End Guitar

♪ Les Pauls

♪ Recorders

♪ Slide

♪ Solo

Image C: STH Recreated Isolated Audio Tracks

♪ Acoustic Guitar

♪ Cello 1

♪ Cello 2

♪ Cymbal

♪ Flute

♪ Harpsichord

♪ String Bass

♪ Viola

♪ Violins

Image D: T Recreated Isolated Audio Tracks

19.     After a song is recorded, "mixing" is the process where recording engineers, often, with producers, adjust the individual volume level and tone of

10

1    each recorded track after it has been recorded to create a stereo "master." This
2    master is then duplicated for commercial release.

3          20.    Additionally, effects such as reverb, which could be compared to
4    the sound created as if the musician was performing in a basketball gym, or
5    arena, can be applied during the mixing process. When using reverb, the
6    resulting sound "appears" far away and the duration of the sound is longer
7    than if the musician was performing in a small room. Both T and STH feature
8    acoustic guitars "bathed" in reverb. The following audio exhibits demonstrate
9    the use of reverb to create a mystic, dreamlike quality. The resulting effect is
10   like each note of the guitar has a "whispering tail."

11

12   **Audio Exhibit 7: Stairway to Heaven (0 seconds – 25 seconds)**
13   **Audio Exhibit 8: Taurus (45 seconds – 1minute, 13 seconds)**

14         21.    It's obvious to me the songs were both intended to inspire a
15   haunting, melodramatic feel. From the first guitar notes, verbatim guitar
16   arpeggios lull the listener along… Since both songs feature a single guitar,
17   playing a musical composition that in both cases are fingered virtually the
18   same on the guitar, the combined resulting effect, reverb with acoustic guitar,
19   is identical.

20         22.    In addition to recreating the multitrack recordings of STH and T, I
21   recorded exact replicas of each songs' first 8 measures at a consistent 78 beats
22   per minute, performed by master guitarist Kevin Hanson.

23

24   **Audio Exhibit 9: 8 measures of STH from note 1 of the acoustic**
25   **guitar, repeated multiple times**
26   **Audio Exhibit 10: 8 measures of T from note 1 of the acoustic guitar,**
27   **repeated multiple times**
28   **Audio Exhibit 11: 8 measures of STH and T played together from**

11

Case No. 15-cv-03462 RGK (AGRx)      DECLARATION OF BRIAN BRICKLIN IN OPPOSITION TO
                                     DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1    **note 1 of the acoustic guitar, repeated multiple times**

2    23.    I think when listening to Audio Exhibit 11, it is clear that it appears

3    as one piece of music, indicating to me, beyond a reasonable doubt, the

4    compositions are one in the same.

5    24.    It is my expert opinion, based upon the songwriting process

6    employed by Led Zeppelin, that the song *Taurus* was infringed upon by Led

7    Zeppelin with their recording of *Stairway to Heaven*.  It is my expert opinion

8    that acoustic guitar introduction and verse to *Stairway to Heaven* are identical

9    to the composition in *Taurus* by Randy California. The evidentiary record I

10   have reviewed indicates that Led Zeppelin had access to *Taurus* well before

11   writing *Stairway to Heaven* in 1970. The record further indicates that Jimmy

12   Page allegedly first conceived just the guitar introduction to *Stairway to*

13   *Heaven*.  It is my further expert opinion that Led Zeppelin's songwriting

14   method heavily utilized full sections of material written by others, copied

15   verbatim. It is my expert opinion, based on the above, that Jimmy Page copied

16   the introduction and verse to *Stairway to Heaven* and that *Stairway to Heaven*

17   was derived as part of the same songwriting process that developed much of

18   Led Zeppelin's catalogue.

19   **REBUTTAL OF MATHES & FERRARRA**

20   25.    I rebut both the reports of Mathes and Ferrarra. I took the audio

21   produced by defendant expert Mathes performing both Taurus and Stairway to

22   Heaven on the acoustic guitar. A simply temp matched his audio performance

23   of both Taurus and Stairway to Heaven and then combined them on an audio

24   track. Analysis of the musical compositional elements is evident as the piece

25   can be heard as one and it is one as it is  the same underlying composition in

26   Part A. See audio exhibits:

27   **AUDIO EXHIBITS – REBUTTAL OF MATHES**

28   **Audio Exhibit 45:        Mathes Audio Exhibit Tempo Matched – Stairway**

**Audio Exhibit 46:**        **Mathes Audio Exhibit Tempo Matched – Taurus**
**Audio Exhibit 47:**        **Mathes Audio Exhibit Tempo Matched – STH & Taurus**

26.     I hold these opinions with a reasonable degree of professional and musical certainty. I am being compensated at the rate $175 per hour for this report and $350 for trial. I have testified previously in Marino v. Usher (11-cv-06811 E.D. Pa.).

Executed this 10th day of February 2016, at Lansdowne, Pennsylvania.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

                               */s/ Brian Bricklin*
                                 Brian Bricklin

***\*\*\* See attachments including Audio and Visual Files \*\*\****

Case No. 15-cv-03462 RGK (AGRx)          DECLARATION OF BRIAN BRICKLIN IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**AUDIO EXHIBITS**
**Audio Exhibit 1:**
**Dazed and Confused by Led Zeppelin**

**Audio Exhibit 2:**
**Dazed and Confused by Jack Holmes (1967)**

**Audio Exhibit 3:**
**Whole Lotta Love by Led Zeppelin**

**Audio Exhibit 4:**
**Muddy Waters' You Need Love (1962) (10 seconds – 28 seconds)**

**Audio Exhibit 5:**
**The Small Faces' You Need Loving (1966) (25 seconds – 48 seconds)**

**Audio Exhibit 6:**
**Live performance of Led Zeppelin playing Fresh Garbage 1-10-1969**


**AUDIO EXHIBITS – COMPARISON AUDIO**
**Audio Exhibit 7:**
**Stairway to Heaven (0 seconds – 25 seconds)**

**Audio Exhibit 8:**
**Taurus (45 seconds – 1 minute, 13 seconds)**

**Audio Exhibit 9:**
**8 measures of Stairway from note 1 of the acoustic guitar, repeated multiple times**

**Audio Exhibit 10:**
**Part A:**
**8 Measures of Taurus from note 1 of the acoustic guitar, repeated multiple times**

**Audio Exhibit 11:**
**8 measures of Stairway and Taurus played together from note 1 of the acoustic guitar, repeated multiple times**

**AUDIO EXHIBITS - RE-RECORDING OF STAIRWAY TO HEAVEN**

| | |
|---|---|
| Audio Exhibit 12: | Acoustic Guitar |
| Audio Exhibit 13: | Bass |
| Audio Exhibit 14: | Drums |
| Audio Exhibit 15: | Electric 12 Strings |
| Audio Exhibit 16: | Electric Piano |
| Audio Exhibit 17: | End Guitar |
| Audio Exhibit 18: | Les Pauls |
| Audio Exhibit 19: | Recorders |
| Audio Exhibit 20: | Slide |
| Audio Exhibit 21: | Solo |

**AUDIO EXHIBITS - RE-RECORDING OF TAURUS**

| | |
|---|---|
| Audio Exhibit 22: | Acoustic Guitar |
| Audio Exhibit 23: | Cello 1 |
| Audio Exhibit 24: | Cello 2 |
| Audio Exhibit 25: | Cymbal |
| Audio Exhibit 26: | Flute |
| Audio Exhibit 27: | Harpsichord |
| Audio Exhibit 28: | String Bass |
| Audio Exhibit 29: | Viola |
| Audio Exhibit 30: | Violins |

## AUDIO EXHIBITS – ALEXANDER STEWART

**Audio Exhibit 31:**                          **(Previously: Audio Exhibit A)**
**"Stairway to Heaven" (album)**

**Audio Exhibit 32:**                          **(Previously: Audio Exhibit B)**
**"Taurus" (album)**

**Audio Exhibit 33:**                          **(Previously: Audio Exhibit E)**
**Taurus Live at Ash Grove (7/10/1967)**

**Audio Exhibit 34:**                          **(Previously: Audio Exhibit C)**
**Taurus Live at Ash Grove (7/31/1967)**

**Audio Exhibit 35:**                          **(Previously: Audio Exhibit D)**
**Taurus Live at Ash Grove (8/8/1967)**

**Audio Exhibit 36:**                          **(Previously: Audio Exhibit H)**
**Taurus Demo Recording (8/1967)**

**Audio Exhibit 37:**                          **(Previously: Audio Exhibit F)**
**Taurus Live at Kaleidoscope (4/5/1968)**

**Audio Exhibit 38:**                          **(Previously: Audio Exhibit G)**
**Taurus Live at The Time Coast**

**Audio Exhibit 39:**                          **(Previously: Audio Exhibit H)**
**Taurus Live at Acoustic (1996)**

**Audio Exhibit 40:**                          **(Previously: Audio Exhibit J)**
**Combination – Acoustic Taurus Synced to STH SR – Part A, played over Master
SR of STH**

**Audio Exhibit 41:**                          **(Previously: Audio Exhibit K)**
**Acoustic Taurus Synced to Master SR of STH – Part A**

**Audio Exhibit 42:**                          **(Previously: Audio Exhibit L)**
**Stairway Acoustic – Part A:**

**Audio Exhibit 43:**                          **(Previously: Audio Exhibit M)**
**Taurus Acoustic – Part A:**

**Audio Exhibit 44:**                          **(Previously: Audio Exhibit N)**
**Combination – Acoustic Taurus Synced to Master SR of STH (Part A), played
over Acoustic Stairway (Part A)**

**AUDIO EXHIBITS – REBUTTAL OF MATHES**

| | |
|---|---|
| **Audio Exhibit 45:** | **Mathes Audio Exhibit Tempo Matched - Stairway** |
| **Audio Exhibit 46:** | **Mathes Audio Exhibit Tempo Matched - Taurus** |
| **Audio Exhibit 47:** | **Mathes Audio Exhibit Tempo Matched - STH & Taurus** |

**VIDEO EXHIBITS – DEMONSTRATIVE GUITAR PERFORMANCE**

| | |
|---|---|
| **Video Exhibit 1:** | **Taurus – Left Hand** |
| **Video Exhibit 2:** | **Taurus – Right Hand** |
| **Video Exhibit 3:** | **Stairway to Heaven – Left Hand** |
| **Video Exhibit 4:** | **Stairway to Heaven – Right Hand** |

| Audio Exhibit 46: | Mathes Audio Exhibit Tempo Matched - Taurus |
| Audio Exhibit 47: | Mathes Audio Exhibit Tempo Matched - STH & Taurus |

26.    I hold these opinions with a reasonable degree of professional and musical certainty. I am being compensated at the rate $175 per hour for this report and $350 for trial. I have testified previously in Marino v. Usher (11-cv-06811 E.D. Pa.).

Executed this 10th day of February 2016, at Lansdowne, Pennsylvania.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

*Brian Bricklin*

/s/ *Brian Bricklin*

Brian Bricklin

*** See attachments including Audio and Visual Files ***

Case No. 15-cv-03462 RGK (AGRx)   DECLARATION OF BRIAN BRICKLIN IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Scanned by CamScanner

02198

Case 2:15-cv-03462-RGK-AGR   Document 154-5   Filed 03/30/16   Page 1 of 32   Page ID
#:3854

1   Francis Malofiy, Esq.
2   Francis Alexander, LLC
    280 N. Providence Rd. | Suite 105
3   Media, PA 19063
4   T: (215) 500-1000; F: (215) 500-1005
    E: francis@francisalexander.com
5   *Attorney for Plaintiff*

6
7   Glen L. Kulik, Esq. (SBN 082170)
    Kulik Gottesman & Siegel LLP
8   15303 Ventura Blvd., Suite 1400
    Sherman Oaks, CA 91403
9   T: (310) 557-9200; F: (310) 557-0224
    E: gkulik@kgslaw.com
10  *Attorney for Plaintiff*

11

12              **UNITED STATES DISTRICT COURT**

13         **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

14

15   MICHAEL SKIDMORE, as Trustee for      Case No. 15-cv-03462 RGK (AGRx)
     the RANDY CRAIG WOLFE TRUST,
16                                          Hon. R. Gary Klausner
17              Plaintiff,
                                            **DECLARATION OF ERIK**
18        v.                                **JOHNSON IN OPPOSITION TO**
                                            **DEFENDANTS' MOTION FOR**
19                                          **SUMMARY JUDGMENT OR IN**
     LED ZEPPELIN; JAMES PATRICK            **THE ALTERNATIVE, PARTIAL**
20   PAGE; ROBERT ANTHONY PLANT;            **SUMMARY JUDGMENT**
     JOHN PAUL JONES; SUPER HYPE
21   PUBLISHING, INC.; WARNER MUSIC
     GROUP CORP., Parent of                 **Date:  March 28, 2016**
22   WARNER/CHAPPELL MUSIC, INC.;           **Time:  9:00 a.m.**
23   ATLANTIC RECORDING                     **Room:**
     CORPORATION; RHINO
24   ENTERTAINMENT COMPANY,
25
26              Defendants.
27
28

Case No. 15-cv-03462 RGK (AGRx)          DECLARATION OF ERIK JOHNSON IN OPPOSITION TO
                                         DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## DECLARATION OF ERIK JOHNSON

I, Erik Johnson, declare as follows:

1.      I was retained as an expert in this case to listen to and analyze *Taurus* and *Stairway to Heaven*, to perform both pieces as a master musician and faithfully replicate the original recordings for the purpose of creating multitrack facsimiles. I also created a full transcription of *Taurus* and incorporated by reference the corresponding audio for both *Taurus* and *Stairway to Heaven*.   I have personal knowledge of the facts recited below and if called as a witness could and would testify competently to each such fact.

2.      I am proficient on the following instruments (years of experience in parentheses):

- Drums/percussion (40 years)
- Electric Bass (35 years)
- Guitar (35 years)
- Piano/keyboards (30 years)
- Voice (40 years)
- Saxophone (35+ years)

I was engaged to play the following instruments on the *Taurus* and *Stairway to Heaven* re-recordings:

- Drums
- Electric Bass
- Electric Piano
- Other Keyboards
- Percussion

I was also asked to then analyze both pieces of work, *Stairway to Heaven* and *Taurus*, from a performance and compositional perspective and to provide a complete transcription of *Taurus* which is attached.

3.      I have personal knowledge of the facts recited in this declaration and if

1

1   called as a witness could and would testify competently to such facts.

2

3                                    **QUALIFICATIONS**

4       4.      My profession is master musician and session musician.  In my

5   occupation, I am required to perform, create, analyze and address all aspects of

6   music creation at the highest level. My services are in demand as a result of years of

7   cultivating a discriminating musical ear and the ability to execute musical ideas in

8   innumerable genres on a variety of instruments. I have recorded, performed and

9   toured with world-renowned musicians in the genres of jazz, classical, pop, rock

10  and other styles.  My credits include releases on Interscope Records, Blue Note,

11  Argo/Decca, Sony Publishing, and performances on television including "Late

12  Night with Conan O'Brien."  I also have extensive experience as a musician,

13  recording engineer and producer at premier studios in Philadelphia, New York and

14  Los Angeles.   My resume is attached hereto as Exhibit 1.

15      5.      I have also been a professor of music on the University level for 17

16  years, beginning in 1999, the year that I graduated Summa Cum Laude from

17  Temple University's esteemed Esther Boyer College of Music. I have taught music

18  theory, ear training, styles and analysis, improvisation, pedagogy, private lessons

19  and have coached large and small ensembles in multiple genres.  I am currently an

20  Adjunct Assistant Professor on the faculty of The University of the Arts where I

21  have been teaching since 2006.

22                             ***STAIRWAY TO HEAVEN***

23              **Familiarity with Led Zeppelin and Stairway to Heaven**

24      6.      I obtained my first copy of "Led Zeppelin IV," the album that contains

25  *Stairway to Heaven* at the age of 10.  Since then I have listened to the album

26  countless times. *Stairway to Heaven* was an unavoidable staple on FM radio and

27  my turntable throughout my formative years.  Despite my lifelong admiration for

28  Led Zeppelin I must admit that the revelations of their unattributed "borrowing" of

                                            2

Case No. 15-cv-03462 RGK (AGRx)          DECLARATION OF ERIK JOHNSON IN OPPOSITION TO
                                         DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1  lyrics and music from prior artists is disappointing and alarming. *Whole Lotta*

2  *Love*, *Dazed and Confused* and *Babe I'm Gonna Leave You* are just a few of the

3  well-known examples of this unfortunate practice. However, to this musician, the

4  most egregious of these violations is the lifting of substantial musical information

5  from *Taurus* and its repurposing in the most iconic portions of *Stairway to Heaven*.

**Analysis**

7      7.     *Stairway to Heaven* begins with one of the most iconic musical

8  introductions in the history of popular music. The arpeggiated guitar chord

9  sequence in the introduction, which also underlies parts of the verses, is arguably

10 the primary defining musical element of the entire recording and composition, even

11 when considered in the context of the extended and complex form of the entire

12 song. As the song progresses the musical elements begin to stray from the initial

13 statement, eventually abandoning the distinct arpeggiated guitar. Despite this fact

14 the initial guitar arpeggios are certainly the "Name That Tune" part of the

15 recording, surest to lead to a positive identification of the song.

**Recording Process**

17     8.     In the reconstruction of *Stairway to Heaven* I was tasked with

18 identifying and re- creating the exact electric bass, drum set and electric piano parts

19 as played on the original recording. I recorded each instrument individually,

20 faithfully recreating each instruments' parts. Great care was taken to capture tones,

21 articulations, dynamics and overall performances that mimicked those contained on

22 the original recording. Performances were executed while listening to the original

23 Stairway to Heaven recording for reference.

24 **Comparative Analysis of Original *Stairway to Heaven* to Re-Recorded**

25 **Stairway to Heaven**

26     9.     In my opinion, the performances on the reconstruction of Stairway to

27 Heaven are virtually identical to the original. Every nuance was considered and

28 analyzed in an effort to impart not only the pure musical information but also the *je*

3

1    *ne sais quoi* that gives *Stairway to Heaven* its particular character and mood.  If the

2    re-creation and the original are synchronized, a simple A-B comparison will

3    confirm these assertions. Furthermore, I incorporate by reference the audio files

4    which constitute the re-recording of Taurus and Stairway to Heaven, both of which

5    I was heavily involved in creating. Even the most discriminating listener will agree

6    that these are faithful re-creations, held to the highest level of professional musical

7    certainty.

8    ***TAURUS***

9    **Familiarity with Spirit and Taurus**

10        10.   As a performing and recording musician for nearly 40 years I have had

11    occasion to listen to a staggering amount of music. Over the course of my career I

12    have become somewhat familiar with the music of "Spirit," especially the selection

13    *Taurus*, largely due to its undeniable similarity to *Stairway to Heaven*.  I am now

14    especially familiar with every detail of the recording, having transcribed it note for

15    note.

16    **Analysis**

17        11.   After a rubato introduction the substantial portion of *Taurus* begins

18    with an arpeggiated acoustic guitar. The initial musical statement is then repeated.

19    What follows is a pseudo-baroque cornucopia of guitar, harpsichord, atmospheric

20    percussion and strings.

21    **Recording Process**

22        12.   I was responsible for re-creating the harpsichord, strings and

23    percussion. We took great care to listen to the original recording through various

24    monitoring sources to obtain the clearest possible audio image of the recorded

25    content. We then proceeded to perform the individual parts, one at a time, while

26    listening to the original recording for reference.

27    **Comparative Analysis of Original Taurus to Re-Recorded *Taurus***

28        13.   The re-creation of Taurus is virtually identical to the original.

4

Case No. 15-cv-03462 RGK (AGRx)   DECLARATION OF ERIK JOHNSON IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1 Production values, instrumentation and performances were identified and analyzed,
2 allowing for a faithful reproduction of the original recording.

3 <u>COMPARISON OF *TAURUS* AND *STAIRWAY TO HEAVEN*</u>

4     14.    The guitar introduction of *Stairway to Heaven* is, in mood, tempo and
5 specific pitch information, strikingly similar, and in many ways, identical to the
6 arpeggiated guitar part in *Taurus*.  In my opinion, this opening guitar part for
7 *Stairway to Heaven* is its calling card. The same is true for the arpeggiated guitar in
8 Taurus. Therefore, in my opinion, the primary identifying element for *Stairway to*
9 *Heaven* is, in every relevant manner, a near replica of the arpeggiated guitar in
10 *Taurus*, also its primary musical element.

11     15.    Additionally, the first three pitches of the vocal melody of *Stairway to*
12 *Heaven* that correspond to the lyric "There's a la[dy]"are identical to the first three
13 notes of the harpsichord part in *Taurus*, despite being offset rhythmically by one
14 beat. As the melody of *Stairway to Heaven* progresses other striking similarities
15 emerge:

16     &bull;   The words "all that glitt[ers]" in *Stairway to Heaven* are
17         melodically identical to the corresponding harpsichord part
18         that is played during the equivalent part of the phrase in
19         *Taurus*.

20     &bull;   Equivalent similarities are found during the remainder of Part
21         I in both A and B vocal parts (words and portions of words in
22         bold italics indicate melodies from *Stairway to Heaven* that
23         correspond to the harpsichord melodies in *Taurus*):

24

25        ***There's a la***dy who's sure ***all that gli***tters is
26        is gold And she's buying a stairway to heaven.
27        ***When she gets*** there she knows,***if the stores*** are
28               all closed

5

| Case No. 15-cv-03462 RGK (AGRx) | DECLARATION OF ERIK JOHNSON IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| --- | --- |

1   With a word she can get what she came for.

2   Ooh, ooh, and she's buying a stairway to heaven.

3   There's a sign on the wall **but she wants** to be

4   sure 'Cause you know sometimes words have two

5   meanings. **In a tree** by the brook, **there's a**

6   **song**bird who sings, Sometimes all of our

7   thoughts are misgiven.

8

9   Ooh, it makes me

10   wonder, Ooh, it makes

11   me wonder.

12

13   **There's a feel**ing I get **when I look** to the

14   west, And my spirit is crying for leaving.

15   **In my thoughts** I have seen **rings of smoke**

16   through the trees,

17   And the voices of those who stand looking.

18

19   Ooh, it makes me

20   wonder, Ooh, it really

21   makes me wonder.

22

23   **And it's whis**pered that soon, **if we all** call

24   the tune, Then the piper will lead us to

25   reason.

26

27   **And a new day** will dawn **for those** who stand

28   long,

6

| Case No. 15-cv-03462 RGK (AGRx) | DECLARATION OF ERIK JOHNSON IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| --- | --- |

1   directly mined from the harpsichord part in *Taurus*.

2      20.   All my efforts in listening, analyzing, and performing *Stairway to*

3  *Heaven* and *Taurus*, including the transcription, was all done to a reasonable degree

4  of professional musical certainty.

6     *Having completed reviewing the expert reports of Ferrara and Mathes I am*

7     *compelled to respond to a number of issues, some methodological, some factual*

8     *and some simple matters of interpretation. Some of the assertions, especially in*

9     *the case of Lawrence Ferrara, are not only factually inaccurate but*

10    *disingenuous in their presentation. I will address the objectionable statements*

11    *and claims below.*

13      **REBUTTAL TO LAWRENCE FERRARRA'S EXPERT REPORT**

14      21.   Many of Ferrara's claims about the supposed lack of similarity

15  between *Taurus* and *Stairway* employ comparisons of the **deposit copy** of *Taurus*

16  with **transcriptions of the recording** of *Stairway* from "Led Zeppelin IV." This is

17  a simple "apples to oranges" fallacy of comparison.  When the pure musical data as

18  consideration in context of its compositional musical elements (apples to apples)

19  the introduction of *Taurus* is not only **strikingly similar** to *Stairway* but, for the

20  purposes of this discussion, nearly identical for three crucial measures and

21  **strikingly similar** for six of eight of the initial measures, which are iterated

22  numerous times.

23      22.   These opening statements are more than mere introductions.  They are

24  crucial, indispensable calling cards for each of the pieces. I would argue that if the

25  first eight measures of both *Taurus* and *Stairway* are not only *strikingly similar* but

26  *essential to the identification* of each piece one must at least submit that these

27  portions bear not only *structural* but *essential* similarity. Analogously, if two homes

28  are built with identical foyers and great rooms on the first floor, one would likely

8

1          And the forests will echo with laughter.

2

3    16.    Of the musical parts I was asked to replicate from *Stairway to Heaven*,

4    none were recognized as far as songwriting credit is concerned. The electric bass

5    and keyboard parts, created and performed by John Paul Jones, were not, insofar as

6    I am aware, included in the songwriting credit. The same is true for the drum set

7    part, created and performed by John Bonham.

8    17.    In the case of *Stairway to Heaven*, Jimmy Page received the

9    songwriting credit for the instrumental portion exclusively, and that his parts

10   constitute the only creditable instrumental portions of the musical composition.

11   This fact is reflected in the final crediting of Page and Plant as the songwriters,

12   despite the substantial contributions of the other musicians. Therefore, the

13   inevitable conclusion is that the signature arpeggiated guitar part that precedes any

14   other accompaniment constitutes the most significant portion of the material that is

15   germane to the creditable instrumental material as far as any copyright is

16   concerned. Additionally, significant portions of the melodic content of *Stairway to*

17   *Heaven* correspond almost exactly and, at times, exactly, with the harpsichord parts

18   from *Taurus*, further calling into question the originality of *Stairway to Heaven*.

19   18.    If *Stairway to Heaven* is stripped down to the bare elements that

20   received songwriting credit, the listener is left with two parts:

21            o   an arpeggiated guitar part, the signature element, which is

22                substantially the same as the signature guitar element in *Taurus*;

23            o   a vocal melody that bears significant resemblance to the

24                harpsichord in *Taurus*, followed by a series of riffs, chord

25                progressions and solos.

26   19.    The most essential, elemental portion of *Stairway to Heaven* is, for any

27   practical purposes, nearly identical to the equivalent instrumental portion of *Taurus*.

28   Furthermore, many of the melodies found in *Stairway to Heaven* appear to be

7

1   describe them as bearing significant structural similarities, even if the upstairs

2   bed/bath configurations are vastly different.

3        23.    Furthermore, the first, second, third, and seventh, eighth and ninth

4   pitches of the melody of *Stairway* correspond exactly to the harpsichord part in both

5   the deposit copy and the recording of *Taurus*, although the first three notes of the

6   melody of *Stairway* occur one beat earlier, a minor point in the overall context of

7   this comparison.

8        24.    Moreover, I strongly object to the idea that extrinsic evidence is

9   somehow limited to this kind of pseudo-mathematical reduction. In the case of

10   comparing *Taurus* and *Stairway* it is imperative to consider the combination of all

11   of the features of the contested musical territory, including the following obvious

12   commonalities between the two compositions and recordings, specifically the

13   crucial "name that tune" 8 bar initial musical statement:

14       • Many common pitches

15       • Same key

16       • Strikingly similar rhythm
          • Nearly identical articulation

17       • Strikingly similar mood/stylistic qualities

18       • Nearly identical tempo

19       • Identical primary instrumentation ( both crucial parts played on
           acoustic guitar)

20       • Similar supplemental instrumentation (flute on *Taurus,* recorders on
           *Stairway)*

21

22       • Identical phrase length of crucial initial eight-bar statements
          • Similar sonic landscape, crucial to the perception of both pieces.

23

24        25.    Ferrara oversimplifies the commonalities between *Taurus* and

25   *Stairway* by attributing any similarities to the mutual use of the "minor line cliché,"

26   words used to describe a particular musical device found in music for centuries.

27   While both *Taurus* and *Stairway* exhibit features that can partially be described in

28   this fashion, this common element represents only a small portion of the elements

9

1    that *Stairway* borrows (steals) from *Taurus*. I will provide further clarification

2    below.

3         26.    Ferrara cites a number of musical examples of the "minor line cliché"

4    for the purpose of devaluing its compositional significance in *Taurus* and *Stairway*

5    by way of showing that it is a device with extensive historical precedent. However,

6    most of the examples cited in his numerous visual exhibits are in different keys

7    from both *Taurus* and *Stairway* (G minor, E minor, G minor, G major/E minor, Eb

8    major, C major, C minor). "What Are You Doing the Rest of Your Life" by Michel

9    LeGrand happens to be written in A minor but shares only the similarity of a

10   descending bass line with *Taurus* and *Stairway*. Additionally, the rhythmic feels,

11   tempo and, in a few cases, even the meter of nearly all of the visual exhibits are

12   vastly different from *Taurus* and *Stairway*.

13        27.    Ferrara states in a footnote that "*In keeping with musicological*

14   *practices, all of the transcriptions of works in minor keys are presented in the key of*

15   *A minor to facilitate comparisons.*" On its face this seems an innocuous gesture

16   intended for the reader's convenience and it may indeed have been intended as

17   such. However, to this writer, composers choose particular keys based upon the

18   particular characteristics of specific keys. If key was of no import, the chord

19   structure of compositions would be written numerically to indicate nothing more

20   than chord-to-chord relationships, leaving the final decision of a particular key to a

21   performer or conductor (Ferrara's visual exhibit "E" would thusly be titled "Prelude

22   in Whichever Minor Key One Prefers", by Frederic Chopin).

23        28.    To further elucidate the incongruity of the rhythms found in *Taurus*

24   and *Stairway* versus the visual and musical exhibits provided by Ferrara one need

25   not search terribly far. Here are *just a few* examples (BPM = beats per minute, a

26   standard method of tempo identification):

27

| **First portion of *Taurus* and *Stairway*:** | **Slow, straight eighth note feel with** |
|---|---|

28

---

10

|  | **pseudo-Baroque features, 70-73 BPM** |
|---|---|
| *It Don't Mean a Thing (If it Ain't Got That Swing) (Ferrara Visual Exhibit H)* | Fast swing |
| *One Note Samba (Ferrara Visual Exhibit K)* | Samba |
| *Chim Chim Cher-ee (Ferrara Audio Exhibits, Track 04)* | Fast Waltz at approximately 212 BPM |
| *How Insensitive (Ferrara Audio Exhibits, Track 05)* | Bossa Nova at 120 BPM |
| *My Funny Valentine (Ferrara Audio Exhibits, Track 09* | Jazz Ballad at 70 BPM |

*Note: Tracks 06, 07 and 08 ("Walkin' My Baby Back Home", "More" and "Spring Is Near" respectively) did not contain the selections as labeled.*

29.    Ferrara also claims that no significant structural similarities exist between *Taurus* and *Stairway*. While this might be true when considering the entirety of each composition, the initial eight-measure statements bear something *beyond* striking similarities to each other.

30.    Ferrara also asserts that no significant harmonic similarities exist between *Taurus* and *Stairway,* yet the lion's share of his arguments are based upon ***a harmonic similarity***, this mythical "minor line cliché." If no significant harmonic similarities exist then why present a panoply of visual and audio evidence of examples of harmonic information that is common to the crucial, disputed portions of *Taurus* and *Stairway?* This writer finds it baffling. Ferrara asserts that arpeggios and minor line clichés are simply commonplace musical devices, freely available to all with no strings attached and without preferential usage rights. This is preposterous in the context I've presented above and will continue to present below.

11

31.     Ferrara claims that no significant rhythmic similarities exist between *Taurus* and *Stairway*. He cites the deposit copy of *Taurus* and the fact that he was required to "halve the note values" to properly compare the two pieces. It is at this point that I detect a hint of disingenuousness. Ferrara cites the transcription of the *recording* of *Stairway* numerous times throughout his report but seems only to acknowledge the deposit copy of *Taurus* while ignoring the recording. If we are seeking a true comparison of facts it is only fair to compare like items, i.e. the *recording* to *recording* or *deposit copy* to *deposit copy*. I will proceed on this basis.

32.     Despite the supposed notational issue (lacking in completeness) of the *Taurus* deposit copy (a niggling objection) a simple side-by-side analysis of the musical composition elements done be listening and analyzing of both these selections exposes Ferrara's argument for what it is: obfuscation through minutia. It must be noted that defendants nor their experts are not confused as to the proper comparison of the musical elements to compare, consider, and analyze. It is the acoustic guitar musical composition that must be compared in the two works. It should be noted that defendants expert (Mathes) took the time to play and compare this seminal parts to both works and produced them as audio exhibits in his initial reports (Mathes Audio Excerpt 1 Stairway Guitar Parts – Contrast). They are nearly identical rhythmically in much the same way that an English yard is equal to 0.9144 meters. It is a difference of nomenclature, not substance—or confusion of what is being compared.

33.     Ferrara states that on the basis of a quantitative analysis, "2.23% of the music in 'Stairway' embodies music that is similar, although not meaningfully similar, to 'Taurus'." I have already partially explained why, in my opinion, Ferrara grossly underestimates the degree and significance of similarity between *Taurus* and *Stairway*. From the perspective of qualitative analysis he submits that there are "grounds for *increasing* the 2.23% qualitative value of the descending line of notes in 'Stairway' that is similar to 'Taurus'." He then proceeds to explain that the

12

DECLARATION OF ERIK JOHNSON IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1  lyrical composition is not quantified here, etc., thereby skewing, presumably in

2  favor of his argument, the data.

3      34.    In attachment F. 2., paragraph 7., Ferrara explains that his quantitative

4  analysis was easily accomplished by analyzing the score that he created with

5  "Sibelius," a music notation program. The result of this analysis is the mystifying

6  2.23% similarity metric which, according to my calculation, equals 9.5667 seconds

7  of music.  Ferrara's grossly undersized percentage still yields an impressive *nearly*

8  *10 seconds* of what even he would describe as *similar material.*  Furthermore,

9  Ferrara states in attachment F. 1., paragraph 2 that 18 measures in *Stairway* out of

10  166 contain similarities to *Taurus,* which is equivalent to 10.8% of the composition.

11  While Ferrara does also point out that these measures also contain differences, he

12  consistently underestimates and downplays the obvious similarities between the two

13  pieces throughout his report.

14      35.    As far as I understand, "Sibelius" does not offer the ability to quantify

15  all of the elements listed above. As a result I find the mathematical reduction

16  supplied by Mr. Ferrara to be of little or no value or relevance.

17      36.    In the section of his report that follows, Ferrara digs into the qualitative

18  aspect of his analysis and states the following:

19      *"Some parts in a musical composition can be more qualitatively valuable*

20      *than other music in the same composition. For example, if the music in*

21      *"Stairway" that is similar to "Taurus" includes one or more of the most*

22      *memorable parts of "Stairway", such a qualitative finding would increase*

23      *the purely 2.23% quantitative value."*

24  The first eight measures of *Stairway* constitute eight of the most recognizable

25  measures of rock music *ever written or recorded.* I believe this fact helps to meet

26  Mr. Ferrara's burden of "if" as stated above.  To refer to these crucial eight

27  measures as merely introductory material ignores not only obvious, but subjective,

28  perception, but also testable extrinsic qualities as presented musically in the

13

Case No. 15-cv-03462 RGK (AGRx)        DECLARATION OF ERIK JOHNSON IN OPPOSITION TO
                                     DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1    aggregate.

2        37.    Ferrara states at least eight different times that the fifth bar of *Taurus*

3    contains only the pitch of "f" which is untrue by either of his arbitrarily cited

4    benchmarks, the deposit copy or the recording. Since the *Stairway* transcription is

5    so frequently cited by Mr. Ferrara it is fair to use the recording of *Taurus* for

6    comparison. With that in mind, Ferrara's assessment of the fifth bar of *Taurus* is

7    incorrect.

8        38.    As stated above, Ferrara consistently compares the deposit copy of

9    *Taurus* to the *transcription* of *Stairway*. It is important to note that the deposit copy

10   of *Stairway* bears little resemblance to any transcriptions published after the fact.

11   For example, *MUSICAL EXAMPLE 8* from ATTACHMENT B compares the

12   deposit copy of *Taurus* in a staff directly above a transcription of *Stairway*. This is

13   not only unacceptable but deceiving.

14       Here are a few more examples of spurious comparisons and assertions:

15   - "How Insensitive" (Audio Exhibit 1, Track 05) contains a descending
16       bass line but markedly different chords
17   - "Michelle," "Music to Watch Girls Go By" and "Summer Rain"(Audio
         Exhibit 1, Tracks 12, 13 and 14, respectively) contain a minor line
18       cliché but no other similarities
19   - In ATTACHMENT E. 3., paragraph 5, Ferrara refers to "memorable
         guitar fanfares" that occur during the bridge and guitar solo of
20       *Stairway*. Surely he must recognize that the opening eight measures of
21       *Stairway* constitute the *most* memorable guitar part of the entire
         composition and that it is this portion that bears striking similarity to
22       *Taurus*.

