# Nos. 16-56057 & 16-56287

=====================================================

## UNITED STATES COURT OF APPEALS
### FOR THE NINTH CIRCUIT
_____

MICHAEL SKIDMORE, AS TRUSTEE FOR THE RANDY CRAIG
WOLFE TRUST,
*Plaintiff-Appellant-Appellee*

v.

LED ZEPPELIN, *et al.,*
*Defendants-Appellees*

AND

WARNER/CHAPPELL MUSIC, INC.,
*Defendant-Appellee-Appellant*
_____

*On Appeal from the United States District Court*
*For the Central District of California*
*Case No. 2:15-cv-03462-RGK(AGRx)*
*Hon. R. Gary Klausner, District Court Judge*

=====================================================

## AMICI CURIAE BRIEF OF MUSICOLOGISTS IN SUPPORT OF DEFENDANTS-APPELLEES AT *EN BANC* REHEARING

**Kenneth D. Freundlich**
**FREUNDLICH LAW**
**16133 Ventura Blvd. Ste. 645**
**Encino, CA 91436**
**(310) 275-5350**
*Counsel for Amici Curiae*

July 1, 2019

## IDENTITY OF AMICI

This brief of amici curiae is submitted on behalf of the following

persons (academic affiliations are listed for identification purposes

only):

| | |
|---|---|
| **Nicole Biamonte, PhD**<br>Associate Professor of Music Theory<br><br>Schulich School of Music<br>McGill University | **John Covach, PhD**<br>Professor of Music Theory<br><br>The College Department of Music<br>Director, Institute for Popular<br>Music Mercer Brugler<br>Distinguished Teaching Professor<br><br>The College Department of Music,<br>University of Rochester |
| **Charles Cronin, PhD**<br>B.M., J.D., M.A., Ph.D.<br>(musicology)<br><br>M.I.M.S. (Masters, Information<br>Management & Systems)<br><br>Lecturer in Law, University of<br>Southern California Law School | **Dr. Gerald Eskelin**<br>Doctor of Music Education<br><br>Formerly of:<br>University of Southern California<br>music faculty; Pierce College,<br>Music chairman and teacher of<br>music theory<br><br>Testifying witness and advisor<br>regarding music copyright issues<br>Stage 3 Music |
| **Robert Fink, PhD**<br>Professor IV<br><br>Director of Undergraduate<br>Studies; Department of<br>Musicology Chair, Music Industry<br>Program UCLA Herb Alpert | **Michael Harrington, D.M.A.**<br>Professor and Course Author<br><br>Berklee College of Music / Berklee<br>Online<br>Music Business Program Faculty<br>Chair |

i

| | |
|---|---|
| School of Music Professor in Humanities | |
| **Katherine M. Leo, Ph.D., J.D.** Assistant Professor of Music Millikin University | **Brad Osborn, Ph.D.** Associate Professor of Music Theory University of Kansas School of Music Affiliated Faculty: American Studies |
| **André O. Redwood, PhD** Assistant Professor of Music Theory University at Albany – SUNY | **Anthony Ricigliano** Former Chairman of the Music Theory Department Manhattan School of Music Testifying Musicologist Donato Music Services, Inc. |
| **Dr. Patrick Savage** Associate Professor Faculty of Environment and Information Studies Keio University SFC (Shonan Fujisawa Campus) | **Eleanor Selfridge-Field, PhD** Consulting Professor, Music Stanford University |
| **Mark Spicer, Ph.D.** Professor of Music Hunter College and the Graduate Center City University of New York | **Robert Walser, PhD.** Professor of Music Case Western Reserve University |

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned states that none of the amici is a corporation that issues stock or has a parent corporation that issues stock.

