**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MICHAEL SKIDMORE, as Trustee for the Randy Craig Wolfe Trust, *Plaintiff-Appellant*, <br><br> v. <br><br> LED ZEPPELIN; JAMES PATRICK PAGE; ROBERT ANTHONY PLANT; JOHN PAUL JONES; SUPER HYPE PUBLISHING, INC.; WARNER MUSIC GROUP CORPORATION; WARNER/CHAPPELL MUSIC, INC.; ATLANTIC RECORDING CORPORATION; RHINO ENTERTAINMENT COMPANY, *Defendants-Appellees.* | No. 16-56057 <br><br> D.C. No. 2:15-cv-03462-RGK-AGR |

| | |
|---|---|
| MICHAEL SKIDMORE, as Trustee for the Randy Craig Wolfe Trust, *Plaintiff-Appellee*, <br><br> v. <br><br> WARNER/CHAPPELL MUSIC, INC., *Defendant-Appellant*, | No. 16-56287 <br><br> D.C. No. 2:15-cv-03462-RGK-AGR <br><br><br> OPINION |

and

LED ZEPPELIN; JAMES PATRICK
PAGE; ROBERT ANTHONY PLANT;
JOHN PAUL JONES; SUPER HYPE
PUBLISHING, INC.; WARNER MUSIC
GROUP CORPORATION, ATLANTIC
RECORDING CORPORATION; RHINO
ENTERTAINMENT COMPANY,
*Defendants.*

Appeal from the United States District Court
for the Central District of California
R. Gary Klausner, District Judge, Presiding

Argued and Submitted En Banc September 23, 2019
San Francisco, California

Filed March 9, 2020

Before:  Sidney R. Thomas, Chief Judge, and M. Margaret
McKeown, William A. Fletcher, Johnnie B. Rawlinson,
Carlos T. Bea, Sandra S. Ikuta, Mary H. Murguia,
Jacqueline H. Nguyen, Paul J. Watford, Andrew D.
Hurwitz and Bridget S. Bade, Circuit Judges.

Opinion by Judge McKeown;
Concurrence by Judge Watford;
Partial Concurrence and Partial Dissent by Judge Ikuta

# SUMMARY[*]

## Copyright

The en banc court affirmed the district court's judgment after a jury trial in favor of Led Zeppelin in a copyright action alleging that the opening notes of *Stairway to Heaven* infringed *Taurus*, a song written by guitarist Randy Wolfe and performed by his band Spirit.

In Part I, the en banc court held that the 1909 Copyright Act, which does not protect sound recordings, rather than the 1976 Copyright Act, controlled its analysis because the copyright at issue was for the unpublished musical composition of *Taurus*, which was registered in 1967. The scope of the copyright in the unpublished work was defined by the deposit copy, which in the case of *Taurus* consisted of only one page of music. Accordingly, it was not error for the district court to decline plaintiff's request to play sound recordings of the *Taurus* performance that contained further embellishments or to admit the recordings on the issue of substantial similarity.

In Part II, the en banc court held that proof of copyright infringement required plaintiff to show: (1) that he owned a valid copyright in *Taurus*; and (2) that Led Zeppelin copied protected aspects of the work. The en banc court explained that the second prong contains two separate components: "copying" and "unlawful appropriation." A plaintiff may prove copying circumstantially by showing access and

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

striking similarity. The hallmark of "unlawful appropriation" is that the works share substantial similarities. Both an extrinsic and an intrinsic test must be satisfied for the works to be deemed substantially similar.

In Part III, the en banc court addressed the district court's exclusion of sound recordings of *Taurus* as relevant to prove access but too prejudicial because of the risk that the jury would confuse access with substantial similarity. The en banc court concluded that this evidentiary issue was moot because the jury found access.

In Part IV, the en banc court addressed three jury instruction issues: (1) the failure to give an inverse ratio rule instruction; (2) the sufficiency of the court's originality instructions; and (3) the failure to give a selection and arrangement instruction. In Part IV.A, joining the majority of circuits, the en banc court rejected the inverse ratio rule, which requires a lower standard of proof of substantial similarity when a high degree of access is shown. The en banc court overruled circuit precedent to the contrary. In Part IV.B, the en banc court held that the district court properly instructed the jury on originality. In Part IV.C.1, the en banc court concluded that the failure to give a selection and arrangement instruction would be reviewed for plain error. In Part IV.C.2, the en banc court held that the district court did not commit plain error. In Part IV.C.3, the en banc court held that the district court did not commit any error because plaintiff did not present a selection and arrangement theory at trial. In Part IV.C.4, the en banc court held that, even though the district court did not instruct the jury on selection and arrangement, its instructions, as a whole, fairly and adequately covered plaintiff's argument for extrinsic similarity between *Taurus* and *Stairway to Heaven*.

In Part V, the en banc court held that the district court did not err in setting trial time limits, responding to a jury question, admitting expert testimony, or declining to award attorneys' fees.

Concurring, Judge Watford wrote that he joined the court's opinion, with the exception of section IV.C, because he saw no reason to decide whether plaintiff adequately preserved his request for a selection-and-arrangement instruction when, even if such an instruction had been given, no reasonable jury could have found infringement.

Concurring in part and dissenting in part, Judge Ikuta, joined by Judge Bea, wrote that she dissented from Part IV(B) to (C) because, without plaintiff's requested instruction on selection and arrangement, the jury was deprived of the opportunity to consider plaintiff's central theory of the case, and the instructions given to the jury were misleading.

## COUNSEL

Francis Malofiy (argued) and Alfred Joseph Fluehr, Francis Alexander LLC, Media, Pennsylvania, for Plaintiff-Appellant.

Peter J. Anderson (argued), Law Offices of Peter J. Anderson, Los Angeles, California; Helene M. Freeman, Phillips Nizer LLP, New York, New York; for Defendants-Appellees.

Edwin F. McPherson and Tracy B. Rane, McPherson Rane LLP, Los Angeles, California, for Amici Curiae 123 Songwriters, Composers, Musicians, and Producers;

Nashville Songwriters Association International (NSAI); and Songwriters of North America (SONA).

Eugene Volokh, Mayer Brown LLP, Los Angeles, California; Danielle M. Aguirre and Erich C. Carey, National Music Publishers' Association, Washington, D.C.; for Amici Curiae Recording Industry Association of America and National Music Publishers Association.

Sean M. O'Connor, Center for the Protection of IP, Arlington, Virginia; Lateef Mtima and Steven D. Jamar, Institute for Intellectual Property and Social Justice, Inc.

Professor Mark A. Lemley, Stanford Law School, Center for Internet & Society, Stanford, California, for Amici Curiae 19 Intellectual Property Professors.

Kenneth D. Freundlich, Freundlich Law, Encino, California, for Amici Curiae Musicologists.

Joseph H. Hunt, Assistant Attorney General; Nicola T. Hanna, United States Attorney; Scott R. McIntosh and Daniel Tenny, Appellate Staff; Civil Division, United States Department of Justice, Washington, D.C.; Regan A. Smith, General Counsel and Associate Register of Copyrights; Jason E. Sloan, Assistant General Counsel; Jalyce E. Mangum, Attorney-Advisor; United States Copyright Office, Washington, D.C.; for Amicus Curiae United States.

W. Michael Hensley, AlvaradoSmith, Santa Ana, California, for Amicus Curiae The Pullman Group LLC and Structured Asset Sales LLC.

## OPINION

McKEOWN, Circuit Judge, with whom THOMAS, Chief Judge, FLETCHER, RAWLINSON, MURGUIA, NGUYEN, Circuit Judges, join in full, and with whom WATFORD, Circuit Judge, joins except as to Part IV.C, and with whom HURWITZ, Circuit Judge, joins except as to Parts IV.C.3 and IV.C.4, and with whom BADE, Circuit Judge, joins except as to Part IV.C.3:

*Stairway to Heaven* has been called the greatest rock song of all time. Yet, hyperbole aside, nearly 40 years after the English rock band Led Zeppelin released its hit recording, the song is not impervious to copyright challenges. The estate of guitarist Randy Wolfe claims that Led Zeppelin and its guitarist Jimmy Page and vocalist Robert Plant copied portions of *Taurus,* a song written by Wolfe and performed by his band Spirit.

This appeal stems from the jury's verdict in favor of Led Zeppelin and a finding that the two songs are not substantially similar. Like the jury, we don't need to decide whether *Stairway to Heaven* has a place in the annals of iconic rock songs. Instead, we address a litany of copyright issues, including the interplay between the 1909 and 1976 Copyright Acts, the inverse ratio rule, the scope of music copyright, and the standards for infringement.

The 1909 Copyright Act, which does not protect sound recordings, controls our analysis. The copyright at issue is for the unpublished musical composition of *Taurus*, which was registered in 1967. The unpublished work is defined by the deposit copy, which in the case of *Taurus* consists of only one page of music. We also join the majority of circuits in rejecting the inverse ratio rule and overrule our precedent to the contrary. Finally, we are not persuaded by the challenges

to jury instructions and various other evidentiary and trial rulings. We affirm the district court's entry of judgment in favor of Led Zeppelin and related parties.

## BACKGROUND

Randy Wolfe, professionally known as Randy California, wrote the instrumental song *Taurus* in 1966 or 1967. He was a guitarist in the band Spirit. Spirit signed a recording contract in August 1967 and released its first eponymous album—which included *Taurus*—a few months later. Wolfe also entered into an Exclusive Songwriter's and Composer's Agreement with Hollenbeck Music Co. ("Hollenbeck"). In December 1967, Hollenbeck registered the copyright in the unpublished musical composition of *Taurus*, listing Wolfe as the author. As required for registration of an unpublished work under the 1909 Copyright Act, which was in effect at the time, Hollenbeck transcribed *Taurus* and deposited one page of sheet music (the "*Taurus* deposit copy"), with the United States Copyright Office.

Around the same time, across the Atlantic, another rock band, Led Zeppelin, was formed by Jimmy Page, Robert Plant, John Paul Jones, and John Bonham. Led Zeppelin released its fourth album in late 1971. The untitled album, which became known as "Led Zeppelin IV," contained the now iconic song *Stairway to Heaven*. *Stairway to Heaven* was written by Jimmy Page and Robert Plant.

It is undisputed that Spirit and Led Zeppelin crossed paths in the late 1960s and the early 1970s. The bands performed at the same venue at least three times between 1968 and 1970. Led Zeppelin also performed a cover of a Spirit song, *Fresh Garbage*. But there is no direct evidence

that the two bands toured together, or that Led Zeppelin band members heard Spirit perform *Taurus*.

Wolfe passed away in 1997. After his death, Wolfe's mother established the Randy Craig Wolfe Trust (the "Trust")[1] and served as the trustee until she passed away. Neither Wolfe nor his mother filed a suit regarding *Stairway to Heaven*. Michael Skidmore became a co-trustee of the Trust in 2006.

Fast forward forty-three years from the release of *Stairway to Heaven* to May 2014. Skidmore filed a suit alleging that *Stairway to Heaven* infringed the copyright in *Taurus*, naming as defendants Led Zeppelin, James Patrick Page, Robert Anthony Plant, John Paul Jones, Super Hype Publishing, and the Warner Music Group Corporation as parent of Warner/Chappell Music, Inc. ("Warner/Chappell"), Atlantic Recording Corporation, and Rhino Entertainment Co. (collectively "Led Zeppelin").[2] One may wonder how a suit so long in the making could survive a laches defense. The Supreme Court answered this question in *Petrella v. Metro-Goldwyn-Mayer, Inc.*, which clarified that laches is not a defense where copyright infringement is ongoing. 572 U.S. 663, 668 (2014).

Skidmore alleged direct, contributory, and vicarious copyright infringement. He also sought equitable relief for a claim that he titled "Right of Attribution—Equitable

---

[1] Led Zeppelin does not challenge on appeal that all of Wolfe's intellectual property rights, including the ownership interest in *Taurus*, were transferred to the Trust.

[2] The case was filed in the Eastern District of Pennsylvania and later transferred to the proper venue, the Central District of California. *Skidmore v. Led Zeppelin*, 106 F. Supp. 3d 581, 589–90 (E.D. Pa. 2015).

Relief—Falsification of Rock n' Roll History." Skidmore's claims are not based on the entire *Taurus* composition. Rather, Skidmore claims that the opening notes of *Stairway to Heaven* are substantially similar to the eight-measure passage at the beginning of the *Taurus* deposit copy:



The claimed portion includes five descending notes of a chromatic musical scale. These notes are represented on the piano as a set of adjacent black and white keys, from right to left. The beginning of *Stairway to Heaven* also incorporates a descending chromatic minor chord progression in A minor. However, the composition of *Stairway to Heaven* has a different ascending line that is played concurrently with the descending chromatic line, and a distinct sequence of pitches in the arpeggios, which are not present in *Taurus*.

Led Zeppelin disputed ownership, access, and substantial similarity. Led Zeppelin also alleged affirmative defenses, including independent creation, unclean hands, and laches.

At the close of discovery, Led Zeppelin moved for summary judgment. The district court granted the motion in part and denied it in part. The district court dismissed the claims against defendants John Paul Jones, Super Hype Publishing, and Warner Music Group because they had not performed or distributed *Stairway to Heaven* within the three-year statute of limitations period preceding the filing of the complaint. The district court also granted summary judgment to Led Zeppelin on Skidmore's "Right of Attribution—Equitable Relief: Falsification of Rock n' Roll History" claim. Although the claim was "creatively termed" and "inventive" according to the district court, a right of attribution claim under the Copyright Act extends only to visual arts.