23       39.    Ferrara opens the door to comparisons with the <u>recording</u> of *Taurus*,

24   not simply the deposit copy by consistently comparing the deposit copy to *Stairway*

25   <u>transcriptions</u>, which amount to notated representations of the actual recording. By

26   this standard many of Ferrara's claims are patently false. Inconsistencies and

27   inaccuracies plague this report. Despite the distraction of an onslaught of musical

28

14

1    citations, exhibits and examples, many of Mr. Ferrara's assertions are questionable;

2    some are, to this writer, simply false.

3

4    **REBUTTAL TO ROBERT MATHES EXPERT REPORT**

5    40.    Mathes states in his report that in preparing for his report he "carefully

6    listened to and studied the recording of *Taurus...*" He also submitted an audio

7    example of him performing *Taurus*. While he may have mostly abided by a literal

8    interpretation of the deposit copy of the written music he obviously ignored the

9    recording he so carefully studied. The performance barely halfway corresponds to

10   the recording of *Taurus*. The rhythm is incorrect as compared to the recording.

11   Furthermore, Mathes performs a transcription of the **recording** of *Stairway*, so a

12   fair comparison must include **not** a performance of the deposit copy of *Taurus* but a

13   rendering of the guitar part as **performed** on the recording. There is absolutely no

14   dispute as to what is being referred and what musical compositional elements need

15   to be compared given that defendants' expert Mathes has already performed the

16   relevant parts in his initial report. (Mathes Audio Excerpt 1 Stairway Guitar Parts –

17   Contrast). For Mathes to submit a different audio recording for purposes of the

18   Summary Judgment motion is telling.

19   41.    (I will not address the minor line cliché in my assessment of Mathes'

20   report as I have adequately addressed said issues in my comments on the report

21   above submitted by Mr. Ferrara.)

22   42.    Mathes makes a point of distinguishing the guitar part in *Taurus* by

23   referring to a "cluster" of notes that isn't present in *Stairway*. While this might be

24   partially true, he ignores the obvious and numerous striking similarities that exist in

25   favor of hyper-focusing on one small musical element.

26   43.    In summary, Mr. Mathes clearly expresses his admiration for Led

27   Zeppelin but does not make a compelling argument in support of his opinions.

28

15

Case No. 15-cv-03462 RGK (AGRx)        DECLARATION OF ERIK JOHNSON IN OPPOSITION TO
                                       DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1    Executed this 7th day of March, 2016, at Philadelphia, Pennsylvania.

2    I declare under penalty of perjury under the laws of the United States of

3    America that the foregoing is true and correct.

4                                    /s/ Erik Johnson
                                      Erik Johnson
5

6    *** See attachments including Audio and Visual Files ***

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16

Case No. 15-cv-03462 RGK (AGRx)          DECLARATION OF ERIK JOHNSON IN OPPOSITION TO
                                         DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**AUDIO EXHIBITS**

**Audio Exhibit 1:**
**Dazed and Confused by Led Zeppelin**

**Audio Exhibit 2:**
**Dazed and Confused by Jack Holmes (1967)**

**Audio Exhibit 3:**
**Whole Lotta Love by Led Zeppelin**

**Audio Exhibit 4:**
**Muddy Waters' You Need Love (1962) (10 seconds – 28 seconds)**

**Audio Exhibit 5:**
**The Small Faces' You Need Loving (1966) (25 seconds – 48 seconds)**

**Audio Exhibit 6:**
**Live performance of Led Zeppelin playing Fresh Garbage 1-10-1969**


**AUDIO EXHIBITS – COMPARISON AUDIO**

**Audio Exhibit 7:**
**Stairway to Heaven (0 seconds – 25 seconds)**

**Audio Exhibit 8:**
**Taurus (45 seconds – 1 minute, 13 seconds)**

**Audio Exhibit 9:**
**8 measures of Stairway from note 1 of the acoustic guitar, repeated multiple times**

**Audio Exhibit 10:**
**Part A:**
**8 Measures of Taurus from note 1 of the acoustic guitar, repeated multiple times**

**Audio Exhibit 11:**
**8 measures of Stairway and Taurus played together from note 1 of the acoustic guitar, repeated multiple times**

1

**AUDIO EXHIBITS - RE-RECORDING OF STAIRWAY TO HEAVEN**

2

| **Audio Exhibit 12:** | **Acoustic Guitar** |
|---|---|
| **Audio Exhibit 13:** | **Bass** |
| **Audio Exhibit 14:** | **Drums** |
| **Audio Exhibit 15:** | **Electric 12 Strings** |
| **Audio Exhibit 16:** | **Electric Piano** |
| **Audio Exhibit 17:** | **End Guitar** |
| **Audio Exhibit 18:** | **Les Pauls** |
| **Audio Exhibit 19:** | **Recorders** |
| **Audio Exhibit 20:** | **Slide** |
| **Audio Exhibit 21:** | **Solo** |

3

4

5

6

7

8

9

10

11

**AUDIO EXHIBITS - RE-RECORDING OF TAURUS**

12

| **Audio Exhibit 22:** | **Acoustic Guitar** |
|---|---|
| **Audio Exhibit 23:** | **Cello 1** |
| **Audio Exhibit 24:** | **Cello 2** |
| **Audio Exhibit 25:** | **Cymbal** |
| **Audio Exhibit 26:** | **Flute** |
| **Audio Exhibit 27:** | **Harpsichord** |
| **Audio Exhibit 28:** | **String Bass** |
| **Audio Exhibit 29:** | **Viola** |
| **Audio Exhibit 30:** | **Violins** |

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**AUDIO EXHIBITS – ALEXANDER STEWART**

| | |
|---|---|
| **Audio Exhibit 31:** | **(Previously: Audio Exhibit A)** |
| **"Stairway to Heaven" (album)** | |
| | |
| **Audio Exhibit 32:** | **(Previously: Audio Exhibit B)** |
| **"Taurus" (album)** | |
| | |
| **Audio Exhibit 33:** | **(Previously: Audio Exhibit E)** |
| **Taurus Live at Ash Grove (7/10/1967)** | |
| | |
| **Audio Exhibit 34:** | **(Previously: Audio Exhibit C)** |
| **Taurus Live at Ash Grove (7/31/1967)** | |
| | |
| **Audio Exhibit 35:** | **(Previously: Audio Exhibit D)** |
| **Taurus Live at Ash Grove (8/8/1967)** | |
| | |
| **Audio Exhibit 36:** | **(Previously: Audio Exhibit H)** |
| **Taurus Demo Recording (8/1967)** | |
| | |
| **Audio Exhibit 37:** | **(Previously: Audio Exhibit F)** |
| **Taurus Live at Kaleidoscope (4/5/1968)** | |
| | |
| **Audio Exhibit 38:** | **(Previously: Audio Exhibit G)** |
| **Taurus Live at The Time Coast** | |
| | |
| **Audio Exhibit 39:** | **(Previously: Audio Exhibit H)** |
| **Taurus Live at Acoustic (1996)** | |
| | |
| **Audio Exhibit 40:** | **(Previously: Audio Exhibit J)** |
| **Combination – Acoustic Taurus Synced to STH SR – Part A, played over Master SR of STH** | |
| | |
| **Audio Exhibit 41:** | **(Previously: Audio Exhibit K)** |
| **Acoustic Taurus Synced to Master SR of STH – Part A** | |
| | |
| **Audio Exhibit 42:** | **(Previously: Audio Exhibit L)** |
| **Stairway Acoustic – Part A:** | |
| | |
| **Audio Exhibit 43:** | **(Previously: Audio Exhibit M)** |
| **Taurus Acoustic – Part A:** | |
| | |
| **Audio Exhibit 44:** | **(Previously: Audio Exhibit N)** |
| **Combination – Acoustic Taurus Synced to Master SR of STH (Part A), played over Acoustic Stairway (Part A)** | |

1

**AUDIO EXHIBITS – REBUTTAL OF MATHES**

2
**Audio Exhibit 45:**       **Mathes Audio Exhibit Tempo Matched - Stairway**
**Audio Exhibit 46:**       **Mathes Audio Exhibit Tempo Matched - Taurus**

3
**Audio Exhibit 47:**       **Mathes Audio Exhibit Tempo Matched - STH & Taurus**

4

5

6

**VIDEO EXHIBITS – DEMONSTRATIVE GUITAR PERFORMANCE**

7
**Video Exhibit 1:**       **Taurus – Left Hand**

8
**Video Exhibit 2:**       **Taurus – Right Hand**
**Video Exhibit 3:**       **Stairway to Heaven – Left Hand**

9
**Video Exhibit 4:**       **Stairway to Heaven – Right Hand**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**02219**

180 Thornton Road, Thornton, PA 19373
610-357-4239 ▪ johnsondrums@gmail.com

**ERIK JOHNSON,** *Professor of Music, Professional Musician*

**PROFILE**   Professional studio/performing musician, producer, composer/arranger, university professor. 30+ years performance/recording experience, 17 years university-level instruction at prestigious schools of music.

**PROFESSIONAL AND PEDAGOGICAL EXPERIENCE**

### Studio Musician
- First-call studio drummer in Philadelphia since 1990.
- Recorded hundreds of albums for labels such as Interscope Records, Sony, Argo and many others.
- Extensive experience as a producer and engineer.
- Recorded and produced albums in New York, Los Angeles and Philadelphia.
- Albums featuring world-class jazz musicians including Tim Hagans, Gary Bartz, Jef Lee Johnson and countless others.
- Classical/experimental percussionist for renowned composer Robert Moran on Argo/Decca Records

### University Professor
- Diverse experience teaching courses in music theory, ear training, musicianship, improvisation, styles and analysis, historical analysis, pedagogy and performance.

### Performing Musician
- Countless performances with world-class musicians in jazz, folk, rock, hip hop and R+B
- Performances on radio, both local stations across country and nationally syndicated shows such as *World Café with David Dye* and *Mountain Stage*
- Television performances including *Late Night with Conan O'Brien*

**WORK EXPERIENCE**

**Adjunct Assistant Professor,** *University of the Arts, Philadelphia, Pennsylvania, 2006-present*
- Extensive experience teaching the following areas of study:
  - Transcription and Analysis
  - Jazz and Popular Styles and Historical Analysis
  - Jazz Improvisation
  - Ear Training
  - Music Theory
  - Jazz and Popular Performance
  - Master's level Music Pedagogy
  - Large and Small ensembles

- Extensive lecturing and masterclasses on jazz and popular music, comparative listening, philosophy of music, other topics

**02220**

1

**Adjunct Faculty,** *Temple University, 1999-2006*
- Extensive experience teaching the following areas of study:
  - Transcription and Analysis
  - Jazz Styles and Historical Analysis
  - Jazz Improvisation
  - Aural Skills
  - Jazz Theory and Practice
  - Jazz Performance
  - Large and Small ensembles
- Extensive lecturing and masterclasses on jazz, comparative listening, philosophy of music, other topics

**2000-Present:**
- *House drummer at Morningstar Studios for Grammy Award-Winning producer Glenn Barratt*
  - *Recorded hundreds of albums in genres ranging from Gospel to Singer/Songwriter to Metal*
  - *Recorded as a drummer, bassist and vocalist*
  - *Recorded music for Fox Sports, Speed Network, ESPN, NASCAR, others*
- *Drummer for MAJA Studios*
  - *Recorded numerous critically-acclaimed jazz and pop albums*
  - *Drums for multiple documentary films*
  - *Drum set performance with the Philadelphia Orchestra for a piece commissioned by the National Park Service*
  - *Performed on countless jingles and other commercial work*
- *House drummer at Barn Studios for producer Derek Chafin*
- *Highly sought-after multi-instrumentalist in Philadelphia and New York with a rigorous performing and recording schedule*
- *Owner/engineer/producer at High Hill Studio, Thornton, PA*

**1999-2003:**
- Drummer in critically acclaimed *Trio of Many:*
  - Recordings and performances with *Gary Bartz, George Garzone, Tim Hagans, Jack Walrath, Terrell Stafford* and many others.

**1993-1998:**
- Drummer/producer with *Interscope Records* artist *Huffamoose,* album charted to #31 on the Alternative charts
- Toured extensively with *Huffamoose* throughout the contiguous 48 states and Alaska, performing on hundreds of radio and television shows

**1990-1999**
- Drummer with PBS favorite Susan Warner, Jim Boggia (solo artist, *Fab Faux*) and dozens of others

**EDUCATION**

**B.F.A.,** ***Summa Cum Laude,*** **1999,** Temple University, Philadelphia, PA

Case 2:15-cv-03462-RGK-AGR   Document 154-5   Filed 03/30/16   Page 24 of 32   Page ID
#:3877

# Taurus Transcription

## Score

ERIK JOHNSON, B.F.A.
Adjunct Assistant Professor
University of the Arts
Philadelphia, PA

:45

A Adagio ♩= 69

Acoustic Guitar

Harpsichord

Violin 1

Violin 2

Viola

Cello

Acoustic Bass

Synthesizer



Case 2:15-cv-03462-RGK-AGR   Document 154-5   Filed 03/30/16   Page 26 of 32   Page ID #:5872





Case 2:15-cv-03462-RGK-AGR   Document 154-5   Filed 03/30/16   Page 28 of 32   Page ID #:5801







Case 2:15-cv-03462-RGK-AGR   Document 154-5   Filed 03/30/16   Page 31 of 32   Page ID #:3884



1       Executed this 7th day of March, 2016, at Philadelphia, Pennsylvania.

2       I declare under penalty of perjury under the laws of the United States of

3  America that the foregoing is true and correct.

4                              /s/ *Erik Johnson*

5                              Erik Johnson

6  **\*\*\* See attachments including Audio and Visual Files \*\*\***

Case No. 15-cv-03462 RGK (AGRx)      DECLARATION OF ERIK JOHNSON IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1   Francis Malofiy, Esq.
2   Francis Alexander, LLC
    280 N. Providence Rd. | Suite 105
3   Media, PA 19063
4   T: (215) 500-1000; F: (215) 500-1005
    E: francis@francisalexander.com
5   *Attorney for Plaintiff*

6
    Glen L. Kulik, Esq. (SBN 082170)
7   Kulik Gottesman & Siegel LLP
8   15303 Ventura Blvd., Suite 1400
    Sherman Oaks, CA 91403
9   T: (310) 557-9200; F: (310) 557-0224
    E: gkulik@kgslaw.com
10  *Attorney for Plaintiff*

11

12              **UNITED STATES DISTRICT COURT**

13          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

14

15  MICHAEL SKIDMORE, as Trustee for       Case No. 15-cv-03462 RGK (AGRx)
    the RANDY CRAIG WOLFE TRUST,
16                                          Hon. R. Gary Klausner
17                  Plaintiff,
                                            **DECLARATION OF KEVIN
18          v.                              HANSON IN OPPOSITION TO
                                            DEFENDANTS' MOTION FOR
19                                          SUMMARY JUDGMENT OR IN
    LED ZEPPELIN; JAMES PATRICK            THE ALTERNATIVE, PARTIAL
20  PAGE; ROBERT ANTHONY PLANT;           SUMMARY JUDGMENT**
    JOHN PAUL JONES; SUPER HYPE
21  PUBLISHING, INC.; WARNER MUSIC
22  GROUP CORP., Parent of                 **Date:  March 28, 2016**
    WARNER/CHAPPELL MUSIC, INC.;          **Time: 9:00 a.m.**
23  ATLANTIC RECORDING                     **Room:**
24  CORPORATION; RHINO
    ENTERTAINMENT COMPANY,
25
26                  Defendants.
27
28

    Case No. 15-cv-03462 RGK (AGRx)        DECLARATION OF KEVIN HANSON IN OPPOSITION TO
                                           DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

                            **02231**

## DECLARATION OF KEVIN HANSON

I, Kevin Hanson, declare as follows;

1.    I have been retained as an expert in this case to listen to *Taurus* and *Stairway to Heaven*, to perform both pieces as a master musician and execute the pieces as per their original recordings. I have personal knowledge of the facts recited it this declaration and if called as a witness could testify competently to such facts.

2.    I am an accomplished musician, proficient on electric and acoustic guitars, bass, drums, keyboards and vocals. I was engaged to play the following instruments on the *Taurus* and *Stairway to Heaven* re-recordings:

- Electric 6 and 12 string guitars
- Acoustic guitars
- Recorder parts via MIDI.

I was also asked to analyze both Taurus and Stairway to Heaven from both performance and production perspectives.

## QUALIFICATIONS

3.    I am a guitarist, songwriter, producer, teacher, and university professor with 35 years of playing experience and 25 years of teaching experience. I have performed and recorded extensively with both major label and independent bands, toured throughout the US and internationally, and have both studied and taught the guitar on a focused, in-depth level. I have played on hundreds of both major label and independent recordings for 20 years, in genres including rock, jazz, blues, gospel, hip hop, R+B and classical. I teach university courses on songwriting and on the form and structure of songs. This requires a profound understanding of song composition, arrangement, instrumentation, production and performance.

## STAIRWAY TO HEAVEN

### Familiarity with Led Zeppelin and *Stairway to Heaven*

4.    I have heard *Stairway to Heaven* my entire life. The song was still

1

1  hugely popular in 1972, the year of my birth. Led Zeppelin's music, in particular

2  Led Zeppelin IV, was a significant part of my musical upbringing. It was played on

3  the radio, on our home stereo system and at many social functions. I began learning

4  Led Zeppelin's guitar riffs when I began playing guitar at age 10 and still use the

5  guitar parts from *Stairway to Heaven* as teaching tools and songwriting topics in my

6  current teaching positions.

7  <u>**Comparative Analysis of Original *Stairway To Heaven***</u>

8  <u>**to Re-Recorded *Stairway To Heaven***</u>

9      5.    The re-recorded version of Stairway to Heaven was performed and

10  recorded to sound identical to the original. All of the guitar parts were emulated

11  with great specificity in terms of instrumentation, sound, performance feel and

12  energy. The main theme and all of the riffs, chords, guitar solo, and other solo lines

13  are all played note-for-note in the re-recorded version, performed to a high level of

14  musical accuracy.

15  ***TAURUS***

16  **Familiarity with Spirit and Taurus**

17      6.    I first heard of the band Spirit through an article discussing the

18  similarities of the song *Taurus* and *Stairway to Heaven*. When I first heard *Taurus*,

19  I was shocked at the similarities. I am deeply acquainted with the music of Led

20  Zeppelin and, regrettably, with the multiple accusations levied at the band for their

21  habit of borrowing the music of others without properly crediting the original

22  artists. These stories are common knowledge in the music scene, with the example

23  of *Stairway to Heaven* and its remarkable similarity to *Taurus* being the most

24  notable.

25  **COMPARATIVE ANALYSIS OF TAURUS AND STAIRWAY TO HEAVEN**

26      7.    Many of the components of the initial guitar figure of Taurus are

27  virtually identical to those found in Stairway to Heaven: the key, the tempo, the

28  feel, the chord progression, the pitches and duration of the melody and the

2

Case No. 15-cv-03462 RGK (AGRx)       DECLARATION OF KEVIN HANSON IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1   instrumentation are strikingly similar and much of the two pieces are identical.

2   Knowing the history of the bands' mutual encounters, it is my opinion that the

3   similarities of the main themes, as performed on acoustic guitar, are beyond

4   coincidental.

5       8.   Taurus was written and performed in a ballad-like tempo on a steel

6   string acoustic guitar in the key of A minor, as was Stairway to Heaven.

7       9.   Taurus begins with an arpeggiated A minor figure in 8th notes on the

8   notes A, C, and E, as does Stairway to Heaven. The rhythm of the figures is

9   identical up until the last measure.

10      10.   The bass notes of the guitar figure of Taurus descend chromatically

11   from the tonic down to the b6 degree, as does Stairway to Heaven.

12      **11.**   Taurus' opening figure begins on the 4th string at the 7th fret with the

13   third finger and on the 3rd string at the 5th fret with the first finger, as does

14   Stairway to Heaven.

15      12.   Both selections are performed at virtually the same tempo with the

16   same feel, articulation and style.

17      13.   The chord progression is virtually identical for the first 5 chord

18   changes.

19      14.   The phrasing of the two figures is virtually identical. Groups of four

20   8th notes descending over five chords that finally resolve to the tonic.

21      15.   When the audio tracks of the two figures are isolated and matched at

22   the same tempo, they are almost indistinguishable. I incorporate by reference the

23   audio exhibits.

24      16.   *Taurus* and *Stairway to Heaven* are similar both from a listening

25   standpoint and from a performance standpoint. From a listening standpoint, the

26   main guitar themes of both songs are strikingly similar in tempo, key, melody,

27   melodic shape, rhythm, phrasing, instrumentation, and mood.

28      17.   From a performance standpoint, *Taurus* and *Stairway to Heaven* are

3

1   performed at a nearly identical position on the guitar fretboard. Both figures begin
2   on the same strings in the same position with the same fingerings.

3        18.    For a reasonably skilled guitarist there are many ways to play one
4   chord. For an A minor triad, there are at least 20 different inversions that are
5   common and easily accessible. When the instrument's range beyond one octave is
6   taken into consideration, this number is increased substantially. In comparing the
7   video exhibits "*Taurus* - left hand" and "*Stairway to Heaven* - left hand", one can
8   see that the triads in both examples begin in the same position in the same octave. I
9   incorporate by reference the four video exhibits of *Taurus* and *Stairway to Heaven*.

10        19.    The guitar parts that I replicated in the re-recordings of both songs did
11   receive songwriting credit, as they rightfully should, as they are both melodic
12   themes of primary importance. The verses of both songs are built around the guitar
13   parts.

14        20.    The chord progression for the main theme of STH is not uncommon. It
15   has been used in many jazz standards, show tunes, and orchestral works. The
16   following elements from Stairway to Heaven and Taurus are almost completely in
17   common:

18             o    Actual melodic material;
19             o    Rhythmic placement of the notes of the guitar part;
20             o    Nearly identical performance, in tempo, style and articulation.
21   This sets *Stairway to Heaven* apart from a song like "Chim Chim Cher-ee", which
22   does feature a chromatically descending bass line, but functions simply to move the
23   harmony beneath an entirely different melody. It is also a medium-fast waltz.
24   *Stairway to Heaven's* similarities to *Taurus* are in the actual guitar part itself, not
25   just a harmonic device. *Stairway to Heaven* also differs from what many mistakenly
26   consider to be the same chromatic descending line. A song such as "*Ice Cream*
27   *Dream*" by The Cartoones does not follow this chromatic bass line. The first
28   interval is a whole step, which by definition is not chromatic. To compare the main

4

Case No. 15-cv-03462 RGK (AGRx)         DECLARATION OF KEVIN HANSON IN OPPOSITION TO
                                   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1　　guitar theme of *Stairway to Heaven* to a song like Davey Graham's version of "*Cry*

2　　*Me a River*" is also not a proper comparison. Though the chromatic bass movement

3　　is intact for a brief moment, Graham's usage of it is a loose interpretation of the

4　　original vocal melody. The brief section in question is also performed in a different

5　　time signature, 12/8, which gives it a completely different feel from *Taurus* or

6　　*Stairway to Heaven*.

7　　　　21.　　To further illustrate, some common jazz standards, "*My Funny*

8　　*Valentine*" (Rodgers and Hart), "*It Don't Mean a Thing If It Ain't Got That Swing*"

9　　(Duke Ellington) and "*In Walked Bud*" (Thelonius Monk) all feature a

10　　chromatically descending bass line underneath a minor chord. The aforementioned

11　　songs differ greatly from *Taurus* and *Stairway to Heaven* because the melodies of

12　　*Taurus* and *Stairway to Heaven* are intimately linked to the composition and

13　　performance of the main guitar theme. It is my opinion that *Taurus* was the single

14　　greatest influence on the composition of *Stairway to Heaven*.

15　　　　22.　　I have additionally provided video of me playing the acoustic guitar

16　　part of Taurus and Stairway to Heaven:

17　　　　　　Video Exhibit 1:　　Taurus – Left Hand

18　　　　　　Video Exhibit 2:　　Taurus – Right Hand

19　　　　　　Video Exhibit 3:　　Stairway to Heaven – Left Hand

20　　　　　　Video Exhibit 4:　　Stairway to Heaven – Right Hand

21　　　　　23.　　I offer these opinions to a reasonable degree of professional and

22　　musical certainty. I am being compensated at $175 per hour for this report and $350

23　　for trial testimony.

24　　　　　Executed this 7th day of March, 2016, at Philadelphia, Pennsylvania.

25　　　　　I declare under penalty of perjury under the laws of the United States of

26　　America that the foregoing is true and correct.

27

28　　　　　　　　　　　　　　　　　*/s/ Kevin Hanson*

5

| Case No. 15-cv-03462 RGK (AGRx) | DECLARATION OF KEVIN HANSON IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

1          Kevin Hanson

2

3    *** *See attachments including Audio and Visual Files* ***

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6

Case No. 15-cv-03462 RGK (AGRx)       DECLARATION OF KEVIN HANSON IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**AUDIO EXHIBITS**
**Audio Exhibit 1:**
**Dazed and Confused by Led Zeppelin**

**Audio Exhibit 2:**
**Dazed and Confused by Jack Holmes (1967)**

**Audio Exhibit 3:**
**Whole Lotta Love by Led Zeppelin**

**Audio Exhibit 4:**
**Muddy Waters' You Need Love (1962) (10 seconds – 28 seconds)**

**Audio Exhibit 5:**
**The Small Faces' You Need Loving (1966) (25 seconds – 48 seconds)**

**Audio Exhibit 6:**
**Live performance of Led Zeppelin playing Fresh Garbage 1-10-1969**


**AUDIO EXHIBITS – COMPARISON AUDIO**
**Audio Exhibit 7:**
**Stairway to Heaven (0 seconds – 25 seconds)**

**Audio Exhibit 8:**
**Taurus (45 seconds – 1 minute, 13 seconds)**

**Audio Exhibit 9:**
**8 measures of Stairway from note 1 of the acoustic guitar, repeated multiple times**

**Audio Exhibit 10:**
**Part A:**
**8 Measures of Taurus from note 1 of the acoustic guitar, repeated multiple times**

**Audio Exhibit 11:**
**8 measures of Stairway and Taurus played together from note 1 of the acoustic guitar, repeated multiple times**

**AUDIO EXHIBITS - RE-RECORDING OF STAIRWAY TO HEAVEN**

| | |
|---|---|
| **Audio Exhibit 12:** | **Acoustic Guitar** |
| **Audio Exhibit 13:** | **Bass** |
| **Audio Exhibit 14:** | **Drums** |
| **Audio Exhibit 15:** | **Electric 12 Strings** |
| **Audio Exhibit 16:** | **Electric Piano** |
| **Audio Exhibit 17:** | **End Guitar** |
| **Audio Exhibit 18:** | **Les Pauls** |
| **Audio Exhibit 19:** | **Recorders** |
| **Audio Exhibit 20:** | **Slide** |
| **Audio Exhibit 21:** | **Solo** |

**AUDIO EXHIBITS - RE-RECORDING OF TAURUS**

| | |
|---|---|
| **Audio Exhibit 22:** | **Acoustic Guitar** |
| **Audio Exhibit 23:** | **Cello 1** |
| **Audio Exhibit 24:** | **Cello 2** |
| **Audio Exhibit 25:** | **Cymbal** |
| **Audio Exhibit 26:** | **Flute** |
| **Audio Exhibit 27:** | **Harpsichord** |
| **Audio Exhibit 28:** | **String Bass** |
| **Audio Exhibit 29:** | **Viola** |
| **Audio Exhibit 30:** | **Violins** |

**AUDIO EXHIBITS – ALEXANDER STEWART**

**Audio Exhibit 31:**                   **(Previously: Audio Exhibit A)**
**"Stairway to Heaven" (album)**

**Audio Exhibit 32:**                   **(Previously: Audio Exhibit B)**
**"Taurus" (album)**

**Audio Exhibit 33:**                   **(Previously: Audio Exhibit E)**
**Taurus Live at Ash Grove (7/10/1967)**

**Audio Exhibit 34:**                   **(Previously: Audio Exhibit C)**
**Taurus Live at Ash Grove (7/31/1967)**

**Audio Exhibit 35:**                   **(Previously: Audio Exhibit D)**
**Taurus Live at Ash Grove (8/8/1967)**

**Audio Exhibit 36:**                   **(Previously: Audio Exhibit H)**
**Taurus Demo Recording (8/1967)**

**Audio Exhibit 37:**                   **(Previously: Audio Exhibit F)**
**Taurus Live at Kaleidoscope (4/5/1968)**

**Audio Exhibit 38:**                   **(Previously: Audio Exhibit G)**
**Taurus Live at The Time Coast**

**Audio Exhibit 39:**                   **(Previously: Audio Exhibit H)**
**Taurus Live at Acoustic (1996)**

**Audio Exhibit 40:**                   **(Previously: Audio Exhibit J)**
**Combination – Acoustic Taurus Synced to STH SR – Part A, played over Master SR of STH**

**Audio Exhibit 41:**                   **(Previously: Audio Exhibit K)**
**Acoustic Taurus Synced to Master SR of STH – Part A**

**Audio Exhibit 42:**                   **(Previously: Audio Exhibit L)**
**Stairway Acoustic – Part A:**

**Audio Exhibit 43:**                   **(Previously: Audio Exhibit M)**
**Taurus Acoustic – Part A:**

**Audio Exhibit 44:**                   **(Previously: Audio Exhibit N)**
**Combination – Acoustic Taurus Synced to Master SR of STH (Part A), played over Acoustic Stairway (Part A)**

**AUDIO EXHIBITS – REBUTTAL OF MATHES**

| | |
|---|---|
| **Audio Exhibit 45:** | **Mathes Audio Exhibit Tempo Matched - Stairway** |
| **Audio Exhibit 46:** | **Mathes Audio Exhibit Tempo Matched - Taurus** |
| **Audio Exhibit 47:** | **Mathes Audio Exhibit Tempo Matched - STH & Taurus** |

**VIDEO EXHIBITS – DEMONSTRATIVE GUITAR PERFORMANCE**

| | |
|---|---|
| **Video Exhibit 1:** | **Taurus – Left Hand** |
| **Video Exhibit 2:** | **Taurus – Right Hand** |
| **Video Exhibit 3:** | **Stairway to Heaven – Left Hand** |
| **Video Exhibit 4:** | **Stairway to Heaven – Right Hand** |

Case 2:15-cv-03462-RGK-AGR   Document 154-8   Filed 03/30/16   Page 12 of 12   Page ID #:3908

1   guitar theme of *Stairway to Heaven* to a song like Davey Graham's version of "Cry

2   *Me a River*" is also not a proper comparison. Though the chromatic bass movement

3   is intact for a brief moment, Graham's usage of it is a loose interpretation of the

4   original vocal melody. The brief section in question is also performed in a different

5   time signature, 12/8, which gives it a completely different feel from *Taurus* or

6   *Stairway to Heaven*.

7       21.   To further illustrate, some common jazz standards, "*My Funny*

8   *Valentine*" (Rodgers and Hart), "*It Don't Mean a Thing If It Ain't Got That Swing*"

9   (Duke Ellington) and "*In Walked Bud*" (Thelonius Monk) all feature a

10   chromatically descending bass line underneath a minor chord. The aforementioned

11   songs differ greatly from *Taurus* and *Stairway to Heaven* because the melodies of

12   *Taurus* and *Stairway to Heaven* are intimately linked to the composition and

13   performance of the main guitar theme. It is my opinion that *Taurus* was the single

14   greatest influence on the composition of *Stairway to Heaven*.

15       22.   I have additionally provided video of me playing the acoustic guitar

16   part of Taurus and Stairway to Heaven.

17       Video Exhibit 1:   Taurus – Left Hand

18       Video Exhibit 2:   Taurus – Right Hand

19       Video Exhibit 3:   Stairway to Heaven   Left Hand

20       Video Exhibit 4:   Stairway to Heaven – Right Hand

21       23.   I offer these opinions to a reasonable degree of professional and

22   musical certainty. I am being compensated at $175 per hour for this report and $350

23   for trial testimony.

24       Executed this 7th day of March, 2016, at Philadelphia, Pennsylvania.

25       I declare under penalty of perjury under the laws of the United States of

26   America that the foregoing is true and correct.

27

28                                                 /s/ Kevin Hanson

                                      5

**02242**

1   Peter J. Anderson, Esq., Cal. Bar No. 88891
    E-Mail: pja@pjanderson.com
2   LAW OFFICES OF PETER J. ANDERSON
    A Professional Corporation
3   100 Wilshire Boulevard, Suite 2010
    Santa Monica, CA 90401
4   Tel: (310) 260-6030
    Fax: (310) 260-6040
5   Attorneys for Defendants
    JAMES PATRICK PAGE, ROBERT ANTHONY
6   PLANT, JOHN PAUL JONES, WARNER/CHAPPELL
    MUSIC, INC., SUPER HYPE PUBLISHING, INC.,
7   ATLANTIC RECORDING CORP., RHINO
    ENTERTAINMENT COMPANY and WARNER
8   MUSIC GROUP CORP.

9   Helene Freeman, Esq., admitted *pro hac vice*
    E-Mail: hfreeman@phillipsnizer.com
10  PHILIPS NIZER LLP
    666 Fifth Avenue
11  New York, NY 10103-0084
    Tel: (212) 977-9700
12  Fax: (212) 262-5152
    Attorneys for Defendants
13  JAMES PATRICK PAGE, ROBERT ANTHONY
    PLANT and JOHN PAUL JONES
14

15              **UNITED STATES DISTRICT COURT**

16              **CENTRAL DISTRICT OF CALIFORNIA**

17                   **WESTERN DIVISION**

18  MICHAEL SKIDMORE, *etc.*,        )  Case No. 2:15-cv-03462 RGK
                                     )  (AGRx)
19          Plaintiff,               )
                                     )
20      vs.                          )  DEFENDANTS' NOTICE OF
                                     )  MOTION AND MOTION *IN*
21  LED ZEPPELIN, *et al.*,          )  *LIMINE* NO. 4 AND *DAUBERT*
                                     )  MOTION TO EXCLUDE
22          Defendants.              )  STEWART, JOHNSON, BRICKLIN,
                                     )  AND HANSON; MEMORANDUM
23  _____      )  OF POINTS AND AUTHORITIES
                                        AND DECLARATION IN SUPPORT
24

25                                      Date:  May 10, 2016
                                        Time:  9:00 a.m.
26
                                        Courtroom of the Honorable
27                                         R. Gary Klausner
                                        United States District Judge
28

**02243**

1  **TO PLAINTIFF AND HIS ATTORNEYS OF RECORD:**

2      **PLEASE TAKE NOTICE** that on May 10, 2016, at 9:00 a.m. or as soon

3  thereafter as the matter may be heard in Courtroom 850 of the above-entitled District

4  Court, located at 255 East Temple Street, Los Angeles, California, defendants James

5  Patrick Page, Robert Anthony Plant, John Paul Jones, Warner/Chappell Music, Inc.,

6  Super Hype Publishing, Inc., Atlantic Recording Corporation, Rhino Entertainment

7  Company and Warner Music Group Inc., will move the above-entitled Court, the

8  Honorable R. Gary Klausner, United States District Judge presiding, for an Order

9  excluding the testimony of plaintiff's proffered experts Dr. Alexander Stewart, Erik

10  Johnson, Brian Bricklin and Kevin Hanson.

11      This Motion is brought on the grounds that, as stated more fully in the

12  accompanying Memorandum of Points and Authorities, that each of these claimed

13  experts attests to having analyzed, compared or otherwise relied upon recordings of

14  *Taurus* rather than the 1967 transcription of the musical composition *Taurus* – which

15  is the only copyrighted work allegedly infringed – and two of these claimed experts

16  rely upon alleged and unproven prior claims, theoretical claims and settlements, and

17  that as a result their testimony is irrelevant, is unreliable and will unfairly prejudice

18  defendants, confuse the issues, mislead the jury, delay the trial and waste trial time.

19      This Motion is based upon this Notice of Motion and Motion, the

20  Memorandum of Points and Authorities filed with this Notice of Motion and

21  Motion, the pleadings and papers on file in this action, the matters of which this

22  Court may take judicial notice, and such additional matters and oral argument as

23  may be offered in support of the Motion.