Dated: July 1, 2019         **FREUNDLICH LAW**

s/ Kenneth D. Freundlich
Kenneth D. Freundlich
*Attorneys for Amici Curiae*

## <u>STATEMENT OF COMPLIANCE WITH RULES 29-2 and 29(a)(3)</u>

This brief is submitted pursuant to Ninth Circuit Rule 29-2 and Rule 29(a)(3) of the Federal Rules of Appellate Procedure. Plaintiff Skidmore has not consented to the filing of this brief. All other parties have consented. Amici therefore submit this brief concurrently with a Motion for Leave to file it.

No party's counsel authored the brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting the brief and no person or entity – other than the amicus curiae, its members, or its counsel – contributed funds for preparing or submitting the brief.

Dated: July 1, 2019                 **FREUNDLICH LAW**

<u>s/ Kenneth D. Freundlich</u>
Kenneth D. Freundlich
*Attorneys for Amici Curiae*

# TABLE OF CONTENTS

INTEREST OF AMICI CURIAE........................................................1

ARGUMENT ....................................................................3

I.   Stewart's Identified Similarities Between "Taurus"
     and "Stairway" Are Neither Individually nor Collectively Original
     Expression .................................................................6

     A.   Fundamental Elements of Music....................................6

     B.   There Is No Similarity Between Any Alleged Original
          Melodic or Harmonic Elements of 'Taurus'
          and "Stairway" ................................................10

          i.    Unoriginal Chromatic Bass Line...........................11

          ii.   The Harmonic Progression (Chords) Following
                the Bass Line is Not Original ................................12

     C.   Any Shared Musical Elements Between "Taurus" and
          "Stairway" Are Common Musical Elements....................14

II.  The Combination of These Unoriginal Elements
     Is Not Original ...........................................................17

III. CONCLUSION.......................................................19

CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)(7)(C) AND
     CIRCUIT RULE 32-1 ..............................................21

CERTIFICATE OF SERVICE............................................22

v

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Litchfield v. Spielberg*,
 736 F.2d 1352 (9th Cir. 1984)........................................................ 14, 15

*Satava v. Lowry*,
 323 F.3d 805 (9th Cir. 2003)......................................................... 18, 19

*Swirsky v. Carey*,
 376 F.3d 841 (9th Cir. 2004)................................................................ 2

*Williams v. Gaye*,
 895 F.3d 1106 (9th Cir. 2018)..................................................... 4, 5, 6

*Williams v. Gaye*,
 Case No. 15-56880, Nos. 16-55089 and 16-55626 ................................ 1

**Other Authorities**

Alex Ross, *Listen to This* (Farrar, Straus, Giroux, 2010), ch.
 2........................................................................................................ 13

Fishman, J. P., *Music as a matter of law*, Harvard Law
 Review ............................................................................................. 8

Jamie Lund, *An Empirical Examination of the Lay Listener
 Test in Music Composition Copyright Infringement* ............................ 7

Peter Williams, *The Chromatic Fourth During Four
 Centuries of Music* (Oxford, 1998) ...................................................... 13

Richard J. Scott, *Chord Progressions for Songwriters*
 (Writers Club Press, 2003) ................................................................. 13

## **INTEREST OF AMICI CURIAE**

Amici are musicologists who research, teach and write about music, music analysis and music composition. In music copyright infringement cases, musicologists offer expert testimony about similarities between contested musical works, and whether the similarities are musically significant. Such testimony assists judges and jurors to evaluate the significance of alleged similarities between two musical works for extrinsic similarity.

Amici and their composer clients rely on judges, as gatekeepers, to screen out cases where there is no extrinsic similarity by addressing the significance of originality of expression and the protectable musical expression in two musical compositions[1]. Then, if the case proceeds to a jury trial, we must rely on how the jury will be instructed to consider musicological testimony.

---

[1] A similar group of Amici musicologists submitted briefs in the appeal of the so-called *Blurred Lines* case, *Williams v. Gaye*, Case No. 15-56880, Nos. 16-55089 and 16-55626 (consolidated), Dckt. No. 20, and the Petition for *en banc* review, Dckt. No. 99 (arguing that judges should seize upon their role as "gatekeeper" to prevent cases from going to a jury based on claims that should not survive the extrinsic test as a matter of law).