The district court also ruled that under the 1909 Act, the scope of the copyright was circumscribed by the musical composition transcribed in the *Taurus* deposit copy. Thus, only the one-page *Taurus* deposit copy, and not a sound recording, could be used to prove substantial similarity between *Taurus* and *Stairway to Heaven*.

The district court granted Led Zeppelin's motion in limine to exclude *Taurus* sound recordings and expert testimony based on those recordings. The district court again concluded that the *Taurus* deposit copy, rather than any recordings of Spirit's performance of *Taurus*, formed the sole benchmark for determining substantial similarity. The district court found that there were triable issues of fact relating to ownership, access, substantial similarity, and damages.

Against the backdrop of these rulings, the trial lasted five days. Two key issues predominated: access to *Taurus* by Led Zeppelin band members and substantial similarity.

On the access question, the district court allowed Skidmore to play various sound recordings of *Taurus* for Page outside of the presence of the jury. Skidmore then examined Page on access in front of the jury. Page testified that he owned "a copy of the album that contains 'Taurus,' . . . in [his] collection," while denying "any knowledge of 'Taurus.'"

The substantial similarity question pitted two expert musicologists against each other. Skidmore's expert, Dr. Alexander Stewart, analyzed, one by one, five categories of similarities. Dr. Stewart acknowledged that a chromatic scale and arpeggios are common musical elements. But he found *Taurus* and *Stairway to Heaven* to be similar because the descending chromatic scales in the two compositions skip the note E and return to the tonic pitch, A, and the notes in the scale have the same durations. Then he pointed to three two-note sequences—AB, BC, and CF#—that appear in both compositions. In his view, the presence of successive eighth-note rhythms in both compositions also made them similar. Finally, he testified that the two compositions have the same "pitch collection," explaining that certain notes appear in the same proportions in the beginning sequence of both works.

In sum, Dr. Stewart claimed that five musical elements in combination were copied because these elements make *Taurus* unique and memorable, and these elements also appear in *Stairway to Heaven.* Skidmore's closing argument reinforced these points. Neither Dr. Stewart nor Skidmore's counsel argued that the categories of similarities were selected and arranged to form protectable expression in the design, pattern, or synthesis of the copyrighted work. Nor did they make a case that a particular selection and

arrangement of musical elements were copied in *Stairway to Heaven*.

Led Zeppelin's expert, Dr. Lawrence Ferrara, testified that the two compositions are completely distinct. To highlight the marked differences in the compositions, he presented the following exhibit, which juxtaposed the claimed portion of *Taurus* against *Stairway to Heaven*:[3]



**MUSICAL EXAMPLE 1**

Four-measure chord progressions

Top two lines = Section A in "Taurus" with note values halved

Lower two lines = Measures 1-4 in "Stairway"

Dr. Ferrara testified that the similarities claimed by Skidmore either involve unprotectable common musical elements or are random. For example, Dr. Ferrara explained that the similarity in the three two-note sequences is not musically significant because in each song the sequences

---

[3] The duration of the notes in the *Taurus* deposit copy are halved in this exhibit to allow a side-by-side comparison of the two compositions.

were preceded and followed by different notes to form distinct melodies. He described the purported similarity based on these note sequences as akin to arguing that "crab" and "absent" are similar words because they both have the letter pair "ab." He also testified that the similarity in the "pitch collection" is not musically meaningful because it is akin to arguing that the presence of the same letters in "senator" and "treason" renders the words similar in meaning.

At the close of trial, the district court discussed with counsel the intended jury instructions. The district court did not give the proposed instructions on the inverse ratio rule and the selection and arrangement of unprotectable elements. Skidmore objected to the district court's decision to omit an inverse ratio instruction but did not do so as to the omitted selection and arrangement instruction.

The jury returned a verdict for Led Zeppelin. In special interrogatories, the jury found that Skidmore owned the copyright to *Taurus* and that Led Zeppelin had access to *Taurus*, but that the two songs were not substantially similar under the extrinsic test. Following the verdict, the district court entered a judgment and an amended judgment.[4] Skidmore did not file any post-judgment motions challenging the verdict, but timely appealed from the amended judgment.

Significantly, Skidmore does not make a substantial evidence claim. Instead, he focuses on a handful of legal

---

[4] The district court amended the judgment to include all defendants, including those to whom the district court granted summary judgment. Skidmore appeals from the amended judgment related to Led Zeppelin and related parties, but waived any argument regarding the defendants who prevailed at summary judgment.

issues, challenging:  (1) the ruling that substantial similarity must be proven using the copyright deposit copy; (2) the ruling that sound recordings could not be played to prove access; (3) various jury instructions; (4) the imposition of overall time limits for the trial; (5) the fact that the full version of *Taurus* was played in response to the jury's request; and (6) the decision not to exclude or sanction Dr. Ferrara because of a claimed conflict of interest.

Warner/Chappell filed separate motions for attorneys' fees and costs, which the district court denied. Warner/Chappell timely cross-appealed and the two appeals were consolidated.

A panel of our court vacated the amended judgment in part and remanded for a new trial.  We granted rehearing en banc.[5]  *Skidmore v. Led Zeppelin*, 905 F.3d 1116 (9th Cir. 2018), *reh'g en banc granted*, 925 F.3d 999 (9th Cir. 2019).

## ANALYSIS

## I.  THE 1909 COPYRIGHT ACT

The world of copyright protection for music changed dramatically during the twentieth century and those changes dictate our analysis here.  The baseline issue we address is the scope of Wolfe's copyright in the unpublished composition *Taurus*, which was registered in 1967, between the passage of the Copyright Act of 1909 ("1909 Act") and

---

[5] In connection with en banc proceedings, we received thoughtful amicus briefs from a broad array of interested groups, including intellectual property and musicology scholars; songwriters, composers, musicians, and producers; recording companies and music publishers; rights holders; and the U.S. government.  We thank amici for their participation.

the sweeping copyright reform adopted in the Copyright Act of 1976 ("1976 Act"). We conclude that the 1909 Act controls and that the deposit copy defines the scope of the *Taurus* copyright.

## A. THE HISTORY OF COPYRIGHT PROTECTION FOR MUSICAL COMPOSITIONS AND SOUND RECORDINGS

Although it seems unthinkable today, musical compositions were not explicitly subject to copyright in the United States until 1831, when Congress added "musical composition" to the list of statutorily protected works. Copyright Act of 1831, ch. 16, § 1, 4 Stat. 436, 436 (repealed 1909). Thus, the "musical composition," which was understood to be a printed form of the music, joined the statutory protection afforded to dramatic compositions, maps, charts, engraving, photographs and other works.

Between 1831 and the early 1900s, a number of machines were invented that allowed mechanical reproduction of a musical composition. *Goldstein v. California*, 412 U.S. 546, 564 (1973). With the advent of player pianos at the turn of the century, the question arose whether copyright protection extended to the infringement of musical compositions by perforated piano rolls.[6] The Supreme Court held that the copyright statute barred the unauthorized copying of a musical composition "in intelligible notation," but that it would be "strained and artificial" to consider musical sounds coming from an

---

[6] A piano roll is "a roll, usually of paper, on which music is preserved in the form of perforations; it is recorded and played back mechanically on a player piano or pianola." *Piano(la) roll*, The New Grove Dictionary of Jazz (Barry Kernfeld ed., 1994).

instrument to be a copy. *White-Smith Music Publ'g Co. v. Apollo Co.*, 209 U.S. 1, 17–18 (1908). Justice Holmes commented in his concurrence that "[o]n principle anything that mechanically reproduces that collocation of sounds ought to be held a copy, or, if the statute is too narrow, ought to be made so by a further act." *Id.* at 20.

Congress stepped in to remedy the situation, perhaps heeding Justice Holmes's call. The Copyright Act of 1909—landmark legislation that significantly revised copyright law—categorized mechanically-reproduced musical compositions, such as those played on player pianos and phonograph players, as "copies" of the original composition. 1909 Act, ch. 320, § 1(e), 35 Stat. 1075, 1075 (1909) (repealed 1976).

The statute provided copyright protection against "any arrangement or setting of [the musical composition] or of the melody of it in any system of notation or any form of record in which the thought of an author may be recorded and from which it may be read or reproduced." *Id.* Skidmore seizes on this language to argue that the new legislation extended copyright protection beyond sheet music. The text does not support this reading. Although the 1909 Act extended copyright protection against infringement beyond the mere reproduction of the sheet music, Congress did not provide that copyrighted works could be anything other than sheet music or, for an unpublished work, the musical composition transcribed in the deposit copy. 1909 Act §§ 5, 11.

The Court reinforced this principle in *Goldstein v. California* when it noted that the amendments insured that *composers* of *original* musical works received adequate protection, and that "records and piano rolls were to be considered as 'copies' of the original composition . . . , and could not be manufactured" without a specified royalty

payment. 412 U.S. at 565–66. The Court emphasized that "composers were to have no control over the recordings themselves," which Congress considered "a component part of a machine, capable of reproducing an original composition," or "renderings of original artistic performance." *Id.* at 566.

Requiring more formalities than the current copyright act, the procedures for obtaining copyright protection under the 1909 Act were very specific. Registration for an unpublished musical work could be obtained "by the deposit, with claim of copyright, of one complete copy of such work" with the Copyright Office. 1909 Act § 11. In contrast, protection for a published work could be secured by affixing a copyright notice "to each copy thereof published or offered for sale in the United States by authority of the copyright proprietor." *Id.* § 9. Either way, distributing sound recordings did not constitute publication under the 1909 Act, so musical compositions were only published if the sheet music also was published. *See ABKCO Music, Inc. v. LaVere*, 217 F.3d 684, 688 (9th Cir. 2000). Significantly, the Copyright Office did not even accept sound recordings as deposit copies. Indeed, "in order to claim copyright in a musical work under the 1909 Act, the work had to be reduced to sheet music or other manuscript form." 1 M. Nimmer & D. Nimmer, *Nimmer on Copyright* ("Nimmer") § 2.05[A] (2017).

Sound recordings did not become subject to copyright protection until 1972, and then only for the sound recordings fixed on or after February 15, 1972. 17 U.S.C. § 301(c). The amendment did nothing to change the requirements of the 1909 Act or the status of the *Taurus* copyright.

The copyright requirements were changed dramatically by the 1976 Copyright Act, which provided that public

distribution of a sound recording qualified as publication of a musical composition. *Id.* § 101. In other words, composers could submit a recording rather than sheet music as the deposit copy for a musical composition. The catch, for this case, is that publication before the 1978 effective date is not covered by the new statute.

## B. THE *TAURUS* DEPOSIT COPY

The 1967 deposit copy of *Taurus* is a single page of sheet music. Skidmore suggests that the copyright extends beyond the sheet music; that is, the deposit copy is somehow archival in nature and more of a reference point than a definitive filing. This approach ignores the text of the statute and the purpose of the deposit.

We have outlined copyright protection under the 1909 Act as follows: "[A]n unpublished work was protected by state common law copyright from the moment of its creation until it was either published or until it received protection under the federal copyright scheme." *ABKCO*, 217 F.3d at 688 (quoting *LaCienega Music Co. v. ZZ Top*, 53 F.3d 950, 952 (9th Cir. 1995)). The referenced federal copyright protection for unpublished works is found in the text of the statute: "copyright may also be had of the works of an author of which copies are not reproduced for sale, by the deposit, with claim of copyright, of one complete copy of such work if it be a . . . musical composition . . . ." 1909 Act § 11.

The text is clear—for unpublished works, the author must deposit one *complete copy* of such work. The purpose of the deposit is to make a record of the claimed copyright, provide notice to third parties, and prevent confusion about the scope of the copyright. *See Data Gen. Corp. v. Grumman Sys. Support Corp*., 36 F.3d 1147, 1161–62 (1st Cir. 1994) (the deposit requirement provides the "Copyright

Office with sufficient material to identify the work in which the registrant claims a copyright ... [and] prevent[s] confusion about which work the author is attempting to register"), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010); *Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law* 71 (1961) (one of the purposes of the deposit is "to identify the work" being registered).

Even before the 1909 Act, the Supreme Court stated that one objective of the deposit was to permit inspection by other authors "to ascertain precisely what was the subject of copyright." *Merrell v. Tice*, 104 U.S. 557, 561 (1881). At the time that *Taurus* was registered, the Copyright Office's practice regarding applications to register unpublished musical compositions was to consider "writ[ing] to the applicant, *pointing out that protection extends only to the material actually deposited*, and suggesting that in his own interest he develop his manuscript to supply the missing element." *Compendium of Copyright Office Practices* ("*Copyright Office Compendium*") § 2.6.1.II.a (1st ed. 1967) (emphasis added). The inescapable conclusion is that the scope of the copyright is limited by the deposit copy.

The practical treatment of deposit copies underscores their importance. The 1909 Act prohibits destruction of copies of unpublished works without notice to the copyright owner. 1909 Act §§ 59–60. Buttressing this protection, the Register of Copyright's policy is to retain access to the deposit copies of unpublished works for the full copyright term. *See Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law* at 80–81.