24  ///

25  ///

26  ///

27  ///

28  ///

1

1        The Motions are made following the conference with plaintiff's counsel

2    pursuant to Local Rule 7-3, which took place on March 22, 2016.

3    Dated: March 25, 2016

                                          /s/ Peter J. Anderson
                                    Peter J. Anderson, Esq.
                    LAW OFFICES OF PETER J. ANDERSON
                       A Professional Corporation
                       Attorney for Defendants
                    JAMES PATRICK PAGE, ROBERT
                 ANTHONY PLANT, JOHN PAUL JONES,
                   WARNER/CHAPPELL MUSIC, INC.,
                    SUPER HYPE PUBLISHING, INC.,
               ATLANTIC RECORDING CORP., RHINO
                ENTERTAINMENT COMPANY and
                WARNER MUSIC GROUP CORP.

                     Helene M. Freeman, Esq.
                     PHILLIPS NIZER LLP
                    Attorney for Defendants
                    JAMES PATRICK PAGE,
                 ROBERT ANTHONY PLANT and
                    JOHN PAUL JONES

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**1.     INTRODUCTION**

Plaintiff sues for the alleged infringement of a copyright that protects only the musical composition *Taurus* as embodied in the 1967 transcription that was deposited with the Copyright Office when the copyright was registered forty-nine years ago.  Plaintiff, however, has provided the expert reports of four witnesses who ignored the copyrighted 1967 transcription and purported to opine based on recordings of Spirit's performances of *Taurus* and, as to two of these witnesses, on prior instances of alleged copying.   Since recordings of Spirit's performances of *Taurus*, as well as prior instances of alleged copying, are irrelevant and properly excluded, these witnesses' testimony is also irrelevant and properly excluded.

**2.     THE TESTIMONY OF STEWART, JOHNSON, BRICKLIN AND**
**         HANSON IS PROPERLY EXCLUDED**

**         (a)     <u>The Standards Applicable to Plaintiff's Claimed Experts</u>**

Federal Rule of Evidence 702 permits a qualified witness to "to testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

In addition, the Court "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1985). "In its role as gatekeeper, the district court determines the relevance and reliability of expert testimony and its subsequent admission or exclusion." *Barabin v. AstenJohnson, Inc.*, 700 F.3d 428, 431 (9th Cir. 2012) *on reh'g en banc sub nom. Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457 (9th Cir. 2014). "This basic gatekeeping obligation applies [not] only to

///

3

1   'scientific' testimony [but] to all expert testimony." *Kumho Tire Co. v. Carmichael*,
2   526 U.S. 137, 147 (1999).

3       "The party offering the expert bears the burden of establishing that Rule 702
4   is satisfied." *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 549 (C.D. Cal. 2014).

5       **(b)**    <u>**Plaintiff's Witnesses Relied on Irrelevant Matters – Recordings of**</u>
6           <u>***Taurus* and Prior Alleged Claims – Rather than the 1967**</u>
7           <u>**Transcription of *Taurus***</u>

8           **(1)**    **Plaintiff's Expert Disclosures Delimit the Scope of their**
9                 **Testimony**

10      Plaintiff has the burden of proving "defendant[s] copied protected elements of
11  the copyrighted work." *Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir. 1996). Since
12  he carries that burden, he was required to include in his initial disclosures all expert
13  opinions he would rely upon. Fed. R. Civ. P. 26(a)(2)(A) & 26(a)(2)(D)(ii) (rebuttal
14  disclosures limited to "evidence . . . intended solely to contradict or rebut evidence
15  on the same subject matter identified by another party"); *Blake v. Securitas Sec.*
16  *Servs., Inc.*, 292 F.R.D. 15, 18-19 (D.D.C. 2013) (rebuttal report could not be used
17  to circumvent failure to timely provide initial disclosures).

18      Further, while plaintiff served no rebuttal expert reports, he claims his
19  experts' declarations filed in opposition to defendants' motion for summary
20  judgment constitute their rebuttal reports. And in their opposition declarations his
21  experts still did not analyze and compare the 1967 *Taurus* transcription. Stewart
22  Decl. (118-8); Johnson Decl. (Doc. 118-9); Bricklin Decl. (Doc. 118-10); Hanson
23  Decl. (Doc. 119-1).

24      As a result, none of the expert disclosures provided by plaintiff considered the
25  copyrighted work, namely the 1967 *Taurus* transcription.

26          **(2)**    **Alexander Stewart**

27      Dr. Stewart is the only musicologist identified by plaintiff in his expert
28  disclosures. Dr. Stewart's report, however, nowhere mentions the 1967 *Taurus*

4

1    transcription and, instead, purported to analyze and compare recordings of Spirit

2    performing *Taurus*.  Anderson Decl. at 11, ¶ 3, Exh. 1 at 1, ¶ 2.  Moreover, his

3    declaration in opposition to defendants' motion for summary judgment repeated his

4    analysis of the *Taurus* recordings and mentioned the 1967 *Taurus* transcription only

5    to state it is substantially different from the recordings and to reiterate plaintiff's

6    position that the recordings are the relevant work.  *See, e.g.,* Stewart Decl. at 12, ¶

7    31.

8        As defendants have shown, the only copyright on which plaintiff sues protects

9    the 1967 transcription of *Taurus* deposited with the Copyright Office; that copyright

10   does not protect the recordings; and the recordings are irrelevant.  *See,* Def. Motion

11   in Limine No. 3.

12       Because Dr. Stewart failed to analyze and compare the 1967 *Taurus*

13   transcription, his report is irrelevant.  Neither may he testify to opinions not

14   expressed – and in fact avoided – in his report.  In short, his testimony is irrelevant.

15       Further, Dr. Stewart's methodology is fundamentally flawed.  In addition to

16   analyzing the wrong work, he relied on performance elements such as the

17   "fingerpicking style" in *Taurus* recordings, "acoustic guitar, strings, recorder/flute

18   sounds, and harpsichord," "atmospheric sustained pads" and "fretboard positioning

19   and fingering."  Stewart Report (Exh. 1) at 1, ¶ 3, at 6-7, ¶ 14, at 3, & at 4, ¶ 7;

20   *Newton v. Diamond*, 388 F.3d 1189, 1194 (9th Cir. 2004) ("A crucial problem with

21   the testimony of [plaintiff's] experts is that they continually refer to the 'sound'

22   produced by [plaintiff's'] technique," while his "copyright extends only to the

23   elements . . . that he wrote on the score"), *cert. denied* 545 U.S. 1114 (2005).

24       In addition, Stewart failed to disregard non-protectable elements such as

25   chromatic scales, arpeggios and allegedly-shared sequences of only three pitches.

26   *Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004) ("Because the requirement is

27   one of substantial similarity to *protected* elements of the copyrighted work, it is

28   essential to distinguish between the protected and unprotected material in a

5

1    plaintiff's work"); Copyright Office Compendium §§ 313.4(B) (three notes not
2    copyrightable) & 802.5(A) (chromatic scales and arpeggios are "common property
3    musical material" in the public domain); *Allen v. Destiny's Child*, No. 06 C 6606,
4    2009 WL 2178676, at *12 (N.D. Ill. July 21, 2009) (three notes "unprotectable as a
5    matter of law"); *Tisi v. Patrick*, 97 F. Supp. 2d 539, 543-45 (S.D.N.Y. 2000)
6    (claimed similarities in structure and harmony were commonplace and not
7    protected).

8         Dr. Stewart analyzed the wrong work, relies on performance elements of the
9    wrong work and failed to disregard non-protectable elements.  His methodology is
10   not only flawed, it is flatly wrong.  As a result, his testimony is also properly
11   excluded under *Daubert*.

12        In addition, Dr. Stewart's testimony and opinions as to the wrong work are not
13   probative and would be unfairly prejudicial, confuse the issues, mislead the jury,
14   unduly delay the trial and waste time.  Accordingly, his testimony and opinions are
15   also properly excluded under Federal Rule of Evidence 403.

16        **(3)   Erik Johnson**
17        Erik Johnson, as a "master musician," purports in his report to analyze the
18   *Taurus* recordings and *Stairway to Heaven* and to have created recordings
19   "replicat[ing] the original recordings for the purpose of creating multitrack
20   facsimiles" to compare parts of the *Taurus* recordings with *Stairway to Heaven*.
21   Anderson Decl. at 11, ¶ 4, & Exh. 2 at 1.  As with Dr. Stewart, he relies upon the
22   *Taurus* recordings and failed to analyze and compare the relevant copyrighted work,
23   namely the 1967 *Taurus* transcription.  In his opposition declaration, he, like Dr.
24   Stewart, derides analyzing the 1967 transcription, claiming it is comparing "apples
25   to oranges."   Johnson Decl. at 8, ¶ 21.   Johnson also terms "baffling" and
26   "preposterous" the obligation to disregard the unprotected descending chromatic
27   scale (*id.* at 11, ¶ 30) and relies on the non-copyrightable sequence of three pitches.
28   *Id.* at 5, ¶ 15.

6

**02249**

1    Johnson, in a case where only the copyright in the 1967 *Taurus* transcription

2    was allegedly infringed, failed to analyze and compare the copyrighted work and

3    instead analyzed and compared *Taurus* recordings.  His testimony is irrelevant.

4    Also, like Dr. Stewart, Johnson's methodology is plainly wrong: Johnson

5    analyzed and compared *Taurus* recordings, which are the wrong work and not

6    copyrighted; he relies on the *Taurus* recordings' performance elements, which are

7    not protected by the copyright in the 1967 *Taurus* transcription; and he relies on

8    unprotected elements.  His opinions are also not reliable and, as a result, are properly

9    excluded under *Daubert*.

10   Further, Johnson's testimony and opinions are not probative and would be

11   unfairly prejudicial, confuse the issues, mislead the jury, unduly delay the trial and

12   waste time.  His testimony and opinions are also properly excluded under Federal

13   Rule of Evidence 403.

14       **(4)    Brian Bricklin**

15   Brian Bricklin is an audio engineer and musician and in his report he purports

16   to opine as to (1) similarities between *Taurus* recordings and *Stairway to Heaven*,

17   (2) whether Led Zeppelin "employed a songwriting process" of copying other songs

18   and (3) compare "individual components of each individual recorded version" to

19   determine whether there are "similarities in their audio production."  Anderson Decl.

20   at 11, ¶ 5, Exh. 3 at 1.

21   As with Dr. Stewart and Johnson, Bricklin did not analyze or compare the

22   1967 *Taurus* transcription and, instead, analyzed and compared *Taurus* recordings.

23   He also does not identify unprotectable portions – and does not claim expertise in

24   identifying them – and does not disregard them.  His testimony and opinions as to

25   similarities between the *Taurus* recordings and *Stairway to Heaven* are irrelevant,

26   his methodology wrong and unreliable and his testimony unduly prejudicial.

27   Bricklin also purports to opine that Led Zeppelin "employed a songwriting

28   process" of copying other songs and, he concludes, must have had access to and

7

1  copied *Taurus*.  Exh. 3 at 2-3, 8.  His opinion, however, is based on his view or

2  assumption that Led Zeppelin copied other songs to create songs besides *Stairway to*

3  *Heaven*.  *See, e.g., id.* at 2-3.  He does not purport to have undertaken and completed

4  the required analytic dissection of the other songs, so his views as to any similarities

5  or copying are conclusory.  Further, he relies on testimony as to prior claims and

6  assertions by plaintiff's counsel at deposition that other claims could have been

7  asserted.  All of that, however, is irrelevant and barred by Federal Rules of Evidence

8  403, 407 and 408.  *See,* Def. Motion *in Limine* No. 5.  In its role as gate-keeper, the

9  Court should prohibit plaintiff's attempt to misuse a claim of expertise to get in, by

10  the back door, irrelevant and prejudicial testimony as to claims and settlements.

11      Finally, Bricklin's purported opinion that *Taurus* recordings and *Stairway to*

12  *Heaven* bear "similarities in their audio production" again improperly focuses on

13  *Taurus* recordings rather than the copyrighted 1967 *Taurus* transcription.  Thus, he

14  bases his opinion on the presence of "reverb" in the recordings, which is not a

15  feature protected by the musical composition copyright that plaintiff sues upon.

16  Neither does Bricklin claim, nor could he claim, reverb is unique in recordings of

17  that era.

18      Bricklin's testimony and opinions are not probative and would be unfairly

19  prejudicial, confuse the issues, mislead the jury, unduly delay the trial and waste

20  time.  Bricklin's testimony and opinions are also properly excluded under Federal

21  Rule of Evidence 403.

22      **(5)   Kevin Hanson**

23      Kevin Hanson is a musician and in his report states he recorded his

24  performances of *Taurus* and *Stairway to Heaven* "as per their original recordings"

25  and he compared them from "performance and production perspectives."  Anderson

26  Decl. at 11, ¶ 6, & Exh. 4 at 1.  Thus, not only does he rely on a recording of *Taurus*,

27  but a new recording he created copying the recording of *Taurus*, and all to compare

28  "performance and production perspectives" that are not protected by the musical

8

1   composition copyright that plaintiff sues on. *Newton*, 388 F.3d at 1194 (plaintiff's

2   experts' testimony as to recordings irrelevant since plaintiff's "copyright extends

3   only to the elements . . . that he wrote on the score"). Moreover, Johnson's report

4   never mentions the 1967 *Taurus* transcription that is the only work protected by the

5   allegedly-infringed copyright. Neither is his recreation of *Stairway to Heaven*

6   relevant: the only allegedly-infringing work is the authorized *Stairway to Heaven* as

7   created, recorded and released to the public.

8       For the same reasons discussed above, Johnson's testimony and opinions are

9   not probative and would be unfairly prejudicial, confuse the issues, mislead the jury,

10  unduly delay the trial and waste time. His testimony and opinions are also properly

11  excluded under Federal Rule of Evidence 403.

12  **3.**    **CONCLUSION**

13       The law is clear that the copyright plaintiff sues upon protects only the

14  musical composition as transcribed in the 1967 *Taurus* transcription, yet none of

15  these experts analyzed and compared that transcription with *Stairway to Heaven*.

16  The law also is clear that the copyright plaintiff sues upon does not protect the

17  *Taurus* recordings, yet all of these experts purported to analyze and compare those

18  recordings and their elements or features. They opine as to the wrong work and their

19  opinions are irrelevant.

20       Further, their methodologies are fatally flawed: they analyze the wrong work,

21  fail to analyze the correct one and base their opinions on elements not protected by

22  the *Taurus* copyright, elements not protectable at all and unproven assertions about

23  prior claims and theoretical claims as to songs other than *Taurus* and *Stairway to*

24  *Heaven*. Their opinions are both irrelevant and unreliable.

25       Even if plaintiff could overcome all those hurdles, which he cannot, the

26  testimony and opinions as to claimed similarities with *Taurus* recordings and

27  including unsupported assertions of copying other songs, would unfairly prejudice

28  defendants, confuse the issues, mislead the jury, unduly delay the trial and waste

9

1   time.  The testimony and opinions are also properly excluded under Federal Rule of

2   Evidence 403.

3   Dated: March 25, 2016

          _____/s/ Peter J. Anderson_____
          Peter J. Anderson, Esq.
4         LAW OFFICES OF PETER J. ANDERSON
          A Professional Corporation
5         Attorney for Defendants
          JAMES PATRICK PAGE, ROBERT
6         ANTHONY PLANT, JOHN PAUL JONES,
          WARNER/CHAPPELL MUSIC, INC.,
7         SUPER HYPE PUBLISHING, INC.,
          ATLANTIC RECORDING CORP., RHINO
8         ENTERTAINMENT COMPANY and
          WARNER MUSIC GROUP CORP.
9

10        Helene M. Freeman, Esq.
          PHILLIPS NIZER LLP
11        Attorney for Defendants
          JAMES PATRICK PAGE,
12        ROBERT ANTHONY PLANT and
          JOHN PAUL JONES
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                              10

# DECLARATION OF PETER J. ANDERSON

I, Peter J. Anderson, declare and state:

1.      I am an attorney admitted to practice before this Court and all Courts of the State of California.  I have personal knowledge of the following facts and could competently testify to these facts if called upon to do so.

2.      I represent defendants Warner/Chappell Music, Inc., Super Hype Publishing, Inc., Atlantic Recording Corp., Rhino Entertainment Company, James Patrick Page, Robert Plant and John Paul Jones in this action. This Reply Declaration is submitted in support of their foregoing Motion *in limine*.

3.      Attached to this Declaration as Exhibit 1 is a true and correct copy of Dr. Alexander Stewart's Report in this action, without its accompanying exhibits or attachments.

4.      Attached to this Declaration as Exhibit 2 is a true and correct copy of Erik Johnson's Report in this action, without its accompanying exhibits or attachments.

5.      Attached to this Declaration as Exhibit 3 is a true and correct copy of Brian Bricklin's Report in this action, without its accompanying exhibits or attachments.

6.      Attached to this Declaration as Exhibit 4 is a true and correct copy of Kevin Hanson's Report in this action, without its accompanying exhibits or attachments.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 25, 2016.

_/s/ Peter J. Anderson_
PETER J. ANDERSON

11

**02254**

# EXHIBIT 1

**Alexander Stewart, Ph.D.**
**Professor of Music**
**University of Vermont**

**February 10, 2016**

**Re: "Taurus" and "Stairway To Heaven"**

1. I am Professor of Music, Director of Latin American and Caribbean Studies, and Jazz Studies Coordinator at the University of Vermont. I have contributed to numerous peer-reviewed journals and other publications and I am author of a book published by University of California Press. My work encompasses extensive music transcriptions, musicological analysis, historical research, and other scholarly activities, particularly in popular music. I earned a Ph.D. in Music (Ethnomusicology Concentration) from the Graduate Center of the City University of New York (CUNY) and a Master of Music in Jazz and Commercial Music from Manhattan School of Music. During 2006-7 I was a Fulbright scholar researching traditional and popular music in Mexico. As an active professional musician I have performed with leading musicians in jazz and popular music for more than thirty years. I have provided expert opinions and analysis on music copyright matters for over twelve years.

2. I have been asked to compare the songs "Taurus" (T) by Randy California of the group Spirit and "Stairway To Heaven" (STH) by Jimmy Page and Robert Plant. I downloaded the recordings of T and STH from iTunes and purchased the sheet music to STH from musicnotes.com. I was also provided six live versions and a demo of "Taurus" and additional guitar sheet music to STH by attorney Francis Alexander Malofiy. These recordings, sheet music to STH, and transcriptions of the relevant parts of the recordings are attached to this report.

3. Both songs prominently feature a musical segment that contains substantially similar musical expression. This four-measure passage (labeled "A" in the analysis below) appears four times in T at 0:45, 0:58, 1:37, and 1:50. In STH the passage appears six times, at 0:00, 0:13, 0:53, 1:06, 1:47, and 2:00. In three of the six appearances in STH (the first, second, and sixth), it is heard instrumentally (without vocals). During the last iteration some arpeggiated variations are heard in the guitar. As discussed further below, live versions of Taurus also feature a similar fingerpicking style in the passage's later appearances. The third, fourth, and fifth iterations of the passage in STH contain a vocal part. While T is entirely instrumental and features no vocals, a melodic figure heard in the keyboard during this section bears a similarity to the main vocal melody heard during this passage in STH. For reasons given below, these "A" passages are clearly the most important musical expression in both works. Before discussing this musical expression further, this report will examine the general characteristics of each song.

**EXHIBIT 1**
**12**

2

## General Characteristics

|  | Key | Tempo (BPM) | Style |
|---|---|---|---|
| Taurus | A minor | ~72 | quasi-classical |
| Stairway (Part I) | A minor | ~73 | quasi-classical |

4. As can be seen above, both songs are in the same keys (A minor) and are performed at nearly identical tempos. The tempos or beats are somewhat fluid in both songs, as the guitarist lingers slightly on the final cadence during the passages in question. While the tempo of STH eventually accelerates, Part I remains very close to the starting tempo throughout. As will be discussed further below, the instrumental textures are also quite similar, featuring most prominently acoustic guitar and "classical" instruments such as flute, recorders (a type of end-blown flute), and, in T, strings and harpsichord. In both songs the overall mood or style is suggestive of Renaissance-era classical music.

Structure/form

**"Stairway to Heaven"**
PART I
| | |
|---|---|
| 0:00 | A (instrumental) |
| 0:13 | A (instrumental) |
| 0:26 | B (instrumental) |
| 0:53 | A vocal |
| 1:06 | A vocal |
| 1:20 | B vocal |
| 1:47 | A vocal |
| 2:00 | A (instrumental variation) |

PART II
| | |
|---|---|
| 2:14 | vamp 1 (two chord) interlude |
| 2:39 | C |
| 2:51 | C |
| 3:06 | vamp 1 (two chord) interlude |
| 3:29 | C |
| 3:41 | C |
| 3:56 | vamp 1 (two chord) interlude |
| 4:19 | $C^1$ (drums enter) |
| 4:30 | $C^1$ |
| 4:45 | vamp 1 (two chord) interlude |
| 5:07 | $C^1$ |
| 5:18 | $C^1$ |
| 5:34 | Instrumental interlude |
| 5:55 | vamp 2 (three chord) guitar solo |
| 6:44 | vocal re-enters over vamp 2 |

**EXHIBIT 1**
13

3

Section descriptions

| | |
|---|---|
| A | 4-measure verse with descending A minor guitar pattern |
| B | 8-measure "bridge" |
| Vamp 1 | 2-chord progression (essentially Amin – D) |
| C | 4-measure verse melody from A section over descending C major pattern |
| C¹ | 4-measure variation of verse melody over descending C major pattern |
| Vamp 2 | 3-chord progression (Amin – G – F) |

**"Taurus" (studio version)**

| | |
|---|---|
| 0:00 | Intro (studio version only) |
| 0:45 | A |
| 0:58 | A |
| 1:12 | B |
| 1:37 | A |
| 1:50 | A |
| 2:04 | B |

Section descriptions

| | |
|---|---|
| Intro | "atmospheric" sustained "pads" and short figurations in free time |
| A | 4-measure verse with descending A minor guitar pattern |
| B | 7-measure "bridge" |

5. As can be seen in the above analysis, the structure of Part I of "Stairway to Heaven" is nearly identical to that of "Taurus" after the introduction. The introduction in Taurus is not set to a steady beat or meter and effectively sets the mood for the song proper that begins a 0:44. The A sections in both songs are four measures long. They are repeated (AA) and separated by a longer B section or bridge. The overall form of both songs thus can be represented as:

| | |
|---|---|
| T | (intro) AABAAB |
| STH (Part I) | AABAABAA |

**It is important to note that *every* live version and the demo of Taurus begin with the A sections. Clearly, the intro was added for the studio version and was not part of the original composition.** Therefore, forms of "Taurus" and Part I of "STH" are identical. The only structural differences between them are that STH repeats the A sections at the end (still maintaining the AA structure) and the B section in T is one measure shorter, i.e., seven measures instead of eight.

6. After Part I, at 2:14 STH transitions to other material, much of which eventually is supported by the rhythm section (bass and drums). Most of my analysis will be concerned with the first part of STH which contains enough musical content and length to comprise song unto itself (the average popular song is about three minutes in length), Part I is important not only because it is the first music the listener hears (for over two minutes), but also because it contains the weightiest

**EXHIBIT 1**
14
**02258**

4

compositional material in the song. It is meant to evoke a complex polyphonic classical texture and in that respect it offers contrast with the later vamps (repeated patterns of two or three chords) and jams (improvised sections). As discussed later in this report in my qualitative analysis, the most memorable and iconic musical materials in STH are heard during Part I.

**Specific Musical Expression**

7. The "A" sections in both songs are similar on every level: melody, rhythm, harmony, texture, tempo, instrumentation, and fretboard positioning and fingering.

8. Harmony. The underlying harmonic structure contains a descending chromatic bass line. While a related structure has a long history in Western music (sometimes referred to as the "Lament" ground bass), many composers through the ages have found original and creative ways to use this foundational pattern. The setting of the passage in T is exemplar of such creativity and contains original musical expression. By way of comparison I would note as one example that many thousands of songs have been set to twelve-bar blues. Substantial and original expression contained therein remains protectable despite this commonality. As will be seen in my analysis below, both "Taurus" and STH depart from the traditional sequence in similar and significant ways.

9. The chromatic version of the traditional sequence moves through six pitches from the tonic (do) to the important harmonic goal on the fifth degree of the scale (sol). In an unusual variation, both T and STH avoid or defer reaching this important goal on the last pitch of the sequence (the fifth degree or E). In addition to **not** incorporating the entire six-pitch sequence (A G# G F# F E), both T and STH use the first five pitches in exactly the same way. As the bass line descends chromatically from A to F#, each pitch is held for two beats duration before lingering on F for four beats in the third measure. In both songs the movement to the final pitch of the sequence, the fifth degree of the scale E, is not arrived at directly and is only suggested near the end of the fourth measure.

10. The following is a harmonic analysis of the two passages:

| | | | | | |
|---|---|---|---|---|---|
| T(1:37) Amin | Amin/G# | Amin/G | Amin/F# | Fmaj7 | D5 E5/A[1] |
| STH    Amin | Amin/G# | Amin/G | Amin/F# | Fmaj7 | G A (E) |

As can be seen, the harmonies are identical until the final measure. A comparison of the cadences will be found later in this report.

11. Rhythm and tempo. Besides the descending chromatic line described above, both passages are treated with a nearly continuous eighth-note figuration.

---

[1] The fourth measure of Taurus contains slight variations. My analysis will focus on the third iteration (1:37) of the A section as representative.

**EXHIBIT 1**
**15**
**02259**

5

Each measure of the four-measure passage contains four beats and each of these four beats is subdivided in two, for a total of 32 positions or eighth-note "slots" (4x2x4). These eighth notes are set to almost exactly the same tempo making the passages' durations almost the same in both songs – about 13 seconds.

12. Guitar Melody. The following table graphically presents these four measures and depicts the steady eighth-note figurations heard in the acoustic guitar in these passages. Since both songs are in the same key, the actual pitches can be easily compared without transposition.

Example 1.　　Acoustic guitar themes in "Taurus" and "Stairway to Heaven"

| | 1 | | 2 | | 3 | | 4 | | 1 | | 2 | | 3 | | 4 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TAURUS | | C | ECB | | | C | ECB | | | C | ECB | | | C | ECB | |
| | A | | | A | G# | | | G# | G | | | G | F# | | | F# |
| HEAVEN | | C | E | A | B | E | C | B | C | E | C | C | F# | D | A | F# |
| | A | | | | G# | | | | G | | | | F# | | | |

| | 1 | | 2 | | 3 | | 4 | | 1 | | 2 | | 3 | | 4 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TAURUS | | C | ECB | | AB | | AB | | | | | | | | | |
| | F | | | F | | F | | F | D | | | D | A | | | G |
| HEAVEN | E | C | A | C | | E | C | A | G | A | A | | | A | F | E |
| | F | | | | | | | | B | A | A | | | A | F | E |

13. Most of the similarities occur during the first 18 notes. The first measure is almost identical, the second measure contains only two different pitches, and the first two slots of the third measure contain the same pitches. With two slight re-orderings, swapping CE for EC, 14 of the first 18 eighth-note positions or slots (78%) contain the same pitches. Since these pitches, C and E, are both present in T (on the second and fourth beats), and they are chord tones in A minor they are virtually interchangeable (A minor = A, C, E). While there are two B's in the first measure of both songs, the two B's in STH are heard in the top part. The second B in STH moves to a C/G on the first beat of the second measure. During the first 18 notes, then, the basic melodic sequence is virtually the same.

14. Instrumentation and orchestration. One of the most significant similarities between T and STH is the overall texture and orchestration. Both songs feature acoustic guitars on the main theme of the passage discussed immediately above. This acoustic guitar part is the signature theme in both songs. The passages at issue also are supported by sustained chords or "pads" using string or recorder sounds. The descending chromatic line is doubled by string and recorder sounds in

EXHIBIT 1
16
02260

6

both songs (after the first iteration of the signature theme in STH and after the second iteration in T).  Example 2 provides transcriptions of these two parts.

Example 2. String and recorder parts in "Taurus" and "Stairway to Heaven"



The presence of acoustic guitar, strings, recorder/flute sounds, and harpsichord as well as the noticeable absence of bass and drums (and other instruments characteristic of rock and roll) lend both songs a decidedly "classical" style, particularly evoking a Renaissance atmosphere.

15. In both songs, the descending bass line is doubled by instruments with very similar sounds – a cello in T and a bass recorder in STH. This thickening of the texture, occurring after the initial exposition of the theme, contributes to the gradual build in intensity.

16. Other important similarities provide additional evidence of copying. In both songs the passages are set to "pads" or sustained strings or flute sounds. In T these pads are heard in the first, second and third iterations of the passage. The pads in STH occur in the second, fourth, fifth, and sixth iterations (see measures 5, 21, 33, and 37 in the transcription of STH). While the pads contain some different pitches, in both songs they begin with the same sustained pitch as the highest note, E. The top note of any vertical sonority is almost always the most prominent.

17. Vocal Melody. The vocal melody in STH that is set to these guitar passages in the A sections is similar to the harpsichord melodies heard in T during the third iteration of the studio version (1:37) and in the keyboard parts at the very beginning of all the live versions. In STH, this melody, which establishes the subject matter of the song and contains the words "stairway to heaven," is arguably the most important vocal theme in STH. The melody of STH is set to three phrases that climb successively to three higher pitches: C, D, and E. The melody in T also gradually works its way upward through these same pitches. The first vocal phrase of STH begins similarly to the clavinet melody in T as can be seen below:

Taurus     A B C  A
Heaven     A B C BA C ("There's a lady who's sure...")

**EXHIBIT 1**
17
02261

7

It is important to note that this keyboard melody in T and the vocal in STH are placed similarly over the guitar passage in the A sections of both songs.

15. The final cadences of these passages also contain important similarities. The resolution of STH comes at the beginning of the fourth measure while in T the resolution generally also comes in the fourth measure, but on the third beat . The cadence in STH (essentially G major to A minor) contains the following pitches (as can be seen in measure 24 of the STH sheet music).

Stairway
D   E
B   C
G   A
B   A

The cadence in T generally resolves to A on the third beat of the fourth measure. Melodically, the same movement from G to A occurs at the end of th measure leading into the next A section.

Taurus
D   A (GA)
D   E
A   A
A   B
D   A

Example 3 provides a transcription of this cadence from T at 1:47.

Example 3.   "Taurus" cadence (1:47)



**EXHIBIT 1**
**18**
**02262**

8

While there are differences between these two cadences, both A sections return to the tonic in the fourth measure. Most important, the melodic movement from b7 to 1 (G to A) is exactly the same in both songs, although in T it happens at the end of measure four rather than at the beginning of the measure.

18. Significance. The passages at issue are clearly important, easily the *most* important musical expression in both songs. In T the segments comprise the central musical themes heard in the work. Although in the studio version of T a long introduction is heard, in live versions, there was no introduction and the song began with the main theme heard in the acoustic guitar. Similarly in STH the passages open the song, and have acquired iconic status. Instantly recognizable, countless aspiring guitarists and other instrumentalists have learned these parts in their early programs of study.

19. In summary, important musical expression in Taurus and Part I of STH is substantially similar. These similarities should be obvious to the average listener and become explicit under musicological analysis. There is no doubt that the creators of "Stairway to Heaven" drew upon the musical expression central to "Taurus." Besides the overall general form, sound, feel, style, and tempo, these similarities include the signature themes of both songs, in particular the acoustic guitar passages I have labeled section "A." Nearly 80% of the pitches of the first eighteen notes match, along with their rhythms and metric placement. The harmonic setting of these A sections feature the same chords during the first three measures and an unusual variation on the traditional chromatic descending bass line in the fourth measure. While the cadence is delayed slightly in T, each passage ends by moving from b7 or G to 1 or A. Moreover, these passages are supported by similar "pads" or sustained string or recorder sounds and string and bass recorder parts that are identical. The passages are overlayered by vocal melodies in STH and prominent keyboard parts in T that begin the same way.

20. My C.V. contains all pertinent information about my testimony in other cases. I reserve the right to supplement or amend this report. I am being compensated at the rate of $275 per hour for the study of this matter and $475 per hour (four-hour minimum), plus any related travel time and expense, for trial testimony and deposition.

Respectfully submitted,

Alexander Stewart, Ph.D.
Professor of Music
University of Vermont

EXHIBIT 1
19
02263

9

VISUAL EXHIBITS

| | |
|---|---|
| Visual Exhibit A | Sheet Music "Stairway to Heaven" |
| Visual Exhibit B | Sheet Music (guitar) "Stairway to Heaven" |
| Visual Exhibit C | Transcription: "Stairway to Heaven" (Part I) |
| Visual Exhibit D | Transcription: "Taurus" |

AUDIO EXHIBITS

| | |
|---|---|
| Audio Exhibit A | "Stairway to Heaven" |
| Audio Exhibit B | "Taurus" (Studio) |
| Audio Exhibit C | "Taurus" Live at Ashley Grove (7/31/1967) |
| Audio Exhibit D | "Taurus" Live at Ashley Grove (8/8/1967) |
| Audio Exhibit E | "Taurus" Live (7/10/1967) |
| Audio Exhibit F | "Taurus" Live at Kaleidoscope (4/5/1968) |
| Audio Exhibit G | "Taurus" Live The Time Coast |
| Audio Exhibit H | "Taurus" Demo Recording (8/1967) |
| Audio Exhibit I | "Taurus" Live Acoustic (1996) |
| Audio Exhibit J | Combination - Acoustic Taurus Synced to STH SR - Part A, played over Master SR of STH |
| Audio Exhibit K | Acoustic Taurus Synced to Master SR of STH - Part A |
| Audio Exhibit L | Stairway Acoustic - Part A |
| Audio Exhibit M | Taurus Acoustic - Part  A |
| Audio Exhibit N | Combination - Acoustic Taurus Synced to Master SR of STH (Part A), played over Acoustic Stairway (Part A) |

**EXHIBIT 1**
**20**
**02264**

# VISUAL EXHIBIT

# A

**EXHIBIT 1**
21
**02265**

*From: "Led Zeppelin Complete"*

# Stairway to Heaven

by

ROBERT PLANT and JIMMY PAGE

Lyrics by JIMMY PAGE and ROBERT PLANT

Published Under License From

Alfred Publishing Co., Inc.