To find actionable infringement, a jury must find that two works satisfy the "extrinsic test" *and* an "intrinsic test," the latter which asks the jury for its subjective evaluation of the similarity between two compositions based on listening to them. *See generally Swirsky v. Carey*, 376 F.3d 841 (9th Cir. 2004). If a jury finds that there is no extrinsic similarity, as the jury did here, the works will not be intrinsically evaluated by jurors.

Jurors aurally perceive music in different ways. Accordingly, such intrinsic evaluation, where there is no objective similarity between two pieces of music, could produce particularly uneven and unpredictable results. Amici have a strong interest in Courts correctly instructing juries in such a way as to enable them, where appropriate, to find no "extrinsic similarity" between works. Without such consistent and correct instructions, the arguments will invariably proceed to the subsequent "intrinsic test" and grossly inequitable determinations of infringement that will ultimately stifle the robust public domain that has allowed unparalleled creativity and innovation by American popular musicians.

## **ARGUMENT**

The Ninth Circuit panel reversed a defense jury verdict based on its finding that Judge Klausner failed to instruct the jury that it could find infringement based simply on the selection and arrangement of unprotectable elements between two musical compositions. Such an instruction, given in the broad terms suggested by the panel, would foster unprecedented opportunism, unpredictability, and inequity in the initiation and resolution of these disputes. It would enable juries to find infringement even where there is no originality in the selection and arrangement of allegedly similar elements. Disputes would devolve to battles between experts, cherry-picking commonplace unprotectable similarities between two works in an attempt to manipulate musically untrained juries into findings of substantial musical similarity.

All musical works, like works of expression in other fields such as literature and visual arts, use unprotectable elements on some level. All copyrightable musical expression uses a limited number of pitches, rhythms, harmonies, key signatures, tempos, genres, etc., none of which may be monopolized by any musician.

Ninth Circuit Judge Jacqueline Nguyen recently identified the pernicious consequences of finding infringement based on the fact that two works may share a number of unprotected musical elements. In her dissent from the majority opinion in *Williams v. Gaye*, 895 F.3d 1106 (9th Cir. 2018) (the "*Blurred Lines* Case"), Judge Nguyen notes that there was no melodic, harmonic or rhythmic similarity of protectable expression between Marvin Gaye's "Got to Give it Up" and Pharrell Williams, Robin Thicke and Clifford Harris, Jr.'s "Blurred Lines," just an alleged "constellation" of similarities. *Id.* at 1138. In the *Blurred Lines* Case, just like in this case, the Gaye family's expert presented the jury with a cherry-picked list of common generic musical elements, leading to a widely condemned verdict of infringement.

Judge Nguyen, in her well-stated dissent in the *Blurred Lines* Case, aptly disputed the expert's tactic: "[The expert's cherry picking] might be reasonable if the two constellations bore any resemblance. But Big and Little Dipper they are not. The only similarity between these 'constellations' is that they're both compositions of stars." *Id.*

And commenting on the verdict in favor of the Gaye family, Judge Nguyen warned of its deeply regrettable implications:

"The Gayes, no doubt, are pleased by this outcome. They shouldn't be. They own copyrights in many musical works, each of which (including 'Got to Give it Up') now potentially infringes the copyright of any famous song that preceded it. That is the consequence of the majority's uncritical deference to musical experts."

*Id.* at 1152.

If a jury were authorized to find infringement based on the findings of the Plaintiff's expert here, Alexander Stewart, Judge Nguyen's apprehensions would be realized. Stewart, like the Gaye family's expert, identifies commonplace musical elements found in the contested songs. These common arpeggios, repeated eighth notes, repeated two-note phrases, extracted from their larger contexts, are the grounds on which Plaintiff hopes to convince a jury to believe that "Stairway to Heaven" ("Stairway") infringes upon "Taurus."