The cases Skidmore cites to suggest that the content of the deposit copy may be supplemented are not instructive. *See, e.g.*, *Washingtonian Publ'g Co. v. Pearson*, 306 U.S.

30, 41–42 (1939) (addressing the failure to promptly submit a deposit copy for a *published* work); *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 486–87 (9th Cir. 2000) (addressing whether an incomplete deposit copy contained the "essential elements" of the musical composition such that subject matter jurisdiction was proper). Nor do the cases analyzing the 1976 Act illuminate the copyright scope question under the 1909 Act. *See Bridgeport Music, Inc. v. UMG Recordings, Inc.*, 585 F.3d 267, 276 (6th Cir. 2009); *Nat'l Conference of Bar Exam'rs v. Multistate Legal Studies, Inc.*, 692 F.2d 478, 482–83 (7th Cir. 1982).

Although Skidmore offers a host of reasons why adherence to the statute complicates proof in copyright cases, these arguments cannot overcome the statutory requirements. For example, Skidmore claims that it is impractical to compare a sound recording of the infringing work to a deposit copy of the infringed work, even though that is precisely what happened here, and experts for both sides were confident in their analysis. Indeed, during the trial, Skidmore's master guitarist, Kevin Hanson, performed the *Taurus* deposit copy as he interpreted it.

Skidmore also complains that restricting protection to the deposit copy disadvantages musicians who do not read music because it can be time consuming and expensive to make an accurate deposit copy. Apparently, that was not a problem here, as Wolfe's work was transcribed for the sheet music deposit. Digital transcription and other technological advances undercut this argument, not to mention that for decades now, sound recordings have been accepted as the deposit copy. Finally, Skidmore offers conjecture about what might happen if a deposit copy were lost or destroyed. We need not play this "what if" guessing game because the statute is clear and unambiguous.

The district court correctly concluded that under the 1909 Act, which controls the copyright registration in this case, the *Taurus* deposit copy circumscribes the scope of the copyright. Because the deposit copy defines the four corners of the *Taurus* copyright, it was not error for the district court to decline Skidmore's request to play the sound recordings of the *Taurus* performance that contain further embellishments or to admit the recordings on the issue of substantial similarity.

## II. ELEMENTS OF COPYRIGHT INFRINGEMENT

Proof of copyright infringement requires Skidmore to show: (1) that he owns a valid copyright in *Taurus*; and (2) that Led Zeppelin copied protected aspects of the work. *Rentmeester v. Nike, Inc*., 883 F.3d 1111, 1116–17 (9th Cir. 2018) (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)). Skidmore's ownership of a valid copyright in *Taurus* was not challenged on appeal.

The second prong of the infringement analysis contains two separate components: "copying" and "unlawful appropriation." *Rentmeester*, 883 F.3d at 1117. Although these requirements are too often referred to in shorthand lingo as the need to prove "substantial similarity," they are distinct concepts.

Because independent creation is a complete defense to copyright infringement, a plaintiff must prove that a defendant copied the work. *Feist*, 499 U.S. at 345–46. In the absence of direct evidence of copying, which is the case here, the plaintiff "can attempt to prove it circumstantially by showing that the defendant had access to the plaintiff's work and that the two works share similarities probative of copying." *Rentmeester*, 883 F.3d at 1117. This type of probative or striking similarity shows that the similarities

between the two works are due to "copying rather than . . . coincidence, independent creation, or prior common source." *Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1052 (C.D. Cal. 2010) (omission in original) (quoting 4 Nimmer § 13.02[B]). A finding of such similarity may be based on the overlap of unprotectable as well as protectable elements. *Rentmeester*, 883 F.3d at 1117.

On the other hand, the hallmark of "unlawful appropriation" is that the works share *substantial* similarities. *Newton v. Diamond*, 388 F.3d 1189, 1193 (9th Cir. 2004). In our circuit, we use a two-part test to determine whether the defendant's work is substantially similar to the plaintiff's copyrighted work. *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002). The first part, the extrinsic test, compares the objective similarities of specific expressive elements in the two works. *Id.* Crucially, because only substantial similarity in protectable expression may constitute actionable copying that results in infringement liability, "it is essential to distinguish between the protected and unprotected material in a plaintiff's work." *Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004). The second part, the intrinsic test, "test[s] for similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance." *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 637 (9th Cir. 2008) (quoting *Apple Comput., Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994)). Both tests must be satisfied for the works to be deemed substantially similar. *See Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1077 (9th Cir. 2006).

## III.   EVIDENTIARY   CHALLENGE—THE   COPYING PRONG OF INFRINGEMENT

At trial, one of Skidmore's key arguments was that Led Zeppelin members heard either performances or recordings of *Taurus* before creating *Stairway to Heaven*, and thus had access for purposes of copying the music.  To prove that point, Skidmore wanted to play several recordings of *Taurus* during the testimony of Jimmy Page, claiming that *observing* Page *listening* to the recordings would have enabled the jury to evaluate his demeanor with respect to access.  Skidmore's counsel explained that the recordings could be offered to prove access, even if the court excluded them for proving substantial similarity.  The district court determined that although the sound recordings were relevant to prove access, Skidmore's approach would be "too prejudicial for the jury" because it risked confusing access with substantial similarity.  Hence the court excluded the recordings under Federal Rule of Evidence 403.  The court instead permitted Skidmore's counsel to play the recordings for Page outside the presence of the jury and then question him about the recordings in front of the jury.

Skidmore's position is a curious one and defies common sense.  There would have been very little, if any, probative value in watching Page's reaction to *listening* to *Taurus* at the trial in 2016 to prove access to the song half a century ago.  To prevent the jury from making an erroneous comparison for determining substantial similarity, the court properly excluded the sound recording, which contains performance elements that are not protected by the *Taurus* deposit copy.  Indeed, the court's exclusion ruling displayed a clear understanding of the distinct components of copying and unlawful appropriation, letting the evidence in "as far as

access," but "not . . . to compare the performance" to *Stairway to Heaven*.

In any event, the evidentiary question is moot. It turns out Skidmore's examination of Page on access proved fruitful. When Page testified, he candidly admitted to owning "a copy of the album that contains 'Taurus,' . . . in [his] collection," though still denying "any knowledge of 'Taurus.'" The jury found that both Page and Plant "had access to the musical composition Taurus before Stairway to Heaven was created." Once the jury made that finding, the remaining questions on the jury verdict form related to substantial similarity of the works.

In answer to the question of whether "original elements of the musical composition Taurus are extrinsically similar to Stairway to Heaven," the jury said no. Because the extrinsic test was not satisfied, the jury did not reach the intrinsic test. Although these findings ended the jury's copyright analysis, Skidmore also challenges various trial rulings.

## IV.    THE JURY INSTRUCTION CHALLENGES

Three jury instructions are at issue in this appeal: (1) the failure to give an inverse ratio rule instruction; (2) the sufficiency of the court's originality instructions; and (3) the failure to give a selection and arrangement instruction. We review for abuse of discretion the district court's formulation of the instructions and review de novo whether the instructions accurately state the law. *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 941 (9th Cir. 2011). We consider the issued instructions as a whole, but reversal is not warranted if "the error is more probably than not harmless." *Swinton v. Potomac Corp*, 270 F.3d 794, 802, 805 (9th Cir. 2001) (quoting *Caballero v. City of*

*Concord*, 956 F.2d 204, 206 (9th Cir. 1992)). "[W]hen a litigant in a civil trial fails to object to a jury instruction, we may review the challenged jury instruction for plain error." *Chess v. Dovey*, 790 F.3d 961, 970 (9th Cir. 2015).

## A. THE INVERSE RATIO RULE

Copyright infringement cases often boil down to the crucial question of substantial similarity. We have stated that "substantial similarity is inextricably linked to the issue of access," and have adhered to "what is known as the 'inverse ratio rule,'" which requires "a lower standard of proof of substantial similarity when a high degree of access is shown." *Three Boys Music*, 212 F.3d at 485 (quoting *Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir. 1996)). That is, "the stronger the evidence of access, the less compelling the similarities between the two works need be in order to give rise to an inference of copying." *Rentmeester*, 883 F.3d at 1124.

Skidmore proposed an inverse ratio rule instruction, but the court chose not to give the instruction. The court reaffirmed this decision when Skidmore raised the question again after the close of testimony: "We're not going to give that instruction." Because the inverse ratio rule, which is not part of the copyright statute, defies logic, and creates uncertainty for the courts and the parties, we take this opportunity to abrogate the rule in the Ninth Circuit and overrule our prior cases to the contrary. *See e.g.*, *Three Boys Music*, 212 F.3d at 485–86; *Shaw v. Lindheim*, 919 F.2d 1353, 1361–62 (9th Cir. 1990).

The circuits are split over the inverse ratio rule, but the majority of those that have considered the rule declined to adopt it. The Second, Fifth, Seventh, and Eleventh Circuits have rejected the rule. *Peters v. West*, 692 F.3d 629, 634–35

(7th Cir. 2012) (noting that the circuit has never endorsed the idea that "a 'high degree of access' justifies a 'lower standard of proof' for similarity"); *Positive Black Talk, Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 371 (5th Cir. 2004) (acknowledging the rule but explicitly not adopting it), *abrogated on other grounds by Reed Elsevier*, 559 U.S. 154; *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 460 (11th Cir. 1994); *Arc Music Corp. v. Lee*, 296 F.2d 186, 187–88 (2d Cir. 1961). Only our circuit and the Sixth Circuit have endorsed it. [7] *See Stromback v. New Line Cinema*, 384 F.3d 283, 293 (6th Cir. 2004); *see also Peters*, 692 F.3d at 634 (similarly describing the split).

But even within our circuit, our embrace and application of the rule have had a "checkered application." 4 Nimmer § 13.03[D]. The very nature of the rule spawned uncertainty in its application. We first articulated the rule in 1977, holding that the high "degree of access" present in that case "justifie[d] a lower standard of proof to show substantial similarity," though "[n]o amount of proof of access will suffice to show copying if there are no similarities." *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1172 (9th Cir. 1977), *superseded on other grounds by* 17 U.S.C. § 504(b). In its next breath, the court in *Krofft* admitted that "it is impossible to quantify this standard," so it is unsurprising that the court was unclear—failing to explain whether the rule applied to the actual copying or unlawful appropriation prong of the infringement analysis. *Id.*; *see* David Aronoff, *Exploding the "Inverse Ratio Rule,"* 55 J. Copyright Soc'y U.S.A. 125, 136 (2008)

---

[7] The Federal Circuit has applied the rule, but only because it "applies copyright law as interpreted by the regional circuits, in this case . . . the Ninth Circuit." *Amini Innovation Corp. v. Anthony Cal., Inc.*, 439 F.3d 1365, 1368–69 (Fed. Cir. 2006).

("[T]he court [in *Krofft*] was confused as to whether the [inverse ratio rule] applied to the element of actual copying or unlawful appropriation . . . .").

A decade later, we reversed course and distanced ourselves from *Krofft*, relying on the Second Circuit's rejection of the inverse ratio rule in *Arc Music*. *See Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 902 (9th Cir. 1987). According to *Aliotti*, because the rule "ha[d] been employed by no Ninth Circuit case since *Krofft* and had been earlier criticized for 'confus[ing] and even conceal[ing]' the requirement of substantial similarity," the court declined to "address the continuing viability of" the rule. *Id.* (alteration in original) (quoting *Arc Music*, 296 F.2d at 187–88). But *Aliotti* was a momentary detour. We later returned to the inverse ratio rule and, in a series of cases throughout the 1990s and early 2000s, applied it in confusing ways.

Revitalizing *Krofft*, we several times affirmed that the rule guided our analysis of similarity. *See, e.g.*, *Three Boys Music*, 212 F.3d at 485–86; *Smith*, 84 F.3d at 1218 & n.5; *Shaw*, 919 F.2d at 1361–62. Even so, we did not explain *how* to apply the rule. *See* Aronoff, *supra*, at 137 (applying the rule in the context of the unlawful appropriation analysis, "the court did not articulate how [access] is to be considered, or the weight it is to be given").

The lack of clear guidance is likely due in no small part to our use of the term "substantial similarity," both in the context of copying and unlawful appropriation, muddying the waters as to what part of the infringement analysis the rule applies. *See* 3 William F. Patry, *Patry on Copyright* ("Patry") § 9.91 (2017) ("The inverse ratio theory confuses fundamental principles of infringement analysis: access is relevant only in establishing the act of copying, not in establishing the degree thereof. Once copying is established,

access is irrelevant and the inquiry shifts to the final stage of the infringement analysis, material appropriation."). In *Rentmeester*, we pointed out the term's dual use and ultimately stated that the inverse ratio rule "assists only in proving copying, not in proving unlawful appropriation." 883 F.3d at 1124.

Capping off this period of expansion, we even pushed past the rule's outer limits set forth in *Krofft*, *i.e.*, that "[n]o amount of proof of access will suffice to show copying if there are no similarities." 562 F.2d at 1172. In *Metcalf v. Bochco*, though we did not explicitly name the rule, we held that because access was not disputed, we "could easily infer that the many [generic] similarities between [the works] were the result of copying, not mere coincidence." 294 F.3d 1069, 1074–75 (9th Cir. 2002).