© 1972 SUPERHYPE PUBLISHING
All rights administered by WB MUSIC CORP.
All Rights Reserved

Authorized for use by *Alexander Stewart*

NOTICE: Purchasers of this musical file are entitled to use it for their personal enjoyment and musical fulfillment. However, any duplication, adaptation, arranging and/or transmission of this copyrighted music requires the written consent of the copyright owner(s) and of Alfred Publishing Co., Inc.. Unauthorized uses are infringements of the copyright laws of the United States and other countries and may subject the user to civil and/or criminal penalties.

 http://www.musicnotes.com

**EXHIBIT 1**
**22**
**02266**

# STAIRWAY TO HEAVEN

Words and Music by
JIMMY PAGE and ROBERT PLANT



© 1972 SUPERHYPE PUBLISHING
All rights administered by WB MUSIC CORP.
All Rights Reserved

Authorized for use by *Alexander Stewart*

EXHIBIT 1

**EXHIBIT 1**
24
02268

Authorized for use by *Alexander Stewart*

3

**EXHIBIT 1**
**25**
**02269**

Authorized for use by *Alexander Stewart*

**EXHIBIT 1**
**26**
**02270**

Authorized for use by *Alexander Stewart*

5

**EXHIBIT 1**

Authorized for use by *Alexander Stewart*

EXHIBIT 1
28
02272

Authorized for use by *Alexander Stewart*

EXHIBIT 1
29
02273

Authorized for use by *Alexander Stewart*

**EXHIBIT 1**
**30**
**02274**

Authorized for use by *Alexander Stewart*

**EXHIBIT 1**
**31**
**02275**

Authorized for use by *Alexander Stewart*



EXHIBIT 1
32
02276

Authorized for use by *Alexander Stewart*

# VISUAL EXHIBIT

# B

**EXHIBIT 1**
**33**
**02277**

Score

# Stairway to Heaven
## Part I



**EXHIBIT 1**
34

**02278**



Stairway to Heaven
Part I

**EXHIBIT 1**
35
**02279**

Stairway to Heaven
Part I



EXHIBIT 1
36
02280



**EXHIBIT 1**
37
**02281**

# VISUAL EXHIBIT

# C

**EXHIBIT 1**
**38**
**02282**

Score

# Taurus

(to 2:04)





**EXHIBIT 1**

39

**02283**



**EXHIBIT 1**
40

02284



EXHIBIT 1
41
02285



EXHIBIT 1
42
02286



EXHIBIT 1
43
02287

# *Alexander Stewart*

Department of Music
University of Vermont
Burlington, VT 05405

E-mail: astewart@uvm.edu
Office: (802) 656-7766
Mobile: (802) 310-2009

## EDUCATION

GRADUATE CENTER: THE CITY UNIVERSITY OF NEW YORK
  Ph.D. in Music (Ethnomusicology Concentration), 2000
  Dissertation: *Composition and Performance in Contemporary New York City Big Bands (1989-1999)* Advisor: Stephen Blum

MANHATTAN SCHOOL OF MUSIC
  Master of Music, Jazz and Commercial, 1991

LONG ISLAND UNIVERSITY, C.W. POST
  B.F.A., *summa cum laude,* in Music Education, 1988

## TEACHING EXPERIENCE

UNIVERSITY OF VERMONT
  Professor, 2012-present
  Associate Professor, 2005-2012
  Assistant Professor, 1999-2005
  Jazz Studies Coordinator, 2003-present
  Director, Integrated Fine Arts Program, 2008-2012
  Director, Latin American Studies Program, Spring 2006; 2011-present

LONG ISLAND UNIVERSITY, C.W. POST
  Instructor in Music, 1988-1999
  Director of Jazz Studies

Additional courses at:
  The New School (Jazz and American Culture), 1995-1997
  John Jay College of CUNY (History of Jazz and Rock), 1995

## COURSES TAUGHT

Jazz History
Jazz Improvisation I & II
World Music Cultures
Seminar in Ethnomusicology

**EXHIBIT 1**
44
**02288**

Alex Stewart

Music Theory
Musical Avant-Gardes
Music of Cuba, Puerto Rico, and the Dominican Republic
Duke Ellington
Jazz Ensembles (Big Band and Combos)
Seminar in World Music (Honors College)
Latin Jazz Summer Immersion
Music Business & Copyright
Culture and Politics of Latin American Protest Music (team taught with professors from Political
    Science, Romance Languages, and Global Studies)

## PUBLICATIONS

### Books

*Making the Scene: Contemporary New York City Big Band Jazz,* Berkeley: University of
California Press, 2007.

Spanish translation from the French and German: Hans Bodenmann, *El ABC de la Flauta Dulce.*
Zurich: Anton Peterer Music & Books, 2003 (Recorder method book).

### Articles, Book Chapters, Reviews, Entries

"Been Caught Stealing": A Musicologist's Perspective on Unlicensed Sampling Disputes"
*University of Missouri Kansas City Law Review* 83(2): 340-61 (Winter 2014).

"Make It Funky: Fela Kuti, James Brown and the Invention of Afrobeat." *American Studies*
52(4) (2013): 99-118.

"*La chilena mexicana es peruana*: Multiculturalism, Regionalism, and Transnational Musical
Currents in the Hispanic Pacific." *Latin American Music Review/Revista de Música
Latinoamericana* 34(1) (Spring 2013) Austin: University of Texas Press.

"'Funky Drummer': New Orleans, James Brown and the Rhythmic Transformation of American
Popular Music." Reprinted in *Roots Music,* edited by Mark F. DeWitt. London: Ashgate, 2011
(originally published in *Popular Music* 19(3) October 2000 Cambridge University Press).

Review of Ben Ratliff, *Coltrane: The Story of a Sound. Jazz Perspectives* 2(1):103-109 (2008).

"Contemporary New York City Big Bands: Composition, Arranging, and Individuality in
Orchestral Jazz," *Ethnomusicology* 48(2) (Spring/Summer 2004): 169-202.

Review of *The New Grove Dictionary of Jazz* in *Ethnomusicology* 47(3) (Fall 2003):376-80.

"Second Line," *Encyclopedia of Popular Music of the World.* London: Cassell 2003.

**EXHIBIT 1**
**45**
**02289**

2

Alex Stewart

Essay review of Lewis Porter, *John Coltrane: His Life and Music. Annual Review of Jazz Studies 11*, 2000-1 [2002]: 237-52.

"'Funky Drummer': New Orleans, James Brown and the Rhythmic Transformation of American Popular Music," *Popular Music* 19(3) (Winter 2000): 293-318.

Review of Scott DeVeaux, *The Birth of Bebop. Yearbook of Traditional Music* 30 (1998): 135-7.

**Under review or in preparation**

Study of relationship of Music and Anarchism: "Music, Media, and Anarchism in the 'Oaxaca Commune'" (In progress).


## LECTURES, COLLOQUIA, CONFERENCE PAPERS

Invited Keynote Speaker: Symposium on Hip Hop, Technology, and Copyright. Utah State University. (March 28, 2015).

"Make It Funky: Fela Kuti, James Brown and the Invention of Afrobeat." Annual Conference of the American Studies Association. Washington DC, November 23, 2013.

"Creativity and Copyright," Champlain College 2013, October 25, 2013

"Lila Downs: Music, Culture, and Politics in Oaxaca, Mexico." Pre-Concert Lecture. Flynn Center for the Performing Arts. Burlington, VT. April 26, 2013.

"Music, Media, and Anarchism in the Oaxaca Commune" Paper presented at Music and War Panel. AMS/SEM/SMT Annual Conference. New Orleans. Nov. 2, 2012.

"*Pasos cromáticos en la improvisación del jazz* (Chromatic Passing Tones in Jazz Improvisation)." Lecture/workshop (in Spanish) at Instituto Projazz, Santiago, Chile. May 31, 2012.

"Musicology CSI: Sampling, Interpolation, and Copyright." Thursdays at One Performance/Lecture Series, UVM Music Department.

"Music, Media, and Anarchism in the 'Oaxaca Commune,'" Presentation to University of Vermont Global Village, 15 February 2011.

"*Son de las barricadas*: Protest song and revolution on Oaxaca's Radio APPO." Paper read at the annual conference of Society for Ethnomusicology (SEM) in Los Angeles, CA, Nov. 2010.

"*Son mexicano*" OLLI (Osher Life Long Learning Institute). Pre-Concert Lecture Sones de México, Lane Series 8 October 2010.

"*Música popular* and the Ideology of *mestizaje* in Postrevolutionary Mexico." 1 October 2010, UVM Hispanic Forum.

**EXHIBIT 1**
**46**
**02290**

3

Alex Stewart

Musicology CSI: Sampling, Interpolation, and Copyright." Invited lecture, State University of New York (SUNY) Albany, 28 April 2010.

"La Chilena Mexicana: Transnational Musical Currents in the Hispanic Pacific" Global and Regional Studies Lecture, 17 March 2010 Billings Marsh Lounge.

"Copyrights and Copywrongs: Introduction to Forensic Musicology" Invited lecture, State University of New York (SUNY) Plattsburgh, 11 March 2010.

FLYNNsights: Lecture on Charles Mingus opening the residency of the Mingus Repertory Ensembles (Mingus Dynasty, Mingus Orchestra, and Mingus Big Band along with dance troupe choreographed by Danny Buraczeski at the Flynn Center for the Performing Arts. 17 October 2010.

"Supergenre, genre, subgenre: Mexican *son* and the *chilena* complex." Paper presented at the annual conference of the Society for Ethnomusicology (SEM) in Mexico City, November 2009.

"*Socialismo con pachanga*: Music in Revolutionary Cuba." Hispanic Forum, University of Vermont, 22 October 2009.

"Performing Race: Afro-Mexicans and Multiculturalism in Oaxaca's Guelaguetza." Paper presented at the Latin American Studies Association (LASA) XXVIII International Congress, "Rethinking Inequalities" Rio de Janeiro, Brazil, 12 June 2009.

*La chilena oaxaqueña: "El gusto de mi region.*" Paper presented at the annual conference of the Sonneck Society for American Music (SAM), Denver, CO, 19-22 March 2009.

Insights FlynnArts. Pre-concert lecture on Maria Schneider and her Orchestra. 22 January 2009. Amy E. Tarrant Gallery at the Flynn Center for the Performing Arts.

"Performing Race: Afro-Mexicans and Multiculturalism in Oaxaca's Guelaguetza Festival." Paper presented at the annual meeting of the Society for Ethnomusicology (SEM), Wesleyan University, Middletown, CT, 28 October 2008.

"*La Danza de las Diablas*"? Race, Gender, and Local Identity in Afro-mestizo communities of Mexico's Costa Chica. Paper presented at the annual meeting of the Society for Ethnomusicology (SEM), Columbus, OH, 28 October 2007.

"*Son de las Barricadas*": Songs of Protest from the Spanish Civil War to the Present on Oaxaca's Radio APPO." Hispanic Forum, University of Vermont, 10 October 2007.

"Cross-Cultural Learning through Music and Dance: A UVM Class in Guantánamo, Cuba." Presentation to the UVM College of Arts and Sciences Advisory Board, April 2004.

"Beauty and the Beast: Maria Schneider's *Wyrgly.*" Paper presented at special session of the joint meetings of Society for Music Theory (SMT) and the American Musicological Society (AMS), "Women in Jazz: Voices and Roles," Columbus, OH, 1 November 2002.

**EXHIBIT 1**
**47**
**02291**

4

Alex Stewart

"On the Edge: Sue Mingus and the Mingus Big Band." Colloquium at the University of Illinois (Urbana and Champaign), 6 March 2002.

"*Blood on the Fields:* Wynton Marsalis and the Transformation of the Lincoln Center Jazz Orchestra." Paper read at the 2001 annual meeting of the Society for Ethnomusicology (SEM), Detroit, October 2001.

"The Jazz Concerto as Collaborative Work: Jim McNeely's 'Sticks.'" Paper read at the joint meeting of the Society for Music Theory (SMT) and other major music societies in Toronto, 4 November 2000.

"New York City Big Bands and the Professional Jazz Musician." Paper read at the annual meeting of the Society for Ethnomusicology (SEM) in Bloomington, IN, 24 October 1998.

"From Mardi Gras to Funk: Professor Longhair, James Brown and the Transformation of Rhythm and Blues." Paper read at joint meeting of the Society for Ethnomusicology (SEM) and the International Association for the Study of Popular Music (IASPM) in Pittsburgh, PA, October 1997.

## MUSIC COPYRIGHT

Expert Report in Bridgeport Music, Inc. v. Dimension Films, 410 F.3d 792 (6th Cir. 2005). Case recognized as setting new "bright line" standard for use of samples of copyrighted recordings.

Testimony in trial in Federal District Court, Nashville TN, Case No. 3:01-780, Bridgeport Music v. Universal Music. February 2007. "Atomic Dog" and "D.O.G. in Me." Affirmed by US Sixth Circuit Court of Appeals, No. 07-5596, November 4 2009. Case examined issues concerning fragmented literal similarity, originality, and fair use.

Testimony in Federal District Court, Nashville, TN Case No. 3:01-0155 involving rap artist, the Notorious B.I.G and the Ohio Players. (March 2006). Affirmed by US Sixth Circuit Court of Appeals, No. 06-6294, October 17 2007.

Testimony by Deposition (for the Plaintiff), Case No. 1:09-cv-21597-DLG (Florida Southern District Court) Kernel Records Oy v. Timothy Z. Mosley p/k/a Timbaland, UMG Recordings, Inc, et al. New York City, May 27, 2010.

Testimony by Deposition (for the Defense), Case No. 37-2008-00098508-CU-BT CTL (California Southern District Court) Sixuvus v. Victor Willis, New York City, July 7, 2010.

Testimony by Deposition (Los Angeles, September 2011). Case No. 10-CV-08123 Phoenix Phenom v. William Adams, Jr. Stacy Ferguson, et. al.

Testimony by Deposition (New York City, January 2012). Case No. SACV10-1656JST(RZx) Pringle v. William Adams, Jr. Stacy Ferguson, et. al.

**EXHIBIT 1**
**48**
**02292**

5

Alex Stewart

Testimony by Deposition (New York City, June 3, 21, 2013). Case No. CV12-5967 VMG Salsoul, LLC v. Madonna Ciccone, Shep Pettibone, et al.

Testimony by Deposition (New York City, September 11, 2013). 11-cv-6811. Marino v. Usher.

Testimony by Deposition (Burlington, VT, May 20, 2015). RALEIGH-#301280 Absent Element v. Daughtry.

Expert reports and consulting in musicology for King and Ballow, Nashville, TN; Schwartz Cooper, Chicago, IL; Eisenberg Tanchum & Levy, New York NY; Microhits, Los Angeles, CA; Pen Music Group, Los Angeles CA, Rawson, Merrigan & Litner, Greenfield and Boston, MA; JPMC Burlington, VT; Kile, Goekjian, McManus, Washington, DC; Gould Law Group, Chicago, IL; Robert S. Besser Law Offices, Santa Monica, CA; Richardson, Patrick, Westbrook & Brickman, LLC, Mt. Pleasant SC; Hall, Booth, Smith & Slover, Atlanta GA; Miller, Canfield, Paddock & Stone, Detroit, MI; Grubman, Indursky, Shire & Meiselas, New York NY; Clair G. Burrill, Los Angeles CA; Brooks Pierce, Raleigh, NC; and many others.

Classes and seminars in Music Business and Copyright

Symposium on Music Copyright. University of Vermont, January 2003.

## GRANTS AND AWARDS
Interdisciplinary Experiential Engagement Award for course proposal, *Culture and Politics of Latin American Protest Music*, to be taught in collaboration with Political Science, Romance Languages, Global Studies, and Music Departments. January 2013.

Lattie F. Coor Award for International Travel to present paper and chair panel at the Society for Ethnomusicology conference (SEM) Mexico City. November 2009.

Joan Smith Faculty Research Support Award *Performing Race: Afro-Mexicans, Multiculturalism, and the "Black Pacific."*

Lattie F. Coor Award for International Travel to present paper at the Latin American Studies Association (LASA) Congress in Rio de Janeiro, Brazil. June 2009.

Fulbright Research Fellowship to Mexico, Afro-Mexican music, 2006-7.

Award for Contribution to Vermont Jazz Education, presented by Wynton Marsalis and the Flynn Center for the Performing Arts, October 2005.

UVM Arts and Sciences Dean's Fund for Faculty Development (to initiate fieldwork in the Costa Chica of Mexico), Fall 2005.

UVM Humanities Center Research Grant, Spring 2004.

UVM Global Outreach Committee Grant, March 2003.

UVM Arts and Sciences Faculty Development Grant for study in Cuba, May 2002.

**EXHIBIT 1**
**49**
**02293**

6

Alex Stewart

2001 Barry S. Brook Award for best dissertation in music CUNY.

CUNY Dissertation Year Fellowship 1998-1999.


### SELECTED PERFORMANCES: JAZZ AND LATIN

**Burlington Discover Jazz Festival Big Band** (Music Director, Contractor, Performer)

*Birth of the Cool: Music by the Miles Davis Nonet.* Featuring Ray Vega, trumpet. Performances in June 2012 (BDJF), and in September 2012 (UVM), and May 2013 (SUNY Plattsburgh).

*Textures: Jim Hall with Brass featuring the Jim Hall Trio (Jim* Hall, guitar, Scott Colley, bass and Joey Baron, drums) with brass ensemble, Alex Stewart, conductor.  Flynn MainStage, 2010 Burlington Discover Jazz Festival.

*Paquito D'Rivera Funk Tango.* Produced, co-directed, and played saxophone in concert on Flynn MainStage with 17-piece orchestra with guests: Paquito D'Rivera, alto saxophone; Diego Urcola, trumpet; Alex Brown, piano; Massimo Biocalti, bass; Mark Walker, drums; and special guest Ray Vega, trumpet. Burlington Discover Jazz Festival (1 June 2008). Reviews in *Free Press*, AllAboutJazz, and other media.

*Mary Lou Williams Resurgence* with Cecilia Smith, vibraphone and Amina Claudine, piano, 2007 Burlington Discover Jazz Festival, Flynn Center.

*Music of Jim McNeely* with special guest Jim McNeely, piano 2006 Burlington Discover Jazz Festival, Flynn Center.

*Sketches of Spain: Celebrating the Miles Davis/Gil Evans Collaboration* with trumpeter Randy Brecker and guest conductor, Joe Muccioli 2005 Burlington Discover Jazz Festival, Flynn Center.

*The Grand Wazoo: Music of Frank Zappa*, with Ernie Watts, Napoleon Murphy Brock, Ike Willis, and Ed Palermo 2004 Burlington Discover Jazz Festival, Flynn Center.

*Duke Ellington Sacred Concert*, with David Berger, Priscilla Baskerville, Paul Broadnax, and 100-voice Choir, 2003 Burlington Discover Jazz Festival, Flynn Center

**Rick Davies  & Jazzismo**

Featured Performer: Jazz Education Network Conference, San Diego, CA January 2015.

Workshops and concerts, Colectivo Central, Oaxaca, Mexico. June, July 2011.

With guests pianist/composer Arturo O'Farrill (and sons, Zachary, percussion and

**EXHIBIT 1**
**50**
**02294**

7

Alex Stewart

Adam, trumpet), Jonathan Maldonado, drums, and Papo Ross, vocals and alto saxophone.
FlynnSpace. July 30, 2009,

With guest artist Ray Vega, FlynnSpace (July 2003, 2004, 2005, 2006, 2007, 2008).

Appearances at SUNY Plattsburgh Jazz Festival (with Harvie S., 2002; with Chocolate
Armenteros 2003; with Ray Vega 2008, 2011; with Curtis Fowlkes 2010 ); Red Square and other
venues.

Oaxaca, Mexico: Colegio Teizcali, Colectivo Central, Spring 2007.

***Other Jazz and Latin***

James Harvey and Garuda – opening act for Randy Weston in Discover Jazz Festival (2004);
numerous other performances around region.

Beboparaka (featuring poetry of Amiri Baraka) andJazzLit.com – jazz and poetry collaborations
with UVM professors Major Jackson, Tina Escaja, John Gennari  and UVM students.
Performances at the Discover Jazz Festival and local venues. Coverage in the *Burlington Free
Press* and *Vermont Quarterly* (2005, 2006).

Grupo Sabor (Salsa and Merengue) – Performances in UVM's Grand Maple Ballroom and
Brennan's Pub for Alianza Latina (2010), Higher Ground, Burlington; Red Square; Eclipse
Theater, Waitsfield; Onteora Club, New York; Burlington Latino Festival (2001-present).

Performances with UVM jazz faculty (Jeff Salisbury, Joe Capps, Paul Asbell, Patricia Julien,
Ray Vega, John Rivers, Tom Cleary, Rick Davies, Steve Ferraris) at recitals, concerts, and other
events (1999-present).

The Lionel Hampton Orchestra; featured artists: Dizzy Gillespie, Dee Dee Bridgewater, and
others. Extensive tours of Europe and North America and appearances at major jazz festivals
including: North Sea, Nice, Montreal, Newport (NY and Saratoga), Biarritz (1989-1991).
The Bill Warfield Band, The Dorsey Brothers Orchestra, David Berger, Paquito D'Rivera, Clem
DeRosa, Bobby Shew, David Liebman, Andy Farber, Stan Rubin, Lew Anderson, Billy Mitchell,
Roland Hanna, Lew Soloff, Randy Brecker and many more (1985-1999).

The Lehigh Valley Repertory Jazz Orchestra: *Sketches of Spain* featuring Randy Brecker, *An
Evening with David Liebman*, *A Tribute to Benny Goodman* featuring Buddy DeFranco, and
*Celebrating Louis Armstrong* featuring Jon Faddis (1997-2000).

## SELECTED PERFORMANCES: POPULAR AND BLUES

Frankie Valli, Ray Charles (Sweden 1999), Mary Wells, Frankie Avalon (Atlantic City), The
Drifters, Funk Filharmonik, The Funk Collection, Nick Apollo Forte, Little Wilson, Sandra
Wright Band, Jimmy Branca and the Red Hot Instant Combo, Dave Grippo Funk Band, and
others (1985-present).

Joan Rivers

**EXHIBIT 1**
**51**
**02295**

8

Alex Stewart

October 2011. Orchestra contractor and performer with Bernadette Peters at the Flynn Center of the Arts

## SELECTED RECORDINGS

Rick Davies and Jazzismo, *Salsa Norteña*, - Tenor saxophone (Recorded in Montreal 2011 (forthcoming in 2012).

New York Jazz Repertory Orchestra, *Le Jazz Hot*, featuring Dave Liebman and Vic Juris. Planet Arts 310976 - Baritone saxophone, bass clarinet (2009).

Rick Davies and Jazzismo, *Siempre Salsa*, featuring Wayne Gorbea. Emlyn Music EM1001 - Tenor saxophone (2006).

Anne Hampton Callaway, *To Ella with Love,* featuring Wynton Marsalis, Christian McBride, Lewis Nash, Cyrus Chestnut. Touchwood Records TWCD 2006 - Tenor saxophone and clarinet (1998).

Peter Herborn, *Large*, featuring Gene Jackson, Greg Osby, Robin Eubanks, and others. Jazzline JL1154-2 – Baritone saxophone and bass clarinet (1998).

Billy Stritch, *Waters of March: The Brazilian Album.* Sin Drome SD8950 - Tenor saxophone and flute (1998).

Dave Stryker, *Nomad*, featuring Randy Brecker and Steve Slagle. Steeplechase Records SCCD31371 - Baritone saxophone and bass clarinet (1997).

Frankie Lane: *Wheels of a Dream.* Touchwood Records TWCD 2020 - Tenor saxophone, flute, and alto flute (1997).

The Bill Warfield Band, *The City Never Sleeps.* Seabreeze Records CDSB 2048 - Baritone saxophone and bass clarinet (1996).

## CLINICS AND GUEST CONDUCTING

Guest Conductor, Connecticut Valley District Jazz Festival, January 30-31, 2015.

Guest Conductor, Winooski Valley Jazz Festival, February 4-5, 2010.

Adjudicator/Clinician, Vermont All-State Festival, International Association of Jazz Educators (IAJE): 2000-2003.

Guest Conductor, Nassau County (Long Island) All-County Jazz Festival, 1997.

**EXHIBIT 1**
**52**
**02296**

9

Alex Stewart

## MEMBERSHIPS

Friends of Indian Music and Dance (FIMD), Burlington VT

Burlington Discover Jazz Festival Advisory Board

Society for Ethnomusicology (SEM)

Society for American Music (Sonneck)

American Musicological Society (AMS)

Latin American Studies Association (LASA)

**EXHIBIT 1**
**53**

**02297**

# EXHIBIT 2

**MASTER MUSICIAN – LISTEN, ANALYZE AND PERFORM *STAIRWAY TO HEAVEN* AND *TAURUS***

I was retained as an expert in this case to listen to and analyze *Taurus* and *Stairway to Heaven,* to perform both pieces as a master musician and faithfully replicate the original recordings for the purpose of creating multitrack facsimiles. I also created a full transcription of *Taurus* and incorporated by reference the corresponding audio for both *Taurus* and *Stairway to Heaven*.

I am proficient on the following instruments (years of experience in parentheses):

- Drums/percussion (40 years)
- Electric Bass (35 years)
- Guitar (35 years)
- Piano/keyboards (30 years)
- Voice (40 years)
- Saxophone (35+ years)


I was engaged to play the following instruments on the *Taurus* and *Stairway to Heaven* re-recordings:

- Drums
- Electric Bass
- Electric Piano
- Other Keyboards
- Percussion

I was also asked to then analyze both pieces of work, *Stairway to Heaven* and *Taurus*, from a performance and compositional perspective and to provide a complete transcription of *Taurus* which is attached.

It is my understanding that I will also testify and perform at time of trial.

<u>QUALIFICATIONS</u>

**Master Musician/Session Musician.**
- As a master musician/session musician I am required to perform, create, analyze and address all aspects of music creation at the highest level. My services are in demand as a result of years of cultivating a discriminating musical ear and the ability to execute musical ideas in innumerable genres on a variety of instruments. I have recorded, performed and toured with world-renowned musicians in the genres

Page **1** of **6**

EXHIBIT 2
54
02299

of jazz, classical, pop, rock and other styles. My credits include releases on Interscope Records, Blue Note, Argo/Decca, Sony Publishing, and performances on television including "Late Night with Conan O'Brien." I also have extensive experience as a musician, recording engineer and producer at premier studios in Philadelphia, New York and Los Angeles. Please see my attached CV for further clarification.

**University Professor**

- I have also been a professor of music on the University level for 17 years, beginning in 1999, the year that I graduated Summa Cum Laude from Temple University's esteemed Esther Boyer College of Music. I have taught music theory, ear training, styles and analysis, improvisation, pedagogy, private lessons and have coached large and small ensembles in multiple genres. I am currently an Adjunct Assistant Professor on the faculty of The University of the Arts where I have been teaching since 2006. Please see my attached CV for further clarification.

## STAIRWAY TO HEAVEN

### Familiarity with Led Zeppelin and *Stairway to Heaven*

- I obtained my first copy of "Led Zeppelin IV," the album that contains *Stairway to Heaven* at the age of 10. Since then I have listened to the album countless times. *Stairway to Heaven* was an unavoidable staple on FM radio and my turntable throughout my formative years.  Despite my lifelong admiration for Led Zeppelin I must admit that the revelations of their unattributed "borrowing" of lyrics and music from prior artists is disappointing and alarming. *Whole Lotta Love, Dazed and Confused* and *Babe I'm Gonna Leave You* are just a few of the well-known examples of this unfortunate practice. However, to this musician, the most egregious of these violations is the lifting of substantial musical information from *Taurus* and its repurposing in the most iconic portions of *Stairway to Heaven.*

### Analysis

- *Stairway to Heaven* begins with one of the most iconic musical introductions in the history of popular music. The arpeggiated guitar chord sequence in the introduction, which also underlies parts of the verses, is arguably the primary defining musical element of the entire recording and composition, even when considered in the context of the extended and complex form of the entire song. As the song progresses the musical elements begin to stray from the initial statement, eventually abandoning the distinct arpeggiated guitar. Despite this

EXHIBIT 2
55
02300

fact the initial guitar arpeggios are certainly the "Name That Tune" part of the recording, surest to lead to a positive identification of the song.

**Recording Process**

- In the reconstruction of *Stairway to Heaven* I was tasked with identifying and re-creating the exact electric bass, drum set and electric piano parts as played on the original recording. I recorded each instrument individually, faithfully re-creating each instruments' parts. Great care was taken to capture tones, articulations, dynamics and overall performances that mimicked those contained on the original recording. Performances were executed while listening to the original *Stairway to Heaven* recording for reference.

**Comparative Analysis of Original *Stairway to Heaven* to Re-Recorded *Stairway to Heaven***

- In my opinion, the performances on the reconstruction of *Stairway to Heaven* are virtually identical to the original. Every nuance was considered and analyzed in an effort to impart not only the pure musical information but also the *je ne sais quoi* that gives *Stairway to Heaven* its particular character and mood. If the re-creation and the original are synchronized, a simple A-B comparison will confirm these assertions. Furthermore, I incorporate by reference the audio files which constitute the re-recording of *Taurus* and *Stairway to Heaven,* both of which I was heavily involved in creating. Even the most discriminating listener will agree that these are faithful re-creations, held to the highest level of professional musical certainty.

<u>**TAURUS**</u>

**Familiarity with Spirit and *Taurus***

- As a performing and recording musician for nearly 40 years I have had occasion to listen to a staggering amount of music. Over the course of my career I have become somewhat familiar with the music of "Spirit," especially the selection *Taurus*, largely due to its undeniable similarity to *Stairway to Heaven*. I am now especially familiar with every detail of the recording, having transcribed it note for note.

**Analysis**

- After a rubato introduction the substantial portion of *Taurus* begins with an arpeggiated acoustic guitar. The initial musical statement is then repeated. What

follows is a pseudo-baroque cornucopia of guitar, harpsichord, atmospheric percussion and strings.

**Recording Process**

- I was responsible for re-creating the harpsichord, strings and percussion. We took great care to listen to the original recording through various monitoring sources to obtain the clearest possible audio image of the recorded content. We then proceeded to perform the individual parts, one at a time, while listening to the original recording for reference.

**Comparative Analysis of Original *Taurus* to Re-Recorded *Taurus***

- The re-creation of *Taurus* is virtually identical to the original. Production values, instrumentation and performances were identified and analyzed, allowing for a faithful reproduction of the original recording.

### COMPARATIVE STUDY OF TAURUS AND STAIRWAY TO HEAVEN

- The guitar introduction of *Stairway to Heaven* is, in mood, tempo and specific pitch information, strikingly similar, and in many ways, identical to the arpeggiated guitar part in *Taurus*. In my opinion, this opening guitar part for *Stairway to Heaven* is its calling card. The same is true for the arpeggiated guitar in *Taurus*. Therefore, in my opinion, the primary identifying element for *Stairway to Heaven* is, in every relevant manner, a near replica of the arpeggiated guitar in *Taurus*, also its primary musical element.

- Additionally, the first three pitches of the vocal melody of *Stairway to Heaven* that correspond to the lyric "There's a la[dy]"are identical to the first three notes of the harpsichord part in *Taurus,* despite being offset rhythmically by one beat. As the melody of *Stairway to Heaven* progresses other striking similarities emerge:

    - The words "all that glitt[ers]" in *Stairway to Heaven* are melodically identical to the corresponding harpsichord part that is played during the equivalent part of the phrase in *Taurus.*
    - Equivalent similarities are found during the remainder of Part I in both A and B vocal parts (words and portions of words in bold italics indicate melodies from *Stairway to Heaven* that correspond to the harpsichord melodies in *Taurus*):

```
There's a lady who's sure all that glitters is gold
        And she's buying a stairway to heaven.
When she gets there she knows, if the stores are all closed
        With a word she can get what she came for.
    Ooh, ooh, and she's buying a stairway to heaven.
```

Page **4** of 6

**EXHIBIT 2**
57
**02302**

> **There's a sign** on the wall **but she wants** to be sure
> 'Cause you know sometimes words have two meanings.
> **In a tree** by the brook, **there's a song**bird who sings,
> Sometimes all of our thoughts are misgiven.
>
> Ooh, it makes me wonder,
> Ooh, it makes me wonder.
>
> **There's a feel**ing I get **when I look** to the west,
> And my spirit is crying for leaving.
> **In my thoughts** I have seen **rings of smoke** through the trees,
> And the voices of those who stand looking.
>
> Ooh, it makes me wonder,
> Ooh, it really makes me wonder.
>
> **And it's whis**pered that soon, **if we all** call the tune,
> Then the piper will lead us to reason.
> **And a new day** will dawn **for those** who stand long,
> And the forests will echo with laughter.

- Of the musical parts I was asked to replicate from *Stairway to Heaven*, none were recognized as far as songwriting credit is concerned. The electric bass and keyboard parts, created and performed by John Paul Jones, were not, insofar as I am aware, included in the songwriting credit. The same is true for the drum set part, created and performed by John Bonham.

- In the case of *Stairway to Heaven*, Jimmy Page received the songwriting credit for the instrumental portion exclusively, and that his parts constitute the only creditable instrumental portions of the musical composition. This fact is reflected in the final crediting of Page and Plant as the songwriters, despite the substantial contributions of the other musicians. Therefore, the inevitable conclusion is that the signature arpeggiated guitar part that precedes any other accompaniment constitutes the most significant portion of the material that is germane to the creditable instrumental material as far as any copyright is concerned.  Additionally, significant portions of the melodic content of *Stairway to Heaven* correspond almost exactly and, at times, exactly, with the harpsichord parts from *Taurus,* further calling into question the originality of *Stairway to Heaven.*

- If *Stairway to Heaven* is stripped down to the bare elements that received songwriting credit, the listener is left with two parts:

Page **5** of 6

**EXHIBIT 2**
**58**
**02303**

- o an arpeggiated guitar part, the signature element, which is substantially the same as the signature guitar element in *Taurus*;
- o a vocal melody that bears significant resemblance to the harpsichord in Taurus, followed by a series of riffs, chord progressions and solos.

- The most essential, elemental portion of *Stairway to Heaven* is, for any practical purposes, nearly identical to the equivalent instrumental portion of *Taurus*. Furthermore, many of the melodies found in *Stairway to Heaven* appear to be directly mined from the harpsichord part in *Taurus.*

All my efforts in listening, analyzing, and performing *Stairway to Heaven* and *Taurus*, including the transcription, was all done to a reasonable degree of professional musical certainty.

I have been compensated at the rate of $175.00 per hour for this report, and $350 for trial.


  /s/ Erik Johnson_____
Erik Johnson, B.F.A.
Adjunct Assistant Professor of Music
The University of the Arts – Philadelphia

February 10, 2016

EXHIBIT 2
59
02304

# EXHIBIT 3

Brian Bricklin
147 Hilldale Rd.
Lansdowne, PA 19050

**Brian Bricklin - Expert Report**

**Music Producer, Audio Engineer, Songwriter, Band Member**

SUBMITTED TO;
FRANCISALEXANDER MALOFIY
FOR THE LAW FIRM  FRANCIS ALEXANDER,
LLC  280 N. PROVIDENCE RD.
MEDIA, PA 9063
T: (215) 500-1000  F: (215) 500-1005
E: francis@francisalexander.com

Re: "Taurus" vs. "Stairway To Heaven"

### *INTRODUCTION*

I, Brian Bricklin, having expert knowledge regarding the matters described, herein,  declare as follows: I am a music producer, audio engineer, performing arts school and studio owner,  college instructor, musician, band member, song writer and live sound engineer. I  am over the age of 18 and competent to testify as to the matters stated herein.

I have  been retained by Plaintiff in this action to render my opinion regarding the following items:

1.    Compare and contrast the compositions, and recordings, of "Taurus" (T) written by Randy California and performed by the band Spirit and "Stairway To Heaven" (STH) by Robert Plant and Jimmy Page, performed by Led Zeppelin

2.    Render my opinion as to whether Led Zeppelin employed a songwriting process.

3.    Identify the individual components of each individual recorded version of each song and if there are similarities in their studio production.

### *MATERIALS REVIEWED*

- Led Zeppelin's Discovery Production D0001-0606
- Taurus – Audio
- Stairway to Heaven – Audio
- Deposition of James Patrick Page and exhibits
- Deposition of John Paul Jones and exhibits
- Deposition of Robert Anthony Plant and exhibits
- The case docket and filings

**EXHIBIT 3**
[1]60
**02306**

### ANALYSIS

I was initially presented two audio files by the plaintiff's attorney, 1. Stairway to Heaven by Led Zeppelin and 2. Taurus by Spirit.

Both songs contain a musical composition that are almost identical. The four-measure piece appears four times in T at 0:44, 0:58, 1:36, and 1:50. In STH the piece also appears four times, at 0:00; 0:12; 0:52, and 1:06. These sections are in the same key (A minor) and contain a descending chromatic bass line, both feature a similar slow tempo and a single acoustic guitar.

The following report contains my analysis and conclusions based on thorough review of substantial material, music, interviews, critical listening as well as recording recreations of the multitrack tape recordings of both the song T and STH. I will start with defining the recording and mixing process an artist uses to record and release material for public consumption and monetization.

### Songwriting Process

As a songwriter I have had songs featured in major motion pictures like Bill and Ted's Excellent Adventure (Orion Pictures) and Election (MTV Paramount), many TV and radio commercials, as well as signed two times to major labels (A&M, Hybrid/Sire).

There are multiple ways that a song can "come to life." For instance, in some cases there are people who write lyrics, melody and music as well teams where one person writes the music and the other the lyrics. All of these scenarios can exist within a band too. There is also a process known as "jamming." This is where multiple musicians are creating things "on the spot" in a live performance situation (with or without an audience). A simple musical phrase may be introduced by one person which then inspires another person to expand on it. All of this happening in "real time." Many times, if a bona fide song is created from a jam session, credit is given to all of the participating musicians. Other times one person might present a completed, or almost completed song to "the group" and often only the person or persons who were involved in the genesis of the song are credited. In addition, many songwriters will acknowledge they were inspired by another artist, sometimes an older artist in a specific genre as the inspiration for their NEW creation. In many cases the songwriter has only been "inspired" by a previous work, but doesn't "lift" verbatim lyric, melody or music. Unfortunately, there are cases where a previous work doesn't inspire and is instead used verbatim and put forth as a new original creation. In almost all cases songwriters usually follow a process for their works that is repeated as they hone their "craft."