Stewart's implication that infringing melodic and harmonic similarities can result from common generic musical elements falls flat. In fact, these elements comprise nothing more than a descending

chromatic bass line and its associated chords, both of which are commonplace and unprotectable musical *scènes à faire*.

The similar generic musical elements that can be identified in "Taurus" and "Stairway" are not original to either work. These constituent elements are akin to the flecks of similarly colored paint in the pointillist paintings to which Judge Nguyen referred. *See id.* at 1139. Like varied colored flecks of paint, arpeggios and descending bass lines are musical *ideas* that must remain freely available to composers to promote copyright law's fundamental objective to promote the production of innovative expression.

## I.  Stewart's Identified Similarities Between "Taurus" and "Stairway" Are Neither Individually nor Collectively Original Expression

### A.  Fundamental Elements of Music

Musical works are built from a common vocabulary of fundamental elements like pitch, duration, meter, key and timbre[2]. In

---

[2] "Pitch" refers to the selection of notes, of which there are twelve in the standard chromatic scale used in Western popular music.

"Duration" refers to the length of notes (*e.g.*, quarter note and half note).

"Meter" refers to how beats are grouped indicated by a time signature (*e.g.,* 4/4 (4 equally spaced quarter-note beats per bar)).

this regard, the sounds of the instruments chosen for a particular recording of a musical composition can have an outsized effect on a jury's perception of the similarity of two musical compositions by attracting a listener's attention to the performance as opposed to the composition. *See* Jamie Lund, *An Empirical Examination of the Lay Listener Test in Music Composition Copyright Infringement*, 11 Va. Sports Ent. L.J. 137 (2012). This underscores the reason why the "extrinsic test" must be rigorously applied to prevent songs sharing unoriginal elements from ever reaching the jury's "intrinsic" listening test, which is by its nature so subjective.

All songwriters choose from among these commonplace elements in forging their original musical expression. Using these basic elements, composers build more complex structures like chords and melodic and rhythmic motifs, which they further develop and combine to create the rhythmically structured melodies and underlying harmonic progressions that constitute the original backbone of a musical work.

---

"Key" signatures are groups of sharps or flats indicating the notes on which the piece primarily depend.

"Timbre" refers to the character or quality of a musical sound or voice.

Accordingly, the most important elements of a musical composition are its *melody, harmony and rhythm*. *Melody* comprises a succession of pitches, each sounded for a particular duration. It is typically the most distinctive and memorable musical aspect of a popular song and of musical works in general because melody is what listeners most readily comprehend, recall and replicate[3]. In popular songs, the sung vocal line is the most identifiable and hummable part of a composition, and substantial similarity analysis between two popular songs almost invariably results in a question of melodic similarity.

*Harmony* is the relationship between two or more pitches that are sounded simultaneously or in close succession (*e.g.*, arpeggios). These pitches are commonly said to constitute a "chord." The harmonic progression of a composition is the sequence of chords that provide the support for its melodies.

---

[3] *See* Fishman, J. P., *Music as a matter of law*, Harvard Law Review, Vol. 131, pp. 1861–1923 (2018). Melody is, in fact, the only musical element mentioned in the U.S. Copyright and foreign copyright statutes.

*Rhythm* is the pattern of sounds and silences in a piece of music as determined by the sequence and duration of the notes being performed or the beats of a percussion instrument.

In addition to the primary components of melody, harmony, and rhythm, there are, of course, myriad other elements available to composers. These include, for example, tempo[4], instrumentation[5], genre[6], dynamics[7], articulation[8], and phrasing[9]. While particular combinations and deployments of these secondary elements may enhance the appeal of a musical work, these are fundamentally enhancements of the primary melodies, harmonies, and rhythm.