Confusion followed in *Metcalf*'s wake. In one case, we tried to cabin *Metcalf* to cases where there was a clear "concession of access." *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1178–79 (9th Cir. 2003). In other cases, where access was assumed (though not conceded), we "side-stepped" *Metcalf* and held that the similarities between works were insufficient to support a conclusion of copying. Aronoff, *supra* at 139; *see e.g.*, *Funky Films*, 462 F.3d at 1081 n.4; *Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 625 (9th Cir. 2010). The result?—confusion about when to apply the rule and the amount of access and similarity needed to invoke it.

Our jurisprudence in recent years brought additional uncertainty. In 2000, we circumscribed the rule by explaining that it is not a two-way street: while the rule "requires a lesser showing of substantial similarity if there is a strong showing of access," it does not mean that "a weak showing of access requires a stronger showing of substantial

similarity." *Three Boys Music*, 212 F.3d at 486. In 2018, it seems, the rule goes both ways: it also provides that the "more compelling the similarities supporting an inference of copying, the less compelling the evidence of access need be." *Rentmeester*, 883 F.3d at 1124.[8] In the face of tangled precedent, the *Rentmeester* panel tried to carefully thread the needle, but ended up adding another indecipherable stitch.

Just two years ago, we again sowed doubt whether the rule ought to apply at all. In *Williams v. Gaye*, which dealt with the song *Blurred Lines*, the majority initially defended use of the rule against the dissent's criticism because the rule is "binding precedent" that "we are bound to apply." 885 F.3d 1150, 1163 n.6 (9th Cir. 2018). But in an amended opinion, the court deleted all references to the rule. *Williams v. Gaye*, 895 F.3d 1106 (9th Cir. 2018). One commentator posited the rule was excised because it "is so controversial." Edwin F. McPherson, *Crushing Creativity: The* Blurred Lines *Case and Its Aftermath*, 92 S. Cal. L. Rev. Postscript 67, 75 n.22 (2018).

As we struggled with the inverse ratio rule over the years, the Second Circuit rejected it as early as 1961, describing the idea as a "superficially attractive apophthegm which upon examination confuses more than it clarifies." *Arc Music*, 296 F.2d at 187. The court reasoned that "access will not supply [similarity's] lack, and an undue stress upon that one feature can only confuse and even conceal this basic requirement." *Id.* at 187–88. Importantly, the Second

---

[8] The Ninth Circuit Model Jury Instructions Copyright § 17.17 (2017)—Copying—Access and Substantial Similarity—and the *Supplemental Instruction* suffer from similar infirmities in trying to reconcile the case law.

Circuit noted that there is "no such principle" in "the federal law of copyright." *Id.* at 187.

The Second Circuit also identified the problematic implications of this principle where access is very high and similarity very low: "[t]he logical outcome of the claimed principle is obviously that proof of actual access will render a showing of similarities entirely unnecessary." *Id.* However, "it does not follow that 'more' access increases the likelihood of copying." Aronoff, *supra*, at 126. Yet that is what the rule compels. Complete access without any similarity should never result in infringement liability because there *is* no infringement. Even so, the rule suggests that liability may be imposed in such a case. "There is," however, "simply no logic in presupposing that the mid-points of [the rule] give rise to a 'ratio' of access to similarity constituting proof of" infringement. *Id.* at 141. Indeed, even "[w]hen the inverse ratio rule is applied, we still don't know how much similarity is required." Patry § 9.91.

The flaws in the rule can be seen in the inconsistent ways in which we have applied the rule within our circuit, the logic of the circuits that have rejected the rule, and analysis by academics and commentators. *See id.* ("There is nothing positive that can be said about a rule that lacks any clarity at all: trying to get a jury to both understand the rule and apply it properly is totally impossible.").

As a practical matter, the concept of "access" is increasingly diluted in our digitally interconnected world. Access is often proved by the wide dissemination of the copyrighted work. *See Loomis v. Cornish*, 836 F.3d 991, 995 (9th Cir. 2016). Given the ubiquity of ways to access media online, from YouTube to subscription services like Netflix and Spotify, access may be established by a trivial showing that the work is available on demand. *See* Brooks

Barnes, *The Streaming Era Has Finally Arrived.  Everything Is About to Change.*, N.Y. Times, Nov. 18, 2019 (In addition to Netflix, which "entertain[s] more than 158 million subscribers worldwide," there are currently "271 online video services available in the United States").

To the extent "access" still has meaning, the inverse ratio rule unfairly advantages those whose work is *most* accessible by lowering the standard of proof for similarity.  Thus the rule benefits those with highly popular works, like *The Office*, which are also highly accessible.  But nothing in copyright law suggests that a work deserves stronger legal protection simply because it is more popular or owned by better-funded rights holders.

Finally, the inverse ratio rule improperly dictates how the jury should reach its decision.  The burden of proof in a civil case is preponderance of the evidence.  Yet this judge-made rule could fittingly be called the "inverse burden rule."

Although we are cautious in overruling precedent—as we should be—the constellation of problems and inconsistencies in the application of the inverse ratio rule prompts us to abrogate the rule.  Access does not obviate the requirement that the plaintiff must demonstrate that the defendant actually copied the work.  By rejecting the inverse ratio rule, we are not suggesting that access cannot serve as circumstantial evidence of actual copying in all cases; access, however, in no way can prove substantial similarity.  We join the majority of our sister circuits that have considered the inverse ratio rule and have correctly chosen to excise it from copyright analysis.  In light of this holding, the district court did not err in failing to instruct the jury on the inverse ratio rule.

## B.  THE ORIGINALITY INSTRUCTIONS

Although copyright protects only original expression, it is not difficult to meet the famously low bar for originality. *Feist*, 499 U.S. at 345 ("The *sine qua non* of copyright is originality"; "[t]he vast majority of works make the grade quite easily . . . ."); *see also* 17 U.S.C. § 102(a) ("Copyright protection subsists . . . in original works of authorship . . . .").

Even in the face of this low threshold, copyright *does* require at least a modicum of creativity and does not protect every aspect of a work; ideas, concepts, and common elements are excluded.  *See* 17 U.S.C. § 102(b); *Feist*, 499 U.S. at 345–46.  Nor does copyright extend to "common or trite" musical elements, *Smith*, 84 F.3d at 1216 n.3, or "commonplace elements that are firmly rooted in the genre's tradition," *Williams*, 895 F.3d at 1140–41 (Nguyen, J., dissenting).  These building blocks belong in the public domain and cannot be exclusively appropriated by any particular author.  *See Satava v. Lowry*, 323 F.3d 805, 810 (9th Cir. 2003) ("[E]xpressions that are standard, stock, or common to a particular subject matter or medium are not protectable under copyright law").  Authors borrow from predecessors' works to create new ones, so giving exclusive rights to the first author who incorporated an idea, concept, or common element would frustrate the purpose of the copyright law and curtail the creation of new works.  *See id.* at 813 ("we must be careful in copyright cases not to cheat the public domain"); *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985) ("General ideas . . . remain forever the common property of artistic mankind."); 1 Nimmer § 2.05[B] ("In the field of popular songs, many, if not most, compositions bear some similarity to prior songs.").  With

these background principles in mind, we review the district court's instructions on originality, Nos. 16 and 20.[9]

Jury Instruction No. 16 explained "what a copyright is, what it protects, and what it does not protect." [10]   Relevant

---

[9] By filing proposed originality instructions and objecting to Led Zeppelin's versions, Skidmore preserved his objection to the originality instructions given by the district court. *See* Fed. R. Civ. P. 51(c)(1); C.D. Cal. Local Rule 51-1, -5.

[10] Jury Instruction No. 16 reads in full as follows:

> Plaintiff has filed a claim against Defendants for violation of the United States Copyright Act, which governs this case.  In order for you to undertake your responsibility, you must know what a copyright is, what it protects, and what it does not protect.

> Copyright confers certain exclusive rights to the owner of a work including the rights to:

> 1. Reproduce or authorize the reproduction of the copyrighted work;

> 2. Prepare derivative works based upon the copyrighted work.

> 3. Distribute the copyrighted work to the public; and

> 4. Perform publicly a copyrighted musical work.

> Copyright only protects the author's original expression in a work and does not protect ideas, themes or common musical elements, such as descending chromatic scales, arpeggios or short sequences of three notes.

to this appeal, the instruction provided that "[c]opyright only protects the author's original expression in a work."  This statement comes straight from the Supreme Court's opinion in *Feist*. The instruction went on to state that copyright "does not protect ideas, themes or common musical elements, such as descending chromatic scales, arpeggios or short sequences of three notes."   Although this statement is derived from *Smith*, Skidmore objects to the list of unprotectable elements.    In particular, he argues that characterizing the "descending chromatic scales, arpeggios or short sequence of three notes" as examples of "common musical elements" was prejudicial to him.

To put this instruction in context, it is useful to outline the essence of the "common musical elements" or building blocks.  The chromatic scale is one of two principal scales in Western music.  It consists of twelve pitches separated by a half-step.  On a piano, this means playing the white and black keys in order from left to right.  Three or more notes or pitches sounded simultaneously are called chords, and an arpeggio, sometimes called a broken chord, is "[a] chord whose pitches are sounded successively, . . . rather than simultaneously."     *Arpeggio*,   *Chromatic*, and  *Chord*, *Harvard Dictionary of Music* (Don Michael Randel ed., 4th ed. 2003).

To conduct a copyright infringement analysis, the factfinders ask "whether 'the *protectible elements, standing alone*, are substantially similar'" and "disregard the non-

---

Also, there can be no copyright infringement without actual copying.  If two people independently create two works, no matter how similar, there is no copyright infringement unless the second person copied the first.

protectible elements." *Cavalier*, 297 F.3d at 822 (quoting *Williams v. Crichton*, 84 F.3d 581, 588 (2d Cir. 1996)); *see Apple Comput., Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1446 (9th Cir. 1994) (same). Jury Instruction No. 16 correctly listed non-protectable musical building blocks that no individual may own, and did not, as Skidmore claims, exclude the particular use of musical elements in an original expression.

For example, despite Skidmore's challenge to the characterization of descending chromatic scales as unprotectable, even his own expert musicologist, Dr. Stewart, agreed musical concepts like the minor chromatic line and the associated chords have been "used in music for quite a long time" as "building blocks." This candid acknowledgement was echoed by Led Zeppelin's expert. Dr. Ferrara described the "chromatic scale, descending or ascending," as "a musical building block. This is something that no one can possibly own." The commonality of descending scales and arpeggios has been reinforced by the Copyright Office, which lists "[d]iatonic or chromatic scales" and "arpeggios" as common property musical material. *Copyright Office Compendium* § 802.5(A) (3d ed. 2017). Emphasizing the importance of original creation, the Copyright Office notes that "a musical work consisting entirely of common property material would not constitute original authorship." *Id.* Just as we do not give an author "a monopoly over the note of B-flat," descending chromatic scales and arpeggios cannot be copyrighted by any particular composer. *Swirsky*, 376 F.3d at 851.

We have never extended copyright protection to just a few notes. Instead we have held that "a four-note sequence common in the music field" is not the copyrightable expression in a song. *Granite Music Corp. v. United Artists*

*Corp.*, 532 F.2d 718, 721 (9th Cir. 1976). In the context of a sound recording copyright, we have also concluded that taking six seconds of the plaintiff's four-and-a-half-minute sound recording—spanning three notes—is de minimis, inactionable copying. *See Newton*, 388 F.3d at 1195–96. One of our colleagues also expressed skepticism that three notes used in a song can be copyrightable by observing that of the "only $12^3$ or 1,728 unique combinations of three notes," not many would be useful in a musical composition. *See Williams*, 895 F.3d at 1144 n.6 (Nguyen, J., dissenting). The Copyright Office is in accord, classifying a "musical phrase consisting of three notes" as de minimis and thus not meeting the "quantum of creativity" required under *Feist*. *Copyright Office Compendium*, § 313.4(B) (3d ed. 2017). At the same time, we have not foreclosed the possibility that "seven notes" could constitute an original expression. *Swirsky*, 376 F.3d at 852. To the contrary, our sister circuit observed decades ago that "the seven notes available do not admit of so many agreeable permutations that we need be amazed at the re-appearance of old themes." *Arnstein v. Edward B. Marks Music Corp.*, 82 F.2d 275, 277 (2d Cir. 1936).

In view of our precedent and accepted copyright principles, the district court did not commit a reversible error by instructing the jury that a limited set of a useful three-note sequence and other common musical elements were not protectable.

The district court also instructed the jury on copyright originality in Jury Instruction No. 20, which states:

> An original work may include or incorporate elements taken from prior works or works from the public domain. However, any elements from prior works or the public

domain are not considered original parts and not protected by copyright. Instead, the original part of the plaintiff's work is limited to the part created:

1. independently by the work's author, that is, the author did not copy it from another work; and

2. by use of at least some minimal creativity.

Despite Skidmore's claim that the following language has no support in the law and was prejudicial—"any element from prior works or the public domain are not considered original parts and not protected by copyright"—this is black-letter law. *See* 17 U.S.C. §§ 102(b), 103. Reading this sentence with the preceding one—an "original work may include or incorporate elements taken from prior works or works from the public domain"—we conclude that Jury Instruction No. 20 correctly instructed the jury that original expression can be the result of borrowing from previous works or the public domain.