### Led Zeppelin's Songwriting Process

Based on my expert experience, listening to Led Zeppelin's songs, listening to songs upon which Led Zeppelin based their songs, and the deposition testimony of the individual defendants, I conclude that Led Zeppelin utilized two primary songwriting methods. The first was where a band member, usually Jimmy Page and/or Robert Plant, would present a song to the band. In these cases, only Page and/or Plant would be credited. The second is where the band would jam and the resulting creation would usually be credited to all members of the band and always at least three members. It is my expert opinion that both songwriting processes heavily involved

**EXHIBIT 3**
61
²
02307

the use of other artists' work, especially in the first four Led Zeppelin albums.

Take, for example, the song Dazed and Confused from Led Zeppelin I when contrasted with Jake Holmes 1967 song titled similarly, Dazed and Confused.

> **Audio Exhibit 1:  Dazed and Confused by Led Zeppelin**
> **Audio Exhibit 2:  Dazed and Confused by Jake Homes (1967)**

It is obvious that Led Zeppelin made some additions to the song Dazed and Confused by Jake Holmes, but by no means is it a new and unique creation.  When originally released on Led Zeppelin I, Dazed and Confused was credited to Jimmy Page alone and Jake Holmes wasn't acknowledged at all.  It's clear that they incorporated Jake Holmes's original creation in their version of the song.  This is the start of a systematic process the band used for years while creating their music and it became their core songwriting technique; incorporate existing material by other writers verbatim, or add a slight modification or alteration, and then present it as a unique and NEW creation.

Another song, from Led Zeppelin II, Whole Lotta of Love, further illustrates this type of songwriting process, which in my opinion is pervasive in Led Zeppelin's music. Led Zeppelin's version is derived from two other songs: You Need Love performed by Muddy Waters, and You Need Loving by The Small Faces. It's apparent that parts of each of these songs (times listed next to each audio exhibit marker) were incorporated into their recording of Whole Lotta Love. However, the song was originally uncredited to any other songwriters other than the members of Led Zeppelin.

> **Audio Exhibit 3:  Whole Lotta Love by Led Zeppelin**
> **Audio Exhibit 4: Muddy Waters' You Need Love (1962) (10 seconds – 28 seconds)**
> **Audio Exhibit 5:  The Small Faces' You Need Loving (1966) (25 seconds – 48 seconds)**

After hearing testimony from Jimmy Page, John Paul Jones, and Robert Plant, in January of 2016, it is evident to me that their songwriting process included using previous musical compositions and incorporating them into their songs.  In many cases they took sole credit for Led Zeppelin's songs and presented them as unique, NEW creations. There are many more examples of this songwriting process used by Led Zeppelin, including Babe, I'm Gonna Leave You (originally written by Anne Bredon), Black Mountain Side (originally written by Bert Jansch), Bring It On Home (originally written by Willie Dixon), and Since I've Been Loving You (originally written by Moby Grape).  This is far from a complete list. This demonstrated songwriting process by Led Zeppelin is unfortunately more akin to "lifting" verbatim sections of music and lyrics without attribution and presenting it as a new, unique creation.

Both Jimmy Page and Robert Plant have admitted, in various publications and interviews, that Led Zeppelin did indeed lift and copy the work of other artists to varying degrees without giving creidt. Jimmy Page did so in an interview with Brad Tolinski for Guitar World in May 1993, and Robert Plant did so in an NPR interview with Robert Plant on Fresh Air with Terry Gross in 2004.

### *Led Zeppelin's Familiarity with Spirit*

From listening to live recordings of Led Zeppelin from their first tour of America in 1968, reading

**EXHIBIT 3**
3**62**
**02308**

and listening to interviews with Jimmy Page, and from hearing first hand Jimmy Page talk about playing a piece from Spirit's song Fresh Garbage in their early live sets, it's clear the band was aware of and thought highly enough of Spirit to include Spirit's music in their own live shows.

**Audio Exhibit 6: Live performance of Led Zeppelin playing Fresh Garbage 1-10-1969**

This recording is significant as it shows Led Zeppelin were aware, and held in high regard, Sprit's music. In addition, I have seen significant evidence and to my knowledge unrefuted evidence that Spirit and Led Zeppelin played the same shows in the late 1960s and 1970s and I have also been told that Mark Andes and Jay Ferguson testified that at least one festival Led Zeppelin immediately followed Spirit on stage and that the band members interacted backstage. I also heard Jimmy Page testify that he owns the eponymous Spirit album which contains the song Taurus, although he claims he does not know when he acquired it.

*Stairway to Heaven vs. Taurus*

On my initial comparison of T vs. STH, the very first thing that struck me was that both songs feature a single acoustic guitar, picking identical arpeggios upon their entrance. Jimmy Page has commented in interviews that initially he allegedly composed just the acoustic guitar introduction to the song, and the song built from the introduction. The surrounding instrumental accompaniment on both T, and STH, is initially sparse.  T has a background of orchestral strings, flute and then harpsichord (keyboard), STH, recorder(s) and then electric piano (keyboard). Both songs feature similar production and in order to expand on how musical accompaniment and the recording studio "process" can brand a recording, one must have an understanding of how music is produced and "captured" in modern recording studios since music has been distributed for profit.

When a song is recorded by an artist or band, there are usually two other key personnel:
1. Producer:
   > The producer is akin to a director in the motion picture industry, i.e., the vision for the recording project is in the hands of the producer. The producer generally makes all decisions as to what is recorded, which performances are kept or deleted.  The producer also works closely with the recording engineer as to how each instrument or vocal is recorded, which microphone or, other recording equipment, is used to capture the performances. The producer often has final say on the final blend of the instrumentation (mixing) and how the final recordings fits in to a "running order" for an album, i.e. the song order."
2. The Recording Engineer:
   > The recording engineer is responsible for placing microphones to capture acoustic instruments or vocals, routing direct signals to a recording console, setting up and getting volume levels set for the performers to hear each other. Setting volume levels and tone for the items being recorded.  Maintaining the equipment in the recording studio as well as anything technical the producer or artist/band requests during the recording session.

It is important to note that all of Led Zeppelin's recordings, including STH, were produced by band member Jimmy Page. This means, as stated above, he alone was responsible for the final say in regard to the final recorded product that Led Zeppelin commercially released. In addition

**EXHIBIT 3**

to producing STH, Jimmy Page, along with band member Robert Plant, are credited as the alleged composers of the song.

The song T, by Spirit, was produced by Lou Adler with the band members of Spirit. Lou was not a member of the band Spirit. It's important to note, in regards to the song T, I am told that the surviving band members of Spirit, Jay Ferguson and Mark Andes, state that the band was not happy with the introduction of the final version of the song. In its final commercial release, T contains 45 seconds of orchestral music at the top of the song that the band members did not like, including Randy California, T's author. This introduction was added to the song by Lou Adler and it was not a part of Randy's original composition. In essence, to compare STH and T, it is important to start 45 seconds into the commercially released version of T as this is how the author intended it to be. In fact, all recorded live performances of the song T, by Spirit, did not contain this additional orchestral introduction.

Both songs are presented, in their final commercially released versions, with substantially similar production and mixing techniques. In recording studios, since the time when Les Paul invented the technology behind multitrack recording, musicians record instrumentation, vocals and any other elements, to individual "tracks" on a master multitrack recorder. (Since both these songs were recorded before digital technology was the standard, these songs were recorded on multitrack tape recorders.) Multitrack recorders allow each instrument, or element, to be recorded on to individual tracks of a recorder. These tracks will play back individually, or collectively, and can be blended at different volume levels and tone control after a live performance has been captured. In addition, a performance can be played back while another performance is captured over the existing one. This process is commonly referred to as overdubbing.

In order to deconstruct each song at a musical "organic" level, since the multitrack tapes were not available to me for comparison, I faithfully rerecorded each song. Utilizing a skill called critical listening, I was able to discern and identify each musical instrument and component, and recreate the multitrack recordings utilizing master studio musicians performing each part. I recorded the songs using digital multitrack recording software called Avid Pro Tools, the audio elements are illustrated on the next page in Images A and B. (Software – Audacity for images only)

EXHIBIT 3
[5]64
02310



Image A:  Recreated Multitrack recording of STH



**EXHIBIT 3**
6**65**
**02311**

Image B.:  Recreated Multitrack recording of T

This process allowed me to isolate the components of both T and STH to further evaluate individual musical performances that made up each recording.  The following images show each song's discreet elements:



Image C:  STH Recreated Isolated Audio Tracks

Image D:  T Recreated Isolated Audio Tracks

After a song is recorded, "mixing" is the process where recording engineers, often, with producers, adjust the individual volume level and tone of each recorded track after it has been recorded to create a stereo "master." This master is then duplicated for commercial release. Additionally, effects such as reverb, which could be compared to the sound created as if the musician was performing in a basketball gym, or arena, can be applied during the mixing process. When using reverb, the resulting sound "appears" far away and the duration of the sound is longer than if the musician was performing in a small room. Both T and STH feature acoustic guitars "bathed" in reverb.  The following audio exhibits demonstrate the use of reverb to create a mystic, dreamlike quality. The resulting effect is like each note of the guitar has a "whispering tail."

**Audio Exhibit 7: Stairway to Heaven (0 seconds – 25 seconds)**
**Audio Exhibit 8: Taurus (45 seconds – 1minute, 13 seconds)**

**EXHIBIT 3**
[7]**66**

It's obvious to me the songs were both intended to inspire a haunting, melodramatic feel. From the first guitar notes, verbatim guitar arpeggios lull the listener along… Since both songs feature a single guitar, playing a musical composition that in both cases are fingered virtually the same on the guitar, the combined resulting effect, reverb with acoustic guitar, is identical.

In addition to recreating the multitrack recordings of STH and T, I recorded exact replicas of each songs' first 8 measures at a consistent 78 beats per minute, performed by master guitarist Kevin Hanson.

> **Audio Exhibit 9:  8 measures of STH from note 1 of the acoustic guitar, repeated multiple times**
> **Audio Exhibit 10:  8 measures of T from note 1 of the acoustic guitar, repeated multiple times**
> **Audio Exhibit 11:  8 measures of STH and T played together from note 1 of the acoustic guitar, repeated multiple times**

I think when listening to Audio Exhibit 11, it is clear that it appears as one piece of music, indicating to me, beyond a reasonable doubt, the compositions are one in the same.

### *CONCLUSION*

It is my expert opinion, based upon the songwriting process employed by Led Zeppelin, that the song Taurus was infringed upon by Led Zeppelin with their recording of Stairway to Heaven. It is my expert opinion that acoustic guitar introduction and verse to Stairway to Heaven are identical to the composition in Taurus by Randy California. The evidentiary record I have reviewed indicates that Led Zeppelin had access to Taurus well before writing Stairway to Heaven in 1970. The record further indicates that Jimmy Page allegedly first conceived just the guitar introduction to Stairway to Heaven. It is my further expert opinion that Led Zeppelin's songwriting method heavily utilized full sections of material written by others, copied verbatim. It is my expert opinion, based on the above, that Jimmy Page copied the introduction and verse to Stairway to Heaven *and* that Stairway to Heaven was derived as part of the same songwriting process that developed much of Led Zeppelin's catalogue.

I hold these opinions with a reasonable degree of professional and musical certainty. I am being compensated at the rate $175 per hour for this report and $350 for trial. I have testified previously in Marino v. Usher (11-cv-06811 E.D. Pa.).


/s/  Brian Bricklin
Brian Bricklin


February 10, 2016


**EXHIBIT 3**
8**67**
**02313**

Following is a list of songs, originally, or as of yet, uncredited, to songwriters who created unique music or lyrics, which were then incorporated into Led Zeppelin's repertoire and albums. All, either in part, or whole. Led Zeppelin's version is followed by the original unique creations:

**Black Mountain Side (1969) Led Zeppelin**
        **Black Waterside (Bert Jansch, 1966)**

**How Many More Times (1969) Led Zeppelin**
        **No Place to Go (a.k.a. How Many More Years)(Howlin' Wolf)(1959)**
        **Rosie (Alexis Korner Blues Inc.)(1967)**
        **Steal Away (Alexis Korner Blues Inc. & Robert Plant)(1968)**
        **The Hunter (Albert King)(1967)**

**Babe I'm Gonna Leave You (1969) Led Zeppelin**
         **Babe I'm Gonna Leave You (Anne Bredon)(1962)**

**The Lemon Song (1969) Led Zeppelin**
         **Killin' Floor (Howlin' Wolf)(1964)**
         **Traveling Riverside Blues (Robert Johnson)(1937)**

**Bring it on Home (1969) Led Zeppelin**
        **Traveling Riverside Blues (Robert Johnson)(1937)**
**Hats Off to (Roy) Harper (1970) Led Zeppelin**
        **Em on Down (Bukka White)(1937)**

**Since I've Been Loving You (1970) Led Zeppelin**
        **Never (Moby Grape)(1968)**

**Bron-Y-Aur Stomp (1970) Led Zeppelin**
        **The Waggoner's Lad (Bert Jansch)(1966)**

**When the Levee Breaks (1971) Led Zeppelin**
        **When the Levee Breaks (Memphis Minnie & Kansas Joe McCoy)(1929)**

**Custard Pie (1975) Led Zeppelin**
        **Drop Down Mama (Sleepy John Estes)(1935)**
        **I Want Some of Your Pie (Blind Boy Fuller)(1940)**

**In My Time of Dying (1975) Led Zeppelin**
        **Jesus Gonna Make Up my Dying Bed (a.k.a. In my Time of Dying) (Josh White)(1933)**
        **Jesus Make up My Dying Bed (Blind Willie Johnson)(1927)**

**Boogie with Stu (1975) Led Zeppelin**
        **Ooh, My Head (Ritchie Valens)(1957)**

**Nobody's Fault but Mine (1976) Led Zeppelin**
        **Ooh, My Head (Ritchie Valens)(1957)**

**White Summer-Black Mountain Side (1969) Led Zeppelin**
        **White Summer (Yardbirds)(1969)**
        **She Moved Thro' the Fair (Davy Graham) (1963)**

**EXHIBIT 3**
9**68**

**The Girl I Love She Got Long Black Wavy Hair (1969) Led Zeppelin**
     **The Girl I Love She Got Long Curly Hair (Sleepy John Estes)(1927)**
     **Watch Your Step (Bobby Parker)(1961)**

**Your Time Is Gonna Come Led Zeppelin**
     **Dear Mr. Fantasy (Traffic) (1967)**

**Communication Breakdown (1969) Led Zeppelin**
     **Nervous Breakdown (Eddie Cochran)**

**EXHIBIT 3**
10
**69**

**Professional Experience:**

2/1/16 – Present
Future Sonics Inc.        Director of Client Services
Oversee all client relation operations for the premier and leading ear monitor manufacturer.

12/1/2002 – 11/1/15
Music Training Centers, Inc.:  Owner / Director
Engineer and produce original content for Live Performance programs including, fully staged musical theater productions and original song masters.

4/1/2013 – Present
Philadelphia Phillies:   Game Day Audio Engineer
Oversee all broadcast audio elements for game day production. Duties include audio mixing utilizing digital and analog equipment, including stadium audio software and RF components.

7/1/2003 – Present
Philadelphia Eagles:   Game Day Audio Engineer
Oversee all broadcast audio elements for game day production. Duties include audio mixing utilizing digital and analog equipment, including stadium audio software and RF components.

3/1/2009 – 2011
Antoinette Westphal College of Media Arts and Design, Music Industry
Drexel University        Adjunct Faculty
Courses taught:
- Production Company Management
  - Managing a freelance audio engineering career as a business
- Survey of Modern Production Technique
  - Complete history of recording devices, audio engineering and production techniques utilized from the advent of "magnetic" recording

2000 - 2002
Philadelphia Music Conference:        Executive Director
Oversaw all aspects of the annual International Music Conference. More than 25,000 people attended this 3-day event that included panels, workshops, day and nighttime artist showcases, as well as a daily trade show. Responsible for all budget, accounting, and administrative aspects as well as sales, marketing, publicity, Internet, sponsorship and advertising operations of the conference. Created content/text for all PMC brochures, conference directories and ad campaigns in addition to overseeing, editing and approving all graphic artwork, recorded audio and print media. The conference was the subject of a multi-part Comcast CN8 television special, Studio C. (I created and co-produced these programs.)

1970 - Present
                        Musician
Multi-instrumentalist: guitar, bass, drums, and vocals. Professional guitarist since the age of 10 with performances all over the world including: USA (Madison Square Garden, Spectrum, Tower Theatre, Mann Music Center…), Canada, Holland, and Ireland as well as numerous album credits. Featured in "Guitar for the Practicing Musician."   Expert level knowledge of

**EXHIBIT 3**
170

**02316**

amplification, amp modelers, effects and all
forms of processing equipment for instruments and sound reinforcement.


1980 – Present
                    Songwriter, Performer
Co-founding member of the band Bricklin that was signed to A&M records and recently of the band Martin's Dam, signed to Hybrid/Sire. Writer or co-writer of numerous songs in movies and television advertisements including: "Bill & Ted's Excellent Adventure," MTV/Paramount movie "Election," ABC, NBC, CBS, FOX and ESPN, as well as internationally aired television commercials.


1985 - Present
                    Freelance recording engineer

Experienced with Avid Pro Tools®, SSL, Neve, API, Mackie, Korg, Roland, Studer, Alesis, Otari, Antares, etc.; all major brand software and recording equipment. Major and independent label credits.


1990 - 1995
                    Freelance audio engineer for television
Partial credits include: NFL and College football, professional boxing (Mike Tyson, "Bone Crusher" Smith, Michael Moore…), MDA Jerry Lewis telethon (Aretha Franklin), Merv Griffin game show "Ruckus," numerous entertainment specials (PBS Ted Koppel, "World without Walls, "Country Quest," "Seriously Phil," starring Phil Collins…).


1999 - 2002
Sonic Foundry:         Content developer
Created end user audio content (loop libraries) for a software product called "Acid."


Partial list of studios worked in:
Power Station, Avatar, Effenel, Sony, Master Disc, Unique, New York, NY; Wisselloord Studios, Amsterdam, Holland; Range Recording Studios, Studio 4; Sigma Sound; Indre, Meatlocker, Sonic; The Warehouse; 3rd Story; The Dome, Kajem, (in and around) Philadelphia, PA; Rumbo, Skip Saylor, A&M Studios, Los Angeles, CA; Gateway Mastering, Maine; Numerous Mobile Production Trucks; Northwest Mobile;
Generic; EJ Stewart, Sheffield


Partial list of Producer/Engineers worked with:
Kevin Killen (Peter Gabriel, U2, Elvis Costello…), 2 time Grammy winner; Neil Dorfsman (Sting, Paul McCartney, Dire Straits…), Bob Clearmountain (Brian Adams, Bruce Springsteen, Tears for Fears…), Bill Dresher (Rick Springfield, Bangles), Phil Nicolo (Dishwala, Sean Lennon, Anthrax…), Bob Ludwig, Rick Nowels, Bootsy Collins


Affiliations:
Member:  ASCAP
National Academy of Recording Arts and Sciences:
Three times elected to the Board of Governors, National Academy of Recording Arts & Sciences (Grammy Foundation)
Chairperson, MusiCares Committee

**EXHIBIT 3**
12
71

Chairperson, Special Event Committee
Three times appointed to the craft committee for the Grammy category: "Best Engineered
Recording, Non-Classical

**EXHIBIT 3**
13**72**
**02318**

# EXHIBIT 4

**MASTER MUSICIAN – LISTEN, ANALYZE AND PERFORM *TAURUS* AND *STAIRWAY TO HEAVEN***

I, Kevin Hanson, have been retained as an expert in this case to listen to *Taurus* and *Stairway to Heaven*, to perform both pieces as a master musician and execute the pieces as per their original recordings.

I am an accomplished musician, proficient on electric and acoustic guitars, bass, drums, keyboards and vocals. I was engaged to play the following instruments on the *Taurus* and *Stairway to Heaven* re-recordings:

- Electric 6 and 12 string guitars
- Acoustic guitars
- Recorder parts via MIDI.

I was also asked to analyze both *Taurus and Stairway to Heaven* from both performance and production perspectives.

It is my understanding that I will also perform at time of trial.

**QUALIFICATIONS**

**Master Musician/Session Musician**

I am a guitarist, songwriter, producer, teacher, and university professor with 35 years of playing experience and 25 years of teaching experience. I have performed and recorded extensively with both major label and independent bands, toured throughout the US and internationally, and have both studied and taught the guitar on a focused, in-depth level.  I have played on hundreds of both major label and independent recordings for 20 years, in genres including rock, jazz, blues, gospel, hip hop, R+B and classical. I teach university courses on songwriting and on the form and structure of songs. This requires a profound understanding of song composition, arrangement, instrumentation, production and performance.

**STAIRWAY TO HEAVEN**

**Familiarity with Led Zeppelin and *Stairway to Heaven***

I have heard *Stairway to Heaven* my entire life.  The song was still hugely popular in 1972, the year of my birth. Led Zeppelin's music, in particular Led Zeppelin IV, was a significant part of my musical upbringing.  It was played on the radio, on our home stereo system and at many social functions.  I began learning Led Zeppelin's guitar riffs when I began playing guitar at age 10 and

**EXHIBIT 4**
**74**
**02320**

still use the guitar parts from *Stairway to Heaven* as teaching tools and songwriting topics in my current teaching positions.


### Comparative Analysis of Original *Stairway to Heaven* to Re-Recorded *Stairway to Heaven*

The re-recorded version of *Stairway to Heaven* was performed and recorded to sound identical to the original.  All of the guitar parts were emulated with great specificity in terms of instrumentation, sound, performance feel and energy.  The main theme and all of the riffs, chords, guitar solo, and other solo lines are all played note-for-note in the re-recorded version, performed to a high level of musical accuracy.


### **TAURUS**

### Familiarity with Spirit and Taurus

I first heard of the band Spirit through an article discussing the similarities of the song *Taurus* and *Stairway to Heaven*.  When I first heard *Taurus*, I was shocked at the similarities.  I am deeply acquainted with the music of Led Zeppelin and, regrettably, with the multiple accusations levied at the band for their habit of borrowing the music of others without properly crediting the original artists. These stories are common knowledge in the music scene, with the example of *Stairway to Heaven* and its remarkable similarity to *Taurus* being the most notable.


### COMPARATIVE ANALYSIS OF *TAURUS* AND *STAIRWAY TO HEAVEN*

- Many of the components of the initial guitar figure of *Taurus* are virtually identical to those found in *Stairway to Heaven*: the key, the tempo, the feel, the chord progression, the pitches and duration of the melody and the instrumentation are strikingly similar and much of the two pieces are identical. Knowing the history of the bands' mutual encounters, it is my opinion that the similarities of the main themes, as performed on acoustic guitar, are beyond coincidental.
- *Taurus* was written and performed in a ballad-like tempo on a steel string acoustic guitar in the key of A minor, as was *Stairway to Heaven.*
- *Taurus* begins with an arpeggiated A minor figure in 8th notes on the notes A, C, and E, as does *Stairway to Heaven*. The rhythm of the figures is identical up until the last measure.
- The bass notes of the guitar figure of *Taurus* descend chromatically from the tonic down to the b6 degree, as does *Stairway to Heaven.*

**EXHIBIT 4**
75
**02321**

- *Taurus'* opening figure begins on the 4th string at the 7th fret with the third finger and on the 3rd string at the 5th fret with the first finger, as does *Stairway to Heaven*.

- Both selections are performed at virtually the same tempo with the same feel, articulation and style.

- The chord progression is virtually identical for the first 5 chord changes

- The phrasing of the two figures is virtually identical.  Groups of four 8th notes descending over five chords that finally resolve to the tonic

- When the audio tracks of the two figures are isolated and matched at the same tempo, they are almost indistinguishable.  I incorporate by reference the audio exhibits.

- *Taurus* and *Stairway to Heaven* are similar both from a listening standpoint and from a performance standpoint. From a listening standpoint, the main guitar themes of both songs are strikingly similar in tempo, key, melody, melodic shape, rhythm, phrasing, instrumentation, and mood.

- From a performance standpoint, *Taurus* and *Stairway to Heaven* are performed at a nearly identical position on the guitar fretboard.  Both figures begin on the same strings in the same position with the same fingerings.

- For a reasonably skilled guitarist there are many ways to play one chord.  For an A minor triad, there are at least 20 different inversions that are common and easily accessible.  When the instrument's range beyond one octave is taken into consideration, this number is increased substantially.  In comparing the video exhibits "*Taurus* - left hand" and "*Stairway to Heaven* - left hand", one can see that the triads in both examples begin in the same position in the same octave.  I incorporate by reference the four video exhibits of *Taurus* and *Stairway to Heaven.*

- The guitar parts that I replicated in the re-recordings of both songs did receive songwriting credit, as they rightfully should, as they are both melodic themes of primary importance.  The verses of both songs are built around the guitar parts.

- The chord progression for the main theme of STH is not uncommon.  It has been used in many jazz standards, show tunes, and orchestral works.  The following elements from *Stairway to Heaven* and *Taurus* are almost completely in common:

**EXHIBIT 4**
**76**
**02322**

      ○  Actual melodic material;
      ○  Rhythmic placement of the notes of the guitar part;
      ○  Nearly identical performance, in tempo, style and articulation.

This sets *Stairway to Heaven* apart from a song like "Chim Chim Cher-ee", which does feature a chromatically descending bass line, but functions simply to move the harmony beneath an entirely different melody.  It is also a medium-fast waltz.  *Stairway to Heaven*'s similarities to Taurus are in the actual guitar part itself, not just a harmonic device.  *Stairway to Heaven* also differs from what many mistakenly consider to be the same chromatic descending line.  A song such as "Ice Cream Dream" by The Cartoones does not follow this chromatic bass line.  The first interval is a whole step, which by definition is not chromatic.  To compare the main guitar theme of *Stairway to Heaven* to a song like Davey Graham's version of "Cry Me a River" is also not a proper comparison.  Though the chromatic bass movement is intact for a brief moment, Graham's usage of it is a loose interpretation of the original vocal melody.  The brief section in question is also performed in a different time signature, 12/8, which gives it a completely different feel from *Taurus* or *Stairway to Heaven*.

-   To further illustrate, some common jazz standards, "My Funny Valentine" (Rodgers and Hart), "It Don't Mean a Thing If It Ain't Got That Swing" (Duke Ellington) and "In Walked Bud" (Thelonius Monk) all feature a chromatically descending bass line underneath a minor chord.  The aforementioned songs differ greatly from *Taurus* and *Stairway to Heaven* because the melodies of *Taurus* and *Stairway to Heaven* are intimately linked to the composition and performance of the main guitar theme.  It is my opinion that *Taurus* was the single greatest influence on the composition of *Stairway to Heaven*.

I offer these opinions to a reasonable degree of professional and musical certainty.  I am being compensated at $175 per hour for this report and $350 for trial testimony.

/s/ Kevin Hanson
Kevin Hanson

February 10, 2016

EXHIBIT 4
77
02323

1

2

3

4

5

6

7 **UNITED STATES DISTRICT COURT**

8 **CENTRAL DISTRICT OF CALIFORNIA**

9 **WESTERN DIVISION**

10 | MICHAEL SKIDMORE, *etc.*,

| Plaintiff, | Case No. 2:15-cv-03462 RGK (AGRx)

vs.

LED ZEPPELIN, *et al.*,

| Defendants.

[*PROPOSED*] ORDER GRANTING DEFENDANTS' MOTION *IN LIMINE* NO. 4 AND *DAUBERT* MOTION TO EXCLUDE STEWART, JOHNSON, BRICKLIN, AND HANSON

Date: May 10, 2016
Time: 9:00 a.m.

Courtroom of the Honorable
R. Gary Klausner
United States District Judge

1
2
3
4
5
6
7
8

**<u>ORDER</u>**

The Court having considered the Motion *in Limine* No. 4 of defendants James Patrick Page, Robert Anthony Plant, John Paul Jones, Warner/Chappell Music, Inc., Super Hype Publishing, Inc., Atlantic Recording Corporation, Rhino Entertainment Company and Warner Music Group Inc. for an Order excluding the testimony of plaintiff's proffered experts Dr. Alexander Stewart, Erik Johnson, Brian Bricklin and Kevin Hanson., the opposition and reply papers and the oral argument at the hearing on the Motion, the Court rules as follows:

9

**IT IS HEREBY ORDERED**

10
11
12

That defendants' Motion be and hereby is GRANTED and plaintiff's proffered experts Dr. Alexander Stewart, Erik Johnson, Brian Bricklin and Kevin Hanson are excluded.

13
14
15

Dated:

16
17

_____
The Honorable R. Gary Klausner
United States District Judge

18
19
20
21
22

*Submitted by*:

23
24
25
26
27
28

Peter J. Anderson, Esq., Cal. Bar No. 088891
E-Mail: pja@pjanderson.com
LAW OFFICES OF PETER J. ANDERSON
A Professional Corporation
Attorney for Defendants
JAMES PATRICK PAGE, ROBERT ANTHONY
PLANT, JOHN PAUL JONES, WARNER/CHAPPELL
MUSIC, INC., SUPER HYPE PUBLISHING, INC.,
ATLANTIC RECORDING CORP., RHINO
ENTERTAINMENT COMPANY and WARNER
MUSIC GROUP CORP.

1

1

Helene Freeman, Esq., admitted *pro hac vice*
E-Mail:  hfreeman@phillipsnizer.com

2

PHILIPS NIZER LLP
666 Fifth Avenue

3

New York, NY 10103-0084
Tel: (212) 977-9700

4

Fax: (212) 262-5152
Attorneys for Defendants

5

JAMES PATRICK PAGE, ROBERT
ANTHONY PLANT and JOHN PAUL JONES

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

1   Peter J. Anderson, Esq., Cal. Bar No. 88891
    E-Mail: pja@pjanderson.com
2   LAW OFFICES OF PETER J. ANDERSON
    A Professional Corporation
3   100 Wilshire Boulevard, Suite 2010
    Santa Monica, CA 90401
4   Tel: (310) 260-6030
    Fax: (310) 260-6040
5   Attorneys for Defendants
    JAMES PATRICK PAGE, ROBERT ANTHONY
6   PLANT, JOHN PAUL JONES, WARNER/CHAPPELL
    MUSIC, INC., SUPER HYPE PUBLISHING, INC.,
7   ATLANTIC RECORDING CORP., RHINO
    ENTERTAINMENT COMPANY and WARNER
8   MUSIC GROUP CORP.

9   Helene Freeman, Esq., admitted *pro hac vice*
    E-Mail:  hfreeman@phillipsnizer.com
10  PHILIPS NIZER LLP
    666 Fifth Avenue
11  New York, NY 10103-0084
    Tel: (212) 977-9700
12  Fax: (212) 262-5152
    Attorneys for Defendants
13  JAMES PATRICK PAGE, ROBERT ANTHONY
    PLANT and JOHN PAUL JONES

14

15                  **UNITED STATES DISTRICT COURT**

16                  **CENTRAL DISTRICT OF CALIFORNIA**

17                        **WESTERN DIVISION**

18  MICHAEL SKIDMORE, *etc.*,              )   Case No. 2:15-cv-03462 RGK (AGRx)
                                           )
19           Plaintiff,                    )
                                           )
20      vs.                                )   DEFENDANTS' NOTICE OF
                                           )   MOTION AND MOTION *IN*
21  LED ZEPPELIN, *et al.*,                )   *LIMINE* NO. 3 TO EXCLUDE
                                           )   *TAURUS* AUDIO RECORDINGS;
22           Defendants.                   )   MEMORANDUM OF POINTS AND
                                           )   AUTHORITIES IN SUPPORT
23  _____    )
                                           )   Date:  May 10, 2016
24                                             Time: 9:00 a.m.

25                                             Courtroom of the Honorable
                                                   R. Gary Klausner
26                                             United States District Judge

27

28

1  **TO PLAINTIFF AND HIS ATTORNEYS OF RECORD:**

2      **PLEASE TAKE NOTICE** that on May 10, 2016, at 9:00 a.m. or as soon

3  thereafter as the matter may be heard in Courtroom 850 of the above-entitled District

4  Court, located at 255 East Temple Street, Los Angeles, California, defendants James

5  Patrick Page, Robert Anthony Plant, John Paul Jones, Warner/Chappell Music, Inc.,

6  Super Hype Publishing, Inc., Atlantic Recording Corporation, Rhino Entertainment

7  Company and Warner Music Group Inc., will move the above-entitled Court, the

8  Honorable R. Gary Klausner, United States District Judge presiding, for an Order

9  excluding all evidence and argument as to audio recordings of Spirit performing the

10  musical composition *Taurus* and all other audio recordings of that musical

11  composition other than audio recordings strictly limited to the performance of the

12  1967 *Taurus* transcription deposited with the Copyright Office in the 1967

13  registration of the copyright on which plaintiff sues.

14      This Motion is brought on the grounds that, as stated more fully in the

15  accompanying Memorandum of Points and Authorities, plaintiff sues upon a

16  copyright in the 1967 transcription of the musical composition *Taurus* and, as a

17  result, recordings of *Taurus* performed differently than, or with additional music

18  beyond, the 1967 transcription are irrelevant and are likely to unfairly prejudice

19  defendants, confuse the issues, mislead the jury, delay the trial and waste trial time.

20      This Motion is based upon this Notice of Motion and Motion, the

21  Memorandum of Points and Authorities filed with this Notice of Motion and

22  Motion, the pleadings and papers on file in this action, the matters of which this

23  Court may take judicial notice, and such additional matters and oral argument as

24  may be offered in support of the Motion.

25  ///

26  ///

27  ///

28  ///

1

1       The Motions are made following the conference with plaintiff's counsel

2  pursuant to Local Rule 7-3, which took place on March 22, 2016.

3  Dated: March 25, 2016

                                               _____/s/ Peter J. Anderson_____
                                             Peter J. Anderson, Esq.
                         LAW OFFICES OF PETER J. ANDERSON
                         A Professional Corporation
                         Attorney for Defendants
                         JAMES PATRICK PAGE, ROBERT
                       ANTHONY PLANT, JOHN PAUL JONES,
                       WARNER/CHAPPELL MUSIC, INC.,
                       SUPER HYPE PUBLISHING, INC.,
                     ATLANTIC RECORDING CORP., RHINO
                       ENTERTAINMENT COMPANY and
                       WARNER MUSIC GROUP CORP.

                       Helene M. Freeman, Esq.
                       PHILLIPS NIZER LLP
                       Attorney for Defendants
                       JAMES PATRICK PAGE,
                       ROBERT ANTHONY PLANT and
                       JOHN PAUL JONES

2

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**1.    <u>INTRODUCTION</u>**

Plaintiff sues for the alleged infringement of a copyright that protects only the musical composition *Taurus* as embodied in the 1967 transcription that was deposited with the Copyright Office when the copyright was registered forty-nine years ago.    Plaintiff, however, has never produced that 1967 transcription. Defendants did obtain from the Library of Congress a page of sheet music that might be the 1967 *Taurus* transcription – although it does not bear the official stamp appearing on other deposit copies – and provided recordings of a piano and a guitar playing *Taurus* as it appears on the 1967 transcription.

Plaintiff, however, intends to present at trial recordings of Spirit's performances of *Taurus* and new recordings prepared by plaintiff or his claimed experts, and which recordings plaintiff concedes include material and elements that are not in the 1967 transcription and, as a result, are not protected by the only copyright on which plaintiff sues.    Plaintiff intends to do so even though it is established law that those additional materials and elements must be disregarded in comparing *Taurus* and *Stairway to Heaven*.

The recordings of *Taurus* are not relevant and would unfairly prejudice defendants, confuse the issues, mislead the jury, delay the trial and waste trial time. *Taurus* recordings other than recordings strictly limited to the 1967 *Taurus* transcription, should be excluded.

**2.    <u>RECORDINGS OF *TAURUS* ARE PROPERLY EXCLUDED</u>**

    **(a)    <u>Recordings of *Taurus* Are Irrelevant in this Action for Alleged</u>**

           **<u>Infringement of a Copyright in the 1967 Transcription of *Taurus*</u>**

Plaintiff sues on the copyright in the musical composition *Taurus* registered by Hollenbeck Music ("Hollenbeck") in 1967 under the Copyright Act of 1909. Under the 1909 Act, copyright could arise in only two ways.    First, copyright arose if copies were publicly distributed with the required copyright notice.    *Twin Books*

3

1 *Corp. v. Walt Disney Co.*, 83 F.3d 1162, 1165 (9th Cir. 1996).  Second, a copyright

2 could be registered with the Copyright Office along with the mandatory "deposit,

3 with claim of copyright, of one complete copy of such work if it be a . . . musical, or

4 dramatico-musical composition; . . . ."  17 U.S.C. §§ 11-12 (repealed).