There is no music without melody, harmony and rhythm; a musical work comprised of a constellation of elements like key, meter, dynamic markings, and designated instrumentation is meaningless. All songwriters choose from among these commonplace elements in forging

---

[4] The pace of the beat (expressed as beats per minute measured on a metronome for example)

[5] Guitars, drums, piano, trumpet, trombone, etc.

[6] Hip hop, rock, country, rhythm and blues, classical, etc.

[7] The relative volume of the notes

[8] The attack, duration and decay of a given note, *e.g.,* staccato, legato and slurred.

[9] How groups of notes are played

their original musical expression.  The fact that two or more composers may choose to employ some of the same common musical elements, however, has no bearing on the question whether their works contain substantially similar musical *expression*.

Amici believe that when there is no significant similarity of melody, harmony or rhythm, there is no possibility of actionable similarity between two musical compositions.

**B.** **There Is No Similarity Between Any Alleged Original Melodic or Harmonic Elements of "Taurus" and "Stairway"**

Stewart's positing of melodic and harmonic similarity between "Stairway" and "Taurus" is based on a repeating four-measure passage. Defense expert Ferrara's chart (*see* Ferrara's Musical Example 1 reproduced below) comparing the first four measures of the chord progressions between "Taurus" and "Stairway" accurately identifies the

way to reflect the two phrases at issue.[10]



**MUSICAL EXAMPLE 1**

Four-measure chord progressions

Top two lines = Section A in "Taurus" with note values halved

Lower two lines = Measures 1-4 in "Stairway"

### i.    <u>Unoriginal Chromatic Bass Line</u>

The main similarity Stewart identifies between "Taurus" and "Stairway" is a descending chromatic bass line moving in half steps from the first to the fourth degree of the scale.

---

[10] As written in the sheet music, the corresponding "Taurus" portion is actually eight measures long. Ferrara charted "Taurus" and "Stairway" for comparison, halving the difference in "Taurus" note values to facilitate comparative translation of shared similarities. This is an acceptable musicological practice.

Amici concur with Ferrara's testimony that this chromatic bassline is commonly heard not only in many twentieth-century popular songs, but also in musical works in general since the Baroque period.

### ii.    The Harmonic Progression (Chords) Following the Bass Line is Not Original

As indicated in the musical excerpt provided above, there are only three similar chords in the relevant four-bar phrase: A minor, A Flat augmented (which is identical to G Sharp augmented) and a C/G chord with G being the lowest bass note of this inversion of the C chord. The fourth chord in the sequence diverges to a D/F# in "Stairway" and an F# half diminished 7 in "Taurus" which are chords comprised of different note combinations making them entirely different. The variation in this pattern of chords is highlighted further because while "Stairway" has an F Major 7 chord in the third measure (the fifth chord in the sequence), "Taurus" has no chord at all (N.C. in the Ferrara chart, above). Finally, the resolution of these phrases in their final fourth measures is also significantly different - "Stairway" uses the aeolian cadence of G major to A minor (bvii to i) and "Taurus" does not.

The diversions in the fourth and fifth chords and the final measure makes these phrases significantly different.

12

However, regardless of any alleged similarities between these chord sequences, both progressions are essentially implied by the descending bass line and are so commonplace that composers refer to them as the "minor line cliché" (jazz) or the lament progression (in classical). This is so well known that a simple Google search of the words "minor line cliché" reveals numerous explanations of this phenomenon, even a guitarist demonstrating the cliché in the key of e minor,[11] and there are a plethora of examples of this cliché throughout music.[12]

---

[11] https://www.youtube.com/watch?v=rOMXYtiCTs4.