Skidmore appears to want less than the law demands. In his closing and on appeal, he argued that a work is original as long as it was independently created. Not quite. Though not demanding, originality requires at least "minimal" or "slight" creativity—a "modicum" of "creative spark"—in addition to independent creation. *Feist*, 499 U.S. at 345–46, 362. Jury Instruction No. 20 correctly articulated both requirements for originality, that the work be created "independently by the work's author," and contain "at least some minimal creativity." The court's omission of the optional, bracketed language from the Ninth Circuit Model Jury Instruction 17.14 (2017)—which reads, "In copyright

law, the 'original' part of a work need not be new or novel"—was not a reversible error. The reference to "minimal creativity" in Jury Instruction No. 20 embraces this concept. Reviewing the jury instructions as a whole, we conclude that the originality instructions were sound and were not prejudicial to Skidmore.

## C. THE OMISSION OF A SELECTION AND ARRANGEMENT INSTRUCTION

### 1. Skidmore Forfeited His Objection to the Omitted Selection and Arrangement Instruction

The district court did not give what Skidmore denominates as a "selection and arrangement" instruction. Because Skidmore did not preserve his objection to the omission, we review for plain error.

Skidmore maintains that his objection was preserved by the timely filing of a proposed selection and arrangement instruction and by objecting to Led Zeppelin's version. Not so. Federal Rule of Civil Procedure 51(d)(1)(B) provides that "a failure to give an instruction" must be both "properly requested . . . and . . . also properly objected [to]." An objection must be made "on the record," "promptly after learning that the instruction or request will be . . . refused." Fed. R. Civ. P. 51(c)(1), (c)(2)(B). Skidmore may have requested a selection and arrangement instruction, but he did not object to the district court's decision to omit the instruction. In other words, Skidmore's proffer of the instruction was necessary but not sufficient to preserve the objection. *See United States ex rel. Reed v. Callahan*, 884 F.2d 1180, 1184 (9th Cir. 1989) (objection waived where "counsel offered the . . . proposed instructions" but "no objection was made to the failure to give them");

*Monroe v. City of Phoenix*, 248 F.3d 851, 858 (9th Cir. 2001) (objection waived where counsel "simply submitted a proposed jury instruction" but "failed to properly object at trial to the failure to give the proposed instruction"), *abrogated on other grounds by Scott v. Harris*, 550 U.S. 372 (2007).

Nor is this the type of situation where "it is obvious that in the process of settling the jury instructions the court was made fully aware of the objections of the party and the reasons therefor and further objections would be unavailing." *Reed*, 884 F.2d at 1184. According to Skidmore, he could not object to the refused instruction because the district court forbade oral objections. The record tells a different story. Skidmore's myriad other objections, all allowed by the district court, undermine his account of the procedure at trial. For example, Skidmore requested the omission of an instruction on a topic not presented to the jury; objected to the wording of several jury instructions; and proposed a new jury instruction. The court's response was to entertain extensive discussion from the parties about the instructions, letting them state their objections "for the record." Further, the court asked Skidmore to draft the proposed new instruction and bring it in the next day.

A parallel omission situation is illuminating. Skidmore objected to the court's refusal to include a jury instruction on the inverse ratio rule. The judge overruled that objection without suggesting that he would not entertain others. Indeed, when raising the inverse-ratio objection, counsel said "one last thing," implying that he had no other objections. In contrast, Skidmore did not object to the court's refusal to include a jury instruction on selection and arrangement during the extensive discussion counsel and the court had on jury instructions. Nor did Skidmore object to

the omission of the selection and arrangement instruction before the jury was summoned the next morning.

Skidmore was responsible for compiling the court's final instructions, so he was well aware of what instructions were included and omitted. The court affirmatively engaged with Skidmore when he wanted to "make sure" that certain instructions had been included. Although Skidmore argues that the selection and arrangement theory was central to his infringement case, his conspicuous silence on the omission of what he claims to be a crucial instruction cannot be squared with the court's willingness to discuss specific instructions. On this record, it was not "obvious" that an objection to the failure to give a selection and arrangement instruction would be "unavailing."

In any case, there is a real possibility that the district court simply overlooked the instruction, and would have been willing to give one had the omission been brought to its attention. But absent notice and an objection, the district court cannot be expected to divine an objection to an omitted instruction. We do not impose such prescience on the district court in the face of the complicated, and often hurried, process of producing a final set of instructions. We noted long ago that the district court need not "rummage through . . . proposed instructions in an effort to discover potential objections to instructions not . . . given . . . ." *Bertrand v. S. Pac. Co.*, 282 F.2d 569, 572 (9th Cir. 1960). By not putting the district court on notice of an objection to a refused instruction, Skidmore forfeited his objection. Therefore, we apply plain error review. Fed. R. Civ. P. 51(d)(2).

## 2. The District Court Did Not Commit a Plain Error in Omitting the Instruction

Because Skidmore did not preserve his objection, we review the omission of a selection and arrangement instruction for "a plain error in the instructions . . . if the error affects substantial rights." Fed. R. Civ. P. 51(d)(2); *see Chess*, 790 F.3d at 970. Under plain error review of a civil jury instruction, we consider whether "(1) there was an error; (2) the error was obvious; and (3) the error affected substantial rights." *C.B. v. City of Sonora*, 769 F.3d 1005, 1018 (9th Cir. 2014) (en banc). Even where these demanding requirements are met, "the decision whether to correct a plain error under Federal Rule of Civil Procedure 51(d)(2) is discretionary," typically invoked only where "the error seriously impaired the fairness, integrity, or public reputation of judicial proceedings" "to prevent a miscarriage of justice." *Id.* at 1018–19.

Even if there was an error in not giving the instruction, and even assuming the error was plain, we cannot conclude that it produced a miscarriage of justice. The district court did not err in withholding the studio version of *Taurus* from the jury. A selection and arrangement instruction would not have convinced the jury that *Stairway to Heaven* was substantially similar to the deposit copy of *Taurus*. Therefore, the failure to give the selection and arrangement instruction cannot have "likely prejudiced the outcome of the case," or "seriously impaired the fairness, integrity, or public reputation of judicial proceedings." *Hoard v. Hartman*, 904 F.3d 780 787 (9th Cir. 2018) (internal quotation marks omitted). We may also take "into consideration 'the costs of correcting [the] error,'" *id.* (quoting *C.B.*, 769 F.3d at 1018), and that factor clearly supports letting the jury verdict stand.

This case involved a lengthy trial, and there is little reason to have another trial that Skidmore cannot win.

"Rare is the case where the district court's errors are so grave as to 'seriously impair[ ] the fairness, integrity, or public reputation of judicial proceedings.'"  *Id.* at 791 (alteration in original) (quoting *C.B.*, 769 F.3d at 1019); *see also Teixeira v. Town of Coventry ex rel. Przybyla*, 882 F.3d 13, 18 (1st Cir. 2018) (describing such errors as "hen's-teeth rare").  This is not such a case.  The district court did not commit a plain error in deciding not to give a selection and arrangement instruction.

### 3. Skidmore Did Not Present a Selection and Arrangement Theory

Finally, we conclude that the district court did not commit any error.  The fatal flaw in Skidmore's argument that he was entitled to a selection and arrangement instruction is that he did not present that as a separate theory at trial.  To be sure, a copyright plaintiff may argue "infringement . . . based on original selection and arrangement of unprotected elements."  *Metcalf*, 294 F.3d at 1074 (quoting *Apple Computer*, 35 F.3d at 1446).  The supposed centrality of a selection and arrangement theory is belied by the trial record.  Skidmore never once used the words "selection" or "arrangement" during trial.  But we do not rest our discussion on invocation of copyright vernacular; more importantly, Skidmore never presented the argument to the jury.  Nowhere did Skidmore argue that the claimed elements were selected and arranged in a particular way to create the resulting four-bar passage in Section A of the musical composition in *Taurus*.  Nor was there a word in Skidmore's closing about the selection and arrangement theory.  Notably, our decision here is based on the trial

evidence and not an appellate adjudication of copyrightability.

At trial, Skidmore's copyright infringement claim was based on the combination of five elements: minor chromatic line and associated chords; duration of pitches of minor chromatic line; melody placed over the descending chromatic line consisting of combination of arpeggios and two-note sequences; rhythm of steady eighth note beats; and pitch collection.

Skidmore and his expert underscored that the presence of these five musical components makes *Taurus* unique and memorable: *Taurus* is original, and the presence of these same elements in *Stairway to Heaven* makes it infringing. This framing is not a selection and arrangement argument. Skidmore never argued how these musical components related to each other to create the overall design, pattern, or synthesis. Skidmore simply presented a garden variety substantial similarity argument. Yet, Skidmore relies on the handful of times that his expert musicologist, Dr. Stewart, referred to the "unique and memorable" parts of the *Taurus* composition as a "combination" to argue that he made a selection and arrangement argument at trial, though not even this "combination" characterization was included in his closing.

Semantics do not characterize legal arguments—substance does. Skidmore does not contest that the selection and arrangement must itself be original to merit copyright protection. *See Feist*, 499 U.S. at 358. We have extended copyright protection to "a combination of unprotectable elements . . . only if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship." *Satava*, 323 F.3d at 811. Put another way, what

a selection and arrangement copyright protects is the *particular* way in which the artistic elements form a coherent pattern, synthesis, or design. *See L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 850–51 (9th Cir. 2012) ("original selection, coordination, and arrangement" that result in the overall "design" are protectable); *Metcalf*, 294 F.3d at 1074 ("Each note in a scale . . . is not protectable, but a pattern of notes in a tune may earn copyright protection."); *United States v. Hamilton*, 583 F.2d 448, 452 (9th Cir. 1978); *see also Feist*, 499 U.S. at 350–51; *Rentmeester*, 883 F.3d at 1119.

Skidmore and his experts never argued to the jury that the claimed musical elements cohere to form a holistic musical design. Both Skidmore's counsel and his expert confirmed the separateness of the five elements by calling them "five categories of similarities." These disparate categories of unprotectable elements are just "random similarities scattered throughout [the relevant portions of] the works." *Shaw*, 919 F.2d at 1362 (quoting *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984)). Labeling them a "combination" of unprotectable elements does not convert the argument into a selection and arrangement case.[11] Skidmore's selection and arrangement argument fails because a copyright plaintiff "d[oes] not make an argument based on the overall selection and sequencing of

---

[11] Skidmore misconstrues *Swirsky*'s observation that we have upheld "a jury finding of substantial similarity based on the combination of five otherwise unprotectable elements." 376 F.3d at 849. There, the court was trying to fathom which aspects of a musical composition can be used for a similarity analysis, given that no definitive list of musical elements existed in the case law. Properly read, *Swirsky* left open the possibility that five or more different musical elements may be analyzed for a substantial similarity analysis, not that a set of five musical elements is always sufficient to find infringement. *Id.*

. . . similarities," if the theory is based on "*random* similarities scattered throughout the works." *Metcalf*, 294 F.3d at 1074–75 (quoting *Cavalier*, 297 F.3d at 825); *see also Litchfield*, 736 F.2d at 1356 (same). Presenting a "combination of unprotectable elements" without explaining how these elements are particularly selected and arranged amounts to nothing more than trying to copyright commonplace elements. *Satava*, 323 F.3d at 811–12. Without such arrangement, there is no liability for taking "ideas and concepts" from the plaintiff's work, "even in combination." *Rentmeester*, 883 F.3d at 1122–23.

Skidmore misconstrues what the copyright law means by a "combination," "compilation," and "selection and arrangement" of unprotectable elements. The word "combination" cannot mean any "set" of artistic building blocks. We have explained that only the "*new* combination," that is the "*novel* arrangement," *Universal Pictures Co. v. Harold Lloyd Corp.*, 162 F.2d 354, 363 (9th Cir. 1947) (emphasis added), and not "*any* combination of unprotectable elements . . . qualifies for copyright protection," *Satava*, 323 F.3d at 811. Likewise, a protectable "compilation" is the precise "result[]" that is "formed by the collection and assembling of preexisting materials . . . that are selected, coordinated, or arranged." 17 U.S.C. § 101.

Therefore, a selection and arrangement copyright is infringed only where the works share, in substantial amounts, the "particular," *i.e.*, the "same," combination of unprotectable elements. *Feist*, 499 U.S. at 349, 350–51. A plaintiff thus cannot establish substantial similarity by reconstituting the copyrighted work as a combination of unprotectable elements and then claiming that those same elements also appear in the defendant's work, in a different aesthetic context. Because many works of art can be recast

as compilations of individually unprotected constituent parts, Skidmore's theory of combination copyright would deem substantially similar two vastly dissimilar musical compositions, novels, and paintings for sharing some of the same notes, words, or colors. We have already rejected such a test as being at variance with maintaining a vigorous public domain. *See, e.g.*, *Shaw*, 919 F.2d at 1362–63.

To the extent Skidmore's combination theory was meant to encompass or be a variation on the theme of the selection and arrangement claim, the jury was adequately instructed, as noted below. To the extent Skidmore now claims the selection and arrangement theory was a separate claim, he never articulated that theory at trial. But, in any event, any omission was not in error. The trial court was not compelled to give the instruction, nor did it really matter in the end in light of the evidence and the jury's finding that the relevant portions of the songs were not substantially similar.