5   However, a recording of the performance of a musical composition was not a

6 "copy" of the musical composition.  *ABKCO Music, Inc. v. LaVere*, 217 F.3d 684,

7 688-89 (9th Cir. 2000), *cert. denied* 531 U.S. 1051 (2000); *Rosette v. Rainbo Record*

8 *Mfg. Corp.*, 354 F. Supp. 1183, 1192 n. 8 (S.D.N.Y. 1973) (under the 1909 Act "[a]

9 phonograph record is not a copy of the musical composition itself"), *aff'd*, 546 F.2d

10 461 (2d Cir. 1976); 17 U.S.C § 303(b).  "Because, under the 1909 Act, copyright

11 protection required . . . the deposit of *copies* . . . , to claim copyright in a musical

12 work under the 1909 Act, the work had to be reduced to sheet music or other

13 manuscript form."  2 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 2.05[A]

14 (emphasis in original).

15   Further, musical compositions and recordings are separate works.  *Newton v.*

16 *Diamond*, 204 F. Supp. 2d 1244, 1249 (C.D. Cal. 2002), *aff'd* 388 F.3d 1189, *cert.*

17 *denied* 545 U.S. 1114 (2005).  "A musical composition consists of rhythm, harmony,

18 and melody, and . . . [a] musical composition's copyright protects the generic sound

19 that would necessarily result from any performance of the piece."  *Id.*  In contrast,

20 "the sound recording is the sound produced by the performer's rendition of the

21 musical work." *Id.* at 1249-50.  Unless they appear in the musical composition's

22 transcription, performance elements are not protected by the composition copyright.

23 *Id.* at 1250-51.  *Newton v. Diamond*, 388 F.3d 1189, 1193 (9th Cir. 2004) (in

24 considering claim of copying of musical composition, one "may consider only . . .

25 appropriation of the song's compositional elements and must remove from

26 consideration all the elements unique to [the recorded] performance"), *cert. denied*

27 545 U.S. 1114 (2005).

28 ///

1    In 1967, Hollenbeck registered the copyright in the *Taurus* musical

2 composition and in doing so was required to deposit a "complete copy of" the

3 copyrighted work in written, sheet music form.  17 U.S.C. § 12.  Plaintiff has

4 presented no evidence that he is a legal or beneficial owner of a registered copyright

5 in the *Taurus* recordings.  Nor could he, since federal copyright does not protect pre-

6 February 15, 1972 sound recordings.  *Dowling v. United States*, 473 U.S. 207, 211 n.

7 4 (1985) ("Congress did not extend federal copyright protection to sound recordings

8 until the Sound Recording Act of 1971, Pub.L. 92–140, 85 Stat. 391, and then only

9 to sound recordings fixed after February 15, 1972").  As a result, the only material

10 protected by the copyright he sues upon is what appears on the 1967 transcription

11 that Hollenbeck deposited with the Copyright Office.  *Williams v. Bridgeport Music,*

12 *Inc.*, No. LA CV13-06004 JAK, 2014 WL 7877773, at *9-10 (C.D. Cal. Oct. 30,

13 2014) (recordings are "not protectable publications under the 1909 Act" and "the

14 lead sheets are deemed to define the scope of [the 1909 Act] copyrighted

15 compositions"); *Fahmy v. Jay Z*, No. 07CV05715-CAS-PJWx, 2015 WL 5680299,

16 at *13-14 (C.D. Cal. Sept. 24, 2015) (same).

17    Anything beyond the copyrighted 1967 *Taurus* transcription, including in

18 recordings of *Taurus*, is irrelevant to what is protected by the copyright that plaintiff

19 sues upon.  *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1443 (9th Cir.

20 1994) ("only those elements of a work that are protectable and used without the

21 author's permission can be compared when it comes to the ultimate question of

22 illicit copying, . . . ."  ), *cert. denied* 513 U.S. 1184 (1995).

23    Accordingly, recordings of Spirit performing *Taurus*, as well as any other

24 recordings that are not strictly limited to the 1967 transcription, are irrelevant and

25 should be excluded.

26 ///

27 ///

28 ///

5

**(b)** ***Taurus* Recordings that Are Different from the Copyrighted 1967 Transcription Would Confuse Issues, Mislead the Jury, Unfairly Prejudice Defendants, Delay the Trial and Waste Trial Time**

Recordings of *Taurus* that are different from the 1967 *Taurus* transcription also are properly excluded because any "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, . . . ." Fed. R. Evid. 403; *United States v. McFall*, 558 F.3d 951, 963-64 (9th Cir. 2009) (Rule 403 balancing test requires the assessment of probative value in order to weigh it against the danger of undue prejudice).

Recordings of *Taurus* that are different from the 1967 *Taurus* transcription have no probative value because they are not copies of the 1967 musical composition and do not evidence the scope of the musical composition that plaintiff sues upon. *See, above* at 3-4. Further, the use of those *Taurus* recordings would be substantially prejudicial.

Plaintiff concedes that the recordings of Spirit's performances of *Taurus* contain additional material and elements that are not on the 1967 *Taurus* transcription that defendants obtained. *See, e.g.,* Pltf's Oppn. (Doc. 126) at 18:13-15 ("The deposit copy of Taurus does not reflect the entirety of the musical composition in a work, which is instead reflected by the composition of Taurus embodied in the 49-year old sound recording"[1]). Plaintiff also intends to offer new recordings of its claimed experts' performances of *Taurus* replicating Spirit's

---

[1]     As a matter of established law, plaintiff is flatly wrong that the copyrighted *Taurus* musical composition is established by the 1967 Spirit recording. The 1967 recording of Spirit's performance is neither a "copy" of the musical composition (*see, above* at 4) nor even a copyrighted work. *Dowling*, 473 U.S. at 211. Plaintiff sues only on the copyright in the 1967 *Taurus* transcription, which is limited to that transcription. *Williams*, 2014 WL 7877773, at *9-10 ("the lead sheets are deemed to define the scope of [the 1909 Act] copyrighted compositions").

6

**02333**

1    performances, rather than the 1967 *Taurus* transcription.  But, in comparing *Taurus*

2    and *Stairway to Heaven* the jury must disregard the additional material and elements

3    appearing in those recordings and consider only the copyrighted musical

4    composition as memorialized in the 1967 *Taurus* transcription.  That they can do by

5    resort to the recordings defendants provided of *Taurus* as it appears on the 1967

6    transcription.

7         To instead allow plaintiff to use recordings that differ from the 1967 *Taurus*

8    transcription would require that the jury identify the material and elements that are

9    not in the 1967 transcription and – while listening to the Spirit recording or

10   plaintiff's new recordings based on the Spirit recording – disregard those materials

11   and elements.  That alone is either impossible or rife with risk the jury will be

12   confused as to the issues or misled as to what is protected and what is not.  And it is

13   even worse: the jury would then be required – again while listening to those

14   recordings – to determine whether, without the recordings' materials and elements,

15   there is substantial similarity between the 1967 transcription and *Stairway to*

16   *Heaven*.  It is no wonder that Courts have refused to allow the use of recordings

17   where, as here, the only copyrighted work is a transcribed musical composition.

18   *Fahmy*, 2015 WL 5680299, at *14 (given that plaintiff's copyright limited to

19   transcription and he does not own copyright in sound recordings, "[p]resenting the

20   sound recordings at trial carries a significant risk of confusing and misleading the

21   jury"; motion *in limine* granted).

22        Accordingly, recordings of Spirit's performances of *Taurus* are also properly

23   excluded under Rule 403.

24   **3.**    **CONCLUSION**

25        Plaintiff sues on the copyright in a 1967 musical composition and that

26   copyright is limited to the 1967 *Taurus* transcription which is different from the

27   recordings of *Taurus* that plaintiff seeks to use at trial.  Those recordings do not

28   *///*

7

**02334**

1  increase, change or establish the scope of protection accorded the copyright in the

2  1967 *Taurus* transcription and, as a result, are irrelevant.

3      Also, their use at trial would unfairly prejudice defendants, confuse the issues

4  and scope of the allegedly-infringed copyright, mislead the jury as to what is

5  protected by the claimed copyright in the 1967 *Taurus* musical composition, unduly

6  delay the trial and waste trial time.  Evidence and argument as to recordings of Spirit

7  performing *Taurus* or plaintiff's experts performing *Taurus* as Spirit performed it,

8  should be excluded.

9  Dated: March 25, 2016

/s/ Peter J. Anderson
Peter J. Anderson, Esq.
LAW OFFICES OF PETER J. ANDERSON
A Professional Corporation
Attorney for Defendants
JAMES PATRICK PAGE, ROBERT
ANTHONY PLANT, JOHN PAUL JONES,
WARNER/CHAPPELL MUSIC, INC.,
SUPER HYPE PUBLISHING, INC.,
ATLANTIC RECORDING CORP., RHINO
ENTERTAINMENT COMPANY and
WARNER MUSIC GROUP CORP.


Helene M. Freeman, Esq.
PHILLIPS NIZER LLP
Attorney for Defendants
JAMES PATRICK PAGE,
ROBERT ANTHONY PLANT and
JOHN PAUL JONES

8

**02335**

1

2

3

4

5

6

7 **UNITED STATES DISTRICT COURT**

8 **CENTRAL DISTRICT OF CALIFORNIA**

9 **WESTERN DIVISION**

10 MICHAEL SKIDMORE, *etc.*,

11      Plaintiff,

12      vs.

13 LED ZEPPELIN, *et al.*,

14      Defendants.

15

Case No. 2:15-cv-03462 RGK (AGRx)

*[PROPOSED]* ORDER GRANTING DEFENDANTS' MOTION *IN LIMINE* NO. 3 TO EXCLUDE *TAURUS* AUDIO RECORDINGS

Date:  May 10, 2016
Time:  9:00 a.m.

16 Courtroom of the Honorable
17 R. Gary Klausner
United States District Judge

18

19

20

21

22

23

24

25

26

27

28

1

## ORDER

2   The Court having considered the Motion *in Limine* No. 3 of defendants James

3 Patrick Page, Robert Anthony Plant, John Paul Jones, Warner/Chappell Music, Inc.,

4 Super Hype Publishing, Inc., Atlantic Recording Corporation, Rhino Entertainment

5 Company and Warner Music Group Inc. for an Order excluding audio recordings of

6 performances of *Taurus* that are different from the 1967 *Taurus* transcription

7 deposited with the Copyright Office, the opposition and reply papers and the oral

8 argument at the hearing on the Motion, the Court rules as follows:

9   **IT IS HEREBY ORDERED**

10   That defendants' Motion be and hereby is GRANTED and plaintiff may not

11 offer recordings of Spirit performing the musical composition *Taurus* or any other

12 recordings of that musical composition other than audio recordings strictly limited to

13 the performance of the 1967 *Taurus* transcription deposited with the Copyright

14 Office in the 1967 registration of the copyright on which plaintiff sues.

15

16

17 Dated:

18           <u>          </u>
             The Honorable R. Gary Klausner

19              United States District Judge

20

21

22 *Submitted by*:

23 Peter J. Anderson, Esq., Cal. Bar No. 088891
  E-Mail: pja@pjanderson.com

24 LAW OFFICES OF PETER J. ANDERSON
  A Professional Corporation

25 Attorney for Defendants
  JAMES PATRICK PAGE, ROBERT ANTHONY

26 PLANT, JOHN PAUL JONES, WARNER/CHAPPELL
  MUSIC, INC., SUPER HYPE PUBLISHING, INC.,

27 ATLANTIC RECORDING CORP., RHINO
  ENTERTAINMENT COMPANY and WARNER

28 MUSIC GROUP CORP.

1

1  Helene Freeman, Esq., admitted *pro hac vice*
   E-Mail:  hfreeman@phillipsnizer.com
2  PHILIPS NIZER LLP
   666 Fifth Avenue
3  New York, NY 10103-0084
   Tel: (212) 977-9700
4  Fax: (212) 262-5152
   Attorneys for Defendants
5  JAMES PATRICK PAGE, ROBERT
   ANTHONY PLANT and JOHN PAUL JONES
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

1   Peter J. Anderson, Esq., Cal. Bar No. 88891
    E-Mail: pja@pjanderson.com
2   LAW OFFICES OF PETER J. ANDERSON
    A Professional Corporation
3   100 Wilshire Boulevard, Suite 2010
    Santa Monica, CA 90401
4   Tel: (310) 260-6030
    Fax: (310) 260-6040
5   Attorneys for Defendants
    JAMES PATRICK PAGE, ROBERT ANTHONY
6   PLANT, JOHN PAUL JONES, WARNER/CHAPPELL
    MUSIC, INC., SUPER HYPE PUBLISHING, INC.,
7   ATLANTIC RECORDING CORP., RHINO
    ENTERTAINMENT COMPANY and WARNER
8   MUSIC GROUP CORP.

9   Helene Freeman, Esq., admitted *pro hac vice*
    E-Mail:  hfreeman@phillipsnizer.com
10  PHILIPS NIZER LLP
    666 Fifth Avenue
11  New York, NY 10103-0084
    Tel: (212) 977-9700
12  Fax: (212) 262-5152
    Attorneys for Defendants
13  JAMES PATRICK PAGE, ROBERT ANTHONY
    PLANT and JOHN PAUL JONES

14

15                  **UNITED STATES DISTRICT COURT**

16                  **CENTRAL DISTRICT OF CALIFORNIA**

17                       **WESTERN DIVISION**

18  MICHAEL SKIDMORE, *etc.*,          )   Case No. 2:15-cv-03462 RGK (AGRx)
                                       )
19            Plaintiff,               )
                                       )
20       vs.                           )   DEFENDANTS' REPLY
                                       )   MEMORANDUM OF POINTS AND
21  LED ZEPPELIN, *et al.*,            )   AUTHORITIES IN SUPPORT OF
                                       )   MOTION FOR SUMMARY
22            Defendants.              )   JUDGMENT OR, IN THE
                                       )   ALTERNATIVE, PARTIAL
23  _____       )   SUMMARY JUDGMENT
                                       )
24                                         Date:  March 28, 2016
                                           Time: 9:00 a.m.
25
                                           Courtroom of the Honorable
26                                         R. Gary Klausner
                                           United States District Judge
27

28

**02339**

1

## **TABLE OF CONTENTS**

2    REPLY MEMORANDUM OF POINTS AND AUTHORITIES ................................1

3    1.     SUMMARY JUDGMENT ON THE COPYRIGHT CLAIMS ........................1

4        (a)   Plaintiff Cannot Sue Because *Taurus* Is a Work for Hire ......................1

5        (b)   Wolfe Waived the Alleged Infringement..................................................2

6        (c)   Wolfe and the Trust Abandoned the Claim .............................................3

7        (d)   Laches Bars Plaintiff's Suit as Claimed Beneficial Owner of *Taurus* ....4

8        (e)   Even if Plaintiff Avoids these Hurdles, the Copyright Claims Fail ........5

9            (1)   Plaintiff Never Produced the *Taurus* Deposit Copy......................5

10            (2)   Plaintiff Has Not Proven Strikingly Similarity .............................5

11            (3)   Neither Is there Admissible Evidence of Access Plus

12                Substantial Similarities ..................................................................6

13                *i.*    *Plaintiff Presents No Admissible Evidence of Access* .........6

14                     a.   "Taurus" Was Not "Widely Disseminated" ...............6

15                     b.   The Admissible Evidence Is Spirit Rarely

16                         Performed *Taurus* After Spirit Recorded Its

17                         Second Album ............................................................6

18                     c.   The Admissible Evidence Is Undisputed that Led

19                         Zeppelin's Members Never Heard *Taurus* .................7

20                     d.   *Fresh Garbage* Is a Red Herring ................................7

21                     e.   Plaintiff's References to Other Alleged Instances of

22                         Copying is Wrong, Irrelevant and Inadmissible..........7

23                *ii.*   *Plaintiff Presents No Evidence of Substantial*

24                   *Similarities in Protected Expression* ...................................7

25                     a.   Plaintiff Admits He Disclosed No Expert Analysis

26                         as to the Copyrighted Work: the *Taurus* Deposit

27                         Copy...........................................................................7

28

i

1                    b.    Disregarding the Minor Line Cliché Leaves No

2                         Significant Similarities ................................................8

3                    c.    Plaintiffs' New Argument – Selection and

4                       Arrangement of Unprotected Elements – Also

5                     Fails............................................................................9

6       (f)    Plaintiff Concedes the Copyright Claims Fail as to John Paul Jones,

7            Super Hype Publishing and Warner Music Group Corp. ......................10

8  2.       PLAINTIFF ABANDONS HIS "RIGHT OF ATTRIBUTION" CLAIM ......10

9  3.       PARTIAL SUMMARY JUDGMENT...............................................................10

10  4.       CONCLUSION ..............................................................................................10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ii

1

## <u>TABLE OF AUTHORITIES</u>

2   **Cases**

3   *Allen v. Destiny's Child*, No. 06 C 6606, 2009 WL 2178676

4      (N.D. Ill. July 21, 2009) ..................................................................9

5   *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989) ..................................1

6   *Conlon v. United States*, 474 F.3d 616 (9th Cir. 2007)................................................2

7   *Cortner v. Israel*, 732 F.2d 267 (2d Cir. 1984) ...........................................................5

8   *Fahmy v. Jay Z*, No. 07CV05715-CAS-PJWx, 2015 WL 5680299

9      (C.D. Cal. Sept. 24, 2015)..........................................................8

10  *FunkyFilms, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072 (9th Cir. 2006)...........9

11  *Hadady Corp. v. Dean Witter Reynolds, Inc.*, 739 F. Supp. 1392

12     (C.D. Cal. 1990) .................................................................4

13  *Intersong-USA v. CBS, Inc.*, 757 F. Supp. 274 (S.D.N.Y. 1991)................................7

14  *Lopez v. Elec. Rebuilders, Inc.*, 416 F. Supp. 1133 (C.D. Cal. 1976)........................4

15  *Marya v. Warner/Chappell Music, Inc.*, No. CV134460GHK-MRWx,

16     2015 WL 5568497 (C.D. Cal. Sept. 22, 2015) .........................................3

17  *Melchizedek v. Holt*, 792 F. Supp. 2d 1042 (D. Ariz. 2011) .......................................3

18  *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975 (9th Cir. 2006).............................4

19  *Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2012 WL 1965778

20     (N.D. Cal. May 31, 2012) .......................................................3

21  *Oravec v. Sunny Isles Luxury Ventures L.C.*, 469 F. Supp. 2d 1148

22     (S.D. Fla. 2006) *aff'd*, 527 F.3d 1218 (11th Cir. 2008)......................................3, 4

23  *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S.Ct. 1962 (2014) ................................5

24  *Playboy Enter., Inc. v. Dumas*, 53 F.3d 549 (2d Cir. 1995), *cert. denied*

25     516 U.S. 1010 (1995).............................................................1

26  *Sanga Music, Inc. v. EMI Blackwood Music, Inc.*, 55 F.3d 756 (2d Cir. 1995) ..........3

27  *Satava v. Lowry*, 323 F.3d 805 (9th Cir. 2003), *cert. denied* 540 U.S. 983

28     (2003) ................................................................................9

*Scentsy, Inc. v. B.R. Chase, LLC*, 942 F. Supp. 2d 1045 (D. Idaho 2013),

  *rev'd in part*, 585 F. App'x 621 (9th Cir. 2014) ........................................8

*Selle v. Gibb*, 741 F.2d 896 (7th Cir. 1984) ................................................5

*Swirsky v. Carey*, 376 F.3d 841 (9th Cir. 2004) ........................................9

*Three Boys Music Corp. v. Bolton*, 212 F.3d 477 (9th Cir. 2000),

  *cert. denied* 531 U.S. 1126 (2001) ........................................................8

*Tisi v. Patrick*, 97 F. Supp. 2d 539 (S.D.N.Y. 2000) ................................6

*United States v. Bailey*, 696 F.3d 794 (9th Cir. 2012) ..............................7

*Vargas v. Transeau*, 514 F. Supp. 2d 439 (S.D.N.Y. 2007), *aff'd*

  352 F. App'x 458 (2d Cir. 2009) ............................................................6

*Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136 (9th Cir. 2003) ....................4

*Williams v. Bridgeport Music, Inc.*, No. LA CV13-06004 JAK,

  2014 WL 7877773 (C.D. Cal. Oct. 30, 2014) ......................................8

**Statutes**

17 U.S.C. § 101 ............................................................................................1

17 U.S.C. § 106 ..........................................................................................10

17 U.S.C. § 408 ............................................................................................8

**Other Authorities**

Black's Law Dictionary (10th ed. 2014) ......................................................4

Copyright Office Compendium ....................................................................9

**Treatises**

M. Nimmer & D. Nimmer, *Nimmer on Copyright* ......................................5

## REPLY MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff's opposition misstates the applicable law, misstates the evidence he cites, offers declarations from witnesses he never identified and relies on rank hearsay and scurrilous character assassination to try to avoid the inevitable conclusion that his forty-five-year-old claims should be dismissed.

## 1.   SUMMARY JUDGMENT ON THE COPYRIGHT CLAIMS

### (a)   Plaintiff Cannot Sue Because *Taurus* Is a Work for Hire

Plaintiff concedes that under the August 29, 1967 Exclusive Songwriter Agreement, Wolfe was an employee of Hollenbeck and that works created after August 29, 1967 are works for hire as to which plaintiff cannot sue.  Def. Memo. (Doc. 97-1) at 5-8.  Plaintiff argues only that the musical composition *Taurus* predates the Songwriter Agreement.  But, that argument fails for multiple reasons.

Relying on cases applying the 1976 Act, plaintiff states that "Work for Hire contracts only apply to works created after the contract is reduced to writing and signed."  Oppn. (Doc. 126, Exh. A) at 13:25 to 14:3, 14:6-8.[1]  Those cases are inapplicable because the 1909 Act governs who is the author of works created before the 1976 Act.  Def. Memo. at 6:21-25.  That is crucial because under the 1909 Act there simply was no copyrighted musical composition *Taurus* until Hollenbeck registered it with the Copyright Office on December 22, 1967.  Def. Memo. at 6-7. The 1976 Act's stricter definition of work for hire (*Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 747-48, 749 (1989)) does not apply.  Def. Memo. at 6:21-25.

Further, plaintiff's argument that versions of *Taurus* were performed prior to the Songwriter Agreement not only ignores that under the 1909 Act performances were irrelevant, but also ignores the testimony of Spirit's Jay Ferguson that *Taurus* was a work-in-progress that was not completed until it was recorded by Ode

---

[1]   While *Playboy Enter., Inc. v. Dumas*, 53 F.3d 549 (2d Cir. 1995), *cert. denied* 516 U.S. 1010 (1995), also discussed the 1909 Act, plaintiff cites pages 558-59, where *Playboy* applied the 1976 Act.

1

1    Records.  Ferguson Depo. (Anderson Decl. (Doc. 97-10) Exh. 8) at 199:3-18.  The

2    evidence from Ferguson, Andes and even Wolfe is that *Taurus* was recorded under

3    the supervision of Hollenbeck's and Ode Record's Lou Adler.  *Id.* at 197:15 to

4    198:6, 198:12 to 199:2; Andes Depo. (Anderson Decl. 9) at 158:2 to 160:14; Wolfe

5    Interview (Freeman Decl. (Doc. 97-8) Exh. 6) at 1:4-3:7.  And, plaintiff's assertion

6    that Hollenbeck did not specify in the 1967 registration that *Taurus* is a work for

7    hire is both irrelevant (Def. Memo. at 7-8 n. 4) and moot since, as permitted by law

8    (*id.*), Hollenbeck has corrected it.  *Id.*; Anderson Reply Decl. at 1, ¶ 3, Exh. 27.

9         Plaintiff also concedes that he did not timely respond to requests for admission

10   that *Taurus* is a work for hire.  His counsel's unexplained assertion he thought he did

11   not need to timely respond does plaintiff no good.  Objection No. 42.  Plaintiff

12   argues defendants did not rely to their detriment on his deemed admissions.  Oppn.

13   at 15:8-10, *citing Conlon v. United States*, 474 F.3d 616 (9th Cir. 2007).  But,

14   *Conlon*, in affirming the denial of a motion to withdraw deemed admissions, held

15   that even absent prejudice the District Court may deny relief.  *Id.* at 624-65.  And

16   there is prejudice: in reliance on the deemed admissions that *Taurus* is a work for

17   hire, defendants did not depose Adler and others.  Anderson Reply Decl. at 3, ¶ 13.

18        Because *Taurus* is a work for hire, summary judgment should be granted.

19        **(b)**   <u>**Wolfe Waived the Alleged Infringement**</u>

20        Wolfe also expressly waived the alleged infringement in 1991 when he told an

21   interviewer that he was pursuing a claim as to another group's song, but he was not

22   bothered by the alleged use of *Taurus* for the introduction of *Stairway*, that "if they

23   wanted to use" *Taurus* "that's fine," "I'll let them have the beginning of Taurus for

24   their song without a lawsuit" and "I'm letting them off the hook."  Def. Memo. at 4.

25        Faced with a tape recording of Wolfe waiving the claim, plaintiff offers

26   hearsay statements that Wolfe intended to pursue it, speculation that perhaps he was

27   joking and the misrepresentation that defendants did not provide the recording of

28   these statements to the Court.  Freeman Decl. Audio Exh. 4.  Plaintiff also argues

2

1    that Wolfe did not approve the published liner notes, but there is no dispute that he

2    gave the interview for publication and the liner notes correctly quote him.

3         Wolfe's unequivocal waiver of the claim is another basis to grant the motion.

4         **(c)   Wolfe and the Trust Abandoned the Claim**

5         Wolfe's 1991 statements and his and the Trust's failure to sue also constitute

6    abandonment.  Def. Memo. at 8-9.  None of the cases plaintiff cites help him.

7         In *Marya v. Warner/Chappell Music, Inc.*, No. CV134460GHK-MRWx, 2015

8    WL 5568497 (C.D. Cal. Sept. 22, 2015), the issue was whether the copyright

9    proprietors authorized a third party to publish a work without a copyright notice.  *Id.*

10   at *9-10.  Here, defendants rely on the statements and conduct of Wolfe and the

11   Trust, not a third party.  In *Melchizedek v. Holt*, 792 F. Supp. 2d 1042 (D. Ariz.

12   2011), the owner stated his works were copyrighted because his publishers required

13   it, but "personally I have never cared about the copyrights." *Id.* at 1052-53.  His

14   statement confirmed the copyrights, while expressing no personal interest in them.

15   Wolfe specifically abandoned any claim and, with the Trust, refrained from suing for

16   forty-three years.  *Sanga Music, Inc. v. EMI Blackwood Music, Inc.*, 55 F.3d 756,

17   761 (2d Cir. 1995) (songwriter abandoned rights by allowing another to use song).

18        In *Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2012 WL 1965778

19   (N.D. Cal. May 31, 2012), the mere decision not to sue coupled with ambiguous

20   statements did not establish abandonment.  *Id.* at *2.  Here, Wolfe's statements are

21   unambiguous and coupled with forty-three years of inaction.  And, in *Oravec v.*

22   *Sunny Isles Luxury Ventures L.C.*, 469 F. Supp. 2d 1148 (S.D. Fla. 2006) *aff'd*, 527

23   F.3d 1218 (11th Cir. 2008), the statement that no copyright was claimed constituted

24   abandonment and trumped the argument that abandonment was not intended.

25   *Oravec*, 469 F. Supp. 2d at 1178.  Here, as in *Oravec*, Wolfe clearly and

26   unequivocally stated that he relinquished any claim that *Stairway* copied *Taurus*,

27   <u>plus</u> he and the Trust let forty-three years pass.  That is abandonment.

28        Plaintiff tries to distinguish *Hadady Corp. v. Dean Witter Reynolds, Inc.*, 739

3

1   F. Supp. 1392 (C.D. Cal. 1990), by arguing the plaintiff's newsletter
2   "unequivocally" limited copyright to two days.  Oppn. at 16:10-11.  But, Wolfe's
3   1991 statements are also unequivocal and he carefully distinguished between another
4   band's alleged copying of the entirety of another song (the claim he was pursuing)
5   and the alleged copying of a portion of *Taurus* (the claim he was abandoning).

6       Finally, plaintiff offers declarations – including from witnesses he never
7   disclosed – to argue that Wolfe was upset since "the 1970s" and "repeatedly thought
8   about pursuing a suit . . . ."  *Id.* at 16:20 to 17:1.  Aside from defendants' evidentiary
9   objections, plaintiff's effort is for naught because abandonment turns on statements
10  and conduct, not claimed subjective intent.  *Lopez v. Elec. Rebuilders, Inc.*, 416 F.
11  Supp. 1133, 1135 (C.D. Cal. 1976); *Oravec*, 469 F. Supp. 2d at 1178.

12      Abandonment is another independent basis to grant the motion.

13      **(d)   Laches Bars Plaintiff's Suit as Claimed Beneficial Owner of *Taurus***

14      Even if plaintiff could overcome all of those hurdles, he sues as a beneficial
15  owner and cannot overcome the "strong presumption," triggered by forty-three years
16  of delay, that laches bars the claims.  Def. Memo. at 9-11, *quoting Miller v. Glenn
17  Miller Prods., Inc.*, 454 F.3d 975, 997 (9th Cir. 2006).  Indeed, he concedes that in
18  the decades of delay important witnesses have died and memories faded.

19      Plaintiff argues the 1976 Act confers standing on beneficial owners.  Oppn. at
20  17:13-15.  But, it also provides the remedy of profits, which plaintiff concedes is an
21  equitable remedy subject to laches.  *Id.* at 17-18.  That the 1976 Act allows both
22  legal and beneficial owners to sue does not change that beneficial ownership is an
23  equitable claim.   Indeed, the very meaning of beneficial ownership is "[o]ne
24  recognized in equity . . . even though legal title may belong to someone else."
25  Black's Law Dictionary (10th ed. 2014).  Plaintiff tries mischaracterizing *Warren v.
26  Fox Family Worldwide, Inc.*, 328 F.3d 1136 (9th Cir. 2003).  Oppn. at 17:18-21.
27  However, *Warren* agreed that beneficial ownership is "an equitable trust
28  relationship," and merely held that it does not apply to works for hire.  *Warren*, 328

4

1   F.3d 1136, 1144-45, *quoting Cortner v. Israel*, 732 F.2d 267, 271 (2d Cir. 1984).

2       Plaintiff also argues that *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S.Ct.

3   1962 (2014), limited laches to "extraordinary circumstances" that would result in a

4   work's "total destruction." Oppn. at 17:22-25. But, that portion of *Petrella* is both

5   dictum and limited to laches as applied to remedies. 134 S.Ct. at 1977-78. *Petrella*

6   also did not involve a beneficial copyright claim and specifically noted there was no

7   evidentiary prejudice. *Id.* at 1972 n. 11. As a result, *Petrella* does not limit laches

8   when applied to a forty-three-year-old beneficial ownership claim and undisputed

9   evidence of substantial evidentiary prejudice.

10       Plaintiff has not overcome the strong presumption that laches applies, and that

11   is another independent reason the motion should be denied.

12       **(e)**   **<u>Even if Plaintiff Avoids these Hurdles, the Copyright Claims Fail</u>**

13       **(1)**   **Plaintiff Never Produced the *Taurus* Deposit Copy**

14       Plaintiff does not deny that to pursue his claims he must prove the 1967

15   deposit copy of *Taurus* (Def. Memo. at 11) – a distinct issue from what the 1967

16   copyright protects (*see, below* at 7-8) – but suggests defendants provided it. Pltf.

17   Stmt. (Doc. 118-1) at 5, ¶6. He also admits, however, that the *Taurus* transcription

18   defendants received does not bear the Copyright Office's stamp. *Id.* at 6, ¶ 13. In

19   short, there is no confirmation of the *Taurus* deposit copy that plaintiff is required to

20   prove. For that additional reason, the claims fail.

21       **(2)**   **Plaintiff Has Not Proven Strikingly Similarity**

22       Plaintiff asserts that striking similarity "does not require expert testimony . . .

23   as the similarity is so noticeable . . . ." Oppn. at 2:10-12. That similarity is a public

24   domain minor line cliché. Further, the law requires that plaintiff submit admissible

25   expert testimony of striking similarity. *Selle v. Gibb*, 741 F.2d 896, 905 (7th Cir.

26   1984); 4 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 13.02[B] (expert

27   testimony required to prove striking similarities in music cases). Plaintiff falls short.

28       Plaintiff relies on language in Stewart's declaration that does not appear in his

5

1   earlier Rule 26 expert report, which claimed only substantial similarities.  Objection

2   No. 49.  Stewart's new claim of striking similarities is precluded and also properly

3   disregarded since he "equivocates on the level of similarity . . . ."  *Vargas v.*

4   *Transeau*, 514 F. Supp. 2d 439, 445 (S.D.N.Y. 2007), *aff'd* 352 F. App'x 458 (2d

5   Cir. 2009).  Also, his and Johnson's assertions are conclusory, rely on *Taurus*

6   recordings rather than the 1967 *Taurus* transcription, rely on unprotectable elements

7   and disregard the substantial differences.  Objections Nos. 44 & 51; *Vargas*, 514 F.

8   Supp. 2d at 447 ("an issue of fact cannot be created by merely reciting the magic

9   words 'strikingly similar' and 'no possibility of independent creation'"), *quoting Tisi*

10  *v. Patrick*, 97 F. Supp. 2d 539, 549 (S.D.N.Y. 2000).

11              **(3)     Neither Is there Admissible Evidence of Access Plus**

12                       **Substantial Similarities**

13      Since the works are not strikingly similar, plaintiff must present admissible

14  evidence of access <u>and</u> substantial similarity, and he has done neither.

15                  ***i.     Plaintiff Presents No Admissible Evidence of Access***

16                       **a.  "Taurus" Was Not "Widely Disseminated"**

17      Plaintiff produced no evidence of widespread distribution of *Taurus* and now

18  relies on conclusory declarations and previously-undisclosed witnesses.  *See, e.g.,*

19  Objections Nos. 89-90.  There is no admissible evidence of widespread distribution.

20                  **b.  The Admissible Evidence Is Spirit Rarely Performed**

21                       ***Taurus* After Spirit Recorded Its Second Album**

22      Discovery revealed that out of 175 live performances from December 1968 to

23  December 1971, *Taurus* was played twice.  Fact 24.  Plaintiff offers conclusory

24  declarations that *Taurus* was "typically" played and played at unspecified concerts,

25  but that is not evidence and ignores Spirit's surviving members' testimony that the

26  songs they tended to play at concerts did not include *Taurus*.  Fact 33.  Plaintiff also

27  misrepresents that Spirit's December 26, 1968 performance was to support their first

28  album, with *Taurus*, released a year earlier: actually, that concert's handbill instead

6

**02349**

1     identified their new, break-out album, *The Family that Plays Together*.  Fact 34.

2                  **c.   The Admissible Evidence Is Undisputed that Led**

3                     **Zeppelin's Members Never Heard *Taurus***

4       Neither the surviving members of Spirit nor any of the witnesses plaintiff now

5 proffers for the first time claim to have seen any member of Led Zeppelin present

6 when Spirit performed *Taurus*.

7                     **d.   *Fresh Garbage* Is a Red Herring**

8       Plaintiff – although mischaracterizing playing a short bass riff in an unrelated

9 Led Zeppelin medley as "performing" *Fresh Garbage* – does not dispute that *Fresh*

10 *Garbage* was released in England on an album without *Taurus* and that Led

11 Zeppelin began playing that medley before coming to the United States.  Fact 67-69.

12               **e.   Plaintiff's References to Other Alleged Instances of**

13                  **Copying is Wrong, Irrelevant and Inadmissible**

14       Faced with a failure of proof as to access, plaintiff is left with claiming Led

15 Zeppelin copied numerous songs.  That slur is gratuitous because surely plaintiff's

16 counsel knows "[t]here is no logical relevancy to admitting this type of evidence."

17 *United States v. Bailey*, 696 F.3d 794, 800 (9th Cir. 2012).