[12] Peter Williams, *The Chromatic Fourth During Four Centuries of Music* (Oxford, 1998); (citing over 200 examples from classical music); Alex Ross, *Listen to This* (Farrar, Straus, Giroux, 2010), ch. 2; "Chacona, Lamento, Walking Blues: Bass Lines of Music History" (citing dozens of examples from both classical and popular music); Richard J. Scott, *Chord Progressions for Songwriters* (Writers Club Press, 2003), pp. 189ff on "Chromatic Bass Lines" (listing ten popular songs with versions of this progression, plus dozens of closely related variants). Ferrara also illustrated several works ranging from Purcell's "When I am Laid in Earth" (Dido's Lament) (1689) to Chopin's "Prelude in E minor" (1839) through Vic Dana's recording of "More" (1963) and the Sherman Brothers' "Chim Chim Cher-ee" (1964) and Beatles' "Michelle" (1965) to demonstrate how ubiquitous and unoriginal this chord structure is.

In short, there is nothing original in either the descending chromatic bass line or the few chords it implies in "Taurus" and "Stairway."

### C. Any Shared Musical Elements Between "Taurus" and "Stairway" Are Common Musical Elements

The scattershot array of alleged similarities presented by Stewart includes arpeggios; two-note phrases; eighth notes; pitches of similar duration; and pitches derived from the same "pitch collection." Stewart has presented this list of purported similarities without regard to the actual notes being played or their contexts within the two compositions.

One can only infer from Stewart's presentation that he believes Plaintiff should have a monopoly over these commonplace musical characteristics regardless of their placement in the songs in question or whether the actual melody, harmony or rhythm expressed in these commonplace elements is original or even similar. This Circuit has found that such lists as Stewart presents are "inherently subjective and unreliable," *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984), and that the Court should be cautious about them particularly in cases such as this one, where the list "emphasizes random similarities

scattered throughout the works." *Id.* (affirming verdict of no substantial similarity between the film *ET* and the plaintiff's work).

Arpeggios are chords whose notes are played successively. They are commonplace in music works from time immemorial – especially in music arranged for stringed instruments such as the acoustic guitar featured in "Taurus" and "Stairway." It is astonishing that Stewart has included them in his assembly of alleged musical similarities.

Two-note patterns can barely constitute a motif, let alone a protectable melody, especially when, as here, the two-note patterns occur in entirely different contexts and places in both compositions. Amici do not believe that isolated occurrences of two-note phrases could ever constitute protectable music expression. The occurrence of similar two-note phrases in fragments of these two songs is irrelevant to the question of actionable similarity.

Plaintiff claims similarity between the two works based on the common use of eighth notes in the pattern of the bass line; the placement of the chord changes in the measures; and the pattern of the individualized notes played by the respective guitars.

15

Here, the actual duration of the compared notes between "Taurus" and "Stairway" is manifestly different, so much so that Ferrara had to halve the duration of the "Taurus" notes for this comparison to make any sense[13]. The durational similarities, when the two phrases are compared as Ferrara did, are limited to the appearance of eighth notes in both pieces. Eighth notes are one of the traditional building blocks of music, and nobody can claim originality to the inclusion of eighth notes in a piece of music.

Plaintiff's argument that the musical expression of two works may be substantially similar based on the fact that they both use the same collection of pitches is groundless. There are only 12 pitches in Western popular music, which recycle across octaves[14]. Music generally derives from the selection of these pitches and their arrangement into musical compositions. But the mere fact that all music chooses from the same palette of notes is not something that makes any particular piece of

---

[13] *See* footnote 10 and Ferrara's chart reproduced at page 11 of this Amici Brief.

[14] An octave is a series of eight notes in the interval between two notes. For example, Middle C to the C above middle C is an octave. The note names from octave to octave are the same. They just sound differently, lower or higher depending on which octave they occur in.

music original. If the pitches are not arranged in order and duration to form original melodies, there is nothing original about the existence of the pitches themselves. The twelve pitches are a musician's palette, just like the available colors to a painter; and nobody can claim protectability in the musical palette of notes unless it is expressed in an order and duration evidencing originality. Moreover, pitch collections in a given composition are driven by key signature such that an A minor key (which "Taurus" and "Stairway" share) provides a collection of pitches from which all songs in the key of A minor generally create their compositions.