Ultimately, failure to properly invoke a selection and arrangement argument is a death knell for Skidmore's request for a selection and arrangement instruction. He is not entitled to an instruction based on a legal theory that was not presented to the jury. *See Roberts v. Spalding*, 783 F.2d 867, 873 (9th Cir. 1986) ("[T]he district court was under no duty to submit to the jury proposed instructions that contain . . . a theory not supported by the evidence . . . .").[12] The

---

[12] That both Skidmore and Led Zeppelin proposed their own version of a selection and arrangement instruction does not affect whether the district court was required to instruct the jury on the selection and arrangement theory. This just reflects the common practice of proposing, such as in this case several months ahead of trial, broad sets of jury instructions, trial exhibits, and witness lists that may cover an argument presented at trial. The court's ultimate decision on instructions depends on the proof at trial.

district court committed no error by declining to instruct the jury on selection and arrangement.[13]

### 4. The Jury Instructions Fairly Covered Skidmore's Theory

Even though the district court did not instruct the jury on selection and arrangement, its instructions, as a whole, fairly and adequately covered Skidmore's argument for extrinsic similarity between *Taurus* and *Stairway to Heaven*. As discussed above, Jury Instruction No. 20 explained to the jury that an "original work may include or incorporate elements taken from prior works or works from the public

---

[13] Led Zeppelin and several amici have argued that even if Skidmore is entitled to a selection and arrangement instruction, the standard to determine unlawful appropriation under this theory is "virtual identity," not substantial similarity. We do not need to reach this issue because, as noted above, Skidmore has not made a sufficiency of evidence argument. But to be clear, we do not recognize a separate, heightened standard for proving actionable copying. The standard is always substantial similarity. Of course the degree of overlap in original expression that is required for the similarity to be substantial is determined by the range of possible protectable expression. *See Apple Comput.*, 35 F.3d at 1443. More similarities are required to infringe if the range of protectable expression is narrow, because the similarities between the two works are likely to cover public domain or otherwise unprotectable elements. *See Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 913–14 (9th Cir. 2010). Thus, for works where there is a narrow range of available creative choices, the defendant's work would necessarily have to be "virtually identical" to the plaintiff's work in order to be substantially similar. We have at times described this result as the work having a "thin" copyright. *E.g.*, *Apple Comput., Inc.*, 35 F.3d at 1446–47; *see also Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 205 (9th Cir. 1989) ("A *factual* compilation receives only limited copyright protection."). A selection and arrangement copyright is not always thin. *Compare L.A. Printex Indus.*, 676 F.3d at 850 (broad selection and arrangement copyright) *with Satava*, 323 F.3d at 811 (thin selection and arrangement copyright).

domain," and that the "original part" of the work only requires "minimal creativity" by the author. This instruction was immediately followed by Jury Instruction No. 21, which explained that the taking of "original material protected by the copyright" in "significant" amounts constituted infringement. Accordingly, to determine whether the *Taurus* deposit copy was substantially similar to the musical composition of *Stairway to Heaven*, the jury needed to determine whether "any . . . musical elements that are original to Taurus . . . also appear in Stairway to Heaven." The instructions fairly and adequately covered Skidmore's sole argument on substantial similarity, *i.e.*, that there were "five things that these two songs 'Taurus' and 'Stairway to Heaven'" shared.

## V. VARIOUS REMAINING CHALLENGES

### A. TRIAL TIME LIMITS

Based on pretrial proceedings and the scope of proposed testimony, before trial began, the district court advised the parties that each side would have ten hours of witness time. Neither party objected. Skidmore now complains the court's inflexibility was a due process violation. During Led Zeppelin's case in chief, the court advised that Skidmore's counsel was exceeding his time limits. Skidmore requested "a little bit of leeway in getting additional time." When the court gave Skidmore ten additional minutes for cross-examination of each of Led Zeppelin's remaining witnesses, Skidmore's counsel said, "[t]hat's fair." After Led Zeppelin concluded its case, Skidmore requested leave to call two rebuttal witnesses, though he did not identify them. There was no offer of proof and the request was denied.

The district court was not inflexible or unforgiving. Skidmore's counsel was warned during the trial that he was

getting into "all kinds of background information and things that really aren't relevant to this case." The court gave extra time every day and in granting Skidmore extra time to examine defense witnesses, the court reminded counsel that his examination had been "repetitive," included "many questions that were irrelevant," and included "gaps . . . where [he] could have been presenting evidence." Although the court said there was "no excuse and no reason to give [Skidmore] more time," the court did so anyway. Skidmore has shown no prejudice from these rulings. The district court did not abuse its discretion in limiting trial time by being up front about the limits and then being flexible at counsel's request. *See Monotype Corp. v. Int'l Typeface Corp.*, 43 F.3d 443, 450–51 (9th Cir. 1994).

## B. THE DISTRICT COURT'S RESPONSE TO JURY QUESTION

During deliberation, the jury asked to listen to "1. Plaintiff's audio of *Taurus* (guitar)" and "2. Plaintiff's audio of *Stairway to Heaven* (guitar)." During trial, Skidmore's witness, master guitarist Kevin Hanson, performed two versions of the *Taurus* deposit copy—one with just the bass clef part and one with the treble and bass clef parts together. Skidmore's counsel argued that the jury should hear the bass-clef-only version because that version was played repeatedly during trial whereas the version with both parts "was never played . . . in full." When the court asked the jury which version it wanted to hear, one juror said "Bass clef," while the jury foreperson followed up and said "full copy." No other juror spoke up or countermanded the foreperson's request. The district court directed that the full deposit-copy version be played and asked if that answered the jury's question. The foreperson replied, "thank you." Skidmore made no objection at that point and the jury heard

the "full copy," which includes both clefs in the introduction to the songs. The jury made no follow-up request. Skidmore waived any objection to the claim that there was a conflict between jurors and any error was harmless.

## C.  ADMISSION OF DR. FERRARA'S TESTIMONY

Skidmore filed a motion for sanctions and to preclude Led Zeppelin's expert musicologist, Dr. Ferrara, from testifying at trial. At his deposition, Dr. Ferrara testified that he had previously analyzed the similarities between *Taurus* and *Stairway to Heaven* sound recordings for Rondor Music ("Rondor"), a subsidiary of Universal Music Publishing Group. Universal Music Publishing Group was working for Hollenbeck, Spirit's publisher. Dr. Ferrara explained that his analysis for Rondor had already been completed by the time he was contacted by Led Zeppelin's counsel. Rondor waived any conflict and consented to Led Zeppelin retaining Dr. Ferrara as an expert witness.

As a preliminary matter, the district court denied Skidmore's motion as improperly noticed, over the page limit, and untimely. On that basis alone, the district court's ruling was not an abuse of discretion. But even without these infirmities, the district court did not err in denying the motion. Skidmore's challenge is based on a purported conflict of interest that made it improper for Dr. Ferrara to testify for Led Zeppelin without disclosing the conflict or obtaining a waiver from Skidmore.

This argument fails because there was no conflict of interest. Although Rondor waived any potential conflict from having Dr. Ferrara testify on behalf of Led Zeppelin, even that is immaterial because Rondor does not have any interest in this litigation. Skidmore contends that Rondor's parent, Universal Music, was working for Hollenbeck, an

entity that owed a fiduciary duty to Skidmore as a publisher of Spirit's music. But a music publisher does not have a fiduciary relationship with its composers, absent special circumstances. *See Cafferty v. Scotti Bros. Records, Inc.*, 969 F. Supp. 193, 205 (S.D.N.Y. 1997). Skidmore made no showing of any special circumstances, or that Hollenbeck was a fiduciary of the Trust. Nor did Skidmore show that Dr. Ferrara had confidential information concerning Skidmore. *See Erickson v. Newmar Corp.*, 87 F.3d 298, 300 (9th Cir. 1996). Rondor retained Dr. Ferrara to obtain his opinion on two publicly available sound recordings, which he communicated telephonically to Rondor. All of this occurred before Dr. Ferrera ever had contact with Led Zeppelin's attorneys. The district court did not abuse its broad discretion by permitting this expert testimony. *See Campbell Indus. v. M/V Gemini*, 619 F.2d 24, 27 (9th Cir. 1980).

### D. ATTORNEYS' FEES

Warner/Chappell cross appeals the district court's denial of attorneys' fees and costs under 17 U.S.C. § 505. The Supreme Court counsels that a court has "broad leeway" to consider the relevant factors that promote the purposes of the Copyright Act, but the Court also has cautioned against giving substantial weight to just one factor, and directed the courts to "give due consideration to all . . . circumstances relevant to granting fees." *Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979, 1983, 1985 (2016).

Here, after weighing the factors and the circumstance of the case, the district court found that litigation misconduct and the degree of success swung solidly in favor of Warner/Chappell, that the need for compensation weighed slightly in favor of Warner/Chappell, but that motivation, frivolousness, and objective reasonableness weighed

strongly in favor of Skidmore. *See Fantasy, Inc. v. Fogerty*, 94 F.3d 553, 558–59 (9th Cir. 1996). Warner/Chappell's argument that litigation misconduct should form a sole, independent basis for consideration is contrary to the Supreme Court's guidance in *Kirtsaeng*. The district court did not abuse its discretion in concluding that an award of attorneys' fees was not appropriate in light of the Copyright Act's essential goals. Nor did the district court err in declining to award costs to Warner/Chappell.

## CONCLUSION

This copyright case was carefully considered by the district court and the jury. Because the 1909 Copyright Act did not offer protection for sound recordings, Skidmore's one-page deposit copy defined the scope of the copyright at issue. In line with this holding, the district court did not err in limiting the substantial similarity analysis to the deposit copy or the scope of the testimony on access to *Taurus*. As it turns out, Skidmore's complaint on access is moot because the jury found that Led Zeppelin had access to the song. We affirm the district court's challenged jury instructions. We take the opportunity to reject the inverse ratio rule, under which we have permitted a lower standard of proof of substantial similarity where there is a high degree of access. This formulation is at odds with the copyright statute and we overrule our cases to the contrary. Thus the district court did not err in declining to give an inverse ratio instruction. Nor did the district court err in its formulation of the originality instructions, or in excluding a selection and arrangement instruction. Viewing the jury instructions as a whole, there was no error with respect to the instructions. Finally, we affirm the district court with respect to the remaining trial issues and its denial of attorneys' fees and costs to Warner/Chappell.

The trial and appeal process has been a long climb up the *Stairway to Heaven*. The parties and their counsel have acquitted themselves well in presenting complicated questions of copyright law. We affirm the judgment that Led Zeppelin's *Stairway to Heaven* did not infringe Spirit's *Taurus*.

**AFFIRMED.**

WATFORD, Circuit Judge, concurring:

I join the court's opinion, with the exception of section IV.C. I see no reason to decide whether Skidmore adequately preserved his request for a selection-and-arrangement instruction because, even if such an instruction had been given, no reasonable jury could have found infringement here.

At trial, Skidmore predicated his theory of originality on *Taurus*' selection and arrangement of five unprotectable musical elements in the first four measures of the song. Specifically, Skidmore contended that *Taurus* uniquely combined the following features: a five-note descending chromatic scale in A minor; a sequence of half notes and whole notes in the scale; a melody involving various arpeggios and note pairs; a rhythm of successive eighth notes; and a collection of pitches in distinct proportions. None of those elements is subject to copyright protection in its own right; they belong to the public domain from which all musical composers are free to draw. *See, e.g.*, *Granite Music Corp. v. United Artists Corp.*, 532 F.2d 718, 720 (9th Cir. 1976); Copyright Office Compendium § 802.5(A) (3d ed. 2017).

Skidmore can claim protection for the original selection and arrangement of those elements, but the scope of that protection depends on the "range of possible expression." *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1443 (9th Cir. 1994). There are relatively few ways to express a combination of five basic elements in just four measures, especially given the constraints of particular musical conventions and styles. *See Darrell v. Joe Morris Music Co.*, 113 F.2d 80, 80 (2d Cir. 1940) (per curiam). For instance, once Randy Wolfe settled on using a descending chromatic scale in A minor, there were a limited number of chord progressions that could reasonably accompany that bass line (while still sounding pleasant to the ear).[1]

In light of the narrow range of creative choices available here, Skidmore "is left with only a 'thin' copyright, which protects against only virtually identical copying." *Ets-Hokin v. Skyy Spirits, Inc.*, 323 F.3d 763, 766 (9th Cir. 2003); *see also Apple Computer*, 35 F.3d at 1439 ("When the range of protectable and unauthorized expression is narrow, the appropriate standard for illicit copying is virtual identity."). In my view, this standard is separate from—and more demanding than—the "substantial similarity" test. As our cases have repeatedly recognized, the substantial-similarity framework applies only to works with broad copyright protection, while the virtual-identity standard governs thin copyrights. *See, e.g.*, *L.A. Printex Industries, Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 851 (9th Cir. 2012); *Mattel,*

---

[1] Skidmore argues that *Taurus*' omission of one note from the descending chromatic scale further contributed to the song's originality. While this alteration may represent an original use of the descending chromatic scale, it does not change the limited scope of *Taurus*' copyright. As with Skidmore's selection-and-arrangement theory, there are only so many ways to modify a descending chromatic scale in four measures.