18       Ultimately, plaintiff speculates that perhaps a member of Led Zeppelin heard

19 *Taurus* even though there is no evidence they did and it appeared only on Spirit's

20 first and unsuccessful album, or perhaps forty-five years ago Jimmy Page had,

21 listened to and copied a Spirit album he candidly admits having now.  Speculation is

22 not the required "significant, affirmative and probative evidence to support a claim

23 of access." *Intersong-USA v. CBS, Inc.*, 757 F. Supp. 274, 281 (S.D.N.Y. 1991).

24          ***ii.***   ***Plaintiff Presents No Evidence of Substantial Similarities***

25              ***in Protected Expression***

26               **a.   Plaintiff Admits He Disclosed No Expert Analysis as**

27                 **to the Copyrighted Work: the *Taurus* Deposit Copy**

28       Plaintiff concedes his expert reports do not mention, let alone analyze, the

7

1   1967 *Taurus* transcription that Hollenbeck included with its registration and which is

2   the only work protected by the copyright that plaintiff sues upon.  Def. Memo. at 14-

3   16.  Plaintiff, continuing to misapply 1976 Act provisions, refers to "[t]he deposit

4   requirement under [the current] 17 U.S.C. § 408(b) . . . ."  Oppn. at 18.  As a case he

5   cites confirms, while deposit under the 1976 Act is less important because protection

6   arises upon creation of the work, under the 1909 Act the scope of protection is

7   established by the deposit copy.  *Scentsy, Inc. v. B.R. Chase, LLC*, 942 F. Supp. 2d

8   1045, 1050-51 (D. Idaho 2013)*, rev'd in part*, 585 F. App'x 621 (9th Cir. 2014).

9         Plaintiff also confuses issues when he argues that "[a]bsent intent to defraud

10   and prejudice, inaccuracies in copyright registration do not bar actions for

11   infringement."  Oppn. at 18:18-13, *quoting Three Boys Music Corp. v. Bolton*, 212

12   F.3d 477, 486 (9th Cir. 2000), *cert. denied* 531 U.S. 1126 (2001).  Defendants do not

13   contend the 1967 registration is invalid.  Rather, they raised that under the 1909 Act

14   the copyrighted work is the deposit copy and plaintiff's experts did not analyze it

15   and, instead, improperly rely on unprotected recordings.  Def. Memo. at 14-15.  That

16   is exactly what Courts have refused to allow.  *See, e.g., Williams v. Bridgeport

17   Music, Inc.*, No. LA CV13-06004 JAK, 2014 WL 7877773, at *9-10 (C.D. Cal. Oct.

18   30, 2014) (recordings are "not protectable publications under the 1909 Act" and "the

19   lead sheets are deemed to define the scope of [the 1909 Act] copyrighted

20   compositions"); *Fahmy v. Jay Z*, No. 07CV05715-CAS-PJWx, 2015 WL 5680299,

21   at *13-14 (C.D. Cal. Sept. 24, 2015) (same).  Further, while in *Three Boys* the

22   plaintiff's expert testified that elements of the deposit copy had been copied (212

23   F.3d at 486), here plaintiff provided no expert testimony at all as to the deposit copy

24   even though he bears the burden of proving it was copied.

25         For this additional and independent reason, summary judgment is proper.

26   **b.  Disregarding the Minor Line Cliché Leaves No**

27   **Significant Similarities**

28   Plaintiff states the claimed similarity is more than the common minor line

8

1    cliché, but his memorandum does not identify anything more and he leaves it to the

2    Court to search through his experts' declarations.  Oppn. at 12:3-4.  That search is

3    futile.  Aside from the unprotected performance elements, minor line cliché and

4    arpeggios, Stewart claims similarity in a series of pitches, but he improperly ignores

5    their duration.  *Swirsky v. Carey*, 376 F.3d 841, 848 n. 13 (9th Cir. 2004),

6    ("concentration solely on pitch sequence may break music down beyond

7    recognition"); Ferrara Reply Decl. at 3-4, ¶¶ 11-14.  Stewart also does not

8    distinguish between music going up or down, thus equating, *e.g.*, the E going up to

9    A in *Stairway* with the E going down to A in *Taurus*.  *Id.* at 4, ¶ 14.  He and Johnson

10   also rely on the shared presence of three notes, A-B-C, but that is just Do-Re-Mi.  *Id.*

11   at 4, ¶ 16; *Allen v. Destiny's Child*, No. 06 C 6606, 2009 WL 2178676, at *12 (N.D.

12   Ill. July 21, 2009) (three notes "unprotectable as a matter of law"); Copyright Office

13   Compendium §§ 313.4(B) (three notes not copyrightable) & 313.4(C) (same as to

14   "Mi do re sol, sol re mi do").  Stewart and Johnson also ignore the overwhelming

15   differences between *Taurus* and *Stairway*.  *FunkyFilms, Inc. v. Time Warner Entm't*

16   *Co.*, 462 F.3d 1072, 1078 (9th Cir. 2006) (summary judgment proper since

17   "significant differences and few real similarities").

18        For this additional independent reason, summary judgment should be granted.

19                    **c.  Plaintiffs' New Argument – Selection and**

20                         **Arrangement of Unprotected Elements – Also Fails**

21        Plaintiff argues "combinations of unprotectable elements are protectable."

22   Oppn. at 12:2, *citing Swirsky*, 376 F.3d at 851-52.  But, "a combination of

23   unprotectable elements is eligible for copyright protection only if those elements are

24   numerous enough and their selection and arrangement original enough that their

25   combination constitutes an original work of authorship."  *Satava v. Lowry*, 323 F.3d

26   805, 811 (9th Cir. 2003), *cert. denied* 540 U.S. 983 (2003).  Even then, copyright in

27   an arrangement is "thin" and "protects against only virtually identical copying."  323

28   F.3d at 812.  Here, the selection of a minor line cliché and three notes is not

1  numerous and there are substantial differences.  Accordingly, plaintiff's selection-
2  and-arrangement argument fails.

3     **(f)**   **Plaintiff Concedes the Copyright Claims Fail as to John Paul Jones,**
4           **Super Hype Publishing and Warner Music Group Corp.**

5     By his silence, plaintiff concedes summary judgment as to John Paul Jones,
6  Super Hype Publishing, Inc. and Warner Music Group Corp.  Def. Memo. at 18.

7  **2.   PLAINTIFF ABANDONS HIS "RIGHT OF ATTRIBUTION" CLAIM**

8     By his silence, he also abandons his fourth claim for "Right of Attribution—
9  Equitable Relief – Falsification of Rock n' Roll History."  Def. Memo. at 18-19.

10 **3.   PARTIAL SUMMARY JUDGMENT**

11    As for the alternative motion for partial summary judgment, plaintiff pays lip
12 service to striking similarities and ignores that profits are barred by laches.  Oppn. at
13 20:11-16.  As to extraterritorial profits, plaintiff – relying on hearsay that Wolfe
14 showed Jimmy Page how to play *Taurus* – plaintiff argues that is a domestic
15 infringement.  The admissible evidence is that never happened and, in any event, it
16 would not have been a violation of any exclusive right under 17 U.S.C. Section 106.

17 **4.   CONCLUSION**

18    For multiple reasons, each of which is fatal to plaintiff's forty-five-year-old
19 claims, summary judgment should be entered in defendants' favor.

20 Dated: March 14, 2016

          _____/s/ Peter J. Anderson_____
21          Peter J. Anderson, Esq.
        LAW OFFICES OF PETER J. ANDERSON
22          A Professional Corporation
            Attorney for Defendants
23

24          Helene M. Freeman, Esq.
            PHILLIPS NIZER LLP
25          Attorney for Defendants
            JAMES PATRICK PAGE,
26        ROBERT ANTHONY PLANT and
            JOHN PAUL JONES

27

28

                        10

1  Peter J. Anderson, Esq., Cal. Bar No. 88891
    E-Mail: pja@pjanderson.com
2  LAW OFFICES OF PETER J. ANDERSON
    A Professional Corporation
3  100 Wilshire Boulevard, Suite 2010
    Santa Monica, CA 90401
4  Tel: (310) 260-6030
    Fax: (310) 260-6040
5  Attorneys for Defendants
    JAMES PATRICK PAGE, ROBERT ANTHONY
6  PLANT, JOHN PAUL JONES, WARNER/CHAPPELL
    MUSIC, INC., SUPER HYPE PUBLISHING, INC.,
7  ATLANTIC RECORDING CORP., RHINO
    ENTERTAINMENT COMPANY and WARNER
8  MUSIC GROUP CORP.

9  Helene Freeman, Esq., admitted *pro hac vice*
    E-Mail:  hfreeman@phillipsnizer.com
10  PHILIPS NIZER LLP
    666 Fifth Avenue
11  New York, NY 10103-0084
    Tel: (212) 977-9700
12  Fax: (212) 262-5152
    Attorneys for Defendants
13  JAMES PATRICK PAGE, ROBERT ANTHONY
    PLANT and JOHN PAUL JONES

14

15              **UNITED STATES DISTRICT COURT**

16             **CENTRAL DISTRICT OF CALIFORNIA**

17                  **WESTERN DIVISION**

| | |
|---|---|
| 18  MICHAEL SKIDMORE, *etc.*, | Case No. 2:15-cv-03462 RGK (AGRx) |
| 19          Plaintiff, | |
| 20     vs. | DEFENDANTS' RESPONSE TO PLAINTIFF'S ALLEGED UNCONTROVERTED FACTS |
| 21  LED ZEPPELIN, *et al.*, | |
| 22         Defendants. | Date:  March 28, 2016 Time: 9:00 a.m. |
| 23 | |

24                       Courtroom of the Honorable
                           R. Gary Klausner
25                     United States District Judge

26

27

28

**02354**

## RESPONSE TO PLAINTIFF'S
## ALLEGED UNCONTROVERTED FACTS

Defendants James Patrick Page, Robert Anthony Plant, John Paul Jones, Warner/Chappell Music, Inc., Super Hype Publishing, Inc., Atlantic Recording Corporation, Rhino Entertainment Company and Warner Music Group Inc. respectfully submit this Response to plaintiff's Alleged Uncontroverted Facts, beginning at page 47 of plaintiff's Statement of Genuine Issues (Doc. 118-1).[1]

| Plaintiff's Alleged Uncontroverted Facts | Defendants' Response |
|---|---|
| 1.      Randy Wolfe was a musical genius who at the age of 15 was playing with Jimi Hendrix in New York City. Hendrix offered Wolfe the chance to go to London as part of the Jimi Hendrix experience, but his parents declined.<br><br>Claimed evidence: Andrea Wolfe Decl., at ¶1-4; Janet Wolfe Decl., ¶1-5. | Objection: relevance. |
| 2.      When Randy went back to high school that fall, he met a girl named   Robin   who   would   later | Objection:   relevance;   *see,   also* Objections Nos. 9, 12. |

---

[1]      Defendants also separately submit their Objections to plaintiff's evidence.

1

| **Plaintiff's Alleged Uncontroverted Facts** | **Defendants' Response** |
|---|---|
| become his wife. He was so enamored with her that he wrote her a song. Her astrological sign was Taurus, so Randy named his new song *Taurus*.<br><br>Claimed evidence: Andrea Wolfe Decl., at ¶ 4-5; Janet Wolfe Decl., ¶¶ 4-5. | |
| 3.     When he returned from New York in the fall of 1966, Randy formed a band called Spirits Rebellious with two of his school friends, Jay Ferguson and Mark Andes. In late 1966 through the summer of 1967, they played every week at a famous club in Hollywood called the Ash Grove, which was owned by Randy's uncle.<br><br>Claimed evidence: Janet Wolfe Decl., ¶ 5-8. | Objection: relevance; *see, also* Objection No. 14. |

2

| | **Plaintiff's Alleged Uncontroverted Facts** | **Defendants' Response** |
|---|---|---|
| 4. | The family eventually moved in 1967 from Ojai to Santa Monica. Brian Berry, brother of singer Jan Berry of the famous "Jan and Dean" group, heard the band rehearsing and knocked on the door to introduce himself. This led to a fast friendship, and it was Berry who later introduced Spirit to Lou Adler, owner of Hollenbeck and Ode Records, which signed the band to a recording contract on August 29, 1967.<br><br>Claimed evidence: Janet Wolfe Decl., ¶¶ 5-8. | Objection: relevance, except for the band members' entry into the August 29, 1967 recording contract with Ode Records, Inc. |
| 5. | Taurus was played repeatedly before August 29, 1967 by Spirit in concerts at the Ash Grove.<br><br>Claimed evidence: Janet Wolfe Decl., ¶¶ 5-8; Andrea Wolfe Decl. at ¶ 5; Malofiy Decl., Exhibit 8 – Andes Depo., p.150-156; Declaration of Barry Hansen, ¶1-2 & Emails; | Objections: *see,* Objections Nos. 10, 13, 14, 31, 70-71, 82-85, 98-99; cited portion of Andes deposition does not support it being played repeatedly in concert at the Ash Grove before August 29, 1967, and he testified that performances were "fluid" and improvisational. |

3

| | **Plaintiff's Alleged Uncontroverted Facts** | **Defendants' Response** |
|---|---|---|
| 4 | Skidmore Decl., Exhibit 2. | |
| 6 | 6.      Taurus was recorded as part of a multi-song demo in early 1967 to promote Spirit.  Claimed evidence: Declaration of Barry Hansen, ¶1-2 & Emails; Skidmore Decl., Exhibit 2; Malofiy Decl., Exhibit 8 – Andes Depo, at p. | Objection: *see,* Objections Nos. 70-71, 82-85, 31. |
| 15 | 7.      Spirit played many shows that included Taurus well before August 29, 1967, of which there is audio proof.  Claimed evidence: Declaration of Barry Hansen, ¶1-2 & Emails; Skidmore Decl., Exhibit 2. | Objection: *see,* Objections Nos. 70-71, 82-85. |
| 24 | 8.      Taurus was created before the August 29, 1967, contract Randy Wolfe signed with Hollenbeck Music and Lou Adler. | Objection: legal conclusion, contrary to law and undisputed facts; *see, also,* Objections Nos. 9-10, 12-13, 31, 70-71, 82-85. |

4

| | **Plaintiff's Alleged Uncontroverted Facts** | **Defendants' Response** |
|---|---|---|
| 4<br>5<br>6<br>7<br>8<br>9<br>10 | Claimed evidence: Janet Wolfe Decl., ¶5-8; Andrea Wolfe Decl. at ¶5; Malofiy Decl., Exhibit 8 – Andes Depo., p.150-156; Declaration of Barry Hansen, ¶1-2 & Emails; Skidmore Decl., Exhibit 2. | |
| 11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22 | 9.    Taurus is not a work made for hire as the composition was created and made well before the August 29, 1967 agreement.<br><br>Claimed evidence: Janet Wolfe Decl., ¶5-8; Andrea Wolfe Decl. at ¶5; Malofiy Decl., Exhibit 8 – Andes Depo., p.150-156; Declaration of Barry Hansen, ¶1-2 & Emails; Skidmore Decl., Exhibit 2. | Objections:   plaintiff   conclusively admitted   the   copyrighted   musical composition *Taurus* is a work for hire, F. R. Civ. P. 36(b); Fact 7; Anderson Decl. at 2-3, ¶¶ 9-14, Exh. 13-15; *see, also* Objections Nos. 9-10, 12-13, 31, 70-71, 82-85. |
| 23<br>24<br>25<br>26<br>27<br>28 | 10.    The   orchestral   opening   to "Taurus" on the *Spirit* album was never played live.<br><br>Claimed evidence:  Malofiy  Decl., Exhibit 8 – Andes Depo, at p.155:15- | Admitted. |

5

| | **Plaintiff's Alleged Uncontroverted Facts** | | **Defendants' Response** |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | | | |
| 4 | 20; Exhibit 9 – Ferguson Depo., at | | |
| 5 | p.19:23-20:18. | | |
| 6 | | | |
| 7 | 11.   Defendants have produced no | | Objection: the cited evidence does not |
| 8 | evidence that Taurus was ever | | support the claimed uncontroverted |
| 9 | registered with the copyright office | | fact; plaintiff conclusively admitted the |
| 10 | as a work made for hire. | | copyrighted musical composition |
| 11 | | | *Taurus* is a work for hire, F. R. Civ. P. |
| 12 | Claimed evidence: Amended | | 36(b); Fact 7; Anderson Decl. at 2-3, ¶¶ |
| 13 | Complaint, Exhibit 2. | | 9-14, Exh. 13-15; also, disputed: |
| 14 | | | Anderson Reply Decl. at 1, ¶ 3, ¶ 27. |
| 15 | | | |
| 16 | 12.   "Taurus" was registered with | | Objection:   relevance,   plaintiff |
| 17 | the copyright office by Hollenbeck | | conclusively admitted the copyrighted |
| 18 | Music in December 1967 and listed | | musical composition *Taurus* is a work |
| 19 | Randy California as the "author." | | for hire, F. R. Civ. P. 36(b); Fact 7; |
| 20 | | | Anderson Decl. at 2-3, ¶¶ 9-14, Exh. |
| 21 | Claimed evidence: Anderson Decl., | | 13-15; *see, also* (Def. Memo. (Doc. 97- |
| 22 | Exhibit 16. | | 1) at 7 n. 4 (registration information can |
| 23 | | | be corrected and designation of |
| 24 | | | employee as "author" may be due to |
| 25 | | | colloquial use of term; *see, also* |
| 26 | | | Anderson Reply Decl. at 1, ¶ 3, ¶ 27 |
| 27 | | | (correction of registration and renewal |
| 28 | | | information to state *Taurus* musical |

6

| | **Plaintiff's Alleged Uncontroverted Facts** | | **Defendants' Response** |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | | | |
| 4 | | | composition a work for hire). |
| 5 | | | |
| 6 | 13.    Randy Craig Wolfe filed a renewal registration for Taurus in 1996 listing himself as the author. | | Objection: cited evidence is not admissible evidence of claimed fact; relevance, plaintiff conclusively admitted the copyrighted musical composition *Taurus* is a work for hire, F. R. Civ. P. 36(b); Fact 7; Anderson Decl. at 2-3, ¶¶ 9-14, Exh. 13-15; *see, also* (Def. Memo. (Doc. 97-1) at 7 n. 4 (registration information can be corrected and designation of employee as "author" may be due to colloquial use of term; *see, also* Anderson Reply Decl. at 1, ¶ 3, ¶ 27 (correction of registration and renewal information to state *Taurus* musical composition a work for hire). |
| 7 | | | |
| 8 | | | |
| 9 | Claimed    evidence:    Amended Complaint, Exhibit 2. | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | 14.    Between 1996 and February 15, 2016, no individual or entity ever attempted to amend the renewal registration for Taurus or contest that Randy Craig Wolfe was the author of | | Objection: cited evidence is not admissible evidence of claimed fact; relevance, plaintiff conclusively admitted the copyrighted musical composition *Taurus* is a work for hire, F. R. Civ. P. 36(b); Fact 7; Anderson |
| 24 | | | |
| 25 | | | |
| 26 | | | |
| 27 | | | |
| 28 | | | |

7

| Plaintiff's Alleged Uncontroverted Facts | Defendants' Response |
|---|---|
| Taurus.<br><br>Claimed evidence: Amended Complaint, Exhibit 2. | Decl. at 2-3, ¶¶ 9-14, Exh. 13-15; *see, also* (Def. Memo. (Doc. 97-1) at 7 n. 4 (registration information can be corrected and designation of employee as "author" may be due to colloquial use of term. |
| 15.    [Blank in plaintiff's Alleged Uncontroverted Facts.] | |
| 16.    [Blank in plaintiff's Alleged Uncontroverted Facts.] | |
| 17.    [Blank in plaintiff's Alleged Uncontroverted Facts.] | |
| 18.    Led Zeppelin opened for Spirit on December 26, 1968, in Denver, CO, Led Zeppelin's first show in the United States.<br><br>Claimed evidence: Malofiy Decl., Exhibit 1 - Page Deposition at p.416, | Objections: *see,* Objection No. 22. |

8

**02362**

| | **Plaintiff's Alleged Uncontroverted Facts** | **Defendants' Response** |
|---|---|---|
| | 467-69. | |
| | 19. Led Zeppelin's equipment was breaking during the December 26, 1968 show, and they had to borrow equipment from Spirit.<br><br>Claimed evidence: Declaration of Tracy Longo, ¶17-18. | Objection: hearsay not within any exception (Longo was not present and merely states what he contends Wolfe told him); Objection No. 1. |
| | 20. While backstage at a concert in 1969 Page asked Randy California how to play the guitar in "Taurus," which Randy ran through with him several times.<br><br>Claimed evidence: Declaration of Tracy Longo, ¶¶ 19-21. | Objection: hearsay not within any exception (Longo was not present and merely states what he contends Wolfe told him); Objection No. 1. |
| | 21. Defendant James Patrick Page stated in an interview published on April 25, 1970, by New Musical Express: "Spirit do some really nice things on albums. They give a really nice atmosphere when they play and I | Objections: hearsay not within any exception, misstates the cited evidence (Page had no recollection of the interview and could not confirm that the quote was an accurate statement of anything he said; Page deposition at |

9

| | Plaintiff's Alleged Uncontroverted Facts | Defendants' Response |
|---|---|---|
| | always enjoy seeing them."<br><br>Claimed evidence: Malofiy Decl., Exhibit 3 – New Musical Express Interview; Exhibit 1 - Page Deposition at p.467:4-9. | 460-466); Objections Nos. 22, 24. |
| | 22.    Defendant James Patrick Page stated in an interview done in November 1972 with ZigZag magazine that "[The Hollies] were like that: very cut and dried, and samey every night. They were obviously very good, even though they didn't strike me on an emotional level, like Spirit did, for instance. I saw Spirit a couple of times and thought they were very good."<br><br>Claimed evidence: Exhibit 5 – Audio of ZigZag Interview (D160); Exhibit 1 – Page Deposition, at p.434-37. | Objections: hearsay not within any exception, the cited evidence does not support the alleged fact (the purportedly-quoted text is not consistent with the audio exhibit and contains statements that do not appear in the audio exhibit); Objections Nos. 22, 26. |
| | 23.    James Patrick Page stated in 1970s that Spirit was a band that he | Objections: Objection No. 22. |

10

| | Plaintiff's Alleged Uncontroverted Facts | Defendants' Response |
|---|---|---|
| | really liked.<br><br>Claimed evidence: Malofiy Decl., Exhibit 1 – Page Deposition, at p.434-37. | |
| | 24.    Defendant Page possesses the eponymous *Spirit* album which contained "Taurus."<br><br>Claimed evidence: Malofiy Decl., Exhibit 1 – Page Depo. at p. 396-98; Exhibit 2 – Page Interrogatory Responses, at ¶ 11. | Objection: relevance – that he has it now does not mean he had it before recording of *Stairway to Heaven* was completed in January 1971. |
| | 25.    Led Zeppelin played portions of Spirit's song Fresh Garbage at Led Zeppelin's live shows starting in 1968.<br><br>Claimed evidence: Malofiy Decl., Exhibit 1 – Page Depo at p.492. | Objection: relevance: the evidence is undisputed that *Fresh Garbage* was available in England on a compilation album that did not include *Taurus*, and Led Zeppelin included a bass riff similar to *Fresh Garbage* prior to coming to the United States in December 1968, Fact 67-69. |

11

| | **Plaintiff's Alleged Uncontroverted Facts** | | **Defendants' Response** |
|---|---|---|---|
| 1<br>2<br>3 | | | |
| 4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12 | 26.   Defendant Page forgot that he liked Spirit despite twice stating in the 1970s that enjoyed seeing them live, that Spirit's performances struck him on an emotional level, that he liked Spirit's albums, and even though Led Zeppelin played Spirit's music live. | | Objections: hearsay not within any exception, mischaracterizes the cited evidence, & *see* Objections Nos. 22, 24, 25, 39. |
| 13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21 | Claimed evidence: Malofiy Decl., Exhibit 1 – Page Depo., at p.439:3-8, Exhibit 3 – New Musical Express Article, Exhibit 4 – ZigZag Article Reprinted in Composition, Exhibit 5 – ZigZag Audio Interview, Exhibit 19 – Audio of Led Zeppelin Playing Spirit | | |
| 22<br>23<br>24<br>25<br>26<br>27<br>28 | 27.   Defendant Page's alleged recollection of not seeing the band Spirit perform live was demonstrably incorrect based on Page's own interviews.<br><br>Claimed evidence: Malofiy Decl., | | Objections: hearsay not within any exception, mischaracterizes the cited testimony (Page testified he never saw *Taurus* performed and never heard *Taurus* prior to 2014), & *see* Objections Nos. 22, 24, 25, 39. |

12

| | **Plaintiff's Alleged Uncontroverted Facts** | **Defendants' Response** |
|---|---|---|
| 1 2 3 | | |
| 4 5 6 7 8 9 | Exhibit 1 – Page Depo., at p.439, Exhibit 3 – New Musical Express Article, Exhibit 4 – ZigZag Article Reprinted in My Back Pages, Exhibit 5 – ZigZag Audio. | |
| 10 11 12 13 14 15 16 | 28.   Led Zeppelin would reserve seats at Spirit concerts and in fact attended those concerts.<br><br>Claimed evidence: Longo Decl., at ¶ 13. | Objection: hearsay not within any exception (Longo was not present and merely states what he contends Wolfe told him); Objection No. 1. |
| 17 18 19 20 21 22 23 24 25 26 | 29.   Defendant Plant attended a Spirit show in February 1970 at Mother's Club in Birmingham, England.<br><br>Claimed evidence: Malofiy Decl., Exhibit 13 – Robert Plant Crash Article, Exhibit 8 – Andes Depo, at p.111 to 113, 115 to 118. | Objection: relevance (there is no evidence that *Taurus* was performed and the evidence is that it would not have been performed, Fact 73-76). |
| 27 28 | 30.   Defendant Plant played snooker with Spirit bassist Mark | Objection: relevance (there is no evidence that *Taurus* was discussed or |

13

| | **Plaintiff's Alleged Uncontroverted Facts** | | **Defendants' Response** |
|---|---|---|---|
| 1 2 3 | | | |
| 4 5 6 7 8 9 10 | Andes that night. Claimed evidence: Malofiy Decl., Exhibit 13 – Robert Plant Crash Article, Exhibit 8 – Andes Depo, at p.111 to 113, 115 to 118. | | performed and the evidence is that it would not have been performed, Fact 73-76, 78, 80). |
| 11 12 13 14 15 16 17 18 19 | 31.    Defendant Plant was in a car crash the night he saw Spirit perform in February 1970 at Mother's Ball. Claimed evidence: Malofiy Decl., Exhibit 13 – Robert Plant Crash Article, Exhibit 8 – Andes Depo, at p.111 to 113, 115 to 118. | | Objection: relevance. |
| 20 21 22 23 24 25 26 27 28 | 32.    Defendant Page teased Stairway to Heaven in a April 25, 1970, interview by stating "We want to try something new with the organ and acoustic guitar building up and building up to the electric thing." Claimed evidence: Malofiy Decl., Exhibit 3 – New Musical Express | | Objection: relevance, hearsay not within any exception, *see,* Objection No. 24. |

14

| | **Plaintiff's Alleged Uncontroverted Facts** | **Defendants' Response** |
|---|---|---|
| | Article. | |
| | 33.    Defendant Page stated in an audio interview with ZigZag magazine in December 1972 that he came up with the guitar introduction for Stairway to Heaven at the Welsh cottage of Bron-yr-Aur.<br><br>Claimed evidence: Malofiy Decl., Exhibit 16 – ZigZag audio interview (D165), Exhibit 1 – Page Depo., at p.339. | Objections: relevance, hearsay not within any exception, *see* Objections Nos. 26-27; cited testimony of Page deposition does not support claimed fact, and instead testified that no part of Stairway was written at Bron Yr Aur (Page Depo. at 338-39). |
| | 34.    Defendant Jones stated in an audio interview that "Page and Plant [came back] from the Welsh mountains with the guitar intro and verse."<br><br>Claimed evidence: Malofiy Decl., Exhibit 16 – ZigZag audio interview (D165); Def. Answer to Amend. Compl., ¶ 53. | Objections: relevance, hearsay not within any exception, *see* Objections Nos. 26-27; mischaracterizes the pleadings (in addition to referencing the wrong paragraph of the First Amended Complaint and the Answer, the individual defendants' Answer admitted only that Page and Plant went to Bron Yr Aur in 1970 where they composed songs and that *Stairway to Heaven* was written that year, and |

15

| Plaintiff's Alleged Uncontroverted Facts | Defendants' Response |
|---|---|
| | denied the remaining allegations, including that *Stairway to Heaven* was written at Bron Yr Aur; Answer (Doc. 68) at 51)). |
| 35.     When Jones denied under oath in his deposition that he ever said the quote in fact 21, and that it was completely inaccurate, he was incorrect and he did in fact make such a statement—as his own answer to the amended complaint admits.<br><br>Claimed evidence: Malofiy Decl., Exhibit 16 – ZigZag audio interview (D165); Def. Answer to Amend. Compl., ¶53; Jones Deposition, at p.106-09. | Objections: relevance, misstates the pleading, hearsay not within any exception, *see* Objections Nos. 26-27; mischaracterizes the pleadings (*see, above* at ¶ 34). |
| 36.     When Robert Plant denied that Page had ever played Stairway to Heaven's guitar introduction to him at Bron-yr-Aur, and claimed that he came up with the first verse to Stairway to Heaven at Headley | Objections: relevance, misstates the pleading, hearsay not within any exception, *see* Objections Nos. 26-27; mischaracterizes the pleadings (*see, above* at ¶ 34). |

16

| | **Plaintiff's Alleged Uncontroverted Facts** | **Defendants' Response** |
|---|---|---|
| | Grange, he was incorrect.<br><br>Claimed evidence: Malofiy Decl., Exhibit 6 - Jones Deposition, at p.106-09, Exhibit 16 – ZigZag audio interview (D165); Def. Answer to Amend. Compl., ¶ 53. | |
| | 37.   The first part of Stairway to Heaven that Page created was the guitar, which he shared with Plant at Bron-yr-Aur, where Plant came up with the first verse.<br><br>Claimed evidence: Malofiy Decl., Exhibit 6 - Jones Deposition, at p.106-09, Exhibit 16 – ZigZag audio interview (D165); Def. Answer to Amend. Compl., ¶ 53. | Objection: mischaracterizes the cited evidence, which does not support the claimed fact; mischaracterizes the pleadings (*see, above* at ¶ 34). |
| | 38.   Page and Plant used Taurus to create the first 2:14 minutes of Stairway to Heaven, including the guitar and vocal melody. | Objection: the cited evidence is inadmissible and does not support the claimed fact, *see,* Objections Nos. 44-49. |

17

| | **Plaintiff's Alleged Uncontroverted Facts** | **Defendants' Response** |
|---|---|---|
| 1 2 3 | | |
| 4 5 6 | Claimed evidence: Stewart Decl, ¶ 24. | |
| 7 8 9 10 11 12 13 | 39.    Defendant    Page    gave    an interview with Guitar World in 1993.<br><br>Claimed  evidence:  Malofiy  Decl., Exhibit 1 - Page Depo, at p.456-58; Exhibit 7 - Plant Depo., at p.351-53. | Objection: the cited evidence does not support the claimed fact. |
| 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28 | 40.    Page stated in a May 1993 interview with Guitar World when asked "When you were borrowing from classic blues songs on the first two  albums,  did  you  ever  think  it would catch up to you?": "You mean getting sued? Well, as far as my end of it goes, I always tried to bring something  fresh  to  anything  that  I used. I always made sure to come up with some variation. In fact, I think in most  cases,  you  would  never  know what  the  original  source  could  be. Maybe not in every case– but in most cases. So most of the comparisons | Objections:    relevance,    hearsay    not within  any  exception,  Fed.  R.  Evid. 407-08, *see,* Objections Nos. 23, 24, 25. |

18

| | **Plaintiff's Alleged Uncontroverted Facts** | **Defendants' Response** |
|---|---|---|
| 4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18 | rest on the lyrics. And Robert was supposed to change the lyrics, and he didn't always do that– which is what brought on most of the grief. They couldn't get us on the guitar parts of the music, but they nailed us on the lyrics. We did, however, take some liberties, I must say [laughs]. But never mind; we did try to do the right thing, it blew up in our faces…"<br><br>Claimed evidence: Malofiy Decl., Exhibit 1 - Page Depo, at p.456-58; Exhibit 7 - Plant Depo., at p.351-53. | |
| 19<br>20<br>21<br>22<br>23<br>24<br>25<br>26<br>27<br>28 | 41.    Robert Plant does not dispute the accuracy or validity of Page's quote made to Guitar World in or around May 1993.<br><br>Claimed evidence: Malofiy Decl., Exhibit 7 – Plant Depo., at p.351-53. | Objection: relevance, Fed. R. Evid. 407-08, lack of foundation as to personal knowledge whether another made the statements attributed to him, Fed. R. Evid. 602; the deposition question was ambiguous as to whether he questioned the description of the quote, which he did not, or that the underlying statement had been made, as to which he has no personal knowledge; |

| Plaintiff's Alleged Uncontroverted Facts | Defendants' Response |
|---|---|
| | *see,* Objection No. 23. |
| 42.     Led Zeppelin based many of their songs on prior artistic works.  Claimed evidence: Malofiy Decl., Exhibit 1 – Page Depo., 476-90, Exhibit 7 – Plant Depo., at p.317-19. | Objection: unsupported by the cited evidence; lacks foundation including that alleged copying was copying of protected expression and not public domain material or songs; relevance, Fed. R. Evid. 407-08; *see,* Objection No. 23. |
| 43.     Led Zeppelin wrote several of their songs by copying the artistic expression of other artists.  Claimed evidence: Malofiy Decl., Exhibit 7 – Plant Depo., at p.297-333. | Objection: unsupported by the cited evidence; lacks foundation including that alleged copying was copying of protected expression and not public domain material or songs; relevance, Fed. R. Evid. 407-08; *see,* Objection No. 23. |
| 44.     Led Zeppelin changed the credits on their songs "Dazed and Confused," "Babe I'm Gonna Leave You," "Whole Lotta Love," "How Many More Times," "The Lemon Song," "Bring it On Home," and "When the Levee Breaks," to credit | Objection: relevance, Fed. R. Evid. 407-08; *see,* Objection No. 23. |

20

| **Plaintiff's Alleged Uncontroverted Facts** | **Defendants' Response** |
|---|---|
| other artists.<br><br>Claimed evidence: Malofiy Decl., Exhibit 1 – Page Depo., 476-490, Exhibit 6 – Jones Depo. at 176-269, Exhibit 7 – Plant Depo., at p. 297-333. | |
| 45.   Robert   Plant   could   not identify any other band, ever, that changed the credits on their songs as much as Led Zeppelin.<br><br>Claimed evidence: Malofiy Decl., Exhibit 7 – Plant Depo., at p.351-53. | Objection: relevance, argumentative (implies Plant should know what changes other bands have made to credits); Fed. R. Evid. 407-08; *see,* Objection No. 23. |
| 46.   Robert   Plant   admitted   to "lifting" vocal melodies from other songs, stated that the lift was his responsibility, stated that back in the 1960s and 1970s he thought lifting was "just part of the game," and stated that he knew that sounded "naïve and irresponsible." | Objection: unsupported by the cited evidence; lacks foundation including that alleged copying was copying of protected expression and not public domain material or songs; relevance, Fed. R. Evid. 407-08; *see,* Objection No. 23. |