### D. The Combination of These Unoriginal Elements Is Not Original

Because none of the similar elements between "Taurus" and "Stairway" are separately original, Plaintiff resorts to the extravagant suggestion that a composer's use of a combination of the five unoriginal, unprotectable elements asserted by Stewart, earlier used by another composer, constitutes infringement. The jury instruction suggested by the panel would open the possibility that a confused jury might be persuaded that such a "constellation" of similarity is infringement.

17

Here, however, there is nothing original about combining a clichéd bass line and a set of three chords that mirror the cliché with fundamental musical elements that are in the public domain and shared as the commons of musical ideas and elements of expression.

Nobody would claim that Beethoven's "Piano Sonata No. 5 in C minor" and the first movement of his "Piano Sonata No. 8 in C minor ('Pathétique')" are substantially similar simply because they are played on an identical instrument, in the identical key (*i.e.,* the same hierarchical arrangement of the "alphabet" of notes with respect to one another), with the identical tempo indication (*allegro molto* - very swift) in the same expressive manner (*e con brio* - with vigor), and in the same musical form (each a sonata *allegro*).

As with the selection of unprotectable elements of the glass artwork in *Satava v. Lowry*, 323 F.3d 805 (9th Cir. 2003), found by this Circuit to not be original, the selection of these commonplace elements of music in "Taurus" and "Stairway" is not sufficiently original to merit any copyright protection. *See id.* at 812-13 (holding that the "selection of clear glass, oblong shroud, bright colors, proportion, vertical orientation,

and stereotyped jellyfish form, considered together, lacks originality to merit copyright protection").

## II.    <u>Conclusion</u>

The panel decision threatens the public domain and causes paralyzing uncertainty for composers. If a jury instruction is given permitting potential infringement verdicts when the similarities are trivial and commonplace, songwriters will be confused as to when originality – and thereby copyright protection – begins and ends. Such an instruction would threaten to eviscerate important elements of the public domain and stifle musical creativity. Given the confined set of common elements available to composers, they would understandably be anxious, fearing unwarranted and frivolous copyright lawsuits.[15]

Composers should be able to freely borrow from the rich tapestry of public domain musical elements. And musicologists should not be rewarded for cherry-picking unrelated, commonplace elements between

---

[15] Amici note that under no circumstances here are the similarities, if any, virtually identical, which would render even a virtual-identity jury instruction moot. *See, e.g., Satava*, 323 F.3d at  812 (requiring virtual identity if all that is at issue is a thin copyright – *i.e.*, the original selection and arrangement of unprotectable elements).

two musical compositions simply because an errant jury instruction might support an infringement verdict for their client.

Amici urge this Court to reject the panel's disposition of this matter and uphold the jury verdict in this case.

Dated:     July 1, 2019
           Encino, California

                              Respectfully submitted,

                              s/ Kenneth D. Freundlich
                              Kenneth D. Freundlich
                              FREUNDLICH LAW
                              16133 Ventura Blvd., 645
                              Encino, California, 91436

## CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)(7)(C) AND

## CIRCUIT RULE 32-1

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Circuit Rule 32-1, the

attached amici brief is proportionately spaced, has a typeface of 14

points or more and contains  3461 words.

DATED: July 1, 2019                    FREUNDLICH LAW


  s/ Kenneth D. Freundlich
Kenneth D. Freundlich
*Attorneys for Amici Curae*

## **CERTIFICATE OF SERVICE**

I, Kenneth D. Freundlich, a member of the Bar of this Court, hereby certify that on July 1, 2019, I electronically filed the foregoing *AMICI CURIAE BRIEF OF MUSICOLOGISTS IN SUPPORT OF DEFENDANTS-APPELLEES AT EN BANC REHEARING* with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

 s/ Kenneth D. Freundlich