*Inc. v. MGA Entertainment, Inc.*, 616 F.3d 904, 913–14 (9th Cir. 2010); *Satava v. Lowry*, 323 F.3d 805, 812 (9th Cir. 2003); *Ets-Hokin*, 323 F.3d at 766; *Apple Computer*, 35 F.3d at 1439.

Contrary to Skidmore's contention, we have never held that musical works are *necessarily* entitled to broad copyright protection. We did state in *Williams v. Gaye*, 895 F.3d 1106 (9th Cir. 2018), that "[m]usical compositions are not confined to a narrow range of expression." *Id.* at 1120. But we made that statement in the context of assessing the creative choices involved in composing an entire song, which of course could involve a broad range of expression. *See id.* at 1117–18, 1120. We had no occasion there to categorically exempt musical works from the same principles we use to assess the scope of copyright protection for all other works.

Given the thin protection afforded the selection and arrangement of basic musical elements at issue here, Skidmore could prove infringement only if the relevant passages of *Taurus* and *Stairway to Heaven* are virtually identical. They are not. Undeniable and obvious differences exist between the first four measures of both songs: The notes in the melodies are different; the use of the treble clef in conjunction with the bass clef is different; and the rhythm of eighth notes is different. Those facts preclude a finding of virtual identity. As a result, even if the district court had given the jury a selection-and-arrangement instruction, Skidmore's infringement claim would have failed as a matter of law.

IKUTA, Circuit Judge, joined by BEA, Circuit Judge, concurring in part and dissenting in part:

The plaintiff's theory of infringement in this case was straightforward: a four-bar musical passage of *Taurus* that combined an ascending line and a descending chromatic line in a unique and memorable way was substantially similar to the "iconic notes" of a musical passage repeated multiple times in the first two minutes and fourteen seconds of *Stairway to Heaven*. Both the plaintiff and defendant requested jury instructions on the key legal principle underlying this theory: that a combination of common musical elements can be protectable under copyright law, even if each individual element is too common on its own to be protected. Although this legal principle is well supported in our case law and had ample foundation in the evidence in this case, the district court failed to give any instruction on this theory to the jury. Without plaintiff's requested instruction, the jury was deprived of the opportunity to consider the plaintiff's central theory of the case, and the instructions given to the jury (to the effect that common musical elements were not protectable under copyright law) were misleading. Therefore, I dissent from Part IV(B) to (C).

I

It was the late 1960s when songwriter Randy "California" Wolfe wrote a new instrumental piece which he entitled *Taurus* after the astrological sign of a woman he loved and eventually married.[1] Wolfe's band, Spirit, played

---

[1] The origin of the song remains a bit of a mystery, as Skidmore alleged in his complaint that the song was inspired by Wolfe's deep

the song regularly, and it became one of the band's signature numbers. There was substantial evidence that Led Zeppelin was at least familiar with Spirit and their work. In 1968, for instance, Led Zeppelin opened for Spirit at a concert in Denver, and the two bands played the same concerts on other occasions. Randy Wolfe died in 1997, and his intellectual property passed into a trust.

When the Supreme Court ruled in 2014 that laches would not bar a copyright infringement lawsuit, *see Petrella v Metro-Goldwyn-Mayer*, *Inc.*, 572 U.S. 663, 668 (2014), Michael Skidmore, the trustee for Randy Wolfe's estate, filed suit against Led Zeppelin. As stated in the original complaint, Skidmore's theory was that the "iconic notes to 'Stairway to Heaven,' that have enthralled generations of fans, sound almost exactly the same as" the "unique 2 minutes and 37 second instrumental titled 'Taurus.'"

At trial, Skidmore presented evidence to the jury to show the following: The deposit copy of *Taurus* is a single page, comprising 18 bars of music. Skidmore focused on a four-bar passage from this deposit copy, which Skidmore claimed was both unique and protectable, and which was substantially similar to a repeated musical passage in *Stairway to Heaven*. The four-bar passage in *Taurus* (referred to as "Section A") is followed by a seven-measure bridge (labeled "Section B") in an AABAAB format. Section A had an ascending arpeggiated melodic line (identified in the treble clef) that included a series of two-note melodic phrases that move from A to B, B to C, and C to F sharp. This ascending melodic line is played over an arpeggiated descending chromatic line (identified in the bass

---

affection for his bandmates from the band Spirit, some of whom had the astrological sign Taurus.

clef) which skipped the note "E" in its descent before resolving harmonically.[2]  According to Skidmore's experts, Section A of *Taurus* is memorable and unique.  Although descending chromatic lines are commonly used in certain genres of music, Dr. Alexander Stewart testified that the composer of *Taurus* had "found a way to use it in a way that is unlike other works that use [a descending chromatic] line." Specifically, most songs employing a descending chromatic line resolve the scale by passing through the fifth note of the scale (here, the note E), but *Taurus* stops short of the fifth note.  Stewart also testified that the combination of two-note melodic phrases in the ascending line in Section A was "unique," "distinct," and "used in an original and creative way."   Skidmore's experts discussed a number of other musical elements in Section A, including the rhythm, chord progression, and duration of pitches in the minor descending chromatic line.   Finally, Skidmore presented expert testimony that the combination of the descending and ascending lines, along with the other musical elements, made Section A unique.  Stewart testified that the combination of musical elements in Section A, including "an ascending line with unique AB, BC, C to F-sharp pairs" and "the descending line having a similar chord progression arpeggiated in a unique way" were "significant" and "unique" when taken together.  And Kevin Hanson, another expert, testified that "the descending chromatic line, in conjunction with the other arpeggiated figures in the

---

[2] Led Zeppelin's expert, Dr. Lawrence Ferrara, likewise testified that the focus of the case was on Section A of *Taurus*, which had "relevant similarities" to the "opening four measures of the guitar" that is played six times in the first two minutes and fourteen seconds of *Stairway to Heaven.*

ascending melody . . . combined [to] form one piece of original music."

In addition to offering evidence that Section A of *Taurus* was unique and original, Skidmore also presented evidence that the opening two minutes and fourteen seconds of *Stairway to Heaven* incorporated elements that were substantially similar to Section A of *Taurus*. *Stairway to Heaven*'s opening included a thirteen-second musical passage (also referred to as Section A) which is repeated six times, separated by a B section or bridge, in an AABABAA format. *Stairway to Heaven*'s Section A contained an ascending line which used a substantially identical pitch sequence as Section A in *Taurus*, as well as the same memorable two-note phrases. This ascending line played over a descending chromatic line, which likewise skipped over the fifth note in resolving the scale. In his closing argument, Skidmore asserted that "the only two songs in music history that are able to show that it skips the E was two pieces of work: 'Taurus' and 'Stairway to Heaven.'" In addition to using the same pitch sequence, *Stairway to Heaven* used the same rhythm and metric placement.

Led Zeppelin's defense was based on its argument that the musical elements in Section A of *Taurus* were too common to be protectable. Accordingly, it proposed the following jury instructions.[3] Instruction No. 16 stated that "common musical elements, such as descending chromatic scales, arpeggios or short sequences of three notes" are not protected by copyright. Instruction No. 20 stated that "any elements from prior works or the public domain are not

---

[3] The numbering of these three instructions corresponds to the instructions eventually given by the court.

considered original parts and not protected by copyright." And Instruction No. 21 stated:

> You must then disregard all musical elements that are not original to Taurus. Once you have disregarded all musical elements that are not original to Taurus, you must decide whether there are any remaining musical elements that are original to Taurus and also appear in Stairway to Heaven and, if so, whether they are substantial similarities or insubstantial similarities.

In response, Skidmore proposed two instructions to explain that while musical elements that are too common are not protectable under copyright law, such common elements could be protectable in combination under some circumstances.[4] Proposed Instruction No. 35 read, in part, that "[a] combination of individually otherwise unprotected elements can be infringed upon." Skidmore also proposed Jury Instruction No. 38, entitled "Combination of Unprotectable Elements," which stated: "You may find a combination of unprotectable elements to be protectable."

Led Zeppelin objected to both instructions and proposed Instruction No. 29, which stated: "An author's arrangement

---

[4] The majority refers to this instruction regarding the protectability of a combination of musical elements as a "selection and arrangement instruction." While I use this terminology for convenience, the words "selection" and "arrangement" have no special significance in our precedent; the missing instruction could equally be termed a "combination instruction" or "compilation instruction." See, e.g., Satava v. Lowry, 323 F.3d 805, 811 (9th Cir. 2003) (allowing that an original "combination of unprotectable elements may qualify for copyright protection").

and selection of unprotected elements is eligible for copyright protection only if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship." Skidmore objected to this formulation of the instruction.

The district judge considered these objections, but did not allow the parties to make any arguments. Although the judge conferred with the parties outside of the presence of the jury to rule on various pretrial motions, he asked the lawyers to recess for 45 minutes while he prepared the jury instructions. After the recess, the judge addressed counsel, and stated: "This is not to discuss with counsel what instructions are going to be given and which aren't. Both sides have fully briefed this on the instructions, their objections, their replies, et cetera, that I am confident that I can just come out and give the instructions." The judge then appointed Skidmore's counsel to act as "scrivener" to "prepare a clean set of instructions," and dictated the approved jury instructions to Skidmore's lawyer. The court included Led Zeppelin's Instruction Nos. 16, 20 and 21, but did not include either Skidmore's or Led Zeppelin's version of the selection and arrangement instruction. Skidmore's lawyer commented on the wording of two instructions. But when he raised a concern regarding the omission of an instruction on the inverse ratio rule, the court dismissed the question brusquely, saying that the issue was not addressed "because we weren't giving that instruction," and repeated, "[w]e're not going to give that instruction." The judge then ended the meeting. The court's decision to omit any selection and arrangement instruction was not discussed.

On appeal, Skidmore argues that the court erred in not giving the jury the proposed instruction.

II

"A party is entitled to an instruction about his or her theory of the case if it is supported by law and has foundation in the evidence." *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002) (citing *Jenkins v. Union Pac. R.R. Co.*, 22 F.3d 206, 210 (9th Cir. 1994)). A district court errs when it "rejects proposed jury instructions that are properly supported by the law and the evidence." *Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir. 2009). Moreover, "[j]ury instructions must be formulated so that they fairly and adequately cover the issues presented, correctly state the law, and are not misleading." *Duran v. City of Maywood*, 221 F.3d 1127, 1130 (9th Cir. 2000) (per curiam) (quoting *Gilbrook v. City of Westminster*, 177 F.3d 839, 860 (9th Cir. 1999)). "In evaluating jury instructions, prejudicial error results when, looking to the instructions as a whole, the substance of the applicable law was [not] fairly and correctly covered." *Swinton v. Potomac Corp.*, 270 F.3d 794, 802 (9th Cir. 2001) (cleaned up) (quoting *In re Asbestos Cases*, 847 F.2d 523, 524 (9th Cir. 1988)).

Skidmore's request for an instruction that "a combination of unprotectable elements [is] protectable" is supported by both law and evidence.

First, as the majority agrees, the principle underlying Skidmore's requested jury instruction is well-supported in law. Maj. Op. at 44–45. The Supreme Court has made clear that even a work "that contains absolutely no protectible . . . expression" can meet "the constitutional minimum for copyright protection if it features an original selection or arrangement." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348 (1991). We have applied this principle to musical elements. In doing so, we do not draw a distinction between a "combination," "compilation," and a "selection

and arrangement" of musical elements. Thus, in *Three Boys Music Corp. v. Bolton*, we upheld a jury finding of "infringement based on a unique compilation" of five unprotectable musical elements: "(1) the title hook phrase (including the lyric, rhythm, and pitch); (2) the shifted cadence; (3) the instrumental figures; (4) the verse/chorus relationship; and (5) the fade ending." 212 F.3d 477, 485 (9th Cir. 2000). Similarly, in *Swirsky v. Carey*, we disapproved of the district court's approach to pulling "elements out of a song individually, without also looking at them in combination," explaining that to "disregard chord progression, key, tempo, rhythm, and genre is to ignore the fact that a substantial similarity [between copyrighted and allegedly infringing works] can be found in a combination of elements, even if those elements are individually unprotected." 376 F.3d 841, 848 (9th Cir. 2004). Even though "chord progressions may not be individually protected, if in combination with rhythm and pitch sequence, they show the chorus of [a work] to be substantially similar to [another work], infringement can be found." *Id.*; *see also Satava v. Lowry*, 323 F.3d 805, 811 (9th Cir. 2003) (applying this principle to visual arts, and holding that "a combination of unprotectable elements may qualify for copyright protection" so long as the "combination constitutes an original work of authorship" and is "sufficiently original to merit protection") (emphasis and citations omitted). Accordingly, the legal basis for an instruction that a combination of unprotectable elements may be protectable under copyright law is well-established.

Second, the evidence introduced at trial was sufficient for the court to instruct the jury on this principle. Both of Skidmore's experts testified that Section A of *Taurus* was original and creative and gave *Taurus* a distinct and memorable sound. Both also testified that the combination

of musical elements present in Section A of *Taurus* was substantially similar to the six thirteen-second passages in Section A of *Stairway to Heaven*. This evidence is sufficient for a reasonable juror to conclude that Section A of *Taurus* was protectable, and that the repeated appearance of a substantially similar musical passage in the first two minutes and fourteen seconds of *Stairway to Heaven* constituted infringement. Because Skidmore's proposed instruction had a foundation in law and was supported by the evidence, the district court erred in declining to give it.