21

| | **Plaintiff's Alleged Uncontroverted Facts** | **Defendants' Response** |
|---|---|---|
| 1<br>2<br>3 | | |
| 4<br>5<br>6<br>7<br>8<br>9 | Claimed evidence: Malofiy Decl., Exhibit 17 - 2004 NPR Interview of Robert Plant with Terry Gross (22:10 to 24:25); Exhibit 7 – Plant Depo, at p.325-33. | |
| 10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25<br>26<br>27<br>28 | 47.    The following Led Zeppelin songs, not including Stairway to Heaven, were based on prior art and were not independently created as they share unmistakable and not coincidental similarities to other musical works: "Dazed and Confused," "Babe I'm Gonna Leave You," "Whole Lotta Love," "How Many More Times," "The Lemon Song," "Bring it On Home," and "When the Levee Breaks," "Hats off to (Roy) Harper," "Since I've Been Loving You," "Custard Pie," "In My Time of Dying," "Boogie with Stu," "Nobody's Fault but Mine," "The Girl I love She Got Long Black Wavy Hair," "Your Time is Gonna Come," and "Communication | Objection: unsupported by the cited evidence; lacks foundation including that alleged copying was copying of protected expression and not public domain material or songs; relevance, Fed. R. Evid. 407-08; *see,* Objection No. 23. |

| | **Plaintiff's Alleged Uncontroverted Facts** | **Defendants' Response** |
|---|---|---|
| 4<br>5<br>6<br>7<br>8<br>9<br>10<br>11 | Breakdown."<br><br>Claimed evidence: Malofiy Decl., Exhibit 1 – Page Depo., 476-490, Exhibit 6 – Jones Depo. at 176-269; Exhibit 7 – Plant Depo., at p.297-355. | |
| 12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25<br>26 | 48.    Led Zeppelin had two to three songwriting processes: (1) a band member would bring a unique composition to the band, (2) all members of the band would groove together, and (3) and an original chord progression would be played by one member for other band members.<br><br>Claimed evidence: Malofiy Decl., Exhibit 7 – Plant Depo. at p.333-36, Exhibit 6 – Jones Depo., at p.159-160. | Objection: relevance. |
| 27<br>28 | 49.    The songs credited to Page and Plant, and not Jones and | Objection: relevance. |

| | **Plaintiff's Alleged Uncontroverted Facts** | | **Defendants' Response** |
|---|---|---|---|
| 4 | Bonham, were not jam sessions; | | |
| 5 | Jones and Bonham were given song | | |
| 6 | credit for jam sessions. | | |
| 7 | | | |
| 8 | Claimed evidence: Malofiy | | |
| 9 | Decl., Exhibit 6 - Jones Depo., | | |
| 10 | at p.159-160. | | |
| 11 | | | |
| 12 | 50.    Jones claims that he never | | Objection: unsupported by the cited |
| 13 | knew Page and Plant took the music | | evidence; lacks foundation including |
| 14 | and lyrics for the song Whole Lotta | | that alleged copying was copying of |
| 15 | Love from Willie Dixon's You Need | | protected expression and not public |
| 16 | Loving as played by Muddy Waters | | domain material or songs; relevance, |
| 17 | and covered by the Small Faces— | | Fed. R. Evid. 407-08; *see,* Objection |
| 18 | even though there was a prior lawsuit | | No. 23. |
| 19 | over that song and he was deposed | | |
| 20 | for it. Jones claims the same for | | |
| 21 | "When the Levee Breaks" for which | | |
| 22 | he received writing credit, which was | | |
| 23 | based on "When the Levee Breaks" | | |
| 24 | by Memphis Minnie and Kansas Joe | | |
| 25 | McCoy. Jones claims the same for | | |
| 26 | "in My Time of Dying" for which he | | |
| 27 | received writing credit, which was | | |
| 28 | based on Josh White's "Jesus Make | | |

24

| | **Plaintiff's Alleged Uncontroverted Facts** | | **Defendants' Response** |
|---|---|---|---|
| 1 2 3 | | | |
| 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 | Up My Dying Bed (also known as In My Time of Dying," and Blind Willie Johnson's "Jesus Gonna Make Up My Dying Bed." Jones claims the same for "Since I've Been Loving You" for which he received writing credit, which was taken from Moby Grape's "Never." Jones claims the same for "Lemon Song" for which he received writing credit, which was based on "Howlin' Wolf's Killing Floor." These examples are not exhaustive.<br><br>Claimed evidence: Malofiy Decl., Exhibit 6 - Jones Depo., at p.193-212, 225-234, 239-247, 253-54; Bricklin Decl., Audio Exhibits. | | |
| 24 25 26 27 28 | 51.     As Page and Plant did with at least sixteen other songs, they used a prior work to create Stairway to Heaven: "Taurus" by Spirit. | | Objection: unsupported by the cited evidence; lacks foundation including that alleged copying was copying of protected expression and not public domain material or songs; relevance, |

25

**02379**

| | **Plaintiff's Alleged Uncontroverted Facts** | **Defendants' Response** |
|---|---|---|
| 4–9 | Claimed evidence: Malofiy Decl., Exhibit 1 – Page Depo., 476-490, Exhibit 6 – Jones Depo. at p.176-269; Exhibit 7 – Robert Plant at p.297-355; Bricklin Decl., Audio Exhibits. | Fed. R. Evid. 407-08; *see,* Objections Nos. 23, 55-57, 109. |
| 10–16 | 52.    Page had previously asked Randy California how to play the introduction to Taurus.<br><br>Claimed evidence: Declaration of Tracy Longo, ¶19-21. | Objection: hearsay not within any exception (Longo was not present and merely states what he contends Wolfe told him); Objection No. 1. |
| 17–28 | 53.    Spirit was the only rock band that Led Zeppelin ever covered, besides NRBQ, and Page is on record stating that Spirit moved him on an emotional level, that he enjoyed their albums, and that he does possess "Taurus" on a vinyl album of *Spirit*.<br><br>Claimed evidence: Malofiy Decl., Exhibit 3 – New Music Express Page Interview, Exhibit 4 – Page ZigZag Interview; Exhibit 6 – Jones Depo. at | Objections: relevance, hearsay not within any exception, not supported by cited testimony; *see* Objections Nos. 24, 25. |

26

| | **Plaintiff's Alleged Uncontroverted Facts** | **Defendants' Response** |
|---|---|---|
| 4 5 6 | p.59-60, 79; Exhibit 7 – Plant Depo., at p.252-53. | |
| 7 8 9 10 11 12 13 14 15 16 | 54.    In the early 1970s Randy California was upset over what he viewed as the misappropriation of Taurus in Stairway to Heaven.<br><br>Claimed evidence: Declaration of Paul Franklin, ¶5-9; Declaration of Mike Lee, ¶; Declaration of Dave Waterbury, ¶3-7. | Objections: relevance, hearsay not within any exception, failure to disclose claimed witnesses; *see* Objections Nos. 16-21, 63-69, 89, 92-93, 94-96, |
| 17 18 19 20 21 22 23 24 25 26 27 28 | 55.    In 1970, Randy was seriously injured when he was thrown from a horse. He was in the hospital for months, and while he was in intensive care, Ferguson and Andes decided to leave the group because they believed that Randy would never fully recover. Shortly after he was released from the hospital Jimi Hendrix died. Hendrix and Randy had become very close friends over the years. The combination of his | Objections: relevance. |

27

| | **Plaintiff's Alleged Uncontroverted Facts** | **Defendants' Response** |
|---|---|---|
| | serious injuries, Ferguson and Andes leaving the group, and Hendrix dying, sent Randy into a tailspin of depression which lasted several years.<br><br>Claimed evidence: Janet Wolfe Decl., ¶ 9. | |
| | 56.    On April 14, 1973, Spirit performed at the Rainbow in London, England, and played around 7 encores.<br><br>Claimed evidence: Declaration of Larry "Fuzzy" Knight, at ¶ 7. | Objections: failure to disclose claimed witness, relevance, *see* Objection No. 58. |
| | 57.    Following the show there was an after party at which Spirit's members and James Patrick Page were present.<br><br>Claimed evidence: Declaration of Larry "Fuzzy" Knight, at ¶ 8. | Objections: failure to disclose claimed witness, relevance, *see* Objection No. 58. |

28

| | **Plaintiff's Alleged Uncontroverted Facts** | | **Defendants' Response** |
|---|---|---|---|
| 1 2 3 | | | |
| 4 5 6 7 8 9 10 11 12 13 | 58.    Page spoke with Spirit's bassist Larry "Fuzzy" Knight, complimented Spirit's work, said he was a "huge fan" of the band, and complimented the show Spirit played.<br><br>Claimed evidence: Declaration of Larry "Fuzzy" Knight, at ¶¶ 9-10. | | Objection: failure to disclose claimed witness, relevance, *see* Objection No. 58. |
| 14 15 16 17 18 19 20 21 22 23 24 | 59.    During this party, Page was taken aside by Randy California and confronted about Zeppelin's use of Taurus in Stairway to Heaven.<br><br>Claimed evidence: Declaration of David Waterbury, ¶4-6; Declaration of Paul Franklin, ¶7-9; Declaration of Larry "Fuzzy" Knight, at ¶¶ 12-13. | | Objection: failure to disclose claimed witness, relevance, hearsay not within any exception, *see* Objections Nos. 16, 58, 61, 63, 68-69; misstates cited declarations (none of the declarants claimed to have personally heard the alleged conversation). |
| 25 26 27 28 | 60.    Page acknowledged taking Taurus and using it in Stairway to Heaven, but told California that Led Zeppelin would hire 20 to 25 lawyers | | Objections: failure to disclose claimed witness, relevance, hearsay not within any exception (*e.g.,* the quoted statement is Franklin's statement as to |

| | **Plaintiff's Alleged Uncontroverted Facts** | **Defendants' Response** |
|---|---|---|
| 1<br>2<br>3 | | |
| 4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17 | for every lawyer California could hire and that Spirit would never win such a suit.<br><br>Claimed evidence: Declaration of Paul Franklin, ¶7-9 ("Page admitted that he lifted Taurus for Stairway but threatened him and said that he would get 20 lawyers for every lawyer Randy might be able to hire");<br>Declaration of David Waterbury, ¶4-6. | what Wolf told him was said forty-three years ago, when Franklin was not present), *see* Objections Nos. 16, 58, 61, 63, 68-69; misstates cited Declarations (none of the declarants claimed to have personally heard the alleged conversation). |
| 18<br>19<br>20<br>21<br>22<br>23<br>24<br>25<br>26<br>27 | 61.    Randy California was angry and depressed over the taking of Taurus in Stairway to Heaven in 1970s.<br><br>Claimed evidence: Declaration of David Waterbury, ¶4-6; Declaration of Paul Franklin, ¶7-9; Declaration of Mike Lee; Declaration of Robert Lee. | Objections: failure to disclose claimed witness, relevance, hearsay not within any exception, *see* Objections Nos. 16, 58, 63, 68-69, 89, 94; assumes fact not established – that *Taurus* was copied. |
| 28 | | |

30

**02384**

| | **Plaintiff's Alleged Uncontroverted Facts** | **Defendants' Response** |
|---|---|---|
| 62. | Randy California was angry and depressed over the taking of Taurus in Stairway to Heaven in 1980s.<br><br>Claimed evidence: Declaration of David Waterbury, ¶4-6; Declaration of Paul Franklin, ¶7-9; Declaration of Bruce Pates, ¶; Declaration of Mike Lee; Declaration of Robert Lee. | Objections: failure to disclose claimed witness, relevance, hearsay not within any exception, *see* Objections Nos. 16, 58, 63, 68-69, 89, 94; assumes fact not established – that *Taurus* was copied. |
| 63. | Randy California was angry and depressed over the taking of Taurus in Stairway to Heaven in 1990s.<br><br>Claimed evidence: Declaration of David Waterbury, ¶4-6; Declaration of Paul Franklin, ¶7-9; Declaration of Mike Lee ¶6-7; Declaration of Robert Lee ¶4. | Objections: failure to disclose claimed witness, relevance, hearsay not within any exception, *see* Objections Nos. 16, 58, 63, 68-69, 89, 94; assumes fact not established – that *Taurus* was copied. |
| 64. | Randy California attempted to take legal action against Led Zeppelin several times but believed | Objection: failure to disclose claimed witnesses, relevance, hearsay not within any exception, attorney-client privilege, |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

31

| | **Plaintiff's Alleged Uncontroverted Facts** | **Defendants' Response** |
|---|---|---|
| 4 | that the statute of limitations had ran; and he also had no money. | *see* Objections Nos. 1, 7, 15, 89, 91, 92, 94, 96. |
| 7 | Claimed evidence: Declaration of David Waterbury, ¶4-6; Declaration of Paul Franklin, ¶7-9; Declaration of Tracy Longo, ¶26-27 & 2011 Email to Pates; Declaration of Mike Lee ¶6; Declaration of Robert Lee ¶4; Declaration of Linda Mensch, ¶2-6; Janet Wolfe Decl., ¶10. | |
| 17 | 65.    While in Chicago, IL in the 1990s, Randy went with Spirit historian Bruce Pates to an entertainment lawyer named Linda Mensch. Mensch told Randy that any suit over Taurus against Led Zeppelin was likely barred by the statute of limitations and that it would be very expensive, a significant obstacle given that Randy had no money.  Claimed evidence: Declaration of | Objection: relevance, attorney-client privilege, *see* Objection No. 15. |

32

**02386**

| | **Plaintiff's Alleged Uncontroverted Facts** | **Defendants' Response** |
|---|---|---|
| | Linda Mensch, ¶2-6. | |
| | 66.     Randy considered legal action several times but never had the money and thought that he likely would not be able to sue.<br><br>Claimed evidence: Declaration of David Waterbury, ¶4-6; Declaration of Paul Franklin, ¶7-9; Declaration of Tracy Longo, ¶26-27 & 2011 Email to Pates; Declaration of Mike Lee ¶6; Declaration of Robert Lee ¶4; Declaration of Linda Mensch, ¶2-6; Janet Wolfe Decl., ¶10. | Objection: failure to disclose claimed witnesses, relevance, hearsay not within any exception, attorney-client privilege, *see* Objections Nos. 1, 7, 15, 89, 91, 92, 94, 96. |
| | 67.     Before his death on January 2, 1997, Randy California told his guitar tech and friend, Tracy Longo, that he was again considering a lawsuit against Led Zeppelin.<br><br>Claimed evidence:  Declaration of Tracy Longo,  ¶25-27  &  attached | Objection:  relevance,  hearsay  not within any exception; Objection No. 1. |

33

| | **Plaintiff's Alleged Uncontroverted Facts** | | **Defendants' Response** |
|---|---|---|---|
| 1 2 3 | | | |
| 4 5 | 2011 Email from Longo to Pates. | | |
| 6 7 8 9 10 11 | 68.    Taurus guitar is substantially similar to Stairway Guitar.  Claimed evidence: Stewart Decl., ¶20-24; Johnson Decl, ¶14-16. | | Objections: relevance, *see,* Objections Nos. 44-49, 50-54. |
| 12 13 14 15 16 17 18 | 69.    Harpsichord in Taurus and vocal melody in Stairway are substantially similar.  Claimed evidence: Stewart Decl., ¶20-24. | | Objections: relevance, *see* Objections Nos. 44, 48, 50-51. |
| 19 20 21 22 23 24 25 26 | 70.    Songs are strikingly similar and not product of coincidence.  Claimed evidence: Stewart Decl., ¶20-24; Johnson Decl, ¶14-16. | | Objections: relevance, *see* Objections Nos. 44, 49, 50, 53. |
| 27 28 | | | |

34

| | Plaintiff's Alleged Uncontroverted Facts | | Defendants' Response |
|---|---|---|---|
| 1<br>2<br>3 | **Plaintiff's Alleged**<br>**Uncontroverted Facts** | | **Defendants' Response** |
| 4<br>5<br>6<br>7<br>8<br>9<br>10<br>11 | 71.     The guitar at issue in Taurus is not a common unprotected element of a song.<br><br>Claimed evidence: Stewart Decl., ¶9-10, 50; Johnson Decl, ¶22, 25-26, 30. | | Objections: relevance, *see,* Objections Nos. 44-49, 50-54. |
| 12<br>13<br>14<br>15<br>16<br>17<br>18<br>19 | 72.     The guitar introduction to Stairway to Heaven contains the most iconic notes in rock and roll history.<br><br>Claimed evidence: Malofiy Decl., Exhibit 7 – Plant Depo., at p.280:16 to 281:14. | | Objections: relevance, cited testimony does not support claimed fact. |

Dated: March 13, 2016

          /s/ Peter J. Anderson
Peter J. Anderson, Esq.
LAW OFFICES OF PETER J. ANDERSON
A Professional Corporation
Attorney for Defendants
JAMES PATRICK PAGE, ROBERT
ANTHONY PLANT, JOHN PAUL JONES,
WARNER/CHAPPELL MUSIC, INC.,
SUPER HYPE PUBLISHING, INC.,
ATLANTIC RECORDING CORP., RHINO
ENTERTAINMENT COMPANY and
WARNER MUSIC GROUP CORP.

35

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Helene M. Freeman, Esq.
PHILLIPS NIZER LLP
Attorney for Defendants
JAMES PATRICK PAGE,
ROBERT ANTHONY PLANT and
JOHN PAUL JONES

36

1  Francis Malofiy, Esq.
2  Francis Alexander, LLC
   280 N. Providence Rd. | Suite 105
3  Media, PA 19063
4  T:  (215) 500-1000; F:  (215) 500-1005
   E:  francis@francisalexander.com
5  *Attorney for Plaintiff*

6
   Glen L. Kulik, Esq. (SBN 082170)
7  Kulik Gottesman & Siegel LLP
8  15303 Ventura Blvd., Suite 1400
   Sherman Oaks, CA 91403
9  T:  (310) 557-9200; F:  (310) 557-0224
10 E:  gkulik@kgslaw.com
   *Attorney for Plaintiff*
11

12              **UNITED STATES DISTRICT COURT**

13          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

14 | MICHAEL SKIDMORE, as Trustee for     | Case No. 15-cv-03462 RGK (AGRx)
15 | the RANDY CRAIG WOLFE TRUST,
                                          | Hon. R. Gary Klausner
16 |              Plaintiff,

17 |        v.                            | **NOTICE OF LODGING FOR
                                          | PLAINTIFF'S EXHIBITS BEING
18 |                                      | LODGED WITH THE COURT**

19 | LED ZEPPELIN; JAMES PATRICK
20 | PAGE; ROBERT ANTHONY              | **Date:  March 28, 2016**
   | PLANT; JOHN PAUL JONES; SUPER HYPE | **Time:  9:00 a.m.**
21 | PUBLISHING, INC.; WARNER MUSIC     | **Room:**
   | GROUP CORP., Parent of
22 | WARNER/CHAPPELL MUSIC, INC.;
23 | ATLANTIC RECORDING
   | CORPORATION; RHINO
24 | ENTERTAINMENT COMPANY,
25
26 |              Defendants.

27          **NOTICE OF LODGING FOR PLAINTIFF'S EXHIBITS**

28             **BEING LODGED WITH THE COURT**
                                1
COVER PAGE FOR PLAINTIFF'S EXHIBITS BEING LODGED WITH THE COURT

1       With this filing, Plaintiff is submitting the following audio and video exhibits

2   which are not conducive to filing electronically on the docket:

3

4         a.     Malofiy Declaration:

               i.  Exhibits 17 – NPR Audio

5

6         b.     Bricklin Declaration (audio exhibits 1-47 and video exhibit 1-4 for all

7             experts)

8

**AUDIO EXHIBITS**

9  Audio Exhibit 1:

10  Dazed and Confused by Led Zeppelin

11  Audio Exhibit 2:

12  Dazed and Confused by Jack Holmes (1967)

13  Audio Exhibit 3:

14  Whole Lotta Love by Led Zeppelin

15  Audio Exhibit 4:

16  Muddy Waters' You Need Love (1962) (10 seconds – 28 seconds)

17  Audio Exhibit 5:

    The Small Faces' You Need Loving (1966) (25 seconds – 48 seconds)

18

19  Audio Exhibit 6:

    Live performance of Led Zeppelin playing Fresh Garbage 1-10-1969

20

21  **AUDIO EXHIBITS – COMPARISON AUDIO**

    Audio Exhibit 7:

22  Stairway to Heaven (0 seconds – 25 seconds)

23  Audio Exhibit 8:

24  Taurus (45 seconds – 1 minute, 13 seconds)

25  Audio Exhibit 9:

26  8 measures of Stairway from note 1 of the acoustic guitar, repeated multiple times

27  Audio Exhibit 10:

28  Part A:

2

COVER PAGE FOR PLAINTIFF'S EXHIBITS BEING LODGED WITH THE COURT

8 Measures of Taurus from note 1 of the acoustic guitar, repeated multiple times

Audio Exhibit 11:
8 measures of Stairway and Taurus played together from note 1 of the acoustic guitar, repeated multiple times

AUDIO EXHIBITS - RE-RECORDING OF STAIRWAY TO HEAVEN

| | |
|---|---|
| Audio Exhibit 12: | Acoustic Guitar |
| Audio Exhibit 13: | Bass |
| Audio Exhibit 14: | Drums |
| Audio Exhibit 15: | Electric 12 Strings |
| Audio Exhibit 16: | Electric Piano |
| Audio Exhibit 17: | End Guitar |
| Audio Exhibit 18: | Les Pauls |
| Audio Exhibit 19: | Recorders |
| Audio Exhibit 20: | Slide |
| Audio Exhibit 21: | Solo |

AUDIO EXHIBITS - RE-RECORDING OF TAURUS

| | |
|---|---|
| Audio Exhibit 22: | Acoustic Guitar |
| Audio Exhibit 23: | Cello 1 |
| Audio Exhibit 24: | Cello 2 |
| Audio Exhibit 25: | Cymbal |
| Audio Exhibit 26: | Flute |
| Audio Exhibit 27: | Harpsichord |
| Audio Exhibit 28: | String Bass |
| Audio Exhibit 29: | Viola |
| Audio Exhibit 30: | Violins |

AUDIO EXHIBITS – ALEXANDER STEWART

Audio Exhibit 31:                                    (Previously: Audio Exhibit A)
"Stairway to Heaven" (album)

Audio Exhibit 32:                                    (Previously: Audio Exhibit B)
"Taurus" (album)

Audio Exhibit 33:                                    (Previously: Audio Exhibit E)
Taurus Live at Ash Grove (7/10/1967)

Audio Exhibit 34:                                    (Previously: Audio Exhibit C)
Taurus Live at Ash Grove (7/31/1967)

3
COVER PAGE FOR PLAINTIFF'S EXHIBITS BEING LODGED WITH THE COURT

Audio Exhibit 35:                              (Previously: Audio Exhibit D)
Taurus Live at Ash Grove (8/8/1967)

Audio Exhibit 36:                              (Previously: Audio Exhibit H)
Taurus Demo Recording (8/1967)

Audio Exhibit 37:                              (Previously: Audio Exhibit F)
Taurus Live at Kaleidoscope (4/5/1968)

Audio Exhibit 38:                              (Previously: Audio Exhibit G)
Taurus Live at The Time Coast

Audio Exhibit 39:                              (Previously: Audio Exhibit H)
Taurus Live at Acoustic (1996)

Audio Exhibit 40:                              (Previously: Audio Exhibit J)
Combination – Acoustic Taurus Synced to STH SR – Part A, played over Master SR of
STH

Audio Exhibit 41:                              (Previously: Audio Exhibit K)
Acoustic Taurus Synced to Master SR of STH – Part A

Audio Exhibit 42:                              (Previously: Audio Exhibit L)
Stairway Acoustic – Part A:

Audio Exhibit 43:                              (Previously: Audio Exhibit M)
Taurus Acoustic – Part A:

Audio Exhibit 44:                              (Previously: Audio Exhibit N)
Combination – Acoustic Taurus Synced to Master SR of STH (Part A), played over
Acoustic Stairway (Part A)

AUDIO EXHIBITS – REBUTTAL OF MATHES
Audio Exhibit 45:          Mathes Audio Exhibit Tempo Matched - Stairway
Audio Exhibit 46:          Mathes Audio Exhibit Tempo Matched - Taurus
Audio Exhibit 47:          Mathes Audio Exhibit Tempo Matched - STH & Taurus


VIDEO EXHIBITS – DEMONSTRATIVE GUITAR PERFORMANCE
Video Exhibit 1:          Taurus – Left Hand
Video Exhibit 2:          Taurus – Right Hand
Video Exhibit 3:          Stairway to Heaven – Left Hand
Video Exhibit 4:          Stairway to Heaven – Right Hand

4

COVER PAGE FOR PLAINTIFF'S EXHIBITS BEING LODGED WITH THE COURT

2.      The notice of Electronic Filing of Notice of Lodging.

*****

*Respectfully submitted,*

Francis Alexander, LLC

<u>*/s/ Francis Alexander Malofiy*</u>
Francis Alexander Malofiy, Esquire
Attorney ID No.: 208494
280 N. Providence Road | Suite 105
Media, PA 19063
T: (215) 500-1000
F: (215) 500-1005
E: francis@francisalexander.com
*/d/ March 8, 2016*

5
COVER PAGE FOR PLAINTIFF'S EXHIBITS BEING LODGED WITH THE COURT

# CERTIFICATE OF SERVICE

Plaintiff hereby represents that Plaintiff's NOTICE OF LODING FOR PLAINTIFF'S EXHIBITS BEING LODGED WITH THE COURT has been served upon counsel by email:

Helene Freeman, Esquire
666 Fifth Avenue
New York, NY 10103-0084
T: (212) 841-0547
F: (212) 262-5152
E: hfreeman@phillipsnizer.com
*Attorneys for Defendants James Patrick Page, Robert Anthony Plant, and John Paul Jones (collectively with John Bonham (Deceased), professionally known as Led Zeppelin)*

Peter J. Anderson, Esquire
100 Wilshire Blvd. | Suite 2010
Santa Monica, CA 90401
T:(310) 260-6030
F: (310) 260-6040
E: pja@pjanderson.com
*Attorney for Defendants Super Hype Publishing, Inc., Warner Music Group Corp., Warner/Chappell Music, Inc., Atlantic Recording Corporation, and Rhino Entertainment Company*

Glen L. Kulik, Esq. (SBN 082170)
Kulik Gottesman & Siegel LLP
15303 Ventura Blvd., Suite 1400
Sherman Oaks, CA 91403
T:  (310) 557-9200; F: (310) 557-0224
E:  gkulik@kgslaw.com
*Attorney for Plaintiff*

*****

*Respectfully submitted,*

Francis Alexander, LLC

*/s/ Francis Alexander Malofiy*
Francis Alexander Malofiy, Esquire
Attorney ID No.:  208494
280 N. Providence Road | Suite 105
Media, PA 19063
T:  (215) 500-1000
F:  (215) 500-1005
E:  francis@francisalexander.com
*/d/ March 8, 2016*

1

COVER PAGE FOR PLAINTIFF'S EXHIBITS BEING LODGED WITH THE COURT

Francis Malofiy, Esquire
Francis Alexander LLC
280 N. Providence Rd. | Suite 1
Media, PA 19063
Pa. ID: 208494 | T: (215) 500-1000 | F: (215) 500-1005

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Michael Skidmore, Trustee for Randy Craig Wolfe Trust <br><br> PLAINTIFF(S) <br><br> v. <br><br> Led Zeppelin, James Patrick Page, et al. <br><br> DEFENDANT(S). | CASE NUMBER: <br><br> 15-cv-3462 RGK <br><br> **NOTICE OF MANUAL FILING OR LODGING** |

PLEASE TAKE NOTICE:

     Pursuant to Local Rule 5-4.2, the following document(s) or item(s) are exempt from electronic filing, and will therefore be manually ☑ Filed   ☐ Lodged:  (**List Documents**)

- Audio and Video Exhibits
    - Malofiy Declaration, Exhibit 17
    - Bricklin Declaration, Audio Exhibits 1-47
       Video Exhibits 1-4
- Notice of Electronic Filing of Notice of Manual Filing

**Reason:**

☐    Under Seal
☐    In Camera
☑    Items not conducive to e-filing (i.e., videotapes, CDROM, large graphic charts)
☐    Per Court order dated: _____
☐    Other:

March 8, 2016
_____
Date

Francis Malofiy
_____
Attorney Name

Michael Skidmore, Trustee
_____
Party Represented

*Note:   File one Notice of Manual Filing or Lodging in each case, each time you manually submit a document(s).*

**NOTICE OF MANUAL FILING OR LODGING**

**02397**

1  Francis Malofiy, Esq.
2  Francis Alexander, LLC
   280 N. Providence Rd. | Suite 105
3  Media, PA 19063
4  T:  (215) 500-1000; F:  (215) 500-1005
   E:  francis@francisalexander.com
5  *Attorney for Plaintiff*

6
   Glen L. Kulik, Esq. (SBN 082170)
7  Kulik Gottesman & Siegel LLP
8  15303 Ventura Blvd., Suite 1400
   Sherman Oaks, CA 91403
9  T:  (310) 557-9200; F:  (310) 557-0224
10 E:  gkulik@kgslaw.com
   *Attorney for Plaintiff*

11

12              **UNITED STATES DISTRICT COURT**

13        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

14  MICHAEL SKIDMORE, as Trustee for      Case No. 15-cv-03462 RGK (AGRx)
15  the RANDY CRAIG WOLFE TRUST,

16                Plaintiff,               Hon. R. Gary Klausner

17        v.                              **DECLARATION OF FRANCIS
                                          MALOFIY  IN OPPOSITION TO
18                                        DEFENDANTS' MOTION FOR
19  LED ZEPPELIN; JAMES PATRICK           SUMMARY JUDGMENT OR IN
    PAGE; ROBERT ANTHONY PLANT;           THE ALTERNATIVE, PARTIAL
20  JOHN PAUL JONES; SUPER HYPE           SUMMARY JUDGMENT
    PUBLISHING, INC.; WARNER MUSIC
21  GROUP CORP., Parent of                **Date:   March 28, 2016
22  WARNER/CHAPPELL MUSIC, INC.;          Time:  9:00 a.m.
    ATLANTIC RECORDING                    Room:**
23  CORPORATION; RHINO
24  ENTERTAINMENT COMPANY,

25                Defendants.
26

27              **DECLARATION OF FRANCIS MALOFIY**

28
                                    1
   DECLARATION OF FRANCIS MALOFIY IN OPPOSITION TO DEFENDANTS' MOTION FOR
   SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

**02398**

I, Francis Malofiy, declare as follows:

1.    I am an attorney in the law firm of Francis Alexander, LLC, and I represent Plaintiff Michael Skidmore, as Trustee for the Randy Craig Wolfe Trust in the above-captioned matter. I have personal knowledge of the facts stated within this declaration. I could and would testify competently to the facts contained in this declaration.

2.    Attached as Exhibit 1 is a true and accurate copy of the Deposition of James Patrick Page (filed under seal).

3.    Attached as Exhibit 2 is a true and accurate copy of the Interrogatory Responses of James Patrick Page.

4.    Attached as Exhibit 3 is a true and accurate copy of April 25, 1970 New Musical Express Interview with James Patrick Page.

5.    Attached as Exhibit 4 is a true and accurate copy of the 1972 ZigZag Interview with James Patrick Page, reprinted in Guitar World.

6.    Attached as Exhibit 5 is a true and accurate copy of Audio from the 1972 ZigZag interview (D160).

7.    Attached as Exhibit 6 is a true and accurate copy of the Deposition of John Paul Jones (filed under seal).

8.    Attached as Exhibit 7 is a true and accurate copy of the Deposition of Robert Anthony Plant (filed under seal).

9.    Attached as Exhibit 8 is a true and accurate copy of the Deposition of Mark Andes.

10.    Attached as Exhibit 9 is a true and accurate copy of the Deposition of Jay Ferguson.

11.    Attached as Exhibit 10 is a true and accurate copy of the Sheet Music for Stairway to Heaven.

12.    Attached as Exhibit 11 is a true and accurate copy of the Deposition of Bruce Pates.

2

DECLARATION OF FRANCIS MALOFIY IN OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

02399

13.    Attached as Exhibit 12 is a true and accurate copy of the Posters from Spirit Concerts produced in discovery.

14.    Attached as Exhibit 13 is a true and accurate copy of the February 7, 1970 Robert Plant Crash Article from Melody Maker (D146).

15.    Attached as Exhibit 14 is a true and accurate copy of Get the Led Out by Denny Somach.

16.    Attached as Exhibit 15 is a true and accurate copy of Led Zeppelin IV Remastered.

17.    Attached as Exhibit 16 is a true and accurate copy of Audio of Interview with James Patrick Page and John Paul Jones (D165).

18.    Attached as Exhibit 17 is a true and accurate copy of a 2004 NPR Interview of Robert Plant by Terry Gross.

19.    Attached as Exhibit 18 is a true and accurate copy of Spirit the album.

20.    Attached as Exhibit 19 is a true and accurate copy of Led Zeppelin playing Fresh Garbage on January 10, 1969.

21.    Attached as Exhibit 20 is a true and accurate copy of Interview with John Bonham originally published in Melody Maker, and excerpted in DRUM! In 1992.

22.    Attached as Exhibit 21 is a true and accurate copy of the Deposition of William Ruhlmann.

23.    Although Peter Anderson reminded me that the requests for admissions were due, it was my understanding due to injuries my client suffered—and the extensive travel during the month of January 2016 for the case—that Mr. Anderson would not seek to deem them admitted.

24.    I served answers to the requests for admissions to Mr. Anderson.

25.    The first I learned that he was considering the requests for admissions deemed admitted was when Defendants filed for summary judgment.

26.    We had a conference the week before Defendants filed for summary

3

DECLARATION OF FRANCIS MALOFIY IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

02400

judgment to identify the grounds they were moving on; that was not one of the topics, issues, or grounds discussed.

27.   If Mr. Anderson had notified me I would have filed a motion immediately to withdrawn the admissions, and I still reserve the right to do so if necessary as the requests for admissions are contradicted by voluminous evidence in the record.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed March 7, 2016 in Media, PA.


_____*/s/Francis Malofiy*_____
Francis Alexander Malofiy, Esq

DECLARATION OF FRANCIS MALOFIY IN OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

DECLARATION OF FRANCIS MALOFIY IN OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

# EXHIBIT 10



Case 2:15-cv-03462-RGK-AGR  Document 124-1  Filed 03/08/16  Page 213 of 380  Page ID #:2789

STAIRWAY TO HEAVEN

Words and Music by
JIMMY PAGE
ROBERT PLANT

E u 301137

JAN 20 1972

Copyright ©1972 by SUPERHYPE MUSIC, INC., 1841 Broadway, New York, N.Y. 10023
International Copyright Secured    Printed in U.S.A.    All Rights Reserved
D000562

D000563

D000564

D000565

# EXHIBIT 13

Case 2:15-cv-03462-RGK-AGR   Document 124-1   Filed 03/08/16   Page 320 of 380   Page ID #:2906

Page 36—MELODY MAKER, February 7, 1970

# NEWS EXTRA

✱

LED ZEPPELIN vocalist Robert Plant was hurt in a road crash on Saturday, returning from Mothers Club, Birmingham, where he had been to see Spirit.

A mini van and his Jaguar collided and both cars were written off. Plant was taken to Kidderminster Hospital with a badly cut face and smashed teeth, but he discharged himself on Monday, and is spending this week convalescing at home. He hopes to be fit for Zepplin's concert at the Usher Hall, Edinburgh on Saturday.

✱

D000146

Case 2:15-cv-03462-RGK-AGR   Document 124-1   Filed 03/08/16   Page 346 of 380   Page ID #:2932

# EXHIBIT 18







**Stereo**

63278

# SPIRIT

MARK ANDES—BASS & VOCALS
CASSIDY—DRUMS & PERCUSSION
RANDY CALIFORNIA— GUITARS
JOHN LOCKE  KEYBOARD
JAY FERGUSON—VOCAL & PERCUSSION

SIDE 1

FRESH-GARBAGE/Ferguson
UNCLE JACK/Ferguson
MECHANICAL WORLD/Andes & Ferguson
TAURUS/California
GIRL IN YOUR EYE/Ferguson
STRAIGHT ARROW/Ferguson

SIDE 2

TOPANGA WINDOWS/Ferguson
GRAMOPHONE MAN/Ferguson, Locke,
California, Andes & Cassidy
WATER WOMAN/Ferguson
THE GREAT CANYON FIRE
IN GENERAL/Ferguson
ELIJAH/Locke

Producer: Lou Adler
Strings & Horns Arranged By Marty Paich
Engineers: Eirik Wangberg, Armin Steiner
& Mike Leitz
Album Design: Corporate Head
Art Director: Tom Wilkes
Cover Photo: Guy Webster
Back Cover Photo: Jay Thompson
Assisted By Terry Clements/Marshall Blonstein/Doug Wallack

CBS is a Trademark of the Columbia Broadcasting System,
Inc., U.S.A.

Printed and made by Ernest J. Day & Co, Ltd., London, W.11, Patent Pending

BE PLAYED ON TODAY'S MONO RECORD PLAYERS WITH **EXCELLENT** RESULTS. THEY WILL LAST AS LONG AS

373