This error cut the heart out of Skidmore's case. Without this instruction, the three instructions given by the court regarding the unprotectability of common elements (Instruction Nos. 16, 20 and 21) told the jury that a descending chromatic scale, arpeggios, and other common elements are not protected by copyright, and that the jury must disregard all such elements. In other words, the jury was told to disregard the precise elements that Skidmore's experts testified had been combined in a unique and original way, and thus the district court improperly foreclosed the possibility that *Taurus*'s combination of a descending chromatic line (which skipped the note E) and an ascending line using memorable note pairs was protected. Therefore, while Instruction Nos. 16, 20 and 21 are correct statements of the law, they are misleading in omitting the principle that a combination of unprotected elements can be protected. As such, the jury instructions establish a legal principle that is erroneous, and if allowed to stand, establish a mistaken view of copyright protection. Reversal for a new trial is required.

## III

The majority's conclusion that "the district court did not commit any error" in failing to give the jury a selection and

arrangement instruction is wrong as a matter of law.[5]  Maj.
Op. at 43.   First, the majority makes a legal error in
concluding that Skidmore was not entitled to a selection and
arrangement instruction because "Skidmore never presented
the argument to the jury."  Maj. Op. at 43.  Rather, according
to the majority, Skidmore's copyright infringement claim
was based on "disparate categories of unprotectable
elements," which the majority describes as the "minor
chromatic line and associated chords; duration of pitches of
minor chromatic line; melody placed over the descending
chromatic line consisting of combination of arpeggios and
two-note sequences; rhythm of steady 8th note beats; and
pitch collection."  The majority claims that Skidmore "never
argued how these musical components related to each other
to create the overall design, pattern, or synthesis."  Maj. Op
at 44.

The majority's characterization of Skidmore's case is
belied by both the trial record and by common sense.
Hanson testified that Section A of *Taurus* had the holistic
musical design that the majority says is lacking from
Skidmore's argument; among other things, "the descending
chromatic line, in conjunction with the other arpeggiated
figures in the ascending melody . . . combined [to] form one
piece of original music."   Stewart also testified that the
combination of musical elements present in Section A of
*Taurus* was "unique and original."  And in closing argument,
contrary to the majority's contention, Maj. Op. at 43,

---

[5] Because the majority concludes that the district court "did not
commit any error" at all, Maj. Op. at 43, it is irrelevant to the majority's
decision whether Skidmore preserved his claim of error and, if not,
whether the district court's error was plain.  Because the majority's
discussion of these points is unnecessary, I focus on the majority's
erroneous reasoning regarding the merits of the district court's error.

Skidmore reiterated that it was the combination of a descending chromatic line and ascending line that made *Taurus* unique and protectable. This is a paradigmatic "selection and arrangement" theory, similar to the one we approved of in *Three Boys*, 212 F.3d at 485 (upholding a jury finding of infringement based on a "unique compilation of [musical] elements").

Moreover, the majority's claim that Skidmore's selection and arrangement argument fails because his theory was based on "random similarities scattered throughout the works," Maj. Op. at 45 (emphasis omitted), is unreasonable on its face given the brief nature of the passage Skidmore argued was protected.[6] As the majority acknowledges, Maj. Op. at 43, Section A of *Taurus* consists of only four bars of music. And Skidmore argued that the combination of the musical elements in this passage (the ascending melodic line is played over an arpeggiated descending chromatic line which skipped the note "E" in its descent) made it a unique piece of original music that was substantially similar to a specific thirteen-second passage in *Stairway to Heaven*. Nor does the trial record support the majority's claim that the similarities were "scattered throughout" Section A of

---

[6] The concurrence's claim that *Taurus* is entitled to meager copyright protection because there "are relatively few ways to express a combination" of notes "in just four measures," and because there is only a "narrow range of creative choices available here," Concurrence at 55, would come as a surprise to the experts who opined on *Taurus* – and indeed, would likely surprise any talented composer. Like words, musical notes are subject to a range of expression limited only by the imagination and skill of the artist. A poet may select and arrange a mere 16 words (all of them common and unprotectable by themselves) so they are as memorable and unique as a Shakespeare play. *See, e.g.*, William Carlos Williams, *The Red Wheelbarrow*, *in* THE COLLECTED POEMS OF WILLIAM CARLOS WILLIAMS, VOLUME I, 1909–1939 at 224 (A. Walton Litz & Christopher MacGowan eds., 1986).

*Taurus*; rather, Skidmore explained at trial that the various musical elements that were combined in an original way to form *Taurus* played "simultaneously." There is simply no support in the record for the majority's theory that Skidmore's infringement claim was based on random "disparate categories of unprotectable elements" in *Taurus* that merely had counterparts in *Stairway to Heaven*. Maj. Op. at 45.

In short, the majority's misunderstanding of the evidence and its conclusion that the musical elements identified by Skidmore "do not cohere to form a holistic musical design" as a matter of law, Maj. Op. at 45, provide a good lesson as to why, as an appellate body, we are foreclosed from determining whether an identified combination of musical elements is original. We are not well situated to determine whether a musical passage is original; such a determination should have been left up to a properly instructed jury. *See Dezendorf v. Twentieth Century-Fox Film Corp.*, 99 F.2d 850, 851 (9th Cir. 1938). Nor should we determine whether the four bars at issue meet some judicially constructed standard for "holistic musical design." *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251 (1903) ("It would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations, outside of the narrowest and most obvious limits."). But without an instruction that a combination of unprotectable elements can be protectable if combined in an original way, the jury in Skidmore's case was deprived of the opportunity to pass judgment on Skidmore's selection and arrangement theory.

IV

Although unnecessary to its resolution, the majority's rulings on forfeiture and plain error are also wrong.  Maj. Op. at 39–43.

A

First, Skidmore did not forfeit his objection to the district court's omission of his selection and arrangement instruction.  As we have previously explained, a party need not make a formal objection to the omission of a jury instruction if the party has made the district court "fully aware of a [party's] position" with respect to a jury instruction, *Brown v. AVEMCO Inv. Corp.*, 603 F.2d 1367, 1371 (9th Cir. 1979), such as by raising the issue on multiple occasions, *see Dorn*, 397 F.3d at 1189, and the district court has made clear that it would not give the instruction, *see id.* (holding that party did not have to object to the underlying jury instruction when the court was fully informed regarding the party's position on the jury instructions and "any further objection would have been superfluous and futile"); *Brown*, 603 F.2d at 1373 (holding that the party preserved its objection to a jury instruction when the court was aware of the issue and it was clear that the court would not change its mind).

Here, as in *Brown*, the judge was fully aware of Skidmore's position on the requested jury instruction. Skidmore had proposed two jury instructions on the issue, and questioned witnesses at trial about the creative combination of various musical elements in *Taurus.*  Led Zeppelin even cited Skidmore's reliance on a selection and arrangement theory as the rationale for proposing a selection and arrangement instruction of its own, which it described as "crucial."  Moreover, as in *Dorn*, objecting would have been

pointless. The judge made clear that he had already heard all the argument he would need, and that he did not want to discuss which instructions "are going to be given and which aren't" with counsel. Although the majority discounts the effect of the judge's warning because Skidmore sought to clarify or correct the jury instructions on other issues, the judge brusquely silenced Skidmore when he mentioned the omission of an instruction on the inverse ratio rule. At that point, any objection would be "superfluous and futile as well as contrary to the court's warning." *Dorn*, 397 F.3d at 1189. We do not know what objections Skidmore would have raised if not for the court's prefatory warning that began the conference and its sharp rejection of Skidmore's request at the close of the conference; the majority thus reads too much into Skidmore's effort to open the door to further discussion by assuring the court there would only be "one last thing." Given the imbalance of power that exists between a judge and a litigant, we should be careful not to require a litigant to defy explicit warnings from the court. Accordingly, Skidmore preserved his challenge to the omission of a selection and arrangement instruction, and the majority's review should have been de novo. *See Gulliford v. Pierce Cty.*, 136 F.3d 1345, 1348 (9th Cir. 1998).

## B

Second, even if Skidmore had forfeited his objection to the omission of the selection and arrangement instruction, the district court's failure to give this instruction – which had been requested by both parties – was plainly erroneous, and the majority's conclusion to the contrary is wrong. Under our plain error jurisprudence, "[w]e may exercise our discretion to correct a district court on plain error review when the following factors are met: (1) the district court erred; (2) the error was obvious or plain; (3) the error

affected substantial rights; and (4) the error 'seriously impaired the fairness, integrity, or public reputation of judicial proceedings.'" *Hoard v. Hartman*, 904 F.3d 780, 787 (9th Cir. 2018) (quoting *C.B. v. City of Sonora*, 769 F.3d 1005, 1018–19 (2014)). An error affects substantial rights when it "affect[s] the outcome of the district court proceedings." *United States v. Olano*, 507 U.S. 725, 734 (1993); *see also Bearchild v. Cobban*, 947 F.3d 1130, 1139 (9th Cir. 2020) ("We will usually find sufficient prejudice to warrant reversal where 'it is impossible to determine from the jury's verdict and evidentiary record that the jury would have reached the same result had it been properly instructed.'") (quoting *Hoard*, 904 F.3d at 791)

We recently found the district court's instructional error met this standard in *Hoard*, where the plaintiff brought a § 1983 claim against an officer who allegedly had violated his right to be free from excessive force. 904 F.3d at 785. In that case, the district court (with plaintiff's counsel's *approval*) provided an erroneous definition of the word "sadistically" to the jury. *Id.* at 786. Because this definition "saddled [the plaintiff] with the unnecessary and exceedingly difficult burden of proving that the officer was not just cruel, but sadistic as well," *id.* at 782, and made it difficult for the plaintiff to prevail, we held that "th[e] error likely prejudiced the outcome of the case and—left uncorrected—would contribute to a miscarriage of justice." *Id.* at 787. Therefore, we vacated the district court's judgment and remanded. *Id.*

Here, as in *Hoard*, all four prongs of the plain error test are met. For the reasons previously explained, the district court erred by failing to give the crucial selection and arrangement instruction requested by both parties. Moreover, this error was obvious or plain: Skidmore

presented enough evidence at trial supporting the selection and arrangement theory which had been recognized by both parties as Skidmore's central theory at trial. Omitting the instruction in spite of the parties' consensus is an "error that is so clear-cut, so obvious, a competent district judge should be able to avoid it without benefit of objection." *United States v. Gonzalez-Aparicio*, 663 F.3d 419, 428 (9th Cir. 2011) (quoting *United States v. Truman*, 122 F.3d 1167, 1170 (9th Cir. 1997)); *see also Hoard*, 904 F.3d at 790 (explaining that it must have been "sufficiently clear at the time of trial" that the instructions were erroneous for the error to be plain).

Moreover, the error was sufficiently prejudicial with respect to the outcome of the case, given that the omission of the instruction—which "saddled [Skidmore] with the unnecessary and exceedingly difficult burden of proving" that the four bars in *Stairway to Heaven* were substantially similar to *Taurus* without relying on the unique way in which musical elements in *Taurus* were combined— necessarily precluded the jury from finding in Skidmore's favor. *Hoard*, 904 F.3d at 782. Furthermore, by introducing testimony from two experts on the issue, Skidmore "introduced evidence from which a jury could have found" substantial similarity, *Bearchild*, 947 F.3d at 1148 such that it is "impossible to determine whether the jury would have reached the same result had it been properly instructed," *id.* at 1134. This is enough under our law to show that the error affected substantial rights.

Finally, as in *Hoard*, if "left uncorrected[, this error] would contribute to a miscarriage of justice." 904 F.3d at 787. It is clear that the district court's failure to give a correct instruction deprived Skidmore "of a meaningful and fair opportunity" to present his claim. *See id.*; *Bearchild*,

947 F.3d at 1149 ("Because [plaintiff's] ability to pursue his claim was fundamentally diminished by the jury instructions in this case, the final prong of the plain error test is satisfied.").  Skidmore had adduced sufficient evidence for a reasonable juror to find that *Taurus* was protectable under copyright law, and that there was a substantial similarity between *Stairway to Heaven* and the *Taurus* deposit copy, as the district court's prior rejection of Led Zeppelin's summary judgment motion confirmed.  Therefore, the omission of the selection and arrangement instruction not only "placed a heavy thumb on the scale in favor of the [d]efendants," *Hoard*, 904 F.3d at 792, but decided the case entirely.  Accordingly, the district court's error was plain, and just as in *Hoard*, we must vacate the district court's plainly erroneous ruling.

\*\*\*

The majority's rulings on forfeiture, plain error, and the merits are redundant and inconsistent.  If there is no error at all, the majority had no need to reach forfeiture or plain error.  Instead, the majority touches all three doctrines and makes each of them worse.  Nevertheless, my key concern is the majority's erroneous legal ruling on whether the four-bar instrumental passage in *Taurus* was protectable and substantially similar to the "iconic" opening bars of *Stairway to Heaven*.  Unlike the rulings on forfeiture and plain error, this substantive ruling weakens copyright protection for musicians by robbing them of the ability to protect a unique way of combining musical elements.  Therefore, I dissent from Parts IV(B) to (C) of the majority opinion.